**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5055

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN HER OFFICIAL CAPACITY AS
MEMBER OF THE MERIT SYSTEMS PROTECTION BOARD,

*Plaintiff-Appellee,*

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-00412-RC
Hon. Rudolph Contreras, J.

## PLAINTIFF-APPELLEE'S BRIEF IN
## OPPOSITION TO MOTION FOR STAY

MICHAEL J. KATOR
JEREMY D. WRIGHT
KERRIE D. RIGGS
KATOR, PARKS, WEISER &
    WRIGHT, P.L.L.C.
1150 Connecticut Ave.,
NW
Suite 705
Washington, DC 20036
(202) 898-4800
mkator@katorparks.com

LINDA M. CORREIA
CORREIA & PUTH, PLLC
1400 16th St., NW
Suite 450
Washington, D.C. 20036
(202) 602-6500
lcorreia@correiaputh.com

CARL RIZZI
LUCILLE E. BAEURLE
MILBANK LLP
55 Hudson Yards
New York, NY 10001
 (212) 530-5786

NEAL KUMAR KATYAL
    *Counsel of Record*
NATHANIEL A.G. ZELINSKY
KRISTINA ALEKSEYEVA
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee Cathy A. Harris*

March 10, 2025

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Plaintiff-Appellee Cathy A. Harris hereby submits her Certificate as to Parties, Rulings and Related Cases:

## A.      Parties and Amici

All parties, intervenors, and *amici* appearing before the District Court and in this Court are listed in the motion for a stay filed by Defendants.

## B.      Rulings Under Review

References to the rulings at issue appear in the motion for a stay filed by Defendants.

## C.      Related Cases

This case was before the District Court as case No. 1:25-cv-00412-RC.  The government appealed the District Court's grant of a temporary restraining order, and that appeal is pending before this Court as No. 25-5037.

 March 10, 2025

/s/Neal Kumar Katyal
NEAL KUMAR KATYAL
   *Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

STATEMENT OF THE CASE..................................................................4

    A.    Legal Background ...................................................................4

    B.    Procedural History.................................................................5

STANDARD OF REVIEW .......................................................................6

ARGUMENT ...........................................................................................6

I.    The Court Should Reject The Government's Request To Defy
Precedent................................................................................................6

    A.    The *Humphrey's Executor* Framework Is Binding. .............6

    B.    The Government's Remedies Argument Defies Precedent.................16

II.    The Government Will Not Suffer Irreparable Harm. ....................19

III.    The Remaining Factors Favor Harris. ..........................................21

CONCLUSION ......................................................................................25

APPENDIX A – Statement of Undisputed Material Facts, D. Ct. ECF No. 22-2.

APPENDIX B – Declaration of Cathy A. Harris, D. Ct. ECF No. 22-3.

APPENDIX C – Order on Request for Stay, *Special Counsel ex rel. John Doe v. Dep't of Agric.*, No. CB-1208-25-0020-U-1 (MPSB, Mar. 5, 2025).

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agostini v. Felton*,
  521 U.S. 203 (1997)..................................................................2, 11

*Ashwander v. Tennessee Valley Auth.*,
  297 U.S. 288 (1936)......................................................................20

*Buckley v. Valeo*,
  424 U.S. 1 (1976)............................................................................14

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996)......................................................18

*Citizens for Resp. & Ethics in Washington v. FEC*,
  904 F.3d 1014 (D.C. Cir. 2018).................................................6, 19

* *Collins v. Yellen*,
  594 U.S. 220 (2021)................................................................2, 7, 11

*Consumers' Rsch. v. CPSC*,
  91 F.4th 342 (5th Cir. 2024) ..........................................................8

*Dellinger v. Bessent*,
  No. 25-5028, 2025 WL 559669
  (D.C. Cir. Feb. 15, 2025) (per curiam) ..............................17, 20, 21

*Dellinger v. Bessent*,
  No. 25-5052 (D.C. Cir. Mar. 10, 2025) (per curiam) ...............21, 23

*Does 1-3 v. Mills*,
  142 S. Ct. 17 (2021)..........................................................................6

*East Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) .........................................................20

*\* Authorities on which we principally rely are marked with asterisks.*

*In re Exceptions from Competitive Merit Plans*,
9 M.S.P.R. 116 (MSPB 1981) ...........................................................13

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ........................................................................7

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ......................................................................18

*Harris v. Bessent*,
No. 25-cv-00412, 2025 WL 679303
(D.D.C. Mar. 4, 2025) ......................................... 2, 5, 6, 8, 10, 12, 16, 17, 22, 23

*Howell v. HUD*,
No. DC-0432-13-6622-I-2, 2023 WL 303824 (MSPB Jan. 18,
2023) ...............................................................................................23

\* *Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ..............................................................1, 2, 7, 10

*Kalbfus v. Siddons*,
42 App. D.C. 310 (D.C. Cir. 1914) ................................................17

*KalshiEX LLC v. CFTC*,
119 F.4th 58 (D.C. Cir. 2024) .............................................1, 3, 6, 19

*Kaplan v. Conyers*,
733 F.3d 1148 (Fed. Cir. 2013) (en banc) .........................................5

*Kuretski v. Comm'r*,
755 F.3d 929 (D.C. Cir. 2014) ........................................................10

*Leachco, Inc. v. CPSC*,
103 F.4th 748 (10th Cir. 2024) ..........................................................8

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................21

*Macfarland v. U.S. ex rel. Russell*,
31 App. D.C. 321 (D.C. Cir. 1908) ................................................17

*Magnetsafety.org v. CPSC*,
__F.4th__, 2025 WL 665101 (10th Cir. Mar. 3, 2025) ......................7

iv

\* *Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ....................................................9, 17

*Meta Platforms, Inc. v. FTC,*
  No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) (per
  curiam) ..............................................................................................7

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985)..........................................................................23

*Morrison v. Olson,*
  487 U.S. 654 (1988)..........................................................................11

*Myers* v. *United States,*
  272 U.S. 52 (1926) ..............................................................................9

*Nken v. Holder,*
  556 U.S. 418 (2009)............................................................................6

*Qassim v. Trump,*
  938 F.3d 375 (D.C. Cir. 2019) (en banc)........................................2, 7

*Raines v. Byrd,*
  521 U.S. 811 (1997)..........................................................................23

*Sampson v. Murray,*
  415 U.S. 61 (1974) ............................................................................16

*In re Sawyer,*
  124 U.S. 200 (1888)..........................................................................17

\* *Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020)..............................................................1, 2, 7, 12

\* *Severino v. Biden,*
  71 F.4th 1038 (D.C. Cir. 2023)....................................................3, 7, 16

\* *Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996)..........................................................18

*Texas v. Biden,*
  10 F.4th 538 (5th Cir. 2021) (per curiam) ........................................20

*United States v. Perkins*,
   116 U.S. 483 (1886) ..................................................................9

*Vitarelli v. Seaton*,
   359 U.S. 535 (1959) ................................................................16

*White v. Berry*,
   171 U.S. 366 (1898) ................................................................17

* *Wiener v. United States*,
   357 U.S. 349 (1958) .............................................1, 2, 7, 8, 9, 12, 24

*Wise v. Withers*,
   7 U.S. (3 Cranch) 331 (1806) ................................................9

**STATUTES**

5 U.S.C. § 1201 ..........................................................................4

5 U.S.C. § 1202 ......................................................................1, 4

5 U.S.C. § 1214(b)(1)(A)(i) ....................................................15

5 U.S.C. § 2302 ......................................................................5, 8

5 U.S.C. § 3349c ......................................................................21

5 U.S.C. § 3592(a) ....................................................................5

5 U.S.C. § 7105(h) ..................................................................14

5 U.S.C. § 7511 ..........................................................................5

12 U.S.C. § 248(p) ..................................................................14

15 U.S.C. § 53(b) ....................................................................14

15 U.S.C. § 2061(a) ................................................................14

26 U.S.C. § 7441(f) ................................................................10

29 U.S.C. § 154(a) ..................................................................14

38 U.S.C. § 7253(f) ................................................................10

39 U.S.C. § 409 ...............................................................................14

42 U.S.C. § 7171 ........................................................................10, 14

42 U.S.C. § 7412(r)(6) .................................................................10

46 U.S.C. § 41307 ........................................................................14

49 U.S.C. § 1301(c)(1) ...............................................................14

**LEGISLATIVE MATERIALS**

Civil Service Reform Act, Pub. L. No. 95-545, 92 Stat. 1111 (1978) .................4, 9

S. Rep. No. 95-969 (1978) ............................................................4

Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat.
   16 (1989) ................................................................................9

**OTHER AUTHORITIES**

5 C.F.R. § 1200.3 .........................................................................22

Sup. Ct. R. 22.5 ...........................................................................15

Sup. Ct. R. 23.1 ...........................................................................15

James L. High, *A Treatise on Extraordinary Remedies* 69-70 (2d ed.
   1884) ......................................................................................17

Jimmy Carter, *Federal Civil Service Reform Message to the Congress*,
   THE AMERICAN PRESIDENCY PROJECT (Mar. 2, 1978),
   https://www.presidency.ucsb.edu/documents/federal-civil-service-
   reform-message-the-congress ...............................................4

Thomas Tapping, *The Law and Practice of the High Prerogative Writ
   of Mandamus* 240 (1853) ......................................................17

* William Blackstone, *Vol 3, Commentaries on the Laws of England*
   (1768) ................................................................................3, 17

**INTRODUCTION**

This is not a close call.  The government advances breathtaking arguments that run straight into a wall of precedent.  The District Court conclusively rejected each one.  The government now seeks the "extraordinary remedy" of a "stay pending appeal," and asks this Court to ignore binding Supreme Court decisions.  *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quotation marks omitted).  The government has not met the stringent criteria for exceptional relief.  The motion should be denied.

Three weeks ago, the President attempted to remove Cathy Harris from her position as a member of the Merit Systems Protection Board, a purely "adjudicatory body" that hears employment appeals regarding civil servants.  *Wiener v. United States*, 357 U.S. 349, 356 (1958).  Under the law Congress enacted, the President may terminate members "only for inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d).

The government insists that because Harris exercises *some* executive power—even the smallest mote—the Constitution provides the President unchecked authority to remove her at will.  That is not the law.  Under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Congress may enact standards of removal for "multimember board[s]," *Seila Law LLC v. CFPB*, 591 U.S. 197, 207 (2020), that

1

exercise "predominantly quasi judicial" functions, *Humphrey's Executor*, 295 U.S. at 624, and serve as "adjudicatory bod[ies]," *Wiener*, 357 U.S. at 356.

The *Humphrey's Executor* framework "dictates the outcome" here. *Harris v. Bessent*, No. 25-cv-00412, 2025 WL 679303, at *6 (D.D.C. Mar. 4, 2025). In sharp contrast to the Office of Special Counsel in *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir.), the Merit Systems Protection Board is a traditional "multimember" body of "expert[s]," and does "not wield substantial executive power." *Seila Law*, 591 U.S. at 218. The Board may not launch investigations, prohibit unfair practices, set policy, or regulate "the economy at large." *Collins v. Yellen*, 594 U.S. 220, 253 (2021). It hears discrete cases regarding civil servants, and neutrally applies laws Congress passed prohibiting arbitrary dismissal, discrimination, and retaliation.

