Case  25-5055

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CATHY A. HARRIS,

Plaintiff-Appellee,

v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, et al.,

Defendants-Appellants.

---

Appeal from the United States District Court
District of Columbia Civ A. No. 25-412 (RC)
The Honorable Rudolph Contreras

---

## BRIEF OF AMICI CURIAE LAW PROFESSORS JOHN C. COATES, JEFFREY N. GORDON, KATHRYN JUDGE, AND LEV MENAND REGARDING THE GOVERNMENT'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

---

STEVEN A. HIRSCH, #171825
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

*Counsel for Amici Curiae*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to Circuit Rule 28(a)(1), amici curiae submit this certificate as to parties, rulings, and related cases.

### A.    Parties and Amici

Except for the amici submitting this brief, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Government's Emergency Motion for a Stay Pending Appeal ("the Stay Motion").

### B.    Rulings Under Review

A reference to the ruling at issue appears in the Stay Motion.

### C.    Related Cases

This case has not previously been before this Court. The Stay Motion lists cases involving "similar" challenges to the President's removal powers.


DATED:  March 11, 2025            */s/ Steven A. Hirsch*
                                 Steven A. Hirsch
                                 Keker, Van Nest & Peters LLP
                                 *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COUNSEL REGARDING<br>AUTHORITY TO FILE</u>

Pursuant to FRAP 29(a)(2), all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), amici state that a separate amici curiae brief is necessary due to their distinct expertise and interests, as set forth below in the section entitled "IDENTITY AND INTERESTS OF THE AMICI."

DATED: March 11, 2025                    */s/ Steven A. Hirsch*
                                        Steven A. Hirsch
                                        Keker, Van Nest & Peters LLP
                                        *Counsel for Amici Curiae*

2885369

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND
      RELATED CASES ........................................................................ i

CERTIFICATE OF COUNSEL REGARDING AUTHORITY
      TO FILE ..................................................................................... ii

I.      IDENTITY AND INTERESTS OF AMICI CURIAE .................1

II.     INTRODUCTION AND SUMMARY OF ARGUMENT ............4

III.    ARGUMENT ........................................................................6

A.    Central bank independence is an essential component
of monetary policy and long-term economic growth .....................7

      1.    Central-bank independence is the solution
            to what economists call "the time-
            inconsistency problem." ............................................. 9

      2.    Maintaining the credibility of Fed
            independence is crucial to containing
            systemic banking risks. ......................................... 15

B.    The President's proposal to limit Fed independence to
the Fed's monetary functions is unworkable. .............................18

C.    There is no principled way to overturn or more
narrowly construe *Humphrey's Executor* without
damaging Fed independence. .........................................................23

IV.    CONCLUSION ..................................................................28

CERTIFICATE OF COMPLIANCE ....................................................29

CERTIFICATE OF SERVICE .............................................................30

2885369

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Consumer Fin. Prot. Bureau* v. *Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ................................................................ 24

*Dellinger v. Bessent*,
No. 24A790 (U.S. 2025) ......................................................... 23

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) .......................................... 4, 5, 23, 24, 25

*PHH Corp. v. Consumer Fin. Protection. Bureau*,
881 F.3d 75 (D.C. Cir. 2018) ................................................. 25

*Seila Law LLC* v. *Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) .......................................................... 4, 25

**Federal Statutes**

12 U.S.C. § 242 ......................................................................... 9

12 U.S.C. § 301 ......................................................................... 9

12 U.S.C. § 1823(c)(4) ........................................................ 15, 16

12 U.S.C. § 1823(c)(4)(G) ......................................................... 16

12 U.S.C. § 5383(a) ................................................................. 17

**Regulations**

12 C.F.R. §§ 200–299 ............................................................... 23

90 Fed. Reg. 3615 .................................................................... 21

2885369

## Executive Orders

"Ensuring Accountability for All Agencies," Exec. Order No.
14,215, 90 FED. REG. 10,447 (Feb. 24, 2025),
https://www.govinfo.gov/content/pkg/FR-2025-02-
24/pdf/2025-03063.pdf .......................................................... 18

## Other Authorities

Alberto Alesina & Lawrence H. Summers, *Central Bank
Independence and Macroeconomic Performance: Some
Comparative Evidence*, 25 J. MONEY, CREDIT & BANKING
151 (1993) ............................................................................. 13

Alex Cukierman, Steven B. Webb & Bilin Neyapti,
*Measuring the Independence of Central Banks and Its
Effect on Policy Outcomes*, 6 WORLD BANK ECON. REV. 353,
375-76 (1992) ........................................................................ 11

Alexander Hamilton, *Final Version of the Second Report on
the Further Provision Necessary for Establishing Public
Credit (Report on a National Bank)*, Nat'l Archives
Founders Online,
https://founders.archives.gov/documents/Hamilton/01-07-
02-0229-0003#ARHN-01-07-02-0229-0003-fn-0152-ptr ................... 27

Ana Carolina Garriga & Cesar M. Rodriguez, *Central Bank
Independence and Inflation Volatility in Developing
Countries*, 78 ECON. ANALYSIS 1320, 1320 (2023) ............................. 11

