No. _____, Original

## In The
## Supreme Court of the United States

---

Martin Akerman, Pro Se,
Plaintiff,

v.

Arizona; Arkansas; and Nevada,
ex rel. General Daniel R. Hokanson;
Chief of the National Guard Bureau, et al,
Defendant(s).

---

## BRIEF IN SUPPORT OF
## MOTION FOR LEAVE TO FILE
## A BILL OF COMPLAINT

---

MARTIN AKERMAN, Petitioner, Pro Se
2001 North Adams Street, Unit 440
Arlington, VA 22201
(202) 656 - 5601

# TABLE OF CONTENTS PAGE 1

Page

ORIGINAL BUT NOT EXCLUSIVE JURISDICTION.................. 1

Plaintiff, On Behalf of Himself and as Parens Patriae........ 2

Defendant Nevada:............................................................ 3

Defendant Arizona:........................................................... 3

Defendant Arkansas:......................................................... 3

Third-Party Standing Under Parens Patriae................... 4

Administrative and Judicial Exhaustion............................. 5

SCOPE OF CLAIMS BEFORE THE COURT............................. 6

Particularized Injury in Need of Urgent Remedy................ 7

Justiciability: Actual Controversy for Court to Resolve..... 8

1. Case or Controversy:.................................................... 8

2. Article III Standing:..................................................... 9

3. Ripeness:..................................................................... 10

4. Mootness:.................................................................... 10

5. Legal and Constitutional Questions:.......................... 11

6. Abuse of Sovereign Immunity:.................................... 11

# TABLE OF CONTENTS PAGE 2

DISCRETIONARY EXERCISE
OF ORIGINAL JURISDICTION.....................................................12

    Significant National Interest................................................12

    No Other Adequate Forum....................................................13

    Gravity Akin to Casus Belli.................................................14

        1. The Suspension Act of 1861:.......................................14

        2. Japanese American Internment (1942-1945):...........15

        3. Ohio v. Wyandotte Chemicals Corp. (1971):.............15

        4. Loving v. Virginia (1967):...........................................16

FACTUAL ENHANCEMENTS
TO MEET PLEADING STANDARDS.........................................17

    Overview of Federal Pleading Standards...........................17

    Ongoing Attempts to Cover Up
    and Silence the Plaintiff.......................................................18

        On May 27, 2024, the Office of Personnel Management
        provided evidence, as part of an ongoing disability
        retirement appeal, that on October 27, 2023, the
        Department of the Army lied about the status of the
        plaintiff, claiming that he was merely on
        "administrative leave," 5 U.S.C. § 6329a, see Supreme
        Court Docket 23-7127, on a petition for writ of habeas
        corpus, under 28 U.S.C. §§ 2241(c)(1) and 2241(c)(2),
        Appendix D.....................................................................18

## TABLE OF CONTENTS PAGE 3

Res Ipsa Loquitur Evidence of Foul Play........................... 19

Colonel Bret Bassler of the Arkansas Army National Guard was directly involved in an incident on February 14, 2022, where Akerman was illegally detained. This action not only contravened 5 U.S.C. § 6329b but initiated a chain of events that denied Akerman critical statutory procedulral safeguards, as exhausted in MSPB case DC-1221-22-0459-W-1, Appendix E...................................................... 19

Agency Response in MSPB Cases
DC-1221-22-0257-W-1 and DC-0752-22-0376-I-1.................. 19

On May 20, 2022, the National Guard Bureau denied access to information to the EEO Counselor, the Office of Special Counsel, the Department of Labor, and the Office of Personnel Management, responding to Senator Kaine with a dismissive letter that begins by discrediting Akerman's position in the agency, pointing to their jurisdictional response in two cases before the MSPB, DC-1221-22-0257-W-1 and DC-0752-22-0376-I-1, now exhausted and before this Court in this compllaint, Appendix F. Responses can be found in Appendix G........................................................ 19

Illegal Use of State Sovereignty.......................................... 20

On April 24, 2022, General Garduno of the Nevada Air National Guard confirmed a suspension decision against Akerman, which was executed without the due process protections required under 5 U.S.C. § 7513, as elaborated by the agency in response to exhausted MSPB case DC-0752-22-0376-I-1, see Appendix G....... 20

# TABLE OF CONTENTS PAGE 4

Related Case Under 50 U.S.C. § 3341(j)(8)..........................21

On February 8, 2022, Brigadier General Joseph
Baldwin of the Arizona Army National Guard, acting
under federal orders, played a critical role in an
operation that led to the alleged suspension of Martin
Akerman's access. This action was authorized through
delegated authority to Mr. Mark Berglund of the Army
National Guard................................................................21

Retaliation Against Whistleblowing.....................................22

Use of State Officers
to Block Jurisdiction Over Claims.......................................22

Violation of the Posse Comitatus Act..................................23

Impact and Precedent for Military Overreach.............23

Lack of Adequate Safeguards and Oversight...............24

Expanded Analysis on
Age Discrimination Claims Under the ADEA....................24

1. Legal Framework and Recent Developments:..........24

2. Position and Classification Impact:...........................25

3. Analysis of Discriminatory Treatment:.....................26

4. Forced Actions by State Military Officers:...............27

Suppression of Freedom of Speech....................................28

# TABLE OF CONTENTS PAGE 5

Supporting Facts...................................................................30

Throughout the decision-making process,
administrative appeals, and judicial proceedings,
Akerman was not provided with someone who had the
authority to overturn and remedy the due process
violations. This lack of oversight and accountability
further contravenes the procedural requirements of 5
U.S.C. § 7513 and/or 5 U.S.C. § 7532.............................32

REASONS TO GRANT LEAVE TO FILE
A BILL OF COMPLAINT..............................................................33

Violations of Federal Statutes
and Constitutional Protections...........................................33

Unique Intersection of State and Federal Jurisdiction.....34

Exhaustion of Administrative and Judicial Remedies......34

Grave National Importance
and Lack of Alternative Forums.........................................35

Setting Precedents and Ensuring Justice...........................35

Systemic Issues
Affecting Governmental Accountability.............................36

Clarification of Federal Authority
and State Compliance..........................................................36

Ongoing and Irreparable Harm to the Plaintiff.................37

CONCLUSION...........................................................................37

# TABLE OF AUTHORITIES PAGE 1

CONSTITUTIONAL PROVISIONS                    Page

U.S. Const. art. III, § 2............. 1, 2, 8, 9, 10, 11, 22, 23, 27, 33, 37

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;–to all Cases affecting Ambassadors, other public Ministers and Consuls;–to all Cases of admiralty and maritime Jurisdiction;–to Controversies to which the United States shall be a Party;–to Controversies between two or more States;–between a State and Citizens of another State;–between Citizens of different States;–between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects. In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make. The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

# TABLE OF AUTHORITIES PAGE 2

CONSTITUTIONAL PROVISIONS (Continued)          Page

U.S. Const. amend. XIV, § 1.................. 2, 3, 21, 23, 27, 29, 33, 37

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

U.S. Const. art. II, § 2, cl. 1.................................................3, 23, 34

"The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment."

# TABLE OF AUTHORITIES PAGE 3

CONSTITUTIONAL PROVISIONS (Continued)        Page(s)

U.S. Const. amend. VIII.................................................4, 7, 20, 23

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

U.S. Const. amend. V...............5, 20, 21, 23, 24, 25, 26, 27, 28, 32

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

U.S. Const. amend. I................................ 13, 18, 20, 28, 29, 33, 37

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

# TABLE OF AUTHORITIES PAGE 4

CASES                                                                 Page(s)

*Ohio v. Wyandotte Chemicals Corp.,*
401 U.S. 493 (1971)......................................................... 1, 12, 15, 34

*Texas v. New Mexico,*
462 U.S. 554 (1983)................................................................... 1

*Mississippi v. Louisiana,*
506 U.S. 73 (1992)................................................................... 1

*Seminole Tribe of Florida v. Florida,*
517 U.S. 44 (1996)................................................................... 2

*Fitzpatrick v. Bitzer,*
427 U.S. 445 (1976)................................................................. 2

*Hawaii v. Standard Oil Co.,*
405 U.S. 251 (1972)................................................................. 4

*Powers v. Ohio,*
499 U.S. 400 (1991)................................................................. 4

*Babb v. Wilkie,*
140 S. Ct. 1168 (2020)................................................. 5, 24, 26, 27

*Ikossi v. Dep't of Navy,*
516 F.3d 1037 (D.C. Cir. 2008)................................................. 6

*Valentine-Johnson v. Roche,*
386 F.3d 800 (6th Cir. 2004)..................................................... 6

*Kerr v. Jewell,*
836 F.3d 1048 (9th Cir. 2016)................................................... 6

*Flast v. Cohen,*
392 U.S. 83 (1968)................................................................... 8

## TABLE OF AUTHORITIES PAGE 5

CASES (Continued)                                      Page(s)

*Aetna Life Ins. Co. v. Haworth,*
300 U.S. 227 (1937)............................................................ 8

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)........................................................... 8

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803)................................................ 9, 11

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967)........................................................... 10

*United States Parole Comm'n v. Geraghty,*
445 U.S. 388 (1980)........................................................... 10

*Loving v. Virginia,*
388 U.S. 1 (1967)........................................................... 11, 16

*Korematsu v. United States,*
323 U.S. 214 (1944)........................................................... 15

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........................................................... 17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................... 17

*Swierkiewicz v. Sorema N.A.,*
534 U.S. 506 (2002)........................................................... 17

# TABLE OF AUTHORITIES PAGE 6

| STATUTES AND REGULATIONS | Page(s) |
|---|---|
| 28 U.S.C. § 1251(b) | 1, 8, 38 |
| 44 U.S.C. § 3520 | 2 |
| 5 U.S.C. § 7513 | 3, 20, 32 |
| 5 U.S.C. § 6329b | 3, 19 |
| 42 U.S.C. § 2000dd(d) | 4, 7 |
| 18 U.S.C. § 1385 | 4, 12, 14, 22, 23, 24 |
| 29 U.S.C. § 633a | 4, 5, 12, 13, 24, 26, 33 |
| 5 U.S.C. § 7702(e)(1)(B) | 6, 7 |
| 28 U.S.C. § 2241(c)(1) | 18 |
| 28 U.S.C. § 2241(c)(2) | 18 |
| 5 U.S.C. § 6329a | 18, 19 |
| 50 U.S.C. § 3341(j)(8) | 21 |
| 5 U.S.C. § 13105 | 25 |
| 42 U.S.C. § 2000e et seq | 13, 17, 26, 31, 33 |
| 42 U.S.C. § 12101 et seq | 13, 17, 26, 31, 33 |
| 5 U.S.C. § 7532 | 32 |

