# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Cathy A. Harris, in her personal capacity | ) | |
| and in her official capacity | ) | |
| as Member of the Merit Systems Protection Board, | ) | |
| | ) | |
| Plaintiff -Appellee, | ) | |
| | ) | |
| v. | ) | Case No. 25-5037 |
| | ) | & 25-5055 |
| Scott Bessent, in his official capacity | ) | (Consolidated) |
| as Secretary of the Treasury, et al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

---

**On Appeal from the United States District Court for the District of Columbia**
**(No. 1:25-cv-00412, Hon. Rudolph Contreras)**

---

## BRIEF OF MARTIN AKERMAN AS PRO SE AMICUS CURIAE
## IN SUPPORT OF DEFENDANTS-APPELLANTS

---

MARTIN AKERMAN, PRO SE,
Chief Data Officer (44 U.S.C. § 3520),
of the National Guard Bureau (10 U.S.C. § 10501),
in his personal capacity.
P.O. BOX 100057
Arlington, VA 22210
(202) 656-5601

March 27, 2025

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## (A) Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants.

## (B) Rulings Under Review

Appeal Nos. 25-5037 and 25-5055 arise from the district court suit Harris v. Bessent, No. 1:25-cv-412 (D.D.C.), before Judge Rudolph Contreras. The rulings under review in No. 25-5037 are the district court's grant of a temporary restraining order (Dkt. 8) and accompanying memorandum opinion (Dkt. 9), issued on February 18, 2025. The court's opinion will be published in F. Supp. 3d, and is available at 2025 WL 521027. The rulings under review in No. 25-5055 are the district court's grant of summary judgment for declaratory and injunctive relief (Dkt. 39) and accompanying memorandum opinion (Dkt. 40), issued on March 4, 2025. The court's opinion will be published in F. Supp. 3d, and is available at 2025 WL 679303.

This case has been consolidated with Gwynne A. Wilcox v. Donald J. Trump, No. 25-5057 (D.C. Cir.), which presents similar issues regarding removal of an independent agency member.

(C) Related Cases

A related appeal involving the removal of the U.S. Special Counsel is Hampton Dellinger v. Scott Bessent, et al., No. 25-5052 (D.C. Cir.). In that case, Judge Contreras's opinion in Harris v. Bessent was discussed in addressing the President's removal authority, and Ms. Harris filed an amicus brief in the Dellinger appeal (Attachment A).

An emergency application in the Dellinger matter was considered by the Supreme Court in Bessent v. Dellinger, 604 U.S. ___ (2025), in which Justice Gorsuch issued a dissenting opinion relevant to the issues here (Attachment B).

Additionally, Martin Akerman's Freedom of Information Act litigation, Akerman v. Merit Systems Protection Board, et al., No. 23-5309 (D.C. Cir.), is related insofar as it contains evidence pertaining to Ms. Harris's conduct in office.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT............. 1

ARGUMENT...................................................................................6

I.   The President Properly Exercised His Removal Authority
     Under 5 U.S.C. § 1202(d) by Removing Ms. Harris for Cause.................. 6

     A. "Malfeasance in Office" and Similar Misconduct
        Justified Ms. Harris's Removal.................................................. 7

     B. The President's Action Complied with the Statutory Standard
        and Respected the Separation of Powers....................................12

II.  Ms. Harris Has Not Been Denied Due Process, and Any Challenge to
     Her Removal Must Proceed Through the Mechanisms Provided by Law,
     Not Through Equitable Intervention......................................... 17

     A. Harris Possesses an Avenue for Redress and
        Cannot Short-Circuit Congress's Prescribed Process............................18

     B. Equitable Relief Reinstating Harris Was Improper;
        Courts Should Not Override the President's Removal Authority
        Absent the Process Congress Established................................. 23

CONCLUSION.................................................................................30

# TABLE OF AUTHORITIES

Cases                                                                    Page(s)

Bessent v. Dellinger,
604 U.S. ___, 2025,
Gorsuch, J., dissenting ........................................................... 14, 16, 20, 22, 24, 28

Berry v. Reagan,
No. 83-3182 (D.D.C. Nov. 14, 1983).................................................... 25

Case v. Beauregard,
101 U.S. 688 (1880)................................................................................26

Humphrey's Executor v. United States,
295 U.S. 602 (1935),
Holding (limiting removal to enumerated causes)................. 3, 10-13, 15, 17, 25, 30

Marbury v. Madison,
5 U.S. (1 Cranch) 137 (1803)............................................................. 28, 29

Myers v. United States,
272 U.S. 52 (1926)...............................................................................13, 25

Shurtleff v. United States,
189 U.S. 311 (1903) ............................................................................10, 15

White v. Berry,
171 U.S. 366 (1898)....................................................................................24

Wiener v. United States,
357 U.S. 349 (1958)................................................................................15, 27

