**MERITS ORAL ARGUMENT SCHEDULED MAY 16, 2025**

No. 25-5055

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN HER OFFICIAL CAPACITY AS MEMBER OF THE MERIT SYSTEMS PROTECTION BOARD,

*Plaintiff-Appellee*,

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-00412-RC
Hon. Rudolph Contreras, J.

## MOTION FOR EMERGENCY ADMINISTRATIVE
## STAY PENDING REQUEST FOR HEARING EN BANC

MICHAEL J. KATOR
JEREMY D. WRIGHT
KERRIE D. RIGGS
KATOR, PARKS, WEISER &
 WRIGHT, P.L.L.C.
1150 Connecticut Ave.,
NW
Suite 705
Washington, DC 20036
(202) 898-4800
mkator@katorparks.com

LINDA M. CORREIA
CORREIA & PUTH, PLLC
1400 16th St., NW
Suite 450
Washington, D.C. 20036
(202) 602-6500
lcorreia@correiaputh.com

CARL RIZZI
LUCILLE E. BAEURLE
MILBANK LLP
55 Hudson Yards
New York, NY 10001
 (212) 530-5786

NEAL KUMAR KATYAL
*Counsel of Record*
NATHANIEL A.G. ZELINSKY
KRISTINA ALEKSEYEVA
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee Cathy A. Harris*

March 28, 2025

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Plaintiff-Appellee Cathy A. Harris hereby submits her Certificate as to Parties, Rulings, and Related Cases:

## A. Parties and Amici

Plaintiff-Appellee is Cathy A. Harris. Defendants-Appellants are Scott Bessent, Trent Morse, Sergio Gor, Henry Kerner, Donald J. Trump, and Russell T. Vought.

Two groups of states led by Florida and Tennessee; Professors John Coates, Jeffrey N. Gordon, Kathryn Judge, and Lev Menand; the Constitutional Accountability Center; and Martin Akerman filed briefs as *amici curiae*.

## B. Rulings Under Review

The District Court issued a decision on the merits for Harris on March 4 (App. B.), and that ruling is the one on appeal before the Court. The government filed a motion to stay pending appeal in this Court (App. C.). The special panel (Henderson, Millett, Walker, JJ.) issued an order granting the motion on March 28, 2025 (App. A.). Judge Millett dissented.

## C. Related Cases

This case was before the District Court as case No. 1:25-cv-00412-RC. The government appealed the District Court's grant of a temporary restraining order, and that appeal is before this Court as No. 25-5037.

The special panel consolidated this case for oral argument on the government's stay motion alongside *Wilcox v. Trump*, No. 25-5057 (D.C. Cir.).

March 28, 2025

/s/Neal Kumar Katyal
NEAL KUMAR KATYAL
   *Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

# MOTION FOR AN ADMINISTRATIVE STAY

Cathy A. Harris requests the panel administratively stay its order granting the government's motion pending Harris's forthcoming petition to the en banc Court. If the special panel denies this motion for an administrative stay, Harris requests the en banc Court issue an administrative stay.

Harris will submit her petition to the en banc Court by Monday, March 31, 2025. An administrative stay will immediately preserve the status quo ante, and provide the full Court the brief but necessary "time to deliberate" on that petition. *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring).[1]

The matter plainly warrants the full Court's review. Under a statute that Congress enacted decades ago—in reliance on long-settled Judicial precedent, and an equally established interbranch understanding between the Legislative and Executive branches—Harris and other members of the Merit Systems Protection Board "may be removed by the President *only* for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d) (emphasis added).

As the District Court and Judge Millett's dissent both explained, this kind of for-cause removal provision is obviously constitutional. Under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny, Congress may enact

---

[1] Counsel for the government indicates that the government opposes this request. *Cf.* D.C. Cir. R. 8(a)(2).

1

standards of removal for "multimember board[s]," *Seila Law LLC v. CFPB*, 591 U.S. 197, 207 (2020), that exercise "predominantly quasi judicial" functions, *Humphrey's Executor*, 295 U.S. at 624, and serve as "adjudicatory bod[ies]," *Wiener v. United States*, 357 U.S. 349, 356 (1958).

That is precisely what Congress did with the Merit Systems Protection Board, an adjudicatory body that hears discrete appeals from civil servants who allege (for example) partisan discrimination or whistleblower retaliation. *See* App. A. 72 (Millett, J., dissenting) ("In the government's own words, the MSPB is 'predominantly an adjudicatory body.' ").

The panel's extraordinary order allows the Administration to immediately remove Harris from her position as a neutral arbitrator—something no President has attempted in the modern era—and mars the protection that Congress deemed essential for adjudicators to decide cases without fear or favor. The order effectively overturns *Humphrey's Executor* and *Wiener*; defies the Supreme Court's express instructions in *Seila Law* that the *Humphrey's Executor* framework remains good law; and "openly calls into question the constitutionality of dozens of federal statutes conditioning the removal of officials on multimember decision-making bodies— everything from the Federal Reserve Board and the Nuclear Regulatory Commission to the National Transportation Safety Board and the Court of Appeals for Veterans Claims." App. A. 61 (Millett, J., dissenting).

Perhaps most troublingly, the panel reached this result *on an emergency motion*, in which the government sought the "extraordinary remedy" of a "stay pending appeal," and bore the burden of proving "a *strong* showing that it is *likely to succeed*." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (brackets and quotation marks omitted, emphases added).

As Judge Millett's dissent underscores—and as Harris will explain in more detail in her forthcoming filing—this matter meets every criterion for the full Court's review. *See* Fed. R. App. P. 40(b)(2). Judge Walker's and Judge Henderson's "opinions voting to grant a stay rewrite controlling Supreme Court precedent and ignore binding rulings of this court, all in favor of putting this court in direct conflict with at least two other circuits." App. A. 61 (Millett, J., dissenting). Indeed, as Judge Millett warns, the panel order could have devastating immediate effect: Because the order will apply to the Federal Reserve Board too, a "century-plus of politically independent monetary policy is set to vanish with a pre-merits snap of this court's fingers." *Id*. at 112.

Panels are "the agent of the court," and the en banc Court should not let this aberrational result stand. Douglas H. Ginsburg & Donald Falk, *The Court En Banc: 1981-1990*, 59 Geo. Wash. L. Rev. 1008, 1012 (1991); *cf. Garza v. Hargan*, No. 17-05236 (D.C. Cir. 2017) (en banc). The Court must "apply controlling precedent, not play jurisprudential weather forecasters." App. A. 83 (Millett, J., dissenting). A

brief administrative stay will preserve the status quo ante and prevent disruption, while the full Court quickly considers Harris' forthcoming request to consider this matter.

An administrative stay will also not harm the government one bit. Harris has been exercising the powers of her Senate-confirmed office before and during this litigation, with only a brief gap between when the President purported to remove her on February 10, and when the District Court issued a temporary restraining order on February 18. The government took the position that the temporary restraining order was appealable, yet it waited for two weeks to seek emergency relief from this Court (in contrast to *Dellinger v. Bessent*, No. 25-5028 (D.C. Cir.), where it rapidly sought relief both from this Court and the Supreme Court). The government's claim of burden to the Executive faces the additional problem that no executive has ever sought to do what the current President seeks to do here. And as Judge Millett explained, any "asserted injury to the President is entirely bound up with the merits of the government's constitutional argument." App. A. 107 (Millett, J., dissenting).

The government, in short, will not face any meaningful harm if Harris continues to fulfill her adjudicative responsibilities for the brief period in which the en banc Court evaluates this case. Indeed, it would be disruptive to the government and the public at large were Harris to be prevented from fulfilling her congressionally mandated duties for the brief period in which the Court considers her request. As

Judge Millett underscored, the panel's order divests the Merit Systems Protection Board of a quorum and traps "in legal limbo millions of" federal "employees" "whom the law says must go to the" Board. App. A. 62 (Millett, J., dissenting).

Harris respectfully requests the Court rule on this motion for an administrative stay as quickly as possible, but no later than the morning of Monday, March 31, 2025.[2]

March 28, 2025                                  Respectfully submitted,

                                                /s/ Neal Kumar Katyal
MICHAEL J. KATOR                                NEAL KUMAR KATYAL
JEREMY D. WRIGHT                                  *Counsel of Record*
KERRIE D. RIGGS                                 NATHANIEL A.G. ZELINSKY
KATOR, PARKS, WEISER & WRIGHT,                  KRISTINA ALEKSEYEVA
    P.L.L.C.                                     EZRA P. LOUVIS
1150 Connecticut Ave., NW                       SAMANTHA K. ILAGAN
Suite 705                                       MILBANK LLP
Washington, DC 20036                            1850 K St., NW
(202) 898-4800                                  Suite 1100
mkator@katorparks.com                           Washington, DC 20006
                                                (202) 835-7505
LINDA M. CORREIA                                nkatyal@milbank.com
CORREIA & PUTH, PLLC
1400 16th St., NW                               CARL RIZZI
Suite 450                                       LUCILLE E. BAEURLE
Washington, D.C. 20036                          MILBANK LLP
(202) 602-6500                                  55 Hudson Yards
lcorreia@correiaputh.com                        New York, NY 10001
                                                (212) 530-5786
                                                crizzi@milbank.com

*Counsel for Plaintiff-Appellee Cathy A. Harris*

---

[2] To avoid any doubt, Harris requests that the administrative stay persist, at minimum, for the period in which the en banc Court deliberates on this matter.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), I certify that this brief contains 1,027 words. I certify this Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft word 14-point Times New Roman, a proportionally spaced font.

March 28, 2025

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
    *Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 28, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All counsel in this case are registered CM/ECF users and will be served by the appellate CM/ECF.

March 28, 2025

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
  *Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

# Appendix A

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

## No. 25-5037

## September Term, 2024

**1:25-cv-00412-RC**

**Filed On:** March 28, 2025

Cathy A. Harris, in her personal capacity and
in her official capacity as Member of the Merit
Systems Protection Board,

        Appellee

   v.

Scott Bessent, in his official capacity as
Secretary of the Treasury, et al.,

        Appellants

------------------------------

Consolidated with 25-5055

------------------------------

## No. 25-5057

**1:25-cv-00334-BAH**

Gwynne A. Wilcox,

        Appellee

   v.

Donald J. Trump, in his official capacity as
President of the United States and Marvin E.
Kaplan, in his official capacity as Chairman of
the National Labor Relations Board,

        Appellants

   **BEFORE:**   Henderson, Millett[*], and Walker, Circuit Judges

### O R D E R

    Upon consideration of the emergency motions for stay filed in Nos. 25-5055 and
25-5057, the oppositions thereto, the replies, and the briefs filed by amici curiae
regarding the stay motions; it is

---

    [*] Judge Millett dissents from the grant of the emergency motions for stay.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5037**                                     **September Term, 2024**

      **ORDERED** that the emergency motions for stay be granted.  Separate concurring statements of Judge Walker and Judge Henderson and a dissenting statement of Judge Millett are attached.

### Per Curiam

                                    **FOR THE COURT:**
                                    Clifton B. Cislak, Clerk

                BY:     /s/
                                    Daniel J. Reidy
                                    Deputy Clerk

WALKER, *Circuit Judge*, concurring:

Article II of the Constitution vests the "executive Power" in "a President of the United States" and requires him to "take Care that the Laws be faithfully executed."[1] "To protect individual liberty, the Framers . . . created a President independent from the Legislative Branch."[2] "To further safeguard liberty, the Framers insisted upon accountability for the exercise of executive power," so they "lodged full responsibility for the executive power in a President of the United States, who is elected by and accountable to the people."[3]

Executive branch agencies do not disrupt that design when they are accountable to the President. "But consent of the governed is a sham if an administrative agency, by design, does not meaningfully answer for its policies to either of the elected branches."[4] That's why the Supreme Court has said that Congress cannot restrict the President's removal authority over agencies that "wield substantial executive power."[5]

That Court's precedents control this court's case. Under those precedents, the Government is likely to succeed in showing that the statutory removal protections for National Labor Relations Board commissioners and Merit Systems Protection Board members are unconstitutional. The Government has also shown that it will suffer irreparable harm each day the President is deprived of the ability to control the executive branch. Conversely, the removed officials suffer no

---

[1] U.S. Const., art. II, §§ 1, 3.

[2] *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 689 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

[3] *PHH Corp. v. CFPB*, 881 F.3d 75, 164 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

[4] *Id.* at 137 (Henderson, J., dissenting).

[5] *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2199-2200 (2020).

2

cognizable irreparable harm during the pendency of these appeals, nor do the agencies where they previously worked until the President fired them. Finally, the public interest also supports a stay. The people elected the President to enforce the nation's laws, and a stay serves that purpose by allowing the people's chosen officer to control the executive branch.

I therefore support granting the motions for a stay pending appeal in *Harris v. Bessent* (25-5055) and *Wilcox v. Trump* (25-5057).

## I. Background

The National Labor Relations Board and the Merit Systems Protection Board are executive branch agencies. By the terms of statutes that the Government argues are unconstitutional, their members may be removed only for cause.[6]

On January 27, 2025, President Donald Trump removed Gwynne Wilcox from the NLRB prior to her term's expiration in 2028. In an explanatory letter, the President informed Wilcox that the NLRB had not "been operating in a manner consistent with the objectives of [his] administration."[7] Citing several recent Board decisions, he expressed concern that Wilcox was "unduly disfavoring the interests of employers."[8]

Wilcox sued for reinstatement on February 5, 2025. Five days later, she moved for summary judgment on an expedited basis. After a hearing on March 5, the district court granted

---

[6] 5 U.S.C. § 1202(d) (MSPB); 29 U.S.C § 153(a) (NLRB).

[7] Pl.'s Ex. A at 2, *Wilcox v. Trump*, No. 25-cv-334 (D.D.C. Feb. 20, 2025), ECF No. 10-4.

[8] *Id.*

3

summary judgment to Wilcox, declaring that she remained a member of the NLRB and permanently enjoining the NLRB's Chair and his subordinates from effectuating the President's removal order.

A similar chain of events occurred in *Harris v. Bessent*. On February 10, 2025, the President removed Cathy Harris from the MSPB prior to her term's expiration in 2028. Unlike Wilcox, Harris did not receive an explanatory letter.

Harris sued for reinstatement on February 11, 2025. Seven days later, the district court granted her request for a temporary restraining order, effectively reinstating her to the MSPB. A few weeks later, the court granted summary judgment for Harris, declaring that she remained a member of the MSPB and permanently enjoining various government officials from executing the President's removal order.

In defending these removals, the Government has not argued that the President met the statutory criteria for removal.[9] Instead, it has insisted that those provisions are unconstitutional infringements on the President's Article II removal power — a position consistent with the President's recent executive order regarding independent agencies.[10]

---

[9] *See* 5 U.S.C. § 1202(d) (removal "only for inefficiency, neglect of duty, or malfeasance in office"); 29 U.S.C. § 153(a) (removal only "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause").

[10] Exec. Order No. 14,215, Ensuring Accountability for All Agencies (Feb. 18, 2025), https://www.federalregister.gov/d/2025-03063.

The Government also maintains that federal district courts lack the equitable power to reinstate an officer who has been removed by the President. Because this court grants the Government's stay application on alternative grounds, I have no occasion to address this

4

On that basis, the Government appealed both orders and moved for emergency stays pending appeal.  We considered the two motions together and heard oral argument on March 18, 2025.

## II. The Presidential Removal Power

Before addressing the stay factors, it is prudent to address the text, history, and precedents that control this preliminary merits determination.

### A.   History

I begin with a review of our nation's founding period, the creation of our Constitution, and the historical practice in the decades that followed.

### 1.   The Energetic Executive

Under the Articles of Confederation, the early Republic experienced the perils of having a weak executive.  With "no executive separate from Congress,"[11] the federal government had to rely on the states' good graces to carry out national policies.[12]   And it was powerless to respond to national

---

argument.  *Cf. Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (observing that "by the 1880s [the Supreme] Court considered it 'well settled that a court of equity has no jurisdiction over the appointment and removal of public officers'" (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888))); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (reinstating a principal officer is "virtually unheard of").

[11] William P. Barr, *The Role of the Executive*, 43 Harv. J.L. & Pub. Pol'y 605, 607 (2020).

[12] *Printz v. United States*, 521 U.S. 898, 919 (1997).

5

emergencies, like the 1786 Shays' Rebellion.[13]   As Henry Knox put it, the federal government was but "a shadow without power, or effect."[14]

So when "the Framers met in Philadelphia in the summer of 1787, they sought to create a cohesive national sovereign in response to the failings of the Articles of Confederation."[15]  But the Framers also understood that a strong federal government could be abused.   They recognized that "structural protections" — most significantly, the separation of powers — "were critical to preserving liberty."[16]  By splitting the legislative, executive, and judicial powers, and "giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others," the federal government could avoid the "gradual concentration of the several powers in the same department."[17]

After their experience with parliamentary supremacy, the Framers were particularly concerned about the concentration of legislative power.[18]   For example, Gouverneur Morris warned delegates at the Constitutional Convention that the "Legislature will continually seek to aggrandize & perpetuate

---

[13] Max Farrand, The Fathers of the Constitution 95 (1921).

[14] Letter from Henry Knox to George Washington (March 19, 1787), https://perma.cc/9UCC-ZYAP.

[15] *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2263 (2021).

[16] *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

[17] The Federalist No. 51 (James Madison).

[18] *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 689 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

6

themselves."[19]    Drawing on well-established political traditions, the Framers divided Congress "into two Chambers: the House of Representatives and the Senate."[20]

Whereas the Framers *divided* the Legislative Power, they *unified* the Executive.  They were concerned that "the weakness of the executive may require . . . that it should be fortified."[21]  After the "humiliating weakness" of the Articles of Confederation, the "Framers deemed an energetic executive essential to 'the protection of the community against foreign attacks,' 'the steady administration of the laws,' 'the protection of property,' and 'the security of liberty.'"[22]

The Framers debated how to achieve that objective while also avoiding the dangers of monarchy or tyranny.  Some delegates proposed a plural executive to limit the concentration of power in any one person.  For example, Edmund Randolph pressed for a three-member executive representing different

---

[19] James Madison's Notes of the Constitutional Convention (July 19, 1787), https://perma.cc/HU54-J7SU.

[20] *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020).

[21] The Federalist No. 51.

[22] First quoting *Myers*, 272 U.S. 52, 117 (1926); then quoting *Seila Law*, 140 S. Ct. at 2203 (quoting The Federalist No. 70); *see also* Adam White, Chevron *Deference v. Steady Administration*, Yale J. Reg.: Notice & Comment (Jan. 24, 2024), https://perma.cc/8GLE-2JX4 ("Energetic presidents aren't inherently good.  Rather, presidential energy is good for a few important things—especially, Hamilton argued, for 'the steady administration of the laws.'").

7

regions of the country.[23]  And some proposed that Congress should choose the Executive — whether singular or plural.[24]

Ultimately, though, the Framers "'insisted' upon 'unity in the Federal Executive' to 'ensure both vigor and accountability' to the people."[25]  So they settled on a single executive, the President of the United States, who "would be personally responsible for his branch."[26]

That unity affords the President "[d]ecision, activity, secrecy, and dispatch," and it guards against a plural executive's tendency "to conceal faults and destroy responsibility."[27]  It also avoids "the 'habitual feebleness and dilatoriness' that comes with a 'diversity of views and opinions.'"[28]

At the same time, the Framers understood the risks posed by a strong executive.  Their solution?  Making "the President the most democratic and politically accountable official in Government," subject to election "by the entire Nation" every

---

[23] Daniel A. Farber & Suzanna Sherry, A History of the American Constitution 124 (3d ed. 2013).

[24] *Id.* at 118, 127-28.

[25] *Seila Law*, 140 S. Ct. at 2212 (Thomas, J., concurring in part and dissenting in part) (quoting *Printz*, 521 U.S. at 922) (cleaned up).

[26] Akhil Reed Amar, America's Constitution: A Biography 197 (2005); *see also Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring in the judgment) ("Article II makes a single President responsible for the actions of the Executive Branch in much the same way that the entire Congress is responsible for the actions of the Legislative Branch, or the entire Judiciary for those of the Judicial Branch.").

[27] The Federalist No. 70 (Alexander Hamilton).

[28] *Seila Law*, 140 S. Ct. at 2203 (quoting The Federalist No. 70).

8

four years.[29]    The "resulting constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections."[30]

### 2.  Original Understanding of the Removal Power

Against that backdrop, the Constitution assigns a lofty role to the President.  Article II vests the "executive Power" in the "President of the United States of America."[31]  And it charges the President to "take Care that the Laws be faithfully executed."[32]

Of course, the President cannot carry out his duties "alone and unaided" — he must enlist the "assistance of subordinates."[33]    The Framers envisioned a "chain of dependence" in the executive branch, where "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President."[34]  The Vesting Clause empowers the President to direct and control those officials.  As James Madison explained, "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws."[35]

---

[29] *Id.*

[30] *Id.*

[31] U.S. Const. art. II, § 1.

[32] *Id.* § 3.

[33] *Myers*, 272 U.S. at 117.

[34] 1 Annals of Congress 499 (1789) (James Madison).

[35] *Id.* at 463; *see also* Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1215 (2014) ("The text and structure of Article II provide the President with the power to control subordinates within the executive branch.").

9

That includes "a power to oversee executive officers through removal."[36]  Because the Constitution provided no textual limits on that "traditional executive power," "it remained with the President."[37]

Founding-era history confirms that understanding.  The First Congress encountered the question directly, and its debate and decision — now called "the Decision of 1789" — provides "contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument."[38]

During the summer of 1789 "ensued what has been many times described as one of the ablest constitutional debates which has taken place."[39]  The topic of the President's removal power came up "during consideration of a bill establishing certain Executive Branch offices and providing that the officers

---

[36] *Free Enterprise Fund*, 561 U.S. at 492 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), *in* 16 Documentary History of the First Federal Congress 893 (2004)).

[37] *Id.* (cleaned up).

  The absence of a "removal clause" does not mean the President lacks a removal power, just as the absence of a "'separation of powers clause' or a 'federalism clause'" does not undercut those "foundational doctrines."  *Seila Law*, 140 S. Ct. at 2205.  As the Supreme Court has "explained many times before, the President's removal power stems from Article II's vesting of the 'executive Power' in the President."  *Id.*

[38] *Bowsher*, 478 U.S. at 723-24 (internal quotation marks omitted).

[39] *Parsons v. United States*, 167 U.S. 324, 329 (1897).

10

would be subject to Senate confirmation and 'removable by the President.'"[40]

The House debated various theories, including that Congress could specify the President's removal authority on an office-by-office basis, that officers could be removed only through impeachment, that removal required the advice and consent of the Senate, and that the "executive power" conferred plenary removal authority to the President.[41]

The last view, advocated by James Madison, prevailed: The "executive power included a power to oversee executive officers through removal."[42]    To avoid giving the impression that Congress had any say in the President's removal decisions, the House deleted the bill's provision making officers "removable by the President."[43]

In retrospect, the Decision of 1789 has been viewed as "a legislative declaration that the power to remove officers appointed by the President and the Senate [is] vested in the President alone."[44]

---

[40] *Free Enterprise Fund*, 537 F.3d at 691 (Kavanaugh, J., dissenting) (quoting *Myers*, 272 U.S. at 111).

[41] Aditya Bamzai & Saikrishna Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1774 (2023).

[42] *Free Enterprise Fund*, 561 U.S. at 492.

[43] *Myers*, 272 U.S. at 113-14.

[44] *Id.* at 114; *see also id.* at 144 (the Decision of 1789 "has ever been considered as a full expression of the sense of the legislature on this important part of the American constitution" (quoting 5 John Marshall, The Life of George Washington 200 (1807)).

The district court in *Wilcox* took a different view of the Decision of 1789.  *Wilcox v. Trump*, No. 25-334, 2025 WL 720914, at *12 (D.D.C. Mar. 6, 2025).  To the extent the Decision of 1789 is

11

### 3. Historical Practice

The understanding that the President holds unrestricted removal power "became widely accepted during the first 60 years of the Nation."[45]  George Washington removed "almost twenty officers, including a consul, diplomats, tax collectors, surveyors, and military officers."[46]    What's more, his commissions typically stated that officeholders served during "the pleasure of the President," indicating Washington's apparent belief that he could dismiss officers at will.[47]  Then-Secretary of State Timothy Pickering — the official in charge of signing commissions — confirmed the meaning of that language: "In all cases except that of the Judges, it has been established from the time of organizing the Government, that

---

susceptible to multiple interpretations, I follow the Supreme Court's. *See Myers*, 272 U.S. at 114; *Parsons*, 167 U.S. at 328-30; *Bowsher*, 478 U.S. at 723; *Free Enterprise Fund*, 561 U.S. at 492; *Seila Law*, 140 S. Ct. at 2197.

At least one amicus disputes the Supreme Court's settled view of the historical evidence.  Constitutional Accountability Center Br. at 10-12.  Although Alexander Hamilton originally took the position that Senate consent would be required to remove an officer, The Federalist No. 77 (Alexander Hamilton), he "later abandoned" that "initial" view, *Seila Law*, 140 S. Ct. 2205.  Likewise, "whatever Madison may have meant" by his statement in Federalist No. 39 that "the 'tenure' of 'ministerial offices generally will be a subject of legal regulation,'" he later "led the charge" in defending the President's removal authority during the Decision of 1789.  *Seila*, 140 S. Ct. at 2205 n.10.  Finally, the Court has "reject[ed]" Chief Justice Marshall's statement in *Marbury* that some officers are not "removable at the will of the executive" as "ill-considered dicta." *Id.* at 2205 (citing *Myers*, 272 U.S. at 136-39, 142-44).

[45] *Free Enterprise Fund*, 537 F.3d at 692 (Kavanaugh, J., dissenting).

[46] Bamzai & Prakash, *The Executive Power of Removal*, at 1777.

[47] *Id.* at 1777-78.

12

removals from offices should depend on the pleasure of the Executive power."[48]

Subsequent Presidents also dismissed officers at will, often based on political disagreements. John Adams removed Secretary Pickering over a disagreement about America's alignment with France.[49]  (Yes, the same Pickering who defended Washington's removal power.)  James Madison "compelled the resignation of" Secretary of War John Armstrong following the War of 1812.[50]  Andrew Jackson removed Treasury Secretary William Duane for his refusal to withdraw federal deposits from the Second Bank of the United States.[51] William Henry Harrison intended to remove scores of Jacksonian officials but died before he had the chance — just one month after entering office.[52]  His successor, John Tyler, quickly carried out Harrison's removal plans.[53]  Not to be outdone, Millard Filmore dismissed Zachary Taylor's entire cabinet as his "first act in office."[54]

To be sure, these removals sometimes prompted minor opposition from Congress.  For example, after Jackson removed Surveyor General Gideon Fitz, "the Senate adopted a resolution requesting the President to communicate" his

[48] *Id.* at 1778 (quoting Letter from James Monroe to Timothy Pickering (July 31, 1797), *in* 3 The Writings of James Monroe 73, 75 n.1 (Stanislaus Murray Hamilton ed., 1969) (quoting a letter from Pickering to Monroe)).

[49] Steven G. Calabresi & Christopher S. Yoo, The Unitary Executive 62 (2008).

[50] *Id.* at 79.

[51] *Id.* at 106, 108.

[52] *Id.* at 131-32.

[53] *Id.* at 135.

[54] *Id.* at 148.

13

reasons for firing Fitz to aid in the Senate's "constitutional action upon the nomination of his successor."[55] Jackson refused to comply with what he deemed "unconstitutional demands."[56] Presidents in our nation's first hundred years faced other similarly halfhearted resolutions in response to their exercise of the removal power.[57]

One exceptional case was the impeachment of Andrew Johnson, following his removal of Secretary of War Edwin Stanton.[58] The impeachment charged Johnson with violating the 1867 Tenure of Office Act, which required Senate consent to remove officers.[59] Much of Johnson's defense centered on his view that the Act was unconstitutional,[60] a view the Supreme Court later endorsed.[61]

The Senate narrowly acquitted Johnson.[62] "The contentious Johnson episode ended in a way that discouraged congressional restrictions on the President's removal power and helped preserve Presidential control over the Executive

---

[55] *Myers*, 272 U.S. at 287 n.77 (Brandeis, J., dissenting).

[56] *Id.*

[57] *See, e.g.*, *id.* at 279-81 & nn. 64 & 67 (Brandeis, J., dissenting) (discussing proposals to require "the President to give the number and reasons for removals").

[58] Calabresi & Yoo, The Unitary Executive, at 185.

[59] *Id.* at 179.

[60] David Miller DeWitt, The Impeachment and Trial of Andrew Johnson 445 (1903).

[61] *See Myers*, 272 U.S. at 176 (declaring the Tenure of Office Act "invalid" "in so far as it attempted to prevent the President from removing executive officers who had been appointed by him by and with the advice and consent of the Senate").

[62] Calabresi & Yoo, The Unitary Executive, at 186.

14

Branch."[63]  It now "stands as one of the most important events in American history in maintaining the separation of powers ordained by the Constitution."[64]

A few decades later, another removal dispute arose when Grover Cleveland dismissed U.S. Attorney Lewis Parsons prior to the conclusion of Parsons' statutory four-year term.[65] Parsons argued that the President could not remove him until the four-year term elapsed.[66]  The Court disagreed.  After recounting the Decision of 1789 and the "continued and uninterrupted practice" of plenary presidential removal, the Court construed Parsons' four-year term as a ceiling for how long he could remain in office — not as a restriction on the President's power to remove him sooner.[67]

As this history demonstrates, the Founders understood that the President had inherent, inviolable, and unlimited authority to remove principal officers exercising substantial executive authority, and Presidents have exercised that authority since the very beginning of the Republic, beginning with George Washington.

## B.  Precedent

With those historical underpinnings, I turn to the Supreme Court's more recent precedents.  The Court has reaffirmed the President's inherent removal power on several occasions,

---

[63] *Free Enterprise Fund*, 537 F.3d at 692 (Kavanaugh, J., dissenting).

[64] *Id.* at 692-93.

[65] *Parsons*, 167 U.S. at 327-28.

[66] *Id.* at 328.

[67] *Id.* at 338-39, 340.

15

relying often on the historical evidence recounted in the preceding section.

That is not to say the Court's removal-power jurisprudence has always been consistent. Though the Court in *Myers* reaffirmed the President's unilateral removal power, *Humphrey's Executor* created an exception to the rule. It left future courts to decide when that exception might apply. To the extent that *Humphrey's* created a showdown between the *Myers* rule and the *Humphrey's* exception, the Court's recent decisions have been unequivocal: *Humphrey's* has few, if any, applications today. To discern the Supreme Court's rule, I review the Court's holdings, beginning with *Myers*.

### 1. *Myers*

In 1920, President Woodrow Wilson removed postmaster Frank Myers from office.[68] Myers sought backpay, relying on a statute that required the President to obtain Senate approval before removing him — something the President had indisputably not done.[69] The question before the Court was whether the Constitution permitted such a restriction.

Writing for the Court, Chief Justice Taft undertook a deep historical survey, concluding that the statutory provision denying the President the "unrestricted power of removal" was "in violation of the Constitution and invalid."[70] That survey highlighted much of the history recounted above, including the Decision of 1789. The Court focused on four points advanced

---

[68] *Myers*, 272 U.S. at 106.

[69] *Id.* at 107-08.

[70] *Id.* at 176.

16

by James Madison and his allies during that congressional debate.

First, *Myers* stressed that the President's supervisory power over officers is crucial for protecting the separation of powers: "If there is any point in which the separation of the legislative and executive powers ought to be maintained with great caution, it is that which relates to officers and offices."[71] It further explained that to "take care that the laws be faithfully executed," the President must be able to "select those who were to act for him under his direction" and remove "those for whom he cannot continue to be responsible."[72]   The Court's conclusion: "[N]o express limit was placed on the power of removal by the executive" and "none was intended."[73]

Second, the Court considered whether the Senate's role in presidential appointments carried with it a corresponding role in removals.  It concluded that history would not support that inference.  The power of removal "is different in its nature from that of appointment," as was "pointed out" in the First Congress's debate.[74]  That's because a Senate veto of a removal "is a much greater limitation upon the executive branch, and a much more serious blending of the legislative with the executive, than a rejection of a proposed appointment."[75]  So where the Constitution does not directly provide Congress any power over removals, that power "is not to be implied."[76]

---

[71] *Id.* (quoting 1 Annals of Congress 581 (1789) (James Madison)).

[72] *Id.* at 117, 122.

[73] *Myers*, 272 U.S. at 118.

[74] *Id.* at 121.

[75] *Id.*

[76] *Id.*

17

Third, the Court observed that Congress's power to create offices did not carry a corresponding power to limit the President's removal power over them. The "legislative power" is "limited to" the powers "enumerated" under Article I of the Constitution; the "executive power" is a "more general grant."[77] Thus, the Court found it "reasonable to suppose" that if the Founders "intended to give to Congress power to regulate or control removals," they would have included those powers "among the specifically enumerated legislative powers in article 1, or in the specified limitations on the executive power in article 2."[78]

Fourth and finally, the Court noted the threat that Congress could "thwart[ ] the executive in the exercise of his great powers and in the bearing of his great responsibility by fastening upon him . . . men who" might render his faithful execution of the laws "difficult or impossible" — be it "by their inefficient service under him, by their lack of loyalty to the service, or by their different views of policy."[79] To avoid this possibility, the moment that the President "loses confidence in the intelligence, ability, judgment, or loyalty of any one of [his subordinates], he must have the power to remove him without delay."[80]

The Court specifically included within that authority the power to remove executive officers whose duties include those "of a quasi judicial character."[81] Though the Court noted that "the President cannot . . . properly influence or control" the discharge of such duties, he may still "consider the decision

---

[77] *Id.* at 128.

[78] *Myers*, 272 U.S. at 128.

[79] *Id.* at 131.

[80] *Id.* at 134.

[81] *Id.* at 135.

18

after its rendition as a reason for removing the officer. . . . Otherwise he does not discharge his own constitutional duty of seeing that the laws be faithfully executed."[82]

*Myers* was a landmark decision.  It established that the President's removal power is grounded in the Constitution's text and history and bolstered by tradition.  It is essential to the constitutional separation of powers and to the President's ability to "take Care that the Laws be faithfully executed."[83]

### 2.  *Humphrey's Executor*

Then came *Humphrey's Executor*.[84]  It reaffirmed the core holding of *Myers* — that the President holds an "illimitable power of removal" over "purely executive officers."[85]  But "in six quick pages devoid of textual or historical precedent for the novel principle it set forth,"[86] *Humphrey's* carved out an exception for agencies that wield "no part of the executive power."[87]

According to the Court, that exception permitted Congress to insulate officers of the relevant agency, the Federal Trade Commission, from at-will removal.  That exception rested on the Court's characterization of the FTC as an entity that exercised "no part of the executive power" and that in no way acted as "an arm or an eye of the executive."[88]  Instead, the

---

[82] *Id.*

[83] U.S. Const. art. I, § 3.

[84] *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

[85] *Id.* at 627-28.

[86] *Morrison v. Olson*, 487 U.S. 654, 726 (1988) (Scalia, J., dissenting).

[87] *Humphrey's Executor*, 295 U.S. at 628.

[88] *Id.*

19

Court viewed the agency as "wholly disconnected from the executive department" — "an agency of the legislative and judicial departments."[89]

Confronted with the 1935 FTC's role in investigating and reporting violations of the law — responsibilities typically associated with the executive branch — the Court insisted that the 1935 FTC did not wield "executive power in the constitutional sense," even if it performed an "executive function."[90] To justify the distinction, it classified the agency's work as "neither political nor executive, but predominantly quasi judicial and quasi legislative."[91]

The *Humphrey's* Court conceded the ambiguity inherent in its ruling, acknowledging a potential "field of doubt" between *Myers* — where presidential removal power over purely executive officers was absolute — and *Humphrey's*, which permitted removal restrictions only if an agency "exercise[d] no part of the executive power."[92] Rather than clarifying the boundaries between these categories, the Court explicitly deferred such questions for "future consideration and determination."[93]

---

[89] *Id.* at 630.

[90] *Id.* at 28.

I say the "1935 FTC" to distinguish it from the 2025 FTC, which exercises greater power than the 1935 FTC. *See, e.g.*, *Collins v. Yellen*, 141 S. Ct. 1761, 1806 (2021) (Sotomayor, J., concurring in part and dissenting in part) ("1935 FTC did not [have] the power to impose fines").

[91] *Id.* at 624.

[92] *Id.* at 628, 632.

[93] *Id.* at 632.

20

As the rest of this survey will show, subsequent decisions by the Supreme Court have come close to closing the gap that *Humphrey's* left. The Court has consistently declined to extend *Humphrey's* beyond its facts and has instead reaffirmed *Myers* as the default rule that occupies the "field of doubt" for any agency that wields the substantial executive power that *Humphrey's* understood the 1935 FTC not to exercise.

