# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

| | |
|---|---|
| **No. 25-5037** | **September Term, 2024** |
| | 1:25-cv-00412-RC |
| | Filed On: April 7, 2025 |

Cathy A. Harris, in her personal capacity and
in her official capacity as Member of the Merit
Systems Protection Board,

        Appellee

    v.

Scott Bessent, in his official capacity as
Secretary of the Treasury, et al.,

        Appellants

------------------------------

Consolidated with 25-5055

------------------------------

**No. 25-5057**

                                                                   1:25-cv-00334-BAH

Gwynne A. Wilcox,

        Appellee

    v.

Donald J. Trump, in his official capacity as
President of the United States and Marvin E.
Kaplan, in his official capacity as Chairman of
the National Labor Relations Board,

        Appellants

        **BEFORE:**    Srinivasan*, Chief Judge, and Henderson**, Millett, Pillard, Wilkins, Katsas**, Rao**, Walker**, Childs, Pan, and Garcia, Circuit Judges

## O R D E R

      Upon consideration of the petitions for hearing en banc, which include motions for en banc reconsideration and vacatur of the court's March 28, 2025 order granting

the government's motions for a stay pending appeal, and the combined opposition thereto, which includes a request for a 7-day stay if the motions are granted, it is

**ORDERED** that the motions for en banc reconsideration and vacatur be granted and the government's motions for a stay pending appeal be denied.

In *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1958), the Supreme Court unanimously upheld removal restrictions for government officials on multimember adjudicatory boards. While two laws governing removal restrictions for single heads of agencies exercising executive policymaking and enforcement powers have been held unconstitutional, *see Seila Law v. CFPB*, 591 U.S. 197 (2020); *Collins v. Yellen*, 594 U.S. 220 (2021), the Supreme Court has repeatedly stated that it was not overturning the precedent established in *Humphrey's Executor* and *Wiener* for multimember adjudicatory bodies. Instead, the Supreme Court has, in its own words, left that precedent "in place[.]" *Seila Law*, 591 U.S. at 215 (2020); *see id.* at 228 ("not revisit[ing] *Humphrey's Executor*"); *Collins*, 594 U.S. at 250–251 (2021) (recognizing that *Seila Law* did "not revisit [] prior decisions") (quoting *Seila Law*, 591 U.S. at 204); *see also Morrison v. Olson*, 487 U.S. 654, 687 (1988) (in case involving restrictions on removal of an inferior officer, recognizing that *Humphrey's Executor* remains good law); *see generally Free Enter. Fund v. Public Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (in case involving multimember board, declining to "reexamine" *Humphrey's Executor*); *id.* at 501 ("[W]e do not * * * take issue with for-cause limitations in general[.]").

The Supreme Court has repeatedly told the courts of appeals to follow extant Supreme Court precedent unless and until that Court itself changes it or overturns it. If a precedent of the Supreme Court "has direct application in a case," lower courts "'should follow the case which directly controls,'" leaving to the Supreme Court "'the prerogative of overruling its own decisions.'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). That rule governs "even if the lower court thinks the precedent is in tension with 'some other line of decisions.'" *Mallory*, 600 U.S. at 136 (quoting *Rodriguez de Quijas*, 490 U.S. at 484); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").

Circuit precedent compels the same result. *See, e.g., National Security Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This Court is charged with following case law that directly controls a particular issue[.]"); *Shea v. Kerry*, 796 F.3d 42, 54 (D.C. Cir. 2015) (quoting *Agostini*, 521 U.S. at 237); *Sierra Club v. E.P.A.*, 322 F.3d 718, 725 (D.C. Cir. 2003) (quoting *Rodriguez de Quijas*, 490 U.S. at 484).