This Court should reject the invitation to ignore "binding precedent." *Agostini v. Felton*, 521 U.S. 203, 238 (1997). A Court of Appeals should not usurp the Supreme Court's "prerogative of overruling its own decisions." *Qassim v. Trump*, 938 F.3d 375, 377 (D.C. Cir. 2019) (en banc) (Henderson, J., dissenting from denial of en banc review) (quotation marks omitted). *Humphrey's Executor* "remains alive and well." *Harris*, 2025 WL 679303, at *6. This Court is "obligated to follow" it. *Qassim*, 938 F.3d at 377 (Henderson, J., dissenting from denial of en banc review). The government's request to evade precedent is even more troubling because it comes in an emergency motion, in which the government must demonstrate "a

*strong* showing that it is *likely to succeed*." *KalshiEX*, 119 F.4th at 63 (brackets and quotation marks omitted, emphasis added).

Make no mistake: The government's radical theory would upend the law. It would jeopardize not only this board, but also the Federal Reserve Board and other critical entities, like the Securities and Exchange Commission. Taken to its logical conclusion, the government's argument would mean Congress could not protect anyone from arbitrary removal—not even ordinary civil servants.

The government separately argues that Article III courts are powerless to enforce the removal provisions Congress enacted. That proposition is as wrong as it sounds. Courts may "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official." *Severino v. Biden*, 71 F.4th 1038, 1042-1043 (D.C. Cir. 2023) (quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)). Moreover, Anglo-American courts have long issued writs of mandamus as a "full and effectual remedy" "for wrongful removal." 3 W. Blackstone, Commentaries on the Laws of England *264.

Finally, the government has identified no harm warranting extraordinary relief. A stay would harm the public by leaving the Board without a quorum, and would harm Harris by preventing her from fulfilling her duties.

There is a time for emergency relief. This case—a naked attack on centuries of precedent—isn't it.

# STATEMENT OF THE CASE

## A. Legal Background

In 1978, Congress passed the Civil Service Reform Act to ensure a government "impartially administered" by employees judged on merit rather than political favoritism. S. Rep. No. 95-969, at *4 (1978). Among other things, the Act created the Merit Systems Protection Board.

President Carter had asked Congress to create the Board to "safeguard the rights of Federal employees who 'blow the whistle' on violations of laws or regulations by other employees, including their supervisors."[1] At the President's urging, Congress provided that the Board's members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111, 1122 (1978) (codified at 5 U.S.C. § 1202(d)).

Congress structured the Board as a multimember adjudicatory body. *Id.* § 1201. Three members serve staggered seven-year terms, with no more than two belonging to the same political party. *Id.* §§ 1201, 1202(a)-(c).

The Board adjudicates federal employee appeals, including claims of

_____

[1] Jimmy Carter, *Federal Civil Service Reform Message to the Congress*, THE AMERICAN PRESIDENCY PROJECT (Mar. 2, 1978), https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress.

discrimination based on political affiliation and whistleblower retaliation, *id*. §§ 2302(b)(1), (b)(8). The Board's jurisdiction is circumscribed to avoid encroaching on the President's core prerogatives. It may not hear appeals by political appointees, *id*. § 7511, has limited authority with respect to senior civil servants, *id*. § 3592(a), and cannot wade into national security issues, *Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013) (en banc).

### B.     Procedural History

In 2022, Cathy Harris was nominated and confirmed as a member. Her term expires March 1, 2028.

On February 10, 2025, Harris received an email purporting to terminate her. The government has never alleged inefficiency, neglect of duty, or malfeasance. Nor could it. Harris has been extremely effective, leading the Board in clearing "a backlog" of cases. *Harris*, 2025 WL 679303, at *2.

Harris filed this action on February 11. The District Court issued a temporary restraining order on February 18, and a decision for Harris on March 4. The court concluded that "removal protections are constitutional under *Humphrey's Executor*," *id*. at *3; that precedent supported granting injunctive and declaratory relief, *id*. at *10; but that if "equitable injunctive relief" were "unavailable," the court could provide "a writ of mandamus as an alternative remedy," *id*. at *15.

The government appealed.

## STANDARD OF REVIEW

A stay pending appeal is an "extraordinary remedy," *KalshiEX*, 119 F.4th at 63 (quotation marks omitted), intruding "into the ordinary processes of administration and judicial review," *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotation marks omitted). The movant must show (1) a "strong" likelihood of success, (2) irreparable injury, (3) that a stay will not "substantially injure the other parties," and (4) that the public interest favors a stay. *Id.* at 426.

Courts should be wary of litigants using requests for "extraordinary relief" to decide the "merits" "on a short fuse." *Does 1-3 v. Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring).

## ARGUMENT

## I. THE COURT SHOULD REJECT THE GOVERNMENT'S REQUEST TO DEFY PRECEDENT.

### A. The *Humphrey's Executor* Framework Is Binding.

"*Humphrey's Executor* remains alive and well, and it dictates the outcome here." *Harris*, 2025 WL 679303, at *6. In the face of binding precedent, the government cannot "demonstrate *any* 'likelihood' of success," let alone a "substantial" showing. *Citizens for Resp. & Ethics in Washington v. FEC*, 904 F.3d 1014, 1017-1018 (D.C. Cir. 2018) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 n.1) (emphasis added). This Court is "obligated to follow" precedent.

*Qassim*, 938 F.3d at 377 (Henderson, J., dissenting from denial of en banc review). It should reject the government's emergency motion.

**1.** Under *Humphrey's Executor* and its progeny, Congress may afford a measure of removal protection to "multimember board[s] or commission[s]," *Seila Law*, 591 U.S. at 207, which exercise "predominantly quasi judicial" functions, *Humphrey's Executor*, 295 U.S. at 624, and serve as "adjudicatory bod[ies]," *Wiener*, 357 U.S. at 356.

*Selia Law* and *Collins* held that *Humphrey's Executor* does not extend to "novel" agencies headed by a single director that wield considerable "rulemaking and enforcement powers" and are exempt from the traditional appropriations process. *Collins*, 594 U.S. at 251; *see Seila Law*, 591 U.S. at 207; *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496 (2010). But the Supreme Court went out of its way to confirm that it did not "revisit *Humphrey's Executor* or any other precedent." *Seila Law*, 591 U.S. at 228. The Court repeatedly contrasted the novel agencies at issue in those cases with permissible multi-member boards. *See, e.g.*, *id.* at 207, 216, 218, 237; *Collins*, 594 U.S. at 253 n.19. The message is clear: *Humphrey's Executor* is the law.

In the years since, this Court and its sister Circuits held just that. *See Severino*, 71 F.4th at 1047 (D.C. Cir.); *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *1 (D.C. Cir. Mar. 29, 2024) (per curiam); *Magnetsafety.org v. CPSC*,

\_\_F.4th\_\_, 2025 WL 665101, at \*7 (10th Cir. Mar. 3, 2025); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762 (10th Cir. 2024); *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 346 (5th Cir. 2024).

**2.** The *Humphrey's Executor* framework is the end of this case. Unlike the Office of Special Counsel in *Dellinger*, the Merit Systems Protection Board is "a traditional independent agency headed by a multimember board or commission," "balanced along partisan lines." *Harris*, 2025 WL 679303, at \*6 (quoting *Seila Law*, 591 U.S. at 207, 216). This is the structure upheld in *Humphrey's Executor* and every relevant case since.

The Merit Systems Protection Board is a quintessential "adjudicatory body." *Wiener*, 357 U.S. at 356. The Board's hears federal employee appeals of adverse actions, including those alleged to involve prohibited personnel practices. *See* 5 U.S.C. § 2302. The Board does not launch investigations or fill up vague statutes. Nor does it possess "rulemaking authority except in furtherance of its judicial functions." *Harris*, 2025 WL 679303, at \*6. Instead, like an Article III court, the Board decides discrete disputes brought before it.

The Board's history confirms its adjudicatory nature. In 1883, Congress established the Board's precursor, the Civil Service Commission. In 1978, Congress split the Commission into multiple entities, including: (1) the Office of Personnel Management, to manage the federal workforce as a true organ of executive power;

and (2) the Merit Systems Protection Board, as an adjudicatory authority. Civil Service Reform Act, Pub. L. No. 95-545, 92 Stat. at 1122.[2] In 1989, Congress cleaved off the Office of Special Counsel—a single-director led entity that investigates and prosecutes violations of civil service rules—into a separate executive branch agency. Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat. 16 (1989). The result is a purely "adjudicatory" Board. *Wiener*, 357 U.S. at 356.

**3.** The blast radius of the government's constitutional theory would reach and uproot centuries of precedent.

The government's argument (at 14-15) that *any* official who exercises even an iota of executive power must be removable at the President's whim has never been true. In *Marbury v. Madison*, Chief Justice Marshall explained that William Marbury's "appointment" as justice of the peace "*was not revocable*" by the executive, 5 U.S. (1 Cranch), 137, 162 (1803) (emphasis added), and Marbury's "powers" were "partly executive," *Wise v. Withers*, 7 U.S. (3 Cranch) 331, 336 (1806). In *United States v. Perkins*, the Court confirmed Congress may "limit, restrict, and regulate the removal" of "officers" who exercise executive authority. 116 U.S. 483, 485 (1886). Even in *Myers v. United States*—the brief, highwater

---

[2] Below, the government did not dispute the Board "does not dictate or enforce policies regarding the federal workforce," App. A. ¶ 60, or any other fact, and cannot do so now.

mark of the removal power—the Court recognized Congress could limit "the exercise of the power of removal," again refuting the notion that the President must be able to arbitrarily remove anyone wielding the smallest amount of executive power. 272 U.S. 52, 161 (1926). For the government to prevail, it must throw out that precedent. Indeed, the Board stands on particularly solid constitutional footing precisely because its duties "dovetail" with and are "structurally inseparable" from Congress's long-exercised authority "to regulate the civil service." *Harris*, 2025 WL 679303 at *6.

Meanwhile, if the purely adjudicatory Merit Systems Protection Board is not constitutional, neither are venerable "legislative [c]ourt[s]," *Humphrey's Executor*, 295 U.S. at 629, including the Court of Appeal for Veterans Claims, *see* 38 U.S.C. § 7253(f), and the Tax Court, *see* 26 U.S.C. § 7441(f), which "exercise[]" "authority as part of the Executive Branch," *Kuretski v. Comm'r*, 755 F.3d 929, 943 (D.C. Cir. 2014), to say nothing of everything from the Federal Energy Regulatory Commission, 42 U.S.C. § 7171(b), to the Chemical Safety and Hazard Investigation Board, 42 U.S.C. § 7412(r)(6).

The government half-heartedly suggested below that the Federal Reserve Board might be different. D. Ct. ECF No. 33 at 12. That gives up the game. If an independent Federal Reserve—which performs the executive function of setting monetary policy—is constitutional, the far more modest Merit Systems Protection

Board passes muster. It speaks volumes that, in oral argument below, the Government then never distinguished the constitutionality of the Federal Reserve, despite that being a focus of argument.

**4.** The government offers two arguments, each a paper-thin request for this Court to defy precedent.

*First*, the government argues (at 14-16) that *Humphrey's Executor* mischaracterized the Federal Trade Commission as exercising quasi-legislative and quasi-judicial power, and this case is distinguishable because modern courts understand entities like the Board to exercise executive authority.

The Supreme Court rejected that argument decades ago: It does not matter "whether an official is classified as 'purely executive.' " *Morrison v. Olson*, 487 U.S. 654, 690 (1988). The terms quasi-legislative and quasi-judicial "describe the circumstances in which Congress" may conclude a for-cause removal standard "is necessary." *Id*. at 691 n.30.