Ben S. Bernanke, Fed Emergency Lending, Brookings (Dec.
3, 2015), https://www.brookings.edu/articles/fed-
emergency-lending/ .............................................................. 22

Burton A. Abrams, *How Richard Nixon Pressured Arthur
Burns: Evidence from the Nixon Tapes*, 20 J. ECON.
PERSPECTIVES 177, 178 (2006) ....................................................... 12, 14

Catherine L. Mann, The Great Moderation 20 Years On—
 and Beyond, Address to the Annual Conference of the
 Society of Professional Economists (Nov. 14, 2024),
 https://www.bankofengland.co.uk/speech/2024/november/c
 atherine-l-mann-society-of-professional-economists-
 annual-conference ................................................................... 12

*Central Bank Independence*, IMF WORKING PAPER WP/24/35
 (Feb. 2024),
 https://www.imf.org/en/Publications/WP/Issues/2024/02/23
 /A-New-Measure-of-Central-Bank-Independence-545270 ................. 19

Christine Kexel Chabot, *Is the Federal Reserve
 Constitutional? An Originalist Argument for Independent
 Agencies*, 96 NOTRE DAME L. REV. 1, 27–28 (2020) ............................ 26

Christopher Crowe & Ellen E. Meade, *The Evolution of
 Central Bank Governance around the World*, 21 J. ECON.
 PERSPECTIVES 69 (2007) ....................................................... 10

Cristina Bodea & Raymond Hicks, *Price Stability and
 Central Bank Independence: Discipline, Credibility, and
 Democratic Institutions*, 69 INT'L ORGS. 35, 37 (2015)
 ....................................................................... 12, 13, 14, 27

European Central Bank, *Benefits of Price Stability*,
 https://www.ecb.europa.eu/mopo/intro/benefits/html/index
 .en.html#:~:text=When%20inflation%20is%20low%2C%20
 stable,turn%20creating%20jobs%20and%20prosperity ...................... 7

THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES 6-13
 (2020),
 https://www.federalreserve.gov/aboutthefed/files/the-fed-
 explained.pdf ............................................................... 9, 21

*The Federalist* No. 77 .............................................................. 26

GEOFFREY M. HODGSON, THE WEALTH OF A NATION:
 INSTITUTIONAL FOUNDATIONS OF ENGLISH CAPITALISM
 (2023) .................................................................................. 8

2885369

J. Bradford DeLong, Slouching Towards Utopia: An Economic History of the Twentieth Century (2022) ...................... 8

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021) ....................................... 26

Letter from Sarah M. Harris to Hon. Richard J. Durbin at p. 2 (Feb. 12, 2025), https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxbo ava/2025.02.12-OUT-Durbin-530D.pdf .................................................. 5

Lev Menand, *The Logic and Limits of the Federal Reserve Act*, 40 Yale J. on Reg. 197, 240-50 (2023) ........................................ 22

Morgan Ricks, Ganesh Sitaraman, Shelley Welton & Lev Menand, Networks, Platforms, and Utilities: Law and Policy 819-20 (2022) ............................................................... 8

Nicolò Fraccaroli, Rhiannon Sowerbutts & Andrew Whitworth, *Does Regulatory and Supervisory Independence Affect Financial Stability?* J. Banking & Fin. 107318, at p. 2 (2025) ................................................. 11

Thomas W. Merrill, *The Essential Meaning of the Rule of Law*, 17 J. of Law, Econ. & Pol. 673 (2022) ....................................... 6

To Modernize the Federal Reserve System: Hearing on H.R. 7001 Before the Subcomm. on Domestic Monetary Pol'y of the H. Comm. on Banking, Fin. & Urb. Affs., 96th Cong. 60 (1980) ............................................................................ 21

vii

## I.    IDENTITY AND INTERESTS OF AMICI CURIAE[1]

Amici are law professors with financial-regulation experience who have published extensive research on that subject. Here they urge that, however the Court rules on the Government's emergency stay motion, the Court make no statement that markets could construe as affecting the independence of the Federal Reserve System. Were the Court's order to raise doubts about the Fed's independence, even with respect to only some of its present functions, it could disrupt markets and undermine the credibility of Fed officials in ways that might not be easily reversed.

**John C. Coates** is the John F. Cogan Professor of Law and Economics at Harvard Law School. His research focuses on financial regulation and institutional design, including administrative and constitutional law relevant to those topics. He has served as General Counsel of the Securities and Exchange Commission, served as a

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), counsel for amici represent that they authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than amici or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

monitor for the Department of Justice of a large systemically important financial institution, has advised the Department of Treasury and the Federal Reserve Board, and was a partner focused on financial institutions at Wachtell Lipton Rosen & Katz before coming to Harvard.

**Jeffrey N. Gordon** is the Richard Paul Richman Professor of Law at Columbia Law School. Professor Gordon teaches and writes extensively on a variety of business-law subjects, including the regulation of financial institutions. He is the co-author of *Principles of Financial Regulation* (2016), which addresses the challenges facing regulators of financial institutions and markets in an interconnected and evolving global financial system, particularly the challenges in maintaining financial stability. Before becoming an academic, Professor Gordon served as an attorney for the U.S. Department of the Treasury in Washington, D.C.