## TABLE OF AUTHORITIES PAGE 7

RELATED CASES                                    Page(s)

Supreme Court Application for a Stay 23A489:
DENIED on January 8, 2024..........................................................2

Supreme Court Petition for Writ of Certiorari 23-7072:
DENIED on June 10, 2024................................ 2, 5, 10, 11, 13, 34

Federal Circuit Case Number 2024-1913.................................. 21


DECISIONS BELOW

Fourth Circuit (Appendix B):
Consolidated cases 22-2066(L), 22-2147, and 22-2154...............5

United States District Court
for the Eastern District of Virginia,
Alexandria Division (Appendix C):
Case references 1:22-cv-00696 and 1:22-cv-01258......................5

Merit Systems Protection Board:
DC-0752-23-0376-I-1 (Appendix G):
Initial decision issued on August 10, 2022......................5, 19, 20


EXHAUSTED MSPB CASES MENTIONED

DC-1221-22-0257-W-1................................................................ 6, 19

DC-1221-22-0445-W-1..................................................................... 7

DC-1221-22-0459-W-1..................................................................... 7

## TABLE OF AUTHORITIES PAGE 8

APPENDICES                                          Page(s)

APPENDIX A (June 21, 2022):
Right to Sue from the EEOC for Age Discrimination......... 5, 1a

APPENDIX B (November 3, 2022):
District Court Dismissal With Prejudice,
on Jurisdictional Grounds,
see Supreme Court Certiorari Docket 23-7072,
REHEARING DENIED on June 10, 2024........................... 5, 10a

APPENDIX C (October 17, 2022):
EEOC Confirmation of Right to Sue for Mixed Claims.....5, 14a

APPENDIX D (October 27, 2023):
Evidence of Fraud and Racial Discrimination,
see Supreme Court Habeas Docket 23-7127,
REHEARING Scheduled for June 20, 2024...........18, 26, 31, 16a

APPENDIX E (February 15, 2022):
Memorandum from Arkansas Colonel Basler..................19, 17a

APPENDIX F (May 20, 2022):
Letter from Agency to Virginia Senator Tim Kaine......... 19, 19a

APPENDIX G (May 17, 2022):
Agency Response in DC-0752-22-0376-I-1................... 19, 20, 21a

1

## ORIGINAL BUT NOT EXCLUSIVE JURISDICTION

Pursuant to Article III, § 2 of the U.S. Constitution and 28 U.S.C. § 1251(b), the Supreme Court holds original but not exclusive jurisdiction in matters of grave national importance that typically involve the federal government and the states. This jurisdiction is invoked under two critical subsections pertinent to this case:

- **Subsection (b)(3):** Controversies Between the United States and a State: The involvement of state National Guard officers under federal command raises issues related to the Commander-in-Chief powers vested in the President by Article II, § 2, cl. 1 of the U.S. Constitution. The Supreme Court's jurisdiction over such cases is foundational for addressing federal issues that significantly impact governance. The lack of alternative forums underscores the necessity for Supreme Court intervention, as articulated in *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493, 497 (1971).

- **Subsection (b)(2):** Actions by a State Against Citizens of Another State: This case involves actions by Arizona, Arkansas, and Nevada against Martin Akerman, a Virginia resident, thereby invoking this subsection. The Court's original jurisdiction is crucial for resolving interstate conflicts that affect national legal principles, as demonstrated in cases like *Texas v. New Mexico*, 462 U.S. 554 (1983), and *Mississippi v. Louisiana*, 506 U.S. 73 (1992).

2

<u>Plaintiff, On Behalf of Himself and as Parens Patriae</u>

Martin Akerman, the tenured Chief Data Officer of the National Guard Bureau, appearing pro se, brings this action against the States of Arizona, Arkansas, and Nevada; General Daniel R. Hokanson, Chief of the National Guard Bureau; together with Lloyd J. Austin III, Secretary of the Department of Defense; Christine E. Wormuth, Secretary of the Army; Frank Kendall, Secretary of the Air Force; the Department of Defense; the Department of the Army; the Department of the Air Force; and the Defense Counterintelligence and Security Agency, as further elaborated in related Application for a Stay 23A489, DENIED on Jan 8, 2024, and related Petition for Writ of Certiorari 23-7072, DENIED on June 10, 2024. Pursuant to Article III, § 2 of the U.S. Constitution, the Supreme Court's original jurisdiction is established, enabling the Court to adjudicate cases of significant national importance involving state and federal entities.

Appointed under 44 U.S.C. § 3520, Akerman has a statutory duty to increase transparency within the National Guard and to report deficiencies to Congress, especially in situations that pose risks to the safety of citizens and soldiers who are often unable to protect themselves. The ratification of the U.S. Constitution implies that states consent to be sued by the federal government and other states, as established in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). Additionally, under the Fourteenth Amendment of the U.S. Constitution, states have consented to such suits, as confirmed in *Fitzpatrick v. Bitzer*, 427 U.S. 445.

3

### Defendant Nevada:

The actions of General Garduno of the Nevada Air National Guard on April 24, 2022, further illustrate the misuse of military authority across state lines under federal command. The procedural due process rights under the Fourteenth Amendment, as reinforced by 5 U.S.C. § 7513, were violated when General Garduno suspended Akerman without adhering to these constitutional protections.

### Defendant Arizona:

On February 8, 2022, Brigadier General Joseph Baldwin of the Arizona Army National Guard, while purportedly acting under federal orders, played a pivotal role in the alleged suspension of access action against Martin Akerman.

### Defendant Arkansas:

On February 14, 2022, Colonel Bret Bassler of the Arkansas Army National Guard played a direct role in the forcible removal of Akerman from his office. During this incident, Akerman was also deprived of his equipment, an action that directly violated 5 U.S.C. § 6329b. This event set off a chain of further denials of rights and benefits to which Akerman was entitled, including workers' compensation, Equal Employment Opportunity (EEO) counseling, intervention by the Office of Special Counsel, and other entitlements under federal tenure.

4

## Third-Party Standing Under Parens Patriae

Although *parens patriae* is typically used by states, the federal nature of the National Guard and the involvement of multiple states justify invoking this principle to highlight the broader implications of the case. See *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257 (1972).

Exceptions to the general rule of no third-party standing exist when a litigant can demonstrate a concrete injury, a close relationship with the third party, and a hindrance to the third party's ability to protect their own interests. See Powers v. Ohio, 499 U.S. 400, 411 (1991).

This case arises from serious allegations involving federal and state actions that have violated federal constitutional and statutory provisions, including but not limited to the improper application of state and federal power against a federal employee in violation of 42 U.S.C. § 2000dd(d), breaches of the Posse Comitatus Act, as codified under 18 U.S.C. § 1385, and violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633a(a).

5

<u>Administrative and Judicial Exhaustion</u>

The plaintiff received a right-to-sue notice from the Equal Employment Opportunity Commission (EEOC) on June 21, 2022, and subsequently, a 30-day notice of Constructive Dismissal on June 7, 2023, pursuant to the federal-sector provision of the ADEA, 29 U.S.C. § 633a(a), as interpreted in *Babb v. Wilkie*, 140 S. Ct. 1168, 1171 (2020), Appendix A.

Judicial exhaustion can be traced back to DENIED Petition for Writ of Certiorari 23-7072 to the U.S. Court of Appeals for the Fourth Circuit, on consolidated cases 22-2066(L), 22-2147, and 22-2154, that can be traced back to the United States District Court for the Eastern District of Virginia, Alexandria Division, under the case references 1:22-cv-00696 and 1:22-cv-01258, Appendix B.

Additionally, MSPB case DC-0752-23-0376-I-1, initiated on April 26, 2022, involved mixed claims concerning the illegal suspension. The case was considered exhausted upon issuance of the initial decision by the MSPB on August 10, 2022, a status confirmed by the EEOC on October 17, 2022, Appendix C.

6

## SCOPE OF CLAIMS BEFORE THE COURT

Legal precedents establish a crucial framework for transitioning administrative cases to civil litigation under 5 U.S.C. § 7702(e)(1)(B). Notably, in *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1042 (D.C. Cir. 2008), it was clarified that "section 7702(e)(1)(B) explicitly sanctions a civil action in the federal district courts once 120 days have passed without a final decision from the MSPB." This perspective is further reinforced by *Valentine-Johnson v. Roche*, 386 F.3d 800, 813 (6th Cir. 2004) and *Kerr v. Jewell*, 836 F.3d 1048, 1056 n.6 (9th Cir. 2016), which affirm that a district court can independently review claims if statutory timelines are not met, emphasizing that plaintiffs can escalate their grievances to federal courts following administrative inactions or delays, effectively asserting their legal and procedural rights.

In light of these precedents, the requirement to backdate the status of these cases to October 17, 2022, is necessary to align the procedural histories with judicial expectations and ensure consistent application of statutory requirements across related cases.

- **Case DC-1221-22-0257-W-1:** Initiated on February 28, 2022, this MSPB whistleblower claim was first exhausted through the Office of Special Counsel (OSC). Subsequent to the initiation, the initial decision was not rendered until November 18, 2022—well beyond the 120-day statutory requirement under 5 U.S.C. § 7702(e)(1)(B).

7

- **Case DC-1221-22-0445-W-1:** This case, having a parallel trajectory and originating on March 14, 2022, also experienced procedural delays with the initial MSPB decision issued on November 23, 2022. Exhaustion was achieved identically through the OSC by March 11, 2022. The elapsed time from case initiation to the decision far exceeded 120 days, reiterating the claimant's entitlement to seek recourse in federal district courts as per the provisions of 5 U.S.C. § 7702(e)(1)(B).

- **Case DC-1221-22-0459-W-1:** Commencing on June 10, 2022, with whistleblower claims processed through the OSC until May 5, 2023, the initial MSPB decision was provided on November 1, 2022. This scenario again demonstrates a clear passage of more than 120 days without final MSPB action from the date of initiation, thereby fulfilling the conditions for exhaustion required to facilitate a civil lawsuit.

### Particularized Injury in Need of Urgent Remedy

Akerman, a resident of Virginia, disabled and diagnosed with Post Traumatic Stress Disorder, continues to face disruption by one or more defendants in his efforts to secure disability retirement, in clear and present violation of 42 U.S.C. § 2000dd(d).

8

<u>Justiciability: Actual Controversy for Court to Resolve</u>

The Supreme Court's ability to exercise original jurisdiction, under 28 U.S.C. § 1251, is contingent upon the presence of a justiciable controversy. Article III, § 2, cl. 1 of the U.S. Constitution restricts federal court jurisdiction to genuine cases or controversies, emphasizing the need for a live, substantial dispute for judicial intervention. See *Flast v. Cohen*, 392 U.S. 83, 94-95 (1968). A justiciable controversy must involve a real and substantial dispute, not merely a hypothetical or abstract disagreement. As articulated in *Aetna Life Insurance Co. v. Haworth*, a controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests." 300 U.S. 227, 240-41 (1937). In this case, the allegations against the states and federal officials present a clear and concrete dispute that demands judicial intervention to resolve the significant federal issues at stake.