Williams v. Phillips,
482 F.2d 669 (D.C. Cir. 1973)............................................................. 16, 27

Statutes and Constitutional Provisions                                    Page(s)

U.S. Const. art. II, § 3 (Take Care Clause)............................................................ 17

5 U.S.C. § 1202(d)........................................................... 1, 2, 6, 11–13, 30

5 U.S.C. § 1221(c)............................................................................... 1, 24

5 U.S.C. § 5596 (Back Pay Act)....................................................4, 19, 24

5 U.S.C. § 7702(e)(1)(B)........................................................................ 24

5 U.S.C. § 7703...................................................................................... 1

D.C. Code § 16-3501 et seq. (Quo Warranto).......................................... 19

5 C.F.R. §§ 1209.8–11....................................................................... 1, 24


Other Authorities                                                         Page(s)

House Report, Civil Service Reform Act of 1978................................... 15

Martin Akerman's FOIA Complaint,
Akerman v. MSPB, D.C. Cir. No. 23-5309
(see related SCOTUS Case No. 24-339)..................................... 2, 7–9, 14

Martin Akerman v. Air Force,
MSPB Stay DC-1221-22-0445-S-1 (pending since 2022)................... 1, 24

Document 2105622, Attachment 5 (District of Nevada litigation)........................ 24

Attachments:

- Attachment A: Amicus Curiae Brief of Cathy A. Harris in related case Dellinger v. Bessent, No. 25-5052 (D.C. Cir. Mar. 3, 2025), filed in support of Plaintiff–Appellee Dellinger and opposing a stay pending appeal.

- Attachment B: Dissenting Opinion of Justice Gorsuch, 604 U.S. ___ (2025), Bessent v. Dellinger, No. 24A790 (U.S. Feb. 21, 2025), emphasizing historical limitations on equitable reinstatement of removed officers.

## INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT

*Pro Se Amicus* Martin Akerman is a federal employee and whistleblower who has firsthand experience with the Merit Systems Protection Board ("MSPB") and the importance of its statutory mandate. He is in the process of litigating a Freedom of Information Act case (Akerman v. MSPB, No. 23-5309) that brings to light serious misconduct by MSPB leadership, including Cathy Harris. As someone who depends on the MSPB to fairly adjudicate federal employment disputes, Mr. Akerman has a profound interest in ensuring that MSPB Members uphold the highest standards of efficiency, duty, and integrity. He files this amicus brief in support of Defendants-Appellants to underscore that the President's removal of Ms. Harris was lawful under 5 U.S.C. § 1202(d) and that Ms. Harris must pursue any challenge to her removal through the proper legal process established by Congress, rather than through extra-statutory equitable relief.

Federal employees who are unlawfully removed or suspended—such as Amicus, whose whistleblower claims are currently pending in cases DC-1221-22-0257-W-2 and DC-1221-22-0445-W-2—typically must await the outcome of their Merit Systems Protection Board (MSPB) appeals or related court proceedings before obtaining any relief. Interim reinstatement, pursuant to 5 U.S.C. § 1221(c) and 5 C.F.R. §§ 1209.8–11, should be but is not the norm, see pending stay request in DC-1221-22-0445-S-1.

1

Congress has determined that MSPB Board members, like Ms. Harris, "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office" (Attachment A). Amicus agrees that this for-cause removal protection is valid and vital to the MSPB's independence. However, that protection is not a blanket immunity from accountability; it simply means the President cannot remove an MSPB member at will, but can do so for the specified causes. Here, Ms. Harris's removal by President Trump on February 10, 2025 was not an arbitrary "at will" firing, but a justified response to serious malfeasance. Although the removal notice sent to Ms. Harris was brief, evidence in the record (some of it obtained through Mr. Akerman's FOIA litigation) establishes that Ms. Harris engaged in conduct amounting to malfeasance in office, thus satisfying the statutory standard for removal. For example, documents uncovered in FOIA litigation show that, as MSPB Chair, Ms. Harris unlawfully withheld information that she was legally obligated to disclose, directly undermining transparency and the rights of whistleblowers. Such unlawful withholding of information and failure to comply with statutory duties constitute precisely the "malfeasance" or "neglect of duty" that 5 U.S.C. § 1202(d) contemplates.

Because cause for removal existed in this case, the President acted within his lawful authority in removing Ms. Harris. Nearly a century of Supreme Court precedent confirms that when a statute limits the President's removal power to certain causes, the President may remove the official for those causes, but not for others. In Humphrey's Executor v. United States, the Supreme Court upheld the statutory provision protecting Federal Trade Commissioners from at-will removal, emphasizing that "the intent of the Act is to limit the executive power of removal to the causes enumerated." In that case, President Roosevelt's attempt to remove a Commissioner without claiming any statutory cause was invalid because "none of [the enumerated causes] is claimed" to exist. Here, by contrast, at least one of the enumerated causes – malfeasance – is not only claimed but supported by evidence.