### 3. *Wiener*

One might say *Humphrey's* had "one good year" in 1958, when the Court applied it in *Wiener v. United States*.[94] There, the Court "read a removal restriction into the War Claims Act of 1948" because the War Claims Commission "was an adjudicatory body."[95]

The *Wiener* opinion took for granted that the Commission was purely an adjudicatory body. Indeed, the Commission's entire responsibility, in the Court's view, consisted of "receiv[ing] and adjudicat[ing] . . . three classes of claims" defined by statute.[96] Nothing more. So in *Wiener*, the *Humphrey's* exception continued unchanged: Officers of agencies that do not exercise executive power may be insulated from presidential removal.

---

[94] 357 U.S. 349 (1958); *cf.* Cass Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 322 (2000).

[95] *Collins*, 141 S. Ct. 1761, 1783 n.18.

[96] *Wiener*, 357 U.S. at 354 (quoting War Claims Act of 1948, Pub. L. No. 80-896, ch. 826, § 3, 62 Stat. 1240, 1241 (codified at 50 U.S.C. § 4102)).

21

#### 4.  *Free Enterprise Fund*

The Court declined to extend *Humphrey's* in *Free Enterprise Fund v. PCAOB*.[97]  That case involved a challenge to the Public Company Accounting Oversight Board's double-layer removal protections — its members were removable only for cause by SEC commissioners who in turn were removable only for cause.[98]

Reversing a panel decision of this court, the Supreme Court rejected the Board's structure as a violation of the Vesting Clause, the Take Care Clause, and the Constitution's separation of powers.[99]  Multi-layered removal protections rendered the President helpless to "oversee the faithfulness of the officers who execute" the law.[100]  If an inferior officer performed poorly, the President could not remove him; nor could the President remove the poor performer's supervisor for failing to carry out the desired removal.[101]  As a result, the President had no way to hold officers accountable in the executive branch.

According to *Free Enterprise Fund*, the Founders created a unitary executive in part to ensure political accountability to the people.  Because citizens "do not vote for the 'Officers of the United States,'" they must instead "look to the President to guide the 'assistants or deputies . . . subject to his

---

[97] 561 U.S. 477 (2010).

[98] *Id.* at 487.

[99] *Id.* at 484, 492.

[100] *Id.* at 484.

[101] *Id.*

22

superintendence."[102]  Without this "clear and effective chain of command," voters cannot identify "on whom the blame or the punishment" should fall when the government errs.[103]

The Court stressed that its decision did not constrain the size of the executive branch but instead safeguarded its accountability.  The larger and more complex the executive branch becomes, the greater the risk that it will "slip from the Executive's control, and thus from that of the people."[104]  As the executive branch expands — wielding "vast power and touch[ing] almost every aspect of daily life" — its accountability to a democratically elected President is even more essential.[105]

Where did *Free Enterprise Fund* leave *Myers*?  It called *Myers* a "landmark."[106]  And it reaffirmed *Myers*' "principle that Article II confers on the President 'the general administrative control of those executing the laws,'" including the removal power.[107]

And *Humphrey's*?  The Court declined to extend that decision to "a new type of restriction."[108]  So *Free Enterprise*

---

[102] *Free Enterprise Fund*, 561 U.S. at 497-98 (first quoting U.S. Const. art I, § 2, cl. 2, then quoting The Federalist No. 72 (Alexander Hamilton)).

[103] *Id.* at 498 (quoting The Federalist No. 70 (Alexander Hamilton)).

[104] *Id.* at 499.

[105] *Id.*

[106] *Id.* at 492.

[107] *Free Enterprise Fund*, 561 U.S. at 492 (quoting *Myers*, 272 U.S. at 164).

[108] *Id.* at 514.

23

*Fund*'s reasoning "is in tension with" *Humphrey's*,[109] including *Humphrey's* departure from *Myers*' "traditional default rule" that "removal is incident to the power of appointment."[110] For any future case about an agency in the "field of doubt" between *Myers* and *Humphrey's*, the Court directed us to apply *Myers*, not *Humphrey's*.

### 5. *Seila Law*

The Court again declined to extend *Humphrey's* in *Seila Law LLC v. CFPB*.[111] That case presented another "new situation": "an independent agency," the Consumer Financial Protection Bureau, "led by a single Director and vested with significant executive power."[112]

As in *Free Enterprise Fund*, the Supreme Court repudiated a decision of this court.[113] And as in *Free Enterprise Fund*, the Supreme Court took the President's absolute removal power as expressed in *Myers* as "the rule," with *Humphrey's* as a limited exception.[114] The Court explained that *Humphrey's* represents "the *outermost* constitutional limits of permissible congressional restrictions on the President's removal power,"

---

[109] *PHH Corp. v. CFPB*, 881 F.3d 75, 194 n.18 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (citing *In re Aiken County*, 645 F.3d 428, 444-46 (D.C. Cir. 2011) (Kavanaugh, J., concurring)); *see also* Rao, *Removal*, at 1208.

[110] *Free Enterprise Fund*, 561 U.S. at 509.

[111] 140 S. Ct. 2183, 2203 (2020).

[112] *Id.* at 2201.

[113] *See id.* at 2194 (discussing *PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc)).

[114] *Id.* at 2201.

24

and it declined to extend *Humphrey's* to the novel agency structure at issue in *Seila Law*.[115]

The Court fashioned a clear rule for the *Humphrey's* exception: It applies only to "multimember expert agencies that do not wield substantial executive power."[116]

Once again, *Seila Law* confirmed that in cases falling in the "field of doubt" between *Myers* and *Humphrey's*, *Myers* controls.

### 6. *Collins*

*Collins v. Yellen* applied *Seila Law*'s holding to another independent agency led by a single top officer — the Federal Housing Finance Authority.[117]  In doing so, the Court doubled down on its prior reasoning and has been understood by some — including Justice Kagan — to have gone even further than *Seila Law* in affirming the *Myers* default rule.[118]

First, the Court rejected the argument that FHFA's more limited authority justified its removal protection.[119]  Instead, the Court reaffirmed the President's removal power as serving "vital purposes" regardless of an agency's scope or power.[120]

---

[115] *Id*. at 2200 (quoting *PHH Corp.*, 881 F.3d at 196 (Kavanaugh, J., dissenting)) (emphasis added).

[116] *Id.* at 2200-01.

[117] *See* 141 S. Ct. 1761, 1783-87 (2021).

[118] *Id.* at 1801 (Kagan, J., concurring in part and concurring in the judgment) (noting the majority jettisoned "significant executive power" from the test in *Seila Law*).

[119] *Id.* at 1784-85.

[120] *Id.* at 1784.

25

Second, the Court rejected the argument that the FHFA doesn't exercise executive power given its role as a conservator or receiver, in which it sometimes acts as "a private party."[121] To the contrary, the FHFA derived its power from a statute and was tasked with interpreting and implementing that statute — "the very essence of execution of the law."[122] The FHFA's ability to issue binding orders further confirmed that it "clearly exercises executive power."[123]

Third, the Court asked whether an agency that does not regulate "purely private actors" might avoid the presidential removal rule.[124] Again, the Court answered in the negative. Once more, it emphasized the "important purposes" served by the removal power, regardless of whether an agency regulates private actors directly.[125] The implication: If an agency "can deeply impact the lives of millions of Americans" through its decisions, even indirectly, it is an agency that the President must be able to control.[126]

Finally, the Court addressed whether the "modest" nature of the FHFA director's tenure protection — less restrictive than other removal clauses — warranted a different outcome.[127] Again, the Court rejected the distinction, holding

---

[121] *Id.* at 1785-86.

[122] *Collins*, 141 S. Ct. at 1785 (cleaned up).

[123] *Id.* at 1786.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Collins*, 141 S. Ct. at 1786.

26

that the Constitution "prohibits even 'modest restrictions'" on the President's removal power.[128]

Once again, *Myers* occupied the "field of doubt" between the (by now exceptionally broad) *Myers* rule and the (by now exceptionally narrow) *Humphrey's* exception.

### C. The State of the Doctrine Today

Text, history, and precedent are clear: The Constitution vests the "entire 'executive Power'" in the President.[129] That power "includes the ability to remove executive officials."[130] Without such power, it would be "impossible for the President . . . to take care that the laws be faithfully executed."[131]

The Supreme Court has "left in place two exceptions to the President's unrestricted removal power."[132] Each of them is binding on lower courts, even if each of them is also on jurisprudential life support. One of them — *Morrison v. Olson* — is not relevant here.[133]

The second exception is *Humphrey's*. It allows Congress to restrict the President's removal power for "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions" and exercises "no part of the

---

[128] *Id.* at 1787 (quoting *Seila Law*, 140 S. Ct. at 2205).

[129] *Seila Law*, 140 S. Ct. at 2197.

[130] *Id.*

[131] *Id.* at 2198 (quoting *Myers*, 272 U.S. at 164).

[132] *Id.*

[133] 487 U.S. 654 (1988); *cf. Seila Law*, 140 S. Ct. at 2200 (*Morrison* covers "inferior officers with limited duties and no policymaking or administrative authority").

27

executive power."[134]  Under modern Supreme Court precedent, that exception stretches no further than partisan-balanced "multimember expert agencies that do not wield substantial executive power."[135]

For a court to conclude that an executive agency wields substantial executive power, it need not assemble a fact-intensive catalog of the agency's executive functions.  The default: *Executive* agencies exercise *executive* power.  The exception covers only an agency materially indistinguishable from the 1935 FTC, as *Humphrey's* understood the 1935 FTC.

Why did the Supreme Court narrow *Humphrey's* so severely in *Seila Law* and *Collins*?

Perhaps it was because *Humphrey's* "authorize[s] a significant intrusion on the President's Article II authority to exercise the executive power and take care that the laws be faithfully executed."[136]

Or perhaps it was because *Humphrey's* "did not pause to examine how a purpose to create a body 'subject only to the people of the United States' — that is, apparently, beyond control of the constitutionally defined branches of

---

[134] *Id.* at 2198-99 (second part quoting *Humphrey's Executor*, 295 U.S. at 628).

[135] *Id.* at 2199-2200.

Although the CFPB does not conduct adjudications, it's clear that *Seila*'s "substantial executive power" test applies to adjudicatory agencies like the MSPB and NLRB.  After all, *Seila* was describing the exception in *Humphrey's*, which dealt with an adjudicatory agency — the 1935 FTC.

[136] *Free Enterprise Fund*, 537 F.3d at 696 (Kavanaugh, J., dissenting).

28

government — could itself be sustained under the Constitution."[137]

Or perhaps it was because *Humphrey's* relied on inconsistent separation-of-powers logic, which fails to account for how "an agency can at the same moment reside in both the legislative and the judicial branches" without infringing on "the 'fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence . . . of either of the others.'"[138]

Or perhaps still it was because *Humphrey's* made incomprehensible distinctions "between 'executive function' and 'executive power.'"[139]  "Of course the commission was carrying out laws Congress had enacted; in that sense its functions could hardly have been characterized as other than executive, whatever procedures it employed to accomplish its ends."[140]

Whatever the reason, without overturning *Humphrey's*, the Supreme Court has seemed "keen to prune . . . *Humphrey's*."[141]    The Court's recent opinions have "characterized the 'independent agencies' as executive and

---

[137] Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 Colum. L. Rev. 573, 611-12 (1984).

[138] *Id.* at 612 (quoting *Humphrey's Executor*, 295 U.S. at 629).

[139] *Id.*

[140] *Id.*

[141] Aditya Bamzai & Saikrishna Bangalore Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1759 (2023).

29

have rejected the notion that these agencies exercise quasi-legislative or quasi-judicial powers."[142]

No wonder that *Humphrey's* has been mostly ignored in recent years by Supreme Court majorities — like a benched quarterback watching *Myers* (and the original meaning of the Constitution) from the sideline.

To be clear, this court must "follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions."[143]    We cannot overrule

---

[142] *Id.*

Recent Supreme Court precedents have "doubted Congress's ability to vest *any* judicial power (whether 'quasi' or not) in an executive agency." *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring) (citing *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1372-73 (2018)). And "congress cannot delegate legislative power to the president." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *cf. Mistretta v. United States*, 488 U.S. 361, 419 (1989) (Scalia, J., dissenting) ("Strictly speaking, there is *no* acceptable delegation of legislative power."). As a result, while specifically listing an executive agency's executive functions is a sufficient basis for concluding the President may remove that agency's principal officers, it is not a necessary basis. *See Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring in part and concurring in the judgment) (arguing that *Collins* "broaden[ed]" *Seila Law* by clarifying that "the constitutionality of removal restrictions does not hinge on the nature and breadth of an agency's authority" (cleaned up)). If it's not exercising executive power, what is it doing in the executive branch? *Cf. Severino*, 71 F.4th at 1050 (Walker, J., concurring) ("[I]t might be that little to nothing is left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates.").

[143] *Mallory v. Norfolk Southern Railway Co.*, 143 S. Ct. 2028, 2038 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).

30

*Humphrey's*. And if the agency in question is the identical twin of the 1935 FTC (as *Humphrey's* understood the 1935 FTC) then *Humphrey's* controls.

But as Judge Henderson wrote in 2018, we should "be loath to cede *any* more of Article II than *Humphrey's Executor* squarely demands."[144] Since then, *Seila Law* and *Collins* have turned that wisdom into a binding command on the lower courts. As in the context of *Bivens* — like *Humphrey's*, a precedent not overruled but severely narrowed by subsequent decisions — "[e]ven a modest extension is still an extension."[145] And because the Supreme Court has forbidden extensions of *Humphrey's* to any new contexts, we cannot extend *Humphrey's* — not even an inch.

### III. Stay Factors

To determine whether a stay pending appeal is appropriate, "we ask (1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies."[146] "The first two factors . . . are the most critical."[147]

---

[144] *PHH Corp.*, 881 F.3d at 156 (Henderson, J., dissenting).

[145] *Id.* (Henderson, J., dissenting) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017)).

[146] *Ohio v. EPA*, 144 S. Ct. 2040, 2052 (2024) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

[147] *Nken*, 556 U.S. at 434.

31

## A.  Likelihood of Success on the Merits

Under binding Supreme Court precedent, Congress cannot restrict the President's power to remove the principal officers of agencies that "wield substantial executive power."[148]  And for the reasons explained below, the NLRB and the MSPB "exercis[e] substantial executive authority" — as then-Judge Kavanaugh said in a dissent later vindicated by *Seila Law*.[149]

Because those agencies exercise "substantial executive power,"[150] the Government is likely to prevail in its contention that the President may fire NLRB commissioners and MSPB members.

### 1.  *Wilcox v. Trump*

The NLRB is an executive branch agency that administers federal labor law.[151]  It has five members who are "appointed by the President by and with the advice and consent of the Senate."[152]   They serve five-year terms, and the President chooses "one member to serve as Chairman."[153]   The statute purports to restrict the President's removal power.[154]

---

[148] *Seila Law v. CFPB*, 140 S. Ct.2183, 2199-2200 (2020).

[149] *PHH Corp. v. CFPB*, 881 F.3d 75, 173 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

[150] *Seila Law*, 140 S. Ct. at 2199-2200.

[151] 29 U.S.C. §§ 153(a), 160(a).

[152] *Id.* § 153(a).

[153] *Id.*

[154] *See id.* § 153(a) ("Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause.").

32

By law, the NLRB is "empowered . . . to prevent any person from engaging in any unfair labor practice."[155]  Like other executive agencies, it carries out this law enforcement mission by promulgating rules, overseeing adjudications, issuing cease-and-desist orders, ordering backpay, and seeking enforcement orders and injunctions in federal court.[156]

These are "exercises of . . . the 'executive Power.'"[157] When Congress validly authorizes agencies to promulgate rules, their rulemaking is "the very essence of execution of the law" because it requires the agency to "interpret[] a law enacted by Congress to implement the legislative mandate."[158] Likewise, when agencies choose whether to bring enforcement actions in federal court, their "discretion encompasses the Executive's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law."[159]  And when agencies seek monetary relief like backpay "against private parties on behalf of the United States in federal court," they exercise a "quintessentially executive power not considered in *Humphrey's Executor*."[160]

---

[155] *Id.* § 160(a).

[156] *Id.* §§ 156, 160(b)-(e), (j).

[157] *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const., art. II, § 1, cl. 1).

[158] *Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021) (cleaned up).

[159] *In re Aiken County*, 725 F.3d 255, 266 (D.C. Cir. 2013).

[160] *Seila Law*, 140 S. Ct. at 2200 (2020).

33

The NLRB does all that and more. It is not a "mere legislative or judicial aid."[161] Instead, it is a (strong) arm of the executive branch and wields substantial executive power.[162]

To reinstate Wilcox, the district court relied on an overbroad reading of *Humphrey's* and a misplaced emphasis on twentieth-century history.

*First*, beginning with *Humphrey's*, the district court compared the NLRB to the 1935 FTC, arguing that they share similar functions and authorities.[163] But the two agencies are far from identical. For one thing, the NLRB is not subject to a statutorily imposed partisan-balance requirement.[164] And the NLRB exercises authorities that the 1935 FTC did not. For example, it has the power to go directly to federal court to seek injunctions against employers or unions while a case is pending.[165] And the NLRB's ability to seek monetary relief like backpay "against private parties on behalf of the United

---

[161] *Id.*

[162] True, as the district court pointed out, the General Counsel (removable at will) leads investigations and prosecutions "on behalf of the Board." *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *7 (D.D.C. Mar. 6, 2025) (citing 29 U.S.C. § 153(d)). But the General Counsel is subservient to the NLRB, which possesses the sole power to seek enforcement of its orders in federal court, pursue injunctive relief, and approve certain settlements. 29 U.S.C. § 160(e), (j); *NLRB v. United Food & Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 121 (1987).

[163] *Wilcox,* 2025 WL 720914 at *8-10 & n.11.

[164] Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 Colum. L. Rev. 9, 32 (2018).

[165] 29 U.S.C. § 160(j).

34

States in federal court" is a "quintessentially executive power not considered in *Humphrey's Executor*."[166]

I suppose it is conceivable that the *Humphrey's* Court would have upheld removal restrictions for the NLRB had it heard the case in 1935. But it is not our job to ask, "What would the 1935 Court do?" Rather, we must ask what the Supreme Court *has done* — in *Humphrey's* yes, but also in *Seila Law*, *Collins*, and the Court's other precedents (guided by the original meaning of the Constitution when binding precedent does not answer the question).[167]

Under *Seila Law*, "the *Humphrey's Executor* exception depend[s]" on "the set of powers the [*Humphrey's*] Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court."[168] Under *Collins*, "the President's removal power serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives."[169]

The district court did not grapple with these developments, instead fixating on *Humphrey's*. Opposing the Government's stay motion, Wilcox supports that approach, repeating the uncontroversial statement that *Humphrey's* is "good law," as if that requires us to read it broadly when the Supreme Court's

---

[166] *See Seila Law*, 140 S. Ct. at 2200.

[167] *See id.* at 2198-99; *Collins*, 141 S. Ct. at 1784-86.

[168] *Seila Law*, 140 S. Ct. at 2198, 2200 n.4.

[169] *Collins*, 141 S. Ct. at 1786.

35

more recent precedents command us to read it narrowly.[170] That approach does not faithfully apply precedent.

Under a faithful application of *Seila Law* and *Collins*, *Humphrey's* controls only if an agency is materially indistinguishable from the 1935 FTC. *Humphrey's* covers nothing more than that because the reasoning in *Seila Law* and *Collins* requires a reading of *Humphrey's* that covers nothing more than that. In other words, *Humphrey's* can cover only an agency that exercises no "substantial executive power." The district court "chants [*Humphrey's Executor*] like a mantra, but no matter how many times it repeats those words, it cannot give [*Humphrey's Executor*] substance" that *Seila Law* and *Collins* say "that it lacks."[171]

Strikingly, the district court gave short shrift to *Collins*, dismissing it in a footnote because it involved a single-headed agency and the Court "reaffirmed it 'did not revisit its prior decisions.'"[172]  *Of course* neither *Seila Law* nor *Collins* overruled *Humphrey's*. But we are not free to ignore the Supreme Court's binding *interpretation* of its precedent simply because the Court didn't *overrule* that precedent.

After *Seila Law*, a removal restriction is valid only if it (1) applies to a "multimember expert agenc[y], balanced along partisan lines" that (2) does not "wield substantial executive power."[173] Though the FHFA in *Collins* clearly failed the first prong, the Court also addressed the second prong. When *Collins* did so, it arguably "broaden[ed]" *Seila Law* and

---

[170] Wilcox Opp. 1, 15, 16.

[171] *SEC v. Jarkesy*, 144 S. Ct. 2117, 2138 (2024).

[172] *Wilcox*, 2025 WL 720914, at *11 n.13 (quoting *Collins*, 141 S. Ct. at 1761) (cleaned up).

[173] *Seila Law*, 140 S. Ct. at 2199-2200.

36

narrowed *Humphrey's* even more, by asking not whether an agency exercises "significant executive power" but only whether an agency exercises *any* "executive power."[174]

*Second*, history does not support Wilcox either. The district court found it persuasive that no President before President Trump removed an NLRB commissioner.[175] But Supreme Court precedent, not twentieth-century history, resolves this case. And as the district court said, Congress's widespread use of independent, multimember boards and commissions did not begin until the early 1900s.[176] So even if we were evaluating the original meaning of Article II on a blank slate, which we aren't, that twentieth-century history would be of limited value for discerning the Constitution's original meaning.[177]

Finally, the district court described the President's removal of Wilcox as a "power grab" and "blatantly illegal."[178] But unconstitutional statutes are void ab initio because

---

[174] *Id.* at 1801 (Kagan, J., concurring in part and concurring in the judgment).

[175] *Wilcox*, 2025 WL 720914, at *5.

[176] *See id.* at *6.

[177] Similarly unpersuasive is Wilcox's assertion that Congress specifically designed the NLRB to be independent. Wilcox Opp. 5-6. That may well be true, but it does not bear on whether Article II, as interpreted by the Supreme Court, renders NLRB removal restrictions invalid. After all, "Members of Congress designed the PCAOB to have 'massive power, unchecked power.'" *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 687 (D.C. Cir. 2008) (Kavanaugh, J., dissenting). That did not win the day at the Supreme Court.

[178] *Wilcox*, 2025 WL 720914, at *3, *5.

37

Congress lacks the authority to enact them.[179]  Such statutes are not law, so it is not "illegal" for the President to violate them.[180] And under the Supreme Court's precedents, the President's actions within the executive branch cannot amount to a "power grab" because "[t]he entire 'executive Power' belongs to the President alone."[181]

\*   \*   \*

The NLRB exercises "substantial executive power."[182] Therefore, the Government is likely to prevail in its argument that the NLRB's removal protections are unconstitutional.

## 2.  *Harris v. Bessent*

The Merit Systems Protection Board is an executive agency that resolves intra-branch disputes under the Civil

---

[179] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

[180] Oral Arg. Tr. 77-78 (Question: "If [the statutory removal restrictions] are not constitutional, then would it be legal for the President to fire Ms. Wilcox?"  Counsel for Wilcox: "I mean, I think you're asking a very simple question. . . . You're saying if we lose on everything and the statute is unconstitutional, does the President have the ability?  Yes, of course."  Question: "And if the provisions are unconstitutional, they were always illegal, right?  They were void ab initio, right?"  Counsel for Wilcox: "Yes, I think that's the right way to think about the Constitution."  Question: "I do think these are simple questions, but I ask because the district court said that the President's action was 'blatantly illegal' because the statute prohibits it.  Well, if it's an unconstitutional statute, then a statutory prohibition against it is not something that would make it 'blatantly illegal.'"  Counsel for Wilcox: "Yes . . . .").

[181] *See Seila Law*, 140 S. Ct. at 2197.

[182] *Id.* at 2199-2200.

38

Service Reform Act.[183]  It has three members "appointed by the President, by and with the advice and consent of the Senate."[184] They serve seven-year terms, and only two members "may be adherents of the same political party."[185]  The Act also purports to restrict the President's removal power.[186]

Under the Civil Service Reform Act, the MSPB's powers are four-fold.[187]

1.  It can "hear" and "adjudicate," and ultimately "take final action," on a wide range of matters, including removals, suspensions, furloughs, and demotions; rights or benefits for servicemembers; whistleblower complaints; Hatch Act violations; and other prohibited personnel practices.[188]

2.  It can "order any Federal agency or employee to comply with any order or decision issued by the [MSPB] . . . and enforce compliance with any such order."[189]

3.  It can "conduct . . . special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free

---

[183] 5 U.S.C. § 1204(a).

[184] *Id.* § 1201.

[185] *Id*. §§ 1201(d), 1202(a).

[186] *Id.* § 1202 ("Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office.").

[187] *Id.* § 1204(a).

[188] *Id.* § 1204(a)(1); *see id.* §§ 1214(a)(3), 1221, 1216(a), (c), 2302(b), 4303(e), 7513(d); 38 U.S.C §§ 4322, 4324(a)(1).

[189] *Id.* § 1204(a)(2).

39

of prohibited personnel practices is being adequately protected."[190]

4. It can "review . . . rules and regulations of the Office of Personnel Management" and "declare such provision[s] . . . invalid" if it would cause an employee to commit a prohibited personnel practice.[191]

These are "exercises of . . . the 'executive Power.'"[192] Plus, the MSPB also represents itself in federal court — a "quintessentially executive function."[193]  And a single MSPB member can unilaterally stay an agency's personnel action — or 6,000 such actions, as it turns out[194] — for 45 days without participation from the other members.[195]  That stay can then be extended "for any period which the Board considers appropriate."[196]

Harris disagrees.   She emphasizes the MSPB's "adjudicatory nature," likening it to an "Article III court."  But

---

[190] *Id.* § 1204(a)(3).

[191] *Id.* § 1204(a)(4), (f); *id.* § 2302(b).

[192] *City of Arlington*, 569 U.S. at 304 n.4 (quoting U.S. Const., art. II, § 1, cl. 1).

[193] *Seila Law*, 140 S. Ct. at 2200; 5 U.S.C. § 7703(a)(2).

[194] Order on Stay Request, *Special Counsel ex rel John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5.

[195] 5 U.S.C. § 1214(b)(1)(A)(i).

   As Judge Henderson notes, there is tension between that unilateral authority and Harris's declaration, in which she claims she "cannot issue adjudication decisions unilaterally."  J. Henderson Op. 5 n.1 (quoting Harris Decl. ¶ 26, *Harris v. Bessent*, No. 25-cv-412 (D.D.C. Feb. 23, 2025), ECF No. 22-3).

[196] *Id.* § 1214(b)(1)(B)(i).

40

the MSPB is not like the Federal Trade Commission in
*Humphrey's* or the War Claims Commission in *Wiener* because
it resolves disputes *within* the executive branch.[197]    That
distinguishes it from the 1935 FTC and the War Claims
Commission, both of which adjudicated disputes between the
government and the public.  MSPB adjudication is nothing
more than intra-branch dispute resolution.  That's an exercise
of executive (not quasi-judicial) power.

In additional ways, the MSPB is not like the 1935 FTC as
understood by *Humphrey's*.    It reviews the removal and
discipline of federal employees and has the power to directly
override other executive agencies' disciplinary actions.[198]  That
gives it a significant authority that the FTC never had.
Additionally, the MSPB has the power to issue binding orders
and "enforce compliance with any such order."[199]  The 1935
FTC lacked that power.  It could issue cease-and-desist orders,
but if those were disobeyed, the agency had to petition to a
federal court to enforce its orders.[200]

Nor is the MSPB like the War Claims Commission in
*Wiener*.  The MSPB is a *permanent* body, unlike the *temporary*
War Claims Commission, which served the limited purpose of
assigning distributions from a compensation fund.[201]    More
importantly, the MSPB's powers far outstrip the War Claims
Commission's in a critical way — it can force the President to

---

[197] *See Frazier v. MSPB*, 672 F.2d 150, 154 (D.C. Cir. 1982) (the
MSPB adjudicates "conflicts between federal workers and their
employing agencies").

[198] 5 U.S.C. § 7701.

[199] *Id.* § 1204(a)(1)-(2).

[200] *See Humphrey's Executor*, 295 U.S. at 620-21 (citing 15 U.S.C.
§ 45).

[201] *Wiener v. United States*, 357 U.S. 349, 350 (1958).

41

work with thousands of employees he doesn't want to work
with, an unquestionable exercise of "substantial executive
power."[202]

It's also clear that the MSPB does not exercise quasi-
legislative functions.  To the extent its ability to invalidate
certain regulations resembles legislative activity, that authority
does not involve public-facing regulation.[203]  So again, even
under a broad reading of *Humphrey's*, the MSPB's functions
do not align with those of the 1935 FTC or the War Claims
Commission.  The MSPB "is hardly a mere legislative or
judicial aid."[204]  It does far more than merely make "reports and
recommendations to Congress, as the 1935 FTC did."[205]

The district court recognized that the MSPB "preserves
power within the executive branch by charging presidentially
appointed [MSPB] members with mediation and initial
adjudication of federal employment disputes."[206]  But the
district court erred in concluding that the MSPB's "features"
made any effect on the President's exercise of the executive
power "limited."[207]  To the contrary, as one member of the
Supreme Court has already acknowledged, the preserved
power within the MSPB is "substantial executive authority."[208]

In Harris's tenure alone, the MSPB resolved thousands of
cases involving "allegations that federal agencies engaged in

---

[202] *Seila Law*, 140 S. Ct. at 2200.

[203] *See* 5 U.S.C. § 1204(f).

[204] *Seila Law*, 140 S. Ct. at 2200.

[205] *Id.*

[206] *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *6 (D.D.C.
Mar. 4, 2025) (emphasis omitted).

[207] *Id*.

[208] *PHH Corp.*, 881 F.3d at 173 (Kavanaugh, J., dissenting).

42

prohibited personnel practices, such as targeting of federal employees based on political affiliation; retaliation against whistleblowers reporting violations of law, waste, fraud and abuse; discrimination; and [Uniformed Services Employment and Reemployment Rights Act] violations, among others."[209]

Those cases highlight that the MSPB's focus on internal-dispute resolution does not mean it is an insignificant or nonexecutive agency. Just because a CEO may informally adjudicate an internal employee dispute does not mean the CEO is any less the chief *executive* officer. It's part of the job. What's more, Harris has been a productive member of the MSPB, participating "in nearly 4,500 decisions" between June 1, 2022, and February 10, 2025.[210] In short, the district court's self-contradictory assertion that the MSPB "does not wield substantial executive power, but rather spends nearly all of its time adjudicating inward-facing personnel matters involving federal employees," tends to show that the MSPB *does indeed* exercise substantial executive power.[211]

Finally, the position of the Department of Justice two years ago in *Severino v. Biden*, supports at-will removal of MSPB members.[212] There, DOJ argued that the President's unrestricted removal power did not extend to the Administrative Conference of the United States because the Conference "does not resolve or commence matters for the Executive Branch or determine anyone's rights or obligations."[213] The MSPB, in contrast, does "resolve . . .

---

[209] *Harris*, 2025 WL 679303, at *14.

[210] *Id.* at *2.

[211] *Id.* at *6 (cleaned up).

[212] 71 F.4th 1038 (D.C. Cir. 2023).

[213] Appellee Supplemental Brief at 5, *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) (No. 22-5047).

43

matters for the Executive Branch"[214] — sometimes several thousands of them in one day.[215] So even according to the understanding of presidential removal power asserted by DOJ in *Severino*, the removal protections for MSPB members are unconstitutional.

*   *   *

In sum, the Government is likely to prevail on its claim that MSPB members must be removable by the President at will and consequently that the relevant removal restrictions are unconstitutional.

## B.  Irreparable Harm

A stay applicant must show that it will be irreparably harmed absent a stay.[216]

Here, the Government contends that the President suffers irreversible harm each day the district courts' injunctions remain in effect because he is deprived of the constitutional authority vested in him alone.  I agree.

Article II vests the President with the "entire 'executive Power,'" which "generally includes the ability to remove executive officials."[217]  The district courts' orders effectively nullify that power.  That level of interference is "virtually unheard of," and "it impinges on the 'conclusive and preclusive' power through which the President controls the

---

[214] *Id.*

[215] Order on Stay Request, *Special Counsel ex rel John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5.

[216] *Nken*, 556 U.S. at 434.

[217] *Seila Law*, 140 S. Ct. at 2197.

44

Executive Branch that he is responsible for supervising."[218]  If the President "loses confidence in the intelligence, ability, judgment, or loyalty of any one of [his subordinates], he must have the power to remove him *without delay*."[219]

To be clear, this is not an abstract constitutional injury; it is a serious, concrete harm.  Each year, the NLRB oversees tens of thousands of unfair labor practice charges and decides (on average) roughly 200 cases.[220]  Additionally, the NLRB lacks a quorum without Wilcox, meaning the district court's order tips the scales in favor of political appointees that do not share the President's policy objectives.  The President's removal power, properly understood, avoids that result.[221]

As for the MSPB, just this month, upon the motion of a judicially reinstated Special Counsel, Harris (also judicially reinstated) stayed the termination of roughly 6,000 probationary employees.[222]  Now, in opposing the Government's stay motion, Harris assures us that we need not worry about such actions because the President (after action by this court) replaced the Special Counsel.  But even if Harris no longer has the opportunity to stay personnel actions, she

---

[218] *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14, *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (quoting *Trump v. United States*, 144 S. Ct. 2312, 2327-28 (2024)).

[219] *Myers*, 272 U.S. at 134 (emphasis added).

[220] *Wilcox*, 2025 WL 720914, at *17; *Board Decisions Issued*, NLRB, perma.cc/T9XE-TF8M.

[221] Such disagreement on policy is not mere speculation; the President cited the NLRB's recent policy decisions as a partial basis for Wilcox's removal.

[222] Order on Stay Request at 11, *Special Counsel ex rel John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5.

45

continues to play an ongoing role in resolving intra-branch, employee-employer clashes, against the wishes of the "one person" who is "responsible for *all* decisions made by and in the Executive Branch."[223]

The Government has established a likelihood of irreparable harm.

## C.  Harm to Removed Officials

Although the two "most critical" factors support issuing stays, I also consider whether those stays "will substantially injure the other parties interested in the proceeding."[224]

They will not.  Harris and Wilcox identify harms that are either incognizable or outweighed by the irreparable harm suffered by the Government under the district courts' injunctions.[225]

First, Wilcox and Harris assert a statutory right to remain in office.  According to Harris, a stay will prevent her "from fulfilling her duties while removed," which she says is irreparable because she "took an oath of office to fulfill specific statutory functions set out by Congress."[226]  Similarly, Wilcox

---

[223] *Free Enterprise Fund*, 537 F.3d at 689 (Kavanaugh, J., dissenting).

[224] *Nken*, 556 U.S. at 434.

[225] Vague assertions about presidential removal committing "violence to the statute Congress enacted" will not suffice — even setting aside that an unconstitutional statutory provision cannot be validly enacted.  *See* Harris Opp. 23.

[226] Harris Opp. 23.

46

suggests that her removal "prevents her from carrying out the duties Congress has assigned to her."[227]

The assertion of a "statutory right" is, of course, entangled with the merits because a statutory right exists only if the statute is constitutional. I've explained why the removal provisions here are likely not constitutional. And I assume that Wilcox and Harris each took an oath to "support and defend the Constitution."[228] So I'm not convinced that their removals inflict any irreparable harm.

Second, both Harris and Wilcox allege that if we issue a stay, their agencies will be harmed. Specifically, Wilcox argues that she (and the other NLRB commissioners) will be "deprived of the ability to carry out their congressional mandate in protecting labor rights" and "suffer an injury due to the loss of the office's independence."[229] She adds that her removal "eliminated a quorum, . . . bringing an immediate and indefinite halt to the NLRB's critical work."[230] For her part, Harris contends "a stay would mar the very independence that Congress afforded Harris and the other members of the Board."[231]

To begin, those are institutional interests, not personal interests, so we may take them into account only as they relate to the public interest. Even then, this court recently doubted its ability to "balance [one agency's] asserted public interest against the public interest asserted by the rest of the executive

---

[227] Wilcox Opp. 21 (quoting *Harris v. Bessent*, No. 25-cv-412, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025)).

[228] 5 U.S.C. § 3331.

[229] *Wilcox*, 2025 WL 720914, at *15-16.

[230] Wilcox Opp. 21.

[231] Harris Opp. 23.

47

branch."[232]    Even assuming a court could weigh those conflicting governmental interests, Wilcox admits the President "could easily establish a majority on the Board by appointing members to fill its two vacant positions," solving the quorum problem.[233]  And if that were not the case, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution."[234]

## D.  Public Interest

Staying these cases pending appeal is in the public interest.  The people elected the President, not Harris or Wilcox, to execute the nation's laws.[235]

The forcible reinstatement of a presidentially removed principal officer disenfranchises voters by hampering the President's ability to govern during the four short years the people have assigned him the solemn duty of leading the executive branch.[236]  One may honestly believe that labor disputes and personnel matters are more conveniently or efficiently resolved by an independent agency, but

---

[232] Order at 7, *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 10, 2025).