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5037**                                                                          September Term, 2024

 

      The Supreme Court's repeated and recent statements that *Humphrey's Executor* and *Wiener* remain precedential require denying the government's emergency motions for a stay pending appeal.  The government, in fact, has acknowledged a lack of clarity in the law.  *See* Oral Arg. Tr. 24:25–25:3 ("I'm not saying that [the Supreme Court has been] clear."); 10:24–11:5 ("[T]he Supreme Court has left the lower courts in something of a tough spot[.]"); 84:16–23 (There is, "at a minimum, a very substantial question" and "reasonable minds can differ" about the scope of *Humphrey's Executor* today.); 88:17–18 ("[T]here's some uncertainty" in the wake of *Collins*.).  In addition, at both parties' request, the court has set a highly expedited schedule for the merits of these appeals that will allow the cases to be resolved in short order.

      We hereby vacate the March 28, 2025 order staying the district courts' final judgments and permanent injunctions in these cases.  In light of the precedent in *Humphrey's Executor* and *Wiener* concerning multimember adjudicatory bodies, the government's motions for a stay pending appeal are denied.  The government has not demonstrated the requisite "strong showing that [it] is likely succeed on the merits" of these two appeals.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The government likewise has not shown a strong likelihood of success on the merits of its claim that there is no available remedy for Harris or Wilcox, or that allowing the district court's injunctions to remain in place pending appeal is impermissible.  *See* Panel Order Granting Stay at 41-46 (Millett, J., dissenting).  Nor has it demonstrated irreparable injury because the claimed intrusion on presidential power only exists if *Humphrey's Executor* and *Wiener* are overturned.  *See Wiener*, 357 U.S. at 356 ("[N]o such power" to remove a predominantly adjudicatory board official "is given to the President directly by the Constitution[.]"); *Humphrey's Executor*, 295 U.S. at 629.  It is

      **FURTHER ORDERED** that the request for a 7-day stay be denied.

### Per Curiam

                                                                             **FOR THE COURT:**
                                                                             Clifton B. Cislak, Clerk

                              BY:    /s/
                                              Laura M. Morgan
                                              Deputy Clerk

 

\* Chief Judge Srinivasan fully joins this order, but he would grant the government's request to stay this order for 7 days to permit the government to seek relief from the Supreme Court.

**No. 25-5037** September Term, 2024

\*\* Circuit Judges Henderson, Katsas, Rao, and Walker dissent from this order, and they would also grant the government's request to stay this order for 7 days to permit the government to seek relief from the Supreme Court. Separate dissenting statements of Circuit Judges Henderson, Rao, and Walker are attached. Circuit Judges Henderson, Katsas, and Walker join in the statement of Circuit Judge Rao. Circuit Judge Henderson joins in the statement of Circuit Judge Walker.

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting:

We do the parties (especially a functioning executive branch) no favors by unnecessarily delaying Supreme Court review of this significant and surprisingly controversial aspect of Article II authority. Only the Supreme Court can decide the dispute and, in my opinion, the sooner, the better.

RAO, *Circuit Judge*, dissenting: President Donald Trump removed two principal officers wielding significant executive power: Cathy Harris of the Merit Systems Protection Board and Gwynne Wilcox of the National Labor Relations Board. The district court held the removals were unlawful and imposed unprecedented and far reaching injunctions, ordering cabinet secretaries and other Executive Branch officials to treat Harris and Wilcox as if they were never removed. A panel of this court wisely stayed those orders pending appeal. A majority of the en banc court now vacates the panel's order and denies the stay pending appeal.

The government raises two independent grounds for granting a stay. The en banc majority briefly discusses the first: the lawfulness of the President's removal of these officers. In my view, a stay is warranted on this ground. But even accounting for disagreement as to the continuing validity of *Humphrey's Executor*, the district court's remedial overreach independently justifies a stay. Because the majority denies the stay, it should have explained why the government is not likely to prevail on its argument that the injunctions exceed the court's equitable authority. Instead, the order devotes a single sentence to this question, likely because these remedies have no historical basis and put the courts on a collision course with the President over his exercise of core executive power. I respectfully dissent.