The government suggests (at 16) *Seila Law* and *Collins* effectively overturned *Humphrey's Executor*. That is wrong. *Seila Law* went out of its way to preserve *Humphrey's Executor*, and *Collins* was a "straightforward application" of *Seila Law*. *Collins*, 594 U.S. at 251. "Court[s] of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *See Agostini*, 521 U.S. at 237 (quotation marks omitted). Because this case involves "a

traditional" "adjudicatory body" "headed by a multimember board," moreover, this case is also nothing like *Dellinger*, which involved the Office of Special Counsel led by one director. *Seila Law*, 591 U.S. at 207; *Wiener*, 357 U.S. at 356.

*Second*, the government (at 12-13) paints the Board as performing "significant executive functions," and tries to distinguish the Board from the purely "adjudicatory body" in *Wiener*. This is bunk.

Contrary to the government's argument, the fact that the Board "hears" "matters within its jurisdiction," and directs "compliance" with its decisions does not render it unconstitutional. Mot. 12 (brackets and quotation marks omitted). A board hearing cases is the *ne plus ultra* of a permissible "adjudicatory body." *Wiener*, 357 U.S. at 356. In fact, the Board exercises *less* authority than the War Claims Commission upheld in *Wiener*, which issued completely non-reviewable decisions. *Id*. at 355. The Board's decisions are reviewable in Article III courts.

The government complains (at 12) the Board possesses the ability to *sua sponte* review certain regulations issued by the Office of Personnel Management. This incidental authority is far from the Board's primary function. Such review "is an exceedingly rare occurrence that has not happened during" Harris's "tenure." *Harris*, 2025 WL 679303, at *2 n.1 (quotation marks omitted). The government has

not cited an example of *sua sponte* review in recent memory.[3] If it ever happens, the Board's role would be exceptionally circumscribed: The Board may review only to ensure compliance with laws Congress passed regulating prohibited practices, such as discrimination and retaliation. The executive branch may seek review of the Board's determination in Article III courts. In any event, if this Court were worried about that one ancillary function, the solution is not to remove Harris via an emergency motion, but to nullify the effect of the Board's review should it ever happen.

The government complains (at 13) the Board is "the named respondent" before an Article III court in two circumstances: (1) complex procedural appeals, and (2) the theoretical circumstance in which the Director of the Office of Personnel Management appeals the Board's decision regarding a regulation. There are no constitutional concerns here. This procedural device "ensures the Board's expert attorneys can provide their specialized knowledge" in "complex cases," and allows the Board to provide its perspective to the court if the Director appeals. App. A. ¶ 67.

The Board's ability to represent itself when sued looks nothing like the litigation authority the executive branch wields through the Department of Justice,

---

[3] We could find one instance of such review, which upheld a regulation. *In re Exceptions from Competitive Merit Plans*, 9 M.S.P.R. 116 (1981).

which launches investigations and prosecutes cases. The ability to litigate cases is a typical feature of independent agencies, which only underscores the degree to which adopting the government's position here would require overturning *Humphrey's Executor*. *See* 15 U.S.C. § 2061(a) (Consumer Product Safety Commission); 42 U.S.C. § 7171(i) (Federal Energy Regulatory Commission); 5 U.S.C. § 7105(h) (Federal Labor Relations Authority); 46 U.S.C. § 41307(a), (d) (Federal Maritime Commission); 12 U.S.C. § 248(p) (Federal Reserve); 15 U.S.C. § 53(b) (Federal Trade Commission); 29 U.S.C. § 154(a) (National Labor Relations Board); 49 U.S.C. § 1301(c)(1) (Surface Transportation Board); 39 U.S.C. § 409 (United States Postal Service). Nor is participating in litigation uniquely executive. Federal district courts retain attorneys to litigate on their behalf in mandamus cases, and the houses of Congress litigate in court.

The government's invocation (at 12) of *Buckley v. Valeo*, 424 U.S. 1 (1976), backfires. Quite unlike the Board, the Federal Election Commission in *Buckley* exercised "direct and wide ranging" "enforcement power." *Id*. at 111. And yet, even then, the Supreme Court cited *Humphrey's Executor* and made clear that "the President may not insist that such functions be delegated to an appointee of his removable at will." *Id*. at 141.

Finally, the government's observation (at 17) that Harris recently granted "a stay of the termination of several thousand probationary employees at the U.S.

Department of Agriculture" is equally unavailing. Because Harris is an adjudicator, we allow her decision to speak for itself. *See* App. C.

But note three things. *First*, only the Special Counsel (not Harris or any other Board official) may seek this kind of stay. *See* 5 U.S.C. § 1214(b)(1)(A)(i). Because Dellinger no longer contests his removal from that post and the President has installed his preferred Acting Special Counsel, the President 100% controls the ability to request these stays. *Second*, just as a single judge of a multimember court may exercise limited authority to grant certain motions, a single Board member possesses limited authority to issue a temporary 45-day stay. *See id.*; Sup. Ct. Rs. 22.5, 23.1 ("A stay may be granted by a Justice" or referred "to the Court for determination"). *Third*, the Board's decisions, including stays, neither set policy nor supervise the federal workforce. The Board applies the standards Congress established regarding the civil service. A neutral arbitrator calling balls and strikes is the foundation of the rule of law.

\* \* \*

In short, any concerns the government may have about Harris improperly usurping the President's powers during the pendency of this appeal are ill-founded. The Board does not set policy. It applies the law. The Board has not exercised *sua sponte* review in decades, such review is not a significant constitutional concern anyway, and if it were, that review could be challenged

(including potentially on an emergency basis) in the appropriate court. The other chief example cited by the government—the Special Counsel initiating stays on behalf of federal employees—is likewise not a concern, and additionally involves processes now firmly controlled by President Trump.

### B. The Government's Remedies Argument Defies Precedent.

**1.** The government advances the astonishing theory that Article III courts are effectively powerless to remedy the executive violating a for-cause removal statute. Mot. 18. That is wrong. Full stop.

This Court has recently reaffirmed that courts may "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official." *Severino*, 71 F.4th at 1042-1043 (quoting *Swan*, 100 F.3d at 980). Meanwhile, the Supreme Court has explained that much "water has flowed over the dam" since the Nineteenth Century cases cited by the government; "federal courts do have authority to review" unlawful removals; and courts may use "injunctive power" in the "extraordinary situation." *Sampson v. Murray*, 415 U.S. 61, 71, 92 n.68 (1974); *see, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959).

That is enough to decide this motion. But there is more. "[E]ven if *Sampson*, *Swan*, and *Severino* did not make equitable relief available" here, the District Court "would grant mandamus relief in the alternative." *Harris*, 2025 WL 679303, at *3, 11. As the District Court detailed, English courts "recognized" the power to grant

mandamus in this circumstance "and exercised it regularly." *Id*. at *11. "[M]andamus" is a "full and effectual remedy" "for wrongful removal." 3 W. Blackstone, Commentaries on the Laws of England *264-265; *see* James L. High, *A Treatise on Extraordinary Remedies* 69-70 (2d ed. 1884) ("mandamus" may restore one "to an office to which he is justly entitled"); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus* 240 (1853) (mandamus provides "remedy for a wrongful dispossession of an office").

That legal principle is at the heart of our tradition of judicial review. In *Marbury v. Madison*, Marbury's unlawful ouster presented a "plain case for a mandamus." 5 U.S. (1 Cranch) at 173. This Court has confirmed the "overwhelming" authority providing " '[a] mandamus to restore' " lies where a person removable only for "causes specified" "is wrongfully dispossessed of [an] office." *Kalbfus v. Siddons*, 42 App. D.C. 310, 319 (D.C. Cir. 1914); *see, e.g.*, *Macfarland v. U.S. ex rel. Russell*, 31 App. D.C. 321, 322 (D.C. Cir. 1908). Even the government's cases (at 19) recognize courts may issue "mandamus" here. *White v. Berry*, 171 U.S. 366, 377 (1898); *In re Sawyer*, 124 U.S. 200, 212 (1888).

**2.** The government argues (at 21) that a court may not "enjoin[] the President[]." But the District Court did *not* enjoin the President. The court enjoined subordinates. As this Court recently confirmed, "a court can unquestionably review the legality of the President's action" in a suit against subordinate officers. *Dellinger*

*v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) (per curiam); *see, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). Holding otherwise would effectively eliminate judicial review of the executive branch.

This case is nothing like *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), in which a court granted "a type of relief that has never been available before," *id*. at 322. Quite the opposite. The long history of mandamus relief *confirms* that similar injunctive relief is appropriate. As this Court has detailed, after the merger of law and equity, in a suit to "comply with removal restrictions," mandamus and an injunction are "essentially" the same. *Swan*, 100 F.3d at 977 & n.1.

Most tellingly, the government offers a single sentence about mandamus (at 22), claiming Harris's right to relief is not "clear." The government could not be more incorrect. The statute regulating Harris's removal is unambiguous. Precedent is clear and binding. Moreover, accepting the government's argument would require overruling this Court's decision in *Swan*, which explained that removal statutes— even those less pellucid than the statute here—create a duty of "sufficient clarity" for mandamus relief. *Swan*, 100 F.3d at 978; *see id*. at 976 n.1.[4]

_____

[4] *Amicus* Florida is wrong (at 12) about *quo warranto*, as explained below. D. Ct. ECF No. 38 at 18 n.10.

Finally, it bears emphasis: Harris filed an extensive brief on mandamus below and an *amicus* brief in *Dellinger*. In declining to engage with her—or the District Court's decision—the government forfeited any new arguments it might raise in reply.

* * *

Our Anglo-American traditions matter. The government's remedies theory isn't rooted in them. It is pure make believe. This Court should reject it.

## II.  THE GOVERNMENT WILL NOT SUFFER IRREPARABLE HARM.

The government cannot show irreparable harm either, which is independently "fatal." *KalshiEX*, 119 F.4th at 64. The government must identify harm "both certain and great." *Citizens for Resp.*, 904 F.3d at 1019 (brackets and quotation marks omitted). It falls far short.

*First*, despite bearing a heavy burden, the government has not identified *any* cognizable harm. The government argues (at 22) that the President is harmed by Harris "exercising executive power over" his "objection." But that just repeats the government's theory that the President may violate for-cause removal provisions. The question of whether the government will prevail is distinct from whether the government will suffer irreparable harm absent a stay. Were it otherwise, an appellant could always bootstrap the likelihood of success into a showing of

irreparable harm. *See Dellinger*, 2025 WL 559669, at *6 (rejecting bootstrapped theory of harm).

To the extent the government is concerned about some specific exercise of powers that they deem impermissibly "executive," the solution consistent with principles of constitutional avoidance is to prevent the Board from exercising that particular power in an appropriate case, not enable the executive branch to defy laws Congress enacted a half-century ago and remove members altogether. *Cf. Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

Other courts have confirmed that a vague assertion of "harm to the separation of powers," Mot. 22, is not irreparable injury. *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (Bybee, J.) (rejecting notion "institutional injury" to "the separation of powers" constitutes irreparable injury) (quotation marks omitted). As Judges Elrod, Oldham, and Wilson explained in a case challenging the Biden Administration's immigration policies, "it is the resolution of the case on the merits, not whether the injunction is stayed pending appeal, that will affect principles of separation of powers." *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (per curiam) (quotation marks omitted).