**Kathryn Judge** is the Harvey J. Goldschmid Professor of Law at Columbia Law School. Her research focuses on banking, financial crises, regulatory architecture, and intermediation design. She has served as a member of the Financial Stability Task Force co-sponsored by the

2885369

Brookings Institution and the Chicago Booth School of Business, and as a member of the Financial Research Advisory Committee (FRAC) to the Office of Financial Regulation. While serving on FRAC, she co-chaired the working groups on financial innovation and the London Interbank Offered Rate (LIBOR) transition.

**Lev Menand** is an associate professor of law at Columbia Law School, where he teaches financial institutions and administrative law. He has written extensively on money and banking, including a book, *The Fed Unbound: Central Banking in a Time of Crisis* (2022). Professor Menand served as senior adviser to the deputy secretary of the Treasury from 2015 to 2016 and senior adviser to the assistant secretary for Financial Institutions from 2014 to 2015. He was previously an economist at the Federal Reserve Bank of New York, where he helped to develop econometric models for the Federal Reserve System's first Comprehensive Capital Assessment and Review. While at the New York Fed, Menand was seconded to the Financial Stability Oversight Council, where he helped to prepare the Council's first financial-stability report.

2885369

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT[2]

Amici curiae write to urge that the Court's order on the Government's emergency stay motion in this case make no statement that markets could construe as undermining the carefully calibrated institutional design of the Federal Reserve, which prevents the President from removing members of its Board of Governors (or from demoting the Board's Chair) prior to the completion of their statutory terms except for cause.

Fed independence is tied to that of the Merit Systems Protection Board. Both are multimember expert boards.[3] Both have, since their inception, enjoyed a degree of independence from presidential control. Both fall under the umbrella of *Humphrey's Executor v. United States*,[4] the seminal Supreme Court decision whose overruling is advocated by

---

[2] Throughout this brief, unless otherwise indicated, emphases were added to quotations, while internal citations, footnotes, brackets, ellipses, and the like were omitted from them.

[3] *See Seila Law LLC* v. *Consumer Fin. Prot. Bureau*, 591 U.S. 197, (2020) (affirming President's power to remove individual agency heads at will, but distinguishing agencies led by multimember boards like the FTC in *Humphrey's Executor*).

[4] 295 U.S. 602 (1935).

the current Administration.[5] As a result, statements suggesting that *Humphrey's Executor* may be overruled threaten to damage the Fed, potentially undermining economic and financial stability.

Amici law professors also write to explain the critical importance of Federal Reserve independence to the government's capacity to maintain price stability, fight inflation, and promote economic growth. Research on central-bank independence demonstrates that the government's capacity to achieve broadly agreed-upon aims—such as monetary expansion consistent with the economy's long-run potential to increase production—depends on governance structures that impose modest but meaningful limits on the capacity of outside actors such as the President to direct policy. These structures include provisions tenuring members of multi-member boards like the Federal Reserve Board and authorizing the President to remove them only for cause.

Consistent with the original public understanding of the Constitution, the U.S. has relied on central-bank independence since

---

[5] *See* Letter from Sarah M. Harris to Hon. Richard J. Durbin at p. 2 (Feb. 12, 2025), https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxboava/2025.02.1 2-OUT-Durbin-530D.pdf.

the Federal Reserve's inception in 1913. Any judicial intervention to redress supposed constitutional deficiencies in this design would not only upend longstanding historical practice and settled legal understandings but also put the judiciary in the position of usurping legislative prerogatives. Congress delegated extraordinary power to the Board to control the money supply on the understanding that these powers would *not* be subject to presidential direction. Moreover, as further explained below, there is no way to distinguish the Board from other agencies or to bifurcate its independence that would not irreparably harm that legislative scheme by undermining the Fed's ability to credibly commit to price stability over the long term.

### III.  ARGUMENT

Stability and predictability are core aspects of the rule of law.[6] The Framers were particularly concerned with stable administration and understood the Constitution as empowering Congress to design government bodies in ways that facilitate policy continuity. Accordingly, the U.S. has long relied on tenured officers, including independent

---

[6] *See generally* Thomas W. Merrill, *The Essential Meaning of the Rule of Law*, 17 J. OF LAW, ECON. & POL. 673 (2022).

judges and administrators, to formulate law in ways that people can rely on to persist over time. Drawing on this tradition, Congress created the Federal Reserve in 1913 on the understanding that the organization's insulation from day-to-day presidential direction would enable it to exercise its vast powers in ways conducive to long-term price stability. Modern economic research has borne out the wisdom of that design.

## A.    Central bank independence is an essential component of monetary policy and long-term economic growth

The economy's long-term health requires a central bank with a measure of independence from executive interference. The problem may be simply stated. Modern economies depend on long-term investments, and the level of long-term investment is tied to expectations that prices will remain stable.[7] When price stability is lost, long-term investment becomes more expensive, growth slows—and those adverse effects are hard to reverse. Deflationary spirals can be similarly destructive.