1.    **Case or Controversy:**

The "case or controversy" requirement is foundational to justiciability. Under Article III of the U.S. Constitution, federal judicial power is limited to actual "cases" and "controversies," necessitating (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

9

As Chief Justice Marshall explained in *Marbury v. Madison*, the judiciary's role is to resolve disputes involving individual rights, rather than to adjudicate political questions or matters constitutionally committed to the executive branch. See *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Here, the plaintiff has suffered concrete injuries through violations of his constitutional and statutory rights, establishing a legitimate case or controversy that merits judicial review.

## 2.     Article III Standing:

Standing is an essential component of the case-or-controversy requirement. It ensures that the parties have a sufficient stake in the dispute to justify judicial intervention. In this case, the plaintiff has demonstrated a concrete and particularized injury due to the tampering with his security clearance by Arizona, the detention by Arkansas and Nevada, and the resultant professional and personal harms.

The causal connection is clear, with the defendants' actions directly leading to the injury. Moreover, a favorable decision by the Court would likely redress the injury by restoring the plaintiff's rights and status.

10

### 3.    Ripeness:

The ripeness doctrine ensures that a dispute has matured into a live controversy fit for judicial resolution, preventing courts from entangling themselves in abstract disagreements. The Supreme Court evaluates ripeness by considering the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. See *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).

In this case, the issues are ripe for judicial determination as the plaintiff has exhausted all available administrative and judicial remedies and has suffered ongoing harm due to the defendants' actions. The controversy is not based on speculative future events but on current and continuing violations of the plaintiff's rights, vide Docket No. 23-7072.

### 4.    Mootness:

Mootness is another aspect of justiciability under Article III. It restricts federal courts to deciding live controversies where the parties have a continuing, legally cognizable interest. A case becomes moot if the issues are no longer live or the parties lack a legally cognizable interest in the outcome. See *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). This case is not moot, as the plaintiff continues to suffer from the alleged violations. The relief sought would address ongoing harms and prevent future violations, maintaining the case as a live controversy.

11

### 5.    Legal and Constitutional Questions:

The political question doctrine excludes from judicial review issues that are constitutionally committed to other branches of government. This doctrine was first articulated in Marbury v. Madison, where Chief Justice Marshall emphasized that courts should not decide political questions. See *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803).

The present case does not involve a political question but rather legal and constitutional issues regarding the misuse of military power and violations of federal laws and individual rights. These are precisely the types of disputes the judiciary is tasked with resolving.

### 6.    Abuse of Sovereign Immunity:

In this case, the federal government has attempted to use sovereign immunity by acting through the states to shield its actions from judicial review. The states of Arizona, Arkansas, and Nevada, acting under the direction of federal officials, have engaged in actions that violate federal constitutional and statutory provisions, leaving no other court to take jurisdiction over the matter, vide Docket No. 23-7072.

The Supreme Court has held that federal courts can enjoin state officials from violating federal law, reinforcing the constitutional balance established by *Loving v. Virginia*, 388 U.S. 1 (1967).

12

# DISCRETIONARY EXERCISE
# OF ORIGINAL JURISDICTION

The Supreme Court's discretionary exercise of original jurisdiction, as discussed in *Ohio v. Wyandotte Chemicals Corp.*, is crucial for managing disputes of significant national interest, particularly when no other adequate forum exists. This case, involving alleged violations of federal law and potential interstate conflict, presents such a scenario. The seriousness of the claims, akin to casus belli in their gravity, underscores the absence of an alternative remedy and the appropriateness of this Court's intervention.

### Significant National Interest

The implications of this case extend beyond the personal grievances of Martin Akerman, touching on systemic issues of federal authority, state compliance, and military conduct within the civil sector. The alleged violations of the Posse Comitatus Act, which restricts the military's ability to engage in domestic law enforcement, and breaches of the ADEA present fundamental questions about the limits of military and federal authority. Such questions bear significantly on the interpretation of federal statutes and the constitutionally prescribed balance of powers.

The resolution of this case will likely set precedents affecting the application of federal authority and the protection of individual rights within the federal workforce.

13

<u>No Other Adequate Forum</u>

The plaintiff's journey through the administrative and judicial avenues has conclusively ended with the Supreme Court's denial of the petition for writ of certiori on June 10, 2024, Docket No. 23-7072.

This denial effectively terminates any further review of claims grounded in the discrimination allegations confirmed by the EEOC's right-to-sue notice and the mixed claims adjudicated under the MSPB proceedings. Absent the ability to file this complaint, Mr. Akerman stands to irretrievably lose the opportunity to remedy the alleged violations under the ADEA and related statutes. This not only strips him of his right to a judicial review but arguably infringes upon his First Amendment petition clause rights, denying him access to a necessary and constitutionally protected avenue for redress.

Moreover, the complexity and scope of the legal issues involved, combined with the cross-jurisdictional nature of the defendants—including several state actors and federal agencies—leave no other court with clear and comprehensive jurisdiction over the entirety of the claims.

14

<u>Gravity Akin to Casus Belli</u>

The gravity of Akerman's claims can be contextualized within a broader historical and legal framework, emphasizing the potential consequences of unchecked governmental actions and the crucial role of the Supreme Court in addressing such fundamental issues.

1.    **The Suspension Act of 1861:**

During the American Civil War, President Abraham Lincoln suspended the writ of habeas corpus, a decision that later faced significant legal challenges. This action was initially taken without Congressional approval, leading to serious debates over the limits of executive power and civil liberties. The parallels here lie in the use of government authority in ways that may exceed legally granted powers, similar to the allegations of misapplication of the Posse Comitatus Act in Akerman's case. Both situations raise fundamental questions about the balance of power within the government and the protection of individual rights.

15

### 2.    Japanese American Internment (1942-1945):

The U.S. government's decision to intern Japanese Americans based on national security concerns was later deemed to have been based on racial prejudice, wartime hysteria, and a failure of political leadership, as acknowledged by the Civil Liberties Act of 1988. The internment was challenged in several landmark cases, including *Korematsu v. United States*, 323 U.S. 214 (1944), which tested the boundaries of constitutional rights against national security claims. This historical event parallels Akerman's case in the context of potentially overriding personal liberties in the name of security or administrative convenience.

### 3.    Ohio v. Wyandotte Chemicals Corp. (1971):

In *Ohio v. Wyandotte Chemicals Corp.*, the Supreme Court exercised its original jurisdiction in a case of grave national importance, where no other adequate forum existed to address the issues. The Court emphasized the necessity of its intervention when significant federal questions and interstate disputes are at stake. This precedent is pertinent to Akerman's case, which involves complex legal issues and actions by multiple states under federal direction, leaving no other court with comprehensive jurisdiction. The intervention of the Supreme Court is crucial to resolve these substantial federal questions, ensuring that justice is served and constitutional protections are upheld.

16

### 4.    Loving v. Virginia (1967):

In *Loving v. Virginia*, the Supreme Court invalidated laws prohibiting interracial marriage, reinforcing the principle that state laws cannot infringe upon fundamental personal rights guaranteed by the Constitution. This case highlights the judiciary's role in safeguarding individual liberties against state actions that violate federal law. Similarly, Akerman's case involves state actions, under federal directives, that allegedly violate federal constitutional provisions and statutory rights.

The precedent set in *Loving v. Virginia* underscores the necessity for federal courts to intervene and correct such injustices, reinforcing the protection of individual rights against unlawful state interference.

Given the historical gravity and current implications of Martin Akerman's allegations, this Court is urged to grant leave to proceed on a bill of complaint. The unique combination of federal overreach, state involvement, and violations of constitutional rights presents a scenario that cannot be adequately addressed in any lower court. These elements underscore not only the legal significance but also the profound national concern embedded in this case, making it a prime candidate for the exercise of the Court's original jurisdiction.

17

# FACTUAL ENHANCEMENTS
# TO MEET PLEADING STANDARDS

In support of the Bill of Complaint and the motion for leave to file, the following factual enhancements are detailed to substantiate the claims made by Plaintiff Martin Akerman under the pleading standards established in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## Overview of Federal Pleading Standards

The Federal Rules of Civil Procedure, specifically Rule 8(a)(2), require that a pleading include a "short and plain statement of the claim showing that the pleader is entitled to relief." This standard ensures that defendants receive clear notice of the claims and the grounds upon which they are based, facilitating a fair litigation process. The Supreme Court in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), reinforced that employment discrimination complaints must contain a concise statement of the claim, even if they do not need to detail all facts necessary for a prima facie case. The standards for pleading were further refined in *Twombly* and *Iqbal. Twombly* introduced the plausibility standard, requiring that a complaint must state enough factual matter to show that the claim is plausible, not merely conceivable. *Iqbal* emphasized that conclusory allegations are insufficient without supporting facts.

18

## Ongoing Attempts to Cover Up
## and Silence the Plaintiff

On May 27, 2024, the Office of Personnel Management provided evidence, as part of an ongoing disability retirement appeal, that on October 27, 2023, the Department of the Army lied about the status of the plaintiff, claiming that he was merely on "administrative leave," 5 U.S.C. § 6329a, see Supreme Court Docket 23-7127, on a petition for writ of habeas corpus, under 28 U.S.C. §§ 2241(c)(1) and 2241(c)(2), Appendix D.

The actions taken by various elements of the federal and state governments in Martin Akerman's case represent not just procedural missteps but suggest a concerted effort to suppress and discredit his claims and concerns. These efforts are particularly egregious given their potential to infringe on the plaintiff's rights to free speech and to petition the government for redress of grievances, as protected by the First Amendment. Additionally, these actions threaten his due process rights, which are foundational to the rule of law in the United States.

19

## Res Ipsa Loquitur Evidence of Foul Play

Colonel Bret Bassler of the Arkansas Army National Guard was directly involved in an incident on February 14, 2022, where Akerman was illegally detained. This action not only contravened 5 U.S.C. § 6329b but initiated a chain of events that denied Akerman critical statutory procedulral safeguards, as exhausted in MSPB case DC-1221-22-0459-W-1, Appendix E.