The President's action therefore accords with the statute's text and with Humphrey's Executor's teaching: a for-cause removal restriction both restricts removals absent cause and permits removals for cause. The district court erred by treating Ms. Harris's removal as ultra vires "with no basis in fact," while disregarding evidence of malfeasance. Properly considered, the President's authority under § 1202(d) was lawfully exercised here to maintain the integrity of the MSPB.

Furthermore, Ms. Harris has not been denied due process. She is not without recourse if she believes her removal was unjustified. But the avenue for any challenge is the one provided by law – for instance, an action for back pay under the Tucker Act and Back Pay Act, or a *quo warranto* proceeding to test her claim to office – not an immediate injunctive restoration to office via a collateral lawsuit.

Congress, in the Civil Service Reform Act, carefully prescribed how federal employment disputes are to be resolved, and it did not create an implied right for a removed MSPB Board member to sue the President directly for injunctive relief. Ms. Harris was entitled to invoke appropriate legal remedies (indeed, she did by filing suit), but once those remedies were in progress, she had to follow the process to completion rather than short-circuit it with a sweeping preliminary injunction. Amicus submits that the district court's issuance of injunctive relief reinstating Ms. Harris was improper and unprecedented.

As Justice Gorsuch observed in a related case, courts historically have not wielded a broad equitable power to reinstate executive officials who have been removed from office (Attachment B). Instead, officials disputing a removal have traditionally sought legal remedies like backpay or a *writ of quo warranto*, rather than injunctions against the President.

Ms. Harris's situation is no different. She can be made whole if she proves that her removal lacked cause – for example, through an order restoring lost salary or other relief available after a full adjudication – but she is not entitled to freeze the functioning of the Executive Branch with an extraordinary injunction pending such a determination. To hold otherwise would upset the constitutional separation of powers and ignore the alternative remedies at her disposal.

In sum, this Court should hold that the President's removal of Ms. Harris was proper under § 1202(d)'s "inefficiency, neglect of duty, or malfeasance" standard and that the district court's interference with that removal was error. The President did not act unlawfully; to the contrary, he acted to enforce the very standards of efficiency and integrity that Congress imposed on the MSPB. And if Ms. Harris wishes to contest the finding of cause, she must do so through the normal process Congress has established – which fully preserves her due process rights – rather than by seeking an extra-statutory equitable remedy. The rule of law and the Constitution's separation of powers require nothing less.

**ARGUMENT**

I.    <u>The President Properly Exercised His Removal Authority</u>

<u>Under 5 U.S.C. § 1202(d) by Removing Ms. Harris for Cause</u>

Congress enacted 5 U.S.C. § 1202(d) to ensure that Members of the Merit Systems Protection Board could be removed only for legitimate cause – specifically, "inefficiency, neglect of duty, or malfeasance in office". This for-cause provision reflects a balance: it shields MSPB Members from arbitrary or politically motivated firing, but it reserves to the President the power to remove a Member who fails to uphold the standards of her office.

In this case, President Trump's removal of Cathy Harris fell squarely within his authority under § 1202(d) because it was predicated on cause – namely, Ms. Harris's malfeasance and neglect of duty. By removing an official who engaged in misconduct, the President was not flouting the statute; he was enforcing it. Ms. Harris and her supporters have characterized her removal as "without cause" and thus per se unlawful. They point to the terse email notification she received, which did not recite a litany of reasons. But the absence of a detailed explanation in the email does not mean the absence of a factual basis. The law does not require a presidential removal order to resemble a judicial opinion or to enumerate causes on its face. What matters is that, in fact, a valid cause for removal existed at the time.

Here, substantial evidence demonstrates that Ms. Harris had committed malfeasance in office. The district court overlooked or downplayed this evidence, focusing instead on perceived procedural deficiencies. Amicus aims to dispel any doubt that cause existed and to show that the President's action was substantively justified.

## A. "Malfeasance in Office" and Similar Misconduct Justified Ms. Harris's Removal

"Malfeasance in office" is a legal term encompassing wrongdoing or misconduct by a public official in the course of her duties. It includes acts that violate the law or the public trust associated with the office.

The record developed since Ms. Harris's removal reveals at least one clear instance of malfeasance: her failure to comply with the Freedom of Information Act ("FOIA") and her obstruction of the public's right to information, in a manner that betrayed her duties as an MSPB official. Martin Akerman's FOIA litigation provides a concrete example. Mr. Akerman, a federal whistleblower, filed FOIA requests seeking information relevant to his claims of agency wrongdoing. As the MSPB Chair at the time, Ms. Harris was the official responsible for responding to FOIA and Privacy Act appeals on behalf of the Board.

Instead of fulfilling this duty in good faith, Ms. Harris stonewalled. In Akerman v. MSPB, Case No. 23-5309, Mr. Akerman was forced to sue to obtain records that should have been released. That lawsuit and its underlying agency correspondence show that Ms. Harris (and those under her direction) engaged in the unlawful withholding of information rightfully requested under FOIA.