[233] Wilcox Opp. 20.

[234] *INS v. Chadha*, 462 U.S. 919, 944 (1983).

[235] *See Seila Law*, 140 S. Ct. at 2203 ("Only the President (along with the Vice President) is elected by the entire Nation."); *see also* Andrew Jackson, Presidential Proclamation, 11 Stat. 771, 776 (Dec. 10, 1832) ("We are *one people* in the choice of President and Vice-President.").

[236] *PHH Corp.*, 881 F.3d at 137 (Henderson, J., dissenting).

48

"[c]onvenience and efficiency are not the primary objectives—
or the hallmarks—of democratic government."[237]

### IV. Conclusion

The district courts did their level best in rushed
circumstances to follow Supreme Court precedent. But their
fidelity to that precedent was unduly selective. By reading
*Humphrey's Executor* in an expansive manner, they read it in a
manner that *Seila Law* and *Collins* preclude. Though those
cases did not overturn *Humphrey's Executor*, their holdings
relied on an exceptionally narrow reading of it.

Even the most casual reader will have guessed by now that
I agree with how *Seila Law* and *Collins* read *Humphrey's
Executor*. But even if I disagreed with them, this court would
lack the authority to undo what they did. For a lower court like
us, *that* would be a "power grab."[238]

---

[237] *Chadha*, 462 U.S. at 944.

[238] *Wilcox*, 2025 WL 720914, at *3.

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the grants of stay: I agree with many of the general principles in Judge Walker's opinion about the contours of presidential power under Article II of the Constitution, although I view the government's likelihood of success on the merits as a slightly closer call. Whatever the continuing vitality of *Humphrey's*, I agree that we should not extend it in this preliminary posture during the pendency of these highly expedited appeals. I write separately to highlight areas of the merits inquiry that remain murky and to emphasize that the government has easily carried its burden of showing irreparable harm—the second of the two "most critical" stay factors. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## A.

I do not repeat at length here my views on the presidential removal power doctrine pre-*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), which I expressed in *PHH Corp. v. CFPB*, 881 F.3d 75, 138 (D.C. Cir. 2018) (en banc) (Henderson, J., dissenting). Instead, I emphasize certain ways in which *Seila Law* left unclear where the rule from *Myers v. United States*, 272 U.S. 52 (1926), ends and the exception from *Humphrey's Executor*, 295 U.S. 602 (1935), begins.

*Seila Law* described the scope of the *Humphrey's Executor* exception as applying to "multimember expert agencies that do not wield substantial executive power." 591 U.S. at 218. The Court first observed that the CFPB is not a multimember expert agency because it "is led by a single Director who cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle." *Id.* The Court then distinguished the CFPB from the 1935 FTC—which had been characterized as a "mere legislative or judicial aid"—based on three sets of powers. *Id.* Those powers "*must be* exercises of" the "executive Power" under our constitutional structure but they

2

can "take 'legislative' and 'judicial' forms." *Id.* at 216 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013)).

First, in terms of executive power with a legislative form the CFPB Director "possesses the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy." *Seila Law*, 591 U.S. at 218. Second, as to executive power with a judicial form, "the Director may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* at 219. Third, regarding purely executive power, "the Director's enforcement authority includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*." *Id.* Based on the breadth of those three powers, and before going on to raise other concerns about the novelty of the CFPB's structure, the Court held that the CFPB was "[u]nlike the New Deal-era FTC upheld [in *Humphrey's*]." *Id.* at 218.

The next question becomes what kind of agency—single- or multi-headed—falls on either side of *Seila Law*'s "substantial executive power" dividing line. On the one hand, a plurality of the *Seila Law* court mused in its discussion of severability that "[o]ur severability analysis does not foreclose Congress from pursuing alternative responses to the problem—for example, converting the CFPB into a multimember agency." *Id.* at 237 (Roberts, C.J.). But simply converting the CFPB into a multi-headed agency could not have sufficed because the Court had earlier explained that the CFPB failed the *Humphrey's* "substantial executive power" test. *See Seila Law*, 591 U.S. at 218–19 (maj. op.) (explaining why the CFPB itself falls outside the *Humphrey's* exception). Perhaps the

3

plurality's dictum in another section of the opinion meant that such a response would be a necessary but not sufficient condition. Conversely, *Seila Law*'s gloss on *Humphrey's* did use the same phrase—"substantial executive power"—as Justice Kavanaugh's dissent in *PHH* when he was a judge on this court. 881 F.3d at 167 (Kavanaugh, J., dissenting). That opinion listed both the NLRB and the MSPB as "agencies exercising substantial executive authority." *Id.* at 173.

In *Collins v. Yellen*, the Court further explained that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." 594 U.S. 220, 251–52 (2021). Instead, "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Id.* at 253; *see also id.* at 273 (Kagan, J., concurring in part and concurring in the judgment) (recognizing *Collins*' "broadening" of *Seila Law*); *id.* at 293 (Sotomayor, J., concurring in part and dissenting in part) (same). However, *Collins* did not discuss *Humphrey's* and the Court characterized its decision as a "straightforward application of our reasoning in *Seila Law*" because the agency there was also "led by a single Director." *Id.* at 251 (maj. op.). Thus, it is not clear that *Collins*' instruction not to weigh up the nature and breadth of an agency's authority extends to multimember boards.

Accordingly, reasonable minds can—and often do— disagree about the ongoing vitality of the *Humphrey's* exception. *See, e.g.*, *Consumers' Rsch. v. CPSC*, 98 F.4th 646 (5th Cir.) (mem.) (splitting 9–8 on whether to grant rehearing en banc on the constitutionality of the Consumer Product Safety Commission's removal restrictions). But simply

4

applying *Seila Law*'s test and examining both the NLRB's and the MSPB's executive powers—regardless of their legislative, judicial and executive forms—the government has satisfied its burden of showing a strong likelihood that they are substantial. Both Wilcox and Harris concede that their agencies wield substantial power of an "adjudicative" form—indeed, that is how they hope to fall within the *Humphrey's* exception. We must therefore consider those powers that are of a legislative and executive form.

The NLRB has traditionally preferred to set precedent by adjudicating, *Wilcox v. Trump*, 2025 WL 720914, at *9 (D.D.C. Mar. 6, 2025), but it retains broad authority of a legislative form to promulgate "such rules and regulations as may be necessary to carry out" its statutory mandate, 29 U.S.C. § 156. Moreover, its regulatory authority over labor relations affects a "major segment of the U.S. economy." *Seila Law*, 591 U.S. at 218. Indeed, the district court explained that the NLRB was established by the Congress "in response to a long and violent struggle for workers' rights," *Wilcox*, 2025 WL 720914, at *3, and emphasized its indisputably "important work," *id.* at *17. Granted, the NLRB's executive power is partly bifurcated because the General Counsel investigates charges and prosecutes complaints before the Board. *See* 29 U.S.C. § 153(d). However, as Judge Walker points out, the Board retains the power to "seek monetary relief like backpay 'against private parties on behalf of the United States in federal court,' [which is] a 'quintessentially executive power not considered in *Humphrey's Executor*.'" Op. (Walker, J.) at 32 (quoting *Seila Law*, 591 U.S. at 219).

The MSPB's powers are relatively more circumscribed. In terms of power of a legislative form, its rulemaking authority is limited to issuing "such regulations as may be necessary for the performance of its functions." 5 U.S.C. § 1204(h).

5

However, it possesses the negative power, even if rarely used, to review sua sponte and invalidate regulations issued by the Office of Personnel Management. *Id.* § 1204(f).  As to power of an executive form, at least in certain circumstances it represents itself litigating in federal court.  *See* Harris Decl. ¶ 33 (Harris Opp'n App. B at 7–8); 5 U.S.C. §§ 1204(i), 7703(a)(2).  As the Supreme Court stated in *Buckley v. Valeo*, 424 U.S. 1, 139–40 (1976), the "responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" is one of the "executive functions."  The MSPB's litigation power also distinguishes it from other agencies that cannot be respondents in federal court.  *See, e.g.*, *Oil, Chem. & Atomic Workers Int'l Union v. OSHRC*, 671 F.2d 643, 651–53 (D.C. Cir. 1982) (explaining that the Occupational Safety and Health Review Commission cannot be a respondent in federal court and contrasting it with the NLRB).  And Harris as a single MSPB member recently wielded considerable power *over* the executive by temporarily reinstating thousands of probationary employees.  Order on Stay Request (Mar. 5, 2025) (Harris Opp'n App. C).[1]

Granted, in *Seila Law* the Court distinguished the Office of the Special Counsel from the CFPB in part because the OSC "does not bind private parties," 591 U.S. at 221, and the MSPB similarly operates entirely within the executive branch.  But it may be that the Court was simply highlighting that the CFPB posed more of a threat to individual liberty than the OSC rather than diminishing the constitutional problem of dividing power within the executive branch.  *Compare PHH*, 881 F.3d at 183 (Kavanaugh, J., dissenting) (emphasizing the CFPB's structure

---

[1]  Indeed, Harris's declaration recites that she "cannot issue adjudication decisions unilaterally," Harris Decl. ¶ 26 (Harris Opp'n App. B at 5), thereby conceding that perhaps her most expansive action to date—"staying" the termination of executive branch employees by the thousands—is not in fact adjudicative.

6

as a threat to individual liberty), *with Seila Law*, 591 U.S. at 223 (explaining that the Framers sought to "divide" the legislative power and "fortif[y]" the executive power) (quoting The Federalist No. 51 (J. Madison)).

Accordingly, the first *Nken* factor is a somewhat closer call in my view than in Judge Walker's but the government has met its "strong showing" burden at this stage because of the substantial executive power that the NLRB and MSPB both wield.

**B.**

In addition, the government has more than satisfied its burden to show irreparable harm that far outweighs any harm to Harris and Wilcox from a stay. As Harris concedes, the "question of whether the government will prevail is distinct from whether the government will suffer irreparable harm absent a stay." Harris Opp'n 19. Thus, we consider whether any harm suffered by the government can be undone *if it prevails*.

As this panel explained in *Dellinger v. Bessent*, "it is impossible to unwind the days during which a President is 'directed to recognize and work with an agency head whom he has already removed.'" *Dellinger v. Bessent*, No. 25-5052, slip op. at 6 (D.C. Cir. Mar. 10, 2025) (alterations omitted) (quoting *Dellinger v. Bessent*, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting)). Such a requirement encroaches on the President's "conclusive and preclusive" power to supervise those wielding executive power on his behalf. *Trump v. United States*, 603 U.S. 593, 608–09 (2024) (citing *Seila Law*, 591 U.S. at 204; *Myers*, 272 U.S. at 106).

Harris is also wrong to downplay the government's injury as a "vague assertion of harm to the separation of powers."

7

Harris Opp'n 20.  In addition to the concrete actions by the NLRB and the MSPB that Judge Walker details, Op. (Walker, J.) at 45, the *executive branch*—not merely the separation of powers—is harmed through (1) a "[d]iminution of the Presidency" and (2) a "[l]ack of accountability," *see PHH*, 881 F.3d at 155–60 (Henderson, J., dissenting).

First, as the Supreme Court explained in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 499 (2010), our "Constitution was adopted to enable the people to govern themselves, through their elected leaders."  The growth of the "headless Fourth Branch" of government, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 525–26 (2009) (Scalia, J.), "heightens the concern that [the Executive Branch] may slip from the Executive's control, and thus from that of the people, *Free Enter. Fund*, 561 U.S. at 499.  It is incongruous with the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, that he be "fasten[ed]" with principal officers who "by their different views of policy might make his taking care that the laws be faithfully executed most difficult or impossible," *Myers*, 272 U.S. at 131.  It makes no difference that the President can appoint the chair or other members of a board to reduce the magnitude or duration of this diminution—it is a diminution nonetheless.  *See PHH*, 881 F.3d at 156–57 (Henderson, J., dissenting) ("Even assuming the CFPB violates Article II only some of the time—a year here, a couple years there—that is not a strong point in its favor.").

Second, the Framers decided to check the President's uniquely concentrated power by making him "the most democratic and politically accountable official in Government." *Seila Law*, 591 U.S. at 224.  That accountability is "enhanced by the solitary nature of the Executive Branch, which provides 'a single object for the jealousy and

8

watchfulness of the people.'" *Id.* (quoting The Federalist No. 70 (A. Hamilton)). Accordingly, the President "cannot delegate ultimate responsibility or the active obligation to supervise that goes with it . . . ." *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 496–97). Without the power to remove principal officers, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514. That the buck would stop with members of a board rather than a solitary agency head obstructing his agenda does not eliminate his injury.

Conversely, both Harris and Wilcox assert harm from their inability to perform their official functions in addition to any backpay to which they may be entitled if they prevail. *See* Wilcox Opp'n 21 (arguing harm of deprivation of "statutory right to function") Harris Opp'n 23 (arguing stay will "prevent Harris from fulfilling her duties"). Indeed, the district courts found injuries to Harris and Wilcox in being deprived of the "statutory right to function" as well as distinct injuries to their agencies. *Harris v. Bessent*, 2025 WL 679303, at *13 (D.D.C. Mar. 13, 2025) (quoting *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam)); *see also Wilcox*, 2025 WL 720914, at *15–16 (citing *Berry*, 1983 WL 538, at *5). Needless to say, we are not bound by a vacated district court decision from 40 years ago. At this stage at least, it is far from clear that Harris or Wilcox may assert rights against the executive branch on behalf of their offices or agencies as opposed to themselves personally. *See* Op. (Walker, J.) at 46–48.

For its part, the government cites *Raines v. Byrd*, 521 U.S. 811, 820 (1997), for the proposition that "public officials have no individual right to the powers of their offices." Harris Gov't Mot. 3; Wilcox Gov't Mot. 3. The Supreme Court in *Raines*

9

pointed out that if a federal court were to have heard a dispute
between the President and the Congress about the
constitutionality of restrictions on the presidential removal
power, it "would have been improperly and unnecessarily
plunged into the bitter political battle being waged between"
them. *Raines*, 521 U.S. at 827. Instead, Presidents wait for "a
suit brought by a plaintiff with traditional Article III standing."
*Id.* Here, we are being asked to enter a political battle between
the institutional offices of the NLRB, the MSPB and other
executive-branch officials, including the President.

The district court in *Harris* sought to distinguish *Raines* by
observing that it addressed whether legislators had standing to
challenge a vote that did not go their way, that the injury was
diffused across members of the Congress and that "the
legislators did not claim injury arising from 'something to
which they *personally* are entitled.'" 2025 WL 679303, at *13
(quoting *Raines*, 521 U.S. at 821). But the next clause of the
quoted language reads: "such as their seats as Members of
Congress after their constituents had elected *them*." *Raines*,
521 U.S. at 821. Here, voters elected the President, not Harris
or Wilcox. As in *Raines*, Harris's and Wilcox's "injury thus
runs (in a sense) with the Member's seat, a seat which the
Member holds (it may quite arguably be said) as trustee . . . ,
not as a prerogative of personal power." *Id.* (citing The
Federalist No. 62 (J. Madison)). Moreover, in *Raines* the
legislators "had not been authorized to represent their
respective Houses of Congress in th[e] action, and indeed both
Houses actively oppose[d] their suit." *Id.* at 829. Here, there
is at least a serious question whether Harris and Wilcox seek to
vindicate personal rights or only those of the office and agency,
and their suits are actively opposed by their own branch of
government.

10

As we recently explained in *Dellinger*, "[a]t worst" Harris and Wilcox "would remain out of office for a short period of time." *Dellinger*, slip op. at 7. Because we have ordered highly expedited merits briefing with the agreement of the parties, that period is particularly brief. *See* Order, *Wilcox v. Trump*, No. 25-5057 (D.C. Cir. Mar. 18, 2025); Order, *Harris v. Bessent*, No. 25-5037 & 25-5055 (D.C. Cir. Mar. 18, 2025). "By contrast, the potential injury to the government of . . . having to try and unravel [Harris's and Wilcox's] actions is substantial." *Dellinger*, slip op. at 7. Thus, even if the first *Nken* factor is not a lead-pipe cinch, the injury-focused factors plainly favor a stay.

## C.

In terms of the public interest, and as we explained in *Dellinger*, it is not clear how we could balance Harris's and Wilcox's asserted public interest on behalf of the MSPB and NLRB continuing to function as the Congress intended against the public interest asserted by the rest of the executive branch. *See Dellinger*, slip op. at 7. And of course, "[o]nly the President (along with the Vice President) is elected by the entire Nation." *Seila Law*, 591 U.S. at 224. At minimum, this factor does not weigh in Harris's and Wilcox's favor.

\* \* \*

Accordingly, the government has met its burden for grants of a stay during the pendency of these appeals.

MILLETT, Circuit Judge, dissenting:  The two opinions voting to grant a stay rewrite controlling Supreme Court precedent and ignore binding rulings of this court, all in favor of putting this court in direct conflict with at least two other circuits.  The stay decision also marks the first time in history that a court of appeals, or the Supreme Court, has licensed the termination of members of multimember adjudicatory boards statutorily protected by the very type of removal restriction the Supreme Court has twice *unanimously* upheld.

What is more, the stay order strips the National Labor Relations Board and the Merit Systems Protection Board of the quora that the district courts' injunctions preserved, disabling agencies that Congress created and funded from acting for as long as the President wants them out of commission.  That decision will leave languishing hundreds of unresolved legal claims that the Political Branches jointly and deliberately channeled to these expert adjudicatory entities.  In addition, the majority decisions' rationale openly calls into question the constitutionality of dozens of federal statutes conditioning the removal of officials on multimember decision-making bodies—everything from the Federal Reserve Board and the Nuclear Regulatory Commission to the National Transportation Safety Board and the Court of Appeals for Veterans Claims.

That would be an extraordinary decision for a lower federal court to make under any circumstances.  But what makes it even more striking is that all we are supposed to decide today is whether a stay pending appeal should issue.  As to that narrow question, the stay decision is an unprecedented and, in my view, wholly unwarranted use of this court's stay power, which is meant only to maintain the status quo pending an appeal.  *See Nken v. Holder*, 556 U.S. 418, 429 (2009) ("A stay simply suspend[s] judicial alteration of the status quo," which is defined as "the state of affairs before the removal order[s] [were] entered.") (citation omitted);

2

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (A stay pending appeal is "preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit."); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–734 (D.C. Cir. 2022) ("[T]he status quo [i]s 'the last peaceable uncontested status' existing between the parties before the dispute developed.") (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (3d ed. 1998)).

I cannot join a decision that uses a hurried and preliminary first-look ruling by this court to announce a revolution in the law that the Supreme Court has expressly avoided, and to trap in legal limbo millions of employees and employers whom the law says must go to these boards for the resolution of their employment disputes. I would deny a stay.

# I

## A

These cases arise out of the summary termination, without notice, of two members of multimember adjudicatory bodies that Congress created to resolve disputes impartially and free of political influence for reasons of grave national importance.

Cathy Harris is a member of the Merit Systems Protection Board ("MSPB"). The MSPB is an adjudicatory body that primarily reviews federal employees' appeals alleging that their government employer discriminated against them based on their race, color, gender, political affiliation, religion, national origin, age, disability, or marital status; retaliated against them for whistleblowing; failed to comply with protections for veterans; or otherwise subjected them to an

3

adverse employment action, such as termination, suspension, or a reduction in pay grade, 5 U.S.C. §§ 1204(a)(1); 1221; 2302(b)(1), (8)–(9); 3330a(d); 7512.

The MSPB has three members who are appointed by the President with the advice and consent of the Senate to serve seven-year terms. 5 U.S.C. §§ 1201, 1202(a)–(c). No more than two members of the MSPB may belong to the same political party. *Id.* § 1201. The President can also appoint one of the members, with the advice and consent of the Senate, as the Chair of the MSPB. *Id.* § 1203(a). MSPB members may be removed only for "inefficiency, neglect of duty, or malfeasance in office." *Id*. § 1202(d).

Gwynne Wilcox is a member, and former Chair, of the National Labor Relations Board ("NRLB"), which Congress charged with "prevent[ing] any person from engaging in any unfair labor practice[.]" 29 U.S.C. § 160(a). The NLRB has two distinct parts. The five-member Board, on which Wilcox sits, adjudicates appeals of labor disputes from administrative law judges. *Id.* § 153(a). Separately, the NLRB General Counsel prosecutes unfair labor-practice charges. *Id.* § 153(d); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 139 (1975). These two divisions of the Board operate independently. *NLRB. v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 118 (1987).

When reviewing administrative law judge decisions, the NLRB reviews the entire record, receives briefing, and issues its own decision on both the facts and the law. 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. The Board may issue a cease-and-desist order to halt unfair labor practices, or it may issue an order requiring reinstatement of terminated employees, with or without backpay, and similar equitable remedies. 29 U.S.C.

4

§ 160(c).  These orders, however, are not self-executing.  They are enforceable only by a federal court.  *Id.* § 160(e).

The President appoints NLRB members with the advice and consent of the Senate, and the members serve staggered five-year terms.  29 U.S.C. § 153(a).  The President also designates one of the members to serve as Chair.  *Id.*  Congress limited the President's power to remove a Board member to "neglect of duty or malfeasance in office," and required advance notice and a hearing.  *Id.*  In contrast, the President may remove the General Counsel at will.  *See id.* § 153(d).

**B**

**1**

Cathy Harris began her seven-year term as a member of the MSPB in June 2022.  On February 10, 2025, Harris received an email from the White House Office of Presidential Personnel stating:  "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately."  Declaration of Cathy Harris ("Harris Decl.") ¶ 4.  The email did not allege any inefficiency, neglect of duty, or malfeasance on Harris's part.

Harris filed suit on February 11th, challenging her removal as *ultra vires*, unconstitutional, and a violation of the Administrative Procedure Act.  She sought relief under the Declaratory Judgment Act, issuance of a writ of mandamus, and equitable relief.  The district court awarded summary judgment to Harris and granted a permanent injunction and declaratory relief maintaining her in office.  *Harris v. Bessent*, __ F. Supp. 3d __, No. 25-cv-412 (RC), 2025 WL 679303, at *3 (D.D.C. March 4, 2025).  The court added that, if equitable

5

relief were "unavailable[,]" it would issue a writ of mandamus "as an alternative remedy at law." *Id.* at *15.

**2**

Gwynne Wilcox was confirmed in September 2023 for her second term as a member of the NLRB. President Biden designated her Chair of the Board in December 2024. On January 27, 2025, Wilcox received an email from the White House Office of Presidential Personnel stating that she was "hereby removed from the office of Member[] of the National Labor Relations Board." Declaration of Gwynne Wilcox Ex. A, at 1. Wilcox did not receive the statutorily required advance notice of her termination, and the email did not offer Wilcox a hearing or claim any neglect of duty or malfeasance on her part. *Id.*; *see also* Motions Hearing Tr. 51:6–14 (March 5, 2025) (government acknowledging that Wilcox was not "removed for any neglect or malfeasance").

Wilcox sued President Trump and the new Board Chairman, Marvin Kaplan, on February 5th, alleging that her removal violated the National Labor Relations Act. Her complaint sought an injunction directing Kaplan to reinstate her as a member of the Board. Because the suit involved only questions of law, Wilcox promptly moved for expedited summary judgment. The district court granted summary judgment for Wilcox, holding that her removal was unlawful and issued a permanent injunction maintaining her in office. *Wilcox v. Trump*, __ F. Supp. 3d__, No. 25-cv-334 (BAH), 2025 WL 720914, at *5, 18 (D.D.C. Mar. 6, 2025).

6

**3**

The government appealed the judgments in both Harris's and Wilcox's cases and seeks a stay of the district courts' judgments.

**II**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such exceptional relief, the stay applicant must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

The government has satisfied none of those stay factors. First, the government has failed to make any showing, let alone a "strong showing[,] that [it] is likely to succeed on the merits" in its appeal to this court. *Nken*, 556 U.S. at 434; *see also id.* (the likelihood of success on the merits and irreparable injury are the "most critical" factors). Controlling Supreme Court precedents—*Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1958)—establish that the MSPB and NLRB's for-cause removal protections are constitutional. Circuit precedent binds this panel to that same conclusion. In addition, the government's efforts to de-constitutionalize those statutory protections are unlikely to succeed given the long tradition of removal limitations and their particular justifications.

7

Second, the government has not identified any irreparable harm that would arise from a stay while these appeals are expeditiously decided. Its argument that the President's removal power is irreparably impaired depends entirely on this court overturning Supreme Court rulings holding that these removal protections do not unconstitutionally encroach on the President's power.

Third, the balance of harms to the plaintiffs and the public interest weighs strongly against a stay.

## III

### A

The Supreme Court's decisions in *Humphrey's Executor* and *Wiener* squarely foreclose the government's arguments on appeal. In those cases, the Supreme Court unanimously held that for-cause removal protections like those applicable to MSPB and NLRB members were constitutional as applied to officials on multimember independent agencies that exercise quasi-adjudicatory and quasi-legislative functions within the Executive Branch—just like those undertaken by the MSPB and NLRB. *Humphrey's Executor*, 295 U.S. at 624; *Wiener*, 357 U.S. at 355–356.

In *Humphrey's Executor*, the Supreme Court upheld for-cause removal protections for members of the Federal Trade Commission ("FTC"). 295 U.S. at 620. The Court reasoned that, as a five-member board with no more than three commissioners from the same political party, the FTC was designed to be "nonpartisan" and "act with entire impartiality." *Id.* at 619–620, 624. In addition, the FTC was "charged with the enforcement of no policy except the policy of the law." *Id.* at 624.

8

In that way, the FTC's functions were held to be "predominantly quasi-judicial and quasi-legislative." *Humphrey's Executor*, 295 U.S. at 624. The Commission's functions were quasi-judicial because it could hold "hearing[s]" on claims alleging "unfair methods of competition," prepare "report[s] in writing stating its findings as to the facts," and "issue * * * cease and desist order[s,]" which only federal courts (and not the FTC itself) could enforce. *Id.* at 620–622, 628. The FTC was quasi-legislative, in that the Commission "fill[ed] in and administer[ed] the details" of the Federal Trade Commission Act and made "investigations and reports * * * for the information of Congress[.]" *Id.* at 628.

The Supreme Court reaffirmed *Humphrey's Executor* two decades later. In *Wiener*, the Court upheld for-cause removal protections for members of the War Claims Commission—a three-member body that adjudicated Americans' injury and property claims against Nazi Germany and its allies. 357 U.S. at 350. The Court concluded that the Commission could not accomplish its adjudicatory function—fairly applying "evidence and governing legal considerations" to the "merits" of claims—without some protection against removal. *Id.* at 355–356. The Constitution, the Court held, permitted sheathing "the Damocles' sword of removal" by instituting for-cause protections for Commission members. *Id.* at 356.

The *Wiener* Court also clarified what qualifies as a "quasi-judicial" function. It explained that, even though the Commission was part of the Executive Branch, its role was purely adjudicatory because Congress "chose to establish a Commission to 'adjudicate according to law' the classes of claims defined in the statute[.]" *Wiener*, 357 U.S. at 355. That

9

demonstrated the "intrinsic judicial character of the task with which the Commission was charged." *Id.*

**B**

*Humphrey's Executor* and *Wiener* are precedential decisions that bind this court. Even as the Supreme Court has rejected more modern and novel constraints on the removal of single heads of agencies exercising substantial executive power, its modern precedent has consistently announced that *Humphrey's Executor* remains "in place[.]"  *Seila Law v. CFPB*, 591 U.S. 197, 215 (2020); *see id*. at 228 ("not revisit[ing] *Humphrey's Executor*"); *Collins v. Yellen*, 594 U.S. 220, 250–251 (2021) (recognizing that *Seila Law* did "not revisit [] prior decisions") (quoting *Seila Law*, 591 U.S. at 204); *see also Morrison v. Olson*, 487 U.S. 654, 687 (1988) (in case involving restrictions on removal of an inferior officer, recognizing that *Humphrey's Executor* remains good law); *see generally Free Enter. Fund v. Public Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (in case involving multimember board, declining to "reexamine" *Humphrey's Executor*); *id*. at 501 ("[W]e do not" "take issue with for-cause limitations in general[.]").

*Free Enterprise Fund*, for example, held unconstitutional double-layered for-cause removal protections.  That is, Members of the Public Company Accounting Oversight Board could be removed only for cause by the Securities Exchange Commission, whose members, in turn, the Court accepted could be removed by the President only for cause. *Free Enter. Fund*, 561 U.S. at 484–487.  The Supreme Court held that a twice-restricted removal power imposed too great a constraint on the President's authority. *Id.* at 492.

10

In devising a remedy, the Supreme Court left the Securities and Exchange Commission's accepted single-layer removal protections intact; only the Board's protections were stricken. *Free Enter. Fund*, 561 U.S. at 492, 495, 509.  The Court found this would be a sufficient constitutional remedy because, even with the Commissioners enjoying for-cause protection, the President could "then hold the Commission to account for its supervision of the Board, to the same extent that he may hold the Commission to account for everything else it does." *Id.* at 495–496.  In so ruling, the Court repeated the rule from *Humphrey's Executor* that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." *Id.* at 483.

*Seila Law* likewise repeated that *Humphrey's Executor* remains governing precedent.  In that case, the Supreme Court invalidated the removal protections for the Consumer Financial Protection Bureau ("CFPB")'s single director because she had "sole responsibility to administer 19 separate consumer-protections statutes" and could "*unilaterally*, without meaningful supervision, issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Seila Law*, 591 U.S. at 219, 225.  Structural features of the CFPB further insulated the director from presidential control.  Because the agency was headed by one director with a five-year term, "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities." *Id.* at 225.  The CFPB also receives its funding from the Federal Reserve Board, which is funded outside of the annual appropriations process, further diluting presidential oversight. *Id.* at 226.

11

Importantly, the Supreme Court's decision was explicit that *Humphrey's Executor* remains "in place." *Seila Law*, 591 U.S. at 215; *id*. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today[.]").  In fact, in *Seila Law*, three Justices invited Congress to "remedy[] the [CFPB's] defect" by "converting the CFPB into a multimember agency," *id*. at 237 (Roberts, C.J., joined by Alito and Kavanaugh, JJ., concurring in the judgment), and four more Justices agreed that such a redesign would be constitutional, *id*. at 298 (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in the judgment with respect to severability and dissenting in part).

Most recently, the Supreme Court's decision in *Collins*, which struck down another single-headed agency performing predominantly executive functions, also acknowledged that *Humphrey's Executor* remained precedential.  *Collins*, 594 U.S. at 250–251.

## C

Under the precedent set in *Humphrey's Executor* and *Wiener*, and preserved in *Free Enterprise Fund*, *Seila Law*, and *Collins*, the MSPB and NLRB removal protections are constitutional.

## 1

The MSPB is a "multimember expert agenc[y] that do[es] not wield substantial executive power[.]"  *Seila Law*, 591 U.S. at 218.  No more than two of its three members may hail from the same political party. 5 U.S.C. § 1201; *see also Humphrey's Executor*, 295 U.S. at 624 ("The commission is to be nonpartisan[.]").  MSPB members serve staggered seven-year terms, giving each President the "opportunity to shape [the Board's] leadership and thereby influence its activities." *Seila*

12

*Law*, 591 U.S. at 225.  President Trump, in fact, will be able to appoint at least two of the MSPB's three members.

In the government's own words, the MSPB is "predominantly an adjudicatory body."  Oral Arg. Tr. 12:19–23.  The MSPB has no investigatory or prosecutorial role. Instead, it hears disputes between federal employees and federal agencies.  5 U.S.C. §§ 1204(a)(1), 7701(a).  As such, the MSPB is passive and must wait for appeals to be initiated either by employees who have suffered an adverse employment action, discrimination, or whistleblower retaliation, or by employing agencies or the Office of Special Counsel.  *Id.* §§ 1204(a)(1), 1214(b)(1)(a); 5 C.F.R. § 1201.3; *see Seila Law*, 591 U.S. at 219–220 (reiterating the constitutionality of removal protections for an officer who wielded "core executive power" because "that power, while significant, was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter in which the Department of Justice had a potential conflict of interest").[1]

Like the War Claims Commission in *Wiener*, the MSPB must "'adjudicate according to law' the classes of claims defined in the statute[.]"  357 U.S. at 355.  That confirms the "intrinsic judicial character of the task with which" the MSPB is "charged."  *Id*.

---

[1] In the exercise of its adjudicatory authority, the MSPB has limited jurisdiction.  Only civil servants that fall within the statutorily defined term "employee" can seek its review.   5 U.S.C. §§ 7511(a)(1), 7701(a); *see also Roy v. MSPB*, 672 F.3d 1378, 1380 (Fed. Cir. 2012).  That definition excludes, among other categories, political appointees and civil servants in "probationary" or "trial period[s]" of employment.  5 U.S.C. § 7511(a)(1); *see also Roche v. MSPB*, 596 F.3d 1375, 1383 (Fed. Cir. 2010).

13

The history of the MSPB as a bifurcated entity reinforces its almost exclusively adjudicatory role. In 1978, Congress divided the Civil Service Commission into the Office of Personnel Management and the MSPB. Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 201, 92 Stat. 1111, 1119. The Office of Personnel Management was tasked with "executing, administering, and enforcing * * * civil service rules and regulations[,]" while the MSPB—then, as now—was tasked with adjudicating disputes. *Id.* § 202, 92 Stat. at 1122.

Once the MSPB issues decisions, federal agencies and employees are expected to "comply" with its orders, 5 U.S.C. § 1204(a)(2), but the MSPB has no independent means of enforcing its orders. *Cf. Humphrey's Executor*, 295 U.S. at 620–621 (FTC cease-and-desist orders could only be enforced by application "to the appropriate Circuit Court of Appeals[.]").

In addition, most MSPB decisions are subject to Article III review. Employees can appeal to federal court any decision that "adversely affect[s] or aggrieve[s]" them, and the Director of the Office of Personnel Management can petition for judicial review of any MSPB decision that the Director believes is erroneous and "will have a substantial impact on a civil service law, rule, regulation, or policy directive." 5 U.S.C. § 7703(a)(1), (d)(1).

The MSPB has limited rulemaking authority to prescribe only those regulations "necessary for the performance of its functions," many of which are akin to the federal rules of procedure and local rules that courts adopt. 5 U.S.C. § 1204(h); *see, e.g.*, 5 C.F.R. §§ 1201.14 (electronic filing procedures), 1201.23 (computation of time for deadlines), 1201.26 (service of pleadings). It also must prepare "special studies" and "reports" on the civil service for the President and

14

Congress, 5 U.S.C. § 1204(a)(3), but these are just "recommendations[,]" carry no force of law, and are not enforced by the MSPB, Harris Decl. ¶ 30; *see Humphrey's Executor*, 295 U.S. at 621 (citing 15 U.S.C. § 46). In addition, the MSPB remains accountable to the President and Congress through the appropriations process. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 557 (2024). That affords the President an "opportunity to recommend or veto spending bills" to fund its operations. *Seila Law*, 591 U.S. at 226.

**2**

The NLRB also fits the *Humphrey's Executor* and *Wiener* mold. Indeed, Congress enacted the National Labor Relations Act, which created the NLRB, just over a month after *Humphrey's Executor* was decided and modeled the statute on the FTC's organic statute. *Compare* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935), *with* An Act to create a Federal Trade Commission, Pub. L. No. 63-203, 38 Stat. 717 (1914); *see also* J. Warren Madden, *Origin and Early Years of the National Labor Relations Act*, 18 HASTINGS L.J. 571, 572–573 (1967).

As designed, the NLRB is a "multimember" agency that does "not wield substantial executive power[.]" *Seila Law*, 591 U.S. at 218. It is composed of five members that serve staggered five-year terms, thus affording each President the chance to affect its composition. 29 U.S.C. § 153(a); *see also Seila Law*, 591 U.S. at 225. Though the Act does not require the Board's members to be balanced across party lines, Presidents since Eisenhower have adhered to a "tradition" of appointing no more than three members from their own party. Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 COLUM. L. REV. 9, 54–55 (2018). No one disputes

15

that continues to be the case with the current Board of which Wilcox is a member.

The NLRB is predominantly an adjudicatory body. It hears complaints alleging unfair labor practices by employers and labor unions. *Glacier Northwest v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775–776 (2023). It can issue cease-and-desist orders aimed at unfair labor practices and orders requiring reinstatement or backpay. 29 U.S.C. § 160(c). These orders, however, are not independently enforceable. They must be given legal force by a federal court of appeals. *Id*. at §§ 154(a), 160(e); *see also Dish Network Corp. v NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020) (The NLRB "needs a court's imprimatur to render its orders enforceable."). In addition, any person "aggrieved" by an NLRB decision may obtain judicial review in federal court. 29 U.S.C. § 160(f).

Conspicuously absent from the NLRB's authority is any power to investigate or prosecute cases. That authority is left to the (removable-at-will) General Counsel. *See* 29 U.S.C. § 153(d). So the NLRB's powers are less than those of the FTC in *Humphrey's Executor* because the FTC could launch investigations "at its own instance[.]" Brief for Samuel F. Rathbun, Executor, at 46 n.21, *Humphrey's Executor*, 295 U.S. 602 (1935) (No. 667); *see Seila Law*, 591 U.S. at 219 n.4 ("[W]hat matters" for assessing *Humphrey's Executor* "is the set of powers the Court considered as the basis for its decision[.]").