\* \* \*

As to the constitutional question, the government is likely to succeed because the President's removal of Harris and Wilcox falls within his Article II authority. The Constitution vests all executive power in a single President. U.S. CONST. art. II, § 1. The President has both the power and the responsibility to supervise and direct Executive Branch officers. *Id.* § 3 (requiring the President to "take Care that the Laws be faithfully executed"). To carry out this responsibility, the

2

President must be able to remove officers at will. "Since 1789, the Constitution has been understood to empower the President to keep … officers accountable—by removing them from office, if necessary." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (citing *Myers v. United States*, 272 U.S. 52 (1926)); *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (explaining that without the removal power "the President could not be held fully accountable for discharging his own responsibilities") (cleaned up).

The en banc majority urges that we must continue to follow *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1958), which held Congress may impose limits on the President's ability to remove officers of some so-called independent agencies. Although those cases have not been formally overruled, a series of recent Supreme Court decisions has substantially eroded them, as Judge Walker explained. *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *7–13 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring); *see also id.* at *21–23 (Henderson, J., concurring) (concluding "reasonable minds can—and often do—disagree about the ongoing vitality of the *Humphrey's* exception"). Under Article II, "[t]he buck stops with the President," and he "therefore must have some power of removing those for whom he cannot continue to be responsible." *Free Enter. Fund*, 561 U.S. at 493 (cleaned up). While statutes provide for-cause removal protections for Harris and Wilcox, these restrictions are likely unconstitutional because they interfere with the President's authority to remove principal officers who execute the law.

I will not elaborate on these points in this posture, as the disagreement about the scope of the President's removal power was discussed at length in the panel opinions granting the stay.

3

* * *

That brings us to the second ground for granting a stay pending appeal: the district court's expansive and unprecedented injunctions. Since the panel majority granted the stay on constitutional grounds, it had no need to evaluate the likelihood the government would succeed on its challenge to the injunctive remedies. *See Harris*, 2025 WL 980278, at *2 n.10 (Walker, J., concurring). The en banc majority, however, is *denying* the stay and therefore should at least have explained why the government's challenge to the remedy fails. Even if the majority is right that Harris and Wilcox were unlawfully removed under current Supreme Court precedent, there is a wholly separate question of whether *reinstatement*, effectuated by enjoining scores of Executive Branch officials, is the proper remedy.

In its rush to vacate the panel's stay and get Harris and Wilcox back to work, the en banc majority essentially ignores this question and assumes Harris and Wilcox may be restored to their offices through a judicially imposed fiction—namely, injunctions directing agency officials to treat Harris and Wilcox as though they remain in office.

The district court's injunctions present difficult and novel questions about the remedial authority of the Article III courts in the context of the President's exercise of his Article II powers. *See Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (noting the "extraordinary character" of an order "direct[ing] the President to recognize and work with an agency head whom he has already removed"). The government is likely to succeed on its remedial challenge because the injunctive relief concocted by the district court is wholly unprecedented and transgresses historical limits on our equitable authority.

4

It is worth recounting the broad sweep of the injunctions imposed here. Harris and Wilcox are no longer in office. The district court purported to reinstate these officers by simply declaring they were never removed in the first place and ordering Executive Branch officials to play along. For Wilcox, the district court ordered the Chairman of the NLRB "and his subordinates, agents, and employees" to refrain "from removing [Wilcox] from her office without cause or *in any way treating [Wilcox] as having been removed from office*, from impeding in any way her ability to fulfill her duties as a member of the NLRB, and from denying or obstructing her authority or access to any benefits or resources of her office." *Wilcox v. Trump*, No. 25-334, 2025 WL 720914, at *18 (D.D.C. Mar. 6, 2025) (emphasis added). It further ordered these same officials to provide Wilcox access to government facilities and equipment to carry out her duties. *Id.* The injunction for Harris is similarly novel, prohibiting the Secretary of the Treasury and numerous other Executive Branch officers from "removing Harris from her office without cause or *in any way treating her as having been removed* without cause." *Harris v. Bessent*, No. 25-412, 2025 WL 679303, at *16 (D.D.C. Mar. 4, 2025) (emphasis added). The order enjoins those same officials from "placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board in Harris's position." *Id.*