*Second*, the government's own conduct confirms extraordinary relief is unnecessary. The District Court issued a temporary restraining order on February

18, 2025. Harris has been performing her duties since. As it did in *Dellinger v. Bessent*, No. 25-5028 (D.C. Cir.), the government appealed the temporary restraining order to this Court, resulting in *Harris v. Bessent*, No. 25-5037 (D.C. Cir.). But in sharp contrast to *Dellinger*, in which the government promptly sought relief from this Court and the Supreme Court, the government completely abandoned the appeal in *Harris*. After sitting on its hands for two weeks, the government cannot credibly claim a need for emergency relief now.

*Third*, also unlike in *Dellinger*, the President cannot appoint an acting member to the Board. *See* 5 U.S.C. § 3349c (excluding multimember boards). The President therefore will not face the hypothetical harm of his preferred designee being "unable to act" in Harris's stead. Order at 8, *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 10, 2025).

*Fourth*, the government's request looks nothing like a traditional stay pending appeal, which preserves the status quo to prevent irreparable harm. Harris has served as a member since 2022. The status quo is Harris fulfilling the duties of that adjudicatory office. The Court should not disrupt that status quo, one intentionally set up by Congress decades ago.

## III. THE REMAINING FACTORS FAVOR HARRIS.

**A.** There is "no public interest in the perpetuation of unlawful" "action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). A stay

21

would also be incredibly disruptive. The Merit Systems Protection Board has three members, with two constituting a quorum. On February 28, member Raymond Limon retired, leaving only two members. If this Court stays the District Court's order, the Board will have one member, will lack a quorum, and will be unable to perform functions Congress deemed essential: adjudicating petitions for review of decisions issued by administrative judges. *See* 5 C.F.R. § 1200.3(a), (c). Indeed, the last time the Board lost a quorum, it resulted in "a backlog of approximately 3,800 cases." *Harris*, 2025 WL 679303, at *2.

The harm will be particularly acute for federal employees with meritorious cases. If neither party files a petition before the Board, the aggrieved party may appeal the administrative judge's decision to an Article III court. But if a party chooses to file a petition before the quorum-less Board, the appeal will remain in abeyance indefinitely until either (1) the party withdraws the petition, or (2) the Board regains a quorum.

The latter scenario facilitates a degree of procedural gamesmanship. When the Board previously lost a quorum, federal agencies could file petitions before the Board when an administrative judge ruled for the employee. In some cases, the tactic could place the employee in limbo, unable to pursue the case to completion in an Article III court so long as the agency's petition remained pending and the Board

lacked a quorum. *See, e.g., Howell v. HUD*, No. DC-0432-13-6622-I-2, 2023 WL 303824, at *1 & n.3 (MSPB Jan. 18, 2023).

**B.** Granting the government's stay request would cause significant harm to Harris and the Board.

A stay will prevent Harris from fulfilling her duties while removed. Harris took an oath of office to fulfill specific statutory functions set out by Congress. If she is barred from performing her adjudicatory duties, no amount of money will repair that injury to her in her personal and official capacities, or undo the violence to the statute Congress enacted.[5] Nor is backpay "the traditional remedy"—as the extremely long history of mandamus shows—precisely because these injuries are not reparable by dollars and cents. Order at 6, *Dellinger*, No. 25-5052.

For another, a stay would mar the very independence that Congress afforded Harris and the other members of the Board. The point of removal protection is to ensure adjudicators decide cases free from fear or favor. If the executive may illegally bar adjudicators from office and then receive a stay in this posture, the independence Congress and the President deemed so critical would be "effectively lost," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and Harris and every

---

[5] Contra the government (at 3), *Raines v. Byrd*, 521 U.S. 811 (1997), "supports Harris's claim to injury." *Harris*, 2025 WL 679303 at *13. The government is wrong (at 23) that Harris has "been removed." She remains in and has a duty to exercise her office.

adjudicator will live underneath the "Damocles' sword of removal." *Wiener*, 357 U.S. at 356.

* * *

The Supreme Court has rejected the "naked[]" "claim that the President could remove a member of an adjudicatory body" "merely because he wanted his own appointees." *Wiener*, 357 U.S. at 356. This Court should deny the government's invitation to defy precedent via emergency motion.

## CONCLUSION

Appellants' motion should be denied.

March 10, 2025                              Respectfully submitted,

                                            /s/ Neal Kumar Katyal
MICHAEL J. KATOR                            NEAL KUMAR KATYAL
JEREMY D. WRIGHT                                *Counsel of Record*
KERRIE D. RIGGS                             NATHANIEL A.G. ZELINSKY
KATOR, PARKS, WEISER & WRIGHT,              KRISTINA ALEKSEYEVA
    P.L.L.C.                                EZRA P. LOUVIS
1150 Connecticut Ave., NW                   SAMANTHA K. ILAGAN
Suite 705                                   MILBANK LLP
Washington, DC 20036                        1850 K St., NW
(202) 898-4800                              Suite 1100
mkator@katorparks.com                       Washington, DC 20006
                                            (202) 835-7505
                                            nkatyal@milbank.com
LINDA M. CORREIA
CORREIA & PUTH, PLLC
1400 16th St., NW                           CARL RIZZI
Suite 450                                   LUCILLE E. BAEURLE
Washington, D.C. 20036                      MILBANK LLP
(202) 602-6500                              55 Hudson Yards
lcorreia@correiaputh.com                    New York, NY 10001
                                            (212) 530-5786
                                            crizzi@milbank.com

*Counsel for Plaintiff-Appellee Cathy A. Harris*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), I certify that Appellee's Response Brief contains 5,197 words. This Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft word 14-point Times New Roman, a proportionally spaced font.

March 10, 2025

/s/ Neal Kumar Katyal

NEAL KUMAR KATYAL
*Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 10, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All counsel in this case are registered CM/ECF users and will be served by the appellate CM/ECF.

March 10, 2025

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
*Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

# Appendix A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, in her personal capacity
and in her official capacity as Member of the
Merit Systems Protection Board,

                        Plaintiff,


        -against-                                    Civil Case No. 1:25-cv-00412-RC


SCOTT BESSENT, in his official capacity as
Secretary of the Treasury, TRENT MORSE,
in his official capacity as Deputy Assistant to
the President and Deputy Director of the
White House Presidential Personnel Office,
SERGIO GOR, in his official capacity as
Director of the White House Presidential
Personnel Office, HENRY J. KERNER, in his
official capacity as Acting Chairman of the
Merit Systems Protection Board, DONALD J.
TRUMP, in his official capacity as President
of the United States of America, RUSSELL
VOUGHT, in his official capacity as Director
of the Office of Management and Budget,

                        Defendants.


## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 7(h), Plaintiff hereby submits this Statement of Material Facts Not

in Dispute in conjunction with her motion for preliminary injunction and judgment on the merits.

1.    In January 2022, President Biden nominated Plaintiff Cathy Harris to be a member

of the Merit Systems Protection Board in January 2022.  Ex. 1 at ¶2.

2.    The Senate confirmed Plaintiff on May 25, 2022, and she was sworn in on June 1,

2022. Ex. 1 at ¶2; William Spencer, *MSPB Welcomes Acting Chairman Cathy A. Harris*, U.S.

Merit Systems Protection Board (June 6, 2022),

https://www.mspb.gov/publicaffairs/press_releases/Cathy_Harris_Press_Release_1930967.pdf.

3.      Harris's current term expires on March 1, 2028.  Ex. 1 at ¶2.

4.      Shortly after being sworn in, President Biden designated Plaintiff as Vice Chairman, and she served as Acting Chairman of the Board until March 6, 2024, when the Senate confirmed her as Chairman.  Ex. 1 at ¶3.

5.      Harris was sworn in as Chairman of the Board on March 14, 2024. Ex. 1 at ¶3; William Spencer, *New MSPB Chairman and Vice Chairman*, U.S. Merit Systems Protection Board (Mar. 14, 2024), https://www.mspb.gov/publicaffairs/press_releases/New_MSPB_Chairman _and_Vice%20Chairman.pdf.

6.      On February 11, 2025, Ms. Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]"  Ex. 1 at ¶15; Ex. 2.

7.      The one-sentence email does not allege any inefficiency, neglect of duty, or malfeasance in office.  Ex. 2.

8.      During her time as a member of the Board, Harris has been extremely efficient and effective.  Ex. 1 at ¶¶4-14, 18-22.

9.      As a member of the Board since June 1, 2022, Ms. Harris has deliberated and voted on cases at the Board's appellate level, which are mostly on "petitions for review." Ex. 1 at ¶6.

10.     From June 1, 2022, through the date of the termination (February 10, 2025), Ms. Harris participated in approximately 4,472 decisions. Ex. 1 at ¶6.

11.     As of the date of the termination, there were approximately 70 additional cases that had been voted by the three Board members and pending issuance by the Board's staff. Ex. 1 at ¶6.

12.     When the Board lost its quorum between January 7, 2017, and March 3, 2022, the Board could not vote on any petitions for review. At the time the quorum was restored on March 4, 2022, the new Board, consisting of Tristan Leavitt and Raymond Limon, inherited a caseload of 3,793 cases. The Board have referred to this as the "inherited inventory." Ex. 1 at ¶7.

13.     Between March 4 and June 1, 2022, the other Board members began issuing decisions. They issued about 225 decisions before Ms. Harris's arrival. Ex. 1 at ¶8.

14.     When she arrived at the Board in June 2022, Ms. Harris was informed that it was predicted that it would take 5-6 years to clear the remaining inherited inventory. Ex. 1 at ¶9.

15.     Ms. Harris determined that the Board needed to try to clear the inherited inventory much sooner. Ms. Harris set a target that we would clear the inherited inventory by the end of 2025, if not sooner. Ex. 1 at ¶9.

16.     The Board has provided statistics at the end of each month to show the progress with the inherited inventory. *See* https://www.mspb.gov/foia/files/HQ_Case_Processing_Data.pdf. Ex. 1 at ¶10.

17.     Between the restoration of the quorum and the end of the 2022 fiscal year, the Board decided 528 cases, which included both inherited inventory headquarters (HQ) cases as well as HQ cases docketed after the restoration of the quorum. At that point, there was 87% of the inherited inventory remaining. Ex. 1 at ¶11.

18.    By the end of the FY 2023, the Board had decided a total of 2,027 cases since the quorum was restored. At that point, there was 50% of the inherited inventory remaining. Ex. 1 at ⁋12.

19.    By the end of FY 2024, the Board had decided 4,368 cases since the quorum was restored. This left only 6% of the inherited inventory remaining. Ex. 1 at ⁋13.

20.    By the end of January 2025, the Board had decided 4620 cases. This left only 56 inherited inventory cases, representing only 1% of the inherited inventory. Ex. 1 at ⁋14.

21.    As of Friday, February 7, 2025, the Board had 44 inherited inventory cases remaining. As of Friday, February 21, 2025, the Board had 32 inherited inventory cases remaining. Ex. 1 at ⁋15.

22.    In addition to deciding the inherited inventory cases, the Board has also worked to decide newly-filed appellate-level cases. Ex. 1 at ⁋16.

23.    Historically, about 400-600 cases are filed each year at the appellate level. Ex. 1 at ⁋16.

24.    The Board decided that, in addition to deciding the oldest cases pending before the Board, the Board would decide newly-incoming cases so that a perpetual backlog would not be created. Ex. 1 at ⁋16.

25.    Between February 11, 2025, and February 18, 2025, the Board did not issue any Board-level decisions. The Board resumed issuance of such decisions on February 19, 2025. Ex. 1 at ⁋17.