---

[7] European Central Bank, *Benefits of Price Stability*, https://www.ecb.europa.eu/mopo/intro/benefits/html/index.en.html#:~:te xt=When%20inflation%20is%20low%2C%20stable,turn%20creating%20 jobs%20and%20prosperity.

Monetary instability has famously contributed to democratic erosion and collapse around the world.[8]

The central goal of monetary policy is to facilitate the expansion of the money supply at a rate that lowers the cost of investment and maximizes long-term economic growth. It has long been recognized that achieving this goal requires careful institutional design, with officials insulated from short-term pressures that might undermine confidence that the central bank will strike the necessary balance. Indeed, to generate the expectations that monetary policy will be appropriate over the long term, nations have long relied on institutions independent from close executive control. This innovation dates to the Bank of England Act in 1694, which created an independent corporation to expand the money supply, arguably launching modern financial capitalism and the industrial revolution.[9]

---

[8] *See generally* J. BRADFORD DELONG, SLOUCHING TOWARDS UTOPIA: AN ECONOMIC HISTORY OF THE TWENTIETH CENTURY (2022).

[9] *See* MORGAN RICKS, GANESH SITARAMAN, SHELLEY WELTON & LEV MENAND, NETWORKS, PLATFORMS, AND UTILITIES: LAW AND POLICY 819–20 (2022); GEOFFREY M. HODGSON, THE WEALTH OF A NATION: INSTITUTIONAL FOUNDATIONS OF ENGLISH CAPITALISM (2023).

2885369

Created in 1913, the Federal Reserve System is a complex structure that ensures independence from direct political interference. The system includes the Federal Open Market Committee (FOMC), which regulates the money supply through a variety of policy tools. A majority of the FOMC (seven members) are members of the Fed's Board of Governors, whom the President appoints to staggered 14-year terms and whom he can remove only "for cause."[10] Five members of the FOMC are presidents of regional Federal Reserve Banks who are appointed to their position by the boards of directors of their regional banks, subject to the approval of the Board of Governors, which may also "suspend or remove any officer or director of any Federal Reserve bank, the cause of such removal to be forthwith communicate in writing."[11]

### 1.    Central-bank independence is the solution to what economists call "the time-inconsistency problem."

Recent decades have seen the rise of an entire economic literature on "central-bank independence," or CBI, demonstrating the relationship

---

[10] 12 U.S. Code § 242.

[11] 12 U.S. Code § 301; *see also id.*, 248(f). For an excellent description of the Fed's structure, *see* THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES 6–13 (2020), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf [hereinafter *Fed Explained*].

between independence and a healthy economy. In this literature, CBI is widely understood to be the antidote to a dilemma that economists have dubbed the "time-inconsistency problem." That problem arises from the fact that central-bank policies operate over an extended time frame, but a non-independent central bank can face pressures to quickly stimulate the economy for political reasons.[12]

To put it in more straightforward terms: There are times when a political leader seeking re-election will prioritize short-term economic activity over long-term price stability. A president may, for example, want unemployment to go down and economic activity to increase in the run-up to voting. More accommodative monetary policy can achieve those effects but also will increase the risk of higher levels of inflation in the future.

The cure for the time-inconsistency problem is to lengthen the decision-making horizon of central bankers by shielding them from certain forms of outside pressure. Research, theory, and evidence all confirm that a central bank's ability to control inflation hinges on its

---

[12] *See* Christopher Crowe & Ellen E. Meade, *The Evolution of Central Bank Governance around the World*, 21 J. ECON. PERSPECTIVES 69 (2007).

ability to formulate and implement monetary policy over reasonable
time frames without political interference. Consequently, nearly all
advanced economies and many developing countries now have
independent central banks that set monetary policy without being
subject to direct political control.[13] Empirically, greater regulatory and
supervisory independence is associated with improved financial
stability.[14]

    This is not just an abstract theory; nor is it partisan. Economists
have developed a robust literature showing that lower levels of central-

---

[13] *See generally* Alex Cukierman, Steven B. Webb & Bilin Neyapti,
*Measuring the Independence of Central Banks and Its Effect on Policy
Outcomes*, 6 WORLD BANK ECON. REV. 353, 375–76 (1992) (concluding
that a central bank's "legal independence is systematically and
inversely related to inflation in industrial . . . countries"); Ana Carolina
Garriga & Cesar M. Rodriguez, *Central Bank Independence and
Inflation Volatility in Developing Countries*, 78 ECON. ANALYSIS 1320,
1320 (2023) (finding that CBI not only "has been linked with lower
levels of inflation in developed and developing countries" but also is
"directly and unconditionally associated with . . . reduction of [inflation]
volatility," defined as "the prospect that the market's psychology
switches abruptly from fears of inflation to concerns about deflation,
and back again").

[14] *See* Nicolò Fraccaroli, Rhiannon Sowerbutts & Andrew Whitworth,
*Does Regulatory and Supervisory Independence Affect Financial
Stability?*, 170 J. BANKING & FIN. 107318, at p. 2 (2025).