## Agency Response in MSPB Cases
## DC-1221-22-0257-W-1 and DC-0752-22-0376-I-1

On May 20, 2022, the National Guard Bureau denied access to information to the EEO Counselor, the Office of Special Counsel, the Department of Labor, and the Office of Personnel Management, responding to Senator Kaine with a dismissive letter that begins by discrediting Akerman's position in the agency, pointing to their jurisdictional response in two cases before the MSPB, DC-1221-22-0257-W-1 and DC-0752-22-0376-I-1, now exhausted and before this Court in this compllaint, Appendix F. Responses can be found in Appendix G

20

<u>Illegal Use of State Sovereignty</u>

**On April 24, 2022, General Garduno of the Nevada Air National Guard confirmed a suspension decision against Akerman, which was executed without the due process protections required under 5 U.S.C. § 7513, as elaborated by the agency in response to exhausted MSPB case DC-0752-22-0376-I-1, see Appendix G.**

This act of confirmation by a state officer acting in a federal capacity illustrates a clear disregard for the procedural rights owed to federal employees under the law. On multiple occasions, the responsible authorities have attempted to obfuscate the true nature of Akerman's employment status and the legality of the actions taken against him. These attempts to cover up and silence a tenured federal Chief Data Officer, appointed to oversee transparency under 44 U.S.C. § 3520, are detrimental to the integrity of the institutions responsible for upholding justice and democratic values.

The denial of access to crucial information and support services, such as those provided by the EEO Counselor, the Office of Special Counsel, the Department of Labor, and OPM, serves as a barrier to justice. By restricting Akerman's ability to obtain necessary documentation and support, the National Guard Bureau and associated entities effectively limited his ability to challenge the actions taken against him.

21

<u>Related Case Under 50 U.S.C. § 3341(j)(8)</u>

**On February 8, 2022, Brigadier General Joseph Baldwin of the Arizona Army National Guard, acting under federal orders, played a critical role in an operation that led to the alleged suspension of Martin Akerman's access. This action was authorized through delegated authority to Mr. Mark Berglund of the Army National Guard.**

Currently, this case is under review by the Federal Circuit, case number 2024-1913. The ongoing litigation before the Federal Circuit further emphasizes the procedural rigor and administrative exhaustion undertaken by Akerman, validating the necessity for judicial intervention and the correction of the procedural and substantive injustices he has faced.

- **February 17, 2022:** Akerman contacted Virginia Senator Tim Kaine.

- **March 15, 2022:** Congress passed Public Law 117–103, enacting 50 U.S.C. § 3341(j)(8).

- **March 25, 2022:** Akerman received evidence of discrimination and violations of due process related to his detention.

- **March 30, 2022:** Senator Tim Kaine responded to Akerman, confirming an ongoing investigation covered by Public Law 117–103.

22

## Retaliation Against Whistleblowing

The sequence of events leading to Akerman's suspension shortly after his involvement in whistleblowing activities raises serious concerns about retaliation. This pattern indicates a systemic issue within the handling of whistleblowers within the military and defense sectors, where individuals raising concerns are not only ignored but actively punished and silenced.

## Use of State Officers
## to Block Jurisdiction Over Claims

The strategic employment of state officers in roles that impact federal jurisdiction over Akerman's claims creates a significant legal loophole that only the Supreme Court can effectively address. This manipulation of jurisdictional boundaries serves to protect the actions taken against Akerman from scrutiny and review, effectively silencing his ability to obtain justice through traditional legal avenues. This situation exemplifies a critical gap in the protective mechanisms intended to safeguard federal employees, necessitating an intervention by the highest court.

The involvement of National Guard units from Arizona, Arkansas, and Nevada in the affairs of a federal employee underlines a misuse of military power in a civil context, which is precisely the type of activity that the Posse Comitatus Act is designed to prevent.

23

## Violation of the Posse Comitatus Act

The 'federalization' of state National Guard members to perform actions that resulted in punitive measures against a federal civilian employee without due process highlights a significant overstep. This strategic deployment of military authority to enforce or influence civil administrative decisions reflects a profound misunderstanding or disregard of the legal limitations imposed by the Pospe Comitatus Act.

The direct involvement of Brigadier General Joseph Baldwin and Colonel Bret Bassler in decisions impacting the civil rights and employment status of Martin Akerman illustrates a clear breach of the Posse Comitatus Act. These military officers, acting under federal orders but within their capacity as state National Guard members, engaged in law enforcement activities by enforcing administrative actions that are typically reserved for civil authorities.

### Impact and Precedent for Military Overreach

The actions taken by General Garduno in affirming the suspension of Martin Akerman without the necessary due process safeguards not only violated specific federal statutes but also set a concerning precedent for military involvement in civil matters. This overreach threatens the foundational separation between military power and civilian law enforcement, potentially eroding civil liberties under the guise of military authority.

24

## Lack of Adequate Safeguards and Oversight

The failure to provide adequate safeguards against the misuse of military power in these instances points to a systemic issue within the integration of National Guard units into federal operations.

## Expanded Analysis on
## Age Discrimination Claims Under the ADEA

### 1.    Legal Framework and Recent Developments:

The Age Discrimination in Employment Act (ADEA) safeguards federal employees against age-based discrimination. The Supreme Court's ruling in *Babb v. Wilkie* significantly impacts this protection, clarifying that "age need not be a but-for cause of an employment decision" for a plaintiff to establish discrimination. 140 S. Ct. 1168, 1172 (2020). Instead, age must be "the but-for cause of differential treatment," not the but-for cause of an ultimate employment decision. Id. at 1174 (emphasis in original). This interpretation means that a federal employee alleging discrimination under the ADEA only needs to demonstrate that age discrimination played "any part" in the personnel decision. Id.

25

## 2.    Position and Classification Impact:

Until December 27, 2022, Martin Akerman's position as a GS-15/10 employee in the National Guard Bureau was equivalent to an O-6 military officer, not an O-7 Brigadier General. This classification is clarified by the passage of 5 U.S.C. § 13105, which states:

> "Each officer or employee in the executive branch, including a special Government employee as defined in section 202 of title 18, who occupies a position classified above GS–15 of the General Schedule or, in the case of positions not under the General Schedule, for which the rate of basic pay is equal to or greater than 120 percent of the minimum rate of basic pay payable for GS–15 of the General Schedule; each member of a uniformed service whose pay grade is at or in excess of O–7 under section 201 of title 37; and each officer or employee in any other position determined by the Director of the Office of Government Ethics to be of equal classification."

This classification is crucial for understanding the taint and bias in Akerman's employment situation. During the period in question, Akerman's role was equivalent to an O-6 colonel, not an O-7 Brigadier General, affecting the evaluation of his differential treatment and the corresponding biases.

26

### 3.     Analysis of Discriminatory Treatment:

The ruling in *Babb v. Wilkie* emphasizes that a personnel decision is tainted by discrimination if a protected characteristic, such as age, plays "any part" in the decision-making process. Thus, a federal employer is liable for discrimination if a protected characteristic was "the but-for cause of differential treatment," regardless of whether it was the but-for cause of the ultimate employment decision. (quoting *Babb*, 140 S. Ct. at 1174). Even when there are non-pretextual reasons for an adverse employment decision, the presence of discriminatory considerations taints the decision-making process.

In Akerman's case, the differential treatment he faced, including suspension and denial of due process, is influenced by age discrimination. His role and responsibilities were subject to the same biases affecting military officers' promotion and retention, creating an environment where age played a significant role in the decisions made against him. This taint and bias are critical factors in evaluating his claims under the ADEA.

Between January 24, 2022, and February 14, 2022, Mr. Ken McNeill ordered the suspension of Akerman, citing perceived mental impairment. This suspension was later confirmed by the EEOC on October 17, 2022. Following Akerman's suspension, Mr. Ken McNeill hired an African American man to replace Akerman, a Hispanic Jewish man, as Chief Data Officer, as detailed in Appendix D.

27

### 4.    Forced Actions by State Military Officers:

By compelling state military officers to take action against Akerman, the federal defendants introduced additional taint and bias stemming from military practices. The "up-or-out" promotion system in the military is inherently biased against older employees, who are often forced out if not promoted. This system's influence on Akerman's treatment by state military officers, under federal directive, exacerbates the age discrimination he faced.

The adoption of military "up-or-out" policies by state military officers, acting under federal orders, underscores the systemic age bias that infiltrated Akerman's case. These practices, typically leading to the exclusion of older personnel, were unfairly applied to Akerman, a civilian employee, further highlighting the discriminatory environment.

The Supreme Court's interpretation in *Babb v. Wilkie* makes clear that even minor age discrimination can affect personnel decisions, establishing liability. Akerman's claims highlight the necessity for judicial intervention to address age discrimination in the Department of Defense, ensuring that civilians are not subjected to the same promotion and retention biases that affect military officers.

By compelling state military officers to enforce discriminatory policies, the federal defendants violated these principles, necessitating judicial correction.

28

## Suppression of Freedom of Speech

Akerman's actions to address equality and discrimination within the Air Force relate to his First Amendment rights to free speech and petition the government for redress of grievances. On May 3, 2021, Akerman sent an email highlighting unauthorized personnel alignments and proposing corrective actions to ensure compliance with existing laws. Despite these legitimate concerns, no corrective measures were taken.

On May 19, 2021, Akerman requested updated Position Descriptions (PDs) and HAF Mission Directives (MDs) for SAF/COS. In response, on May 25, 2021, he received a Corrective Letter of Admonishment for merely questioning the mismanagement and unfair treatment of staff. This action was a clear attempt to chill Akerman's speech, violating the Whistleblower Protections Enhancement Act (WPEA).

Undeterred, Akerman contacted the Air Force Equal Employment Opportunity (EEO) office on May 28, 2021, to express his concerns about these retaliatory actions. He also reached out to his military mentors and, on June 16, 2021, filed a formal investigation and whistleblower retaliation complaint.

The whistleblowing was confirmed, and an attempt to remedy the situation was made through informal negotiations by the Office of Special Counsel (OSC) on August 11, 2021.

29

Immediately after his official appointment as Chief Data Officer of the National Guard Bureau on December 20, 2021, Akerman took over the implementation of a critical program designed to help prevent and report suicides across the National Guard. In this capacity, he uncovered a double purchase of data capabilities, which he identified as both a waste of funds and an attempt to undermine modernization efforts aimed at increasing transparency and threatening to expose the underreporting of suicides across the National Guard. When Akerman called out this foul play, he faced further retaliation.

This sequence of events underscores a broader violation of Akerman's constitutional rights. The First Amendment of the U.S. Constitution protects his right to speak out against government misconduct and to seek redress for grievances without fear of retaliation. Additionally, the Fourteenth Amendment's Due Process Clause of the U.S. Constitution guarantees that individuals cannot be deprived of their rights without fair procedures. The retaliation Akerman faced for exercising his constitutional rights is a direct affront to these protections, highlighting the urgent need for judicial intervention to safeguard fundamental freedoms.

30

## Supporting Facts

- **August 11, 2021:** During the ADR with OSC, Akerman accepted an offer for employment with the National Guard Bureau, seeking protection from future reprisal. OSC negotiated the following to resolve the matter at the Air Force: removal of records from his file, student loan repayment, and no further input from Ms. Vidrine or her staff.