An MSPB Board member, especially the Chair, has a duty to uphold merit system principles of accountability and transparency – not to shield the agency from them. By flouting FOIA, Ms. Harris neglected her duty to the public and committed actionable misconduct. Notably, Defendants-Appellants have cited additional instances of malfeasance or neglect by Ms. Harris in the administrative record. For example, evidence in the Joint Appendix indicated irregularities in how MSPB case backlogs were handled under Ms. Harris's leadership. While the MSPB made impressive progress in reducing a massive backlog of appeals (clearing thousands of cases that had accumulated during years without a quorum), questions arose about whether Ms. Harris took certain procedural shortcuts or failed to follow required adjudicatory protocols in that rush.

Amicus does not presume to resolve those factual questions here. It is sufficient that at least one well-documented ground – the FOIA malfeasance – was before the President when he decided to remove Ms. Harris. The statute requires a cause, not multiple. Ms. Harris argues that she was an effective Chair who succeeded in eliminating the backlog and that "Defendants do not dispute that Harris has been efficient and diligent" in many respects. That may be so; this amicus brief does not suggest that Ms. Harris was incompetent in every facet of her job. But even an official who is generally effective can still commit a specific act of malfeasance grave enough to warrant removal.

The for-cause standard does not demand a showing of pervasive failure or wrongdoing in every duty – a single act of significant misconduct suffices. Here, Ms. Harris's deliberate obstruction of FOIA and disregard of her legal obligations is sufficiently serious to meet any reasonable definition of "malfeasance in office." It undermined the MSPB's credibility as a guardian of merit system law and thus struck at the heart of her role. The President, upon learning of such misconduct, had not only the authority but a responsibility to remove her to protect the integrity of the Board. The Supreme Court's precedents confirm that "malfeasance" is a broad term encompassing exactly this sort of breach of public trust.

In Shurtleff v. United States, 189 U.S. 311 (1903), the Court, examining a similarly worded removal statute, understood "malfeasance" to cover wrongdoing and "neglect of duty" to cover failure to perform one's responsibilities. The Court in Shurtleff ultimately permitted a removal because it concluded the President had inherent power notwithstanding the statute, but importantly it did not question that if the statute applied, proof of one of the enumerated causes (like malfeasance) would justify removal. In Ms. Harris's case, that proof exists. And unlike in Shurtleff or in the removal of FTC Commissioner Humphrey, the President here is not claiming an unbounded removal power or a policy disagreement – he is acting on evidence of misconduct, precisely within the statutory bounds.

Finally, it bears noting that honoring the for-cause removal standard in this way (by permitting removal when cause exists, and disallowing it when not) actually reinforces the independence of agencies like the MSPB in the long run.

The statutory tenure protection was never intended to be a shield for malfeasance; rather, it was meant to prevent capricious political firings. By removing Ms. Harris under § 1202(d) for cause, the President demonstrated respect for the law: he did not remove her at will (which would raise constitutional questions under Humphrey's Executor), but waited until a legitimate cause was apparent. In this sense, the removal affirms the principle that independent agency officials are accountable under law – they must meet the standards of efficiency and integrity that Congress has set, or else be removable.

This is consistent with the design of the Civil Service Reform Act of 1978, which created the MSPB: Congress wanted Board members to be insulated from undue political influence, but not to be untouchable if they themselves violate the merit system principles.

The House Report on the CSRA explicitly noted that MSPB Members "are subject to removal for cause" as a means of "ensuring Board Member accountability for malfeasance or failure to perform duties." That is exactly what occurred here. Substantial evidence of malfeasance justified Ms. Harris's removal. The President's decision was rooted in her own conduct, not in any improper motive. Under 5 U.S.C. § 1202(d), this removal was lawful.

## B. The President's Action Complied with the Statutory Standard and Respected the Separation of Powers

Recognizing that cause existed for Ms. Harris's removal answers the statutory question in this appeal: Yes, the President does have authority under 5 U.S.C. § 1202(d) to remove an MSPB Member for "inefficiency, neglect of duty, or malfeasance," and that is exactly what happened. It is worth emphasizing how unremarkable – indeed, how anticipated – this authority is. The Supreme Court's foundational removal-power cases establish that when Congress lawfully imposes a for-cause removal restriction, the President's power is "limited to removal for the specific causes enumerated." But that limitation is also a permission: if one of the enumerated causes exists, the President is empowered to act. In Humphrey's Executor, the Court held that President Roosevelt could not remove FTC Commissioner Humphrey merely over policy disagreements, because the FTC Act only allowed removal for "inefficiency, neglect of duty, or malfeasance" and none of those causes was present. The Court explicitly concluded that Congress intended to "limit the executive power of removal to the causes enumerated."