Like the MSPB, the NLRB is funded through congressional appropriations. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 698 (2024). Also like the MSPB, the NLRB has circumscribed rulemaking authority. It can issue rules and regulations that are necessary to carry out its statutory duties. 29 U.S.C. § 156. As

16

part of this authority, the NLRB may promulgate interpretive rules "advis[ing] the public of [its] construction" of the National Labor Relations Act, *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1994) (citation omitted), but Article III courts review those interpretations *de novo*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).

## D

All of that makes the answer to the question whether the government is likely to succeed in its appeal an easy "No." The unanimous holdings in *Humphrey's Executor* and *Wiener* that removal restrictions on multimember, non-partisan bodies engaged predominantly in adjudicatory functions are constitutional bind this court, especially in light of the Supreme Court's repeated preservation of that precedent and *Seila Law*'s express invitation for Congress to change the CFPB into a multimember body.

The government and my colleagues' opinions press two central arguments to escape this binding authority, but neither affords the government a likelihood of success on appeal.

## 1

To start, the government and the opinions of Judges Henderson and Walker try to distinguish the MSPB and NLRB from the multimember agencies at issue in *Humphrey's Executor* and *Wiener*. But those efforts do not work.

The government casts the MSPB as exercising executive authority because the MSPB "hear[s]" and "adjudicate[s]" matters, is authorized to take "final action" on those matters, "issue[s]" remedies, and orders "compliance" with its

17

decisions.  Gov't Stay Mot. in Harris 12 (quoting 5 U.S.C.
§ 1204(a)(1)–(2)).

True—the MSPB does do those things.  But those are the
hallmarks of an adjudicative body.  The War Claims
Commission was an "adjudicatory body[,]" and it issued final
and unreviewable decisions that ordered funds to be paid from
the Treasury Department's War Claims Fund.  *Wiener*, 357
U.S. at 354–356.  The decisions of the MSPB and NLRB, more
modestly, can only be enforced by a federal court.  *See* 5 U.S.C.
§§ 1204(a)(2), 7703 (MSPB); 29 U.S.C. § 160(e) (NLRB).

The government points out that the MSPB can invalidate
rules issued by the Office of Personnel Management.  Gov't
Stay Mot. in Harris 12 (citing 5 U.S.C. § 1204(f)).  But the
MSPB can invalidate only those rules that are themselves
inherently unlawful because they would require employees to
violate the law by engaging in discriminatory, retaliatory, or
other impermissible conduct.  5 U.S.C. §§ 1204(f)(2), 2302(b).
Needless to say, that type of invalidation is an "exceedingly
rare occurrence," Harris Decl. ¶ 31, and could not trench upon
any lawful exercise of the President's duty to "faithfully
execute" the laws of the United States, U.S. CONST. Art. II, § 3.
And the government nowhere disclaims its ability to obtain
judicial review of such a decision.  *See generally* 5 U.S.C.
§ 7703(d)(1).

The government also highlights that MSPB attorneys, as
opposed to lawyers from the Department of Justice, may
represent the Board in civil actions in the lower federal courts.
Gov't Mot. in Harris 12 (citing 5 U.S.C. § 1204(i)).  But that is
also true of the Federal Reserve Board, 12 U.S.C. § 248(p), and
the Securities Exchange Commission, whose removal
protections the Supreme Court took as given as part of the
constitutional remedy adopted in *Free Enterprise*, 15 U.S.C.

18

§§ 77t(b)–(c), 78u(c)–(e).   Anyhow, independent litigating authority is not uniquely executive in character.  The Political Branches have statutorily authorized the Senate Legal Counsel and the General Counsel of the House to represent the Senate and House, respectively, in court proceedings.   2 U.S.C. §§ 288c, 5571(a).

Finally, Judge Walker claims that the MSPB wields executive power because "it can force the President to work with thousands of employees he doesn't want to work with[.]" J. Walker Op. 40–41.  The assertion that the President could fire every single *employee* in the Executive Branch, as opposed to principal officers, is a breathtaking broadside on the very existence of a civil service that not even the government advances.   And Judge Walker cites no authority for that proposition, which is odd given that the only issue before us is the likelihood of the government's success on appeal on the arguments it advances.

Anyhow, his point proves the opposite.  Issuing an order that an employee was unlawfully discharged is intrinsically adjudicative.  Federal courts often conclude that employment discharges by the federal government were contrary to law and order employees reinstated.  *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (reversing lower courts and ordering reinstatement of Department of Interior employee who was fired without procedurally proper notice or hearing); *Lander v. Lujan*, 888 F.2d 153, 158 (D.C. Cir. 1989) (affirming district court order reinstating Bureau of Mines employee to position he was demoted from in violation of Title VII); *American Postal Workers Union, AFL-CIO v. United States Postal Serv.*, 830 F.2d 294, 312 (D.C. Cir. 1987) (finding Postal Worker discharged in violation of the First Amendment was entitled to reinstatement and back pay).

19

Judge Walker's opinion also overlooks that the MSPB has no legal authority to "force" its decisions on anybody as it has no enforcement arm or sanctions to impose for noncompliance. Only a federal court can do that. And even then, the decisions only "force" the President to work with individuals whom the President cannot legally fire under the anti-discrimination, whistleblower-protection, and veterans-preference laws that he has sworn to uphold. So just like the FTC, the MSPB's charge is "the enforcement of no policy except the policy of the law." *Humphrey's Executor*, 295 U.S. at 624.

As for the NLRB, the government insists that the Board is not "hermetically sealed" off from the General Counsel's enforcement functions. Gov't Stay Mot. in Wilcox 16. In particular, the government argues that the Board, not the General Counsel, may seek injunctions against unfair labor practices in federal court. *Id.* (citing 29 U.S.C. § 160(j)). My colleagues' opinions likewise note that the NLRB can seek backpay against private parties in federal court. J. Walker Op. 33–34; J. Henderson Op. 4.

But the Board's power to seek injunctions in federal court mirrors the 1935 FTC's power to "apply" to circuit courts for "enforcement" of cease-and-desist orders. *Humphrey's Executor*, 295 U.S. at 620–621. In any event, the Board cannot act until the General Counsel does. The Board may seek an injunction only upon the "issuance of a complaint[,]" 29 U.S.C. § 160(j), which the General Counsel has "final authority" to issue or not, *id.* § 153(d). As for backpay, such equitable relief must be sought by the General Counsel who alone supervises the attorneys representing the NLRB in federal court. *Id.*

Lastly, Judge Walker's opinion says that having an intrinsically adjudicatory function like the War Claims Commission in *Wiener* does not count because the

20

Commission's work was "temporary." J. Walker Op. 40. The opinion nowhere explains why the length of an agency's mandate matters constitutionally. If Congress established an agency to run the military, gave its directors for-cause removal protection, but limited its operation to two years, that agency would trench on the President's Article II authority far more than the NLRB or MSPB ever could. In any event, if time matters, Harris's and Wilcox's remaining tenures in office would be shorter than those of the War Claims Commissioners. *See* War Claims Act of 1948, Pub. L. No. 80-896, § 2(a), (c)– (d), 62 Stat. 1240, 1241 (The War Claims Commissioners were originally authorized to serve up to five-year terms).

In short, none of the government's arguments or my colleagues' opinions distinguish the MSPB or NLRB in any materially relevant way from the Supreme Court's holdings in *Humphrey's Executor* and *Wiener*.

**2**

**a**

As their second tack, the government and my colleagues' opinions take aim at *Humphrey's Executor*. The government says that decision has effectively been overruled and confined to its facts because its conclusion about the nature of the FTC's executive power "has not withstood the test of time." Gov't Stay Mot. in Harris 15 (quoting *Seila Law*, 591 U.S. at 216 n.2); *see also* Gov't Stay Mot. in Wilcox 14.

The Supreme Court expressly rejected this argument in *Morrison*. *See Morrison*, 487 U.S. at 686–691, 689 n.28 (applying *Humphrey's Executor* even though the "powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some

21

degree"). That ruling binds this court. Plus that argument has nothing to say about the controlling force of *Wiener*, which involved a predominantly adjudicatory body much more akin to the NLRB and MSPB.

It is this court's job to apply Supreme Court precedent, not to cast it aside or to declare it on "jurisprudential life support." J. Walker Op. 26. If a precedent of the Supreme Court "has direct application in a case"—as *Humphrey's Executor* and *Wiener* do here—"a lower court 'should follow the case which directly controls,'" leaving to the Supreme Court "'the prerogative of overruling its own decisions.'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).

Importantly, that rule governs "even if the lower court thinks the precedent is in tension with 'some other line of decisions.'" *Mallory*, 600 U.S. at 136 (quoting *Rodriguez de Quijas*, 490 U.S. at 484); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); *National Security Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This Court is charged with following case law that directly controls a particular issue[.]").[2]

Yet "tension" is the most that the government and my colleagues' opinions can claim. The government frankly admits it. At oral argument, the government, with admirable

---

[2] *See also Shea v. Kerry*, 796 F.3d 42, 54 (D.C. Cir. 2015) (quoting *Agostini*, 521 U.S. at 237); *Sierra Club v. E.P.A.*, 322 F.3d 718, 725 (D.C. Cir. 2003) (quoting *Rodriquez de Quijas*, 490 U.S. at 484).

22

candor, acknowledged no less than *four* times that it believes the constitutionality of removal protections for multimember bodies is not "clear." Oral Arg. Tr. 24:25; *see id.* at 10:24–11:5 ("[T]he Supreme Court has left the lower courts in something of a tough spot[.]"); 84:16–23 (There is, "at a minimum, a very substantial question" and "reasonable minds can differ" about the scope of *Humphrey's Executor* today.); 88:17–18 ("[T]here's some uncertainty" in the wake of *Collins*.).

Judge Henderson agrees that it is "unclear" when the *Humphrey's Executor* rule for multimember boards applies, J. Henderson Op. 1, and that "reasonable minds can—and often do—disagree" about how to apply the Supreme Court's precedent, *id.* at 3.

The reason for that lack of clarity is obvious: The Supreme Court has not overruled *Humphrey's Executor* or *Wiener*. Quite the opposite, it has expressly carved out multimember independent boards from its recent holdings on the removal power and has expressly left *Humphrey's Executor* "in place[.]" *Seila Law*, 591 U.S. at 215. That is why the concurring opinion of Justices Thomas and Gorsuch in *Seila Law* exists at all: They write to say that they would have gone *further* than the Court and struck down *Humphrey's Executor*. *Id.* at 238–239 (Thomas, J., joined by Gorsuch, J., concurring in part and dissenting in part). So Judge Walker cannot cite a single Supreme Court case saying that the Court has effectively overruled *Humphrey's Executor* or confined that opinion to its facts, never to be applied again. *See* J. Walker Op. 30.

Judge Walker's opinion, instead, presumes to do the Supreme Court's job for it. After omitting what the Supreme Court actually said about *Humphrey's Executor* in *Free Enterprise*, *Seila Law*, and *Collins*, Judge Walker discerns a clarity that everyone else has missed, announcing that the

23

Supreme Court has imposed "a binding command on the lower courts" not to extend *Humphrey's Executor* to "any new contexts," so that this court "cannot extend *Humphrey's*—not even an inch." J. Walker Op. 30.

The problem? The opinion never cites to Supreme Court language for that "binding obligation," nor does it quote or cite anything for the proposed requirement that any multimember board must be an "identical twin" to the FTC to be sustained.

That is because the Supreme Court has not said either thing. Rather than take the Supreme Court at its word, Judge Walker's opinion prognosticates that the Supreme Court will in the future invalidate all removal protections for all multimember boards that exercise "any" executive power in any form. J. Walker Op. 36.

*But that is the very job the Supreme Court has forbidden us to undertake.* We are to apply controlling precedent, not play jurisprudential weather forecasters. To do otherwise would be to accuse the Supreme Court of not meaning what it said when it repeatedly left *Humphrey's Executor* in place, and of engaging in a disingenuous bait-and-switch when seven Justices openly invited Congress to repair the constitutional flaw in the CFPB by reconstituting it as a multimember body. *Seila Law*, 591 U.S. at 237 (Roberts, C.J., joined by Alito and Kavanaugh, JJ., concurring in the judgment); *id.* at 298 (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in the judgment with respect to severability and dissenting in part).

Getting out ahead of the Supreme Court that way is beyond my pay grade. When the Supreme Court makes and expressly preserves precedent, "we [should] take its assurances seriously. If the Justices [were] just pulling our leg, let them say so."

24

*Sherman v. Community. Consol. Sch. Dist. 21 of Wheeling Township*, 980 F.2d 437, 448 (7th Cir. 1992) (Easterbrook, J.); *see also Illinois v. Ferriero*, 60 F.4th 704, 718–719 (D.C. Cir. 2023) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (citation omitted).

Staying in our lane is even more vital in deciding a motion to stay. A stay pending appeal, like a preliminary injunction, is meant to be a "stopgap measure[,]" made under "conditions of grave uncertainty" and with the awareness that it may prove to be "mistaken" once the merits are decided. *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (citation omitted). It is not an opportunity to effect a sea change in the law—especially one that the Supreme Court itself has repeatedly forborne.

**b**

As if Supreme Court precedent was not enough to find that the government is not likely to succeed in these appeals, binding circuit precedent doubles down on it. Prior circuit opinions are "of course binding on us under the law-of-the-circuit doctrine." *Palmer v. FAA*, 103 F.4th 798, 806 (D.C. Cir. 2024); *Campaign Legal Ctr. v. 45Committee, Inc.*, 118 F.4th 378, 386 n.* (D.C. Cir. 2024) ("'One three-judge panel' of this court 'does not have the authority to overrule another three-judge panel of the court. * * * That power may be exercised only by the full court,' either through an *en banc* decision or a so-called *Irons* footnote.") (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc)).

This court has repeatedly applied *Humphrey's Executor* as precedent, including as recently as the last two years. *See Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam); *Severino v. Biden*, 71

25

F.4th 1038, 1047 (D.C. Cir. 2023); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (noting that cases such as *Humphrey's Executor* and *Morrison* confirmed the constitutionality of the Federal Election Commission's structure). Yet both Judge Walker's and Judge Henderson's opinions ignore that binding precedent.

Other circuits too have faithfully hewed to the Supreme Court's admonition not to get out over their jurisprudential skis and have continued to apply *Humphrey's Executor*. *See Consumers' Research v. CPSC*, 91 F.4th 342, 347, 352 (5th Cir. 2024) (*Humphrey's Executor* is "still-on-the-books precedent" and "has not been overruled[.]"), *cert. denied*, 145 S. Ct. 414 (2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 761–762 (10th Cir. 2024) ("[T]he Supreme Court in *Seila Law* clearly stated that *Humphrey's Executor* remains binding today."); *Magnetsafety.org v. CPSC*, No. 22-9578, 2025 WL 665101, at *7 (10th Cir. Mar. 3, 2025) ("*Humphrey's Executor* remains binding today.") (quoting *Leachco*, 103 F.4th at 761).

In sum, this court's duty—especially at this early stay stage—is to follow binding and dispositive Supreme Court and circuit precedent in evaluating the government's likelihood of success. And the government has not shown any likelihood of prevailing under *Humphrey's Executor* and *Wiener*, as well as circuit precedent. If the government thinks it has a likelihood of success on certiorari to the Supreme Court, it can raise that argument there. This court has no business getting ahead of that Court in these appeals. And we certainly should not cast off Supreme Court precedent, depart from circuit precedent, and create a circuit conflict just to determine the government's eligibility for a *stay* that is meant only to maintain the status quo.

26

**E**

Even if Supreme Court precedent did not dictate the answer to the likelihood-of-success question, the government's and my colleagues' efforts in their opinions to reduce *Humphrey's Executor* and *Wiener* to constitutional rubble are not likely to succeed.

**1**

This court's starting point is to presume that the Civil Service Reform Act and the National Labor Relations Act are constitutional. *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019); *Mississippi Commission on Environmental Quality v. E.P.A.*, 790 F.3d 138, 182 (D.C. Cir. 2015). And with or without that presumption, the statutory removal provisions pass constitutional muster.

To start, the removal restrictions comport with the Constitution's text. Article I gives Congress the full authority to create agencies and the officer positions to run those agencies. U.S. CONST. Art. I, § 8, cl. 18 ("The Congress shall have Power * * * To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."). The Constitution also makes explicit that Congress, and not just the President, has a role in staffing the agencies and positions created by law. Under Article II's Appointments Clause, the President can appoint principal officers only "by and with the Advice and Consent of the Senate" and only as the legislature "shall * * * establish[] by Law" those positions. Art. II, § 2, cl. 2. Congress also has plenary power to vest the appointment of inferior officers "in the President alone, in the Courts of Law, or in the Heads of

27

Departments." *Id.* And, of course, it is Congress who pays, with taxpayer dollars, for everyone employed in the Executive Branch. Art. I, § 8, cl. 1.

Article II, for its part, says nothing about removal power. But it does vest in the President "[t]he executive Power" and charge the President with "tak[ing] Care that the Laws be faithfully executed[.]" U.S. CONST. Art. II, §§ 1, 3. Read together, the Constitution invests both the President and Congress with coordinate responsibilities to build an effective and efficient government that serves the Nation's important interests.

History confirms that Congress may, as part of its design and staffing decisions, condition the President's removal authority when necessary to accomplish vital national goals. Congressional authority to enact for-cause removal restrictions traces back to the time of the Constitution's adoption. When Congress reenacted the Northwest Ordinance, it transferred the Confederation Congress's removal authority over territorial officials to the President, *An Act to provide for the Government of the Territory Northwest of the river Ohio*, ch. 8, § 1, 1 Stat. 50, 53 (Aug. 7, 1789), but left intact for-cause removal protections for territorial judges, *id.* at 51.[3]

Then, in 1790, Congress created the Sinking Fund Commission (the Federal Reserve's early predecessor) to perform economically critical executive and policy functions. Congress directed that two of its five directors would be officials whom the President could not remove. *An Act making*

---

[3] Territorial judges do not constitutionally enjoy tenure protection because they are not Article III judges. *American Insurance Co. v. 356 Bales of Cotton*, 26 U.S. 511, 546 (1828).

28

*provision for the reduction of the Public Debt*, ch. 47, § 2, 1 Stat. 186 (1790).  As for the First and Second Banks of the United States, Congress provided the President no removal authority over members of the First Bank, *An act to incorporate the subscribers in the Bank of the United States*, ch. 10, § 4, 1 Stat. 191, 192–193 (1791), and gave the President control over only five out of twenty-five members of the Second Bank, *An Act to incorporate the subscribers to the Bank of the United States*, ch. 44, § 8, 3 Stat. 266, 269 (1816).[4]

Next, in 1855, Congress created the Court of Claims, the judges of which held office "during good behaviour," *An Act to establish a Court for the Investigation of Claims against the United States*, ch. 22, § 1, 10 Stat. 612 (1855), even though they were not Article III judges, *see Williams v. United States*, 289 U.S. 553, 563 (1933).

The list goes on.  The statute creating the Comptroller of the Currency required the President to gain Senate approval before removing the Comptroller, *An Act to provide a national Currency,* ch. 58, § 1, 12 Stat. 665–666 (1863), and its successor statute, while vesting removal authority in the President, still required the President to "communicate[]" his reason "to the Senate" before exercising that authority, *An Act*

---

[4] Judge Walker's opinion makes much of the Decision of 1789.  *See* J. Walker Op. 9–10.  But the only thing decided in 1789 was that the President need not always consult with the Senate before removing a principal officer, a proposition that no one contests today.  *E.g.*, *Myers v. United States*, 272 U.S. 52, 241 (1926) (Brandeis, J., dissenting).  Rather than focusing on short snippets from legislative debates and law review articles, one can simply observe that the same Congress that apparently decided against removal restrictions also decided to create removal restrictions, just not for every principal officer.

29

*to provide a National Currency*, ch. 106, § 1, 13 Stat. 100 (1864).

Then, in 1887, Congress created the Interstate Commerce Commission to regulate railroads. Neither President Cleveland nor a single member of Congress raised a constitutional objection to the provision allowing the removal of Commissioners only "for inefficiency, neglect of duty, or malfeasance in office[.]" *An act to regulate commerce*, ch. 104, § 11, 24 Stat. 383 (1887).

Founding-era Supreme Court precedent documents the practice as well. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), the Supreme Court, through Chief Justice Marshall, recognized that some executive officers are not removable by the President:

> Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is not removable at the will of the executive, the appointment is not revocable, and cannot be annulled. It has conferred legal rights which cannot be resumed.

*Id.* at 162*; see also id.* at 172–173 (Marbury "has been appointed to an office, from which he is not removable, at the will of the executive; and being so appointed, he has a right to the commission which the secretary has received from the president for his use.").[5]

---

[5] To be sure, the Supreme Court in dicta has dismissed this discussion in *Marbury* as "ill-considered dicta." *Seila Law*, 591 U.S.

30

None of this is surprising given the Constitution's textual checking and balancing, and general opposition to the over-concentration of power in a single Branch.  As Justice Scalia summarized when discussing the modern counterparts of these early agencies, "removal restrictions have been generally regarded as lawful for so-called 'independent regulatory agencies,' such as the Federal Trade Commission, * * * the Interstate Commerce Commission, * * *, and the Consumer Product Safety Commission * * *, which engage substantially in what has been called the 'quasi-legislative activity' of rulemaking[.]"  *Morrison*, 487 U.S. at 724–725 (Scalia, J., dissenting).  Such "'long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President."  *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (quoting *The Pocket Veto Case,* 279 U.S. 655, 689 (1929)).

---

at 227.  But it seems to me to be wisdom and knowledge gained from firsthand experience at the time of the founding, and so cannot be brushed away so easily.  John Marshall participated in the Virginia ratification debates and served in the legislative and executive branches before becoming Chief Justice.  *See* Supreme Court Historical Society, *Life Story:  John Marshall* (2025), https://perma.cc/JHA4-EPTH.  He was joined by Justice Paterson, a delegate to the Constitutional Convention and a Senator in 1789, when the debate over removal took place.  *See* Supreme Court Historical Society, *William Paterson* (2025), https://perma.cc/TL6M-7Y9M.  In searching for the Constitution's original meaning, it is hard to understand the preference of Judge Walker's opinion for *Myers*—written 138 years after the Constitution's ratification—to *Marbury*, written by jurists who helped to write and to ratify the Constitution.

31

That is the historical grounding for the Supreme Court's decisions in *Humphrey's Executor* and *Wiener*. And the MSPB's and NLRB's for-cause removal protections fit that historical practice.

**a**

Start with the MSPB.  In 1883, Congress created the Civil Service Commission—the MSPB's predecessor entity—to address the serious problem of a federal workforce beset by political patronage, political coercion, and instability. Presidents and their subordinates could reward their supporters with taxpayer-funded government jobs, but often had to fire those already in office to make room for their favorites.  The result was administrative dysfunction.  As one commentator put it, "[a]t present there is no organization save that of corruption[;] * * * no system save that of chaos; no test of integrity save that of partisanship; no test of qualification save that of intrigue."  Ari Hoogenboom, *The Pendleton Act and the Civil Service*, 64 AM. HIST. REV. 301, 301 (1959) (*quoting* Julius Bing, *Our Civil Service*, PUTNAM'S MAG. 232, 236 (Aug. 1868)); *see id.* at 302 ("Contemporaries noted the cloud of fear that hovered over government workers, especially after a change of administration.  It was impossible for an *esprit de corps* or for loyalty to office or agency to develop in an atmosphere of nervous tension. * * * A civil servant was loyal primarily to his patron—the local political who procured him his job.").

Concerns about this patronage system were a longstanding concern.  As Mark Twain observed:  "Unless you can get the ear of a Senator, or a Congressman, or a Chief of a Bureau or Department, and persuade him to use his 'influence' in your behalf, you cannot get an employment of the most trivial nature in Washington.  Mere merit, fitness and capability[] are useless

32

baggage to you without 'influence.'" MARK TWAIN & CHARLES WARNER, THE GILDED AGE 223 (1873); *see also* Mark Twain, Special Dispatch, *N.Y. Times* (Oct. 2, 1876) ("We hope and expect to sever [the civil] service as utterly from politics as is the naval and military service, and we hope to make it as respectable, too. We hope to make worth and capacity the sole requirements of the civil service[.]").

Governmental malfunction was so disabling that President Garfield devoted a portion of his 1881 inaugural address to the problem. He emphasized the need for tenure protections, explaining that the civil service could "never be placed on a satisfactory basis until it is regulated by law[s]" that "prescribe the grounds upon which removals shall be made during the terms for which incumbents have been appointed." President James A. Garfield, *Inaugural Address* (March 4, 1881), https://perma.cc/B5DM-T738. President Garfield's assassination a few months later by a disappointed job seeker transformed concerns about the patronage system into a national crisis. Alan Gephardt, *The Federal Civil Service and the Death of President James A. Garfield*, National Park Service (2012), https://perma.cc/3QY2-LEUT.

Two years later, "strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, [ch. 27, 22 Stat. 403 (1883)]." *Elrod v. Burns*, 427 U.S. 347, 354 (1976). That Act created a Civil Service Commission to eliminate the "patronage system" of governance and create a professional civil service dedicated only to working for the American people. *Id.* In that way, "Congress, the Executive, and the country" all agreed "that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly[.]" *United States Civil Service Comm'n v. National Association of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564 (1973).

33

The MSPB's *raison d'etre* is to effectuate this governmental commitment to prioritizing merit over partisan loyalty. Housing all employment matters in the Civil Service Commission had proven unworkable as the Commission had accumulated "conflicting responsibilities" in its roles as "a manager, rulemaker, prosecutor and judge." President Jimmy Carter, *Fed. Civ. Serv. Reform Msg. to Cong.* (March 2, 1978), https://perma.cc/2URA-FJRR. Its slow pace of decision-making had also confounded efforts to enforce civil service laws for both employees and employing agencies. *See United States v. Fausto*, 484 U.S. 439, 458 (1988) (Stevens, J., dissenting).

To address the problem, the 1978 Civil Service Reform Act created the Office of Personnel Management to perform "personnel administration[,]" the Office of Special Counsel to "investigate and prosecute[,]" and the MSPB to "be the adjudicatory arm of the new personnel system." President Carter, *Fed. Civ. Serv. Reform Msg.*; *see* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 3, 92 Stat. 1111, 1112 (The Act will provide "the people of the United States with a competent, honest, and productive Federal work force" that is governed by "merit system principles and free from prohibited personnel practices[.]").

The Reform Act provided MSPB members with some removal protection to ensure both employees and agencies that decisions would be made based on the facts and law, rather than political allegiance or fear of retribution. The MSPB also hears claims by whistleblowers exposing waste, fraud, and abuse within federal agencies. Removal protections offer whistleblowers assurance that their claims will be heard impartially and objectively, free from retributive political pressure. For "it is quite evident that one who holds his office

34

only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor*, 295 U.S. at 629.

Said another way, if the Constitution requires that Presidents be allowed to fire members of the *Merit* Systems Protection Board for any partisan, policy, or personal reason, then Congress and the taxpayers cannot have a professional civil service based on merit. Nor could the MSPB provide the "requirement of neutrality in adjudicative proceedings" that "safeguards the * * * central concerns of procedural due process[.]" *Marshall v. Jericco*, 446 U.S. 238, 242 (1980); *see Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities.").

At the same time, by housing the adjudicatory authority in a multimember board, the Political Branches prevented the accumulation of power in the hands of a single individual answerable to no one. *Cf. Seila Law*, 591 U.S. at 222–226; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("[T]he Constitution diffuses power the better to secure liberty[.]"). The group decision-making dynamic of the collective Board also helps to ensure that members can and will ground their decisions in the law and facts alone, which they have to justify in their judicially reviewable written decisions. That is, they have to show their work. The requirement of a politically balanced Board demonstrates the Political Branches' bipartisan commitment to creating a neutral and unbiased adjudicatory process. That contrasts sharply with the single heads of agencies in *Seila Law* and *Collins*, who were accountable to no one and did not need to be appointed in a politically neutral manner.

35

Presumably that balance is why, over the last 50 years and eight presidential administrations, there has been nary a constitutional objection in a presidential signing statement or Office of Legal Counsel opinion to the MSPB's removal restrictions. Quite the opposite. Shortly before passage of the Reform Act, the Office of Legal Counsel agreed that the MSPB was "a quasi-judicial body whose officials may be legitimately exempted from removal at the pleasure of the President." *Presidential Appointees—Removal Power—Civil Serv. Reform Act-Const. L. (Article II, S 2, Cl. 2)*, 2 Op. O.L.C. 120, 121 (1978).[6]

---

[6] The government's briefs and Judge Henderson's and Judge Walker's opinions cite nothing at all. The most I have found is that Presidents George H. Bush and Clinton noted different potential constitutional problems related to the MSPB with the Whistleblower Protection Act of 1989 and MSPB Reauthorization Act of 1994, respectively, but those had nothing to do with constitutional concerns about removal protections for MSPB members. Presidential Statement upon Signing the Whistleblower Protection Act of 1989, 25 WEEKLY COMP. PRES. DOC. 516 (Apr. 10, 1989); Presidential Statement on Signing Legislation Reauthorizing the Merit Systems Protection Board and the Office of Special Counsel, 30 WEEKLY COMP. PRES. DOC. 2202 (Oct. 29, 1994). Moreover, to my knowledge, neither OLC nor any President in a signing statement has called into doubt *Humphrey's Executor* or *Wiener* or suggested that those opinions have lost their validity. This stands in sharp contrast to removal restrictions on the four modern single-head agencies whose constitutionality was questioned from the outset. *Seila Law*, 591 U.S. at 221 (The Office of Special Counsel was the "first enduring single-leader office, created nearly 200 years after the Constitution was ratified, [and] drew a contemporaneous constitutional objection from the Office of Legal Counsel under President Carter and a subsequent veto on constitutional grounds by President Reagan."); *Collins*, 594 U.S. at 251 (These agencies

36

**b**

The critical national need for an impartial, multimember adjudicatory process applies with at least equal force to the NLRB. Before its creation, the United States was racked by violent labor strikes and brutal repression of the strikers. Between 1877 and 1934, there were thousands of violent labor disputes, many of which required state and federal troops to control. *See* Philip Taft & Philip Ross, *American Labor Violence: Its Causes, Character, and Outcome, in* VIOLENCE IN AMERICA: HISTORICAL AND COMPARATIVE PERSPECTIVES: A STAFF REPORT TO THE NATIONAL COMM'N. ON THE CAUSES AND PREVENTION OF VIOLENCE 225–272 (Hugh Graham & Ted Gurr eds. 1969) ("*National Report on Labor Violence*"). In 1934 alone, the National Guard had to be mobilized to quell strikes in Minnesota, Alabama, Georgia, North Carolina, South Carolina and California. *Id.* at 269–272. In addition to the human toll of the many killed and wounded, the economic costs were staggering: "the vacating of 1,745,000 jobs," the "loss of 50,242,000 working days every 12 months," and a cost to the economy of "at least $1,000,000,000 per year" in 1934 dollars, which would be approximately $23.5 billion per year now. S. REP. NO. 74-573, at 2 (1935); *see* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935) ("The denial by some employers of the right of employees to organize * * * lead[s] to strikes and other forms of industrial strife or unrest, which have * * * the necessary effect of burdening or obstructing commerce[.]").

---

"lack[] a foundation in historical practice[.]") (quoting *Seila Law*, 591 U.S. at 204).

37

The inability to facilitate peaceful negotiations between employers and labor was "one of the most prolific causes of strife" and, according to the Supreme Court, was such "an outstanding fact in the history of labor disturbances that it [wa]s a proper subject of judicial notice and require[d] no citation of instances." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 42 (1937).

Importantly, federal and state courts had proven unable to resolve these conflicts. *See* FELIX FRANKFURTER & NATHAN GREENE, THE LABOR INJUNCTION (1930); HOWARD GILLMAN, THE CONSTITUTION BESIEGED 61–100 (1995). That is why Congress created the NLRB—an expert agency capable of facilitating "negotiation" and "promot[ing] [the] industrial peace[.]" *Jones & Laughlin*, 301 U.S. at 45. "Everyday experience in the administration of the [National Labor Relations Act] gives [the NLRB] familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self organization and collective action, and with the adaptability of collective bargaining for the peaceful settlement of their disputes with their employers." *NLRB v. Hearst Publications*, 322 U.S. 111, 130 (1944).

As with the MSPB, the Political Branches concluded that the neutrality of Board members would be indispensable to their vital role, so they had to be kept free from both the perception and the reality of direct political influence that an unalloyed removal power would permit. With "the Damocles' sword of removal by the President" hanging over the NLRB, *Wiener*, 357 U.S. at 356, employers and labor would lose faith that the NRLB is impartially administering the law rather than tacking to ever-changing political winds.

38

In addition, an unchecked removal power would cause frequent and sharp changes in how the NLRB adjudicates cases. That lack of stability in the law would make it harder for businesses and labor to enter into agreements to resolve labor disputes. One party might prefer to wait for the next election before committing to a collective bargaining agreement. Or those agreements could be shortened to mirror the terms of politically replaceable Board members. Both would spawn more breakdowns in labor relations, strikes, and economic disruption. *See International Organization of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (discussing the importance of consistent policymaking to protect and encourage reliance interests).

Ninety years after the NLRA, it may be hard to imagine the exceptional disruption to the national economy caused by the absence of an impartial and expert administrative forum for the resolution of labor disputes. But that is because the NLRB has worked. *National Report on Labor Violence* at 292 ("The sharp decline in the level of industrial violence is one of the great achievements of the National Labor Relations Board."). And it is the indispensability of a neutral adjudicator between labor and employers that explains why the Supreme Court has said directly that the NLRB does not "offend against the constitutional requirements governing the creation and action of administrative bodies." *Jones & Laughlin*, 301 U.S. at 46–47.

**2**

In response to the Political Branches' joint and longstanding conclusions as to the critical necessity for a professional civil service and a neutral adjudicatory forum to obtain industrial peace in the national economy, the government and Judge Walker's opinion blow a one-note horn:

39

accountability.  J. Walker Op. 1, 7, 21–22; Gov't Stay Mot. in Harris 10, 13; Gov't Stay Mot. in Wilcox 9, 12.

But accountability remains.  Harris and Wilcox were nominated by the President and confirmed by the Senate.  S. Roll Call Vote No. 209, 117th Cong., 2d Sess. (2022) (Harris); S. Roll Call Vote No. 216, 118th Cong., 1st Sess. (2023) (Wilcox).  They must leave office when their terms of seven and five years respectively end.  5 U.S.C. § 1202(a) (Harris); 29 U.S.C. § 153(a) (Wilcox).  In the interim, the President can remove them for cause if they fail to "faithfully execute[]" the law, as well as for basic incompetence.  U.S. CONST. Art. II, § 3; *see* 5 U.S.C. § 1202(d) (Harris); 29 U.S.C. § 153(a) (Wilcox).  This alone gives the President "ample authority" to ensure they are "competently performing [their] statutory responsibilities[.]"  *Morrison*, 487 U.S. at 692; *see also Free Enter. Fund*, 561 U.S. at 509 (With "a single level of good-cause tenure" between the President and the Board, "[t]he Commission is then fully responsible for the Board's actions, which are no less subject than the Commission's own functions to Presidential oversight.").  On top of this, Congress can eliminate their offices completely.  U.S. CONST. Art. I, § 8.  The public can comment on their policies.  5 U.S.C. § 553(c).  And they must regularly send reports to the President and Congress.  *Id.* § 1206 (Harris); 29 U.S.C. § 153(c) (Wilcox).  Just because a President cannot fire Harris and Wilcox for no reason or because he does not like their rulings does not mean that they wield unchecked and unaccountable authority.

Beyond that, the suggestion in Judge Walker's opinion that electoral accountability is the Constitution's lodestar for the executive branch is misplaced.  *See* J. Walker Op. 48 ("The *people* elected the President, *not* Harris *or* Wilcox, to execute the nation's laws.") (emphases added).  But there are other

40

values at stake—stability, competence, experience, efficiency, energy, and prudence, for example. Anyhow, the members of Congress who created the MSPB and NLRB are *directly* elected by the people who are affected by the competence and stability of the federal civil service and labor disruptions. By contrast, Americans do not directly elect the President. Instead, they vote for delegates to the electoral college who cast votes for the President. *See* U.S. CONST. Amend. XII. This procedure was not designed to maximize popular accountability. *See* THE FEDERALIST NO. 68 (Alexander Hamilton) ("It was equally desirable, that the immediate election should be made by men most capable of analyzing the qualities adapted to the station, and acting under circumstances favorable to deliberation, and to a judicious combination of all the reasons and inducements which were proper to govern their choice. A small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to such complicated investigations."). To the extent that Judge Walker's opinion's description of the presidency appears familiar, it is because it describes the presidency circa 2025, not circa 1788 when the Constitution was adopted and the roles of Congress and the President in designing the government were formulated.