These injunctions are formally directed at Executive Branch officials, not the President. But in reality, their prohibitions include actions only the President may take. By what remedial fiction can the district court enjoin the Chairman of the NLRB or the Treasury Secretary from removing officers they have no power to remove? No one suggests anyone other than the President has authority to remove these principal officers. By what remedial fiction can the district court enjoin

5

executive officers from *choosing a replacement* for Harris? Members of the Merit Systems Protection Board must be appointed by the President with the advice and consent of the Senate. *See* 5 U.S.C. § 1201. When a decision, like appointment or removal, "is by Constitution or law conferred upon [the President], … we are precluded from saying that it is, in practical effect, the decision of someone else." *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment). The injunctions purport to enjoin the President's subordinates, directing them to disregard the President's removal and to refrain from taking actions within the President's exclusive constitutional and statutory powers. There is simply no precedent for such expansive judicial directives against officers of the Executive Branch wielding essential executive powers.[1]

These orders effectively reappoint officers removed by the President and direct all other Executive Branch officials to treat the removed officers as if they were still in office. Such injunctive relief is beyond the scope of our equitable authority. Federal courts have authority to issue only those equitable remedies administered by the English Court of Chancery and courts sitting in equity at the time of the Founding. *See Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999) ("[T]he equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court

---

[1] Plaintiffs identify only two district court decisions enjoining Presidential removal decisions. *See Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *6 (D.D.C. Nov. 14, 1983); *Mackie v. Bush*, 809 F. Supp. 144, 148 (D.D.C. 1993). We vacated *Mackie* as moot without reaching the merits. *Mackie v. Clinton*, No. 93-5001, 1993 WL 498033, at *1 (D.C. Cir. Oct. 27, 1993). More to the point, both cases directly contradict Supreme Court precedent recognizing courts lack authority to enjoin the President. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866); *Franklin*, 505 U.S. at 802–03.

6

of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act …. The substantive prerequisites for obtaining an equitable remedy … depend on traditional principles of equity jurisdiction.") (cleaned up); *Boyle v. Zacharie*, 31 U.S. (6 Pet.) 648, 658 (1832) ("[T]he settled doctrine of this court is, that the remedies in equity are to be administered … according to the practice of courts of equity in [England].").

Nothing in Anglo-American history supports the injunctive relief granted by the district court and restored by the en banc majority. Although the injunctions are nominally directed at subordinate executive officials, their purpose and effect are to restrain the President's exercise of his constitutional appointment and removal powers. But courts have never possessed authority to "enjoin the President in the performance of his official duties."[2] *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring) (describing this limitation as "implicit in the separation of powers established by the Constitution").

---

[2] The Supreme Court has left open the possibility that a court may enjoin the President to discharge a ministerial duty, that is, one in which the President has no discretion. *See Johnson*, 71 U.S. at 498 (reserving the question of whether "the President of the United States may be required, by the process of this court, to perform a purely ministerial act under a positive law"); *Franklin*, 505 U.S. at 802 (same). The President's exercise of his appointment and removal authority can in no way be denominated as "ministerial," however, as these powers are essential to his Article II power to control and supervise "those who wield executive power on his behalf." *Seila Law*, 140 S. Ct. at 2191; *see also Johnson*, 71 U.S. at 499 (distinguishing ministerial duties from "purely executive and political" duties).

7

Even indulging the fiction that the injunctions are aimed only at subordinate executive officials, equitable remedies of this kind still find no support in our history. At the Founding, it appears to have been well-established that a court sitting in equity had "no jurisdiction over the appointment and removal of public officers."[3] *White v. Berry*, 171 U.S. 366, 377 (1898) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)); *see also Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting). The lesson from history is clear: Federal courts have no equitable authority to enjoin the removal or to mandate the reinstatement of executive officers.