26.    Generally, the issued cases are available on the Board's website the next business day.  See, e.g., https://www.mspb.gov/decisions/nonprecdec.htm (non-precedential decisions); https://www.mspb.gov/decisions/precdec.htm (precedential decisions). Ex. 1 at ⁋17.

27.     After Ms. Harris was appointed and confirmed as a member, and once Ms. Harris became acclimated to the job at the Board, she sought to consider, deliberate, and vote on approximately 35 cases per week. Some weeks were higher, some lower. Some cases were more complex or required more extensive deliberations. Ex. 1 at ¶18.

28.     Ms. Harris encouraged her fellow Board members to have the same goal of 35 cases per week, if possible. Ex. 1 at ¶18.

29.     To reach a decision on a case, the attorneys in the Board's Office of Appeals Counsel (OAC), prepare a draft decision for consideration by the Board members. Ex. 1 at ¶19.

30.     Ms. Harris typically reviews materials prepared by OAC counsel as well as relevant portions of the hearing-level record from the initial appeal stage of the case. The hearing-level record can be quite voluminous. Ex. 1 at ¶19.

31.     At times, Ms. Harris has adopted the draft decision from OAC. At other times, she has revised the draft decision, written an entirely new decision, or recommended to the other Board members that they send the case back to OAC for a rewrite. At times, multiple alternative decisions are exchanged until consensus is reached by the Board members. Ex. 1 at ¶19.

32.     To maximize the efficiency of the Board's decisions, the Board deployed a Case Review Update team to review and revise the draft decisions that had been drafted by the OAC attorneys during the lack of quorum. Because of changes in the law that had occurred during the lack of quorum, many of the previously drafted decisions had to be updated. Ex. 1 at ¶20.

33.     The Board also determined that it would be most efficient to focus on the cases that would likely be precedential decisions, so that other cases that might rely on such precedent could flow afterward and be more efficiently processed. Ex. 1 at ¶21.

34.    Before Ms. Harris's arrival, the other Board members issued 15 precedential decisions. Ex. 1 at ¶21.

35.    Between June 1, 2022 and September 30, 2022, the Board issued an additional 18 precedential decisions. Ex. 1 at ¶21.

36.    In FY 2023, the Board issued 37 precedential decisions. Ex. 1 at ¶21.

37.    In FY 2024, the Board issued 13 precedential decisions. Ex. 1 at ¶21.

38.    So far, in FY 2025, the Board has issued 9 precedential decisions. Ex. 1 at ¶21.

39.    In terms of the volume of overall decisions, both precedential and non-precedential, before the loss of quorum, the Board issued 207 cases at the appellate-level in FY 2017 before it lost its quorum. Ex. 1 at ¶22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2017_Annual_Report_1481375.pdf at 13.

40.    The Board issued decisions in 1,180 cases in FY 2016. Ex. 1 at ¶22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2016_Annual_Report_1374269.pdf at 15.

41.    The Board issued decisions in 3,120 cases in FY 2015, an unusual year in which mass furloughs were conducted in the federal government. Ex. 1 at ¶22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2015_Annual_Report_1275851.pdf at 15.

42.    The Board issued decisions in 1,101 cases in FY 2014. Ex. 1 at ¶22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2014_Annual_Report_1179694.pdf at 15.

43.    The Board issued decisions in 952 cases in FY 2013. Ex. 1 at ¶22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2013_Annual_Report_1038222.pdf.

6

44.     The Board does not establish policy other than policies regarding its own staff and operations and has no rulemaking authority.   Ex. 1 at ⁋23.

45.     The Board is also neither an investigative nor prosecutorial agency. Ex. 1 at ⁋24.

46.     The Board performs no investigations of external parties and does not prosecute cases. Ex. 1 at ⁋24.

47.     The Board does not investigate allegations of wrongdoing brought by federal employees in the first instance; rather, it adjudicates appeals brought by federal employees who have been subject to an adverse action, or who bring an individual right of action alleging whistleblower retaliation after first bringing such allegations for investigation to the Office of Special Counsel (OSC). Ex. 1 at ⁋24.

48.     Rarely, the Board also adjudicates appeals brought to it by agencies, such as in the case of discipline sought against administrative law judges, or in Hatch Act cases brought by OSC. Ex. 1 at ⁋24.

49.     The Board does not initiate disciplinary actions against federal employees (with the exception of disciplinary actions against Board employees, when appropriate). Ex. 1 at ⁋24.

50.     The Board has no enforcement units, such as a Hatch Act unit or a USERRA unit, like OSC has. Rather, the Board adjudicates cases brought before the Board under the Hatch Act and USERRA. Ex. 1 at ⁋24.

51.     The Board does not order other agencies to conduct investigations or to produce written reports. Ex. 1 at ⁋24.

52.     The Board is a multi-member, bi-partisan tribunal, consisting of three members. The President may nominate a Chairman, who must be confirmed by the Senate. The President

may also appoint a Vice Chairman, who is not subject to Senate confirmation. In the absence of a confirmed Chairman, the Vice Chairman may serve as Acting Chairman. Ex. 1 at ¶25.

53.    As a member of the Board, Ms. Harris cannot issue adjudication decisions unilaterally. Rather, there must be a quorum, consisting of at least two Board members, to issue a decision. The decisions are voted on by all of the Board members. There may be dissents, split decisions, concurrences, and recusals. Ex. 1 at ¶26.

54.    During Ms. Harris's tenure, over 95% of the decisions (not including any recusals) have been unanimous. Ex. 1 at ¶26.

55.    During her tenure with the Board, Ms. Harris estimates that over 95% of the time spent working by a Board member is devoted to adjudicating cases before the Board. Ex. 1 at ¶27.

56.    The Chairman, who is the "chief executive and administrative officer of the Board," 5 U.S.C. § 1203(a), acts on behalf of the Board with respect to most administrative and operational matters, and spends additional time on internal administrative matters such as Board personnel matters, labor-management relations, hiring, IT (including the Board's new e-Appeal system), security, strategic planning, and MSPB budgetary issues.  Ex. 1 at ¶27.

57.    The Chairman supervises the Executive Director and the EEO Director. Ex. 1 at ¶27.

58.    The agency's Performance Improvement Officer is housed within the Chairman's office. Ex. 1 at ¶27.

59.    The Chairman also selects and hires the General Counsel of the agency. The Chairman is the official who responds on behalf of the agency to FOIA and Privacy Act appeals made by external parties. Ex. 1 at ¶27.

60.     The Board does not dictate or enforce policies regarding the federal workforce. That power is entrusted to the Office of Personnel Management. Ex. 1 at ¶28.

61.     5 U.S.C. § 1204(a)(2) provides that the Board shall "order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order." This is similar to the powers of a court to issue orders and is in no way a prosecutorial function. Ex. 1 at ¶29.

62.     5 U.S.C. § 1204(a)(3) provides that the Board shall "conduct, from time to time, special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free of prohibited personnel practices is being adequately protected." These studies are recommendations provided to Congress and the President and are similar to the studies conducted by the legislative Congressional Research Service. The Board's studies have no authoritative force of law and are not enforced by the Board. All of the Board members vote on whether the studies are released to Congress and the President, and are not subject to any unilateral action by any one Board member. This is a very limited duty and has taken up less than 1% of the working time spent by Ms. Harris. Ex. 1 at ¶30.

63.     5 U.S.C. § 1204(a)(4) provides that the Board shall "review, as provided in subsection (f), rules and regulations of the Office of Personnel Management." Subsection (f) provides that the Board may review such rules and regulations "on its own motion," "on the granting by the Board . . . of any petition for review filed with the Board by any interested person," or "on the filing of a written complaint by the Special Counsel seeking such review." These reviews are done through an adjudicative review process. The Board may declare such rules or regulations invalid on its face only under very limited circumstances, i.e. if the rule or regulation "on its face"

requires any employee to violate 5 U.S.C. § 2302(b). The Board may declare a rule or regulation "invalidly implemented by any agency" if it its implementation required any employee to violate section 2302(b). Ms. Harris cannot recall any such instances occurring during her tenure, and her understanding is that this is an exceedingly rare occurrence. Ex. 1 at ¶31.

64.    The Board's decisions are subject to judicial review. Ex. 1 at ¶32.

65.    Pursuant to 5 U.S.C. § 7703(a), an employee may appeal to an Article III court, which is generally but not always the Federal Circuit. Ex. 1 at ¶32.

66.    Pursuant to 5 U.S.C. § 7703(d), the Director of the Office of Personnel Management may also petition a federal court, which is generally but not always the Federal Circuit, to review decisions by the Board. Ex. 1 at ¶32.

67.    The Board may be a named defendant before a court in two circumstances. First, if the Board issues a decision on a procedural or jurisdictional basis, the Board will be a defendant, and the Board's attorneys will appear in court (with the exception that the Solicitor General represents the Board before the Supreme Court). This ensures the Board's expert attorneys can provide their specialized knowledge in procedurally and jurisdictionally complex cases. Second, if the Director of the Office of Personnel Management petitions for review, the Board will be a named defendant. This ensures the Board's attorneys can provide the court the Board's perspective on the matter. Finally, the Board will also be a plaintiff before a court when it requests that court to enforce a subpoena issued by the Board. That is a very rare occurrence, and Ms. Harris is aware of no instances in which this has occurred during her tenure. The Board is otherwise not a party in court and does not litigate before courts. Ex. 1 at ¶33.

68.    The Board has seen an increase in new filings this year. Ex. 1 at ¶34.

69.     While ordinarily the MSPB will receive about 400 new appeals per month at the

regional level, during the time period from February 9-20, 2025, the MSPB received more than

1,600 new appeals. Ex. 1 at ¶34.

Respectfully submitted,

Dated: February 23, 2025
    Washington, D.C.

/s/ Jeremy D. Wright
MICHAEL J. KATOR, D.C. Bar No. 366936
JEREMY D. WRIGHT, D.C. Bar No. 483297
KERRIE D. RIGGS, D.C. Bar No. 995784
KATOR, PARKS, WEISER & WRIGHT,
  P.L.L.C.
1150 Connecticut Ave., NW, Suite 705
Washington, DC 20036
(202) 898-4800
(202) 289-1389 (fax)
mkator@katorparks.com
jwright@katorparks.com
kriggs@katorparks.com

LINDA M. CORREIA, D.C. Bar No. 435027
CORREIA & PUTH, PLLC
1400 16th Street, NW, Suite 450
Washington, D.C. 20036
(202) 602-6500
lcorreia@correiaputh.com

NEAL KUMAR KATYAL, D.C. Bar No. 462071
 *pro hac vice application pending*
NATHANIEL A.G. ZELINSKY, D.C. Bar No. 1724093
 *pro hac vice application pending*
EZRA P. LOUVIS, D.C. Bar No. 90005185
 *pro hac vice application pending*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com
nzelinsky@milbank.com
elouvis@milbank.com

*Attorneys for Plaintiff Cathy A. Harris*

# Appendix B

# DECLARATION OF CATHY A. HARRIS

I, Cathy A. Harris, hereby declare:

1. I have served as a member of the Merit Systems Protection Board (MSPB or Board) since June 1, 2022.

2. On or about June 24, 2021, President Biden nominated me to be a member and Chairman of the MSPB. I was renominated by President Biden to be a member of the MSPB on January 4, 2022. The Senate confirmed my nomination as a member to the MSPB on May 25, 2022. I was sworn in as a member of the Board on June 1, 2022. My term as a member of the MSPB expires on March 1, 2028.