11

bank independence is correlated with higher levels of inflation.[15] Experience in the United States has borne out these concerns.[16]

The correlation between CBI and low inflation exists "only in the presence of multiple constitutional checks and balances."[17] CBI does not imply lack of accountability, but does require some degree of insulation from day-to-day direct control by politicians. Indeed, as economists have shown in formal models and empirical studies, public belief in the Fed's independence from political forces is crucial to the Fed's effectiveness in preventing high levels of inflation. "[I]f the public *believes* that the central bank is free from interference and that the law [governing the bank] is unlikely to change swiftly and without debate, it will also lower inflationary expectations, leading to price stability above and beyond

---

[15] See n.10, *supra*.

[16] Burton A. Abrams, *How Richard Nixon Pressured Arthur Burns: Evidence from the Nixon Tapes*, 20 J. ECON. PERSPECTIVES 177, 178 (2006) [hereinafter *Nixon Pressure*]; *see also* Catherine L. Mann, The Great Moderation 20 Years On—and Beyond, Address to the Annual Conference of the Society of Professional Economists (Nov. 14, 2024), https://www.bankofengland.co.uk/speech/2024/november/catherine-l-mann-society-of-professional-economists-annual-conference.

[17] Cristina Bodea & Raymond Hicks, *Price Stability and Central Bank Independence: Discipline, Credibility, and Democratic Institutions*, 69 INT'L ORGS. 35, 37 (2015) [hereinafter *Stability and Independence*].

the control of the money supply."[18] As a result, doubts about the constitutional viability of the design and independence of the Federal Reserve may not only roil markets but trigger knock-on effects that are hard to predict and that may prove hard to contain. Concerns (warranted or unwarranted) that the Fed's operations could be subject to interference by other executive-branch officials could undermine the Fed's credibility, creating a heightened risk of financial instability and persistently higher levels of inflation.[19]

Far from jeopardizing democratic accountability, this limited form of insulation enables democracies to adopt widely agreed-upon policies, like price stability. "Delegation of monetary policy to an independent central bank in democracies allows the bank to actually behave in a conservative fashion that is reflected directly in lower rates of money supply growth [or other restrictive policies]. That is, the central bank can increase interest rates or target the exchange rate or money supply to ensure, most prominently, price stability, regardless of short-term

---

[18] *Id.* at 37.

[19] *See generally* Alberto Alesina & Lawrence H. Summers, *Central Bank Independence and Macroeconomic Performance: Some Comparative Evidence*, 25 J. MONEY, CREDIT & BANKING 151 (1993).

government pressure."[20] CBI therefore promotes democratic values by allowing the government to create the conditions that allow economies to thrive and individuals living in those economies to exercise meaningful choice in their lives.

CBI is at least as important here, in the world's largest economy, as it is in any other nation. An infamous case of CBI breakdown in this country involved President Nixon's pressuring of Fed Chairman Arthur Burns to pursue an expansionary monetary policy in the run-up to the 1972 presidential election. That policy helped Nixon get reelected, but it also "helped to trigger an extremely costly inflationary boom-bust cycle" that took a decade to resolve.[21]

In short, CBI is critical to the economy and depends on building and maintaining democratic checks and balances that insulate the central bank from inappropriate forms of political influence. Any hint that the United States is abandoning its commitment to CBI could shake confidence in the American economy.

---

[20] *Stability and Independence* at 37.

[21] *Nixon Pressure* at 187.

**2.    Maintaining the credibility of Fed independence is crucial to containing systemic banking risks.**

Protecting central-bank officials from the threat of immediate removal because of policy differences is also critical to combatting moral hazard[22] and helping to contain systemic banking risks. Congress has sought to control those risks by enacting a system of checks and balances designed to control the immediate impulse to "bail out" a failing financial institution in response to political pressure to avoid the pain of an institution's default and to curb losses to uninsured depositors.

Fed independence plays an integral role in this system of checks and balances. In the "resolution" of a failing bank, the FDIC protects insured depositors but is otherwise mandated to resolve the bank with the "least possible cost to the deposit insurance fund." 12 U.S.C. § 1823(c)(4). This may mean imposing losses on sophisticated creditors who receive higher yields for bearing greater risk and who are presumed to have the capacity to monitor the bank's risk-taking.

---

[22] "Moral hazard" refers to the extra risk that people and entities take on because they believe that they are insured against resulting losses.

2885369

There will always be intense pressure to protect those sophisticated creditors in order to avoid local economic fallout or political pushback. Yet to make such bailouts commonplace would erode the discipline on which banking-system stability depends. In that event, we would see more risk-taking and more bailouts.

To avoid this, Congress devised a scheme that critically relies on the independence of multiple regulators—including the Fed. Under that scheme—known as "the systemic-risk exception"—the FDIC can depart from the "least possible cost" framework, but only after the relevant agencies make an "emergency determination" that such help is necessary in order to avoid "serious adverse effects on economic conditions or financial stability." 12 U.S.C. § 1823(c)(4). Invoking the systemic-risk exception requires not only a determination by the Secretary of the Treasury but also a supermajority vote of the Board of the FDIC *and* of the Governors of the Federal Reserve. 12 U.S.C. § 1823(c)(4)(G).