- **August 13, 2021:** Akerman's interim Top Secret clearance was unjustly revoked.

- **August 17, 2021:** Akerman informed OSC of potential retaliation through the transfer form SF-75 to the National Guard.

- **August 20, 2021:** Akerman received a letter from the Air Force General Counsel and the Security Manager stating he was not at fault for alleged missed responses to the DoD CAF. OSC compelled Ms. Vidrine to sign a document continuing Akerman's security clearance, acknowledging that he was not at fault for the alleged missed responses to the DoD CAF. This action was taken to counteract the retaliatory measures and ensure Akerman's clearance was upheld.

31

- **August 30, 2021:** Akerman updated the ADR request to include full payment for tuition repayment as per the SF-52 submission, emphasizing that any actions affecting his access to classified information in reprisal for protected disclosures would violate Presidential Policy Directive 19 (PPD-19).

- **November 9, 2021, and January 11, 2022:** FOIA requests returned incomplete information, indicating possible deliberate withholding or fabrication of documents related to his security clearance.

- **February 4, 2022:** Akerman requested an extension to the response date from March 24 to May 12, due to a date provided by a FOIA request from the State Department.

- **February 8, 2022:** The extension was granted by the DoD CAF, showing an acknowledgment of the procedural needs but highlighting the ongoing delays and administrative barriers.

- **Between January 24, 2022, and February 14, 2022:** Mr. Ken McNeill ordered the suspension of Akerman through military personnel, citing perceived mental impairment. This suspension was later confirmed by the EEOC on October 17, 2022.

- **Following Akerman's suspension**, Mr. Ken McNeill hired an African American man to replace Akerman, a Hispanic Jewish man, as Chief Data Officer, see Appendix D.

32

> Throughout the decision-making process, administrative appeals, and judicial proceedings, Akerman was not provided with someone who had the authority to overturn and remedy the due process violations. This lack of oversight and accountability further contravenes the procedural requirements of 5 U.S.C. § 7513 and/or 5 U.S.C. § 7532.

On February 14, 2022, Akerman received a Notice of Proposed Indefinite Suspension and several enclosures, including a Notice of Suspension of his access to classified information. This action was taken without providing a complete AR 380–67, DA Form 5248–R (Report of Unfavorable Information for Security Determination), supposed to be forwarded and decided by the Commander, General Daniel R. Hokanson, if invoking 5 U.S.C. § 7532.

The actions of General Garduno of the Nevada Air National Guard on April 24, 2022, further illustrate the misuse of military authority across state lines under federal command. General Garduno affirmed the decision to suspend Akerman without the due process guaranteed under 5 U.S.C. § 7513. This suspension obstructed Akerman's pursuit of justice and redress, effectively denying him the procedural protections owed to a tenured federal employee.

33

# REASONS TO GRANT LEAVE TO FILE
# A BILL OF COMPLAINT

Given the substantial factual and legal grounding presented, it is imperative that the Supreme Court exercise its original jurisdiction to address the matters raised by Martin Akerman. The facts of the case illustrate not only a breach of federal statutes and a potential misuse of military authority but also suggest systemic issues that could impact broader governmental accountability and individual rights. The reasons to grant leave to file this Bill of Complaint are as follows:

### Violations of Federal Statutes
### and Constitutional Protections

Akerman's allegations detail specific instances where federal and state actions contravened statutes such as the Posse Comitatus Act (18 U.S.C. § 1385) and the Age Discrimination in Employment Act (ADEA, 29 U.S.C. § 633a). These actions also violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and the Americans with Disabilities Act (ADA, 42 U.S.C. § 12101 et seq.), as well as his First Amendment rights to free speech and to petition the government for redress of grievances, and his Fourteenth Amendment right to due process. These are not merely procedural errors but substantive violations that could set detrimental precedents if left unaddressed.

34

## Unique Intersection of State and Federal Jurisdiction

The involvement of state National Guard units under federal command raises issues related to the Commander-in-Chief powers vested in the President by Article II, § 2, cl. 1 of the U.S. Constitution. This case provides a rare but critical opportunity to clarify the extent of federal oversight and the applicability of federal laws to actions taken by state entities under federal direction. This unique intersection necessitates Supreme Court intervention, as articulated in *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493 (1971).

## Exhaustion of Administrative and Judicial Remedies

Akerman has exhausted all reasonable administrative and judicial avenues, including receiving a right-to-sue notice from the EEOC and exhausting claims through the MSPB and other federal courts. The denial of his petition for a writ of certiorari (Docket No. 23-7072) highlights the necessity for Supreme Court intervention to ensure justice is served, as no other adequate forum exists to address these significant issues.

35

## Grave National Importance
## and Lack of Alternative Forums

The issues raised have significant national implications, involving the balance of federal and state powers, military involvement in civil matters, and the protection of civil rights within the federal workforce. The lack of alternative forums underscores the necessity for Supreme Court intervention to resolve these substantial federal questions, ensuring that justice is served and constitutional protections are upheld.

## Setting Precedents and Ensuring Justice

This case provides an opportunity for the Supreme Court to set important precedents regarding the protection of federal employees, the limits of military power in civil contexts, and the application of federal laws to intergovernmental actions. Addressing these issues will help streamline similar disputes in the future and reduce the burden on lower courts and administrative bodies, ensuring a consistent application of statutory requirements across related cases.

36

## Systemic Issues
### Affecting Governmental Accountability

The case touches on broader issues of governmental accountability and the protection of individual rights against arbitrary or capricious actions by state and federal entities. Ensuring that these frameworks are upheld and appropriately applied is crucial for maintaining public trust in governmental institutions. The Supreme Court's guidance is necessary to ensure these frameworks are not only upheld but also appropriately applied, particularly when military authority is exercised in civil contexts.

## Clarification of Federal Authority
### and State Compliance

This case presents an opportunity to clarify the extent of federal authority over state actions, particularly in the context of the National Guard operating under federal orders. This clarification is essential for maintaining the constitutionally prescribed balance of powers and ensuring that state compliance with federal directives does not infringe upon individual rights or exceed the limits of federal authority.

37

<u>Ongoing and Irreparable Harm to the Plaintiff</u>

Akerman continues to suffer from ongoing and irreparable harm due to the actions taken against him. These harms include the denial of due process, retaliation for whistleblowing, and age discrimination. Addressing these harms through the Supreme Court's intervention would ensure that justice is not only served but also seen to be served, providing necessary redress and preventing future violations, thereby maintaining the case as a live controversy and ensuring that Akerman's rights are fully protected.

## CONCLUSION

In conclusion, Martin Akerman's case presents critical legal and constitutional issues that merit the Supreme Court's original jurisdiction. The claims involve substantial violations of federal statutes and constitutional protections, including the Posse Comitatus Act, the ADEA, and the First and Fourteenth Amendments. These violations highlight systemic issues of governmental accountability and the misuse of military authority in civil matters, which have significant implications for civil liberties and federal governance.

38

Akerman has exhausted all administrative and judicial remedies, underscoring the necessity for Supreme Court intervention to ensure justice. The case offers a unique opportunity to clarify the jurisdictional boundaries between state and federal actions and to set important precedents for protecting federal employees and upholding constitutional rights. Granting leave to file the Bill of Complaint is imperative to address these substantial federal questions, ensure consistent application of statutory requirements, and provide a necessary forum for resolving these complex, cross-jurisdictional issues.

The Motion to File a Bill of Complaint should be GRANTED.

County/City of _Arlington_
Commonwealth/State of _Virginia_                    Respectfully Submitted Under Oath,
The foregoing instrument was acknowledged
before me this _19th_ day of _July_
_2024_ by
_Martin Akerman_                                    Martin Akerman, Pro Se
(name of person seeking acknowledgement)            2001 North Adams Street, 440
                                                    Arlington, VA 22201
Notary Public
My Commission Expires: _09/30/2026_                 (202) 656 - 5601

Tijer Leigh Hall
Commonwealth of Virginia
Notary Public
Commission No. 8024890
My Commission expires 9/30/2026

APPENDIX

## TABLE OF APPENDICES

Page(s)

APPENDIX A (June 21, 2022):
Right to Sue from the EEOC
for Age Discrimination....................................................1a

APPENDIX B (November 3, 2022):
District Court Dismissal With Prejudice,
on Jurisdictional Grounds,
see Supreme Court Certiorari Docket 23-7072,
REHEARING DENIED on June 10, 2024.................... 10a

APPENDIX C (October 17, 2022):
EEOC Confirmation of Right to Sue
for Mixed Claims.......................................................... 14a

APPENDIX D (October 27, 2023):
Evidence of Fraud and Racial Discrimination,
see Supreme Court Habeas Docket 23-7127,
REHEARING Scheduled for June 20, 2024.................16a

APPENDIX E (February 15, 2022):
Memorandum from Arkansas Colonel Basler............17a

APPENDIX F (May 20, 2022):
Letter from Agency to Virginia Senator Tim Kaine.. 19a

APPENDIX G (May 17, 2022):
Agency Response in DC-0752-22-0376-I-1.................. 21a

1a

*Appendix A*

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Office of Federal Operations
P. O. Box 77960
Washington, D.C. 20013

June 21, 2022

Re: June 7, 2022- Notice of Intent to Sue

Dear Martin Akerman:

The purpose of this letter is to acknowledge that the U.S. Equal Employment Opportunity Commission (EEOC) has received your documentation regarding a notice of intent to file a civil action against the Department of Defense pursuant to Section 15(d) of the Age Discrimination in Employment Act (ADEA) of 1967, as amended, 29 U.S.C. Section 633a. For your reference, a copy of your documentation is attached hereto.

This is a form acknowledgment and does not address either the merits of the allegations forming the basis of the notice or the sufficiency of the notice. If you have not filed a formal administrative equal employment opportunity (EEO) complaint, you must provide a notice of intent to sue to the EEOC within one hundred and eighty days after the alleged unlawful practice occurred.

2a

Please be aware, however, that your notice must comply with EEOC Management Directive 110, Chapter 4, Section IV. B., which states that the notice of intent to sue should be dated and must contain the following information:

(1) statement of intent to file a civil action under Section 15(d) of the ADEA;

(2) name, address, and telephone number of the employee or applicant;

(3) name, address, and telephone number of the complainant's designated

representative, if any;

(4) name and location of the federal agency or installation where the alleged

discriminatory action occurred;

(5) date on which the alleged discriminatory action occurred;

(6) statement of the nature of the alleged discriminatory action(s); and

(7) signature of the complainant or the complainant's representative.

3a

If you have already filed a formal EEO administrative complaint based, at least in part on age, you must exhaust the administrative process before pursuing a civil action in a U. S. district court.