Notably, the Court did not hold that the President lacks power to remove even for cause – quite the opposite. It implied that had President Roosevelt alleged one of the valid causes (e.g., malfeasance), the removal would fall within his power. In fact, the decision in Humphrey's carefully distinguished the situation from Myers v. United States, 272 U.S. 52 (1926), by pointing out that Myers concerned a purely executive officer (a postmaster) with no statutory tenure protection. For independent agency officials like FTC Commissioners (or MSPB Board members), the President must adhere to the for-cause standard. But so long as he does, his removal is effective. The present case is Humphrey's Executor in reverse. There, no cause was asserted and the removal failed; here, cause is present and thus the removal should be upheld.

Viewing the President's action through this lens harmonizes it with precedent. It shows the President respected the constraint – he did not remove Harris at will, but for cause – thereby remaining within the law. It is also important to situate this in the separation-of-powers context. The Constitution assigns the President the duty to "take Care that the Laws be faithfully executed" (U.S. Const. art. II, § 3). That duty has long been understood to encompass the authority to remove executive branch officers, an authority that is at its zenith when needed to ensure an officer's faithfulness to law.

By removing an officer who was, in the President's judgment, violating her legal duties (e.g., by flouting FOIA and undermining merit system laws), the President was fulfilling his constitutional responsibility. Far from a separation-of-powers violation, the removal vindicated constitutional structure: it prevented an independent agency from being led by someone engaging in unlawful conduct. To be sure, MSPB Members perform adjudicatory functions and are not purely executive actors. Ms. Harris's amicus brief in the related Dellinger case stressed that the MSPB "is a purely adjudicatory body" and "does not exercise substantial executive power," implying that removing its members poses little risk to core executive functions. Amicus does not dispute the adjudicatory character of the MSPB; indeed, that is why Congress could validly give members tenure protection. But acknowledging MSPB's quasi-judicial role does not immunize a Member from removal for cause. Even judges can be removed through impeachment for bad behavior.

Likewise, an MSPB Member can be removed for the causes Congress enumerated without threatening the agency's adjudicative independence – because the removal is based on that individual's misconduct, not on political disagreement or a desire to influence case outcomes. In fact, allowing a malfeasant member to remain in office would do more to undermine the MSPB's adjudicatory integrity than a removal for cause would.

The removal of Ms. Harris in no way jeopardized the MSPB's ability to function impartially; if anything, it helped preserve the Board's legitimacy by showing that its members are not above the law. Moreover, when assessing separation-of-powers implications, this Court should recall that upholding Ms. Harris's removal under the statutory standard avoids any need to confront constitutional questions about the removal restriction itself.

The government initially argued (in Question 1 of its brief) that the MSPB's removal restrictions might be unconstitutional in light of Seila Law LLC v. CFPB, 591 U.S. __, 140 S. Ct. 2183 (2020) (which invalidated for-cause protection for a single-headed agency). But those arguments are largely mooted here. Even if MSPB's structure is constitutionally sound (and numerous precedents, including Humphrey's Executor and Wiener v. United States, 357 U.S. 349 (1958), say it is), the President still wins on the facts: he complied with the statute. Thus, by recognizing the validity of the President's cause-based removal, the Court can resolve the case without disturbing the general principle of agency independence.

In essence, this path honors both Congress's power to create independent agencies and the President's power (and duty) to remove officials who breach legal standards. It threads the constitutional needle.

Finally, it is instructive to consider historical practice. There have been few instances of Presidents removing independent agency members for cause – partly because such misconduct at high levels is (we hope) rare, and partly because many officials, like Mr. Dellinger in the parallel case, resign when confronted with allegations of cause.

However, one relevant incident occurred in 1973, when President Nixon attempted to remove a member of the Civil Service Commission (CSC) for cause amid allegations of improper political activity. In Williams v. Phillips, 482 F.2d 669 (D.C. Cir. 1973), a case involving the interim appointment of a replacement, the D.C. Circuit did not ultimately resolve the validity of the removal, but it signaled that a President's compliance with a for-cause standard is key.

The Nixon Administration asserted cause (misconduct by the CSC official), and no court injunction restored that official to office. The matter was overtaken by events, but Williams exemplifies that the executive and judicial branches both proceed on the understanding that if cause exists, the President's removal is lawful, subject at most to later review of the cause's sufficiency.

In summary, President Trump's removal of Cathy Harris respected the limits and conditions of his authority. The cause requirement in § 1202(d) was not ignored – it was observed.

Upholding this removal thus poses no conflict with Humphrey's Executor (indeed, it reinforces it) and poses no threat to the separation of powers (indeed, it safeguards it by ensuring laws are executed faithfully). The Court should hold that the removal was consistent with § 1202(d).