\* \* \* \* \*

In short, this Nation's historical practice of removal restrictions on multimember boards combined with the acute need for impartial adjudicatory bodies to give effect to civil service protections and to provide labor peace and stability together demonstrate the constitutional permissibility of the removal limitations for members of these two adjudicatory bodies. Such a "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to

41

uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'executive Power' vested in the President by § 1 of Art. II." *Youngstown Sheet & Tube Co.*, 343 U.S. at 610–611 (Frankfurter, J., concurring).

For all those reasons, at this procedural juncture, the government is not likely to succeed on the merits of its argument that the removal provisions are unconstitutional even if binding Supreme Court and circuit precedent did not already resolve the likelihood of success question in favor of Harris and Wilcox.

**F**

The government additionally has failed to demonstrate a likelihood of success on its argument that this court cannot remedy Harris's and Wilcox's injuries. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury*, 5 U.S. at 163. And it is "indisputable" that the wrongful removal from office constitutes "a cognizable injury[.]" *Severino*, 71 F.4th at 1042; *see Sampson v. Murray*, 415 U.S. 61, 91 (1974); *Wiener*, 357 U.S. at 356 (permitting suit for damages). Indeed, the government acknowledges that Harris and Wilcox have remediable injuries. Gov't. Stay Mot. in Harris 18; Gov't. Stay Mot. in Wilcox 19.

Four remedies are available in this context, should the district court judgments in favor of Harris and Wilcox be sustained on appeal.

*First*, there is no dispute that Harris and Wilcox could obtain backpay due to an unlawful firing if their wages have been disrupted. *See, e.g.*, *Myers*, 272 U.S. at 106.

42

*Second*, federal courts may preserve in office or reinstate someone fired from the Executive Branch with an injunction if the circumstances are "extraordinary." *Sampson*, 415 U.S. at 92 n.68; *see Service v. Dulles*, 354 U.S. 363, 388 (1957). The plaintiff must demonstrate "irreparable injury sufficient in kind and degree to override" the "disruptive effect" to "the administrative process[.]" *Sampson*, 354 U.S. at 83–84; *see id.* at 92 n.68.

This rule extends to officers who hold positions on multimember boards. Even though an injunction cannot restore such officeholders to office *de jure*, this court's precedent holds that a court can order their restoration to office *de facto*. In *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), President Clinton removed Robert Swan from the board of the National Credit Union Administration, *id.* at 974. This court held that it could grant Swan relief by enjoining the board and all other relevant executive officials subordinate to the President to treat Swan as a legitimate board member. *Id.* at 980. Similarly, in *Severino v. Biden*, this court concluded that it could issue an injunction to "reinstate a wrongly terminated official 'de facto,' even without a formal presidential reappointment." 71 F.4th at 1042–1043 (quoting *Swan*, 100 F.3d at 980).

At this juncture, the government has failed to show that, should the judgments in favor of Harris and Wilcox be sustained on appeal, there would be an insufficient basis for the injunctions that retained them in office. Harris's and Wilcox's removals would disrupt the routine administration of the Executive Branch by (1) depriving the adjudicatory bodies on which they sit of quora to function, and (2) denying the parties' whose cases Congress has channeled to the MSPB and NLRB the very impartiality and expertise in decision-making that

43

protections against removal provide. A merits panel could find that to be a severe injury to the public.

The government invokes older caselaw holding that an injunction cannot restore someone to their position in the Executive Branch. *See* Gov't Stay Mot. in Harris 19–20 (citing *In re Sawyer*, 124 U.S. 200, 212 (1888), and *White v. Berry*, 171 U.S. 366, 377 (1898)). But, as the Supreme Court itself has said: "Much water has flowed over the dam since 1898," and it is now well established that "federal courts do have authority to review the claim of a discharged governmental employee." *Sampson*, 415 U.S. at 71.

The government argues that we cannot enjoin the President. Gov't Stay Mot. in Harris 18. That argument is beside the point because Harris and Wilcox never asked the district court to enjoin the President. The district courts enjoined subordinate executive officers, not the President, consistent with circuit precedent in *Swan* that binds this panel. *Harris*, 2025 WL 679303, at *16; *Wilcox*, 2025 WL 720914 at *16, 18. Injunctions against subordinate executive officials to prevent illegal action by the Executive Branch are well known to the law. *See, e.g.*, *Youngstown Sheet & Tube Co.*, 343 U.S. at 584; *Hamdan v. Rumsfeld*, 548 U.S. 557, 567 (2006); *Swan*, 100 F.3d at 980. Nor do such injunctions "necessarily target[] the President[.]" *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 n.2 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting). The injunctions put the President under no legal obligation to recognize Harris and Wilcox as legitimate officeholders. The injunctions instead require *other* government officials to treat them as *de facto* office holders for the rest of their terms.

The government reads *Swan* and *Severino* as limited to disputes about standing. Gov't Stay Mot. in Harris 20. That

44

makes no sense. Standing is a jurisdictional prerequisite to bringing suit in federal court. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998). To establish standing, plaintiffs must show, among other things, that their "injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568–571 (1992); *Steel Co.*, 523 U.S. at 107. So recognizing the existence of a legal remedy is a critical precondition to resolving a lawsuit on the merits. Because jurisdiction in both *Swan* and *Severino* depended on holding that an injunction could issue, and both cases held that there was jurisdiction and went on to decide the merits, both cases necessarily held that an injunction could restore someone to office *de facto*.

*Third*, the government did not dispute in district court that Wilcox could obtain a declaratory judgment, so it has forfeited any argument as to the unavailability of that form of relief in her case. *Wilcox*, 2025 WL 720914, at *16.

The government does argue that Harris is ineligible for declaratory relief. Gov't Stay Mot. in Harris 21. That is incorrect. Declaratory relief is governed by "the same equitable principles relevant to the propriety of an injunction." *Samuels v. Mackell*, 401 U.S. 66, 73 (1971). For the same reasons that injunctions could be warranted in these cases, so too could declaratory judgments. And a declaratory judgment may issue against the President. *Clinton v. City of New York*, 524 U.S. 417, 428 (1998); *National Treasury Employees*, 492 F.2d at 616.

*Fourth*, a writ of mandamus is another available form of relief for Harris and Wilcox. A writ of mandamus is a traditional remedy at law ordering an executive official to carry out a mandatory and legally ministerial duty, *Swan*, 100 F.3d

45

at 977, which includes redressing an unlawful removal from public office, *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377.

The use of mandamus to assert title to an office was well known at the founding. *See, e.g.*, *R. v. Blooer* (1760) 97 Eng. Rep. 697, 698 (KB) (Mansfield, C.J.) ("A mandamus to restore is the true specific remedy where a person is wrongfully dispossessed of any office or function[.]"); 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *264 (1765) ("The writ of mandamus" is "a most full and effectual remedy" for "wrongful removal, when a person is legally possessed" of an office.); *R. v. The Mayor, Aldermen, and Common Council, of London*, (1787) 100 Eng. Rep. 96, 97–98 (KB) (Ashhurst, J.) (agreeing with counsel's argument that "[w]henever a person is improperly suspended or removed from an office * * * the Court will grant a mandamus to restore him"); *R. v. The Mayor and Alderman of Doncaster* (1752) 96 Eng. Rep. 795, 795 (KB) (restoring an alderman to office with a writ of mandamus). Indeed, Marbury—who, like Harris and Wilcox, was nominated by the President, and confirmed by the Senate, *Journal of the Executive Proceedings of the Senate*, vol. 1, at 338, 390 (1801)—sought mandamus to compel delivery of his commission to serve as a justice of the peace in Washington D.C, *see Marbury*, 5 U.S. at 155.

If no injunctive relief were available, mandamus could issue in these cases because the President violated a non-discretionary statutory duty by firing Harris and Wilcox without relevant justification, in direct violation of the governing laws' plain language. *See* 5 U.S.C. § 1202(d) (MSPB members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office."); 29 U.S.C. § 153(a) (The President can remove NLRB board members only with advance notice and "for neglect of duty or

46

malfeasance in office"). Although the President certainly enjoys broad discretion when making a finding of inefficiency, neglect, or malfeasance, the duty to justify removal on one of those grounds is non-discretionary under both statutes.

The government argues that the President is not amenable to mandamus. Gov't. Stay Mot. in Harris 22. While issuance of mandamus against the President would be a last-resort remedy to enforce the rule of law, binding circuit precedent says that "[m]andamus is not precluded because the federal official at issue is the President of the United States." *National Wildlife Federation v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980); *see National Treasury Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974).

The government relies on *Mississippi v. Johnson*, 71 U.S. 475 (1866), but that case expressly "left open" the question whether mandamus can issue against the President. *Franklin v. Massachusetts*, 505 U.S. 788, 801–802 (1992); *see Swan*, 100 F.3d at 977. That is because *Johnson* involved the President's discretionary judgment under the Reconstruction Acts to use military force to govern the former confederate states. 71 U.S. at 499. So that decision does not speak to circuit precedent holding that mandamus is available for non-discretionary ministerial duties.

For all those reasons, the government is not likely to succeed in its argument that no remedy can be given to Harris and Wilcox, should the decisions in their favor be sustained on appeal.

## IV

The remaining stay factors concern injury to the parties and the public interest. That balance implicates multiple competing

47

interests here because the government seeks to have provisions of duly enacted federal statutes declared unconstitutional and to prevent agencies created and funded by Congress from functioning during (at least) the pendency of these appeals, if not longer.

As the party seeking a stay, the government bears the burden of demonstrating that it will suffer an irreparable injury during the time these cases are pending before this court. *Nken*, 556 U.S. at 433–434. The government has disclaimed any argument that Harris and Wilson are incompetent or malfeasant. Instead, the sole irreparable injury asserted is that the President's asserted constitutional right to terminate Harris and Wilcox will be infringed. *See* Gov't. Stay Mot. in Harris 22; Gov't. Stay Mot. in Wilcox 22. That falls short of an irreparable injury for three reasons.

*First*, the asserted injury to the President is entirely bound up with the merits of the government's constitutional argument. And controlling Supreme Court precedent says there is no such constitutional injury. The Supreme Court in *Wiener* said specifically that "no such power" to remove a predominantly adjudicatory board official "is given to the President directly by the Constitution[.]" 357 U.S. at 356; *see Humphrey's Executor*, 295 U.S. at 629. This court is in no position to recognize an injury that the Supreme Court has twice unanimously disclaimed. *See Agostini*, 521 U.S. at 237. So the same lack of clarity that Judge Henderson's opinion sees in the merits, J. Henderson Op. 1–3, means that the asserted injury of not being able to remove Harris and Wilcox is equally uncertain to exist.

*Second*, the government itself has not manifested in this litigation the type of imminent or daily injury now claimed by the government and Judge Walker's opinion. Gov't Stay Mot.

48

in Harris 22–23; Gov't Stay Mot. in Wilcox 22–24; J. Walker Op. 43–45. Harris's and Wilcox's cases have been pending for almost two months. In Harris's case, the government agreed to have the district court proceed to briefing and decision on summary judgment on an expedited basis while a temporary restraining order was in place. Joint Status Report for Harris, ECF No. 13 at 1. In Wilcox's case, the government proposed *lengthening* the briefing schedule, requesting that its brief be due on March 10th, rather than Wilcox's proposed February 18th. Joint Response Regarding Briefing Schedule for Wilcox, ECF No. 12 at 2. The government has not explained why it could not similarly afford this court the time necessary to decide a highly expedited appeal.

*Third*, the notion that the presidency is irreparably weakened by not terminating Harris and Wilcox while this litigation is pending ignores that eight Presidents (including this President) have faced similar constraints in removing MSPB members for decades, and fifteen Presidents could not remove NLRB members without cause. Yet the government points to no concrete manifestation of the harm it asserts, or even a public complaint from any preceding President. Plus, if the government prevails on appeal, any decisions resulting from Harris's and Wilcox's presence on their Boards would have to be "completely undone" if a party requested it. *Collins*, 594 U.S. at 259–260. So any harm in terms of decisions made is repairable.

By contrast, the entry of a stay in these cases materially alters the status quo in an unprecedentedly injurious manner to the public as well as to Harris and Wilcox. The point of a stay is to preserve the status quo pending litigation. *Nken*, 556 U.S. at 429; *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1312 (1986) (Scalia, J., in chambers). And this court's precedent defines the relevant status quo as "the last

49

*uncontested* status which preceded the pending controversy[,]" which is Harris and Wilcox in office. *Huisha-Huisha*, 27 F.4th at 733 (citation omitted). So does the Supreme Court: "Although such a stay acts to 'ba[r] Executive Branch officials from removing [the applicant,] * * * it does so by returning to the status quo—the state of affairs before the removal order was entered." *Nken*, 556 U.S. at 429 (citation omitted); *cf. Lackey v. Stinnie*, 145 S. Ct. 659, 662 (2025) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

Yet the stay sought by the government and entered by the court today turns the status quo for the last 46 and 89 years upside down. By virtue of a preliminary and expeditiously considered order, this court has, for the first time in the Nation's history, allowed the termination of an MSPB member and an NLRB member in violation of express statutory conditions, 5 U.S.C. § 1202(d) (MSPB); 29 U.S.C. § 153(a) (NLRB), and on-point Supreme Court and circuit precedent.

In addition, this court, without any adjudication of the merits, has afforded the government relief that will disable the MSPB and NLRB from operating by depriving both boards of a quorum. 5 C.F.R. § 1200.3 (MSPB); 29 U.S.C. § 153(b) (NLRB). Far from "staying" anything, the court's order acts to kneecap two federal agencies and prevent them from performing the work assigned them by federal law and funded by Congress.

Because federal law expressly channels federal employee and labor disputes to these agencies, the stay will lead to an immediate backlog of cases. When the MSPB was deprived of a quorum between 2017 and 2022, a backlog of 3,793 cases built up. MSPB, *Lack of Quorum and the Inherited Inventory:*

50

*Chart of Cases Decided and Cases Pending* at 2 (Feb. 2025), https://perma.cc/Q58S-PLVV.

The NLRB likewise cannot decide cases without a quorum. *See* 29 U.S.C. § 153(b); *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 676 (2010). Although the NLRB can delegate some of its responsibilities, 29 C.F.R. §§ 102.178–182; *Order Contingently Delegating Authority to the General Counsel*, 76 Fed. Reg. 69,768 (Nov. 9, 2011), it cannot delegate the authority to decide cases. Hundreds of cases are already pending before the NLRB. NLRB, *Administrative Law Judge Decisions* (Mar. 18, 2025), https://perma.cc/Z5S2-4UEP.

If these Boards are deprived of quora, both employers and workers will be trapped with no other place to take their disputes for resolution. Federal courts cannot hear labor disputes in the first instance because prior review by the NLRB is a jurisdictional prerequisite for judicial review. 29 U.S.C. § 160(f); *Boire v. Greyhound Corp.*, 376 U.S. 473, 476–477 (1964). Nor can the parties resort to state court because the National Labor Relations Act preempts state procedures. *San Diego Building Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 245 (1959) ("[T]he States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). Paralyzing the peaceful resolution of labor disputes threatens the vital public interests in avoiding labor strife and the severe economic consequences it causes.

There is also a risk that these boards will be disabled for a much longer period of time. Nothing obligates the President to appoint replacement members. So by granting a stay, the majority opinion converts the President's removal authority into the power to render inoperable, potentially for years on

51

end, boards that Congress established and funded to address critical national problems. And that single-handed power to shutter agencies would render vital federal legislation a futility.

In short, whatever the scope of the non-textual constitutional removal power, it cannot license the Executive to destroy the ability of Congress to solve critical national problems and to provide Americans with neutral and impartial decision-making processes when their economic lives, property, and wellbeing are affected. The authority of two Branches is equally at stake. That is why historical practice has treated the statutory adoption of removal limitations for multimember boards and adjudicatory bodies as a matter for Congress and Presidents to work out together through the enactment and presentment process.

These are just the consequences for the two agencies before this court. But given the test proposed by Judge Walker's opinion foreclosing the exercise of "any" executive power or deviating in any trivial manner from the 1935 FTC, this stay decision admits of no cabining. *See* J. Walker Op. 10 (The Decision of 1789 eliminated "any" Congressional control over removal.), 14 ("[T]he President ha[s] inherent, inviolable, and unlimited authority to remove principal officers exercising substantial executive authority[.]"), 15 (*Humphrey's Executor* "has few, if any, applications today."), 20 (There can be no removal protections for "any agency that wields the substantial executive power that *Humphrey's* understood the 1935 FTC not to exercise."), 30 (*Humphrey's Executor* cannot be extended "to any new contexts[.]"), 36 (Removal protections are unconstitutional if the agency exercises "*any*" executive power.); *see also* J. Henderson Op. 1 (questioning "the continuing vitality of *Humphrey's*").

52

That would mean that a century-plus of politically independent monetary policy is set to vanish with a pre-merits snap of this court's fingers. A constitutional ruling that the President has unrestricted removal power over all multimember agencies exercising any executive power directly threatens the independence of numerous multimember agencies, including the Federal Reserve Board, the Open Market Committee, the Nuclear Regulatory Commission, the National Transportation Safety Board, the Chemical Safety and Hazard Investigation Board, and the National Mediation Board, among others.

The government insists that there is a special rule for the Federal Reserve Board. Gov't Reply Br. in Harris 8; Gov't Reply Br. in Wilcox 7–8. The President does not agree. While his recent Executive Order chose to exempt "the Board of Governors of the Federal Reserve System" and "the Federal Open Market Committee" from his "ongoing supervision and control," that carveout is limited only to their "conduct of monetary policy." Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10,447, 10,448 (Feb. 24, 2025). As to all other Federal Reserve Board activities, such as bank regulation, 12 U.S.C. § 1813(q)(3), and consumer protection regulation, 15 U.S.C. § 1681m(e)(1), the Executive Order claims unlimited power to remove members of the Federal Reserve Board for any reason or no reason at all, 90 Fed. Reg. at 10,448. That part-in-part-out approach allows a President unhappy with monetary policy to fire one or all Federal Reserve members at will because he need not give any reason for a firing. By definition, a right to remove someone for no reason cannot be confined to certain reasons.

Beyond that, the Executive Order does not disclaim authority to remove members of the Federal Reserve or Federal Open Market Committee going forward, and the government's

53

position and Judge Walker's opinion here admit of no such limit. Indeed, it is difficult to understand how it could, as the theory that the President has illimitable removal authority is, by definition, a theory that there are *no* limits on the President's authority to remove every single executive official.[7]

Agencies are not the only entities at risk under the majority opinion's new regime. Given the primarily adjudicatory nature of the MSPB and the NLRB, it is difficult to understand how the majority opinion's rule does not eliminate removal restrictions on non-Article III judges, including judges of the Court of Federal Claims, the Bankruptcy Courts, the Court of Appeals for Veterans Claims, and the Court of Appeals for the Armed Forces. Apparently all of those adjudicators can now be fired based not on any constitutional decision by the Supreme Court or this court, but simply on the government's application for a stay citing nothing more than the President's inability to fire those officials as the requisite irreparable injury.

Such action fails to exhibit the normal "judicial humility" that courts adopt at a preliminary stage when there is still

---

[7] To the extent that the government suggests a potential exemption for the Federal Reserve Board given its "unique historical background" and "special arrangement sanctioned by history," *see CFPB v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416, 467 n.16 (2024) (Alito, J., dissenting), that exemption applies equally to the MSPB and NLRB, given that removal restrictions on adjudicators like territorial and Claims Court judges and justices of the peace go back to the founding. Since there is no basis in the Constitution's text or separation-of-powers principles for minting an *ad hoc* exception just for certain functions of one entity, the better lesson to draw from this history is that limited removal restrictions for multimember and adjudicatory bodies are a manifestation of the Constitution's division of powers.

54

"grave uncertainty" about the merits. *Hanson v. District of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (McConnell, J., concurring)).

**V**

The whole purpose of a stay is to avoid instability and turmoil. But the court's decision today creates them. I accordingly respectfully dissent from the decision to grant a stay pending appeal.

# Appendix B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, *in her personal capacity*   :
*and in her official capacity as Member of the*   :
*Merit Systems Protection Board*,   :
                            :
      Plaintiff,               :     Civil Action No.:    25-412 (RC)
                            :
      v.                    :     Re Document No.:   22
                            :
SCOTT BESSENT, *in his official capacity as*   :
*Secretary of the Treasury*, *et al.*,   :
                            :
      Defendants.           :

## MEMORANDUM OPINION

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Cathy A. Harris was appointed to the Merit Systems Protection Board ("MSPB") on June 1, 2022, for a term set to expire on March 1, 2028. Federal law states that members of the MSPB may be removed from office "only for inefficiency, neglect of duty, or malfeasance in office." On February 10, 2025, President Donald J. Trump informed Harris that her position on the MSPB was "terminated, effective immediately" but provided no reason for Harris's termination. The following day, Harris filed this lawsuit against President Trump and several other federal officials ("Defendants"), claiming that her termination violated federal law. She moved for a temporary restraining order enjoining Defendants from treating her as removed from office, which this Court granted. The parties consolidated preliminary injunction briefing with the merits, and Harris moved for summary judgment. The Court grants that motion, along with declaratory judgment and a permanent injunction.

## II.  BACKGROUND

### A.  Statutory Background

Congress created the Merit Systems Protection Board as a component of the Civil Service Reform Act of 1978 ("CSRA"), which "establishes a framework for evaluating personnel actions taken against federal employees."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also* CSRA, Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121–25 (1978) (codified at 5 U.S.C. §§ 1201–05). Congress's Findings and Statement of Purpose indicate that "[i]t is the policy of the United States that . . . to provide the people of the United States with a competent, honest, and productive Federal work force[,] . . . Federal personnel management should be implemented consistent with merit system principles."  CSRA § 3, 92 Stat. at 1112.  Those merit system principles include, among others, "[r]ecruitment . . . from qualified individuals" where "selection and advancement [is] determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."  *Id.* § 101, 92 Stat. at 1113 (codified at 5 U.S.C. § 2301).  Congress additionally instructed that "[e]mployees should be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," as well as "against reprisal for the lawful disclosure of information which the employees reasonably believe evidences," among other things, violations of law, gross waste of funds, an abuse of authority, or substantial and specific dangers to public health or safety.  *Id.*, 92 Stat. at 1114 (codified at 5 U.S.C. § 2301).

The CSRA established the MSPB as "an independent agency consisting of three members" and "charged [it] with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies."  *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 154 (D.C. Cir. 1982); *see also* CSRA § 101, 92 Stat. at 1114–17 (codified at 5

U.S.C. § 2302) (establishing prohibited personnel practices, such as employment discrimination, unlawful political activities, and any other violations of law within the federal civil service). The Board's primary function is to review federal employee appeals of adverse actions "which [are] appealable to the Board under any law, rule, or regulation," including those related to removal or suspension for periods greater than fourteen days. 5 U.S.C. § 7701(a); *see also id.* § 1204(a)(1). These adjudications consume approximately 95 percent of MSPB members' time. *See* Pl.'s Statement of Undisputed Material Facts ¶ 54 ("SUMF"), ECF No. 22-2. The Board may order federal agencies and employees to comply with its decisions, *see* 5 U.S.C. § 1204(a)(2), which are nonetheless subject to judicial review. *See id.* § 7703. The MSPB thus acts as a preliminary adjudicator of these employment disputes, with federal courts providing the final say if the parties so desire.

The MSPB carries out other limited tasks in pursuit of its mission. It conducts studies "relating to the civil service" for the President and Congress, *see* 5 U.S.C. § 1204(a)(3), although this function takes up less than one percent of members' time, *see* SUMF ¶ 62. The Board may also review "rules and regulations of the Office of Personnel Management," *see id.* § 1204(a)(4), on its own motion, following a complaint from the Special Counsel, or in response to a third party's petition, *see id.* § 1204(f)(1). The MSPB may invalidate the rule or its implementation if it would require a federal employee to engage in prohibited personnel practices. *See id.* § 1204(f)(2).[1]

Members of the MSPB are "appointed by the President, by and with the advice and consent of the Senate," and "not more than 2 of [the members] may be adherents of the same

---

[1] Harris explains that invalidation of an Office of Personnel Management rule under this mechanism "is an exceedingly rare occurrence" that has not happened during her tenure. Harris Decl. ¶ 31, ECF No. 22-3.

political party." CSRA § 202 (codified at 5 U.S.C. § 1201). Members of the MSPB are appointed to seven-year terms that may be extended by up to one year if a successor has not yet been appointed. *Id.* (codified at 5 U.S.C. § 1202(a)–(c)). "Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* (codified at 5 U.S.C. § 1202(d)).

### B. Factual and Procedural Background

President Joseph R. Biden nominated Harris to be a member of the MSPB in January 2022. SUMF ¶ 1. The Senate confirmed her on May 25, 2022, and she was sworn in on June 1, 2022. *Id.* ¶ 2. Her term expires on March 1, 2028. *Id.* ¶ 3. The Senate later confirmed Harris as Chairman, and she was sworn in as Chairman on March 14, 2024. *Id.* ¶¶ 4–5.

Defendants do not dispute that Harris has been efficient and effective in her role at the MSPB. *See id.* ¶ 8. When the MSPB's quorum was restored in March 2022, the agency had a backlog of approximately 3,800 cases that had accrued since 2017, and officials estimated that it would take five or six years for the agency to catch up. *Id.* ¶¶ 12–14. By January 2025, however, the MSPB had cleared nearly 99 percent of its backlog. *Id.* ¶ 20. From June 1, 2022, to February 10, 2025, Harris participated in nearly 4,500 decisions. *Id.* ¶ 10.

On February 10, 2025, Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]

Ex. 4 to Pl.'s Mot. for Prelim. Inj. and J. on the Merits, ECF No. 22-4. The communication did not explain the basis for Harris's termination.

Harris filed this lawsuit on February 11, 2025, claiming that her firing was *ultra vires*,
unconstitutional, and a violation of the Administrative Procedure Act ("APA").  *See* Compl.
¶¶ 31–37, 40–41, ECF No. 1.  She seeks relief under the Declaratory Judgment Act, issuance of a
writ of mandamus, and equitable relief.  *See id.* ¶¶ 38–39, 42–46.  Harris additionally filed a
motion for a temporary restraining order, *see* Pl.'s Mot. for TRO, ECF No. 2, which Defendants
opposed, *see* Defs.' Opp'n to Mot. for TRO, ECF No. 6.  The Court held a hearing on the TRO
motion on February 13, 2025, and granted the motion on February 18, 2025.  *See* Min. Entry
dated Feb. 13, 2025; Order Granting Pl.'s Mot. for TRO, ECF No. 8; Mem. Op. Granting Pl.'s
Mot. for TRO ("Mem. Op."), ECF No. 9.  Defendants appealed that order to the D.C. Circuit,
and the appeal remains pending.  *See* Notice of Appeal, ECF No. 15.

On February 19, 2025, the parties filed a joint status report indicating that the Court's
consideration of the subsequent motion for preliminary injunction should be consolidated with
the merits of the case pursuant to Federal Rule of Civil Procedure 65(a)(2).  *See* Joint Status
Report, ECF No. 13.  On February 23, 2025, Harris filed a motion for a preliminary injunction
and judgment on the merits.  *See* Pl.'s Mot. for Prelim. Inj. and J. on the Merits ("Pl.'s Mot."),
ECF No. 22.  Defendants opposed the motion, *see* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. and
J. on the Merits ("Defs.' Opp'n"), ECF No. 33, and Harris filed a reply, *see* Defs.' Reply, ECF
No. 38.  The parties appeared for a hearing before the Court on March 3, 2025.

### III.  LEGAL STANDARD

"Having granted consolidation under Rule 65(a)(2), the Court 'treats the parties' briefing
as cross-motions for summary judgment.'"  *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 226
(D.D.C. 2020) (quoting *Trump v. Comm. on Oversight & Reform of the U.S. House of
Representatives*, 380 F. Supp. 3d 76, 90 (D.D.C. 2019)).  "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. On summary judgment, the Court views all evidence "in the light most favorable to the nonmoving party and . . . must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

The Court first considers the constitutionality of the MSPB's structure, concluding that its members' for-cause removal protections are constitutional under *Humphrey's Executor*.

Federal law thus prevents the President from removing members of the MSPB without cause, and the President's attempt to terminate Harris was unlawful. As such, Harris is entitled to summary judgment. The Court next determines the remedies to which Harris may be entitled, granting her declaratory judgment and a permanent injunction. To the extent that injunctive relief may be unavailable, the Court would grant mandamus relief in the alternative.

### A. Constitutionality of the MSPB Members' Removal Protections

Harris claims that her termination was *ultra vires* in violation of statutory authority, violated the separation of powers, and was contrary to law under the APA. *See* Compl. ¶¶ 31– 37, 40–41. She argues that this case falls squarely within the heartland of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny, and that the Board is a traditional multimember body that does not wield traditional executive power. *See* Pl.'s Mot. at 11–20. MSPB members' removal protections are therefore constitutional, according to Harris. *See id.* at 11–12. Defendants respond that the MSPB does not fall within *Humphrey's Executor*, and that the independent agency wields substantial executive power. *See* Defs.' Opp'n at 5–13. The Court concludes that MSPB members' removal protections are constitutional under *Humphrey's Executor* and must be upheld here.

In *Humphrey's Executor*, the Supreme Court upheld a statutory provision identical to the one at issue here restricting removal of Federal Trade Commission ("FTC") members. *See Humphrey's Executor*, 295 U.S. at 619–20 (discussing 15 U.S.C. § 41); 5 U.S.C. § 1202(d). The FTC comprises five members "appointed by the President[,] by and with the advice and consent of the Senate," and "[n]ot more than three of the commissioners shall be members of the same political party." *Humphrey's Executor*, 295 U.S. at 619–20 (quoting 15 U.S.C. § 41). "Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance

in office." *Id.* (quoting 15 U.S.C. § 41).  In *Humphrey's Executor*, President Hoover had appointed William Humphrey as a member of the Federal Trade Commission, which carried a term of seven years.  295 U.S. at 612.  Less than two years later, President Roosevelt terminated Humphrey over differences of political opinion, stating, "[e]ffective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission."  *Id.* at 619.  Humphrey died several months later, but his estate sued to recover backpay on the basis that his removal was unlawful.  *Id.* at 612.

The Supreme Court confirmed that President Roosevelt's termination of Humphrey was indeed unlawful.  The Court observed that "[t]he statute fixes a term of office, in accordance with many precedents."  *Id.* at 623.  The Court further explained that the commission comprised a "nonpartisan" "body of experts" that was intended to "act with entire impartiality."  *Id.* at 624.  It was "charged with the enforcement of no policy except the policy of the law" and acted in a manner that was "predominantly quasi judicial and quasi legislative" rather than traditionally "political []or executive" in nature.  *Id.*  The Court differentiated FTC members from the postmaster in *Myers v. United States*, 272 U.S. 52 (1926) (evaluating statute stating that postmasters "shall hold their offices for four years unless sooner removed or suspended according to law").  "A postmaster is an executive officer restricted to the performance of executive functions" and is "charged with no duty at all related to either the legislative or judicial power."  *Id.* at 627.  The FTC, in contrast, "acts in part quasi legislatively and in part quasi judicially" rather than exercising traditional executive powers.  *Id.* at 628.  "We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named," the Court concluded.  *Id.* at 629.

Two decades later, the Court considered President Eisenhower's removal of a member of the War Claims Commission, whom President Truman had appointed and the Senate had confirmed.  *See Wiener v. United States*, 357 U.S. 349, 350 (1958).  Congress charged that commission with processing "claims for compensating internees, prisoners of war, and religious organizations . . . who suffered personal injury or property damage at the hands of the enemy in connection with World War II," and the commissioners' terms were limited by the short duration of the commission's existence.  *Id.*  The Court reasoned that Congress intended to "preclude[] the President from influencing the Commission in passing on a particular claim," which meant that the President naturally could not "hang . . . the Damocles' sword of removal" over the commissioners.  *Id.* at 356.  The Court reaffirmed that the President had "no such power" to "remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission."  *Id.*[2]

In two more recent cases, however, the Supreme Court ruled that for-cause removal provisions applying to independent agencies with a single director violated the separation of powers.  *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 218 (2020); *Collins v. Yellen*, 594 U.S. 220, 253 (2021).  Neither of those cases undermines the

---

[2] The Court once again considered a multimember body in *Mistretta v. United States* when passing on the constitutionality of the United States Sentencing Commission, which formally resides in the Judiciary.  488 U.S. 361 (1989).  The Sentencing Report Act of 1984 empowered the President to appoint commissioners to the Sentencing Commission, with members "subject to removal by the President 'only for neglect of duty or malfeasance in office or for other good cause shown.'"  *Id.* at 368 (quoting 28 U.S.C. § 991(a)).  When considering whether the Act affords the President undue influence over federal judges who served as commissioners, the Court recognized that "the President's removal power under the Act is limited."  *Id.* at 410.  "Such congressional limitation on the President's removal power, like the removal provisions upheld in *Morrison v. Olson*, 487 U.S. 654 (1988), and *Humphrey's Executor* . . . , is specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies."  *Id.* at 410–411.

constitutionality of for-cause removal provisions for multimember bodies of experts heading an independent agency. *See Seila Law*, 591 U.S. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today.").

"Rather than create a traditional independent agency headed by a multimember board or commission, Congress elected to place the [Consumer Financial Protection Bureau ("CFPB")] under the leadership of a single Director." *Seila Law*, 591 U.S. at 207. In *Seila Law*, the Court observed that "[a]n agency with a structure like that of the CFPB is almost wholly unprecedented." *Id.* as 220; *see also id.* at 220–22 (searching for historical precedent to support the CFPB's structure). The Court further concluded that "[t]he CFPB's single-Director structure" contravenes the separation of powers "by vesting significant governmental power in the hands of a single individual accountable to no one," emphasizing that the director may act "*unilaterally*" and "[w]ith no colleagues to persuade." *Id.* at 224–25. Two other features of the CFPB undermined the constitutionality of the agency's structure. First, the director's five-year term meant that "some Presidents may not have any opportunity to shape [the agency's] leadership and thereby influence its activities." *Id.* at 225. Second, "[t]he CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control." *Id.* at 226. For these reasons, the Court concluded that the CFPB's structure violated the separation of powers. *See id.* at 232.

None of the reasoning in *Seila Law* undermined the constitutionality of the traditional independent agency structure outlined in *Humphrey's Executor*. *See id.* at 218 (describing "exception[]" for "multimember expert agencies that do not wield substantial executive power"). Rather, the Court's reasoning reaffirmed the constitutionality of multimember boards with for-cause removal protections, as those agencies have a robust basis in this country's history, and

their members lack the power to act unilaterally.  *See* Pl.'s Mot. at 11 (emphasizing that Congress established the first such board in 1887).  The Court's rationale also relied on the CFPB's divergence from traditional agency structures when finding the for-cause removal protections unconstitutional.  *See, e.g.*, *Seila Law*, 591 U.S. at 205–07 (emphasizing facts showing drift from Elizabeth Warren's initial proposal for multimember board to Congress's enactment of single-headed agency).  The Court even opined that Congress could fix the problem by "for example, converting the CFPB into a multimember agency."  *Id.* at 237.

*Collins* then represented a "straightforward application" of the Court's "reasoning in *Seila Law*" to the Federal Housing Finance Agency ("FHFA").  594 U.S. at 251; *see also Seila Law*, 591 U.S. at 222 (noting doubt as to the constitutionality of the FHFA's structure).  Similarly to the CFPB, the FHFA was "an agency led by a single Director" that "lack[ed] a foundation in historical practice and clashe[d] with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control."  594 U.S. at 251.

*Humphrey's Executor* thus remains alive and well, and it dictates the outcome here.  The MSPB is "a traditional independent agency headed by a multimember board or commission," *Seila Law*, 591 U.S. at 207, and as such Congress may grant the Board's members for-cause removal protections.  The MSPB is "a multimember body of experts" that is "balanced along partisan lines."  *Seila Law*, 591 U.S. at 216; *see also Humphrey's Executor*, 295 U.S. at 624 (noting that the FTC is a "nonpartisan" "body of experts" that was intended to "act with entire impartiality").  The CSRA envisions that the Board "is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality."  *Humphrey's Executor*, 295 U.S. at 624.  The CSRA also "fixes a term of office."  *Id.* at 623.  The Board's members serve on overlapping, staggered seven-year terms, meaning that the President will have the "opportunity to shape [the

MSPB's] leadership and thereby influence its activities." [3] *Seila Law*, 591 U.S. at 225. The members' staggered terms permit them to "accumulate[] expertise" in the operation of federal agencies and federal employment law. *Id.* at 218. The MSPB's duties are "quasi judicial," *Humphrey's Executor*, 295 U.S. at 624, in that it conducts preliminary adjudications of federal employees' claims, which may then be appealed to Article III courts. *See* 5 U.S.C. § 7703 (providing for review in the Federal Circuit); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 423 (2017) (providing for review of mixed cases in district court). The MSPB's rulemaking authority is limited to "regulations . . . necessary for the performance of its functions." 5 U.S.C. § 1204(h). Congress further intended the agency to aid its legislative goals by regularly transmitting reports to Congress regarding the Board's functions. *See* 5 U.S.C. §§ 1204(l), 1205. It is additionally evident that Congress hoped to "preclude[] the President from influencing the [Board] in passing on a particular claim." *Wiener*, 357 U.S. at 356. The MSPB nonetheless remains politically accountable to both Congress and the President through the appropriations process in a manner inapplicable to independent agencies with their own funding sources, such as the CFPB and FHFA. *See Selia Law*, 591 U.S. at 226; *Collins*, 594 U.S. at 231.