Perhaps recognizing these limits on our equitable authority, officers challenging their removals have generally refrained from seeking injunctions mandating their reinstatement. The removed officers have instead brought backpay actions for damages. *See, e.g.*, *Wiener*, 357 U.S. at 349–50; *Humphrey's Executor*, 295 U.S. at 618; *Myers*, 272 U.S. at 106. The en banc majority binds itself to the mast of

---

[3] Equitable remedies were unavailable because courts of law had exclusive jurisdiction to determine title to public office. *See In re Sawyer*, 124 U.S. 200, 212 (1888); *Kalbfus v. Siddons*, 42 App. D.C. 310, 319–21 (1914) (collecting English and American cases granting mandamus to restore an unlawfully removed officer). Although the Supreme Court has more recently stated that courts are "not totally without authority to grant interim injunctive relief" directing the reinstatement of wrongfully terminated federal *employees*, *see, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 63 (1974), such cases do not necessarily raise the same constitutional concerns as judicial reinstatement of an *officer* removed by the President. Even in cases involving mere employees, the Court has warned that an injunction will issue only upon a heightened showing. *Id.* at 83–84. Insofar as these decisions go beyond the scope of equity jurisdiction at the time of the Founding, they conflict with the Supreme Court's more recent holding in *Grupo*. *See* 527 U.S. at 318–19.

8

*Humphrey's Executor* and *Wiener* with respect to the constitutional merits but says nothing about these precedents on the question of remedies.

\* \* \*

Finally, the district court and Judge Millett in her panel dissent suggest Harris and Wilcox could secure a writ of mandamus if injunctive relief were unavailable. But it is extremely unlikely that mandamus could issue to reinstate officers removed by the President.

As a threshold matter, against whom would mandamus lie? These cases seem to present two options: The court could issue mandamus against the President to reinstate the officers, or it could issue mandamus against everyone else in the Executive Branch to *act as if* the President has reinstated the officers. The district court here would apparently have done the latter, directing various principal officers and their subordinates—but not the President—to recognize that Harris and Wilcox remain in office.[4] *See Harris*, 2025 WL 679303, at \*15; *Wilcox*, 2025 WL 720914, at \*16 n.22. A writ of mandamus, however, may be issued only when an official violates a "clear duty to act." *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021). No Executive Branch officer or employee, not even the Treasury

---

[4] Although our decision in *Swan v. Clinton* contemplates that de facto reinstatement via mandamus issued against Executive Branch officials may be available, that determination was made in the context of finding redressability for the purposes of standing. The court denied relief on the merits, so it never imposed this extraordinary relief. *See* 100 F.3d 973, 976–81, 988 (D.C. Cir. 1996); *see also Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023) (reaffirming *Swan*'s redressability analysis). Moreover, *Swan* says nothing about when it would be *appropriate* to impose mandamus. In any event, the en banc court is not bound by *Swan*'s analysis.

9

Secretary or the Chairman of the NLRB, could have violated a clear duty because no officer or employee removed Harris or Wilcox—the President did. If mandamus were to issue against these officers, there would be a complete mismatch between the supposedly unlawful removal and the officers being targeted with mandamus.

That leaves the President. Judge Millett argued in dissent that mandamus could issue against the President because he "violated a non-discretionary statutory duty by firing Harris and Wilcox without relevant justification." *See Harris*, 2025 WL 980278, at *45 (Millett, J., dissenting). It is extremely doubtful that mandamus could issue against the President. While this court has at times claimed authority to issue writs of mandamus against the President, I am aware of no case in which we have taken this extraordinary step. To the contrary, we have repeatedly declined to issue the writ "in order to show the utmost respect to the office of the Presidency and to avoid … any clash between the judicial and executive branches of the Government." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974); *see also Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 928 (D.C. Cir. 1980) (declining to issue mandamus against the President).

Even if mandamus could lie against the President, it is unlikely Harris and Wilcox could have established a "clear right to relief." *Muthana*, 985 F.3d at 910. Given the substantial questions regarding whether *Humphrey's Executor* remains good law, it is hard to see how the plaintiffs could have shown their removal from office "was so plainly and palpably wrong as [a] matter of law that the writ should issue." *United States ex rel. Chicago Great W. R. Co. v. Interstate Commerce Comm'n*, 294 U.S. 50, 61 (1935). Moreover, Harris and Wilcox have failed to identify a single case in which mandamus has been granted when an officer contests his removal by the

10

President. At a minimum, the fact that such a remedy has never been imposed, much less against the President, is good evidence that Harris and Wilcox do not have a clear entitlement to the writ.