3. President Biden designated me as Vice Chairman of the MSPB on June 6, 2022, and I served as Acting Chairman of the MSPB until March 6, 2024. The Senate confirmed me as Chairman of the MSPB on March 6, 2024, and I was sworn in as Chairman of the MSPB on March 14, 2024.

4. Early in the morning on February 11, 2025, I saw an email from Trent Morse from the White House Office of Presidential Personnel. The email indicated that it was sent on February 10, 2025, at 10:49 PM. The email stated, "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately." A true and correct copy of the email that I received is attached as Exhibit 2.

5. I did not perform any Board work after I received the email until the Court issued its TRO order on February 18, 2025. On February 19, 2025, I resumed deliberating and voting on cases.

6. In my role as a member of the Board since June 1, 2022, I deliberate and vote on cases at the Board's appellate level, which are mostly on "petitions for review." Since June 1, 2022, through the date I was terminated (February 10, 2025), I participated in approximately 4,472 decisions. As of the date of my termination, there were approximately 70 additional cases that have been

voted by the three Board members and pending issuance by the Board's staff.

7.  When the Board lost its quorum between January 7, 2017, and March 3, 2022, the Board could not vote on any petitions for review. At the time the quorum was restored on March 4, 2022, the new Board, consisting of Tristan Leavitt and Raymond Limon, inherited a caseload of 3,793 cases. We have referred to this as the "inherited inventory."

8.  I joined the Board on June 1, 2022. Between March 4 and June 1, 2022, the other Board members began issuing decisions. They issued about 225 decisions before my arrival.

9.  When I arrived at the Board in June 2022, I was informed that it was predicted that it would take 5-6 years to clear the remaining inherited inventory. I determined that we needed to try to clear the inherited inventory much sooner. I set a target that we would clear the inherited inventory by the end of 2025, if not sooner.

10. The Board provides statistics at the end of each month to show the progress with the inherited inventory. *See* https://www.mspb.gov/foia/files/HQ_Case_Processing_Data.pdf.

11. Between the restoration of the quorum and the end of the 2022 fiscal year, the Board decided 528 cases, which included both inherited inventory headquarters (HQ) cases as well as HQ cases docketed after the restoration of the quorum. At that point, there was 87% of the inherited inventory remaining.

12. By the end of the FY 2023, we had decided a total of 2,027 cases since the quorum was restored. At that point, there was 50% of the inherited inventory remaining. We were well ahead of the goal to clear the inherited inventory by the end of 2025.

13. By the end of FY 2024, we had decided 4,368 cases since the quorum was restored. This left us with only 6% of the inherited inventory.

14. By the end of January 2025, we had decided 4620 cases. This left us with only 56 inherited inventory cases, representing only 1% of the inherited inventory.

15. As of Friday, February 7, 2025, the Board had 44 inherited inventory cases remaining. As of Friday, February 21, 2025, the Board had 32 inherited inventory cases remaining.

16. In addition to deciding the inherited inventory cases, the Board has also worked to decide newly-filed appellate-level cases. Historically, about 400-600 cases are filed each year at the appellate level. We decided that, in addition to deciding the oldest cases pending before the Board, we would decide newly-incoming cases so that a perpetual backlog would not be created. This proved to be quite efficient.

17. Between February 11, 2025, and February 18, 2025, the Board did not issue any Board-level decisions. The Board resumed issuance of such decisions on February 19, 2025. Generally, the issued cases are available on the Board's website the next business day. *See, e.g.*, https://www.mspb.gov/decisions/nonprecdec.htm (non-precedential decisions); https://www.mspb.gov/decisions/precdec.htm (precedential decisions).

18. After I was appointed and confirmed as a member, and once I became acclimated to the job, I sought to consider, deliberate, and vote on approximately 35 cases per week. Some weeks were higher, some lower. Some cases were more complex or required more extensive deliberations. I encouraged my fellow Board members to have the same goal of 35 cases per week, if possible.

19. To reach a decision on a case, the attorneys in the Board's Office of Appeals Counsel (OAC), prepare a draft decision for consideration by the Board members. I typically review materials prepared by OAC counsel as well as relevant portions of the hearing-level record from the initial appeal stage of the case. The hearing-level record can be quite voluminous. At times, I adopt the draft decision from OAC. At other times, I revise the draft decision,

write an entirely new decision, or recommend to my fellow Board members that we send the case back to OAC for a rewrite. At times, multiple alternative decisions are exchanged until consensus is reached by the Board members.

20. To maximize the efficiency of our decisions, we deployed a Case Review Update team to review and revise the draft decisions that had been drafted by the OAC attorneys during the lack of quorum. Because of changes in the law that had occurred during the lack of quorum, many of the previously drafted decisions had to be updated.

21. We also determined that it would be most efficient for us to focus on the cases that would likely be precedential decisions, so that other cases that might rely on such precedent could flow afterward and be more efficiently processed. Therefore, before my arrival, the other Board members issued 15 precedential decisions. Between June 1, 2022 and September 30, 2022, we issued an additional 18 precedential decisions. In FY 2023, we issued 37 precedential decisions. In FY 2024, we issued 13 precedential decisions. So far, in FY 2025, we have issued 9 precedential decisions.

22. In terms of the volume of overall decisions, both precedential and non-precedential, before the loss of quorum, the Board issued 207 cases at the appellate-level in FY 2017 before it lost its quorum; 1,180 cases in FY 2016; 3,120 cases in FY 2015, an unusual year in which mass furloughs were conducted in the federal government; 1,101 cases in FY 2014; and 952 cases in FY 2013. *See* https://www.mspb.gov/about/annual_reports/MSPB_FY_2017_Annual_Report_1481375.pdf at 13; https://www.mspb.gov/about/annual_reports/MSPB_FY_2016_Annual_Report_1374269.pdf at 15; https://www.mspb.gov/about/annual_reports/MSPB_FY_2015_Annual_Report_1275851.pdf at 15; https://www.mspb.gov/about/annual_reports/MSPB_FY_2014_Annual_Report_1179694.pdf at 15;

https://www.mspb.gov/about/annual_reports/MSPB_FY_2013_Annual_Rep ort_1038222.pdf.

23. The Board does not establish policy other than policies regarding its own staff and operations and has no rulemaking authority.

24. The Board is also neither an investigative nor prosecutorial agency. The Board performs no investigations of external parties and does not prosecute cases. The Board does not investigate allegations of wrongdoing brought by federal employees in the first instance; rather, it adjudicates appeals brought by federal employees who have been subject to an adverse action, or who bring an individual right of action alleging whistleblower retaliation after first bringing such allegations for investigation to the Office of Special Counsel (OSC). Rarely, the Board also adjudicates appeals brought to it by agencies, such as in the case of discipline sought against administrative law judges, or in Hatch Act cases brought by OSC. The Board does not initiate disciplinary actions against federal employees (with the exception of disciplinary actions against Board employees, when appropriate). The Board has no enforcement units, such as a Hatch Act unit or a USERRA unit, like OSC has. Rather, the Board adjudicates cases brought before the Board under the Hatch Act and USERRA. The Board does not order other agencies to conduct investigations or to produce written reports.

25. The Board is a multi-member, bi-partisan tribunal, consisting of three members. The President may nominate a Chairman, who must be confirmed by the Senate. The President may also appoint a Vice Chairman, who is not subject to Senate confirmation. In the absence of a confirmed Chairman, the Vice Chairman may serve as Acting Chairman.

26. As a member of the Board, I cannot issue adjudication decisions unilaterally. Rather, there must be a quorum, consisting of at least two Board members, to issue a decision. The decisions are voted on by all of the Board members. There may be dissents, split decisions, concurrences, and recusals. However, during my tenure, over 95% of the decisions (not including any recusals) have been unanimous.

27. During my tenure with the Board, I estimate that over 95% of the time spent working by a Board member is devoted to adjudicating cases before the Board. The Chairman, who is the "chief executive and administrative officer of the Board," 5 U.S.C. § 1203(a), acts on behalf of the Board with respect to most administrative and operational matters, and spends additional time on internal administrative matters such as Board personnel matters, labor-management relations, hiring, IT (including the Board's new e-Appeal system), security, strategic planning, and MSPB budgetary issues. The Chairman supervises the Executive Director and the EEO Director. The agency's Performance Improvement Officer is housed within the Chairman's office. The Chairman also selects and hires the General Counsel of the agency. The Chairman is the official who responds on behalf of the agency to FOIA and Privacy Act appeals made by external parties.

28. The Board does not dictate or enforce policies regarding the federal workforce. That power is entrusted to the Office of Personnel Management.

29. 5 U.S.C. § 1204(a)(2) provides that the Board shall "order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order." This is similar to the powers of a court to issue orders and is in no way a prosecutorial function.

30. 5 U.S.C. § 1204(a)(3) provides that the Board shall "conduct, from time to time, special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free of prohibited personnel practices is being adequately protected." These studies are prepared by the Board's Office of Policy and Evaluations, and are recommendations provided to Congress and the President and are similar to the studies conducted by the legislative Congressional Research Service. The Board's studies have no authoritative force of law and are not enforced by the Board. All of the Board members vote on whether the studies are released to Congress and the President, and are not subject to any unilateral action by

any one Board member. This is a very limited duty and has taken up less than 1% of my time.

31. 5 U.S.C. § 1204(a)(4) provides that the Board shall "review, as provided in subsection (f), rules and regulations of the Office of Personnel Management." Subsection (f) provides that the Board may review such rules and regulations "on its own motion," "on the granting by the Board . . . of any petition for review filed with the Board by any interested person," or "on the filing of a written complaint by the Special Counsel seeking such review." Thus, these reviews are done through an adjudicative review process. The Board may declare such rules or regulations invalid on its face only under very limited circumstances, i.e. if the rule or regulation "on its face" requires any employee to violate 5 U.S.C. § 2302(b). The Board may declare a rule or regulation "invalidly implemented by any agency" if its implementation required any employee to violate section 2302(b). I cannot recall any such instances occurring during my tenure, and my understanding is that this is an exceedingly rare occurrence.

32. The Board's decisions are subject to judicial review. Pursuant to 5 U.S.C. § 7703(a), an employee may appeal to an Article III court, which is generally but not always the Federal Circuit. Pursuant to 5 U.S.C. § 7703(d), the Director of the Office of Personnel Management may also petition a federal court, which is generally but not always the Federal Circuit, to review decisions by the Board.

33. By statute, the Board may be a named defendant before a court in two circumstances. First, if the Board issues a decision on a procedural or jurisdictional basis, the Board will be a defendant, and the Board's attorneys will appear in court (with the exception that the Solicitor General represents the Board before the Supreme Court). This ensures the Board's expert attorneys can provide their specialized knowledge in procedurally and jurisdictionally complex cases. Second, if the Director of the Office of Personnel Management petitions for review, the Board will be a named defendant. This ensures the Board's attorneys can provide the court the Board's perspective on the matter. Finally, the Board will also be a plaintiff

before a court when it requests that court to enforce a subpoena issued by the Board. However, that is a very rare occurrence, and I am aware of no instances in which this has occurred during my tenure. The Board is otherwise generally not a party in court and does not litigate before courts.