The point is this: Protecting against excessive bailouts, shielding the "least possible cost" scheme from erosion, and resisting political pressure all depend on one thing: the credible independence of the

16

regulatory agencies that have to sign off on any invocation of the systemic-risk exception—namely, the FDIC and the Fed. But that independence would be shattered, and Congress's careful cabining of the systemic-risk exception would collapse into short-term considerations, if the President could remove the board members of those agencies at will. The consequence would be more risk-taking and more ongoing threats to financial stability.[23]

---

[23] Similarly, Congress created a "triple key" approach for invoking the "Orderly Liquidation Authority" in the Dodd Frank Act of 2010. *See* Dodd-Frank Act § 203(a), 12 U.S.C. § 5383(a). Triggering "Orderly Liquidation Authority" ("OLA") moves a failing financial firm into a special proceeding that is likely to reduce creditor losses through use of Treasury resources. The alternative would be a bankruptcy proceeding. Before triggering the special proceeding, the Secretary of the Treasury needs to obtain the agreement of a supermajority of the Board of Governors of the Federal Reserve and of either the FDIC Board (in most cases) or the Securities Exchange Commission (in the case of a securities firm). In short, to minimize politicization of the OLA decision, Congress required concurrence by two independent financial regulatory agencies. If board members could be removed without cause, the agencies' independence would collapse, and market participants could foresee that political pressure will substitute for sound financial management. This, too, would produce more risk-taking and thus an on-going threat to financial stability.

**B.    The President's proposal to limit Fed independence to the Fed's monetary functions is unworkable.**

The President recently issued an Executive Order ("EO")[24] rejecting the concept of independent agencies while carving out a narrow exception for the Fed's independence "in its conduct of monetary policy."[25] The EO purports to eliminate Fed independence only as to "its supervision and regulation of financial institutions."[26] But the proposed dichotomy is unworkable.

To begin with, Fed independence is an all-or-nothing proposition because CBI is a system of interdependent protections. Withdrawing even one critical element can bring that system crashing down. Two

---

[24] "Ensuring Accountability for All Agencies," Exec. Order No. 14,215, 90 FED. REG. 10,447 (Feb. 24, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-24/pdf/2025-03063.pdf [hereinafter "EO"]. Among other things, the EO (1) suggests that independent agencies violate the constitutional separation of powers, (2) announces that the Administration's policy is to "ensure Presidential supervision and control of the *entire* executive branch," and (3) requires "all executive departments and agencies, including so-called independent agencies," to submit all proposed and final "significant regulatory actions" to the White House Office of Information and Regulatory Affairs before publication in the *Federal Register*. EO § 1 at 10,447.

[25] *Id.*, § 2(b) at 10,477; *see also id.*, § 3(a) at 10,478.

[26] EO § 2(b) at 10,447.

18

elements are especially important: the term tenure of the Governors, which can be abrogated only for cause; and the term tenure of the Chair, which cannot be abrogated—that is, the Chair cannot be demoted, only removed for cause from the Board entirely. If either of these critical foundations is weakened, Fed independence collapses.[27] For example: The Fed Chair enjoys extensive power over policy. If the Chair can be demoted, the President will have gained a tool that functionally ends Fed independence; markets are likely to react; and any other CBI protections may be rendered illusory.

Because Fed independence is an all-or-nothing proposition, adopting the Government's split-the-baby approach to Fed independence inevitably would shatter the credibility that the Fed

---

[27] *See* Tobias Adrian, Ashraf Khan & Lev Menand, *A New Measure of Central Bank Independence*, IMF WORKING PAPER WP/24/35 at p. 13 (Feb. 2024), https://www.imf.org/en/Publications/WP/Issues/2024/02/23/A-New-Measure-of-Central-Bank-Independence-545270 (discussing interdependence of CBI protections—e.g., if a central bank's chief can be removed at will by the executive, the chief's term of office "does not matter much at all," and if the chief's term of office is one year, strong removal protections are "not particularly valuable"—and proposing a new measure of CBI that "do[es] not credit central bank laws that appear to offer central bank officials decisional independence in some ways but contain loopholes that render the independence generated by those features illusory.").

19

needs to conduct monetary policy effectively as well as to fulfill its functions. Two specific problems would arise.

First, markets would swiftly realize that the President can easily circumvent the Fed's remaining zone of purported independence. If the President could remove Fed officials (or demote the Fed Chair) without cause except "in [the Fed's] conduct of monetary policy," the President would have an enormous incentive to identify a *pretext* for removal or demotion—i.e., a claim that, *outside* the realm of monetary policy, the Fed isn't obeying his directives.

For example, a President displeased by the Fed's refusal to loosen *monetary policy* in the run-up to an election might exert control by demoting the Fed Chair on the pretextual ground that the Fed just isn't *deregulating banks* quickly enough. And once that happens, the Fed's credibility as an inflation-fighter is shot. Indeed, the President need not actually terminate or demote anyone for the Fed's inflation-fighting credibility to take a serious hit—it's enough that market participants believe that he now *could* do so.