We are forwarding a copy of your notice, and by copy of this response we are providing notice to the Department of Defense of your intent. The Equal Employment Opportunity Commission Directive (EEO-MD-110), Chapter 4, Section IV, requires that within thirty days of receipt of this notice, the agency must review the allegation(s) of age discrimination and conduct an inquiry sufficient to determine whether there is evidence that unlawful age discrimination has occurred. The method of the inquiry is a matter for determination by the particular agency and may vary depending on the scope and complexity of the allegation(s).

In order to resolve age discrimination claims informally and preclude the necessity for litigation, the EEOC expects that the agency's inquiries under EEO-MD-110 will begin immediately and be completed promptly. Agency inquiries based on a notice of intent to sue should begin immediately and be completed promptly. Prompt inquiries are necessary so that aclaimant's right to seek redress is not jeopardized by the expiration of a limitations period for filing a civil action. Agencies should implement case tracking systems to ensure the prompt processing of these matters.

4a

The agency is encouraged to make good faith efforts to resolve the matter and must implement the appropriate make-whole relief under 29 C.F.R. Part 1614, Subpart E, where unlawful age discrimination is found. Please be aware that you may file a civil action under the ADEA at any time after thirty days from the date of filing a compliant notice of intent to sue with EEOC regardless of whether your agency has conducted any inquiry into your allegation.

If you have questions regarding the above information, please call the EEOC's Contact Center (Monday through Friday) at 1-800-669-4000 or contact the EEOC's Office of Federal Operations at ofo.eeoc@eeoc.gov.

Sincerely,
/s/
Lori Grant, Director
Agency Oversight Division
Office of Federal Operations
Federal Sector Programs

cc: Charmane Johnson
Department of Defense
Office of Diversity Management and Equal Opportunity
4000 Defense Pentagon Rm 5D641
Washington, DC 20301
Via email: charmane.s.johnson.civ@mail.mil

5a

Maritza Sayle-Walker ,
Department of the Air Force
AIQ
1500 W. Perimeter Rd Suite 4500
JB Andrews, Maryland 20762
Via email: maritza.sayle_walker.12@us.af.mil

Seema Salter
Department of the Army
US Army Equity and Inclusion Agency
5825 21st Street Building 214
Fort Belvoir, Virginia 22060
Via email: seema.e.salter.civ@army.mil

Paul Kurle
National Guard Bureau
NGB-DEI
111 S. George Mason Drive
Arlington, Virginia 22204
Via email: paul.d.kurle.civ@army.mil

Carey Williams
Defense Counterintelligence and Security Agency
Diversity & Equal Opportunity
27130 Telegraph Road
Quantico, Virginia 22134
Via email: carey.j.williams2.civ@mail.mil

6a

*Appendix A - Enclosure 1*

## NOTICE OF INTENT TO SUE (7 June 2022)

1. I intend to file a civil action under Section 15(d) of the Age Discrimination in Employment Act of 1967, as amended. Ref. 29 CFR § 1614.201.

2. Martin Akerman
   2001 North Adams Street, Unit 440
   Arlington, VA 22201
   202-656-5601

3. Pro Se

4. Department of Defense (including Department of the Air Force, Department of the Army, National Guard Bureau, and Office of the Under Secretary for Jnlelligence - DCSA), Pentagon Washington, DC

5. 19 May 2022 - 2 June 2022

6. Statement of the nature of the alleged discriminatory action (Termination):

a. There exists in the Department of Defense a taint and bias against individuals who are 40 years of age or older that stems from the cultural adoption of DOPMA.

b. I was constructively discharged from my tenured Federal GS- I 5, Step 10 position.

c. The agency took impermissible discriminatory actions, violated my right to due process and lied about my ability to obtain and maintain a security clearance, resulting in working conditions that are so intolerable that any reasonable person would feel compelled to resign.[...]

7a

*Appendix A - Enclosure 2*

## Letter of Resignation (6 June 2022)

General Hokanson,

I hereby resign from my position as Chief Data Officer of the National Guard Bureau. [1] [2] [3]

The agency took impermissible discriminatory actions, violated my right to due process and lied about my ability to obtain and maintain a security clearance, placing me on Notice Leave (5 U.S. Code § 6329b) and in an indefinite unpaid suspension status, resulting in working conditions that are so intolerable that any reasonable person would feel compelled to resign.

I elect to incur a debt to FEHB only until the end of this current pay period, 18 June 2022. [...]

---

[1] 44 U.S.C. § 3520

[2] 10 U.S.C. § 10501 - The National Guard Bureau is a joint activity of the Department of Defense.

[3] The National Guard Bureau is the channel of communications on all matters pertaining to the National Guard, the Army National Guard of the United tates. and the Air National Guard of the United States between (1) the Department of the Army and Department of the Air Force. and (2) the several States.

8a

*Appendix A - Enclosure 3*

## Communication With Senator Tim Kaine
## (Feb 17 2022)

My name is Martin Akermana and I am the Chief Data Officer of the National Guard. I was the Director of Data Strategy at the Department of the Air Force in my previous role. The job of a good CDO is to increase organizational transparency, improve efficiencies and position data for information superiority. This has huge National Security implications in the case of CDO's in the Department of Defense.

I am a leading CDO in the Department of Defense, the only one directly representing the 54 States and Territories. The Department of Defense is currently utilizing Prohibited Personnel Practices to push me out. These include falsifying documentation and leveraging a seemingly untouchable Security Clearance process to disqualify me from my position.

The OSC appears powerless against the Department of Defense and I am kindly requesting for you to help me get a status on my OSC case including 9 PPPs dating back to the Air Force and through the National Guard. [..]

This incentive to maintain status quo and disincentive to innovate, if left unmitigated, will be the single reason we will not be able to outpace our adversaries and [will] inevitably lose.

9a

*Appendix A - Enclosure 4*

# MEMORANDUM FOR ALL
# NATIONAL GUARD PERSONNEL

## Appointment
## of a National Guard Bureau
## Chief Data Officer
## (DEC 20 2021)

Reference: National Guard Strategic Data Management Framework, 08 June 2021

1.  In accordance with the reference, I hereby designate Mr. Martin Akerman as the National Guard Bureau (NGB) Chief Data Officer (CDO).

2.  The NGB CDO will lead the utilization and governance of data across the National Guard.

3.  The NGB COO, in coordination with the Army National Guard and the Air National Guard, will lead the National Guard's Implementation Plan of the Department of Defense Data Strategy. See the attached "Supporting Department of Defense Data 'Decrees'" for more information.

4.  The point of contact is Mr. Martin Akerman; NGB-J6; 703-607-7125.

/s/

DANIEL R. HOKANSON, General, USA
Chief, National Guard Bureau

10a

*Appendix B*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

November 3, 2022

Alexandria Division

MARTIN AKERMAN,

Plaintiff,

v.

LLOYD J. AUSTIN, III, SECRETARY OF

DEPARTMENT OF DEFENSE, et al.,

Defendants.

1:22-cv-696 (LMB/WEF)

MEMORANDUM OPINION

Before the Court are defendants' Motion to Dismiss [Dkt. No. 46] the operative Amended Complaint filed on July 21, 2022 [Dkt. No. 6] and plaintiff's multiple motions for relief, which include numerous requests for leave to amend his complaint [Dkt. Nos. 25, 26, 27, 36, 55, 91].

11a

Finding that oral argument will not aid in the decisional process, the Court will resolve the motions on the papers. For the reasons that follow, defendants' Motion to Dismiss will be granted, plaintiff's motions will be denied, and this civil action will be dismissed with prejudice. [...]

[...] This claim must be dismissed because, as defendants argue, it does not allege a plausible claim of age discrimination.[...]

[...] To state a prima facie case under the ADEA, a complaint must allege facts, not opinions, indicating that the plaintiff"( 1) was a member of a protected class, i.e., age 40 or older, (2) suffered an adverse employment action, (3) was meeting his employer's expectations at the time of the adverse action, and (4) was replaced by or treated less favorably than someone outside the protected class or someone 'substantially younger'" Sullivan v. Perdue Farms, Inc., 133 F. Supp. 3d 828,837 (E.D. Va. 2015). The Amended Complaint contains only a conclusory allegation of "age discrimination" and is devoid of any factual allegations suggesting that plaintiff was treated less favorably than a younger employee for any reason. As such, the Amended Complaint has not pleaded a plausible ADEA claim.[...]

12a

[...]In their Motion to Dismiss, defendants correctly point out that the Court lacks jurisdiction over all these claims, because, as pleaded, all of them are based on, or connected to, the revocation of his eligibility for a security clearance. See id. at 8. Under Supreme Court and Fourth Circuit precedent, this Court does not have jurisdiction over these claims. Specifically, in Department of the Navy v. Egan, the Supreme Court recognized that the "[p]redictive judgment" involved in a security clearance determination "must be made by those with the necessary expertise in protecting classified information," and therefore "the protection of classified information must be committed to the broad discretion of the agency responsible[.]" 484 U.S.518,529 (1988). [...]

13a

## V. CONCLUSION

For the foregoing reasons, defendants Motion to Dismiss [Dkt. No. 46] will be GRANTED under Fed. R. Civ. P. 12(b)(l) as to the claims for unlawful indefinite suspension and constructive discharge[...] the hostile work environment claims under the ADEA, [...], and thePrivacy Act claims [...] plaintiffs motions [Dkt. Nos. 25, 26, 27, 36, 55, 91] will be DENIED; and this civil action will be dismissed with prejudice by an accompanying order.[4]

Entered this 3rd day of November, 2022.

/s/

Leonie M. Brinkeina

United States District Judge

---

[4] Normally, a dismissal based on a finding under Fed. R. Civ. P. 12(b)(1) that the Court lacks subject matter jurisdiction would be without prejudice because the Court lacks the authority to adjudicate that over which it has no jurisdiction. In this case, plaintiffs track record of not respecting the Court's decisions and filing repetitive, abusive pleadings justifies a dismissal of this entire action with prejudice, to make clear that he cannot refile any of the claims discussed in this opinion.

14a

*Appendix C*

## U.S. Equal Employment Opportunity Commission
## [NAME REDACTED IN ORIGINAL]

October 17, 2022

Petition No. 2022005058,
MSPB No. DC-0752-22-0376-I-1

---

### ORDER OF DISMISSAL

On June 21, 2022, Petitioner filed Civil Action No. 1:22cv696 in the United States District Court for the Eastern District of Virginia, Alexandria Division. A review of the complaint filed in the civil action reflects that the claims raised in the civil action are the same as those raised in the Initial Decision issued by the Merit Systems Protection Board (MSPB), which is raised in the instant EEO petition for review.