II.   Ms. Harris Has Not Been Denied Due Process, and Any Challenge to Her Removal Must Proceed Through the Mechanisms Provided by Law, Not Through Equitable Intervention

Ms. Harris contends that her abrupt removal amounted to a denial of due process and that only immediate injunctive relief restoring her to her position could vindicate her rights. That contention is incorrect. Ms. Harris was afforded due process – she had notice of the cause asserted (through subsequent disclosures and litigation) and the opportunity to challenge her removal through legal processes. What she seeks is not due process, but an extraordinary shortcut around the process that is due. The law provides specific avenues for a removed official to contest the removal. Ms. Harris chose to bypass those avenues by seeking an unprecedented form of equitable relief. In doing so, she asked the judiciary to act beyond its traditional authority and to intrude on the Executive's domain in a manner not sanctioned by historical practice or statute.

This Court should decline that invitation. The proper course is to require Ms. Harris to pursue her remedies in the ordinary way – which she has been doing by litigating the merits – and to reject the notion that courts can or should preemptively reinstate an official absent the completion of that legal process.

## A. Harris Possesses an Avenue for Redress and Cannot Short-Circuit Congress's Prescribed Process

It is important to clarify what "process" is available to Ms. Harris. The Civil Service Reform Act and related statutes do not leave a removed MSPB Board member without remedy. While an MSPB Board member cannot appeal her removal to the MSPB itself (since the Board is the body from which she was removed), she can bring her grievances to court through other mechanisms. Indeed, Ms. Harris did so, filing suit in the district court invoking the court's federal question jurisdiction and seeking declaratory and injunctive relief. One could question whether the CSRA actually intended such immediate district court review – after all, the CSRA often channels federal employment disputes through administrative routes and then to the Federal Circuit. But even if we assume the district court had jurisdiction, the key point is that Ms. Harris's rights are being adjudicated; she is getting her day in court on the question of whether her removal was for valid cause or not.

Furthermore, even beyond an injunction, Congress has provided a remedy that addresses the core harm of an unjustified removal: the Back Pay Act, 5 U.S.C. § 5596. If Ms. Harris is correct that her removal was unlawful, she is entitled to be treated as if she had remained in her position, which would include back pay and potentially reinstatement. Typically, an employee (or former employee) would seek such relief by first obtaining a determination that the removal was improper (e.g., via MSPB or a court) and then invoking the Back Pay Act. In Ms. Harris's unique situation, the district court effectively gave her that determination on summary judgment. The question then becomes one of remedy and timing: does she get reinstated now via injunction, or must she wait for the normal appellate process and any claims for monetary relief? The latter is the norm.

Due process does not entitle a litigant to an immediate remedy before the litigation is concluded – it entitles her to a fair hearing and adjudication, which she is receiving. Additionally, District of Columbia law provides a specific process by which someone claiming entitlement to a public office can test that claim: a *quo warranto* proceeding. D.C. Code § 16-3501 et seq. permits the U.S. Attorney or D.C. Attorney General (or, in some cases, a private relator with leave of court) to bring an action to determine the right of a person to hold a public office in the District.

Historically, *quo warranto* has been the vehicle to resolve disputes over who is the lawful holder of an office when two individuals claim the title – for example, when an incumbent is removed and a successor appointed, and the validity of the removal (and thus the validity of the successor's appointment) is in question. Here, after Ms. Harris's removal, there was (presumably) an Acting Chairman or another official (Defendant Kerner) exercising the office's functions. If Ms. Harris believed she was still the rightful officeholder, *quo warranto* was an available remedy. Yet, as Justice Gorsuch noted in his dissent, Ms. Harris (like Mr. Dellinger in the parallel case) did not invoke the *quo warranto* process. The existence of that legal remedy strongly undermines any claim that she was forced to seek equitable relief.

Courts of law were open to her claims; she opted for a more aggressive course in equity. The Supreme Court's stay decision in Bessent v. Dellinger (the Special Counsel case) underscores this principle. Although the majority there held the application in abeyance on procedural grounds, Justice Gorsuch's dissent stressed that the availability of *quo warranto* or similar legal remedies "cut[s] against recognizing a novel equitable power" to directly reinstate an official. That reasoning applies equally to Ms. Harris. She cannot reasonably assert that due process required the district court to immediately restore her to her position, when she had not even exhausted (or attempted) the ordinary legal remedy to contest her ouster.

The process Congress (and the D.C. Council) provided – *quo warranto* – was tailor-made for her situation. By sidestepping it, Ms. Harris sought to obtain more relief than the law otherwise allows, faster than the law otherwise allows. It is also noteworthy that Ms. Harris did receive process even before her removal in a practical sense: the Administration's decision to remove her was not made in secret or without cause; it was made after two weeks of the new Administration evaluating holdover officials. While she was not given a formal hearing pre-removal (nor is that typically required for such high-level officers), the cause for her removal did not come out of the blue. And once removed, she promptly went to court and obtained a TRO hearing within days. The speed with which the district court intervened (issuing a TRO on February 12, 2025) shows that Ms. Harris had access to judicial process and used it to argue her case. The issue is that the district court gave her more relief than the law supports, not that she lacked a forum.