The MSPB also "do[es] not wield substantial executive power," *Seila Law*, 591 U.S. at 218, but rather spends nearly all of its time adjudicating "inward-facing personnel matters" involving federal employees, Pl.'s Mot. at 4. The Board does not regulate the conduct of private parties, nor does it possess its own rulemaking authority except in furtherance of its judicial functions. *See id.* at 12. It cannot initiate its own personnel cases, but must instead "passively

---

[3] One MSPB member's term has now expired, and Harris's term expires on March 1, 2028. *See* Pl.'s Mot. at 29 n.20; Pl.'s Reply at 13–14; SUMF ¶ 3. President Trump will therefore have the opportunity to appoint at least two members to the MSPB during his term in office.

wait for them to be brought." *Id.* at 12; *see also* 5 U.S.C. § 1204 (defining the Board's powers

and functions). Harris additionally points out that the MSPB *preserves* power within the

executive branch by charging presidentially appointed Board members with mediation and initial

adjudication of federal employment disputes, rather than shifting those decisions to Article III

courts in the first instance. *See* Pl.'s Mot. at 14.

Several other features of the MSPB demonstrate its limited effects on the President's

powers. The MSPB's jurisdiction is generally restricted to civil servants and does not include

political appointees.[4] *See* 5 U.S.C. § 7511. Even among civil servants, members of the Senior

Executive Service removed "for less than fully successful executive performance" are entitled

only to an informal hearing before the Board. *See* 5 U.S.C. § 3592(a). Furthermore, the MSPB's

decisions are generally not the final word. Federal employees may appeal the Board's decisions

to Article III courts, *see* 5 U.S.C. § 7703(a), and the Director of the Office of Personnel

Management may similarly seek review of any decision that he determines "will have a

substantial impact on a civil service law, rule, regulation, or policy directive," *id.* § 7703(d)(1)–

(2).

Finally, the MSPB's mission and purpose require independence. In enacting the CSRA,

Congress exercised its power to regulate the civil service, defining certain prohibited personnel

practices, to include discrimination, loyalty oaths, coercion to engage in political activity, and

retaliation against whistleblowers. *See* 5 U.S.C. § 2302(b)(1)–(3), (8). Direct political control

over the MSPB would have limited effect on the President's implementation of his policy

agenda. It would instead neuter the CSRA's statutory scheme by allowing high-ranking

---

[4] Nor may the Board review the merits of determinations concerning an employee's eligibility to occupy a sensitive position that implicates national security. *See Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013).

government officials to engage in prohibited practices and then pressure the MSPB into inaction. The MSPB's independence is therefore structurally inseparable from the CSRA itself. These duties dovetail with *United States v. Perkins*, in which the Supreme Court held that Congress may "limit, restrict, and regulate the removal" of inferior officers. 116 U.S. 483, 485 (1886). Denying independence to the Board would undermine these constitutionally sound limitations on the removal of civil servants.

Defendants cannot argue that *Humphrey's Executor* has been overturned, so they instead suggest that even if the MSPB is a traditional multimember agency, it wields "'substantial' executive power" in a manner found significant in *Seila Law*. Defs.' Opp'n at 8 (quoting *Seila Law*, 591 U.S. at 218). Yet the Supreme Court has clarified that it did not mean *Humphrey's Executor* to exclude removal protections for any official exercising authority within the executive branch. *See Morrison v. Olson*, 487 U.S. 654, 688–89 (1988); *see also Seila Law*, 591 U.S. at 216 (detailing "several organizational features that helped explain" the *Humphrey's Executor* court's "characterization of the FTC as non-executive"). There is instead a "spectrum" that runs from "'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role" and those who serve "'quasi-legislative' or 'quasi-judicial'" roles, where the President's control is not "so central to the functioning of the Executive Branch" as to require the President to be able to terminate the official at will. *Morrison*, 487 U.S. at 690–91. As the Court explained above, the Board's duties—which primarily include adjudication of employment claims—do not represent "substantial" executive power and instead take on a quasi-judicial role. Furthermore, the MSPB's powers are no more expansive than the FTC's functions upheld in *Humphrey's Executor*, which remains good law.

Several courts have deployed similar reasoning when rejecting challenges to the structures of traditional multimember agencies in the years since *Seila Law* and *Collins*. Last year, the Fifth Circuit upheld the structure of the Consumer Product Safety Commission ("CPSC"), concluding that the agency is "a prototypical 'traditional independent agency, run by a multimember board,'" is not directed by a single individual, and that the President may influence its activities through appointments or the appropriations process. *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 354–55 (5th Cir. 2024), cert. denied, 145 S. Ct. 414, 170 (2024). The Tenth Circuit turned away a comparable challenge to the agency, reasoning that *Humphrey's Executor* remains good law, that the CPSC is structured similarly to the FTC, and that limited civil and criminal enforcement powers do not undermine the constitutionality of its tenure protections. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), cert. denied, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025). Courts have additionally found the FTC's structure constitutionally sound because the Supreme Court has not revisited *Humphrey's Executor*. *See Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023); *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024). This Court, likewise, cannot reach a different outcome regarding the MSPB.

Because the MSPB falls within the scope of *Humphrey's Executor*, Congress has the power to specify that members of the MSPB may serve for a term of years, with the President empowered to remove those members only for inefficiency, neglect of duty, or malfeasance in office. The President thus lacks the power to remove Harris from office at will. Because the President did not indicate that he sought to remove Harris for inefficiency, neglect of duty, or

malfeasance in office, his attempt to terminate her was unlawful and exceeded the scope of his authority.[5]

## B. Remedy

With the merits aside, the Court turns to the question of remedy. Harris offers up three avenues for relief: declaratory judgment, a permanent injunction, and a writ of mandamus. *See* Compl. ¶¶ 38–39, 42–44, 45–46; Pl.'s Mot. at 27–36. The Court concludes that because any attempt to remove Harris is unlawful, she is entitled to declaratory judgment that she remains a properly appointed member of the MSPB. The Court additionally determines that Harris has met her burden for the permanent injunction she seeks, and that a writ of mandamus would be appropriate if such injunctive relief were unavailable.

### 1. Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). It provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court. *See C&E Servs., Inc. of Washington v. D.C. Water & Sewer Autho.*, 310 F.3d 197, 201 (D.C. Cir. 2002); *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016). The Article III case-or-controversy requirement "is no less strict when a party is seeking a declaratory judgment than for any other

---

[5] The parties do not debate the cause of action through which this legal challenge must flow—whether it be the APA, an *ultra vires* claim, or a separation of powers claim. These distinctions can be meaningful. *See, e.g.*, *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 199–201 (D.D.C. 2024) (examining the compatibility of an APA and *ultra vires* claim). The Court does not interpret this issue to be jurisdictional, however, and does not address an question the parties themselves declined to raise.

relief." *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995) (citing *Altvater v. Freeman*, 319 U.S. 359, 363 (1943)).  To establish that a matter is a "controversy" within the meaning of the Declaratory Judgment Act and Article III of the Constitution, a party "must 'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Hoffman v. Dist. of Columbia*, 643 F. Supp. 2d 132, 140 (D.D.C. 2009) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"[A] declaratory judgment always rests within the sound discretion of the court," *President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942)), and "[t]here are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012)).  Several factors may be helpful to the Court's consideration of "the propriety of granting a declaratory judgment," however, such as "whether it would finally settle the controversy between the parties"; "whether other remedies are available or other proceedings pending"; and "the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976).  The Court might also consider "1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn*, 222 F. Supp. 3d at 36 (citing *President*, 627 F.2d at 365 n.76).

First, the Court finds a "controversy" here within the meaning of the Declaratory Judgment Act.  The parties place before the Court a "substantial controversy" over the

lawfulness of the President's effort to terminate Harris without cause, and whether she remains a member of the MSPB. *Hoffman*, 643 F. Supp. 2d at 140; *see also* Pl.'s Mot. at 11–26; Defs.' Opp'n at 5–13. The parties have adverse legal interests, with Defendants arguing that the President has a power that Harris claims he does not. *See, e.g.*, Defs.' Opp'n at 5 (arguing that the President's removal power over principal officers is absolute). This controversy is also "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Hoffman*, 643 F. Supp. 2d at 140. The controversy here is not based, for instance, on "the occurrence of a future or contingent event," but has rather come to a head after the President attempted to terminate Harris. *C.F. Folks, Ltd. v. DC Jefferson Bldg., LLC*, 308 F. Supp. 3d 145, 150 (D.D.C. 2018).

The Court additionally finds that declaratory relief is appropriate here. A declaratory "judgment will serve a useful purpose in clarifying the legal relations" between Harris and Defendants and abate ongoing "uncertainty, insecurity, and controversy" over her status as a member of the MSPB. *Glenn*, 222 F. Supp. 3d at 36. The question is also one of significant "public importance," *Hanes Corp.*, 531 F.2d at 592 n.4, given that it concerns the structure and independence of a federal agency. Although "other remedies" may be available, *id.*, declaratory judgment remains appropriate to clarify Harris's legal status, particularly given the complexity of injunctive relief in this area. In addition, the Declaratory Judgment Act grants authority to enter declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

Defendants argue that the Court cannot issue declaratory judgment because it cannot enjoin the President. *See* Defs.' Mot. at 21–22 (citing *Samuels v. Mackell*, 401 U.S. 66, 70 (1971)). First, the declaratory judgment here clarifies not just the President's legal relationship with MSPB members, but also subordinate officials' legal rights and duties. Second, the

Supreme Court clarified in *Samuels* that it did "not mean to suggest that a declaratory judgment should never be issued in cases of this type if it has been concluded that injunctive relief would be improper." *Samuels*, 401 U.S. at 73. "There may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive." *Id.* "[I]n such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief." *Id.* Courts withhold injunctive relief against the President precisely because it is considered "particularly intrusive or offensive," and declaratory judgment remains warranted here given Harris's "strong claim for relief under the established standards." *Id.* Defendants additionally cite no controlling authority for the notion that declaratory judgment may not clarify the legal relationship between the President and other parties. To the contrary, appellate courts have previously affirmed the issuance of declaratory relief involving the President. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (considering declaratory judgment to be a less drastic remedy than a writ of mandamus); *see also Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that the President's actions under Line Item Veto Act were invalid).

For these reasons, the Court enters declaratory judgment in this case clarifying that Harris remains a member of the MSPB, and that she may not be removed from her position absent inefficiency, neglect of duty, or malfeasance in office.

### 2. Permanent Injunction

Harris additionally seeks a permanent injunction barring several officials—not including the President—from removing her or treating her as removed. *See* Compl. ¶¶ 45–46; Pl.'s Mot.

at 28–30; Pl.'s Proposed Order, ECF No. 22-1.  Defendants argue that Harris is not entitled to an injunction because the Court lacks the power to issue equitable relief "reinstating" an officer removed by the President.  Defs.' Opp'n at 14–18.  Defendants also contend that Harris has not suffered an irreparable injury and that the balance of the equities weigh in their favor.  *See id.* at 18–21.  The Court must therefore examine its power to issue equitable relief here before it considers whether to issue that relief.

### a.  Availability of Injunctive Relief

Defendants argue that Harris's remedy must be limited to backpay, and that an injunction is inappropriate because that relief was not "traditionally accorded by courts of equity" to remedy an official's wrongful removal from office.  Defs.' Opp'n at 14 (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).  Plaintiff responds that federal courts have long granted injunctive relief reinstating federal employees, and that mandamus should be available in the alternative.  *See* Pl.'s Reply at 10–19.

In *Grupo Mexicano*, the Supreme Court considered whether "a United States District Court has the power to issue a preliminary injunction preventing the [debtor] defendant from transferring assets in which no lien or equitable interest is claimed."  527 U.S. at 310.  The Court explained that "equity is flexible; but in the federal system, at least, that flexibility is confined within the broad boundaries of traditional equitable relief."  *Id.* at 322.  "[E]quity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)."  *Id.* at 318 (quoting A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928)).  The Court concluded that because the Court of Chancery lacked "an equitable power to restrict a debtor's use of his unencumbered property

20

before judgment," a contemporary federal court lacks that power as well. *Id.* at 322; *see also id.* at 319–20. Defendants similarly reason that because the Court of Chancery did not issue injunctions returning public officials to their offices, this Court cannot either. *See* Defs.' Opp'n at 14–15. That contention stumbles, however, for at least two reasons.

The first is on-point Supreme Court guidance. In *Sampson v. Murray*, the Supreme Court considered whether a probationary employee at the General Services Administration could receive a temporary restraining order enjoining her dismissal during an administrative appeal to the Civil Service Commission. 415 U.S. 61, 62–63 (1974). The Court explained that a district court has "authority to grant interim injunctive relief to a discharged Government employee," *id.* at 63, but that the plaintiff before the Court did not make the elevated "showing of irreparable injury sufficient in kind and degree to override" the Government's usual autonomy over its internal affairs, *id.* at 84. Loss of wages and reputation could be remedied through further proceedings and was not enough to warrant injunctive relief for a federal employee, *see id.* at 91–92, but that relief may be appropriate "in the genuinely extraordinary situation," rather than "in the routine case." *Id.* at 92 n.68. The Court specifically addressed *White v. Berry*, in which the Supreme Court reasoned that "a court of equity has no jurisdiction over the appointment and removal of public officers." 171 U.S. 366, 377 (1898) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)). The *Sampson* Court asserted that "[m]uch water has flowed over the dam since 1898," and that subsequent cases had recognized that federal courts are generally empowered to review the claims of discharged federal employees. *Sampson*, 415 U.S. 71–72 (citing *Service v. Dulles*, 354 U.S. 363 (1957)); *see also Kloeckner*, 568 U.S. at 44–46 (discussing remedies for federal employee under the CSRA, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012)

(listing "reinstatement" as among "the kinds of relief that the CSRA empowers" courts to provide). Harris's situation is additionally akin to that of the *Sampson* plaintiff because there is a federal standard to which Harris's hiring and firing must adhere, and one that the Court must enforce. *Sampson* thus instructs that equitable relief is available to Harris if she can show that her termination represents a "genuinely extraordinary situation," rather than a "routine case." *Sampson*, 415 U.S. at 92 n.68.[6] *Sampson* is not unique; the Supreme Court has repeatedly determined that plaintiff federal employees were entitled to reinstatement after termination violated their legal rights. *See Service*, 354 U.S. at 388–89; *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959); *see also Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (explaining that for a federal employee experiencing "unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination").

The D.C. Circuit has also found injunctive relief against subordinate federal officials to be available to restore presidential appointees to their offices, although the Government did not raise the scope of historical equitable relief in those cases. *See Swan v. Clinton*, 100 F.3d 973, 976–81 (D.C. Cir. 1996); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023).[7] In *Swan*, the six-year term of a member of the Board of the National Credit Union Administration ("NCUA") had expired, but he remained in office because the relevant statute allowed members to serve until their successors had qualified. *Swan*, 100 F.3d at 975–76. President Clinton

---

[6] There can additionally be no dispute that federal courts may grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).

[7] Cases before other courts add further evidence that this power exists. *See* Pl.'s Reply at 11–12 (collecting cases).

removed the board member, who then sued seeking declaratory judgment and an injunction ordering his reinstatement. *See id.*  The court assessed the board member's standing to bring the case, focusing on whether his claims were judicially redressable. *Id.* at 976–81. The court was uncertain of its power to enjoin the President himself from removing the plaintiff from office, *see id.* at 977–78, but reasoned that it could instead "ensure the rule of law" by issuing "injunctive relief against subordinate officials" effectuating his reinstatement "*de facto* by" requiring his colleagues to treat him "as a member of the NCUA Board and allowing him to exercise the privileges of that office," *id.* at 978, 980.  This encompassed, for instance, "including [the plaintiff official] in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member *etc.*"[8] *Id.* at 980.  The Circuit reprised this analysis in *Severino*, in which President Biden removed a member of the Administrative Conference of the United States Council, *see Severino*, 71 F.4th at 1041, and the plaintiff had standing because a court could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment," *id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980).[9]

Second, it is also clear that even if *Sampson*, *Swan*, and *Severino* did not make equitable relief available to Harris in a "genuinely extraordinary situation," she would nonetheless be entitled to a writ of mandamus—which is a remedy at law.  *See Kalbfus v. Siddons*, 42 App. D.C.

---

[8] The Circuit ultimately concluded that the board member's claim failed on the merits because, even assuming that NCUA board members had removal protections, holdover members would be entitled to no such protection.  *See Swan*, 100 F.3d at 983–88.

[9] Defendants argue that these cases are not on point because the courts there were considering the redressability of the plaintiffs' claims when evaluating their standing.  *See* Defs.' Opp'n at 16; *Swan*, 100 F.3d 976–81; *Severino*, 71 F.4th at 1042–43.  Yet the Circuit's reasoning is no mere dicta, as a federal court must determine that it has the power to grant effective relief before assuming jurisdiction over a case.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

310, 319–21 (D.C. Cir. 1914) (collecting cases); *see also* Pl.'s Reply at 15–16 (collecting

sources).  To the extent that English equity courts declined to issue injunctions reinstating

officials to their positions, they likely did so because the King's Bench, a court of law, would

readily issue mandamus instead.  *See Walkley v. City of Muscatine*, 73 U.S. 481, 483–84 (1867)

(explaining, relying on English cases, that "a court of equity is invoked" only where "a court of

law . . . is inadequate to afford the proper remedy"); *Parker v. Winnipiseogee Lake Cotton &*

*Woolen Co.*, 67 U.S. 545, 550–51 (1862) (similar).  English courts around the time of the

founding recognized this power and exercised it regularly.  *See, e.g.*, *R. v. Mayor of London*, 100

Eng. Rep. 96, 98 (1787) (recognizing power to issue mandamus reinstating public official);[10] *R.*

*v. Mayor and Aldermen of Doncaster* (1752), 96 Eng. Rep. 795 (restoring municipal official to

his office after removal by town council); *R. v. Mayor, Bailiffs, and Common Council of the*

*Town of Liverpool* (1759), 97 Eng. Rep. 533 (same);[11] *R. v. Mayor, Aldermen and Burgesses of*

*Doncaster* (1729), 92 Eng. Rep. 513 (same); 73 Eng. Rep. at 752 (discussing *Thompson v.*

*Edmonds*, in which the King's Bench restored a bailiff to his office because he "was removed"

by the mayor "without cause"); *R. v. Mayor, Aldermen, and Common Council of Gloucester*, 90

Eng. Rep. 1148 (restoring official to office of capital burgess).  Numerous treatises further

confirm this practice.  *See* 3 W. Blackstone, Commentaries *264–265 ("The writ of mandamus is

. . . a most full and effective remedy, in the first place, for refusal of admission where a person is

entitled to an office or place in any such [municipal] corporation; and, secondly, for wrongful

---

[10] During this case, respected trial lawyer Thomas Erskine explained that "[w]henever a person is improperly suspended or removed from an office, whether it concern public or private duties, if he has a certain term in it, and there are profits annexed to it, and the party has no other specific legal remedy, the Court will grant mandamus to restore him."  100 Eng. Rep. at 97.

[11] Here, Lord Mansfield explained that when officials respond to an action for mandamus, "the return must set out all the necessary facts, precisely; to shew that the person is removed in legal and proper manner, and for a legal cause."  97 Eng. Rep. at 537.

removal, when a person is legally possessed."); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus as it Obtains Both in England and in Ireland* 221 (1853) ("The writ of mandamus . . . has by a great number of cases held to be grantable . . . to restore him who has been wrongfully displaced, to any office, function, or franchise of a public nature . . . ."); *id.* at 224 (distinguishing an officer "at pleasure" who may be removed without cause).[12] Even the treatise cited in Defendants' opposition explains that a court sitting in equity would "not interfere by injunction" in such cases simply because it would instead "leave that question to be determined by a legal forum." 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); *see also* Defs.' Opp'n at 15. This was the state of the law at the time of the founding, as well as when Congress passed the All Writs Act as part of the Judiciary Act of 1789. *See Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985). For this reason, the Supreme Court was careful in both *In re Sawyer* and *White v. Berry* to specify that mandamus was available "to determine the title to a public office" in "the courts of law." *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377.[13]

---

[12] Later treatises provide additional support for use of the writ of mandamus "for the purpose of restoring an individual to an office, where he has been illegally deprived of the possession thereof." Horace G. Wood, *A Treatise on the Legal Remedies of Mandamus and Prohibition, Habeas Corpus, Certiorari and Quo Warranto* 11 (1891). "When the title to the office is indisputable," proceedings for the writ of *quo warranto* would be "dilatory" and "a mandamus would be proper and should be awarded." *Id.* at 12 (quoting 7 How., 128); *see also* 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909) ("The jurisdiction to determine the title to a public office belongs only to courts of law and is exercised . . . by mandamus . . . and the mode of procedure established by the common law or by statute"); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 (1911) (same).

[13] Defendants argue that Harris was effectively removed from office and seeks a court order returning her to it. *See* Defs.' Opp'n at 15. The D.C. Circuit has clarified that this is not the case, and that Harris was never in fact removed. *See Kalbfus*, 42 App. D.C. at 321 ("In the present case the removal of the relator having been illegal and void, the office never became vacant . . . .").

As the Court explains below, however, a writ of mandamus can issue under our contemporary jurisprudence only when "the party seeking issuance of the writ ha[s] no other adequate means to attain the relief he desires." *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 403 (1976) (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Because the Court reads *Sampson*, *Swan*, and *Severino* to allow it to issue an injunction, it concludes that this injunction represents "adequate means" to provide Harris's requested relief, barring a mandamus remedy. *Kerr*, 426 U.S. at 403. This represents a curious reversal from norms before English courts, where reinstatement of officials through legal means was preferred over restoration through equitable means. *See Swan*, 100 F.3d at 976–81; *Severino*, 71 F.4th at 1042–43. Yet the broader point is that this Court may provide Harris *some* form of effective relief preventing her unlawful termination from the MSPB, whether it be through an injunction or a writ of mandamus. *See Swan*, 100 F.3d at 977 n.1 (explaining that a request for injunction and request for writ of mandamus can be "essentially" the same thing in some contexts).

Finally, Defendants argue that the Court cannot enjoin the President or enjoin others in a manner that restricts his Article II authority. *See* Defs.' Opp'n at 16. To be clear, Harris does not ask the Court to enjoin President Trump, *see, e.g.*, Pl.'s Proposed Order, and the Court does not do so.[14] Yet Defendants cite no authority for the proposition that a court lacks the power to enjoin the President's subordinates to restrain the President's violation of law. In fact, that is

---

[14] The availability of injunctive relief against the President may depend in part on whether compliance with 5 U.S.C. 1202(d) represents a ministerial rather than executive duty, a question the Supreme Court has "left open." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion); *see also State of Mississippi v. Johnson*, 71 U.S. 475, 498 (1866) (declining to decide whether a court may require the President "to perform a purely ministerial act," and defining a "ministerial duty" as "one in respect to which nothing is left to discretion); *McCray v. Biden*, 574 F. Supp. 3d 1, 9 (D.D.C. 2021) ("*Franklin*, however, did not absolutely slam the door shut on presidential injunctions."). Of course, the Court need not decide this question here.

precisely the remedy the Supreme Court affirmed in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952) (describing preliminary injunction restraining Secretary of Commerce from following President Truman's orders and "continuing the seizure and possession of the [steel] plant").  And in *Swan v. Clinton*, the D.C. Circuit concluded that a district court could enjoin the President's subordinates in order to effectuate a federal official's reinstatement.  *See* 100 F.3d at 979; *see also id.* (concluding that "injunctive relief against such officials could substantially redress [the terminated official's] injury"); *see also Severino*, 71 F.4th at 1042–43.  Having assured itself that injunctive relief is available here, the Court proceeds to consider whether a permanent injunction is warranted.[15]

### b.  Factors for Permanent Injunction

An injunction "is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Yet "it goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief."  *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Horne v. Flores*, 557 U.S. 433, 450 (2009)).  A permanent injunction is a "forward-looking" remedy, *Gratz v. Bollinger*, 539 U.S. 244, 284 (2003), the "principal purpose" of which is to "deter future violations, and not to punish the violator," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978).  "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies

---

[15] Defendants additionally suggest that "when executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement."  Defs.' Opp'n at 13.  The Court fails to see how it might lack the power to issue injunctive relief here simply because the plaintiffs in *Wiener* and *Humphrey's Executor* decided to seek another remedy.

available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (same).

For the same reasons the Court discussed in its previous opinion, Harris has established that she has suffered irreparable harm and will likely suffer irreparable harm in the future absent injunctive relief. *See* Mem. Op. at 11–19; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d. 45, 55 (D.D.C. May 21, 2021) ("While the irreparable-harm requirement is recited in the past tense, it is clear that future harm may qualify." (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010))). Congress intended the MSPB and its members to carry out their limited duties with a degree of independence from the President, guided primarily by his selection of members for the multimember board rather than "the Damocles' sword of removal." *Wiener*, 357 U.S. at 356. As the Court reasoned in its previous memorandum opinion, the MSPB's independence would evaporate if the President could terminate its members without cause, even if a court could later order them reinstated. *See* Mem. Op. at 16. Harris has undoubtedly experienced an injury to this independence in her capacity as a member of the MSPB following the President's attempt to terminate her without cause, and any future attempts would prove just as harmful to that autonomy.

Harris additionally suffers irreparable harm because she has been "depriv[ed] of [her] statutory right to function" as a member of the MSPB, and any further attempts to separate her from her position will exacerbate this injury. *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The termination email Harris received resulted in the inability to pursue her "statutory mission" to protect employees from prohibited personnel practices, such that "the loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, No. 25-cv-0385, 2025 WL 471022, at *11 (D.D.C. Feb. 12, 2025). In addition, unlike most other federal employees, Harris was duly appointed by the President and confirmed by the Senate to a position carrying a term of years with specific reasons for her removal.

The Court finds that this harm represents a "genuinely extraordinary situation" meriting injunctive relief related to a federal employee's discharge. *Sampson*, 415 U.S. at 92 n.68; *see also* Mem. Op. at 12–13 (discussing *Sampson*). The clear federal statute granting Harris for-cause removal protections, coupled with longstanding precedent upholding the constitutionality of analogous provisions, overcomes the "latitude" traditionally afforded the Government "in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83. The plaintiff in *Sampson*, who failed to meet this standard, sought an injunction temporarily enjoining her dismissal during an administrative appeal. *See id.* at 63. Yet the parties point to no administrative pathway here through which Harris could seek reinstatement following improper termination. Furthermore, whereas the *Sampson* plaintiff was a probational employee, *see id.* at 62, Harris is a member of the board of an independent agency, was appointed by the President and confirmed by the Senate, and enjoys tenure protections to preserve her independence.

For similar reasons, it is also apparent that "remedies available at law, such as monetary damages, are inadequate to compensate for" Harris's injuries. *eBay Inc.*, 547 U.S. at 391. Defendants argue that loss of salary generally does not represent irreparable harm. *See* Defs.' Opp'n at 19. As the Court has explained, however, this is not a standard employment action that can be remedied through back pay and later reinstatement, and Harris's claims do not revolve around her salary. *See* Mem. Op. at 15.

Defendants additionally cite *Raines v. Byrd*, 521 U.S. 811 (1997), for the notion that "a loss of political power" does not represent injury. Defs.' Mot. at 15. *Raines* is a case about legislators' standing to sue over legislation they perceive to cede power to the Executive Branch, and the case has minimal application to the irreparable injury analysis here. *See* 521 U.S. at 820–21. Harris is not a member of Congress, nor is standing at issue. The Supreme Court reasoned in *Raines* that any injury would be far too diffuse to support the legislators' standing, as it was spread across both Houses of Congress, and the legislators did not claim injury arising from "something to which they *personally* are entitled." *Id.* at 821. If anything, *Raines* supports Harris's claim to injury based on exclusion from her office: she has "been singled out for specially unfavorable treatment as opposed to other Members," and has lost something to which she is "personally" entitled. *Id.*

Finally, injunctive relief in this case is in the public interest, and the balance of the equities tips in Harris's favor. Given that federal law limits the conditions under which Harris's tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, the Court finds that it is in the public interest to issue injunctive relief. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and

operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). So too is there substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies. Furthermore, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Defendants suggest that the public interest weighs against injunctive relief here because "[s]uch a remedy would undermine the accountability of the Executive Branch instilled by the Constitution," and the President "cannot be compelled to retain the services of a principal officer." Defs.' Opp'n at 20–21. This argument largely relies on Defendants' success on the merits, and the Court has already determined that the President lacks the power to remove Harris at will. Defendants additionally argue that "the public interest is better served by an MSPB member who holds the President's confidence." *Id.* at 21. Yet Defendants decline to explain exactly how the public interest would be better served by removing Harris from her position. They do not dispute any of Harris's factual assertions, including her efforts to consider, deliberate, and vote on 35 cases per week to clear the MSPB's backlog of nearly 3,800 cases. *See* SUMF ¶¶ 12–28. This effort was successful, as by early this year the inherited cases had all but disappeared. *See id.* ¶ 20. Recall that many of these cases involve allegations that federal agencies engaged in prohibited personnel practices, such as targeting of federal employees based on political affiliation; retaliation against whistleblowers reporting violations of law, waste, fraud and abuse; discrimination; and USERRA violations, among others. *See* Pl.'s Mot. at 4–5 (collecting cases). Defendants make no effort to enlighten the Court as to how Harris's handling

of these cases might differ from the President's preferred approach, let alone in a manner that might tilt the public interest factor in their favor. Defendants additionally overlook the fact that if Harris or her colleagues were ever to become inefficient, neglect their duty, or engage in malfeasance in office, the President would be empowered to remove them for cause. *See* 5 U.S.C. § 1202(d). The Court thus finds nothing in Defendants' arguments that might support a public interest against injunctive relief here.

The Court additionally notes that in opposing injunctive relief in its entirety, Defendants have declined to engage with the scope of Harris's proposed relief. *See generally* Proposed Order; Defs.' Opp'n. The Court will nonetheless tailor its declaratory and injunctive relief to meet Harris's entitlement under the law.[16]

### 3. Writ of Mandamus

Harris requests that the Court issue a writ of mandamus if no other relief is available. *See* Pl.'s Mot. at 34–35. Defendants argue that the President has no clear nondiscretionary duty here, as his selection of "who should lead an Executive Branch agency is certainly not a mere ministerial task." Defs.' Mot. at 22.

"The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has "original jurisdiction of any action in the nature of mandamus" only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

---

[16] Although injunctive relief is merited, the Court narrows Harris's request slightly. Harris seeks a permanent injunction prohibiting several Defendants from removing her or treating her as removed. *See* Proposed Order. Yet § 1202(d) permits the President to remove her for inefficiency, neglect of duty, or malfeasance in office. The Court nonetheless notes the undisputed record demonstrating that Harris and her colleagues have carried out their duties to decide cases in addition to clearing a significant backlog.

available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022)

(quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)).  "[M]andamus jurisdiction

under § 1361 merges with the merits." *Muthana*, 985 F.3d at 910 (quoting *Lovitky v. Trump*, 949

F.3d 753, 759 (D.C. Cir. 2020)).  "[E]ven if the plaintiff overcomes all these hurdles, whether

mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir.

2005).

    The Court finds the first two requirements for mandamus relief to be satisfied.  A court

"can analyze the clear right to relief and clear duty to act requirements for mandamus

'concurrently.'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (quoting *Lovitky*, 949

F.3d at 760).  "[T]o meet the 'clear duty to act' standard, '[t]he law must not only authorize the

demanded action, but require it; the duty must be clear and indisputable.'" *Ferriero*, 60 F.4th at

715 (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931).  Based on the

Court's holding that federal law precludes the President's power to remove Harris at will, the

Court finds a duty here that is clear and indisputable, and under binding Supreme Court

precedent there is no "room for an honest difference of opinion" on the part of federal officials.

*Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934).  In other words, the statute does not

provide room for executive discretion—the President has no menu of options to pick from when

he categorically may not remove Harris without cause.  In making this determination, the Court

additionally looks to the voluminous precedent demonstrating that courts of law issued

mandamus relief in similar situations at the time Congress passed the All Writs Act in 1789 and

over the ensuing centuries.

    As the Court previewed earlier, however, it appears at present that Harris has a separate,

"adequate remedy" available in the form of a permanent injunction.  *In re Nat'l Nurses United*,

47 F.4th at 752 n.4.  The Court thus determines that her request for mandamus relief fails on that basis alone.  Were equitable injunctive relief unavailable here, however, the Court would not hesitate to "vigilantly enforce federal law" and "award[] necessary relief" through a writ of mandamus as an alternative remedy at law.  *DL*, 860 F.3d at 726.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff Cathy A. Harris's motion for summary judgment is **GRANTED**; and it is

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute.  Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from removing Harris from her office without cause or in any way treating her as having been removed without cause, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board in Harris's position; and it is

**FURTHER ORDERED** that the Court's Temporary Restraining Order is **VACATED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 4, 2025                                       RUDOLPH CONTRERAS
                                                           United States District Judge

# Appendix C

**No. 25-5055**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CATHY A. HARRIS,

Plaintiff-Appellee,

v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**EMERGENCY MOTION FOR A STAY PENDING APPEAL**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
JOSHUA M. SALZMAN
DANIEL AGUILAR
LAURA E. MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff is Cathy A. Harris.  Defendants are Scott Bessent, in his official capacity as Secretary of the Treasury; Trent Morse, in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office; Sergio Gor, in his official capacity as Director of the White House Presidential Personnel Office; Henry J. Kerner, in his official capacity as Acting Chairman of the Merit Systems Protection Board; Donald J. Trump, in his official capacity as President of the United States of America; and Russell T. Vought, in his official capacity as Director of the Office of Management and Budget.

The Constitutional Accountability Center and the States of Florida and Tennessee participated as amicus curiae before the district court.

### B.    Ruling Under Review

The ruling under review is a summary-judgment order (Dkt. 39) and opinion (Dkt. 40) that the district court issued on March 4, 2025.  That opinion and order are attached to this motion.

## C.    Related Cases

This case has previously been before this Court as No. 25-5037, but that appeal from the district court's TRO order has been rendered moot by the order challenged here.

*Wilcox v. Trump*, No. 25-334 (D.D.C. filed Feb. 5, 2025), similarly involves a challenge to the President's removal of a principal officer from a multimember agency (the National Labor Relations Board) with statutory removal restrictions, 29 U.S.C. § 153(a).

*Grundman v. Trump*, No. 25-425 (D.D.C. filed Feb. 13, 2025), similarly involves a challenge to the President's removal of a principal officer from a multimember agency (the Federal Labor Relations Authority) with statutory removal restrictions, 5 U.S.C. § 7104(b).

*Dellinger v. Bessent*, No. 25-5052 (D.C. Cir), similarly involves a challenge to the President's removal of a principal officer serving as the sole head of an agency (The Office of Special Counsel) with statutory removal restrictions, 5 U.S.C. § 1211(b).

/s/ *Laura E. Myron*
Laura E. Myron
  *Attorney, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT ...................................................................................... 4

    A.   Statutory Background ................................................. 4

    B.   This Litigation ........................................................... 7

ARGUMENT ...................................................................................... 9

    A.   The Government Is Likely To Prevail On The Merits ...............10

        1.   At-will removal is the general rule, and MSPB does not fit within any exceptions ...........................................10

        2.   Harris cannot show entitlement to reinstatement ...........17

    B.   The Remaining Factors Favor A Stay........................................ 22

CONCLUSION ..................................................................................... 24

CERTIFICATE OF COMPLIANCE

ATTACHMENT: District Court's Order and Memorandum Opinion

## INTRODUCTION

This appeal arises from an order of the district court immediately reinstating a principal officer of the United States whom the President has lawfully fired. The district court's unprecedented order works a grave harm to the separation of powers and undermines the President's ability to exercise his executive authority. The government seeks a stay of the order pending appeal and respectfully requests an immediate administrative stay.

The Constitution vests the entirety of the "executive Power" in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; *id.* § 3. That executive power encompasses the authority to remove those who aid the President in carrying out his duties.