Furthermore, it is difficult to see how mandamus to reinstate officers removed by the President could ever be appropriate. "Although the remedy by mandamus is at law, its allowance is controlled by equitable principles, and it may be refused for reasons comparable to those" governing a court of equity. *United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 359 (1933) (cleaned up). For this court to order the performance of executive acts vested exclusively in the President would "at best create[] an unseemly appearance of constitutional tension and at worst risk[] a violation of the constitutional separation of powers." *Swan*, 100 F.3d at 978; *see also Johnson*, 71 U.S. at 499 (rebuffing the idea of ordering the President to perform executive acts as "an absurd and excessive extravagance") (cleaned up). These constitutional concerns render mandamus—an extraordinary writ—wholly inappropriate in these removal cases.

\* \* \*

The Constitution creates three co-equal departments of government, each with an independent responsibility to interpret and uphold the Constitution. While courts must faithfully exercise their duty to say what the law is, in choosing remedies, courts historically have afforded every measure of respect to the President. Sound judgment demands that when contemplating coercive process against the Executive, the courts take account of the "enduring consequences upon the balanced power structure of our Republic." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring).

11

      Without considering the difficult questions regarding the scope of the court's equitable or legal authority, the en banc majority blesses the district court's unprecedented injunctions and purports to reinstate principal officers ousted by the President. In so doing, the majority threatens to send this court headlong into a clash with the Executive. I respectfully dissent.

WALKER, *Circuit Judge*, dissenting:

Having explained my views previously, I add only this: In *PHH v. CFPB*, the en banc court said that the Supreme Court would need to narrow *Humphrey's Executor* in order to hold that the CFPB's removal restrictions are unconstitutional.[1] Then, in *Seila Law*, the Supreme Court held those restrictions unconstitutional.[2] So by the *PHH* majority's own reasoning, the outcome in *Seila Law* depended on the Supreme Court narrowing *Humphrey's Executor*.

Perhaps the members of today's en banc majority recognize that *Humphrey's Executor* cannot be read as broadly as it once could but disagree with the panel in this case about how much it has been narrowed. If so, it is hollow and hyperbolic for today's majority to proclaim, "The Supreme

---

[1] *See* 881 F.3d 75, 93 (D.C. Cir. 2018) ("There is nothing constitutionally suspect about the CFPB's leadership structure. *Morrison* and *Humphrey's Executor* stand in the way of any holding to the contrary."); *id.* at 113 (Tatel, J., concurring, joined by Millett, J., and Pillard, J.) ("PHH is free to ask the Supreme Court to revisit *Humphrey's Executor* and *Morrison*, but that argument has no truck in a circuit court of appeals."); *id.* at 118 (Wilkins, J., concurring, joined by Rogers, J.) ("the dissenters seek to overcome the precedent upholding tenure protection for officers with significant quasi-judicial and quasi-legislative responsibilities").

Similarly, in *Free Enterprise Fund v. PCAOB*, the majority said the "bulk of the Fund's challenge to the Act was fought — and lost — over seventy years ago when the Supreme Court decided *Humphrey's Executor*." 537 F.3d 667, 685 (D.C. Cir. 2008). The Supreme Court disagreed. *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 514 (2010) ("While we have sustained in certain cases limits on the President's removal power, the Act before us imposes a new type of restriction — two levels of protection from removal for those who nonetheless exercise significant executive power. Congress cannot limit the President's authority in this way.").

[2] *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020).

2

Court has repeatedly told the courts of appeals to follow extant Supreme Court precedent unless and until that Court itself changes it or overturns it." Each of us recognizes that a lower court cannot overrule *Humphrey's Executor*. We simply disagree about how broadly to read it.