34. The Board has seen an increase in new filings this year. While ordinarily the MSPB will receive about 400 new appeals per month at the regional level, during the time period from February 9-20, 2025, the MSPB received more than 1,600 new appeals.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_Cathy Harris_
Cathy A. Harris

2/23/2025
Date

# Appendix C

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

| | |
|---|---|
| SPECIAL COUNSEL<br>EX REL. JOHN DOE,<br>    Petitioner, | DOCKET NUMBER<br>CB-1208-25-0020-U-1 |
| v. | |
| DEPARTMENT OF AGRICULTURE,<br>    Agency. | DATE:  March 5, 2025 |

# THIS STAY ORDER IS NONPRECEDENTIAL[1]

Hampton Dellinger, Esquire, and Erik Snyder, Esquire, Washington, D.C.,
 for the petitioner.

Bruce D. Fong, Esquire, Oakland, California, for the petitioner.

John Doe, pro se.

Steven C. Brammer, Esquire, and Domiento C.R. Hill, Esquire,
 Washington, D.C., for the agency.

### BEFORE

Cathy A. Harris, Member

### ORDER ON STAY REQUEST

 Pursuant to 5 U.S.C. § 1214(b)(1)(A), the Office of Special Counsel (OSC)
requests that the Board stay for 45 days the probationary termination of John Doe,

---

[1] A nonprecedential order is one that the Board has determined does not add significantly
to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders
have no precedential value; the Board and administrative judges are not required to
follow or distinguish them in any future decisions.  In contrast, a precedential decision
issued as an Opinion and Order has been identified by the Board as significantly
contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

the above captioned former employee/relator, and the probationary terminations of numerous other individuals who were employed by the agency and terminated during their probationary periods since February 13, 2025, based on letters stating: "The [a]gency finds, based on your performance, that you have not demonstrated that your further employment at the [a]gency would be in the public interest." OSC submits that a 45-day stay will "minimize the adverse consequences of the apparent prohibited personnel practice" while it further investigates these allegations and the agency's "systemic action to terminate probationary employees." *Special Counsel ex rel. John Doe v. Department of Agriculture*, MSPB Docket No. CB-1208-25-0020-U-1, Stay Request File (SRF), Tab 1 at 21.

For the reasons discussed below, OSC's request is GRANTED.

## BACKGROUND

On February 28, 2025, OSC filed a stay request on behalf of Mr. Doe, in which it states that it has reasonable grounds to believe that the agency engaged in prohibited personnel practices under, among other things, 5 U.S.C. § 2302(b)(12),[2] by terminating him in violation of the Federal laws and regulations governing reductions-in-force (RIFs) and probationary terminations. SRF, Tab 1 at 4-5.[3]

---

[2] Because I find that OSC has reasonable grounds to believe that the agency committed a prohibited personnel practice pursuant to 5 U.S.C. § 2302(b)(12) when it terminated Mr. Doe and the other former agency employees during their probationary periods, I need not address OSC's allegations and arguments regarding 5 U.S.C. § 1216(a)(4) at this time.

[3] The agency has filed an opposition to the stay request, and OSC has filed a reply. SRF, Tabs 2-3. I do not consider these additional submissions. The statute at 5 U.S.C. § 1214(b)(1)(a)(iii), by mandating that a Board Member decide the stay request within 3 working days, does not provide an opportunity for agency comment on an initial stay request. *Special Counsel v. Department of Transportation*, 59 M.S.P.R. 556, 558 (1993); *Special Counsel ex rel. Schwarz v. Department of the Navy*, MSPB Docket No. CB-1208-17-0022-U-2, Order, ¶ 7 (Jul. 25, 2017) (stating that the purpose of the stay is to maintain the status quo for a finite period of time, and consistent with that purpose, Congress gave the agency no right to respond to OSC stay requests). Indeed, in contrast to the procedures for an initial stay request described in 5 U.S.C. § 1214(b)(1)(A), which afford no agency comment, the procedures in section 1214(b)(1)(C) explicitly provide for an agency comment on a stay extension request.

OSC also filed the stay request on behalf of "all other probationary employees that [the agency] has terminated since February 13, 2025," pursuant to letters stating: "The [a]gency finds, based on your performance, that you have not demonstrated that your further employment at the [a]gency would be in the public interest." *Id.* at 4. OSC asserts that it has reasonable grounds to believe that the agency engaged in prohibited personnel practices against Mr. Doe and the other probationary employees who were terminated since February 13, 2025, pursuant to these mass termination letters. *Id.* at 5.

OSC alleges that, on February 13, 2025, the agency terminated Mr. Doe, a GS-5 Forestry Technician in the competitive service, during his probationary period. *Id.* at 8. With its stay request, OSC provides a copy of Mr. Doe's termination letter and a declaration, made under penalty of perjury, from Mr. Doe attesting to the circumstances surrounding his termination. *Id.* at 8-9, 26-28. In Mr. Doe's declaration, he states that he "received only positive feedback about [his] performance," he was "never counseled or disciplined and was given no indication that [he] had any performance or conduct deficiencies," and he received a "Fully Successful" performance appraisal on January 15, 2025. *Id.* at 26. OSC also asserts that Mr. Doe's declaration and other evidence obtained by OSC indicate that Mr. Doe's supervisor was not consulted about his termination and was unaware that he was going to be terminated until just hours before he received his letter but would have recommended that he be retained. *Id.* at 8-9. OSC further asserts that Mr. Doe received a termination letter signed by a Director of Human Resources Management, which specified his job title and the date that he started working at the agency. *Id.* at 9, 27. OSC asserts that the letter stated that termination was based on Mr. Doe's "performance," but it provided no explanation of how his performance was deficient or any other individualized analysis. *Id.* OSC also asserts that it gathered evidence indicating that the letter Mr. Doe received was identical to the mass termination letters received by every other probationary employee whom the agency has terminated since February 13, 2025.

*Id.* at 9.  OSC provides with its stay request a "sample" of 29 other probationary termination letters.[4]  *Id.* at 10 n.8, 47-105.

## ANALYSIS

Under 5 U.S.C. § 1214(b)(1)(A)(i), OSC "may request any member of the Merit Systems Protection Board to order a stay of any personnel action for 45 days if [OSC] determines that there are reasonable grounds to believe that the personnel action was taken, or is to be taken, as a result of a prohibited personnel practice." Such a request "shall" be granted "unless the [Board] member determines that, under the facts and circumstances involved, such a stay would not be appropriate." 5 U.S.C. § 1214(b)(1)(A)(ii).  OSC's stay request need only fall within the range of rationality to be granted, and the facts must be reviewed in the light most favorable to a finding of reasonable grounds to believe that a prohibited personnel practice was (or will be) committed.  *Special Counsel ex rel. Tines v. Department of Veterans Affairs*, 98 M.S.P.R. 510, ¶ 5 (2005).  Deference is given to OSC's initial determination, and a stay will be denied only when the asserted facts and circumstances appear to make the stay request inherently unreasonable.  *E.g.*, *Special Counsel v. Department of Veterans Affairs*, 50 M.S.P.R. 229, 231 (1991).

At issue in the instant stay request is 5 U.S.C. § 2302(b)(12), which provides that it is a prohibited personnel practice to "take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in [5 U.S.C. § 2301]."  5 U.S.C. § 2301, in turn, enumerates nine merit system principles for Federal personnel management.  5 U.S.C. § 2301(b)(1)-(9). Thus, to establish that an agency's action constitutes a prohibited personnel practice under 5 U.S.C. § 2302(b)(12), the following three factors must be met: (1) the action constitutes a "personnel action" as defined in 5 U.S.C. § 2302(a); (2) the action violates a law, rule, or regulation; and (3) the violated law, rule, or

---

[4] The names of the individuals who were terminated were redacted from these letters.

regulation is one that implements or directly concerns the merit system principles. *See Special Counsel v. Harvey*, 28 M.S.P.R. 595, 599-600 (1984), *rev'd on other grounds sub nom.*, *Harvey v. Merit Systems Protection Board*, 802 F.2d 537 (D.C. Cir. 1986).[5]

Here, OSC states that the personnel actions at issue, i.e., the probationary terminations, violate the following laws and regulations governing RIFs and probationary terminations: (1) 5 U.S.C. § 3502; (2) 5 C.F.R. part 351; and (3) 5 C.F.R. § 315.801 et seq. SRF, Tab 1 at 11-12. OSC asserts that the identified statute and regulations concern five of the nine merit system principles. *Id.* at 12 (citing 5 U.S.C. § 2301(b)(1), (2), (5), (6), (8)(A)). These five identified principles are as follows:

- Recruitment should be from qualified individuals from appropriate sources in an endeavor to achieve a work force from all segments of society, and selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity.

- All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights.

- The Federal work force should be used efficiently and effectively.

- Employees should be retained on the basis of the adequacy of their performance, inadequate performance should be corrected, and employees should be separated who cannot or will not improve their performance to meet required standards.

- Employees should be—

---

[5] The Board's decision in *Harvey*, 28 M.S.P.R. at 599, references section 2302(b)(11). The Veterans Employment Opportunities Act of 1998 added a new prohibited personnel practice at 5 U.S.C. § 2302(b)(11), resulting in the redesignation of the former (b)(11) to (b)(12). *Blount v. Office of Personnel Management*, 87 M.S.P.R. 87, ¶ 2 n.2 (2000).

(A) protected against arbitrary action, personal favoritism, or coercion for partisan political purposes.

5 U.S.C. § 2301(b)(1), (2), (5), (6), (8)(A). OSC asserts that agencies are prohibited from circumventing the requirements as set forth in the RIF statute and regulations, which apply equally to probationary employees, the evidence indicates that the agency improperly terminated Mr. Doe and the other probationary employees without reference to those rights, and the agency's actions denied Mr. Doe and the other probationary employees the substantive and procedural rights to which they are entitled under RIF procedures. SRF, Tab 1 at 13.

In pertinent part, OSC asserts that, based on the evidence it has reviewed, including guidance from the Office of Personnel Management (OPM), documents and interviews with agency officials, public statements, and the "mass termination notices" that were issued to Mr. Doe and the other probationary employees since February 13, 2025, it has reasonable grounds to believe that the agency terminated probationary employees not to eliminate poor performers, but instead as part of a reorganization, which required the use of RIF procedures. *Id.* at 14-15 (citing 5 C.F.R. § 351.201). Specifically, OSC asserts that OPM guidance led the agency to terminate all probationary employees that it had not designated as "mission critical," which demonstrated that these terminations were actually a "planned elimination . . . of [non-mission-critical] functions or duties." *Id.* at 15 (citing 5 C.F.R. § 351.203). OSC also asserts that OPM's guidance indicated that the agency should terminate probationary employees based on their "performance," but it explained that "performance" in this context meant "the current needs and best interest of the [G]overnment, in light of the President's directive to dramatically reduce the size of the [F]ederal workforce." *Id.* (citing Exhibit 5). OSC further asserts that the evidence indicates that Mr. Doe and the other probationary employees were terminated not based on their individual fitness for Federal service, but rather because they were performing functions that the Government wished to eliminate. *Id*. Finally, OSC asserts that the conclusion that these

probationary terminations were part of a reorganization is highlighted by a February 11, 2025 Executive Order, which directed agencies to start planning for RIFs, and prioritized eliminating "offices that perform *functions* not mandated by statute or other law" and excluded "*functions* related to public safety, immigration enforcement, or law enforcement." *Id.* at 15 (emphasis in original).