The second problem with the EO's split-the-baby approach is that the Fed's various functions don't fit neatly into the EO's two buckets. As

20

legendary former Fed Chair Paul Volcker once put it, "[t]he borderline between monetary, regulatory, and supervisory powers is sometimes indistinguishable."[28]

Most glaringly, the Federal Reserve, when conducting monetary policy, promulgates legislative rules that are binding on banks. For example, under its current implementation framework, when the Fed changes its target for the federal funds rate—the rate at which depository institutions lend to each other[29]—it effects this adjustment through rulemaking. Specifically, it amends Regulation D, the rule that sets reserve requirements for depository institutions and the rate of interest paid on balances maintained at the Federal Reserve banks.[30]

---

[28] To Modernize the Federal Reserve System: Hearing on H.R. 7001 Before the Subcomm. on Domestic Monetary Pol'y of the H. Comm. on Banking, Fin. & Urb. Affs., 96th Cong. 60 (1980) (statement of Hon. Paul A. Volcker, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.). Chairman Volcker pointed out that "information which the [Federal Reserve] System obtains in the course of exercising its supervisory functions provides key insights into such matters as the state of liquidity and viability of the Nation's banking institutions, indispensable elements in the formulation and implementation of monetary policy." *Id.*

[29] *Fed Explained* at 12.

[30] The Fed set the latter rate at 4.4% through an interim final rule on December 19, 2024. 90 Fed. Reg. 3615. More generally, bank balance-sheet regulation and supervision significantly implicate monetary

21

More broadly, the Fed also plays a critical role as a "lender of last resort" to banks and nonbanks during periods of financial distress—and that role overlaps with its role in preserving price stability. Former Federal Reserve Chair and Great Depression expert Ben Bernanke has described collateralized lending as "[t]he most important tool that central banks (like the Fed) have for fighting financial panics."[31] It enables the Federal Reserve to deter bank runs, quell the need for fire sales, smooth market functioning, and otherwise promote credit creation.

The primary reason that central banks around the world are (and have long been) tasked with serving as lenders of last resort is that central banks alone have the capacity to create unlimited money instruments. The magnitude of the Great Financial Crisis of 2008 and the financial ramifications of the COVID-19 pandemic would have been far greater in the absence of the Federal Reserve's willingness and

---

policy. A restrictive regulatory and supervisory framework fosters monetary contraction while a permissive regime drives credit expansion and inflation. *See* Lev Menand, *The Logic and Limits of the Federal Reserve Act*, 40 YALE J. ON REG. 197, 240–50 (2023).

[31] Ben S. Bernanke, Fed Emergency Lending, Brookings (Dec. 3, 2015), https://www.brookings.edu/articles/fed-emergency-lending/.

2885369

capacity to use this tool as needed to help contain the impact of the economic shocks. These containment efforts did not wholly prevent, but helped significantly to mitigate, the impact on the real economy— including its capacity to grow and to provide employment opportunities.

**C.    There is no principled way to overturn or more narrowly construe *Humphrey's Executor* without damaging Fed independence.**

The Government has asserted here and in other recent litigation that, even if *Humphrey's Executor* is not overruled, the "exception" that *Humphrey's Executor* created to the rule of unrestricted presidential removal power "does not apply to multimember agencies that exercise substantial executive power, for instance by promulgating binding rules or issuing final decisions in administrative adjudications."[32]

That reading of *Humphrey's Executor* would spell doom for Fed independence. The Fed is a "multimember agenc[y]" that promulgates "binding rules," including (and importantly) in the routine conduct of monetary policy. *See* 12 C.F.R. §§ 200–299. If the President could

---

[32] Application to Vacate the Order Issued by the United States District Court for the District of Columbia and Request for an Administrative Stay at p. 17 n.5, *Dellinger v. Bessent*, No. 24A790 (U.S. 2025); *see also* Stay Motion at 2–3.

superintend all binding rulemaking, then he also necessarily could superintend interest-rate policy, given that the Fed currently relies on rulemaking to implement its interest-rate policy. Moreover, since the same officials oversee both monetary policy and banking and financial stability, if the latter is subject to executive control, then as a practical matter the former will be as well.

Overruling *Humphrey's Executor* would also destroy the Fed's independence. It is difficult, if not impossible, to identify a legally cognizable structural difference between the Fed—a multimember commission designed by Congress on the model of the Interstate Commerce Commission—and the Federal Trade Commission, the multimember commission that was created the following year (on the same model) and that was the subject of *Humphrey's Executor*. (The Fed lacks a partisan-balance requirement, although presumably that absence would cut against, not in favor, of sustaining its independence.)

Courts likewise jeopardize the Fed's policy credibility by characterizing it as "a special arrangement sanctioned by history," as Justice Alito proposed in a dissent last term.[33] The problem is that

---

[33] *Consumer Fin. Prot. Bureau* v. *Cmty. Fin. Servs. Ass'n of Am., Ltd.*,

market participants may not believe that such a distinction will hold—

and that skepticism will undermine the Fed's policy credibility. Given

the erosion of agency independence over the past decade, market

participants would have reason to doubt the longevity of a Fed carveout.