EEOC Regulation 29 C.F.R. § 1614.409 provides:

Filing a civil action under § 1614.407 or § 1614.408 shall terminate Commission processing of the appeal. A Commission decision on an appeal issued after a Petitioner files suit in district court will not be enforceable by the Commission. If private suit is filed subsequent to the filing of an appeal and prior to a final Commission decision, the complainant should notify the Commission in writing.

15a

Accordingly, the Commission will dismiss a pending petition under these circumstances to prevent a petitioner from simultaneously pursuing both administrative and judicial remedies on the same matters, wasting resources, and creating the potential for inconsistent or conflicting [*2] decisions, and in order to grant due deference to the authority of the federal district court. See, e.g., Wayne C. v. Dep't of Vet. Aff., EEOC Appeal No. 2020002855, 2020 EEOPUB LEXIS 3186 (Oct. 6, 2020); Bart L. v. Dep't of Agric., EEOC Appeal Nos. 2020000098, 2020000100, 2021 EEOPUB LEXIS 622 (Mar. 10, 2021); Von E. v. Dep't of the Treasury, EEOC Appeal No. 2020004947, 2022 EEOPUB LEXIS 483 (Feb. 17, 2022).

Following a review of Civil Action No. 1:22cv696, the Commission has determined that the above-referenced civil action raises the same claims as the EEO petition currently on appeal. Accordingly, EEOC Petition No. 2022005058 must be, and is, DISMISSED.

FOR THE COMMISSION:

/s/

Carlton M. Hadden, Director

Office of Federal Operations

October 17, 2022

16a

*Appendix D*

## OPM FORM 3112B

Employee resigned effective 6 June 2022.

Employee [was] placed on administrative leave on 14 Feb 2022, and suspended on 24 Apr 2022.

Beginning with the time of his placement on administrative leave for failure to attain or maintain a TOP SECRET/Special Sensitive clearance and access to classified Information and systems, Mr. Akerman's most essential duties had to be assigned as an additional duty to another employee, the NGB Chief Technology Officer (CTO), in order to ensure that the NGB data program was implemented and managed at a minimal capability level.

Although the designated employee perfomted admirably as acting Chief Data Officer (CDO), a single person could not fully fill both demanding roles, and therefore both roles were negatively impacted until we were able to hire a new CDO.

In the five months he served as COO prior to being placed in administrative leave status, Mr. Akerman booked 12 hours of annual leave with no indication this was for medical reasons (time and attendance report attached).

Digitally signed by

MCNEILL.KENNETH.CHRISTOPHER.1042118423
Dated: 2023.10.27

17a

*Appendix E*

## NATIONAL GUARD BUREAU
## 111 SOUTH GEORGE MASON DRIVE
## ARLINGTON, VA 22204-1382

NGB CIO/J6                                    15 February 2022

MEMORANDUM FOR Record

SUBJECT: National Guard Bureau Chief Data Officer (NGB-CDO) Notice of Formal Suspension of Access to Classified Information and Proposed Indefinite Suspension

1. On 14 February 2022 at 1400, Mr. Martin Akerman, NGB-CDO was notified by Mr. Kenneth McNeill, NGB CIO-J6 that his access to classified information was being formally suspended effective immediately. He also informed Mr. Akerman that he would be indefinitely suspended no earlier than 30 days from the date of couselling (14 February 2022).

2. Mr. Akerman was provided a binder with all documents related to these actions and advised on the appropriate points of contact[] for questions and responses.

3. Mr. Akerman was notified that during the next 30 days he would be on Notice Leave status (effective 14 February 2022) and would remain so pending a final decision by the Deciding Official [(Nevada Air National Guard General Garduno)].

18a

4. Mr. Akerman refused to sign the Notice of Proposed Indefinite Suspension memorandum but took his copy with the binder.

The point of contact for this action is [Arkansas Army National Guard] COL Brett Basler, brett.d.basler.mil@army.mil, 703-607-3266.

Digitally signed by

BASLER.BRETT.DAVID.1120905615

Date: 2022.02.15

19a

*Appendix F*

## NATIONAL GUARD BUREAU
## 111 SOUTH GEORGE MASON DRIVE
## ARLINGTON, VA 22204-1382

Office of Legislative Liaison                    May 20, 2022

The Honorable Tim Kaine
United States Senate
Attn: Janet Lomax
222 Central Park Avenue, Suite 120
Virginia Beach, VA 23462

Dear Senator Kaine:

This is in response to your inquiry on behalf of Mr. Martin Akerman regarding his request to obtain an explanation for the agency's decision to indefinitely suspend him from his IT Specialist position with the National Guard Bureau (NGB).

The National Guard Bureau Office of the General Counsel (NGB-GC) received Mr. Akerman's inquiry and provided the following information. By memorandum dated February 14, 2022, Mr. Akerman's immediate supervisor proposed to suspend Mr. Akerman indefinitely from his IT Specialist position based on his failure to attain and/or maintain a condition of employment—a Top Secret /Special Sensitive Information clearance and the suspension of his access to classified information and systems.

20a

Mr. Akerman was provided with documentation in support of the proposed action, including an initial decision by the Department of Defense Consolidated Adjudications Facility revoking Mr. Akerman's eligibility for access to classified information and assignment to duties that have been designated national security sensitive, and deny his eligibility for access to Sensitive Compartmented Information.

In an April 11, 2022, memorandum to Mr. Akerman, the Deciding Official, Brigadier General Caesar Garduno, determined the charge of failure to attain and/or maintain the conditions of employment was supported by a preponderance of evidence and Mr. Akerman's indefinite suspension from employment promoted the efficiency of the service.

The agency action to indefinitely suspend Mr. Akerman from the IT Specialist position and other matters are currently subjects of appeals to the U.S. Merit Systems Protection Board (MSPB). For the MSPB appeal with docket number DC-1221-22-0257-W-1, the agency filed a jurisdictional response on May 16, 2022. Likewise, for the MSPB appeal with docket number DC-0752-22-0376-I-1, the agency filed a response on May 17, 2022.

We trust you find this information useful.

Respectfully,
Enclosure Donna Warren
Chief, Congressional Inquiries
National Guard Bureau
Office of Legislative Liaison

21a

*Appendix G*

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD
# WASHINGTON REGIONAL OFFICE
# DOCKET NUMBER DC-0752-22-0376-I-1

AGENCY'S NARRATIVE REPONSE AND MOTION TO
DISMISS, IN PART, FOR LACK OF JURISDICTION

Appellant filed an appeal on April 26, 2022, alleging that the agency discriminated against him based on a perceived mental impairment or disability when the agency indefinitely suspended him for failing to meet a condition of employee, i.e., failure to attain and/or maintain Top Secret (TS)/Sensitive Compartmented Information (SCI). The appellant is specifically requesting a Board hearing to review the merits of the security clearance determination, which is beyond the Board's jurisdiction. Appeal File (AF), Tab 1, continuation sheet. See Department of the Navy v. Egan, 484 U.S. 518, 530 (1988) (holding that the Merit Systems Protection Board did not have the authority to review the substance of an underlying decision to deny or revoke a security clearance).

Appellant also alleged that the agency retaliated against him as a prohibited personnel practice. Appellant has separately filed an Individual Right of Review (IRA) appeal (docket number DC-1221-22-0257-W-1), for which the agency has filed a response to the Board's jurisdictional orders and the

22a

appellant's initial appeal, jurisdictional response, and 29 substantive pleadings, as well as a motion to dismiss for lack of jurisdiction and failure to state a claim. The IRA appeal is before the Board for its jurisdictional determination.

Appellant also alleged that based on his civilian grade (GS-15, Step 10) and years of service, he was held to a comparable military officer's standard. It is not discernable to the agency whether the appellant is accusing the agency of holding him to the military, instead of federal civil service standard. Record does not support the appellant's assertion and the appellant has not pleaded any supporting facts or details for his assertion. The Board should similarly dismiss the appellant's unfounded allegation.

Appella[nt] further alleged that the agency violated due process by engaging in ex parte communications, improper interference, and withholding of information. Records show that the agency has met its due process requirements under 5 U.S.C. § 7513(b).

Appellant has previously raised a similar issue about ex parte communications as a ground to disqualify Agency representative. See DC-1221-22-0257-W-1, AF, Tab 49. The Board found no evidence that "agency counsel directed, ordered, commanded or took any action with respect to the appellant."

The Board thus denied the appellant's motion. See DC-1221-22-0257-W-1, AF, Tab 51. The appellant has not pleaded any supporting facts or details for his allegations of ex parte communications, improper interference, and withholding of information. The

23a

Board should similarly dismiss the appellant's appeal for failure to state a claim. See Mathis v. Department of State, 122 M.S.P.R. 507, ¶

Lastly, the Board has denied the appellant's stay request because "consideration of an affirmative defense alleging discrimination or reprisal would require consideration of the merits of the security clearance determination, which is beyond the Board's authority." DC-0752-22-0376-S-1, AF, Tab 2 at 3 (citing Putnam v. Department of Homeland Security, 121 M.S.P.R. 532, ¶¶ 18-19 (2014)).

The Board has also rejected the appellant's discovery request for filing deficiencies. AF, Tab 4.

FACTS

Employment History

On September 12, 2021, the appellant, an Information Technology (IT) Specialist (Policy and Planning/Data Management), GS-2210-15, started his civil service employment with the National Guard Bureau (NGB) on its Joint Staff at the Army National Guard Readiness Center in Arlington, Virginia. The NGB is a joint activity of the DoD and maintains a separate and distinct legal identity from other DoD components, including the Departments of the Army (DA) and the Air Force (DAF). See 10 U.S.C. § 10501(a). The Chief of the National Guard Bureau (CNGB) heads the agency. Since 2008, CNGB has served under the Secretary of Defense, not the Secretary of the Army. Id.

24a

Prior to 2008, NGB was a joint bureau of the DA and the DAF. The CNGB currently has independent statutory authority to employ federal civil service employees. See 10 U.S.C. § 10580(b). Nevertheless, most NGB federal civil service employees, including the appellant, have retained their legacy status of being employees of the DA or the DAF, while working outside the Military Department in an independent DoD agency. Accordingly, Appellant is an employee of the DA employed by and working at NGB. See Tab 4a.

On June 4, 2021, the appellant applied for the IT Specialist position with NGB-J6. Tab 4b, Encl. 14. The position description for the IT Specialist vacancy advertisement, certified on April 28, 2021, designates the position as a "Tier 5-Sepcial Sensitive, Critical Sensitive, Noncritical Sensitive, and High Risk" position with "special sensitive, national security risk." Tab 4b, Encl. 12. The position requires a Top Secret security clearance as a condition of employment. Id. The incumbent will additionally serve as the Chief Data Officer (CDO) to the National Guard Bureau (NGB) J6/ [Chief Information Officer (CIO)] Directorate, assisting NGB with facilitating and coordinating the employment of Command, Control, Communication and Computers, Informational Technology, Information Management, personnel, and resources for a full range of Homeland Defense/Defense Support of Civil Authorities mission requirements. Id.