In sum, Ms. Harris is not suffering a denial of due process. She has had notice, an opportunity to be heard, and avenues to obtain relief. What due process does not guarantee is victory on the merits or interim reinstatement without proving her case. Her rights are fully protected so long as courts carefully consider whether cause existed for her removal (which this Court is doing now) and, if not, afford her appropriate relief at the conclusion of the case. The existence of these procedures means her constitutional due process claim fails. To the extent she argues that the cause removal protection itself gave her a property interest in continued employment, her "property" is defined by the terms of the statute – i.e., she only has an entitlement to serve out her term if she does not give cause for removal. If cause was present, then by definition she was not deprived of something to which she was entitled.

**B. Equitable Relief Reinstating Harris Was Improper;**

**Courts Should Not Override the President's Removal Authority**

**Absent the Process Congress Established**

The district court's injunction (initially styled a TRO) forcing the Executive to treat Ms. Harris as still in office was an extraordinary step, one that finds little support in legal tradition. Amicus respectfully submits that granting such equitable relief was error, and that Ms. Harris's proper course was to pursue legal remedies to completion rather than seek a preliminary mandatory injunction. Justice Gorsuch's dissent in Bessent v. Dellinger cogently explains why courts should be exceedingly wary of issuing orders like the one below, which "commanded the President and other Executive Branch officials to recognize and work with someone whom the President sought to remove from office." Such an order raises fundamental separation-of-powers concerns, and it was issued without due regard to the historical limits on equitable jurisdiction. As Justice Gorsuch recounted, it has long been "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers."

Dating back to the 19th century, courts recognized that the equitable power to issue injunctions or specific performance does not extend to keeping a person in a public office from which the executive has removed him. In White v. Berry, 171 U.S. 366 (1898), for example, the Supreme Court held that an ousted employee could not obtain an injunction to be restored to his position; his remedy lay in an action at law for back pay. This principle makes eminent sense. The removal or retention of officials is an executive function (or in some cases legislative, via impeachment), and the judiciary's role is generally limited to reviewing the legality of a removal after the fact, not managing the day-to-day occupancy of offices. Furthermore, removed officials who have challenged their ousters in court have almost always done so through legal remedies, not equitable ones. They sue for salary or for a declaratory judgment of wrongful removal, rather than seeking an injunction to resume office immediately. The Supreme Court noted this pattern in Justice Gorsuch's dissent: "throughout the Nation's history, various presidentially appointed officials like Mr. Dellinger have contested their removal—and courts have heard and passed on their claims. But those officials have generally sought remedies like backpay, not injunctive relief like reinstatement."

The classic examples are Myers and Humphrey's Executor themselves – those were suits by removed officials (or their estates) for lost compensation. The courts resolved the legal questions of removal authority in that context, without issuing orders putting the officials back in their chairs during the litigation. The district court in Ms. Harris's case charted a very different course. It intervened at the outset, before full consideration of the merits, effectively deciding the dispute by issuing a TRO/preliminary injunction maintaining Ms. Harris in office. This leap to equitable relief was not only unnecessary (given the availability of legal remedies), but it also skipped over the careful balancing that final relief would require (weighing the cause for removal, etc.). By doing so, the court assumed a "novel equitable power" to negate a presidential removal – a power for which there is scant precedent. Indeed, as noted by Justice Gorsuch and D.C. Circuit Judge Katsas (in dissent below), the only precedent the parties could identify for such an injunction was an unpublished district court decision from 1983, Berry v. Reagan, enjoining President Reagan from removing two members of a temporary board. That outlier case, involving a very different context, did not become a staple of federal practice; it remains an anomaly. It certainly does not establish any general rule that courts can or should enjoin a President's removal of an executive officer. To the contrary, the rarity of such relief highlights how exceptional the district court's action was here.

Equitable restraint in this area is also compelled by the principle that equity will not act if the plaintiff has an adequate remedy at law. As discussed, Ms. Harris did have adequate legal remedies: she could pursue a judgment that her removal was unlawful and receive make-whole relief (pay, reinstatement at the end of the case if warranted, etc.). The Supreme Court has explicitly held that "a court of equity will not entertain a case for relief where the complainant has an adequate legal remedy." This maxim, quoted by Justice Gorsuch from Case v. Beauregard, 101 U.S. 688 (1880), directly applies. Ms. Harris's adequate legal remedy was to litigate her removal in court (as she is doing) and, if she prevailed, obtain relief at law. The existence of the *quo warranto* process and backpay remedy confirm that she was not without legal recourse. Therefore, equity should have stayed its hand. Furthermore, the district court's rush to injunctive relief created a separation-of-powers clash that could have been avoided. By ordering that "Ms. Harris shall continue to serve as a Member of the MSPB" (TRO Order, Feb. 12, 2025, JA25), the court effectively negated the President's personnel decision and placed itself in the role of super-personnel officer for the Executive Branch. That impinges on the executive authority in a manner that final judicial review (after full adjudication) would not.