On February 10, 2025, the President exercised that authority when he removed Cathy Harris from her position as a Member of the Merit Systems Protection Board (MSPB or Board), an Executive Branch agency that performs quintessentially executive functions. Harris filed suit to challenge that removal and the district court granted a temporary restraining order reinstating Harris to office. The court then extended that reinstatement in a permanent injunction after granting summary judgment to Harris. That extraordinary relief is a significant and unjustifiable intrusion on the

President's constitutional authority to oversee the Executive Branch and the principal officers he must trust to carry out the Executive's prerogatives. Indeed, this Court recently stayed a similar order that had reinstated the Special Counsel. The Court directed that the President's removal of the Special Counsel be given effect. *See Dellinger v. Bessent*, No. 25-5052, Order (March 5, 2025). A stay is equally warranted here.

First, the district court erred in holding that the President lacks authority to remove Harris from the MSPB except "for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). That statutory restriction on the President's removal power is unconstitutional. The President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enterprise Fund v. Public Accounting Oversight Board*, 561 U.S. 477, 513-14 (2010). The Supreme Court in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), recognized a limited exception to that rule of at-will Presidential removal for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 216 (2020). That exception, however, does not encompass the MSPB, which plainly exercises executive power: it reviews decisions of other Executive Branch

2

agencies to remove and discipline federal employees, 5 U.S.C. § 7701(a); it issues final decisions and may "enforce compliance with any such order," *id.* § 1204(a)(2); it can *sua sponte* invalidate certain federal regulations and can "require any agency * * * to cease compliance with" such an invalidated rule, *id.* § 1204(f)(1)-(4); and it appears in federal court in its own name and through its own attorneys, *id.* §§ 1204(i), 7703(a)(2). Accordingly, because the MSPB does not fit within the narrow scope of *Humphrey's Executor*, Congress cannot restrict the President's removal authority.

Second, Harris will not suffer irreparable harm in the absence of immediate reinstatement. The district court was wrong to conclude that Harris's removal is the sort of "genuinely extraordinary situation," *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974), in which loss of government employment may constitute irreparable harm. Likewise, the court's conclusion that Harris was irreparably harmed by being "depriv[ed] of [her] statutory rights to function," Dkt. 40 at 29, also fails because public officials have no individual right to the powers of their offices. *See Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("loss of political power" not irreparable harm); *Barnes v. Kline*, 759 F.2d 21, 50 (D.C. Cir. 1984) (Bork, J., dissenting) (notion that public officials "have a separate private right, akin

3

to a property interest, in the powers of their offices" is "alien to the concept of a republican form of government").

Third, the balance of the equities and the public interest favor defendants. The relief Harris seeks—an order requiring the President to reinstate a person he has chosen to remove from office—is extraordinary. Such an order would greatly impede President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 590 U.S. at 203. Allowing Harris to exercise executive power over the President's objection unquestionably inflicts irreparable harm on both the Executive and the separation of powers.

For all these reasons, a stay pending appeal is warranted.

The parties have agreed upon an expedited schedule under which plaintiff would respond to this motion by 11:59PM Monday, March 10, and defendants would reply by 5:00PM Wednesday, March 12. Defendants respectfully request a ruling from the Court as soon as practicable thereafter.

## STATEMENT

### A.    Statutory Background

Congress created the MSPB as part of the Civil Service Reform Act of 1978. Pub. L. No. 95-454, § 202(a), 92 Stat. 1111, 118-44 (1978). The MSPB is a successor to the Civil Service Commission, an agency established in the

Chester A. Arthur Administration to help the President prepare suitable civil service examination rules for applicants seeking federal employment. Act of Jan. 16, 1883, ch. 27, §2, 22 Stat. 403, 403 (1883). The Commission was comprised of three Commissioners appointed by the President and removable at will, *see id.* § 1, 22 Stat. at 403 ("The President may remove any Commissioner.").

Nearly a century later, Congress passed the Civil Service Reform Act and split the Commission's functions between two new agencies: the Office of Personnel Management and the MSPB. 92 Stat. at 1118-44. The Act charged the Office of Personnel Management with conducting the Commission's personnel management functions, while the MSPB performed the Commission's "hearing, adjudication, and appeals functions," and was vested with "authority to enforce agency compliance with its decisions." Congressional Research Service, Merit Systems Protection Board (MSPB): A Legal Overview 3 (March 25, 2019).

The MSPB, like the Commission, consists of three Members appointed by the President with Senate confirmation. 5 U.S.C. § 1201. No more than two Members may belong to the same political party. *Id.* But in a departure from the longstanding operation of the Commission, Congress

limited the President's ability to remove MSPB Members to only cases of "inefficiency, neglect of duty, or malfeasance in office." *Id.* § 1202(d).

The MSPB primarily reviews federal employee appeals of adverse actions "which [are] appealable to the Board under any law, rule, or regulation," including those related to removal or suspension for periods greater than fourteen days. 5 U.S.C. § 7701(a); *see also id.* § 7521(a); 5 C.F.R. § 1201.3(a). The MSPB can hear cases directly or it can refer them for initial adjudication by inferior officers it appoints (administrative judges and administrative law judges). 5 U.S.C. § 7701(b)(1). The MSPB has authority to "take final action on any such matter[s]" before it, *id.* § 1204(a)(1), and can order any federal agency or employee "to comply with any order or decision issued by the Board * * * and enforce compliance with any such order," *id.* § 1204(a)(2). And in addition to these functions, the MSPB may *sua sponte* review and invalidate rules promulgated by the Office of Personnel Management, and "shall require any agency * * * to cease compliance" with such invalidated rules. *Id.* § 1204(a)(4), (f)(1)-(4).

Except in the Supreme Court, "attorneys designated by the Chairman of the Board may appear for the Board, and represent the Board, in any civil action brought in connection with any function carried out by the Board." 5 U.S.C. § 1204(i). And in certain circumstances, the MSPB itself is the

named respondent (and thus a litigant) in judicial proceedings reviewing its decisions. *See id.* § 7703(a)(2).

### B.    This Litigation

Plaintiff Harris was first nominated by President Biden to serve as a Member of the MSPB in 2021. Compl. ¶ 24. Harris eventually began serving as a Member in 2022 and was confirmed as Chairman in 2024. Compl. ¶¶ 24-25. On February 10, 2025, the Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office informed Harris that she was being removed from her position. Compl. Exh. A. The next day, Harris filed this lawsuit, *see generally* Compl., and moved for a temporary restraining order, requesting that she be reinstated, *see* Dkt. 2-4.

The district court issued a temporary restraining order, ordering that "Harris shall continue to serve as chairman of the MSPB" until "the Court rules on a preliminary injunction." Dkt. 9 at 21.[1] Following briefing and the parties' agreement that the preliminary-injunction motion should be consolidated with the merits, the court issued an order granting Harris's motion for summary judgment and entered a permanent injunction and

---

[1] Defendants appealed this decision.  Dkt. 14.  The district court's summary-judgment order rendered that appeal moot.

declaratory judgment. The court concluded that "MSPB members' removal protections are constitutional under *Humphrey's Executor*," Dkt. 40 at 7, and that the court possessed the authority to issue injunctive and declaratory relief, *id.* at 20-26. Accordingly, the court declared that Harris shall continue to serve as a Member of the MSPB unless removed for the reasons listed in 5 U.S.C. § 1202, and enjoined defendants (other than the President) from "removing Harris from her office without cause," treating her as having been removed, denying her access to the "benefits and resources of her office," replacing her, or recognizing any other person as holding her position on the MSPB. *Id.* at 34-35.

Harris continues to wield substantial executive power, notwithstanding her removal from office. Recently, the Special Counsel— whose removal has now been given effect by this Court—requested that the MSPB stay the termination of thousands of probationary employees who were recently terminated by the Department of Agriculture.[2] Harris

---

[2] The filing is available at: https://osc.gov/Documents/PPP/Formal%20Stays/USDA%20Systemic%20Stay%20(redacted).pdf.

directed the Special Counsel to provide the names of the employees in question, and she then unilaterally granted the requested stay.[3]#

## ARGUMENT

In considering a stay pending appeal, this Court examines "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 426 (2009).[4]

This Court recently concluded that the government had satisfied the *Nken* factors and stayed a district order that had reinstated the Special Counsel. *Dellinger v. Bessent*, No. 25-5052, Order (Mar. 5, 2025). A stay is similarly warranted here.

---

[3] The order granting the stay request is available here: https://www.mspb.gov/decisions/nonprecedential/Doe_JohnCB-1208-25-0020-U-1_Order_On_Stay_Request.pdf

[4] The government filed a stay motion in district court pursuant to Fed. R. App. P. 8(a).  That motion was denied on March 5.

### A.    The Government Is Likely To Prevail On The Merits

The government is likely to prevail because the Constitution empowers the President to remove, at will, principal officers leading a freestanding component within the Executive Branch and exercising executive power, such as Members of the MSPB, and because the district court's order exceeds its remedial powers.

#### 1.    At-will removal is the general rule, and MSPB does not fit within any exceptions

Article II of the Constitution provides that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). To discharge those responsibilities, the President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enterprise Fund*, 561 U.S. at 513-14. "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514; *see also, e.g.*, *Exela Enterprise Solutions, Inc. v. NLRB*, 32 F.4th 436, 445 (5th Cir. 2022) ("The President's power to remove is essential to the performance of his Article II responsibilities and control over the Executive Branch.").

The Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 203. First, the Court has held that "Congress could provide tenure protections to certain *inferior* officers with narrowly defined duties." *id.* at 204. Second, *Humphrey's Executor*, 295 U.S. 602, held that Congress could "give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. Those exceptions represent the "outermost constitutional limits of permissible restrictions on the President's removal power" under current precedent. *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)).

There is no question that MSPB Members are principal officers: they are appointed by the President with Senate confirmation, *see* U.S. Const. art. II, § 2, cl. 2; 5 U.S.C. § 1201, oversee their own department, and are not subservient to any other principal officer, *see* 5 U.S.C. § 1204. Thus, the relevant question is whether the MSPB falls within the exception identified in *Humphrey's Executor*. It does not. As the Supreme Court made clear in *Seila Law*, that exception is limited to "multimember bodies with 'quasi-

judicial' or 'quasi-legislative' functions" that exercise no executive power. 591 U.S. at 216-17 (quoting *Humphrey's Executor*, 295 U.S. at 632).

But the MSPB is no "mere legislative or judicial aid." *Seila Law*, 591 U.S. at 199. It is an independent agency that performs significant executive functions. For instance, the MSPB "hear[s], adjudicate[s], or provide[s] for the hearing or adjudication" of matters within its jurisdiction and, "subject to otherwise applicable provisions of law, take[s] final action on any such matter." 5 U.S.C. § 1204(a)(1).  The MSPB can "order any Federal agency or employee to comply with any order or decision issued by the Board * * * and enforce compliance with any such order," 5 U.S.C. § 1204(a)(2); *see also Seila Law*, 591 U.S. 197 at 219 (explaining that the CFPB Director exercises executive power because he "may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications."). The MSPB can also *sua sponte* review and invalidate rules and regulations issued by the Office of Personnel Management, another executive agency, and further order other federal agencies to "cease compliance" with such rules. 5 U.S.C. § 1204(f). The MSPB also has authority to send its own attorneys (not Department of Justice attorneys) to litigate civil actions outside the Supreme Court in connection with any of its functions. *Id.* § 1204(i); *see also Buckley v. Valeo*, 424 U.S. 1, 138-40 (recognizing

12

interpreting and enforcing law through litigation as executive function). And under certain circumstances, the MSPB itself is the named respondent (and thus a litigant) in judicial proceedings reviewing Board decisions. *See* 5 U.S.C. § 7703(a)(2). These features distinguish the Board from a purely adjudicatory body. *Contra Wiener v. United States*, 357 U.S. 349, 355-56 (1958) (upholding removal restriction on members of a purely adjudicatory body with an "intrinsic judicial character").

In short, the MSPB "wield[s] executive power" and therefore must be accountable to the President by at-will removal. *See Seila Law*, 591 U.S. at 204 ("The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II.").

The district court's contrary conclusion rests largely on an overbroad reading of *Humphrey's Executor* and *Wiener*, Dkt. 40 at 7-16, stretching those decisions beyond their facts to encompass an agency that exercises substantial executive power. The Supreme Court in *Seila Law* made clear, however, that neither *Humphrey's Executor* nor *Wiener* extends so far. After *Seila Law*, "only a very narrow reading of those cases is still good law" and "little to nothing is left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates." *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring).

In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a provision prohibiting removal of Commissioners from the Federal Trade Commission (FTC) absent "inefficiency, neglect of duty, or malfeasance in office." 265 U.S. at 632. Despite reaffirming the then-recent holding in *Myers v. United States*, 272 U.S. 52 (1926), that the President "has unrestrictable power * * * to remove purely executive officers," the Court concluded that *Myers* did not control because the FTC Commissioner at issue was "an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President," *id*. at 628, 632.  Instead, *Humphrey's Executor* understood the FTC to be "an administrative body" that "carr[ied] into effect legislative policies" and "perform[ed] other specified duties as a legislative or judicial aid." *Id*. Those duties, according to the Court, "c[ould] not in any proper sense be characterized as an arm or an eye of the executive." *Id*. The Court understood the FTC not to be exercising executive power at all but rather to "act[] in part quasi legislatively and in part quasi judicially." *Id*. On that understanding, *Humphrey's Executor* upheld the provision restricting the removal of FTC Commissioners.

14

*Humphrey's Executor* thus approved the constitutionality of for-cause removal provisions only for multimember boards that do not exercise any executive power. *See Seila Law*, 591 U.S. at 219 n.4 (recognizing that "what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court"). To be sure, the assumption on which *Humphrey's Executor* rests—that the FTC's powers at the time were not properly characterized as executive in nature—has since been "repudiated" by the Supreme Court. *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring in part); *see also Morrison*, 487 U.S. at 689 n.28, 691 (noting that "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree").

In other words, even the 1935 FTC could today be understood as exercising executive power. *See Seila Law*, 591 U.S. at 216 n.2 (observing that *Humphrey's Executor*'s "conclusion that the FTC did not exercise executive power has not withstood the test of time"); *see also Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (noting that agencies may engage in activities that "take 'legislative' and 'judicial' forms, but [those activities] are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'"). But that is all the more reason not to

15

expansively read *Humphrey's Executor* as blessing removal protections for principal officers exercising executive powers that the Supreme Court did not consider when deciding that case.

The district court stressed that the MSPB performs adjudicatory functions and sometimes sends reports to Congress, Dkt. 40 at 11-13, but that ignores the key point that the MSPB exercises executive authority and is therefore not comparable to the FTC as understood by the Supreme Court in *Humphrey's Executor*. That distinction is outcome determinative, because *Seila Law* made clear that the *Humphrey's Executor* exception applies only to multimember agencies similarly situated to how "the Court viewed the FTC (as it existed in 1935)," and therefore exercise "'*no part* of the executive power.'" *Seila Law*, 591 U.S. at 215 (quoting *Humphrey's Executor*, 295 U.S. at 628) (emphasis added).

The district court's assessment that the "MSPB's mission and purpose require independence," Dkt. 40 at 13-14, does not change the analysis. A similar argument was made and rejected in *Seila Law* itself. *Cf. Seila Law*, 591 U.S. at 273 (Kagan, J., concurring in part) (urging that Congress had strong policy justifications for enacting the tenure protections for the CFPB Director that were held invalid by the majority). Moreover, the "nature and breadth of an agency's authority is not dispositive in determining whether

16

Congress may limit the President's [removal] power." *See Collins v. Yellen*, 594 U.S. 220, 251-252, 253 (2021). "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," and "the constitutionality of removal restrictions [does not] hinge[] on such an inquiry." *Id.*

Fundamentally, the MSPB exercises executive power—indeed substantial executive power. Moreover, Board Members may exercise such power unilaterally, as demonstrated by Harris's recent grant of a stay of the termination of several thousand probationary employees at the U.S. Department of Agriculture. Because the MSPB exercises executive power, it does not fall within the narrow *Humphrey's Executor* exception. Board Members must therefore be removable at will by the President. The district court's contrary conclusion is wrong, and the government is likely to prevail on the merits of its appeal.

### 2. Harris cannot show entitlement to reinstatement

Defendants are likely to succeed on a second ground too. As a remedial matter, the district court's order reinstating Harris "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559668, at *14 (D.C. Cir. Feb. 15, 2025)

(Katsas, J., dissenting) (quoting *Trump v. United States*, 603 U.S. 593, 614 (2024)). As Judge Katsas explained, there would be no doubt of "grave and irreparable" injury if the district court had ordered reinstatement of a dismissed Secretary of State, and any differences between the Department of State and the MSPB "go[] to the extent—not the character—of the President's injury." *Id.*

Neither this Court nor the Supreme Court has ever suggested that reinstatement is an appropriate remedy in such circumstances. To the contrary, the Supreme Court recognized long ago that a court "has no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). Accordingly, when principal officers have been removed from their posts, they generally have challenged that removal in suits for back pay. *See Humphrey's Executor*, 295 U.S. at 612 (challenge sought "to recover a sum of money alleged to be due"); *Myers v. United States*, 272 U.S. 52, 106 (1926) (same); *Wiener*, 357 U.S. at 349-351 (1958) (same). That rule reflects the obvious Article II problems that arise if a court attempts to reinstate—that is, reappoint—a principal executive officer removed by the President. Even if an improperly removed officer is entitled to some legal remedy, the President cannot be compelled to retain the services of a

18

principal officer whom he has removed from office. Indeed, this Court recently stayed a district court's order that had reinstated the Special Counsel, directing that the President's removal of the Special Counsel be given effect. *Dellinger*, No. 25-5052, Order (Mar. 5, 2025).

An injunction reinstating Harris also exceeds the scope of the district court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy. "It is . . . well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888). Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a *federal* officer" reflect "a traditional limit upon equity jurisdiction"); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of

another."). This principle applies equally where, as here, relief is directed to the President's subordinate officers. Since only the President has the authority to appoint, remove, and supervise agency heads, any relief preventing Harris's removal "necessarily targets the President." *Dellinger*, 2025 WL 559669, at *13 n.2 (Katsas, J., dissenting).

The district court's order cannot be squared with these precedents. First, the court relied on *Sampson* as establishing that courts can reinstate federal employees. Dkt. 40 at 21-22. But *Sampson* involved a federal employee rather than a principal officer, and thus does not override the rule that courts have "no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. at 212. Second, the district court asserted that cases of this Court have found injunctive relief against subordinate federal officers to be available. Dkt. 40 at 22-23. As the district court acknowledged, however, the cited cases held only that plaintiffs had standing to bring claims challenging their removals; they did not hold that injunctive relief reappointing a removed officer was available. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (declining to decide whether courts have authority to order reinstatement, noting that it was not "determining whether we can order more complete relief").

The same principles foreclose declaratory relief. A declaratory-judgment suit is "'essentially an equitable cause of action.'" *Samuels v. Mackell*, 401 U.S. 66, 70 (1971). And the Declaratory Judgment Act "was not devised to deprive courts of ... their freedom to withhold relief upon established equitable principles." *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943). For that reason, *Samuels* "held that interference with pending state criminal prosecutions by declaratory judgments is subject to the same restrictions curbing federal interference by injunction," *Perez v. Ledesma*, 401 U.S. 82, 86 n.2 (1971), and *Great Lakes* held the same as to interference with "the collection of state taxes," 319 U.S. at 299.

Those principles carry added force when, as here, a district court enjoins the President's removal of an agency head. Just as courts lack jurisdiction to enjoin the President's performance of official duties, *Mississippi*, 71 U.S. at 501, courts have "never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). The district court's order violates those principles. Whether expressly directed at the President or not, an order reinstating an executive officer removed by the President violates Article II.

Finally, while the district court declined to enter a writ of mandamus, Dkt. 30 at 32-34, its suggestion that Harris would be entitled to mandamus relief in the absence of injunctive relief is not warranted. For the reasons explained above, Harris cannot show that she has a "clear" right to relief. *Heckler v. Ringer*, 466 U.S. 602, 616 (1984).

### B. The Remaining Factors Favor A Stay

The equitable factors likewise weigh decisively in the government's favor, and "the public interest and balance of equities factors merge" where, as here, "the government is the party" against whom an injunction is sought. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

As discussed above, the district court's order works an extraordinary harm to the President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 590 U.S. at 203. Because of that order, a person the President has chosen to remove from office is exercising executive power over the President's objection. Indeed, just this week, Member Harris exercised her power unilaterally to stay the termination of thousands of probationary employees. *See supra* pp.8-9. That sort of harm to the Executive, and to the separation of powers, is transparently irreparable.

22

Conversely, a stay would not irreparably harm Harris. Although Harris's removal deprives her of employment and salary, such consequences ordinarily do not amount to irreparable injury, "however severely they may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). Thus, the traditional remedy for such claims has been an award of back pay at the end of the case, not interim reinstatement, and a stay pending appeal "would not substantially harm" Harris. *Dellinger*, 2025 WL 559669, at*17 (Katsas, J., dissenting). Reinstating Harris would also call into question the validity of any actions taken by the MSPB, with her as a Member, while defendants seek further review of this case. *See Collins*, 594 U.S. at 259 (explaining that private parties may be entitled to a remedy when an unconstitutional removal restriction "inflict[s] compensable harm," such as if "the President had attempted to remove [an agency head] but was prevented from doing so by a lower court decision"). Any harm arising from Harris's inability to fulfill statutory duties is not irreparable; those duties are vested in her former office, and Harris has no personal right to exercise the powers of an office after she has been removed.

## CONCLUSION

This Court should stay the district court's order pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
JOSHUA M. SALZMAN
DANIEL AGUILAR
 */s/ Laura E. Myron*
LAURA E. MYRON
   *Attorneys, Appellate Staff*
   *Civil Division*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-1754*

24

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,814 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.

*/s/ Laura E. Myron*
Laura E. Myron

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |  |
|---|---|---|---|
| CATHY A. HARRIS, *in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board*, | : | | |
| | : | | |
| | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 25-412 (RC) |
| | : | | |
| v. | : | Re Document No.: | 22 |
| | : | | |
| SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*, et al., | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## ORDER

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Plaintiff Cathy A. Harris's Motion for Summary Judgment (ECF No. 22) is **GRANTED**.  It is hereby:

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute.  Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from

removing Harris from her office without cause or in any way treating her as having been

removed without cause, denying or obstructing Harris's access to any of the benefits or resources

of her office, placing a replacement in Harris's position, or otherwise recognizing any other

person as a member of the Merit Systems Protection Board in Harris's position; and it is

      **FURTHER ORDERED** that the Court's Temporary Restraining Order (ECF No. 8) is

**VACATED**.

      **SO ORDERED**.

Dated:  March 4, 2025                              RUDOLPH CONTRERAS
                                                 United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, *in her personal capacity*     :
*and in her official capacity as Member of the*     :
*Merit Systems Protection Board*,     :
     :
      Plaintiff,     :     Civil Action No.:     25-412 (RC)
     :
      v.     :     Re Document No.:     22
     :
SCOTT BESSENT, *in his official capacity as*     :
*Secretary of the Treasury*, *et al.*,     :
     :
      Defendants.     :

## <u>MEMORANDUM OPINION</u>

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Cathy A. Harris was appointed to the Merit Systems Protection Board ("MSPB") on June 1, 2022, for a term set to expire on March 1, 2028. Federal law states that members of the MSPB may be removed from office "only for inefficiency, neglect of duty, or malfeasance in office." On February 10, 2025, President Donald J. Trump informed Harris that her position on the MSPB was "terminated, effective immediately" but provided no reason for Harris's termination. The following day, Harris filed this lawsuit against President Trump and several other federal officials ("Defendants"), claiming that her termination violated federal law. She moved for a temporary restraining order enjoining Defendants from treating her as removed from office, which this Court granted. The parties consolidated preliminary injunction briefing with the merits, and Harris moved for summary judgment. The Court grants that motion, along with declaratory judgment and a permanent injunction.

## II.  BACKGROUND

### A.  Statutory Background

Congress created the Merit Systems Protection Board as a component of the Civil Service Reform Act of 1978 ("CSRA"), which "establishes a framework for evaluating personnel actions taken against federal employees."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also* CSRA, Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121–25 (1978) (codified at 5 U.S.C. §§ 1201–05). Congress's Findings and Statement of Purpose indicate that "[i]t is the policy of the United States that . . . to provide the people of the United States with a competent, honest, and productive Federal work force[,] . . . Federal personnel management should be implemented consistent with merit system principles."  CSRA § 3, 92 Stat. at 1112.  Those merit system principles include, among others, "[r]ecruitment . . . from qualified individuals" where "selection and advancement [is] determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."  *Id.* § 101, 92 Stat. at 1113 (codified at 5 U.S.C. § 2301).  Congress additionally instructed that "[e]mployees should be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," as well as "against reprisal for the lawful disclosure of information which the employees reasonably believe evidences," among other things, violations of law, gross waste of funds, an abuse of authority, or substantial and specific dangers to public health or safety.  *Id.*, 92 Stat. at 1114 (codified at 5 U.S.C. § 2301).

The CSRA established the MSPB as "an independent agency consisting of three members" and "charged [it] with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies."  *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 154 (D.C. Cir. 1982); *see also* CSRA § 101, 92 Stat. at 1114–17 (codified at 5

U.S.C. § 2302) (establishing prohibited personnel practices, such as employment discrimination, unlawful political activities, and any other violations of law within the federal civil service). The Board's primary function is to review federal employee appeals of adverse actions "which [are] appealable to the Board under any law, rule, or regulation," including those related to removal or suspension for periods greater than fourteen days. 5 U.S.C. § 7701(a); *see also id.* § 1204(a)(1). These adjudications consume approximately 95 percent of MSPB members' time. *See* Pl.'s Statement of Undisputed Material Facts ¶ 54 ("SUMF"), ECF No. 22-2. The Board may order federal agencies and employees to comply with its decisions, *see* 5 U.S.C. § 1204(a)(2), which are nonetheless subject to judicial review. *See id.* § 7703. The MSPB thus acts as a preliminary adjudicator of these employment disputes, with federal courts providing the final say if the parties so desire.

The MSPB carries out other limited tasks in pursuit of its mission. It conducts studies "relating to the civil service" for the President and Congress, *see* 5 U.S.C. § 1204(a)(3), although this function takes up less than one percent of members' time, *see* SUMF ¶ 62. The Board may also review "rules and regulations of the Office of Personnel Management," *see id.* § 1204(a)(4), on its own motion, following a complaint from the Special Counsel, or in response to a third party's petition, *see id.* § 1204(f)(1). The MSPB may invalidate the rule or its implementation if it would require a federal employee to engage in prohibited personnel practices. *See id.* § 1204(f)(2).[1]

Members of the MSPB are "appointed by the President, by and with the advice and consent of the Senate," and "not more than 2 of [the members] may be adherents of the same

---

[1] Harris explains that invalidation of an Office of Personnel Management rule under this mechanism "is an exceedingly rare occurrence" that has not happened during her tenure. Harris Decl. ¶ 31, ECF No. 22-3.

political party." CSRA § 202 (codified at 5 U.S.C. § 1201). Members of the MSPB are

appointed to seven-year terms that may be extended by up to one year if a successor has not yet

been appointed. *Id.* (codified at 5 U.S.C. § 1202(a)–(c)). "Any member may be removed by the

President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* (codified at 5

U.S.C. § 1202(d)).

### B. Factual and Procedural Background

President Joseph R. Biden nominated Harris to be a member of the MSPB in January

2022. SUMF ¶ 1. The Senate confirmed her on May 25, 2022, and she was sworn in on June 1,

2022. *Id.* ¶ 2. Her term expires on March 1, 2028. *Id.* ¶ 3. The Senate later confirmed Harris as

Chairman, and she was sworn in as Chairman on March 14, 2024. *Id.* ¶¶ 4–5.

Defendants do not dispute that Harris has been efficient and effective in her role at the

MSPB. *See id.* ¶ 8. When the MSPB's quorum was restored in March 2022, the agency had a

backlog of approximately 3,800 cases that had accrued since 2017, and officials estimated that it

would take five or six years for the agency to catch up. *Id.* ¶¶ 12–14. By January 2025,

however, the MSPB had cleared nearly 99 percent of its backlog. *Id.* ¶ 20. From June 1, 2022,

to February 10, 2025, Harris participated in nearly 4,500 decisions. *Id.* ¶ 10.

On February 10, 2025, Harris received an email from Trent Morse, Deputy Assistant to

the President and the Deputy Director of the White House Presidential Personnel Office, which

stated in its entirety:

> On behalf of President Donald J. Trump, I am writing to inform you that your
> position on the Merit Systems Protection Board is terminated, effective
> immediately. Thank you for your service[.]

Ex. 4 to Pl.'s Mot. for Prelim. Inj. and J. on the Merits, ECF No. 22-4. The communication did

not explain the basis for Harris's termination.

Harris filed this lawsuit on February 11, 2025, claiming that her firing was *ultra vires*, unconstitutional, and a violation of the Administrative Procedure Act ("APA").  *See* Compl. ¶¶ 31–37, 40–41, ECF No. 1.  She seeks relief under the Declaratory Judgment Act, issuance of a writ of mandamus, and equitable relief.  *See id.* ¶¶ 38–39, 42–46.  Harris additionally filed a motion for a temporary restraining order, *see* Pl.'s Mot. for TRO, ECF No. 2, which Defendants opposed, *see* Defs.' Opp'n to Mot. for TRO, ECF No. 6.  The Court held a hearing on the TRO motion on February 13, 2025, and granted the motion on February 18, 2025.  *See* Min. Entry dated Feb. 13, 2025; Order Granting Pl.'s Mot. for TRO, ECF No. 8; Mem. Op. Granting Pl.'s Mot. for TRO ("Mem. Op."), ECF No. 9.  Defendants appealed that order to the D.C. Circuit, and the appeal remains pending.  *See* Notice of Appeal, ECF No. 15.

On February 19, 2025, the parties filed a joint status report indicating that the Court's consideration of the subsequent motion for preliminary injunction should be consolidated with the merits of the case pursuant to Federal Rule of Civil Procedure 65(a)(2).  *See* Joint Status Report, ECF No. 13.  On February 23, 2025, Harris filed a motion for a preliminary injunction and judgment on the merits.  *See* Pl.'s Mot. for Prelim. Inj. and J. on the Merits ("Pl.'s Mot."), ECF No. 22.  Defendants opposed the motion, *see* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. and J. on the Merits ("Defs.' Opp'n"), ECF No. 33, and Harris filed a reply, *see* Defs.' Reply, ECF No. 38.  The parties appeared for a hearing before the Court on March 3, 2025.

### III.  LEGAL STANDARD

"Having granted consolidation under Rule 65(a)(2), the Court 'treats the parties' briefing as cross-motions for summary judgment.'"  *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 226 (D.D.C. 2020) (quoting *Trump v. Comm. on Oversight & Reform of the U.S. House of Representatives*, 380 F. Supp. 3d 76, 90 (D.D.C. 2019)).  "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. On summary judgment, the Court views all evidence "in the light most favorable to the nonmoving party and . . . must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV. ANALYSIS

The Court first considers the constitutionality of the MSPB's structure, concluding that its members' for-cause removal protections are constitutional under *Humphrey's Executor*.

6

Federal law thus prevents the President from removing members of the MSPB without cause, and the President's attempt to terminate Harris was unlawful. As such, Harris is entitled to summary judgment. The Court next determines the remedies to which Harris may be entitled, granting her declaratory judgment and a permanent injunction. To the extent that injunctive relief may be unavailable, the Court would grant mandamus relief in the alternative.

### A. Constitutionality of the MSPB Members' Removal Protections

Harris claims that her termination was *ultra vires* in violation of statutory authority, violated the separation of powers, and was contrary to law under the APA. *See* Compl. ¶¶ 31–37, 40–41. She argues that this case falls squarely within the heartland of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny, and that the Board is a traditional multimember body that does not wield traditional executive power. *See* Pl.'s Mot. at 11–20. MSPB members' removal protections are therefore constitutional, according to Harris. *See id.* at 11–12. Defendants respond that the MSPB does not fall within *Humphrey's Executor*, and that the independent agency wields substantial executive power. *See* Defs.' Opp'n at 5–13. The Court concludes that MSPB members' removal protections are constitutional under *Humphrey's Executor* and must be upheld here.

In *Humphrey's Executor*, the Supreme Court upheld a statutory provision identical to the one at issue here restricting removal of Federal Trade Commission ("FTC") members. *See Humphrey's Executor*, 295 U.S. at 619–20 (discussing 15 U.S.C. § 41); 5 U.S.C. § 1202(d). The FTC comprises five members "appointed by the President[,] by and with the advice and consent of the Senate," and "[n]ot more than three of the commissioners shall be members of the same political party." *Humphrey's Executor*, 295 U.S. at 619–20 (quoting 15 U.S.C. § 41). "Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance

in office." *Id.* (quoting 15 U.S.C. § 41). In *Humphrey's Executor*, President Hoover had appointed William Humphrey as a member of the Federal Trade Commission, which carried a term of seven years. 295 U.S. at 612. Less than two years later, President Roosevelt terminated Humphrey over differences of political opinion, stating, "[e]ffective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." *Id.* at 619. Humphrey died several months later, but his estate sued to recover backpay on the basis that his removal was unlawful. *Id.* at 612.

The Supreme Court confirmed that President Roosevelt's termination of Humphrey was indeed unlawful. The Court observed that "[t]he statute fixes a term of office, in accordance with many precedents." *Id.* at 623. The Court further explained that the commission comprised a "nonpartisan" "body of experts" that was intended to "act with entire impartiality." *Id.* at 624. It was "charged with the enforcement of no policy except the policy of the law" and acted in a manner that was "predominantly quasi judicial and quasi legislative" rather than traditionally "political []or executive" in nature. *Id.* The Court differentiated FTC members from the postmaster in *Myers v. United States*, 272 U.S. 52 (1926) (evaluating statute stating that postmasters "shall hold their offices for four years unless sooner removed or suspended according to law"). "A postmaster is an executive officer restricted to the performance of executive functions" and is "charged with no duty at all related to either the legislative or judicial power." *Id.* at 627. The FTC, in contrast, "acts in part quasi legislatively and in part quasi judicially" rather than exercising traditional executive powers. *Id.* at 628. "We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named," the Court concluded. *Id.* at 629.

Two decades later, the Court considered President Eisenhower's removal of a member of the War Claims Commission, whom President Truman had appointed and the Senate had confirmed. *See Wiener v. United States*, 357 U.S. 349, 350 (1958). Congress charged that commission with processing "claims for compensating internees, prisoners of war, and religious organizations . . . who suffered personal injury or property damage at the hands of the enemy in connection with World War II," and the commissioners' terms were limited by the short duration of the commission's existence. *Id.* The Court reasoned that Congress intended to "preclude[] the President from influencing the Commission in passing on a particular claim," which meant that the President naturally could not "hang . . . the Damocles' sword of removal" over the commissioners. *Id.* at 356. The Court reaffirmed that the President had "no such power" to "remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission." *Id.*[2]

In two more recent cases, however, the Supreme Court ruled that for-cause removal provisions applying to independent agencies with a single director violated the separation of powers. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 218 (2020); *Collins v. Yellen*, 594 U.S. 220, 253 (2021). Neither of those cases undermines the

---

[2] The Court once again considered a multimember body in *Mistretta v. United States* when passing on the constitutionality of the United States Sentencing Commission, which formally resides in the Judiciary. 488 U.S. 361 (1989). The Sentencing Report Act of 1984 empowered the President to appoint commissioners to the Sentencing Commission, with members "subject to removal by the President 'only for neglect of duty or malfeasance in office or for other good cause shown.'" *Id.* at 368 (quoting 28 U.S.C. § 991(a)). When considering whether the Act affords the President undue influence over federal judges who served as commissioners, the Court recognized that "the President's removal power under the Act is limited." *Id.* at 410. "Such congressional limitation on the President's removal power, like the removal provisions upheld in *Morrison v. Olson*, 487 U.S. 654 (1988), and *Humphrey's Executor* . . . , is specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies." *Id.* at 410–411.

constitutionality of for-cause removal provisions for multimember bodies of experts heading an independent agency.  *See Seila Law*, 591 U.S. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today.").

"Rather than create a traditional independent agency headed by a multimember board or commission, Congress elected to place the [Consumer Financial Protection Bureau ("CFPB")] under the leadership of a single Director."  *Seila Law*, 591 U.S. at 207.  In *Seila Law*, the Court observed that "[a]n agency with a structure like that of the CFPB is almost wholly unprecedented."  *Id.* as 220; *see also id.* at 220–22 (searching for historical precedent to support the CFPB's structure).  The Court further concluded that "[t]he CFPB's single-Director structure" contravenes the separation of powers "by vesting significant governmental power in the hands of a single individual accountable to no one," emphasizing that the director may act "*unilaterally*" and "[w]ith no colleagues to persuade."  *Id.* at 224–25.  Two other features of the CFPB undermined the constitutionality of the agency's structure.  First, the director's five-year term meant that "some Presidents may not have any opportunity to shape [the agency's] leadership and thereby influence its activities."  *Id.* at 225.  Second, "[t]he CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control."  *Id.* at 226.  For these reasons, the Court concluded that the CFPB's structure violated the separation of powers.  *See id.* at 232.