OSC avers that this evidence indicates that the agency terminated Mr. Doe and the other probationary employees as part of a restructuring plan to eliminate positions that are not mission critical, and eliminating positions for this reason required compliance with RIF regulations. *Id.* at 16. Accordingly, OSC avers that there are reasonable grounds to believe that the agency improperly circumvented RIF regulations, which provide for an orderly process of determining which employees are retained, rather than separated, and ensuring that those decisions are made according to merit-based factors. *Id.* OSC asserts in this regard that proper application of RIF regulations could allow some probationers to keep their jobs or be reassigned to new positions, and the agency's failure to follow RIF procedures deprived Mr. Doe and the other probationary employees of an additional period of employment, compensation, benefits, career transition assistance information, possible accrual of tenure, as well as due process rights. *Id.* at 16-18.

Particularly considering the deference that must be afforded to OSC at this initial stage, *see supra* pp. 4-5, I find that there are reasonable grounds to believe that the agency engaged in a prohibited personnel practice under 5 U.S.C. § 2302(b)(12). First, OSC reasonably alleges that the agency took a personnel action under 5 U.S.C. § 2302(a) when it terminated Mr. Doe and other probationary employees. SRF, Tab 1 at 11; *see Smart v. Department of the Army*, 98 M.S.P.R. 566, ¶ 10 (recognizing that a probationary termination is a personnel action under 5 U.S.C. § 2302(a)(2)(A)), *aff'd*, 157 F. App'x 260 (Fed. Cir. 2005); *see also Cooper v. Department of Veterans Affairs*, 2023 MSPB 24, ¶ 9 (recognizing that section 2302(a)(2)(A) defines "personnel action" as including, among other things,

disciplinary or corrective actions, decisions regarding pay or benefits, and any other significant change in duties, responsibilities, or working conditions).

Second, OSC identifies laws and regulations related to RIFs that it believes the agency violated. SRF, Tab 1 at 11. In this regard, OSC asserts that the probationary terminations violated 5 U.S.C. § 3502 and 5 C.F.R. part 351 because, given the real reason for these terminations, *i.e.*, the elimination of non-mission-critical positions, the agency was required to follow RIF laws and regulations. *Id.* at 13-18; *see Bielomaz v. Department of the Navy*, 86 M.S.P.R. 276, ¶ 11 (2000) (indicating that probationary employees are included in RIF procedures); *Coleman v. Federal Deposit Insurance Corporation*, 62 M.S.P.R. 187, 189-90 (1994) (holding that an appellant who lacked status to directly appeal his termination to the Board could nonetheless claim that his termination was part of an improper RIF); *see also Cox v. Tennessee Valley Authority*, 41 M.S.P.R. 686, 689 (1989) (concluding that the agency "was required to invoke RIF procedures" when it released a competing employee from his competitive level when the release was required because of a reorganization[6]); *Perlman v. Department of the Army*, 23 M.S.P.R. 125, 126-27 (1984) (noting the agency admitted that the removal was not based upon Mr. Perlman personally or the performance of his duties, concluding that the agency should have, but failed to, afford him any procedural or substantive RIF rights when it effected his removal as part of a reorganization, and ordering the agency to cancel the removal action and provide him with back pay); 5 C.F.R. § 351.201(a)(2) (stating, in relevant part, that "[e]ach agency *shall follow* this part when it releases a competing employee from his or her competitive level . . . when the release is required because of . . . [a] reorganization.") (emphasis supplied).

Third, OSC argues that 5 U.S.C. § 3502 and 5 C.F.R. part 351 concern, among other merit system principles, 5 U.S.C. § 2301(b)(6) and 5 U.S.C.

---

[6] Reorganization means the "planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203.

§ 2301(b)(8)(A), which provide that employees should be retained on the basis of the adequacy of their performance, separated when they cannot or will not improve their performance to meet required standards, and protected against arbitrary action.[7]  SRF, Tab 1 at 12.  The term "directly concerning" as used in 5 U.S.C. § 2302(b)(12) is undefined by statute or regulation, and the legislative history of the Civil Service Reform Act of 1978 provides no clear explanation as to the intended meaning of the term.  *See Harvey*, 28 M.S.P.R. at 602.  Absent a distinct definition in a statute or regulation, the words in a statute are assumed to carry their "ordinary, contemporary, common meaning." *Dean v. Department of Agriculture*, 99 M.S.P.R. 533, ¶ 16 (2005) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979); *Union Pacific R.R. Co. v. Hall*, 91 U.S. 343, 347 (1875); *Butterbaugh v. Department of Justice*, 91 M.S.P.R. 490, ¶ 13 (2002), *rev'd on other grounds*, 336 F.3d 1332 (Fed. Cir. 2003)).  The primary dictionary definition of the adverb "directly" is "in a direct manner." *Directly*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/directly (last visited Mar. 5, 2025); *see Maloney v. Executive Office of the President*, 2022 MSPB 26, ¶ 13 (explaining that, in interpreting the "ordinary, contemporary, common meaning" of words, the Board may refer to dictionary definitions).  The primary dictionary definition of the verb "concern" is "to relate to: be about." *Concern*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/concern (last visited Mar. 5, 2025).  Thus, the ordinary meaning of "directly concerning" is to relate to something without an intervening element.  *Cf. United States v. Regan*, 221 F. Supp. 2d 666, 671 (E.D. Va. 2002) (applying dictionary definitions to interpret "directly concerned" in a separate statutory context and finding that the term means to relate to something in a straightforward manner).

---

[7] As the legislative history of the Civil Service Reform Act explains, "[t]he probationary or trial period . . . is an extension of the examining process to determine an employee's ability to actually perform the duties of the position."  S. Rep. No. 95-969, at 45 (1978).

Applying this meaning, and affording OSC the requisite discretion at this stage, *see supra* pp. 4-5, I find it reasonable to posit that 5 U.S.C. § 3502 and 5 C.F.R. part 351, which prescribe RIF procedures that take into account efficiency or performance ratings, directly concern the merit system principle set forth in 5 U.S.C. § 2301(b)(6) and 5 U.S.C. § 2301(b)(8)(A).[8] *See Wilburn v. Department of Transportation*, 757 F.2d 260, 262 (Fed. Cir. 1985) (explaining that the RIF regulations reflect a congressional concern for fairness and limit an agency's discretion in filling a vacancy during a RIF); *cf. Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (finding that an agency action would be arbitrary and capricious under the Administrative Procedure Act when, among other things, it has entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before the agency). This finding is consistent with the Board's longstanding application of the well-established maxim that a remedial statute should be broadly construed in favor of those whom it was meant to protect. *Willingham v. Department of the Navy*, 118 M.S.P.R. 21, ¶ 14 (2012); *see Dean*, 99 M.S.P.R. 533, ¶ 19 (applying this maxim in interpreting the term "relating to" for purposes of the Veterans Employment Opportunities Act of 1998). Considering the deference that should be afforded to OSC in the context of an initial stay request and the assertions made in the instant stay request, I find that there are reasonable grounds to believe that the agency terminated Mr. Doe during his probationary period in violation of 5 U.S.C. § 2302(b)(12).[9]

---

[8] Because I find herein that OSC has made a sufficient showing regarding 5 U.S.C. § 2301(b)(6), (8)(A) as it relates to 5 U.S.C. § 3502 and 5 C.F.R. part 351, I need not address OSC's allegations regarding 5 C.F.R. § 315.801 et seq. or the three other identified merit system principles at this time.

[9] I note that then-Member Raymond A. Limon granted OSC's request for a stay based on similar allegations in *Special Counsel ex rel. John Doe v. Department of Agriculture*, MSPB Docket No. CB-1208-25-0018-U-1, Order on Stay Request (Feb. 25, 2025).

OSC also asks the Board to grant a stay request for "all other probationary employees that [the agency] has terminated since February 13, 2025," pursuant to letters stating: "The [a]gency finds, based on your performance, that you have not demonstrated that your further employment at the [a]gency would be in the public interest." SRF, Tab 1 at 23. On March 3, 2025, I issued an Order, pursuant to 5 C.F.R. § 1201.136(e), directing OSC to provide additional information regarding its request to stay the terminations of individuals other than Mr. Doe. SRF, Tab 4. In its response, OSC provided a list of 5,692 former employees, including Mr. Doe, who were terminated during their probationary periods; it stated that this list was provided by the agency on March 3, 2025, and it explained why it could not provide a definitive list of all affected individuals. *Special Counsel ex rel. John Doe v. Department of Agriculture*, MSPB Docket No. CB-1208-25-0020-U-2, Stay Request File 2 (SRF-2), Tab 2 at 7-8, 10-100.[10] For example, OSC states that the agency cautioned that this number was still in flux due to corrections, rehirings, and changes to mission-critical designations. *Id.* at 7. Indeed, OSC asserts that, on February 24, 2025, the agency provided documentation indicating that, as of February 18, 2025, it had terminated 5,950 probationary employees. *Id.* OSC further asserts that the number of probationary terminations may continue to change and it is not practicable for OSC to "track the moving target of how many individuals are subject to its stay request each day." *Id.* at 8. Because there is a possibility that additional individuals, not specifically named in the agency's response, may be affected by these probationary terminations, and given the assertions made in OSC's initial stay request and the deference to which we afford OSC in the context of an initial stay request, I find that there are reasonable grounds to believe that the agency terminated the aforementioned probationary employees, in violation of 5 U.S.C. § 2302(b)(12).

---

[10] In granting OSC's initial stay request, I have considered the evidence and argument filed in the MSPB Docket Nos. CB-1208-25-0020-U-1 and CB-1208-25-0020-U-2 matters.

# ORDER

Based on the foregoing, I grant OSC's stay request for Mr. Doe and all other probationary employees whom the agency has terminated since February 13, 2025, pursuant to letters stating: "The [a]gency finds, based on your performance, that you have not demonstrated that your further employment at the [a]gency would be in the public interest." Accordingly, a 45-day stay of Mr. Doe's termination and the probationary terminations of the aforementioned probationary employees are GRANTED. The stay shall be in effect from March 5, 2025, through and including April 18, 2025.

It is further ORDERED as follows:

(1)     During the pendency of this stay, Mr. Doe shall be placed in the position that he held prior to the probationary termination. Likewise, all other probationary employees whom the agency has terminated since February 13, 2025, pursuant to letters stating, "The [a]gency finds, based on your performance, that you have not demonstrated that your further employment at the [a]gency would be in the public interest," shall be placed in the positions that they held prior to the probationary terminations;

(2)     The agency shall not effect any changes in the aforementioned employees' duties or responsibilities that are inconsistent with their salary or grade level, or impose upon them any requirement which is not required of other employees of comparable position, salary, or grade level;[11]

---

[11] OSC and the agency should cooperate in good faith to notify the individuals to whom this Order applies of this Order's issuance and of the measures ordered herein.

(3)    Within 5 working days of this Order, the agency shall submit evidence to the Clerk of the Board showing that it has complied with this Order;[12]

(4)    Any request for an extension of this stay pursuant to 5 U.S.C. § 1214(b)(1)(B), and 5 C.F.R. § 1201.136(b) must be received by the Clerk of the Board and the agency, together with any further evidentiary support, on or before April 3, 2025; and

(5)    Any comments on such a request that the agency wants the Board to consider pursuant to 5 U.S.C. § 1214(b)(1)(C) and 5 C.F.R. § 1201.136(b) must be received by the Clerk of the Board on or before April 10, 2025.


FOR THE BOARD:        _____
                      *Gina K. Grippando*
                      Gina K. Grippando
                      Clerk of the Board

Washington, D.C.

_____

[12] Submissions to the Clerk of the Board should be filed under MSPB Docket No. CB-1208-25-0020-U-2 and served only on OSC or the agency, as appropriate.