The President, in the coming years, might challenge the carveout and

seek to abrogate any remaining Fed independence (as the President is

now doing for other independent agencies) and observers could conclude

that such a challenge may succeed on grounds to be articulated by

future courts.[34] This perception alone may be enough to immediately

---

601 U.S. 416, 467 n.16 (2024) (Alito, J., dissenting). Justice Alito argued that the Fed "should not be seen as a model for other Government bodies" because it "is a unique institution with a unique historical background" with a structure "adopted in the Federal Reserve Act of 1913 [that] represented an intensely-bargained compromise between two insistent and influential camps: those who wanted a largely private system, and those who favored a Government-controlled national bank." *See also Seila Law*, 591 U.S. at 222 n.8 (noting, without endorsing, the argument that the Fed may "claim a special historical status."); *PHH Corp. v. Consumer Fin. Protection. Bureau*, 881 F.3d 75, 192 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (referring to the Fed Chair as "an historical anomaly . . . due to the Federal Reserve's special functions in setting monetary policy and stabilizing the financial markets").

[34] For example, were the Supreme Court to overturn *Humphrey's Executor* with a putative Fed carveout, the market might nonetheless anticipate future judicial acquiescence in an assertion of Presidential control over the Fed by defining down "cause" to the point where it

damage the ability of the United States to sustain price stability over
time, resulting in near-term and potentially irreversible harm to
economic growth and vitality.

Moreover, a carve-out based on the Fed's supposedly distinctive
history would rest on dubious historiography.[35] Recent scholarship has
shown that the first Congress, many of whose members helped draft the
Constitution, saw no constitutional impediment to empowering
commissions, at least some of whose members could ***not*** be terminated
at will by the President.[36] For example, the first Congress created a

---

becomes an illusory obstacle to presidential direction.

[35] Contemporary arguments about the President's inherent power over
government officials have become unusually unmoored from original
understandings of Constitutional text and structure. *See* Jane Manners
& Lev Menand, *The Three Permissions: Presidential Removal and the
Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1 (2021).

[36] Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An
Originalist Argument for Independent Agencies*, 96 NOTRE DAME L. REV.
1, 27–28 (2020) [hereinafter *Originalist Argument*]. Moreover, the
Federalist Papers treated the Appointments Clause—which vests
authority to appoint principal officers jointly in the President and
Senate—as requiring *both* the President and Senate to agree to
removals unless otherwise specified by Congress. *The Federalist* No. 77
("The Appointing Power Continued and Other Powers of the Executive
Considered") explained:

> It has been mentioned as one of the advantages to
> be expected from the co-operation of the Senate,
> in the business of appointments, that it would

Sinking Fund Commission to repay the national debt through open-market purchases of U.S. securities.[37] Its members included Alexander Hamilton, Thomas Jefferson, John Jay, and Edmund Randolph; and the President had no power to replace or remove several of them.[38] Likewise, Hamilton's plan for the first National Bank provided for "removal of a Director by the Stockholders"—but not by the President.[39]

---

contribute to the stability of the administration. ***The consent of that body would be necessary to displace as well as to appoint.*** A change of the Chief Magistrate, therefore, would not occasion so violent or so general a revolution in the officers of the government as might be expected, if he were the sole disposer of offices. . . . Those who can best estimate the value of a steady administration, will be most disposed to prize a provision which connects the official existence of public men with the approbation ***or disapprobation*** of that body which, from the greater permanency of its own composition, will in all probability be less subject to inconstancy.

[37] *Originalist Argument* at 34.

[38] *Id.* at 3–4.

[39] Alexander Hamilton, *Final Version of the Second Report on the Further Provision Necessary for Establishing Public Credit (Report on a National Bank)*, Nat'l Archives Founders Online, https://founders.archives.gov/documents/Hamilton/01-07-02-0229-0003#ARHN-01-07-02-0229-0003-fn-0152-ptr.

27

## IV.   CONCLUSION

For all the reasons stated above, the Court's order on the Government's emergency stay motion should avoid any statement that could be construed as undermining the carefully calibrated institutional design of the Federal Reserve, which tenures members of the Federal Reserve Board and prevents the President from removing them (or from demoting the Chair of the Board) except for cause.

Respectfully submitted,

DATED:  March 11, 2025          */s/ Steven A. Hirsch*
                                Steven A. Hirsch
                                Keker, Van Nest & Peters LLP
                                *Counsel for Amici Curiae*

28

2885369

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(d), because this brief contains 5,433 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.


DATED:  March 11, 2025          */s/ Steven A. Hirsch*
                                Steven A. Hirsch
                                Keker, Van Nest & Peters LLP
                                *Counsel for Amici Curiae*

2885369

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system on March 10, 2025, which will send notice of such filing to all counsel who are CM/ECF registered users.

DATED:  March 11, 2025         */s/ Steven A. Hirsch*
                              Steven A. Hirsch
                              Keker, Van Nest & Peters LLP
                              *Counsel for Amici Curiae*

2885369