25a

Security Clearance

Prior to transferring to NGB, Appellant was a DAF civil service employee from November 25, 2019 to September 11, 2021. On November 8, 2019, Appellant submitted a "Questionnaire for National Security Positions, Standard Form 86 (SF-86)," to begin the Top Secret security clearance application process with the DoD Consolidated Adjudications Facility (CAF). Tab 4c, Encl. 2. As part of his application process, the appellant disclosed that he had been hospitalized for a mental health condition in or about February 2012 on SF-86. Id. During his interview with a Defense Counterintelligence and Security Agency (DCSA) Investigator on January 24, 2020, the appellant confirmed his 72-hour, involuntary hospitalization for an emotional/mental health condition at the Psychiatric Institute of Washington, D.C. for stress induced anxiety. Id. The appellant also confirmed that he was seen by a therapist and psychiatrist as an outpatient after he was released. Id. The appellant explained that he was seen by a counselor in 2012, and from about 2013 to about 2018, he was seen by a psychologist.

Based on the information provided by the appellant, on June 2, 2020, and again on October 21, 2020, the DoD CAF requested the appellant to obtain a professional medical opinion from a duly qualified mental health professional acceptable to the U.S. Government.3 Id.

26a

On August 12, 2021, while the appellant was still an DAF employee, DoD CAF issued a preliminary decision to revoke Appellant's eligibility for access to classified information and assignment to duties that have been designated national security sensitive and to deny his eligibility for access to Sensitive Compartmented Information (SCI). Id. DoD CAF explained,

> "[i]nformation concerning your personal history has led to the security concern(s) listed in Attachment 1, Statement of Reasons (SOR), which prevent the DoD CAF from making the affirmative decision that your eligibility is clearly consistent with the interests of national security." Id.

Appellant signed the acknowledgement of receipt for the August 12, 2021 SOR (hereinafter, "August 2021 SOR") on August 18, 2021, and received a response due date of October 17, 2021, 60 calendar days from the date when an employee acknowledged receipt of an SOR.

On September 23, 2022, the appellant requested assistance from Ms. Susanne Kidd, NGB Security's Army National Guard (ARNG) Activity Security Branch Chief, to obtain an extension of his SOR response due date from October 17, 2021 to November 17, 2021. At that time, Ms. Kidd initiated a request to transfer the appellant's security profile, including the

27a

August 2021 SOR, from DAF to NGB via the Defense Information System for Security (DISS) system.

Once the August 2021 SOR was transferred to NGB, Ms. Kidd worked with the appellant to sign the SOR acknowledgment receipt on October 1, 2022. Tab 4c, Encl. 3. Ms. Kidd also advised him on how to respond to the SOR and to notify his leadership of his security clearance status.

Due to this SOR transfer action, the appellant's response due date was pushed from October 17, 2021 to December 1, 2021.

On or about November 9-10, 2021, Appellant requested a second extension of the August 2021 SOR response due date, which Ms. Kidd processed and submitted via DISS on November 12, 2021. Throughout the months of November and December 2021, Ms. Kidd kept Appellant and his attorney informed of the reissuance of the August 2021 SOR by the DoD CAF adjudicator. The August 2021 SOR was reissued on January 24, 2022, and the appellant signed the acknowledgement of receipt on January 25, 2022, during a meeting with Ms. Kidd. Tab 4c, Encl. 4.

<u>The new SOR response due date was March 24, 2022. Then on February 8, 2022, Appellant requested the third extension of the response due date from March 24, 2022 to May 13, 2022. Tab 4b, Encl. 2. Ms. Kidd submitted the third extension request via DISS and emailed directly to the DoD CAF adjudicator on the same day. Id.</u>

28a

On February 8, 2022, Mr. Mark J. Berglund, Deputy Chief of Staff, Army National Guard, issued a memorandum notifying the appellant that the agency is formally and temporarily suspending his access to classified information and systems. Tab 4c, Encl. 5. The access suspension is a result of having unresolved derogatory issues implicating Security Executive Agent Directive 4, National Security Adjudicative Guideline I: Psychological Conditions (i.e., confirmed hospitalization for emotional/mental health condition at Psychiatric Institute of Washington D.C.). Id. The temporary suspension of access was reported to DoD CAF via DISS as Unfavorable Information for Security Determination on DA Form 5248-R on February 8, 2022. Tab 4c, Encl. 6.

The form was re-accomplished with a signature from Mr. Berglund and resubmitted via DISS on February 28, 2022. Tab 4b, Encl. 8. On February 24, 2022, Ms. Kidd explained that the DISS system generated a response due date of March 12, 2022, for the appellant's January 24, 2022 SOR. Tab 4e, Encl. 1. March 12, 2022 is a Saturday, and Ms. Kidd would be out of the office on Friday, March 11, 2022, and thus, the response from the appellant is due to Ms. Kidd for her processing on Thursday, March 10, 2022. Id. Then on February 25, 2022, Ms. Kidd explained to the appellant that other than a written response, there is no hearing and/or appeal process for challenging DoD CAF's preliminary decision to revoke his security clearance eligibility. Id. However, if DoD CAF finalizes its decision to revoke his security clearance eligibility,

29a

then he will have the opportunity to request a hearing with the Defense Office of Hearing and Appeals. Id.

On March 3, 2022, the appellant emailed Mr. Berglund requesting a hearing for the access suspension and all documents used in his decision to suspend the appellant's access to classified information and systems. Tab 4e, Encl. 1. In response, Mr. Berglund explained that the access suspension is based on information included in the August 2021 SOR and resulting from the DoD CAF's preliminary decision to revoke his security clearance. Id.

**<u>Mr. Berglund also denied granting a hearing by a disinterested third party but agreed to meet with the appellant if he wishes. Id.</u>**

### Indefinite Suspension

On February 14, 2022, Mr. Kenneth McNeill, Chief of Information Office and Director of J6, who was also the appellant's supervisor, notified the appellant that his access to classified information and systems had been suspended. Tab 4c, Tab 4b, Encl.1. At the same meeting, Mr. McNeill also issued a "Notice of Proposed Indefinite Suspension" and provided a binder with documents that he relied on to make his proposed decision to the appellant. Id. The indefinite suspension was to be effective 30 calendar days from the date of the notification receipt, February 14, 2022. Id. The charge for the proposed indefinite suspension is the appellant's "failure to attain and/or maintain a condition of employment—Top Secret/Special

30a

Sensitive Clearance and access to classified information and systems." Id. Appellant was provided seven calendar days (due on February 21, 2022) to reply to the proposed indefinite suspension orally and or in writing, as well as to provide affidavits and other documentary evidence in support of his reply, to the Deciding Official, [Nevada Air National Guard] Brigadier General Caesar R. Garduno, Vice Director of Staff, NGB-Joint Staff. Id. The Appellant was also notified that during the next 30 days, he would be on Notice Leave status (paid leave) and would remain so pending a final decision by the Deciding Official. Id.

On February 16, 2022, the appellant requested, among other things, an extension of his paid leave from 30 days until when his security clearance is adjudicated and resolved, and an extension to reply to the Notice of Proposed Indefinite Suspension from February 21, 2022 to May 13, 2022. Tab 4b, Encl. 2. On February 21, 2022, Brig Gen Garduno granted a 14-day extension (i.e, to March 7, 2022) to submit a response to the Notice of Proposed Indefinite Suspension. And on February 24, 2022, Brig Gen Garduno declined the extension of paid leave[...]

[...]

31a

[...]Additionally, when, on March 25, 2022, the appellant was given a timeline MFR documenting events transpired concerning the appellant's security clearance and responding to issues raised by appellant in his replies to the deciding official, the appellant was again given until March 30, 2022, to respond to the timeline MFR.

The timeline MFR, however, merely organizes information already given to [] Brig Gen Garduno and emails, information, and documents either already provided to or generated by the appellant. See Blank v. Department of the Army, 247 F.3d 1225, 1229 (Fed. Cir. 2001) (holding that a deciding official does not violate an employee's due process rights by initiating an ex parte communication that only confirms or clarifies information already contained in the record; as such, the ex parte communication did not meet the first Stone factor).

The MFRs also do not contain communications coaxing or pressuring Brig Gen Garduno to rule in a particular manner. Stone, 179 F.3d at 1376-77. Furthermore, between February 14, 2022 and April 11, 2022, Brig Gen Garduno received numerous written requests and responses from the appellant. Brig Gen Garduno and other relevant agency personnel (i.e., ARNG-HCM-C and NGB-Security) diligently reviewed and responded to each request and provided documents per the appellant's requests. See generally, Tab 4b, Encls; see also Grimes v. Department of Justice, 122 M.S.P.R.

32a

Weighing all the Stone factors, the record shows that the information contained in the ex parte communication was not "so likely to cause prejudice that no employee can be required to be subject to a deprivation of property under such circumstances." Stone, 179 F.3d at 1377. The record plainly shows that there was not a violation of the appellant's due process rights. Finally, the Agency's position is that ultimately, as the United States Supreme Court established in Egan, the MSPB may not review the agency's reasons for revoking the security clearance.

Respectfully submitted,

BERNARD E. DOYLE
Agency Representative

JENNY L. NAYLOR, Lt Col, USAF
Agency Representative

No. _____, Original

## In The

## Supreme Court of the United States

---

Martin Akerman, Pro Se,
Plaintiff,

v.

Arizona; Arkansas; and Nevada,
ex rel. General Daniel R. Hokanson;
Chief of the National Guard Bureau, et al,
Defendant(s).

---

## CERTIFICATE OF COMPLIANCE

As required by Supreme Court Rule 33.1(h), I certify that the BRIEF IN SUPPORT OF THE MOTION FOR LEAVE TO FILE A BILL OF COMPLAINT, in support of both the MOTION FOR LEAVE TO FILE A BILL OF COMPLAINT and the BILL OF COMPLAINT, contains 6,775 words, for a combined total of 8,275, which falls within the standard word limit of 9,000 words, as set forth in Rule 33.2(g)(i).

County/City of _Arlington_
Commonwealth/State of _Virginia_
The foregoing instrument was acknowledged
before me this _9th_ day of _June_
_2024_ _Martin Akerman_
(name of person seeking acknowledgement)

Notary Public
My Commission Expires: _09/30/2026_

Respectfully Submitted Under Oath,

Martin Akerman, Pro Se

Tijer Leigh Hall
Commonwealth of Virginia
Notary Public
Commission No. 8024890
My Commission expires 9/30/2026