If at the end of the case a court concluded that the removal was unlawful due to no cause, an order of reinstatement as part of final judgment could be justified as enforcing the statute. But to do so at the interim stage, before deciding the merits, flips the default: it assumes the President's action is invalid and forces the Executive to act as if the official is still in place, all while the litigation is ongoing. This not only risks error (if it turns out the President was correct about the cause, the injunction will have improperly hampered the agency's operations), but also raises the appearance of judicial interference in the executive domain.

Amicus acknowledges that Ms. Harris's counsel argued that without an injunction she would suffer irreparable harm (the loss of her position and inability to perform her duties). But loss of a government office, while undoubtedly a serious matter, is not typically deemed irreparable in the equitable sense – especially when compensation and reinstatement later can remedy it. For example, Amicus's pending stay request in DC-1221-22-0445-S-1, brought under the Whistleblower Protection Act and exhausted through the Office of Special Counsel pursuant to 5 U.S.C. § 1221(c) and 5 C.F.R. §§ 1209.8–11, remains unresolved, and whistleblower claims are currently blocked in cases DC-1221-22-0257-W-2 and DC-1221-22-0445-W-2, unable to make their way to District Court despite a related pending mixed case in the District of Nevada, under 5 U.S.C. § 7702(e)(1)(B), see Document 2105622, Attachment 5 .

Congress did not create an exception for MSPB Board members to get immediate injunctive relief. The district court's approach effectively gave Ms. Harris greater protection than ordinary civil servants (who at least have to go to the MSPB and cannot simply get a TRO from a judge on day three). There is no basis in the statute for such preferential treatment.

Finally, Ms. Harris's assertion that courts needed to step in to protect officials like her from a President's overreach is overstated. She wrote in her amicus brief in Dellinger that Article III courts must not be "powerless to protect officials like her and Hampton Dellinger" and that historically courts have issued writs of mandamus in such situations.

This argument misconstrues the role of those writs. Mandamus has been used to compel officials to perform clear duties or to hand over an office to the rightful holder (akin to *quo warranto*), but it has not been used to countermand a presidential removal in the way Ms. Harris sought. The venerable case of Marbury v. Madison, 5 U.S. 137 (1803), resulted in a denial of mandamus to appoint Marbury, precisely because the Court lacked power to enforce the appointment against the executive.

Ms. Harris's reliance on historical mandamus writs is therefore misplaced. Those writs operated within the legal bounds of available remedies; they did not create a freestanding license for courts to re-install officials at will. In fact, Chief Justice Marshall's caution in Marbury about general expressions not controlling future cases could well be applied to caution against overreading past instances of judicial review as permission for drastic equitable relief here. In conclusion, the Court should hold that the district court exceeded its equitable powers by reinstating Ms. Harris pendente lite. The appropriate course is to dissolve any injunctive relief that remains in effect and make clear that Ms. Harris's remedy, if any, lies in the judgment to be rendered on the merits (and the ordinary processes following from that judgment). By doing so, the Court will realign this dispute with traditional equitable principles and separation-of-powers norms, while still ensuring that Ms. Harris's legal claims get a full and fair hearing.

## CONCLUSION

For the foregoing reasons, amicus curiae Martin Akerman respectfully urges this Court to reverse the district court's judgment to the extent that it invalidated Ms. Harris's removal and granted injunctive relief. The President's removal of Cathy Harris was proper under 5 U.S.C. § 1202(d) because it was supported by cause – specifically, malfeasance in office – as the statute requires.

Ms. Harris's arguments to the contrary are unavailing, and her resort to extraordinary equitable remedies was unwarranted. The President acted lawfully in removing an official who breached her duties, and Ms. Harris must seek any recourse through the normal legal channels provided by Congress. The Court should uphold the President's authority to remove Ms. Harris for cause, dissolve any injunction restoring her to office, and affirm the principle that the laws – including those protecting tenure – mean what they say: removal only for cause also means removal for cause when cause exists.

Respectfully submitted,

Martin Akerman, Pro Se Amicus Curiae.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and D.C. Circuit Rule 32(e) because it contains 6,092 (excluding the parts of the brief exempted by Fed. R. App. P. 32(f)), according to the word count feature of Google Docs. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman).

Respectfully submitted,

Martin Akerman, Pro Se Amicus Curiae.

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2025, I electronically filed the foregoing Brief of Amicus Curiae Martin Akerman with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system. Additionally, eight paper copies of this brief will be delivered to the Clerk's Office within the time frame specified by the Court's rules.

Respectfully submitted,

Martin Akerman, Pro Se Amicus Curiae.