None of the reasoning in *Seila Law* undermined the constitutionality of the traditional independent agency structure outlined in *Humphrey's Executor*.  *See id.* at 218 (describing "exception[]" for "multimember expert agencies that do not wield substantial executive power").  Rather, the Court's reasoning reaffirmed the constitutionality of multimember boards with for-cause removal protections, as those agencies have a robust basis in this country's history, and

their members lack the power to act unilaterally.  *See* Pl.'s Mot. at 11 (emphasizing that Congress established the first such board in 1887).  The Court's rationale also relied on the CFPB's divergence from traditional agency structures when finding the for-cause removal protections unconstitutional.  *See, e.g.*, *Seila Law*, 591 U.S. at 205–07 (emphasizing facts showing drift from Elizabeth Warren's initial proposal for multimember board to Congress's enactment of single-headed agency).  The Court even opined that Congress could fix the problem by "for example, converting the CFPB into a multimember agency."  *Id.* at 237.

*Collins* then represented a "straightforward application" of the Court's "reasoning in *Seila Law*" to the Federal Housing Finance Agency ("FHFA").  594 U.S. at 251; *see also Seila Law*, 591 U.S. at 222 (noting doubt as to the constitutionality of the FHFA's structure).  Similarly to the CFPB, the FHFA was "an agency led by a single Director" that "lack[ed] a foundation in historical practice and clashe[d] with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control."  594 U.S. at 251.

*Humphrey's Executor* thus remains alive and well, and it dictates the outcome here.  The MSPB is "a traditional independent agency headed by a multimember board or commission," *Seila Law*, 591 U.S. at 207, and as such Congress may grant the Board's members for-cause removal protections.  The MSPB is "a multimember body of experts" that is "balanced along partisan lines."  *Seila Law*, 591 U.S. at 216; *see also Humphrey's Executor*, 295 U.S. at 624 (noting that the FTC is a "nonpartisan" "body of experts" that was intended to "act with entire impartiality").  The CSRA envisions that the Board "is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality."  *Humphrey's Executor*, 295 U.S. at 624.  The CSRA also "fixes a term of office."  *Id.* at 623.  The Board's members serve on overlapping, staggered seven-year terms, meaning that the President will have the "opportunity to shape [the

MSPB's] leadership and thereby influence its activities." [3]  *Seila Law*, 591 U.S. at 225.  The

members' staggered terms permit them to "accumulate[] expertise" in the operation of federal

agencies and federal employment law.  *Id.* at 218.  The MSPB's duties are "quasi judicial,"

*Humphrey's Executor*, 295 U.S. at 624, in that it conducts preliminary adjudications of federal

employees' claims, which may then be appealed to Article III courts.  *See* 5 U.S.C. § 7703

(providing for review in the Federal Circuit); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 423

(2017) (providing for review of mixed cases in district court).  The MSPB's rulemaking

authority is limited to "regulations . . . necessary for the performance of its functions."  5 U.S.C.

§ 1204(h).  Congress further intended the agency to aid its legislative goals by regularly

transmitting reports to Congress regarding the Board's functions.  *See* 5 U.S.C. §§ 1204(l), 1205.

It is additionally evident that Congress hoped to "preclude[] the President from influencing the

[Board] in passing on a particular claim." *Wiener*, 357 U.S. at 356.  The MSPB nonetheless

remains politically accountable to both Congress and the President through the appropriations

process in a manner inapplicable to independent agencies with their own funding sources, such

as the CFPB and FHFA.  *See Selia Law*, 591 U.S. at 226; *Collins*, 594 U.S. at 231.

The MSPB also "do[es] not wield substantial executive power," *Seila Law*, 591 U.S. at

218, but rather spends nearly all of its time adjudicating "inward-facing personnel matters"

involving federal employees, Pl.'s Mot. at 4.  The Board does not regulate the conduct of private

parties, nor does it possess its own rulemaking authority except in furtherance of its judicial

functions.  *See id.* at 12.  It cannot initiate its own personnel cases, but must instead "passively

---

[3] One MSPB member's term has now expired, and Harris's term expires on March 1,
2028.  *See* Pl.'s Mot. at 29 n.20; Pl.'s Reply at 13–14; SUMF ¶ 3.  President Trump will
therefore have the opportunity to appoint at least two members to the MSPB during his term in
office.

wait for them to be brought." *Id.* at 12; *see also* 5 U.S.C. § 1204 (defining the Board's powers and functions). Harris additionally points out that the MSPB *preserves* power within the executive branch by charging presidentially appointed Board members with mediation and initial adjudication of federal employment disputes, rather than shifting those decisions to Article III courts in the first instance. *See* Pl.'s Mot. at 14.

Several other features of the MSPB demonstrate its limited effects on the President's powers. The MSPB's jurisdiction is generally restricted to civil servants and does not include political appointees.[4] *See* 5 U.S.C. § 7511. Even among civil servants, members of the Senior Executive Service removed "for less than fully successful executive performance" are entitled only to an informal hearing before the Board. *See* 5 U.S.C. § 3592(a). Furthermore, the MSPB's decisions are generally not the final word. Federal employees may appeal the Board's decisions to Article III courts, *see* 5 U.S.C. § 7703(a), and the Director of the Office of Personnel Management may similarly seek review of any decision that he determines "will have a substantial impact on a civil service law, rule, regulation, or policy directive," *id.* § 7703(d)(1)–(2).

Finally, the MSPB's mission and purpose require independence. In enacting the CSRA, Congress exercised its power to regulate the civil service, defining certain prohibited personnel practices, to include discrimination, loyalty oaths, coercion to engage in political activity, and retaliation against whistleblowers. *See* 5 U.S.C. § 2302(b)(1)–(3), (8). Direct political control over the MSPB would have limited effect on the President's implementation of his policy agenda. It would instead neuter the CSRA's statutory scheme by allowing high-ranking

---

[4] Nor may the Board review the merits of determinations concerning an employee's eligibility to occupy a sensitive position that implicates national security. *See Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013).

government officials to engage in prohibited practices and then pressure the MSPB into inaction. The MSPB's independence is therefore structurally inseparable from the CSRA itself. These duties dovetail with *United States v. Perkins*, in which the Supreme Court held that Congress may "limit, restrict, and regulate the removal" of inferior officers. 116 U.S. 483, 485 (1886). Denying independence to the Board would undermine these constitutionally sound limitations on the removal of civil servants.

Defendants cannot argue that *Humphrey's Executor* has been overturned, so they instead suggest that even if the MSPB is a traditional multimember agency, it wields "'substantial' executive power" in a manner found significant in *Seila Law*. Defs.' Opp'n at 8 (quoting *Seila Law*, 591 U.S. at 218). Yet the Supreme Court has clarified that it did not mean *Humphrey's Executor* to exclude removal protections for any official exercising authority within the executive branch. *See Morrison v. Olson*, 487 U.S. 654, 688–89 (1988); *see also Seila Law*, 591 U.S. at 216 (detailing "several organizational features that helped explain" the *Humphrey's Executor* court's "characterization of the FTC as non-executive"). There is instead a "spectrum" that runs from "'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role" and those who serve "'quasi-legislative' or 'quasi-judicial'" roles, where the President's control is not "so central to the functioning of the Executive Branch" as to require the President to be able to terminate the official at will. *Morrison*, 487 U.S. at 690–91. As the Court explained above, the Board's duties—which primarily include adjudication of employment claims—do not represent "substantial" executive power and instead take on a quasi-judicial role. Furthermore, the MSPB's powers are no more expansive than the FTC's functions upheld in *Humphrey's Executor*, which remains good law.

Several courts have deployed similar reasoning when rejecting challenges to the structures of traditional multimember agencies in the years since *Seila Law* and *Collins*. Last year, the Fifth Circuit upheld the structure of the Consumer Product Safety Commission ("CPSC"), concluding that the agency is "a prototypical 'traditional independent agency, run by a multimember board,'" is not directed by a single individual, and that the President may influence its activities through appointments or the appropriations process. *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 354–55 (5th Cir. 2024), cert. denied, 145 S. Ct. 414, 170 (2024). The Tenth Circuit turned away a comparable challenge to the agency, reasoning that *Humphrey's Executor* remains good law, that the CPSC is structured similarly to the FTC, and that limited civil and criminal enforcement powers do not undermine the constitutionality of its tenure protections. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), cert. denied, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025). Courts have additionally found the FTC's structure constitutionally sound because the Supreme Court has not revisited *Humphrey's Executor*. *See Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023); *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024). This Court, likewise, cannot reach a different outcome regarding the MSPB.

Because the MSPB falls within the scope of *Humphrey's Executor*, Congress has the power to specify that members of the MSPB may serve for a term of years, with the President empowered to remove those members only for inefficiency, neglect of duty, or malfeasance in office. The President thus lacks the power to remove Harris from office at will. Because the President did not indicate that he sought to remove Harris for inefficiency, neglect of duty, or

malfeasance in office, his attempt to terminate her was unlawful and exceeded the scope of his authority.[5]

## B. Remedy

With the merits aside, the Court turns to the question of remedy. Harris offers up three avenues for relief: declaratory judgment, a permanent injunction, and a writ of mandamus. *See* Compl. ¶¶ 38–39, 42–44, 45–46; Pl.'s Mot. at 27–36. The Court concludes that because any attempt to remove Harris is unlawful, she is entitled to declaratory judgment that she remains a properly appointed member of the MSPB. The Court additionally determines that Harris has met her burden for the permanent injunction she seeks, and that a writ of mandamus would be appropriate if such injunctive relief were unavailable.

### 1. Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). It provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court. *See C&E Servs., Inc. of Washington v. D.C. Water & Sewer Autho.*, 310 F.3d 197, 201 (D.C. Cir. 2002); *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016). The Article III case-or-controversy requirement "is no less strict when a party is seeking a declaratory judgment than for any other

---

[5] The parties do not debate the cause of action through which this legal challenge must flow—whether it be the APA, an *ultra vires* claim, or a separation of powers claim. These distinctions can be meaningful. *See, e.g.*, *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 199–201 (D.D.C. 2024) (examining the compatibility of an APA and *ultra vires* claim). The Court does not interpret this issue to be jurisdictional, however, and does not address an question the parties themselves declined to raise.

relief." *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995) (citing *Altvater v. Freeman*, 319 U.S. 359, 363 (1943)).  To establish that a matter is a "controversy" within the meaning of the Declaratory Judgment Act and Article III of the Constitution, a party "must 'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Hoffman v. Dist. of Columbia*, 643 F. Supp. 2d 132, 140 (D.D.C. 2009) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"[A] declaratory judgment always rests within the sound discretion of the court," *President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942)), and "[t]here are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012)).  Several factors may be helpful to the Court's consideration of "the propriety of granting a declaratory judgment," however, such as "whether it would finally settle the controversy between the parties"; "whether other remedies are available or other proceedings pending"; and "the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976).  The Court might also consider "1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn*, 222 F. Supp. 3d at 36 (citing *President*, 627 F.2d at 365 n.76).

First, the Court finds a "controversy" here within the meaning of the Declaratory Judgment Act.  The parties place before the Court a "substantial controversy" over the

lawfulness of the President's effort to terminate Harris without cause, and whether she remains a member of the MSPB. *Hoffman*, 643 F. Supp. 2d at 140; *see also* Pl.'s Mot. at 11–26; Defs.' Opp'n at 5–13. The parties have adverse legal interests, with Defendants arguing that the President has a power that Harris claims he does not. *See, e.g.*, Defs.' Opp'n at 5 (arguing that the President's removal power over principal officers is absolute). This controversy is also "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Hoffman*, 643 F. Supp. 2d at 140. The controversy here is not based, for instance, on "the occurrence of a future or contingent event," but has rather come to a head after the President attempted to terminate Harris. *C.F. Folks, Ltd. v. DC Jefferson Bldg., LLC*, 308 F. Supp. 3d 145, 150 (D.D.C. 2018).

The Court additionally finds that declaratory relief is appropriate here. A declaratory "judgment will serve a useful purpose in clarifying the legal relations" between Harris and Defendants and abate ongoing "uncertainty, insecurity, and controversy" over her status as a member of the MSPB. *Glenn*, 222 F. Supp. 3d at 36. The question is also one of significant "public importance," *Hanes Corp.*, 531 F.2d at 592 n.4, given that it concerns the structure and independence of a federal agency. Although "other remedies" may be available, *id.*, declaratory judgment remains appropriate to clarify Harris's legal status, particularly given the complexity of injunctive relief in this area. In addition, the Declaratory Judgment Act grants authority to enter declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

Defendants argue that the Court cannot issue declaratory judgment because it cannot enjoin the President. *See* Defs.' Mot. at 21–22 (citing *Samuels v. Mackell*, 401 U.S. 66, 70 (1971)). First, the declaratory judgment here clarifies not just the President's legal relationship with MSPB members, but also subordinate officials' legal rights and duties. Second, the

Supreme Court clarified in *Samuels* that it did "not mean to suggest that a declaratory judgment should never be issued in cases of this type if it has been concluded that injunctive relief would be improper." *Samuels*, 401 U.S. at 73. "There may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive." *Id.* "[I]n such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief." *Id.* Courts withhold injunctive relief against the President precisely because it is considered "particularly intrusive or offensive," and declaratory judgment remains warranted here given Harris's "strong claim for relief under the established standards." *Id.* Defendants additionally cite no controlling authority for the notion that declaratory judgment may not clarify the legal relationship between the President and other parties. To the contrary, appellate courts have previously affirmed the issuance of declaratory relief involving the President. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (considering declaratory judgment to be a less drastic remedy than a writ of mandamus); *see also Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that the President's actions under Line Item Veto Act were invalid).

For these reasons, the Court enters declaratory judgment in this case clarifying that Harris remains a member of the MSPB, and that she may not be removed from her position absent inefficiency, neglect of duty, or malfeasance in office.

### 2. Permanent Injunction

Harris additionally seeks a permanent injunction barring several officials—not including the President—from removing her or treating her as removed. *See* Compl. ¶¶ 45–46; Pl.'s Mot.

at 28–30; Pl.'s Proposed Order, ECF No. 22-1.  Defendants argue that Harris is not entitled to an

injunction because the Court lacks the power to issue equitable relief "reinstating" an officer

removed by the President.  Defs.' Opp'n at 14–18.  Defendants also contend that Harris has not

suffered an irreparable injury and that the balance of the equities weigh in their favor.  *See id.* at

18–21.  The Court must therefore examine its power to issue equitable relief here before it

considers whether to issue that relief.

### a.  Availability of Injunctive Relief

Defendants argue that Harris's remedy must be limited to backpay, and that an injunction

is inappropriate because that relief was not "traditionally accorded by courts of equity" to

remedy an official's wrongful removal from office.  Defs.' Opp'n at 14 (quoting *Grupo*

*Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).  Plaintiff

responds that federal courts have long granted injunctive relief reinstating federal employees,

and that mandamus should be available in the alternative.  *See* Pl.'s Reply at 10–19.

In *Grupo Mexicano*, the Supreme Court considered whether "a United States District

Court has the power to issue a preliminary injunction preventing the [debtor] defendant from

transferring assets in which no lien or equitable interest is claimed."  527 U.S. at 310.  The Court

explained that "equity is flexible; but in the federal system, at least, that flexibility is confined

within the broad boundaries of traditional equitable relief."  *Id.* at 322.  "[E]quity jurisdiction of

the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in

England at the time of the adoption of the Constitution and the enactment of the original

Judiciary Act, 1789 (1 Stat. 73)."  *Id.* at 318 (quoting A. Dobie, Handbook of Federal

Jurisdiction and Procedure 660 (1928)).  The Court concluded that because the Court of

Chancery lacked "an equitable power to restrict a debtor's use of his unencumbered property

before judgment," a contemporary federal court lacks that power as well. *Id.* at 322; *see also id.* at 319–20. Defendants similarly reason that because the Court of Chancery did not issue injunctions returning public officials to their offices, this Court cannot either. *See* Defs.' Opp'n at 14–15. That contention stumbles, however, for at least two reasons.

The first is on-point Supreme Court guidance. In *Sampson v. Murray*, the Supreme Court considered whether a probationary employee at the General Services Administration could receive a temporary restraining order enjoining her dismissal during an administrative appeal to the Civil Service Commission. 415 U.S. 61, 62–63 (1974). The Court explained that a district court has "authority to grant interim injunctive relief to a discharged Government employee," *id.* at 63, but that the plaintiff before the Court did not make the elevated "showing of irreparable injury sufficient in kind and degree to override" the Government's usual autonomy over its internal affairs, *id.* at 84. Loss of wages and reputation could be remedied through further proceedings and was not enough to warrant injunctive relief for a federal employee, *see id.* at 91–92, but that relief may be appropriate "in the genuinely extraordinary situation," rather than "in the routine case." *Id.* at 92 n.68. The Court specifically addressed *White v. Berry*, in which the Supreme Court reasoned that "a court of equity has no jurisdiction over the appointment and removal of public officers." 171 U.S. 366, 377 (1898) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)). The *Sampson* Court asserted that "[m]uch water has flowed over the dam since 1898," and that subsequent cases had recognized that federal courts are generally empowered to review the claims of discharged federal employees. *Sampson*, 415 U.S. 71–72 (citing *Service v. Dulles*, 354 U.S. 363 (1957)); *see also Kloeckner*, 568 U.S. at 44–46 (discussing remedies for federal employee under the CSRA, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012)

(listing "reinstatement" as among "the kinds of relief that the CSRA empowers" courts to provide). Harris's situation is additionally akin to that of the *Sampson* plaintiff because there is a federal standard to which Harris's hiring and firing must adhere, and one that the Court must enforce. *Sampson* thus instructs that equitable relief is available to Harris if she can show that her termination represents a "genuinely extraordinary situation," rather than a "routine case." *Sampson*, 415 U.S. at 92 n.68.[6]  *Sampson* is not unique; the Supreme Court has repeatedly determined that plaintiff federal employees were entitled to reinstatement after termination violated their legal rights. *See Service*, 354 U.S. at 388–89; *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959); *see also Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (explaining that for a federal employee experiencing "unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination").

The D.C. Circuit has also found injunctive relief against subordinate federal officials to be available to restore presidential appointees to their offices, although the Government did not raise the scope of historical equitable relief in those cases. *See Swan v. Clinton*, 100 F.3d 973, 976–81 (D.C. Cir. 1996); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023).[7]  In *Swan*, the six-year term of a member of the Board of the National Credit Union Administration ("NCUA") had expired, but he remained in office because the relevant statute allowed members to serve until their successors had qualified. *Swan*, 100 F.3d at 975–76.  President Clinton

---

[6] There can additionally be no dispute that federal courts may grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).

[7] Cases before other courts add further evidence that this power exists. *See* Pl.'s Reply at 11–12 (collecting cases).

removed the board member, who then sued seeking declaratory judgment and an injunction ordering his reinstatement. *See id.* The court assessed the board member's standing to bring the case, focusing on whether his claims were judicially redressable. *Id.* at 976–81. The court was uncertain of its power to enjoin the President himself from removing the plaintiff from office, *see id.* at 977–78, but reasoned that it could instead "ensure the rule of law" by issuing "injunctive relief against subordinate officials" effectuating his reinstatement "*de facto* by" requiring his colleagues to treat him "as a member of the NCUA Board and allowing him to exercise the privileges of that office," *id.* at 978, 980. This encompassed, for instance, "including [the plaintiff official] in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member *etc.*"[8] *Id.* at 980. The Circuit reprised this analysis in *Severino*, in which President Biden removed a member of the Administrative Conference of the United States Council, *see Severino*, 71 F.4th at 1041, and the plaintiff had standing because a court could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment," *id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980).[9]

Second, it is also clear that even if *Sampson*, *Swan*, and *Severino* did not make equitable relief available to Harris in a "genuinely extraordinary situation," she would nonetheless be entitled to a writ of mandamus—which is a remedy at law. *See Kalbfus v. Siddons*, 42 App. D.C.

---

[8] The Circuit ultimately concluded that the board member's claim failed on the merits because, even assuming that NCUA board members had removal protections, holdover members would be entitled to no such protection. *See Swan*, 100 F.3d at 983–88.

[9] Defendants argue that these cases are not on point because the courts there were considering the redressability of the plaintiffs' claims when evaluating their standing. *See* Defs.' Opp'n at 16; *Swan*, 100 F.3d 976–81; *Severino*, 71 F.4th at 1042–43. Yet the Circuit's reasoning is no mere dicta, as a federal court must determine that it has the power to grant effective relief before assuming jurisdiction over a case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

310, 319–21 (D.C. Cir. 1914) (collecting cases); *see also* Pl.'s Reply at 15–16 (collecting

sources).  To the extent that English equity courts declined to issue injunctions reinstating

officials to their positions, they likely did so because the King's Bench, a court of law, would

readily issue mandamus instead.  *See Walkley v. City of Muscatine*, 73 U.S. 481, 483–84 (1867)

(explaining, relying on English cases, that "a court of equity is invoked" only where "a court of

law . . . is inadequate to afford the proper remedy"); *Parker v. Winnipiseogee Lake Cotton &

Woolen Co.*, 67 U.S. 545, 550–51 (1862) (similar).  English courts around the time of the

founding recognized this power and exercised it regularly.  *See, e.g.*, *R. v. Mayor of London*, 100

Eng. Rep. 96, 98 (1787) (recognizing power to issue mandamus reinstating public official);[10] *R.

v. Mayor and Aldermen of Doncaster* (1752), 96 Eng. Rep. 795 (restoring municipal official to

his office after removal by town council); *R. v. Mayor, Bailiffs, and Common Council of the

Town of Liverpool* (1759), 97 Eng. Rep. 533 (same);[11] *R. v. Mayor, Aldermen and Burgesses of

Doncaster* (1729), 92 Eng. Rep. 513 (same); 73 Eng. Rep. at 752 (discussing *Thompson v.

Edmonds*, in which the King's Bench restored a bailiff to his office because he "was removed"

by the mayor "without cause"); *R. v. Mayor, Aldermen, and Common Council of Gloucester*, 90

Eng. Rep. 1148 (restoring official to office of capital burgess).  Numerous treatises further

confirm this practice.  *See* 3 W. Blackstone, Commentaries \*264–265 ("The writ of mandamus is

. . . a most full and effective remedy, in the first place, for refusal of admission where a person is

entitled to an office or place in any such [municipal] corporation; and, secondly, for wrongful

---

[10] During this case, respected trial lawyer Thomas Erskine explained that "[w]henever a person is improperly suspended or removed from an office, whether it concern public or private duties, if he has a certain term in it, and there are profits annexed to it, and the party has no other specific legal remedy, the Court will grant mandamus to restore him."  100 Eng. Rep. at 97.

[11] Here, Lord Mansfield explained that when officials respond to an action for mandamus, "the return must set out all the necessary facts, precisely; to shew that the person is removed in legal and proper manner, and for a legal cause."  97 Eng. Rep. at 537.

removal, when a person is legally possessed."); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus as it Obtains Both in England and in Ireland* 221 (1853) ("The writ of mandamus . . . has by a great number of cases held to be grantable . . . to restore him who has been wrongfully displaced, to any office, function, or franchise of a public nature . . . ."); *id.* at 224 (distinguishing an officer "at pleasure" who may be removed without cause).[12] Even the treatise cited in Defendants' opposition explains that a court sitting in equity would "not interfere by injunction" in such cases simply because it would instead "leave that question to be determined by a legal forum."  2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); *see also* Defs.' Opp'n at 15.  This was the state of the law at the time of the founding, as well as when Congress passed the All Writs Act as part of the Judiciary Act of 1789.  *See Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985).  For this reason, the Supreme Court was careful in both *In re Sawyer* and *White v. Berry* to specify that mandamus was available "to determine the title to a public office" in "the courts of law."  *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377.[13]

---

[12] Later treatises provide additional support for use of the writ of mandamus "for the purpose of restoring an individual to an office, where he has been illegally deprived of the possession thereof."  Horace G. Wood, *A Treatise on the Legal Remedies of Mandamus and Prohibition, Habeas Corpus, Certiorari and Quo Warranto* 11 (1891).  "When the title to the office is indisputable," proceedings for the writ of *quo warranto* would be "dilatory" and "a mandamus would be proper and should be awarded."  *Id.* at 12 (quoting 7 How., 128); *see also* 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909) ("The jurisdiction to determine the title to a public office belongs only to courts of law and is exercised . . . by mandamus . . . and the mode of procedure established by the common law or by statute"); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 (1911) (same).

[13] Defendants argue that Harris was effectively removed from office and seeks a court order returning her to it.  *See* Defs.' Opp'n at 15.  The D.C. Circuit has clarified that this is not the case, and that Harris was never in fact removed.  *See Kalbfus*, 42 App. D.C. at 321 ("In the present case the removal of the relator having been illegal and void, the office never became vacant . . . .").

As the Court explains below, however, a writ of mandamus can issue under our contemporary jurisprudence only when "the party seeking issuance of the writ ha[s] no other adequate means to attain the relief he desires." *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 403 (1976) (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Because the Court reads *Sampson*, *Swan*, and *Severino* to allow it to issue an injunction, it concludes that this injunction represents "adequate means" to provide Harris's requested relief, barring a mandamus remedy. *Kerr*, 426 U.S. at 403. This represents a curious reversal from norms before English courts, where reinstatement of officials through legal means was preferred over restoration through equitable means. *See Swan*, 100 F.3d at 976–81; *Severino*, 71 F.4th at 1042–43. Yet the broader point is that this Court may provide Harris *some* form of effective relief preventing her unlawful termination from the MSPB, whether it be through an injunction or a writ of mandamus. *See Swan*, 100 F.3d at 977 n.1 (explaining that a request for injunction and request for writ of mandamus can be "essentially" the same thing in some contexts).

Finally, Defendants argue that the Court cannot enjoin the President or enjoin others in a manner that restricts his Article II authority. *See* Defs.' Opp'n at 16. To be clear, Harris does not ask the Court to enjoin President Trump, *see, e.g.*, Pl.'s Proposed Order, and the Court does not do so.[14] Yet Defendants cite no authority for the proposition that a court lacks the power to enjoin the President's subordinates to restrain the President's violation of law. In fact, that is

---

[14] The availability of injunctive relief against the President may depend in part on whether compliance with 5 U.S.C. 1202(d) represents a ministerial rather than executive duty, a question the Supreme Court has "left open." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion); *see also State of Mississippi v. Johnson*, 71 U.S. 475, 498 (1866) (declining to decide whether a court may require the President "to perform a purely ministerial act," and defining a "ministerial duty" as "one in respect to which nothing is left to discretion); *McCray v. Biden*, 574 F. Supp. 3d 1, 9 (D.D.C. 2021) ("*Franklin*, however, did not absolutely slam the door shut on presidential injunctions."). Of course, the Court need not decide this question here.

precisely the remedy the Supreme Court affirmed in *Youngstown Sheet & Tube Co. v. Sawyer*,

343 U.S. 579, 584 (1952) (describing preliminary injunction restraining Secretary of Commerce

from following President Truman's orders and "continuing the seizure and possession of the

[steel] plant"). And in *Swan v. Clinton*, the D.C. Circuit concluded that a district court could

enjoin the President's subordinates in order to effectuate a federal official's reinstatement. *See*

100 F.3d at 979; *see also id.* (concluding that "injunctive relief against such officials could

substantially redress [the terminated official's] injury"); *see also Severino*, 71 F.4th at 1042–43.

Having assured itself that injunctive relief is available here, the Court proceeds to consider

whether a permanent injunction is warranted.[15]

### b.  Factors for Permanent Injunction

An injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Yet "it goes without saying that federal courts

must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *DL v.*

*District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Horne v. Flores*, 557 U.S.

433, 450 (2009)). A permanent injunction is a "forward-looking" remedy, *Gratz v. Bollinger*,

539 U.S. 244, 284 (2003), the "principal purpose" of which is to "deter future violations, and not

to punish the violator," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C.

Cir. 1978). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a

court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). A

plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies

---

[15] Defendants additionally suggest that "when executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement." Defs.' Opp'n at 13. The Court fails to see how it might lack the power to issue injunctive relief here simply because the plaintiffs in *Wiener* and *Humphrey's Executor* decided to seek another remedy.

available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (same).

For the same reasons the Court discussed in its previous opinion, Harris has established that she has suffered irreparable harm and will likely suffer irreparable harm in the future absent injunctive relief. *See* Mem. Op. at 11–19; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d. 45, 55 (D.D.C. May 21, 2021) ("While the irreparable-harm requirement is recited in the past tense, it is clear that future harm may qualify." (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010))). Congress intended the MSPB and its members to carry out their limited duties with a degree of independence from the President, guided primarily by his selection of members for the multimember board rather than "the Damocles' sword of removal." *Wiener*, 357 U.S. at 356. As the Court reasoned in its previous memorandum opinion, the MSPB's independence would evaporate if the President could terminate its members without cause, even if a court could later order them reinstated. *See* Mem. Op. at 16. Harris has undoubtedly experienced an injury to this independence in her capacity as a member of the MSPB following the President's attempt to terminate her without cause, and any future attempts would prove just as harmful to that autonomy.

Harris additionally suffers irreparable harm because she has been "depriv[ed] of [her] statutory right to function" as a member of the MSPB, and any further attempts to separate her from her position will exacerbate this injury. *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The termination email Harris received resulted in the inability to pursue her "statutory mission" to protect employees from prohibited personnel practices, such that "the loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, No. 25-cv-0385, 2025 WL 471022, at *11 (D.D.C. Feb. 12, 2025). In addition, unlike most other federal employees, Harris was duly appointed by the President and confirmed by the Senate to a position carrying a term of years with specific reasons for her removal.

The Court finds that this harm represents a "genuinely extraordinary situation" meriting injunctive relief related to a federal employee's discharge. *Sampson*, 415 U.S. at 92 n.68; *see also* Mem. Op. at 12–13 (discussing *Sampson*). The clear federal statute granting Harris for-cause removal protections, coupled with longstanding precedent upholding the constitutionality of analogous provisions, overcomes the "latitude" traditionally afforded the Government "in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83. The plaintiff in *Sampson*, who failed to meet this standard, sought an injunction temporarily enjoining her dismissal during an administrative appeal. *See id.* at 63. Yet the parties point to no administrative pathway here through which Harris could seek reinstatement following improper termination. Furthermore, whereas the *Sampson* plaintiff was a probational employee, *see id.* at 62, Harris is a member of the board of an independent agency, was appointed by the President and confirmed by the Senate, and enjoys tenure protections to preserve her independence.

For similar reasons, it is also apparent that "remedies available at law, such as monetary damages, are inadequate to compensate for" Harris's injuries. *eBay Inc.*, 547 U.S. at 391. Defendants argue that loss of salary generally does not represent irreparable harm. *See* Defs.' Opp'n at 19. As the Court has explained, however, this is not a standard employment action that can be remedied through back pay and later reinstatement, and Harris's claims do not revolve around her salary. *See* Mem. Op. at 15.

Defendants additionally cite *Raines v. Byrd*, 521 U.S. 811 (1997), for the notion that "a loss of political power" does not represent injury. Defs.' Mot. at 15. *Raines* is a case about legislators' standing to sue over legislation they perceive to cede power to the Executive Branch, and the case has minimal application to the irreparable injury analysis here. *See* 521 U.S. at 820–21. Harris is not a member of Congress, nor is standing at issue. The Supreme Court reasoned in *Raines* that any injury would be far too diffuse to support the legislators' standing, as it was spread across both Houses of Congress, and the legislators did not claim injury arising from "something to which they *personally* are entitled." *Id.* at 821. If anything, *Raines* supports Harris's claim to injury based on exclusion from her office: she has "been singled out for specially unfavorable treatment as opposed to other Members," and has lost something to which she is "personally" entitled. *Id.*

Finally, injunctive relief in this case is in the public interest, and the balance of the equities tips in Harris's favor. Given that federal law limits the conditions under which Harris's tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, the Court finds that it is in the public interest to issue injunctive relief. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and

operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). So too is there substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies. Furthermore, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Defendants suggest that the public interest weighs against injunctive relief here because "[s]uch a remedy would undermine the accountability of the Executive Branch instilled by the Constitution," and the President "cannot be compelled to retain the services of a principal officer." Defs.' Opp'n at 20–21. This argument largely relies on Defendants' success on the merits, and the Court has already determined that the President lacks the power to remove Harris at will. Defendants additionally argue that "the public interest is better served by an MSPB member who holds the President's confidence." *Id.* at 21. Yet Defendants decline to explain exactly how the public interest would be better served by removing Harris from her position. They do not dispute any of Harris's factual assertions, including her efforts to consider, deliberate, and vote on 35 cases per week to clear the MSPB's backlog of nearly 3,800 cases. *See* SUMF ¶¶ 12–28. This effort was successful, as by early this year the inherited cases had all but disappeared. *See id.* ¶ 20. Recall that many of these cases involve allegations that federal agencies engaged in prohibited personnel practices, such as targeting of federal employees based on political affiliation; retaliation against whistleblowers reporting violations of law, waste, fraud and abuse; discrimination; and USERRA violations, among others. *See* Pl.'s Mot. at 4–5 (collecting cases). Defendants make no effort to enlighten the Court as to how Harris's handling

of these cases might differ from the President's preferred approach, let alone in a manner that might tilt the public interest factor in their favor. Defendants additionally overlook the fact that if Harris or her colleagues were ever to become inefficient, neglect their duty, or engage in malfeasance in office, the President would be empowered to remove them for cause. *See* 5 U.S.C. § 1202(d). The Court thus finds nothing in Defendants' arguments that might support a public interest against injunctive relief here.

The Court additionally notes that in opposing injunctive relief in its entirety, Defendants have declined to engage with the scope of Harris's proposed relief. *See generally* Proposed Order; Defs.' Opp'n. The Court will nonetheless tailor its declaratory and injunctive relief to meet Harris's entitlement under the law.[16]

### 3. Writ of Mandamus

Harris requests that the Court issue a writ of mandamus if no other relief is available. *See* Pl.'s Mot. at 34–35. Defendants argue that the President has no clear nondiscretionary duty here, as his selection of "who should lead an Executive Branch agency is certainly not a mere ministerial task." Defs.' Mot. at 22.

"The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has "original jurisdiction of any action in the nature of mandamus" only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

---

[16] Although injunctive relief is merited, the Court narrows Harris's request slightly. Harris seeks a permanent injunction prohibiting several Defendants from removing her or treating her as removed. *See* Proposed Order. Yet § 1202(d) permits the President to remove her for inefficiency, neglect of duty, or malfeasance in office. The Court nonetheless notes the undisputed record demonstrating that Harris and her colleagues have carried out their duties to decide cases in addition to clearing a significant backlog.

available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022)

(quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)).  "[M]andamus jurisdiction

under § 1361 merges with the merits." *Muthana*, 985 F.3d at 910 (quoting *Lovitky v. Trump*, 949

F.3d 753, 759 (D.C. Cir. 2020)).  "[E]ven if the plaintiff overcomes all these hurdles, whether

mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir.

2005).

   The Court finds the first two requirements for mandamus relief to be satisfied.  A court

"can analyze the clear right to relief and clear duty to act requirements for mandamus

'concurrently.'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (quoting *Lovitky*, 949

F.3d at 760.  "[T]o meet the 'clear duty to act' standard, '[t]he law must not only authorize the

demanded action, but require it; the duty must be clear and indisputable.'" *Ferriero*, 60 F.4th at

715 (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931).  Based on the

Court's holding that federal law precludes the President's power to remove Harris at will, the

Court finds a duty here that is clear and indisputable, and under binding Supreme Court

precedent there is no "room for an honest difference of opinion" on the part of federal officials.

*Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934).  In other words, the statute does not

provide room for executive discretion—the President has no menu of options to pick from when

he categorically may not remove Harris without cause.  In making this determination, the Court

additionally looks to the voluminous precedent demonstrating that courts of law issued

mandamus relief in similar situations at the time Congress passed the All Writs Act in 1789 and

over the ensuing centuries.

   As the Court previewed earlier, however, it appears at present that Harris has a separate,

"adequate remedy" available in the form of a permanent injunction.  *In re Nat'l Nurses United*,

47 F.4th at 752 n.4.  The Court thus determines that her request for mandamus relief fails on that basis alone.  Were equitable injunctive relief unavailable here, however, the Court would not hesitate to "vigilantly enforce federal law" and "award[] necessary relief" through a writ of mandamus as an alternative remedy at law.  *DL*, 860 F.3d at 726.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff Cathy A. Harris's motion for summary judgment is **GRANTED**; and it is

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute.  Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from removing Harris from her office without cause or in any way treating her as having been removed without cause, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board in Harris's position; and it is

**FURTHER ORDERED** that the Court's Temporary Restraining Order is **VACATED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously

issued.

Dated:  March 4, 2025                                    RUDOLPH CONTRERAS
                                                         United States District Judge