**ORAL ARGUMENT MAY 16, 2025**

No. 25-5055

IN THE

# United States Court of Appeals for the District of Columbia Circuit

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN HER OFFICIAL CAPACITY AS MEMBER OF THE MERIT SYSTEMS PROTECTION BOARD,

*Plaintiff-Appellee,*

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-00412-RC
Hon. Rudolph Contreras, J.

## MERITS BRIEF FOR APPELLEE

MICHAEL J. KATOR
JEREMY D. WRIGHT
KERRIE D. RIGGS
KATOR, PARKS, WEISER & WRIGHT, P.L.L.C.
1150 Connecticut Ave., NW
Suite 705
Washington, DC 20036
(202) 898-4800
mkator@katorparks.com

LINDA M. CORREIA
CORREIA & PUTH, PLLC
1400 16th St., NW
Suite 450
Washington, D.C. 20036
(202) 602-6500
lcorreia@correiaputh.com

CARL RIZZI
LUCILLE E. BAEURLE
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5786

NEAL KUMAR KATYAL
*Counsel of Record*
NATHANIEL A.G. ZELINSKY
KRISTINA ALEKSEYEVA
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Appellee Cathy A. Harris*

April 7, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Plaintiff-Appellee Cathy A. Harris hereby submits her Certificate as to Parties, Rulings and Related Cases:

### A.     Parties and Amici

The parties, intervenors, and *amici* appearing before the District Court and in this Court to date are listed in Appellants' opening brief.

### B.     Rulings Under Review

References to the rulings at issue appear in Appellants' opening brief.

### C.     Related Cases

This case was before the District Court as case No. 1:25-cv-00412-RC.  The government appealed the District Court's grant of a temporary restraining order, and that appeal is pending before this Court as No. 25-5037.


April 7, 2025                                          /s/Neal Kumar Katyal
                                                       NEAL KUMAR KATYAL
                                                           *Counsel of Record*
                                                       MILBANK LLP
                                                       1850 K St., NW
                                                       Suite 1100
                                                       Washington, DC 20006
                                                       (202) 835-7505
                                                       nkatyal@milbank.com

                                                       *Counsel for Plaintiff-Appellee*
                                                       *Cathy A. Harris*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF THE ISSUES.............................................................5

PERTINENT STATUTES.......................................................................5

STATEMENT OF THE CASE.................................................................5

    A.    The *Humphrey's Executor* Framework.....................................5

    B.    The Merit Systems Protection Board.........................................6

    C.    Procedural History ....................................................................7

SUMMARY OF ARGUMENT ..............................................................10

STANDARD OF REVIEW ...................................................................13

ARGUMENT .......................................................................................13

    I.    THE MERIT SYSTEMS PROTECTION BOARD IS CONSTITUTIONAL..........13

    A.    Under *Humphrey's Executor*, Congress May Enact For-Cause Removal Protection For Traditional Multimember Bodies................................................................................14

    B.    *Seila Law* and *Collins* Confirmed *Humphrey's Executor* Remains Binding....................................................18

    C.    The Board Falls Squarely Within The *Humphrey's Executor* Framework.........................................................23

    D.    Constitutional Text And History Support The Board's Structure. ...................................................................27

    E.    The Court Should Reject The Government's Invitation To Overturn *Humphrey's Executor*. ......................35

    II.    THE GOVERNMENT'S REMEDIES ARGUMENTS ARE MERITLESS. ..........44

    A.    The District Court Properly Awarded Relief...........................45

        1.    Under *Swan* And *Severino*, Courts May Issue Injunctions. ..................................................45

        2.    There Is A Lengthy Anglo-American Tradition Of Mandamus. ..........................................47

        3.    Declaratory Relief Was Independently Appropriate......49

    B.    The Government's Contrary Arguments Are Wrong. ..............49

CONCLUSION .....................................................................................59

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
    64 F.4th 1354 (D.C. Cir. 2023) .......................................................................13

*Borak v. Biddle*,
    141 F.2d 278 (D.C. Cir. 1944) ........................................................................49

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ........................................................................................39

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ......................................................................................17, 41

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024) ..................................................................................32, 33

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................................51

* *Collins v. Yellen*,
    594 U.S. 220 (2021) ......................................... 2, 3, 5, 8, 11, 18, 20, 21, 28, 42

*Consumers' Rsch. v. CPSC*,
    91 F.4th 342 (5th Cir.) ...................................................................................22

*Dellinger v. Bessent*,
    No. 1:25-cv-00385-ABJ (D.D.C. Feb. 25, 2025) .............................................24

*Dellinger v. Bessent*,
    No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ...............................52

*Dellinger v. Bessent*,
    No. 25-5052 (D.C. Cir. Mar. 5, 2025) .............................................................42

*In re Exceptions from Competitive Merit Plans*,
    9 M.S.P.R. 116 (MSPB 1981) ........................................................................43

*In re Flynn*,
    973 F.3d 74 (D.C. Cir. 2020) ..........................................................................58

* *Authorities on which we principally rely are marked with asterisks.*

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992)......................................................................49, 52

*Free Enter. Fund v. PCAOB,*
  561 U.S. 477 (2010)..........................................................5, 18, 29, 39, 42

*Fuller v. Trs. of Acad. Sch. in Plainfield,*
  6 Conn. 532 (Conn. 1827) ...............................................................49

*State ex rel. Gill v. Common Council of City of Watertown,*
  9 Wis. 254 (1859) ..........................................................................49

*Grundmann v. Trump,*
  No. 1:25-cv-425 (D.D.C.)...................................................................4

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999)........................................................................53

*Hosp. Menonita de Guayama, Inc. v. NLRB,*
  94 F.4th 1 (D.C. Cir. 2024)..............................................................23

*\* Humphrey's Executor v. United States,*
  295 U.S. 602 (1935).............................................................................
  ...............1-3, 5, 6, 8-12, 14-23, 26, 27, 29, 30, 31, 33, 35-37, 40, 41, 52, 56, 57

*Illumina, Inc. v. FTC,*
  88 F.4th 1036 (5th Cir. 2023) ..........................................................23

*Jeffries v. Barr,*
  965 F.3d 843 (D.C. Cir. 2020)..........................................................13

*\* Kalbfus v. Siddons,*
  42 App. D.C. 310 (D.C. Cir. 1914).........................................47, 51, 57

*Kaplan v. Conyers,*
  733 F.3d 1148 (Fed. Cir. 2013) ..........................................................7

*Leachco, Inc. v. CPSC,*
  103 F.4th 748 (10th Cir. 2024) .........................................................22

*Leachco, Inc. v. CPSC,*
  No. 24-156 (Nov. 14, 2024)...........................................................6, 20

iv
\* *Authorities on which we principally rely are marked with asterisks.*

*Macfarland v. United States ex rel. Russell*,
  31 App. D.C. 321 (D.C. Cir. 1908) ....................................................49

*Magnetsafety.org v. CPSC*,
  129 F.4th 1253 (10th Cir. 2025) .........................................................22

\* *Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ....................................14, 45, 48, 49, 54

*Marshall v. Jerrico, Inc.*,
  446 U.S. 238 (1980)............................................................................14

*McAllister v. United States*,
  141 U.S. 174 (1891).............................................................................29

*Meta Platforms, Inc. v. FTC*,
  No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024)............................22

*Miller v. Clinton*,
  687 F.3d 1332 (D.C. Cir. 2012)........................................................46

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) .............................................................51

*Mistretta v. United States*,
  488 U.S. 361 (1989)............................................................................17

*Morrison v. Olson*,
  487 U.S. 654 (1988)..........................................................17, 18, 36

*Myers v. United States*,
  272 U.S. 52 (1926).............................................................................15

*PHH Corp. v. CFPB*,
  881 F.3d 75 (D.C. Cir. 2018)..............................................1, 26, 29

*R v. Blooer*,
  (1760) 97 Eng. Rep. 697; 2 Burr. 1043 .............................................47

*R v. Mayor, Bailiffs and Common Council of the Town of Liverpool*,
  (1759) 97 Eng. Rep. 533; 2 Burr. 730 ...............................................48

v
\* *Authorities on which we principally rely are marked with asterisks.*

*Ransom v. Mayor of Boston,*
    79 N.E. 823 (Mass. 1907) ........................................................................49

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
    490 U.S. 477 (1989) .................................................................2, 12, 23, 44

* *Sampson v. Murray,*
    415 U.S. 61 (1974) .........................................................45, 46, 47, 53

*In re Sawyer,*
    124 U.S. 200 (1888) ........................................................................53

* *Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ....................1, 2, 5, 8, 17, 18-20, 21, 26, 27, 29, 36, 37, 41

*Service v. Dulles,*
    354 U.S. 363 (1957) ........................................................................46

*Severino v. Biden,*
    71 F.4th 1038 (D.C. Cir. 2023) .................... 4, 8, 9, 13, 22, 45, 47, 50, 51, 52, 53

*Slaughter v. Trump,*
    No. 1:25-cv-909 (D.D.C.) ....................................................................4

*Students for Fair Admissions v. Harvard,*
    600 U.S. 181 (2023) ........................................................................39

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .................... 4, 8, 9, 13, 45, 47, 50, 51, 52, 53, 54

*Tribby v. O'Neal,*
    39 App. D.C. 467 (D.C. Cir. 1912) ...........................................................57

*Truitt v. City of Philadelphia,*
    70 A. 757 (Pa. 1908) ......................................................................49

*Trump v. United States,*
    603 U.S. 593 (2024) ........................................................................37

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) .........................................................................44

*Authorities on which we principally rely are marked with asterisks.*

*United States v. Perkins*,
  116 U.S. 483 (1886)........................................................................28

*United States v. Wilson*,
  290 F.3d 347 (D.C. Cir. 2002).........................................................49

*Vitarelli v. Seaton*,
  359 U.S. 535 (1959).........................................................................46

*White v. Berry*,
  171 U.S. 366 (1898).........................................................................53

\* *Wiener v. United States*,
  357 U.S. 349 (1958)............ 1, 5, 10-12, 15-17, 19, 20, 22, 25-27, 31, 37, 38, 44

*Wilcox v. Trump*,
  No. 25-5057 (D.C. Cir.) ...............................................................3, 37

*Williams v. United States*,
  289 U.S. 553 (1933).........................................................................30

*Wise v. Withers*,
  7 U.S. (3 Cranch) 331 (1806) .........................................................15

**Statutes and Constitutional Provisions**

5 U.S.C. § 706...................................................................................46

5 U.S.C. § 1201.............................................................................6, 26

5 U.S.C. § 1202(a)-(c)........................................................................6

5 U.S.C. § 1202(d) .......................................................................1, 6, 7

5 U.S.C. § 1204(e)(2)(A)...............................................................39, 40

5 U.S.C. § 1214(b)(1)(A)(i) ...............................................................42

5 U.S.C. § 1214(b)(1)(D)....................................................................41

5 U.S.C. §§ 2302(b)(1), (b)(8) ............................................................6

5 U.S.C. § 3592(a) .............................................................................7

*\* Authorities on which we principally rely are marked with asterisks.*

5 U.S.C. § 7105(h) ...........................................................................41

5 U.S.C. § 7511 ................................................................................6

10 U.S.C. § 942(c) ...........................................................................30

12 U.S.C. § 248(p) ...........................................................................41

12 U.S.C. § 1752a ............................................................................54

15 U.S.C. § 53(b) .............................................................................41

15 U.S.C. § 2061(a) ..........................................................................41

26 U.S.C. § 7443(f) ..........................................................................30

28 U.S.C. § 2201(a) ..........................................................................49

28 U.S.C. § 2202 ..............................................................................46

29 U.S.C. § 154(a) ...........................................................................41

38 U.S.C. § 7253(f) ..........................................................................30

39 U.S.C. § 409 ................................................................................41

42 U.S.C. § 7171(i) ..........................................................................41

46 U.S.C. § 41307(a), (d) .................................................................41

49 U.S.C. § 1301(c)(1) .....................................................................41

Act of Apr. 7, 1798, ch. 28, § 3, 1 Stat. 549, 550 (1798) ..............29

Act of Feb. 24, 1855, ch. 122, § 1-1, 33 Stat. 612 (1855) .............30

Act of June 10, 1890, ch. 407, § 12, 51 Stat. 136-138 (1890).........30

Administrative Procedure Act, ch. 324, § 11, 237, 244 (1946)........30

An Act to Amend the Railway Labor Act, Pub. L. No. 442, 48 Stat. 1185, 1193 (1934)........................................................................31

An Act to Provide for the Government of the Territory North-West of the River Ohio, ch. 8, 1 Stat. 50, 51 (1789)....................................29

*Authorities on which we principally rely are marked with asterisks.*

Atomic Energy Act of 1946, Pub. L. No. 585, 60 Stat. 755, 756-757 (1946) ....................................................................................31

Civil Service Reform Act, Pub. L. No. 95-545, 92 Stat. ......................26

Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565 (1977) ...........................................................................31

Federal Reserve Act, Pub. L. No. 63-48, 38 Stat. 251 (1913) ................31

Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 717 (1914) ......................................................................................31

Interstate Commerce Act, Pub. L. No. 49-104, 24 Stat. 379 (1887) .......31

National Labor Relations Act, Pub. L. No. 198, 49 Stat. 449 (1935)......31

Revenue Act of 1924, ch. 243, 43 Stat. 253 (1924)..............................30

U.S. Const. art. II, § 2, cl. 2 ..............................................................27

Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat. 16 (1989) ...............................................................................26

**Other Authorities**

2 O.L.C. 120, 121 (1978) ...................................................................31

3 O.L.C. 357 (1979) ..........................................................................31

3 William Blackstone, Commentaries ............................4, 13, 44, 48, 54

Alexander Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* (1962) ............................................................24

*Civil Service Law*, ch. XI § V (1939) ...................................................48

D.C. Circuit Handbook of Practice and Internal Procedure...................58

James L. High, *A Treatise on Extraordinary Remedies* (2d ed. 1884)............48, 57

John Shortt, *Informations (Criminal and Quo Warranto), Mandamus and Prohibition* (1888) .......................................................48

* *Authorities on which we principally rely are marked with asterisks.*

Milton Eisenberg, *The Influence of the Writ of Mandamus in Federal Personnel Litigation*, 45 Geo. L.J. 388 (1957) .................................................48

S. Rep. No. 95-969 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2723 ...............6, 35

Samuel Slaughter Merril, *Law of Mandamus* (1892) ............................................48

*Service*,
B-134614, 1958 WL 1888 (Mar. 3, 1958).........................................................46

Shia Kapos, *Musk Defends Million-Dollar Giveaways in Wisconsin*, Politico (Mar. 30, 2025), https://www.politico.com/news/2025/03/30/musk-defends-million-dollar-giveaways-wisconsin-00260042 ...............................................................4

Statement from Justice Department Chief of Staff Chad Mizelle, Department of Justice (Feb. 20, 2025), https://www.justice.gov/opa/pr/statement-justice-department-chief-staff-chad-mizelle ...............................................................42

Subcomm. on Manpower & Civil Service, *Documents Relating to Political Influence in Personnel Actions at the Small Business Administration* (1975).............................................................34

Sup. Ct. R. 22.5, 23.1 ...........................................................................................41

Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus* (1853)...........................................................................................48

U.S. Civ. Serv. Comm., *A Self-Inquiry into Merit Staffing* (1976) ........................34

*\* Authorities on which we principally rely are marked with asterisks.*

**INTRODUCTION**

This appeal is not a close call.  The government advances arguments that run straight into a wall of precedent and that threaten to invalidate Congress's protection for critical agencies on which our society relies.  The District Court conclusively rejected each one.  This Court should affirm.

A few weeks ago, without even trying to show cause, the President purported to remove Cathy Harris from her position as a member of the Merit Systems Protection Board, a purely "adjudicatory body" that hears employment appeals regarding civil servants.  *Wiener v. United States*, 357 U.S. 349, 356 (1958).  By law, the President may terminate members of the Board "only for inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d).

The government insists that because Harris exercises *some* executive power— even the smallest mote—the Constitution provides the President unchecked authority to remove her at will.  That is not the law.  Under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Congress may enact standards of removal for "multimember board[s]," *Seila Law LLC v. CFPB*, 591 U.S. 197, 207 (2020), particularly "predominantly quasi judicial," *Humphrey's Executor*, 295 U.S. at 624, "adjudicatory bod[ies]," *Wiener*, 357 U.S. at 356.

As then-Judge Kavanaugh explained, *Humphrey's Executor* reflects "deeply rooted historical practice."  *PHH Corp. v. CFPB*, 881 F.3d 75, 174 (D.C. Cir. 2018)

(Kavanaugh, J., dissenting).   In *Seila Law* and *Collins*, the Supreme Court invalidated removal protections for novel agencies led "by a single individual" that lacked a foothold in history.  *Seila Law*, 591 U.S. at 213; *see Collins v. Yellen*, 594 U.S. 220, 251 (2021).  But the Court reiterated that it did not "revisit *Humphrey's Executor* or any other precedent," and repeatedly contrasted single-director-led agencies with a traditional multimember board or commission.  *Seila Law*, 591 U.S. at 228.  In fact, "seven Justices openly invited Congress to repair the constitutional flaw" in *Seila Law* "by reconstituting" the agency in question "as a multimember body."  Order at 83, *Harris v. Bessent*, No. 25-5055 (Mar. 28, 2025) (Millett, J., dissenting) ("Stay.Op.").[1]

The government now asks this Court to effectively overrule *Humphrey's Executor* by narrowing it into oblivion.  But the Supreme Court went out of its way not to disturb settled precedent.  The *Humphrey's Executor* framework remains the law.  As the Supreme Court has emphasized, "[i]f a precedent" "has direct application in a case"—even if it "appears to rest on reasons rejected in some other line of decisions"—"the Court of Appeals should follow the case which directly controls, leaving to" the Supreme "Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484

---

[1] Page numbers for the stay opinion and en banc order correspond to PDF pagination.

(1989); *see* Order at 2, *Harris v. Bessent* (Apr. 7, 2025) (en banc) (per curiam) ("En Banc Order").

The Merit Systems Protection Board falls within the heartland of the *Humphrey's Executor* framework. The Board is a traditional multimember agency that the government admits is "predominantly an adjudicatory body." Oral Arg. Tr. 12:22-23. The Board does not launch investigations, set policy, or regulate "the economy at large." *Collins*, 594 U.S. at 253. The Board hears discrete cases regarding civil servants, and neutrally applies laws Congress passed prohibiting arbitrary dismissal, discrimination, and retaliation.

Although the law is straightforward, the stakes are extraordinary. If this Board is not constitutional under *Humphrey's Executor*, nothing is. Not the Federal Reserve Board, which sets monetary policy and regulates banks. Not the National Transportation Safety Board, which investigates air accidents—such as the recent midair collision over the Potomac. The list goes on. Taken to its logical conclusion, the government's limitless theory of the President's removal power would mean Congress could not protect anyone from arbitrary removal—not even ordinary civil servants.

Nor is this case a one-off. The President has already purported to remove members of the National Labor Relations Board, the Federal Labor Relations Authority, and the Federal Trade Commission. *Wilcox v. Trump*, No. 25-5057 (D.C.

Cir.); *Grundmann v. Trump*, No. 1:25-cv-425 (D.D.C.); *Slaughter v. Trump*, No. 1:25-cv-909 (D.D.C.). It is a safe bet more unlawful removals are in the offing. Just days ago, Elon Musk—one of the President's closest advisers—called to "end the Fed."[2]

It bears emphasizing how unusual this is: No modern President has *ever* attempted something like this. Nor has the Supreme Court *ever* invalidated a traditional multimember board.

Finally, there should be no question that the District Court had the authority to grant relief to Harris. Under binding circuit precedent, the District Court had authority to "enjoin 'subordinate executive officials,' " and direct them to treat Harris as remaining in office. *Severino v. Biden*, 71 F.4th 1038, 1042-1043 (D.C. Cir. 2023) (quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)). Moreover, Anglo-American courts have long issued writs of mandamus as a "full and effectual remedy" "for wrongful removal." 3 William Blackstone, Commentaries *264.

This Court should apply settled law and affirm.

---

[2] Shia Kapos, *Musk Defends Million-Dollar Giveaways in Wisconsin*, Politico (Mar. 30, 2025), https://www.politico.com/news/2025/03/30/musk-defends-million-dollar-giveaways-wisconsin-00260042.

## STATEMENT OF THE ISSUES

1. Whether the Merit Systems Protection Board's structure violates the *Humphrey's Executor* framework.

2. Whether the District Court properly granted relief.

## PERTINENT STATUTES

Pertinent statutes appear in the attached addendum.

## STATEMENT OF THE CASE

### A.    The *Humphrey's Executor* Framework

Under the *Humphrey's Executor* framework, Congress may "create expert agencies led by a group of principal officers removable by the President only for good cause." *Seila Law*, 591 U.S. at 204 (emphasis omitted). At the heart of that framework are "adjudicatory bod[ies]" performing tasks of an "intrinsic judicial character." *Wiener*, 357 U.S. at 355-356.

In *Seila Law* and *Collins*, the Supreme Court struck down removal provisions for "novel" single-director-led agencies. *Seila Law*, 591 U.S. at 204; *Collins v. Yellen*, 594 U.S. 220, 251 (2021); *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496 (2010). The Court did "not revisit *Humphrey's Executor* or any other precedent," and contrasted novel single-director-led agencies with a "traditional" "multimember board or commission." *Seila Law*, 591 U.S. at 207, 228.

Since *Seila Law* and *Collins*, this Court and its sister Circuits have uniformly rejected challenges to removal provisions pertaining to multimember boards or

5

commissions. *See infra* pp. 21-23. Until now, the Department of Justice has likewise argued that *Humphrey's Executor* remains good law. *See, e.g.*, U.S. Br. in Opp., *Leachco, Inc. v. CPSC* at 15, No. 24-156 (Nov. 14, 2024).

### B.     The Merit Systems Protection Board

This case involves a quintessential adjudicatory body—the Merit Systems Protection Board—that reflects a centuries-long effort to combat patronage in federal employment. *See infra* pp. 33-35. In 1978, Congress passed the Civil Service Reform Act to ensure a government "impartially administered" by employees judged on merit rather than political favoritism. S. Rep. No. 95-969, at *4 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2723, 2726. Among other things, the Act created the Board.

At then-President Carter's urging, Congress provided that the new Board's members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). The Board's three members serve staggered seven-year terms, with no more than two belonging to the same political party. *Id*. §§ 1201, 1202(a)-(c).

The Board adjudicates federal employee appeals, including claims of political discrimination and whistleblower retaliation. *Id*. §§ 2302(b)(1), (b)(8). Its jurisdiction is circumscribed to avoid encroaching on the President's core prerogatives. The Board may not hear appeals by political appointees, *id*. § 7511,

has limited authority regarding senior executive managers, *id*. § 3592(a), and cannot wade into national security issues, *Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013) (en banc).

### C.   Procedural History

**1.**  In 2022, Cathy Harris was nominated and confirmed as a member.  Her term expires March 1, 2028.

On February 10, 2025, Harris received an email claiming the President terminated her.  She filed this action the next day.  At no point has the government claimed that Harris has committed "inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d).

In the proceedings below, the government did not contest: (i) that the "Board does not establish policy," and does not "dictate or enforce policies regarding the federal workforce"; (ii) that the Board "performs no investigations of external parties and does not prosecute cases"; (iii) that the "Board does not initiate disciplinary actions" and lacks "enforcement units"; (iv) that it "does not order other agencies to conduct investigations or to produce written reports"; and (v) that "over 95% of the decisions" of the Board are "unanimous."  JA55-57.

**2.**  The District Court issued a temporary restraining order, JA27-47, and a detailed decision on the merits for Harris, JA72-106.

The District Court concluded that "removal protections are constitutional under *Humphrey's Executor*." JA77. As the District Court explained, *Seila Law* and *Collins* "ruled that for-cause removal provisions applying to independent agencies with a single director violated the separation of powers." JA80. But neither case disturbed "the constitutionality of for-cause removal provisions for multimember bodies of experts heading an independent agency." JA80-81. In *Seila Law*, the "Court even opined that Congress could fix" the agency in question "by 'for example, converting the' " agency "into a multimember agency." JA82 (quoting *Seila Law*, 591 U.S. at 237).

The District Court then explained that *Humphrey's Executor* "dictates the outcome" of this case. JA82. The Merit Systems Protection Board is a quintessential multimember body with " 'quasi judicial' " "duties" that "conducts preliminary adjudications of federal employees' claims." JA82. "The Board does not regulate the conduct of private parties, nor does it possess its own rulemaking authority except in furtherance of its judicial functions." JA83. "It cannot initiate its own personnel cases, but must instead passively wait for them to be brought." JA83-84 (quotation marks omitted).

The District Court issued both injunctive and declaratory relief for Harris. The court explained that "[t]he D.C. Circuit has found injunctive relief" "to be available" in removal cases, JA93 (citing *Swan*, 100 F.3d at 976-981, and *Severino*,

71 F.4th at 1042-1043), and that "declaratory judgment" would be "appropriate to clarify Harris's legal status," JA89.

The District Court also made clear that, were "equitable injunctive relief" "unavailable" for any reason, it would issue "a writ of mandamus" as "an alternative remedy." JA105. The court outlined the extremely long history of English courts issuing mandamus in precisely this circumstance. JA94-96.

**3.** The government appealed and sought a stay pending appeal.

At oral argument on the stay, the government characterized the Merit Systems Protection Board as "predominantly an adjudicatory body." Oral Arg. Tr. 12:22-23. The government likewise agreed that "as a matter of circuit precedent," the District Court could award injunctive relief under *Swan* and *Severino*. *Id*. at 37:4-5.

**4.** The panel granted the stay pending appeal. Stay.Op.1-60.

There was no majority opinion. In a concurrence, Judge Walker narrowed *Humphrey's Executor* into non-existence. According to Judge Walker, the *Humphrey's Executor* framework applies *only* "if the agency in question is the identical twin of the 1935" Federal Trade Commission. *Id*. at 32 (Walker, J., concurring).

In another concurrence, Judge Henderson voted to grant the stay. *Id.* at 51, 56 (Henderson, J., concurring). But Judge Henderson stated that the Merit Systems

Protection Board's "powers are relatively more circumscribed" than other agencies. *Id*. at 54.

Judge Millett dissented and emphasized that the panel's decision conflicted with "controlling Supreme Court precedent," ignored "binding rulings of this court," and created "direct conflict with at least two other circuits." *Id*. at 61 (Millett, J., dissenting). As Judge Millett explained, invalidating the removal statute in this case would call "into question the constitutionality of dozens" of multimember bodies "from the Federal Reserve Board and the Nuclear Regulatory Commission to the National Transportation Safety Board and the Court of Appeals for Veterans Claims." *Id*.

**4.** Harris filed a petition requesting en banc review of the stay order, and initial hearing en banc on the merits. The full Court vacated the stay order. The en banc Court was emphatic: "[T]he Supreme Court has repeatedly stated that it was not overturning the precedent established in *Humphrey's Executor* and *Wiener* for multimember adjudicatory bodies." En Banc Order at 2.

## SUMMARY OF ARGUMENT

**I.A.** As the en banc Court has already explained, this case is controlled by binding Supreme Court precedent. Under the *Humphrey's Executor* framework, Congress may provide modest for-cause removal protection to multimember boards and commissions. *Humphrey's Executor* and its progeny further critical due process

10

values by ensuring that neutral arbiters housed within Article II can decide cases without fear or favor, free from arbitrary dismissal or reprisal.

**I.B.** *Seila Law* and *Collins* struck down removal protections for two agencies led by single directors who exercised unilateral regulatory authority over large swaths of the American economy. But the Supreme Court took pains not to disturb *Humphrey's Executor*; the Supreme Court has *never* struck down a traditional multimember agency; and this Court and its sister Circuits uniformly agree that *Humphrey's Executor* remains binding.

**I.C.** The Merit Systems Protection Board is constitutional under *Humphrey's Executor* in both function and form. The Board does not set policy or launch investigations. Even the government agrees the Board "is 'predominantly an adjudicatory body.'" Stay.Op.72 (Millett, J., dissenting) (quoting Oral Arg. Tr. 12:19-23). Meanwhile, the Board's structure tracks the approach approved in *Humphrey's Executor*—a traditional multimember body of experts balanced along partisan lines.

**I.D.** Even if this Court could ignore *Humphrey's Executor* and *Wiener*, the Board would still stand on firm footing. There is a long history of independent adjudicators who sit within the executive branch but are protected from arbitrary removal, such as territorial courts and the Court of Claims. There is likewise an established tradition of multimember independent boards and commissions,

11

predating and postdating *Humphrey's Executor*.  That settled history matters in the separation of powers context, particularly because it represents the judgment of all three branches.  Moreover, the Court should be particularly hesitant to invalidate the Merit Systems Protection Board, of all independent agencies, because the Board represents the culmination of a unique historical process, and multigenerational efforts to combat patronage in federal employment.

**I.E.**  It is impossible to rule for the government in this case without overturning *Humphrey's Executor* and *Wiener*.  But the government asks this Court to do just that by narrowing *Humphrey's Executor* and *Wiener* into non-existence.  That is "*the very job the Supreme Court has forbidden*."  Stay.Op.83 (Millett, J., dissenting); *see* En Banc Order at 2.  The government also attempts to argue that the Board exercises substantial executive power, but that is a thinly veiled request to overturn *Humphrey's Executor* too.  If the Board's modest adjudicatory authority crosses the line (and does not), there would be nothing left of *Humphrey's Executor*.

The consequences of invalidating the Board's structure would be extraordinary.  If the Board is not constitutional, then every independent agency is unlawful—from the Federal Reserve Board on down.  Even were the judiciary to reverse more than a century of practice and precedent, such a seismic shift must come from the Supreme Court, if at all.  *Rodriguez*, 490 U.S. at 484.

12

**II.**  The District Court properly granted Harris relief.  Under binding Circuit precedent, courts may "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official."  *Severino*, 71 F.4th at 1042-1043 (quoting *Swan*, 100 F.3d at 980).  Anglo-American courts have long issued writs of mandamus as a "full and effectual remedy" "for wrongful removal."  Blackstone, *supra*, *264.  The District Court, moreover, has the power to issue declaratory relief to clarify the relationship between the parties.

The government effectively concedes all of this: It does not dispute that *Swan* and *Severino* permit courts to issue injunctive relief; it does not contest that courts may issue mandamus; and it likewise does not contest the District Court's ability to issue declaratory relief.  This Court should affirm.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*.  *Jeffries v. Barr*, 965 F.3d 843, 859 (D.C. Cir. 2020).  It reviews a grant of permanent injunctive relief or declaratory judgment for abuse of discretion.  *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1361 (D.C. Cir. 2023).

## ARGUMENT

### I.    THE MERIT SYSTEMS PROTECTION BOARD IS CONSTITUTIONAL.

The Merit Systems Protection Board is a classic multimember adjudicatory body.  The Board does not make policy or fill up vague statutes.  It decides appeals,

13

applying laws regulating federal employment to the discrete cases brought before it. This Court should leave to the Supreme Court the prerogative of overturning its own decisions, apply binding precedent, and affirm.

## A. Under *Humphrey's Executor*, Congress May Enact For-Cause Removal Protection For Traditional Multimember Bodies.

**1.** *Humphrey's Executor* upheld the structure of the Federal Trade Commission, a "nonpartisan" multimember body of experts whose members served staggered terms and were removable only "for inefficiency, neglect of duty, or malfeasance in office"—the same standard that applies to the Merit Systems Protection Board. *Id*. at 623-624.

As *Humphrey's Executor* explained, the removal provision furthered fundamental due process values. Because the Commission exercises "predominantly quasi judicial and quasi legislative" functions, the Commission "must, from the very nature of its duties, act with entire impartiality." *Id*. at 623, 624. But "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Id*. at 629; *see Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

*Humphrey's Executor* drew upon a rich history. As the Supreme Court explained, in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), "Chief Justice Marshall was of opinion that a justice of the peace for the District of Columbia was not removable at the will of the President." *Humphrey's Executor*, 295 U.S. at 631;

14

*see Wise v. Withers*, 7 U.S. (3 Cranch) 331, 336 (1806) (explaining justice of peace position was "partly judicial, and *partly executive*") (emphasis added).

Even in 1935, invalidating the structure of the Federal Trade Commission would have toppled long-settled practice. It would have meant invalidating other multimember bodies, such as the "Interstate Commerce Commission," and even "the legislative Court of Claims," whose members were protected from arbitrary dismissal. *Id*. at 629. And it would have meant that Congress could not even "prescribe causes for removal" for ordinary "civil officers." *Id*.

The government in *Humphrey's Executor* had leaned on statements regarding the President's removal power in *Myers v. United States*, 272 U.S. 52 (1926). But *Humphrey's Executor* expressly cabined *Myers*, declaring that the "narrow point actually decided was only that the President had power to remove a postmaster of the first class, *without the advice and consent of the Senate as required by act of Congress*." *Humphrey's Executor*, 295 U.S. at 626 (emphasis added). The Court "disapproved" anything else in *Myers* that conflicted with *Humphrey's Executor*, declaring that dicta beyond "the rule of stare decisis." *Id*.

**2.** If there were any doubt about *Humphrey's Executor*'s reach, the Court settled it two decades later. In *Wiener*, the Court applied *Humphrey's Executor* to hold that the President could not remove a member of the War Claims Commission at will.

15

The Commission was an Article II executive branch body that consisted of three members who heard "claims" regarding enemy conduct during the Second World War. *Wiener*, 357 U.S. at 350. Congress could have "given jurisdiction over" the same "claims to the District Courts." *Id*. at 355. Congress instead vested the Commission, situated within the executive branch, with the "judicial" task of deciding "the merits of each claim, supported by evidence and governing legal considerations." *Id*. (quoting *Humphrey's Executor*, 295 U.S. at 629).

Congress had not provided an express provision addressing the President's authority to remove commissioners. *Wiener* inferred a statutory limitation on the President's removal power based on the Commission's function "as an adjudicating body." *Id*. at 354. The Supreme Court then rejected the same "naked[]" assertion the government advances here: "that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees." *Id*. at 356.

The Court was emphatic: "no such power is given to the President directly by the Constitution." *Id*. In the process, the Court differentiated between the core "Executive establishment" "removable by virtue of the President's constitutional powers," and "members of a body" like the Commission who must exercise independent judgment. *Id*. at 353. *Wiener* reiterated that independence furthers due process. If an Article II arbiter " 'holds his office only during the pleasure of

16

another,' " he or she lives with the "Damocles' sword of removal" hanging overhead, and may succumb to " 'coercive influence, direct or indirect.' " *Id*. at 355 (quoting *Humphrey's Executor*, 295 U.S. at 629).

**3.** In the many decades following *Humphrey's Executor* and *Wiener*, the Supreme Court has *never* invalidated a "traditional independent agency headed by a multimember board or commission." *Seila Law*, 591 U.S. at 207.

In *Morrison v. Olson*, Justice Scalia—no fan of the *Humphrey's Executor* framework—explained that "removal restrictions," for entities ranging from the "Consumer Product Safety Commission" to "Article I courts," "have been generally regarded as lawful." *Morrison v. Olson*, 487 U.S. 654, 724-725 (1988) (Scalia, J., dissenting); *see Mistretta v. United States*, 488 U.S. 361, 411 (1989); *Buckley v. Valeo*, 424 U.S. 1, 141 (1976).

In *Morrison*, the Supreme Court reinforced two important aspects of the *Humphrey's Executor* framework that are particularly relevant to this appeal.

*First*, the Court rejected the argument that the President must be able to fire officials simply because they sit within Article II. Congress's ability to provide for-cause removal protection does *not* depend on whether "[an] official is classified as 'purely executive.' " *Morrison*, 487 U.S. at 689. There are no "rigid categories of those officials who may or may not be removed at will by the President." *Id*. It is thus not true that "the language of Article II vesting the executive power of the

17

United States in the President requires that every officer of the United States exercising any part of that power must serve at the pleasure of the President." *Morrison*, 487 U.S. at 690 n.29.  To reiterate: *Morrison* directly refutes the claim that the Vesting Clause means that any official within the executive branch must be removable at will.  *See* Stay.Op.26, 29 & n.142 (Walker, J., concurring).

*Second*, the Court explained that the terms "quasi-legislative" and "quasi-judicial" used in *Humphrey's Executor* to characterize the Federal Trade Commission's functions do not mean an agency must be outside of the executive branch for its members to be protected by for-cause removal statutes.  Instead, those terms "describe" the functions an agency performs, and thus "the circumstances in which Congress might be more inclined to find that a degree of independence" is necessary.  *Id.* at 691 n.30.

## B.     *Seila Law* and *Collins* Confirmed *Humphrey's Executor* Remains Binding.

In *Seila Law* and *Collins*, the Supreme Court held that the *Humphrey's Executor* framework does not extend to "novel" agencies headed by a single director. *Collins*, 594 U.S. at 251; *Seila Law*, 591 U.S. at 204; *see also Free Enter. Fund*, 561 U.S. at 496.  But the Supreme Court repeatedly confirmed that it did not "revisit *Humphrey's Executor* or any other precedent."  *Seila Law*, 591 U.S. at 228; *see id.* at 204.

**1.** In *Seila Law*, the Court invalidated for-cause removal protections for the Consumer Financial Protection Bureau.  The Bureau possessed an unprecedented single-director structure in which one unelected person wielded "vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila Law*, 591 U.S. at 203.  That single director "lack[ed] a foundation in historical practice and clashe[d] with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control." *Id*. at 204.

The Court expressly did not "revisit" its "prior decisions" permitting traditional multimember boards "led by a *group* of principal officers removable by the President only for good cause." *Id*. at 204.  Nor did the Court effectively overrule *Humphrey's Executor* and *Wiener* by narrowing them into non-existence.  The Court instead explained that *Humphrey's Executor* and its progeny permit Congress to create "multimember expert agencies that do not wield substantial executive power." *Id*. at 218.

If that were not enough (it is), two additional facts demonstrate *Seila Law* left the *Humphrey's Executor* framework intact.

*First*, the Court repeatedly contrasted the novel structure of the single-director-led Consumer Financial Protection Bureau with traditional multimember boards and commissions.  *See, e.g.*, *id*. at 205, 207, 209, 218.  In fact, "seven Justices openly invited Congress to repair the constitutional flaw in the [Bureau] by

19

reconstituting it as a multimember body." Stay.Op.83 (Millett, J., dissenting). As the Department of Justice argued in the Supreme Court just a few short months ago, litigants "cannot plausibly maintain that" *Seila Law* "invited Congress to adopt a structure that the preceding pages of the same opinion had just declared unconstitutional." U.S. Brief in Opposition, *Leachco, Inc. v. CPSC* at 15, No. 24-156 (U.S. Nov. 14, 2024).

*Second*, Justice Thomas concurred separately to argue that he would have struck down *Humphrey's Executor*. *Seila Law*, 591 U.S. at 238-239 (Thomas, J., joined by Gorsuch, J, concurring in part and dissenting in part.). In the process, Justice Thomas read the Court's decision *not* to disturb the *Humphrey's Executor* exception for "multimember expert agencies that do not wield substantial executive power." *Id*. at 248 (quoting majority opinion); *accord id*. at 239, 250 (same). Justice Thomas's opinion makes little sense if *Humphrey's Executor* and *Wiener* were narrowed into non-existence, as Judge Walker concluded in his stay opinion.

**2.** In *Collins*, the Court struck down for-cause removal protections for the single-director-led Federal Housing Finance Agency—another agency without historical precedent that exercised vast authority over "the lives of millions of Americans." *Collins*, 594 U.S. at 255.

*Collins* represented a "straightforward application of" "*Seila Law*" and underscored the Court did not revisit " 'decisions allowing certain limitations on the

President's removal power.'" *Id*. at 251 (quoting *Seila Law*, 591 U.S. at 204).  As *Collins* instead explained, the Federal Housing Finance Agency was "*led by a single director*," and suffered the same flaws as the Bureau in *Seila Law*.  *Id*. (emphasis added).  The Court once more contrasted the single-director-led agency before it with a "multi-member Commission."  *Id*. at 253 n.19.  The message again: the *Humphrey's Executor* framework remains intact.

But there is more.  Justice Kagan concurred in the judgment and agreed that *Seila Law* required invalidating the agency.  *Id*. at 271 (Kagan, J, concurring in part and in the judgment).  Justice Kagan wrote separately because she thought some single-director-led agencies remain constitutional, and the Court improperly suggested otherwise.  *Id*. at 273.  Meanwhile, Justice Sotomayor dissented because she concluded the agency in *Collins* did not run afoul of *Seila Law*.  *Id*. at 283 (Sotomayor, J., dissenting, joined by Breyer, J.).  Despite criticizing the majority, neither Justices Kagan nor Sotomayor even hinted that *Collins* modified the rule for traditional multimember boards.

**3.**  In the years since, this Court and its sister Circuits have "faithfully hewed to the Supreme Court's admonition not to get out over their jurisprudential skis and have continued to apply" the *Humphrey's Executor* framework.  Stay.Op.85 (Millett, J., dissenting).

21

This Court refused to invalidate the Federal Trade Commission's structure, and has explained that the "Supreme Court has not disturbed" its "precedent." *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam). The Court has elsewhere described *Humphrey's Executor* and *Wiener* as "binding." *Severino*, 71 F.4th at 1047. And in this very case, the en banc Court has confirmed that "the precedent established in *Humphrey's Executor* and *Wiener* for multimember adjudicatory bodies" remains intact. En Banc Order at 2.

The Tenth Circuit declined to invalidate the Consumer Product Safety Commission because "*Humphrey's Executor* remains binding today," and there is "clear precedential support for" the "removal protections" at issue. *Leachco, Inc. v. CPSC*, 103 F.4th 748, 761, 763 (10th Cir. 2024), *cert. denied*, __S. Ct.__, 2025 WL 76435 (Jan. 13, 2025); *accord Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1265 (10th Cir. 2025) (same).

The Fifth Circuit has dismissed a similar challenge to the Consumer Product Safety Commission. *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 354 (5th Cir.), *cert. denied*, 145 S. Ct. 414 (2024) (Willett, J.). As Judge Willett put it, "[o]nly the Supreme Court has power to reconsider" its "precedent." *Id*. at 356. In 2023, the Fifth Circuit likewise rejected the argument that, because the modern Federal Trade Commission has "changed since *Humphrey's Executor*," *Humphrey's Executor* "is

22

no longer binding." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023). That question "is for the Supreme Court," not a Court of Appeals. *Id*.

* * *

In short, the *Humphrey's Executor* framework "remains alive and well." JA82. This Court is "bound to apply" precedent "until th[e] Court instructs otherwise." *Hosp. Menonita de Guayama, Inc. v. NLRB*, 94 F.4th 1, 17 (D.C. Cir. 2024) (Katsas, J., concurring). There is no wiggle room: Even if this Court believes *Humphrey's Executor* "is in tension with some other line of decisions," a "lower court" must "follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions." Stay.Op.81 (Millett, J., dissenting) (quotation marks omitted); *accord Rodriguez*, 490 U.S. at 484. Moreover, a majority of the en banc Court agrees that *Humphrey's Executor* provides the answer. *See* En Banc Order at 2-3. Even if members of the panel disagree, they should at minimum act as faithful agents for the en banc Court and apply that directly controlling precedent.

## C.    The Board Falls Squarely Within The *Humphrey's Executor* Framework.

The *Humphrey's Executor* framework "dictates the outcome." JA82. As both the District Court and Judge Millett detailed, the Merit Systems Protection Board is a quintessential adjudicatory body whose members Congress may protect from arbitrary dismissal.

23

**1.** Start with the Merit Systems Protection Board's functions. "In the government's own words," the Board is "predominantly" "adjudicatory." Stay.Op.72 (Millet, J., dissenting) (quoting Oral Arg. Tr. 12:19-23). In fact, the government recently analogized the Board to no less a judicial body than "the Supreme Court."[3]

The Board does not fill up vague statutes, "establish policy," or "regulate the conduct of private parties." JA55, 83. The Board hears a narrow range of appeals regarding civil servants—including claims of "discrimination, loyalty oaths, coercion to engage in political activity, and retaliation against whistleblowers"— applying the laws Congress passed to the facts of each discrete case. JA84. Just like an Article III court, moreover, the Board "cannot initiate its own personnel cases, but must instead passively wait for them to be brought." JA83. The Board thus "does not investigate allegations of wrongdoing" "in the first instance" and "does not prosecute cases." JA55; *cf.* Alexander Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* (1962). The Board likewise does not possess a mechanism to directly enforce orders.[4]

---

[3] Gov. Reply at 4, ECF No. 25, *Dellinger v. Bessent*, No. 1:25-cv-00385-ABJ (D.D.C. Feb. 25, 2025) ("The Special Counsel is not 'supervised' by the [Board] any more than the Solicitor General is 'supervised' by the Supreme Court.").

[4] The government is wrong: The Board cannot withhold salaries to enforce compliance. *See infra* pp. 39-40.

*Wiener* is directly on point.  Just as with the War Claims Commission, Congress could have "given jurisdiction" over civil service "claims to the District Courts or to the Court of Claims."  *Wiener*, 357 U.S. at 355.  That fact only underscores the "intrinsic judicial character of the task with which the" Board is "charged."  *Id*.  The Board exercises *less* adjudicatory power than the Commission in *Wiener*, whose decisions were completely unreviewable "by any other official of the United States or by any court."  *Id*. (quotation marks omitted).  By contrast, the Board's decisions are reviewable in Article III courts.  There is thus no way to invalidate the Board without overturning *Wiener*.

Meanwhile, Congress tailored the Board's jurisdiction to avoid encroaching on the President's core prerogatives.  The Board can only hear appeals regarding civil servants; has limited authority regarding senior executive managers; cannot adjudicate appeals brought by political appointees; and cannot interfere with national security matters.  At the same time, the Board *itself* reduces the potential for interbranch friction.  Congress created a specialized Article II body to perform "mediation and initial adjudication of federal employment disputes, rather than shifting those decisions to Article III courts in the first instance" to channel these cases to expert adjudicators specially versed in how federal agencies manage their workforce.  JA84.

The Board's history confirms its adjudicatory nature. In 1883, Congress established the Board's precursor, the Civil Service Commission, which handled both personnel management and adjudications. In 1978, Congress split the Commission into multiple entities, including: (1) the Office of Personnel Management, to manage the federal workforce as a true organ of executive power; and (2) the Merit Systems Protection Board, as an adjudicatory authority. Civil Service Reform Act, Pub. L. No. 95-545, 92 Stat. at 1122. In 1989, Congress cleaved off the Office of Special Counsel—a single-director-led entity that investigates and prosecutes violations of civil service rules—into a separate executive branch agency. Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat. 16 (1989). The result is a purely "adjudicatory" Board. *Wiener*, 357 U.S. at 356.

**2.** The Board's multimember structure is straight out of *Humphrey's Executor*. The Board's three members must be "drawn from both sides of the aisle," and serve "staggered terms," ensuring the accrual of "significant expertise." *Seila Law*, 591 U.S. at 218; *accord Humphrey's Executor*, 295 U.S. at 624. By law, the members must be experts whose "ability, background, training, or experience" make them "especially qualified" to serve as members. 5 U.S.C. § 1201.

Meanwhile, the President may designate the Board's chairman, affording him a measure of control over the Board. *See Seila Law*, 591 U.S. at 225; *PHH Corp.*, 881 F.3d at 189 (Kavanaugh, J., dissenting). And the Board lacks the unique

26

permanent funding features that insulated both the Consumer Financial Protection Bureau and the Federal Housing Finance Agency from the constitutional "appropriations process," and further "aggravate[d] the . . . threat to Presidential control." *Seila Law*, 591 U.S. at 226; *see* JA83.

### D.    Constitutional Text And History Support The Board's Structure.

The Court can stop here.  But if the Court could somehow skirt the binding force of *Humphrey's Executor* and *Wiener* (it cannot), the Constitution's text and centuries of historical practice militate in favor of upholding the Board's structure.

**1.**    The Constitution's text underscores that Congress may play a role in regulating the removal of principal officers.

Under the Appointments Clause, the President "shall nominate" all principal "Officers of the United States, whose Appointments . . . *shall be established by Law*."  U.S. Const. art. II, § 2, cl. 2 (emphasis added).  When Congress exercises the power to "establish[]" an office "by Law," Congress may indicate the standards that pertain to that office, including when the official may be removed.  *See Seila Law*, 591 U.S. at 266 (Kagan, J., concurring in the judgment and dissenting in part).

The Supreme Court has already given parallel constitutional text a similar interpretation.  In analyzing the second sentence of the Appointments Clause—permitting Congress "by Law" to "vest the Appointment of such inferior Officers" "in the heads of Departments," U.S. Const. art. II, § 2, cl. 2—the Supreme Court

explained that the authority to, "by law, vest[] the appointment of inferior officers in the heads of departments" includes the ability to "limit and restrict the power of removal." *United States v. Perkins*, 116 U.S. 483, 485 (1886).

The same interpretation holds true for the similar language in the first sentence of the Appointments Clause. When Congress established the office of member of the Merit Systems Protection Board "by law," Congress could "restrict the power of removal." *Id.*[5]

**2.** The Board independently draws support from the second sentence of the Appointments Clause, which empowers Congress to establish a merit-based civil service of which the Board is an integral component. *Id.*

As the District Court explained, the Board's "independence is" "structurally inseparable from" and its "duties dovetail with" the merit system itself. JA85. It would "neuter" the laws Congress passed to allow "high-ranking government officials to engage in prohibited practices and then pressure the [Board] into inaction." JA84-85.

**3.** The Merit Systems Protection Board's structure additionally reflects "deeply rooted historical practice," which carries particularly heavy weight in the

---

[5] *Seila Law* and *Collins* do not contradict this interpretation. They suggest that Congress's authority to "restrict the power of removal" is not limitless, and did not permit Congress to provide for-cause removal protection to the two single-director-led agencies in those cases. *Perkins*, 116 U.S. at 485.

"separation of powers analysis." *PHH Corp.*, 881 F.3d at 174, 179 (Kavanaugh, J., dissenting); *see Seila Law*, 591 U.S. at 222 (invalidating "a historical anomaly"); *Free Enter. Fund*, 561 U.S. at 505 (underscoring a "lack of historical precedent for th[e] entity" (quotation marks omitted)). That practice reflects the judgment of all three branches: Congress and the President enacted legislation through bicameralism and presentment, relying on a century-old framework established by the Supreme Court.

The tradition supporting the Merit Systems Protection Board consists of two overlapping strands that date to the Founding: (1) protections for independent adjudicators within the executive branch; and (2) protections for multimember bodies.

As *Humphrey's Executor* recognized, Congress has long enacted measures to protect the "independence" of adjudicators who sit within the executive branch. 295 U.S. at 630. In the first years of the new nation, Congress passed laws under which territorial judges held their commissions "during good behavior."[6] Shortly before the Civil War, Congress created the Court of Claims, a "legislative [c]ourt" whose judges were likewise protected from arbitrary removal. *Humphrey's Executor*, 295

---

[6] *See, e.g.*, An Act to Provide for the Government of the Territory North-West of the River Ohio, ch. 8, 1 Stat. 50, 51 (1789); Act of Apr. 7, 1798, ch. 28, § 3, 1 Stat. 549, 550 (1798). Territorial courts were "not courts of the United States" under Article III. *McAllister v. United States*, 141 U.S. 174, 184, 187 (1891); *see* Stay.Op.87 n.3 (Millett, J., dissenting).

U.S. at 629.[7]  In 1890, Congress afforded removal protection to the Board of General Appraisers, a multimember body balanced along partisan lines that heard cases regarding imported goods and tariffs.[8]  Congress provided similar protections to the members of the Board of Tax Appeals in 1924, and administrative law judges in 1946.[9]

Today, Tax Court judges, 26 U.S.C. § 7443(f), judges on the Court of Appeals for Veterans Claims, 38 U.S.C. § 7253(f), and judges on the Court of Appeals for the Armed Forces, 10 U.S.C. § 942(c), are all adjudicators protected from arbitrary dismissal through for-cause removal provisions.

There is an equally established tradition of multimember bodies with removal protection.  As Judge Millett detailed, Congress created the multimember Sinking Fund Commission in 1790; the First Bank of the United States a year later; and the Second Bank in 1816.  Stay.Op.88 (Millett, J., dissenting).  To pick a few more, Congress established the Interstate Commerce Commission in 1887; the Federal Reserve Board in 1913; the Federal Trade Commission in 1914; the National Mediation Board in 1934; the National Labor Relations Board in 1935; the Atomic

---

[7] *See* Act of Feb. 24, 1855, ch. 122, § 1-1, 33 Stat. 612 (1855).  The Court of Claims was a "legislative court."  *Williams v. United States*, 289 U.S. 553, 571, 581 (1933); *accord Humphrey's Executor*, 295 U.S. at 629.

[8] Act of June 10, 1890, ch. 407, § 12, 51 Stat. 136-138 (1890).

[9] Revenue Act of 1924, ch. 243, 43 Stat. 253, 337 (1924); Administrative Procedure Act, ch. 324, § 11, 237, 244 (1946).

Energy Commission in 1946; the Federal Energy Regulatory Commission in 1977; and, of course, the Merit Systems Protection Board in 1978.[10]

The executive branch has long accepted this deeply rooted tradition.  Neither the Office of Legal Counsel "nor any President in a signing statement has called into doubt *Humphrey's Executor* or *Wiener*."  App.95 (Millett, J., dissenting).  Quite the opposite.    When Congress created the Merit Systems Protection Board, the Department of Justice took the position that the Board is "a *quasi-judicial body whose officials may be legitimately exempted from removal* at the pleasure of the President." 2 O.L.C. 120, 121 (1978) (emphasis added); *see also, e.g.*, 3 O.L.C. 357, 358-359 (1979) (similar).

In addition to undergirding the constitutional analysis, this history demonstrates the extraordinary stare decisis values at stake.  Ruling for the government would take a sledgehammer to foundational institutions.  If the Merit Systems Protection Board is not constitutional, nothing is.  Not the Federal Reserve Board, which sets monetary policy and regulates banks.    Not the National Transportation Safety Board, which investigates air accidents.  Not the Tax Court,

---

[10] *See* Interstate Commerce Act, Pub. L. No. 49-104, 24 Stat. 379, 383 (1887); Federal Reserve Act, Pub. L. No. 63-48, 38 Stat. 251, 260 (1913); Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 717, 718 (1914); An Act to Amend the Railway Labor Act, Pub. L. No. 442, 48 Stat. 1185, 1193 (1934); National Labor Relations Act, Pub. L. No. 198, 49 Stat. 449, 451 (1935); Atomic Energy Act of 1946, Pub. L. No. 585, 60 Stat. 755, 756-757 (1946); Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565, 582 (1977).

the Court of Appeals for Veterans Claims, nor any other legislative Court. The list goes on.

**4.** In an attempt to contain the damage, and in extraordinarily wishy-washy language, the government suggested that the Federal Reserve's " 'unique historical background' " "*may* illuminate the constitutional analysis" for that particular agency, pointing to "the First and Second Banks of the United States." Gov. Resp. to Admin Stay. Mot. 2 n.2 (emphasis added) (quoting *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 467 n.16 (2024) (Alito, J., dissenting)).

That does not hold up. There is no coherent way to create a special "Federal Reserve exception" that cabins the destructive effects of the government's theory. For one thing, the Federal Reserve exercises *far more* executive power than the Merit Systems Protection Board, and countless other independent agencies. The Federal Reserve sets monetary policy and regulates banks. It is incoherent to argue that the Constitution provides the President unfettered authority to terminate everyone who exercises the smallest amount of executive power—but then blow a massive hole in that constitutional theory for the modern Federal Reserve.

For another, the fact that directors of the First and Second Banks were not removable by the President does not mean there should be a special historical exception for financial institutions. *See* Stay.Op.87-88 (Millett, J., dissenting). It shows that the government's theory of executive power is wrong. The Framers did

*not think* every member of a multimember board needed to be removable by the President at will, and the *Humphrey's Executor* framework thus reflects the original understanding at the Founding.

Regardless, even under an approach that scrutinizes the history of each specific agency, the Merit Systems Protection Board passes in spades. The Board is the product of a unique history resulting in an "intensely-bargained compromise." *Cmty. Fin. Servs.*, 601 U.S. at 467 n.16 (Alito, J., dissenting).

Consider the CliffsNotes of the history. At the Founding, George Washington embraced principles of merit-based service. Patricia Wallace Ingraham, *The Foundation of Merit: Public Service in American Democracy* 17 (1995). But Thomas Jefferson took the position that "party service was a valid criterion for appointment to," and removal from, public service. *Id*. at 18. By the Civil War, a spoils system had taken hold. The effects were "tragic," undermining "the effectiveness of the Union army and" "federal government" during the war. *Id*. at 22.

President Grant "ran on a reform platform," but his administration faced "pressure from members of Congress looking for patronage appointments." *Id*. at 24. In 1871, Congress authorized a short-lived Civil Service Commission that shuttered two years later. *Id*. Only after President Garfield's assassination by a would-be office-seeker did Congress pass the Pendleton Act in 1883, which

established a Civil Service Commission of three members removable by the President at will. *Id*. at 27.

The civil service initially encompassed only 10% of the workforce, *id*., and Presidents continued to use "patronage removals and appointments" into the Twentieth Century, *id*. at 33, 46. Meanwhile, the "Civil Service Commission itself" soon became "a problem" because it served inherently conflicting roles of "administer[ing] and protect[ing] the merit system" while simultaneously "advis[ing] and assist[ing] the president in patronage matters." *Id*.

Abuses in the Watergate Era brought matters to a head. Contemporary investigations uncovered "flagrant violations" of merit principles for partisan "political interests," creating employment processes that "approximate[d] a patronage system." Subcomm. on Manpower & Civil Service, *Documents Relating to Political Influence in Personnel Actions at the Small Business Administration* 11, 13 (1975).

The corruption extended to the Civil Service Commission itself. "[T]op Commission officials," "including Commissioners," improperly sought to place individuals in positions of employment; "Commission officials" succumbed to "high-level pressure" to engage in patronage; and the Commission "failed to respond effectively" to "political interference in the operation of the Federal merit system." U.S. Civ. Serv. Comm., *A Self-Inquiry into Merit Staffing* 39, 46, 65 (1976).

34

President Jimmy Carter made civil service reform a component of his election campaign and spearheaded the passage of the Civil Service Reform Act.  Ingraham, *supra*, at 75-77.  Central to reform was splitting the Commission's personnel management and adjudicatory functions, *see supra* p. 26, and creating a "strong and independent" Board free of the pressures that had plagued the old Commission.  S. Rep. No. 95-969, at 6 (1978).

In short, the Board reflects a consensus forged over centuries.  The Court should not upset our nation's long efforts to ensure that federal jobs serve the public interest.

### E.    The Court Should Reject The Government's Invitation To Overturn *Humphrey's Executor*.

The government asks the Court to narrow *Humphrey's Executor* into non-existence.  This Court should reject the invitation to "rewrite controlling Supreme Court precedent and ignore binding rulings of this court."  Stay.Opp.61 (Millett, J., dissenting).  If the Judiciary is to pull the rug from underneath the democratically elected branches, after centuries of practice and precedent, that extraordinary upheaval must come (if at all) from the Supreme Court.

**1.** The government primarily argues that *Humphrey's Executor* was wrongly decided.  According to the government, *Humphrey's Executor* misclassified the Federal Trade Commission's functions as quasi-judicial and quasi-legislative, but "the agency's powers 'would at the present time be considered 'executive,' at least

35

to some degree," because the Commission is housed within the executive branch. Gov. Br. 21 (quoting *Morrison*, 487 U.S. at 689).

But the Supreme Court "expressly rejected this argument in *Morrison*"—*in the very passages the government quotes*. Stay.Op.80 (Millett, J., dissenting). As explained above, *Morrison* was clear: The mere fact that an entity is housed within Article II, and is therefore part of the executive branch, does not mean the entity necessarily exercises the kind of executive functions that must remain subject to at-will presidential removal.[11]

Nor has the Supreme Court directed lower courts to narrow the *Humphrey's Executor* framework into oblivion, and deem it applicable *only* to "the identical twin of the 1935" Federal Trade Commission "as Humphrey's understood the 1935 Federal Trade Commission." Stay.Op.32 (Walker, J., concurring); *see* Gov. Br. 21-24. Quite the opposite. The Supreme Court *has never struck down* a traditional multimember agency, and *Seila Law* expressly confirmed "that Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause." *Seila*, 591 U.S. at 204.

It bears emphasis: To adopt the government's reading of *Seila Law*, one must conclude the Supreme Court did not mean "what it said when it repeatedly left

---

[11] The government's observation (at 36) that Congress *may choose* to subject "purely adjudicatory bodies" to "presidential control" in no way means the Constitution *requires that result* in every instance.

*Humphrey's Executor* in place." Stay.Op.83 (Millett, J., dissenting). This Court should not defy the Supreme Court's instructions.[12]

**2.** The blast radius from the government's theory reaches far and wide. If everyone who sits within Article II must be removable at will under the Vesting and Take Care Clauses, then *every* independent agency and neutral adjudicator lives underneath the "Damocles' sword of removal." *Wiener*, 357 U.S. at 356. According to the government, the President could fire the members of the National Transportation Security Board if they refuse to cover up the cause of an accident. The President could fire Tax Court judges who decline to give tax breaks to his political allies. The threat of removal will undermine both actual impartiality and the appearance of impartiality that are critical for the public to have faith in these foundational institutions. There is a reason no President has attempted to exert this kind of naked authority: The corrosive effects are vast and disturbing.

Today, the merit-based civil service is also on the chopping block. The government pays lip service (at 17) to precedent permitting Congress to provide the standards of removal for inferior officers and employees. But that precedent is impossible to square with the Administration's limitless theory of removal under

---

[12] The government's citations (at 17, 32) to *Trump v. United States*, 603 U.S. 593 (2024), disprove its case. After stating that the President may remove executive officers, *Trump* cites *Seila Law* to identify "exceptions to the President's unrestricted removal power." *Id*. at 609 (quoting *Seila Law*, 591 U.S. at 215).

which anyone who exercises any amount of executive power must be removable at will by the President.

Perhaps most concerningly, the government's theory means that "a century-plus of politically independent monetary policy" is no more.  Stay.Op.112 (Millett, J.).  A President could order the Federal Reserve to print money so he can win reelection, and fire the Board if they decline to torch the economy.  This result is, to put it mildly, very hard to derive from the text or history of the Constitution.

**3.**  The government (at 33) alternatively attempts to paint the Merit Systems Protection Board as exercising "substantial executive authority."  But even Judge Henderson acknowledged that the Board's "powers are relatively" "circumscribed." Stay.Op.54 (Henderson, J., concurring).  That is an understatement:  The Board does not initiate prosecutions or make policy.  It decides discrete employment appeals.  If the Board does not pass muster, nothing does.

*First*, the fact that the Board "hears" and "adjudicates" "matters within its jurisdiction" does not render the board unconstitutional.  Gov. Br. 33 (brackets omitted).  A board hearing cases is the *ne plus ultra* of a permissible "adjudicatory body."  *Wiener*, 357 U.S. at 356.  In fact, the Board exercises *less* authority than the War Claims Commission in *Wiener*.  The Commission issued completely non-reviewable decisions from its perch within the executive branch.  *Id*. at 354-355. The Board's decisions are reviewable in Article III courts.

*Second*, the Board is not problematic because it applies laws prohibiting arbitrary dismissal and abuse of executive branch "personnel." Gov. Br. 27. The Board no more "interfere[es] with the President's control over" employees, *id.*, than an Article III court interferes with educational institutions' admissions when it enforces foundational civil rights laws, *see Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023). If anything, because the Board specializes in federal employment issues and has a unique knowledge of how agencies operate their personnel, the Board's initial review is *less* intrusive than if an Article III court heard the same claims in the first instance.

*Third*, the Board lacks any direct mechanism to enforce its orders. The government (at 33) harps on a provision of the Civil Service Reform Act that, when enacted in 1978, had permitted the Board to order the withholding of pay from federal employees who refused to comply with its decisions. 5 U.S.C. § 1204(e)(2)(A).

But the Board has *never employed this mechanism* in modern memory. Doing so would require the involvement of the Comptroller General (who is a legislative branch official), and that would be unconstitutional. *See Bowsher v. Synar*, 478 U.S. 714, 733 (1986). The statutory authorization to withhold salaries is thus "unconstitutional and void," and does not factor into the Court's analysis of the Board's authorities. *Free Enter. Fund*, 561 U.S. at 510. Regardless, even if the

Board could order the withholding of pay (it cannot), the ability to sanction contempt is a judicial function.[13]

*Fourth*, the government complains (at 35) the Board is "the named respondent" before an Article III court in two circumstances: (1) complex procedural appeals, and (2) circumstance in which the Director of the Office of Personnel Management petitions a court to review the Board's decision.  There are no meaningful constitutional concerns here either.  Naming the Board as a defendant simply "ensures the Board's expert attorneys can provide their specialized knowledge" in "complex cases," and allows the Board to provide its perspective to the court if the Director appeals.  JA58.

The Board's ability to represent itself when sued looks nothing like the litigation authority the executive branch wields through the Department of Justice, which launches investigations and prosecutes cases.  Moreover, the ability to appear before courts is a typical feature of independent agencies, from the Federal Reserve to the Surface Transportation Board, which only underscores the degree to which adopting the government's position here would require overturning *Humphrey's*

---

[13] Some of the Board's orders have referenced 5 U.S.C. § 1204(e)(2)(A).  But the Board has never used the mechanism, and the process of certifying an order to the Comptroller General is understood to be unconstitutional.

*Executor*.[14]  Nor is appearing in court a uniquely executive function.  Federal district courts retain attorneys on their behalf in mandamus cases, and the houses of Congress litigate in court.

On this score, the government's invocation (at 35) of *Buckley* backfires.  Quite unlike the Board, the Federal Election Commission in *Buckley* exercised "direct and wide ranging" "enforcement power."  *Buckley v. Valeo*, 424 U.S. at 111.  Even then, the Supreme Court cited *Humphrey's Executor* and made clear that "the President may not insist that such functions be delegated to an appointee of his removable at will."  *Id*. at 141.

*Fifth*, the government takes aim (at 34-35) at the fact that the Office of Special Counsel can request a single member of the Board to enter a temporary stay in personnel actions, which the full Board can "terminate[]" "at any time."  5 U.S.C. § 1214(b)(1)(D).  But the ability of a single judge to grant a temporary stay is a typical feature of multimember adjudicatory bodies.  *See, e.g.*, Sup. Ct. R. 22.5, 23.1.  A Board member's authority to enter a brief stay looks *nothing* like the vast power wielded by single directors that troubled the Supreme Court in *Seila Law* and

---

[14] *See, e.g.*, 15 U.S.C. § 2061(a) (Consumer Product Safety Commission); 42 U.S.C. § 7171(i) (Federal Energy Regulatory Commission); 5 U.S.C. § 7105(h) (Federal Labor Relations Authority); 46 U.S.C. § 41307(a), (d) (Federal Maritime Commission); 12 U.S.C. § 248(p) (Federal Reserve); 15 U.S.C. § 53(b) (Federal Trade Commission); 29 U.S.C. § 154(a) (National Labor Relations Board); 49 U.S.C. § 1301(c)(1) (Surface Transportation Board); 39 U.S.C. § 409 (United States Postal Service).

*Collins*. And it pales in comparison to the powers of (for example) the Federal Reserve Board.

Moreover, only the Special Counsel (not Harris or any other Board official) may seek this kind of stay. 5 U.S.C. § 1214(b)(1)(A)(i). In *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 5, 2025) (per curiam), a special panel explained that the President has the authority to remove the Special Counsel because he is a single director head of an agency. As a result of that decision, the President has installed his preferred Acting Special Counsel, who in turn completely controls the ability to request these stays. If the government does not want more such stays, the Acting Special Counsel can simply not seek them. The Board merely adjudicates stay requests brought to it. This theoretical concern is therefore amply solved by the President's existing powers; there is no need whatsoever to invalidate Congress's agency structure to give him greater powers.

*Sixth*, the government argues (at 35) that the Board is unconstitutional because it adjudicates whether an agency has proven the necessary cause when terminating administrative law judges, who are protected from arbitrary removal. This is chutzpah. The Department of Justice's official position is that "removal restrictions shielding administrative law judges (ALJs) *are unconstitutional*."[15] *But see Free*

---

[15] Statement from Justice Department Chief of Staff Chad Mizelle, Department of Justice (Feb. 20, 2025), https://www.justice.gov/opa/pr/statement-justice-department-chief-staff-chad-mizelle (emphasis added).

*Enter. Fund*, 561 U.S. at 507 n.10 (suggesting "administrative law judges" are constitutional because they "perform adjudicative rather than enforcement or policymaking functions"). Regardless, the Board does not play "a significant role in" the "removal" of administrative law judges. Gov. Br. 35. Agencies decide whether a judge has committed misconduct, and the agency initiates the termination. Like any adjudicator, the Board applies law to facts the agency presents.

*Seventh*, and finally, the government argues (at 34) that the Board's structure is unconstitutional because the Board may "*sua sponte* review" Office of Personnel Management regulations to ensure compliance with laws Congress passed regulating prohibited practices, such as discrimination and retaliation.

But this purely "negative power" *is also adjudicatory*. Stay.Op.55 (Henderson, J., concurring). This authority is not just "rarely used"; it is effectively *never* employed. *Id*. We could find one instance, almost a half-century ago, and even that review upheld the regulation. *In re Exceptions from Competitive Merit Plans*, 9 M.S.P.R. 116 (MSPB 1981). As Judge Millett explained, moreover, this adjudicatory authority cannot "trench upon any lawful exercise of the President's duty to 'faithfully execute' the laws," and the government may always seek "judicial review." Stay.Op.77 (Millett, J., dissenting).

Regardless, if the Court were truly worried about that vestigial function or some other, the solution (consistent with principles of constitutional avoidance and judicial modesty) is not to blow up the entire agency structure, but to invalidate the particular exercise of the function should it ever be used. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 24-26 (2021).

* * *

In *Wiener*, the Supreme Court rejected the "naked[]" "claim that the President could remove a member of an adjudicatory body" "merely because he wanted his own appointees." *Wiener*, 357 U.S. at 356. That is precisely what the President is attempting here, and it violates the law that Congress enacted. This Court should follow binding precedent, leave to the Supreme Court its "prerogative of overruling its own decisions," and affirm. *Rodriguez*, 490 U.S. at 484.

## II. THE GOVERNMENT'S REMEDIES ARGUMENTS ARE MERITLESS.

Below, the government argued Article III courts are powerless when the executive violates a for-cause removal statute. The government now retreats and acknowledges that the District Court possessed authority to grant (i) injunctive relief, (ii) mandamus, and (iii) declaratory relief.

With good reason. For hundreds of years, Anglo-American courts have provided a "full and effectual remedy" "for wrongful removal," and the District Court correctly did so here. Blackstone, *supra*, *264-265. But the point is even

more basic:  In our constitutional system, courts "say what the law is," and the executive branch complies with the judiciary's judgments.  *Marbury*, 5 U.S. at 177. To hold that a court cannot provide effective relief in this case would threaten the foundations of judicial review.

## A.    The District Court Properly Awarded Relief.

The District Court awarded an injunction, and explained that it would award "mandamus as an alternative remedy" if "equitable injunctive relief" were unavailable.  In addition, the District Court issued a declaratory judgment in Harris's favor.  All three forms of relief fell well within the District Court's core powers.

### 1.    Under *Swan* And *Severino*, Courts May Issue Injunctions.

As the government acknowledged, under binding "circuit precedent," Oral Arg. Tr. 37:4-5, the District Court possessed the power to enjoin "subordinate executive officials," and order them to treat Harris "as a member of the" "Board and allow[] h[er] to exercise the privileges of that office."  *Swan*, 100 F.3d at 980; *see id*. at 989 (Silberman, J., concurring) (explaining that this type of injunction may issue and provides "complete relief" to officials); *Severino*, 71 F.4th at 1042-1043; Stay.Op.102 (Millett, J., dissenting).

Supreme Court precedent reinforces that same conclusion.  In *Sampson v. Murray*, 415 U.S. 61 (1974), the Court recognized that "in disputes over tenure of governmental employees," courts of law rather than courts of equity historically

provided relief. *Id*. at 71. But the Supreme Court then explained that "[m]uch water has flowed over the dam since" then, and confirmed that "federal courts do have authority to review the claim of a discharged governmental employee." *Id*.

On at least two occasions, the Supreme Court has ordered remands for federal officials to receive injunctive relief in removal cases. In *Service v. Dulles,* 354 U.S. 363, 370, 389 (1957), on which *Sampson* relied, 415 U.S. at 71, a foreign service officer had sought both injunctive and declaratory relief, and obtained that relief on remand after the Supreme Court held his termination unlawful, *Service*, B-134614 (Comp. Gen.), 1958 WL 1888 (Mar. 3, 1958). Meanwhile, in *Vitarelli v. Seaton*, a federal employee sought judgment declaring his dismissal unlawful and "an injunction requiring his reinstatement," and the Court held that he was "entitled to the reinstatement which he seeks." 359 U.S. 535, 537, 546 (1959); *see also, e.g.*, *Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (noting public servants facing "unconstitutional discrimination" may obtain "an injunction").[16]

---

[16] Two additional sources provided the District Court authority. The Administrative Procedure Act authorizes the Court to "compel agency action unlawfully withheld," 5 U.S.C. § 706, and the Declaratory Judgment Act authorizes "[f]urther necessary or proper relief based on a declaratory judgment," 28 U.S.C. § 2202.

### 2. There Is A Lengthy Anglo-American Tradition Of Mandamus.

But even "if *Sampson*, *Swan*, and *Severino* did not make equitable relief available to Harris," there is a an extremely well-documented tradition of Anglo-American courts issuing mandamus in precisely this circumstance. JA94. As the District Court noted, to "the extent that English equity courts declined to issue injunctions," "the King's Bench, a court of law, would readily issue mandamus instead." JA95. Today, a request for an injunction" "is essentially a request for a writ of mandamus in this context"—meaning that this Anglo-American history also supports the District Court's authority to issue an injunction. *Swan*, 100 F.3d at 976 n.1. But the "broader point" is the District Court possessed the authority to "provide Harris *some* form of effective relief"—regardless of the precise label of the order. JA97.

As the District Court detailed, *see* JA95-96, and as this Court recognized more than a century ago, there is "overwhelming" authority that "mandamus" lies where a person removable only for "causes specified" "is wrongfully dispossessed." *Kalbfus v. Siddons*, 42 App. D.C. 310, 319 (D.C. Cir. 1914) (quoting *R v. Blooer*, (1760) 97 Eng. Rep. 697; 2 Burr. 1043, 1045). According to no less an authority than Blackstone, "mandamus" provides a "full and effectual remedy" in removal

cases.  Blackstone, *supra*, \*264; *see, e.g.*, *R v. Mayor, Bailiffs and Common Council of the Town of Liverpool*, (1759) 97 Eng. Rep. 533; 2 Burr. 730-732.[17]

That English tradition crossed the Atlantic and is reflected in American caselaw "from the earliest days of the Republic."  Milton Eisenberg, *The Influence of the Writ of Mandamus in Federal Personnel Litigation*, 45 Geo. L.J. 388, 388 (1957).  Indeed, *Marbury v. Madison* involved an officer whose commission was wrongfully withheld—a circumstance analogous to wrongful removal.  According

---

[17] *See* Oliver Field, *Civil Service Law*, ch. XI § V (1939) ("Mandamus to reinstate . . . is probably the most commonly used remedy in civil service removal cases which reach the courts."); James L. High, *A Treatise on Extraordinary Remedies* 71 (2d ed. 1884) ("[T]he power of the civil courts to restore one [to office] who has been wrongfully removed is well established"); Samuel Slaughter Merril, *Law of Mandamus* 182 (1892) ("When an officer has been wrongfully removed from his office, he will be restored thereto by the writ of *mandamus*."); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus* 240 (1853) (mandamus "to restore" lies as a "remedy for a wrongful dispossession of an office or function which has temporal rights attached to it"); John Shortt, *Informations (Criminal and Quo Warranto), Mandamus and Prohibition* 302 (1888) ("mandamus to restore" is "true specific remedy" for person "wrongfully dispossessed of any office" (quotation marks omitted)).

to Chief Justice Marshall, that scenario presented "a plain case for a mandamus." *Marbury*, 5 U.S. at 173.  Numerous other cases abound.[18]

### 3.    Declaratory Relief Was Independently Appropriate.

Finally, the District Court independently possessed authority to issue declaratory judgment for Harris.  *See* 28 U.S.C. § 2201(a); *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality op.) (ordering declaratory relief against subordinate federal official); *United States v. Wilson*, 290 F.3d 347, 350, 362 (D.C. Cir. 2002) (directing judgment on remand to member of Civil Rights Commission); *Borak v. Biddle*, 141 F.2d 278, 281 (D.C. Cir. 1944) (approving of declaratory judgment "establishing [a] right" to a hearing in case of removal without proper process).

### B.    The Government's Contrary Arguments Are Wrong.

**1.**  The government does not contest the key points.  At oral argument on the stay motion, the government agreed the District Court could provide injunctive relief

---

[18] *Fuller v. Trs. of Acad. Sch. in Plainfield*, 6 Conn. 532, 546 (Conn. 1827) (mandamus proper where "no just cause is shewn"); *State ex rel. Gill v. Common Council of City of Watertown*, 9 Wis. 254, 258 (1859) ("[A] mandamus is a proper remedy to restore a party to the possession of an office from which he has been illegally removed."); *Ransom v. Mayor of Boston*, 79 N.E. 823, 823 (Mass. 1907) (mandamus to "reinstate" plaintiff "unlawfully ousted" from position with city labor service); *Truitt v. City of Philadelphia*, 70 A. 757, 761 (Pa. 1908) (mandamus "to reinstate" local superintendent after he was "illegally removed"); *see also Macfarland v. United States ex rel. Russell*, 31 App. D.C. 321, 322 (D.C. Cir. 1908) (mandamus to compel re-enrollment of plaintiff as police officer).

"as a matter of circuit precedent." Stay Oral Arg. Tr. 37. The government acknowledges (at 45) the extremely long Anglo-American history and tradition of courts providing mandamus relief in this precise context. And the government likewise now agrees (at 40 n.7) that the District Court could award declaratory relief.

The government's objections amount to quibbling on the margins.

*First*, the government (at 37-38, 40) argues the District Court ordered broader relief than authorized by *Swan* and *Severino*. Not true. The District Court hewed to *Swan* and *Severino*, and ordered relief directed only against the President's subordinates.

Before this Court, the government does *not* contest that the District Court could enjoin the subordinate defendants from "treating" "Harris as having been removed without cause," denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board." JA105.

It seems the government's sole complaint is that the District Court stated that "Harris shall continue to serve" in office, and enjoined defendants "from removing Harris from her office without cause." *Id*. This picayune objection is meritless. The portion of the order stating that "Harris shall continue to serve" simply confirms the reality that, if Harris cannot be treated as removed, she shall serve. The portion

stating that no one shall remove Harris underscores that the subordinate officials cannot attempt to prevent Harris from exercising her duties. There is no problem here.

Relatedly, it bears emphasis that the remedy issued by the District Court does not require the President or anyone else to "reappoint" Harris. Gov. Br. 39. Because the President's putative removal was "illegal and void" from the start, Harris "never has been out of [her] office." *Kalbfus*, 42 App. D.C. at 321; *see* JA96 n.13. The District Court's injunction simply requires subordinate officials to treat Harris as in office, which is why orders under *Swan* and *Severino* effectively provide "complete relief." *Swan*, 100 F.3d at 989 (Silberman, J., concurring).

*Second*, the government suggests (at 38) that the District Court somehow overstepped because courts may not enjoin the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866). This is a thinly veiled request to ignore *Swan* and *Severino*.

The Court, moreover, has long rejected the notion that issuing equitable relief against those "acting at the behest of the President" impinges upon his official duties. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also id.* at 1331 n.4 (distinguishing *Mississippi v. Johnson*). As Justice Scalia has explained, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."

51

*Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in judgment).[19]

Indeed, the government's astonishing theory of executive power coupled with its theory of remedies would effectively mean the end of equitable relief against the executive branch altogether. If the President's official duties include "tak[ing] care that the Law be faithfully executed" and wielding "all" "executive Power," Gov. Br. 16 (quotation marks omitted), then a court could *never* enjoin subordinates because doing so would always effectively enjoin the President's exercise of his official duties.

*Third*, the government relatedly argues (at 39) that the "President cannot be compelled to retain the services of a principal officer whom he has removed from office." But that assumes the merits question at the heart of this appeal, *i.e.*, whether the President *may* remove Harris at whim. If Congress may restrict the removal of Board members under the *Humphrey's Executor* framework, the President cannot complain if Harris fulfills her adjudicatory functions.

*Fourth*, despite not contesting the District Court's award of some injunctive relief, the government curiously attempts (at 41-44) to distinguish *Swan* and

---

[19] To the extent that Judge Katsas reached a contrary conclusion in *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (per curiam) (Katsas, J., dissenting), Judge Katsas may have lacked the benefit of *Swan* and *Severino*, which the parties did not identify as binding circuit precedent.

*Severino* as not controlling because those cases arose in the context of the Court determining whether the plaintiffs could prove redressability necessary to establish Article III standing. "That makes no sense." Stay.Op.104 (Millett, J., dissenting). "Because jurisdiction in both *Swan* and *Severino* depended on holding that an injunction could issue, and both cases held that there was jurisdiction and went on to decide the merits, both cases necessarily held that an injunction could" issue. *Id*.

*Fifth*, the government recycles (at 39-40) its argument that historical limits on equity jurisdiction foreclose injunctions in removal cases, citing nineteenth-century cases. But, as the Supreme Court has recognized, "[m]uch water has flowed under the dam" since then, and courts now provide equitable relief. *Sampson*, 415 U.S. at 71. Regardless, even the government's authorities recognize that meaningful relief is available via mandamus. *See, e.g.*, *White v. Berry*, 171 U.S. 366, 377 (1898); *In re Sawyer*, 124 U.S. 200, 212 (1888).

This case is thus unlike *Grupo Mexicano*, on which the government relies (at 39, 44). In *Grupo Mexicano*, a federal court had sought to order a specific type of "relief that has never been available before" and was "specifically disclaimed by longstanding judicial precedent." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond*

*Fund, Inc.*, 527 U.S. 308, 322 (1999).  By contrast, here, there is a long history of Anglo-American courts ordering relief in removal cases.

*Sixth*, the government attempts (at 44-45) a new argument that a court can provide relief only in cases involving federal employees, not principal officers.  This position was not presented below and is therefore forfeited.  It is also incorrect.  *Swan* held that injunctive relief was available to a member of National Credit Union Administration appointed by the President and confirmed by the Senate.  *See Swan*, 100 F.3d at 974; 12 U.S.C. § 1752a.  Moreover, William Marbury was likewise "confirmed by the Senate," Stay.Op.105 (Millet, J., dissenting), and presented "a plain case for a mandamus."  *Marbury*, 5 U.S. at 173.  Meanwhile, English authorities concluded that courts could restore an individual to a "public" office without qualification.  Blackstone, *supra*, *264.  The government's "no relief for principal officers rule" is made up, and at best mimics the government's flawed view on the merits.

*Seventh*, the government contends (at 46), that Harris's right to mandamus is not sufficiently "clear."  Not so.  The statute is unambiguous, and the precedent is binding.  In *Swan*, this Court explained that removal statutes—even those less pellucid than the one here—create a duty of "sufficient clarity" for mandamus to issue.  *Swan*, 100 F.3d at 978; *see id.* at 976 n.1.  Moreover, the order directed at executive subordinates *is* "ministerial."  Gov. Br. 47.  Subordinate executive

defendants must do what the removal statute clearly commands: treat Cathy Harris as the member of the Board that she is, because she has not been removed for cause.

**2.** Finally, the District Court correctly exercised its discretion when it evaluated the balance of harms and issued an injunction.

The Court properly found that Harris will "suffer irreparable harm in the future absent injunctive relief." JA99. Without relief, Harris could not perform the "statutory mission" to which she was nominated and confirmed. JA100 (quotation marks omitted). Meanwhile, her independence as an adjudicator—indeed, the independence of the other Board members and every other person protected by for-cause removal statutes—would "evaporate if the President could terminate" her "without cause." JA99. The long Anglo-American history of courts granting relief in precisely this context, moreover, underscores that the harm is irreparable absent judicial intervention.

The District Court likewise correctly found that an injunction was warranted based on the public interest and the balance of equities. As the court explained, there is a substantial public interest in enforcing the valid removal statute passed by the People's representatives in Congress. JA101. It is hornbook law that the government does not "suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." JA102 (quotation marks omitted). Meanwhile, without Harris serving as a member, the Board lacks a quorum,

preventing it from performing the adjudicatory mission that Congress deemed so critical and undermining the rights of millions of federal employees.

The government nevertheless argues that an injunction undermines "the President's authority to exercise all of the executive Power." Gov. Br. 49 (quotation marks omitted). But as Judge Millett and the District Court both explained, that argument "is entirely bound up with the merits," and the government is wrong on the merits. Stay.Op.107 (Millette, J., dissenting); *see* JA102 ("This argument largely relies on Defendants' success on the merits.").

Much the same is true of the government's speculation (at 50) that it might prevail and future litigants could challenge Harris's participation in decisions. That harm only materializes if the government is right on the merits, and it is not.[20] Regardless, this argument was not presented below, *see* Gov. Opp., D. Ct. Dkt. 33 at 20-21 (never mentioning this argument), and is forfeited on appeal. Moreover, there is a considerable countervailing public interest in the Board functioning. Again, absent an injunction, the Board will lack a quorum.

The government suggests (at 49-50) that removal would "not harm" Harris, because she has no "right to exercise the powers of an office after having been removed." But Harris *was not removed*. She has always remained in office.

---

[20] Even if the Supreme Court overturned the *Humphrey's Executor* framework, it is not clear litigants could challenge Harris's participation. Supreme Court decisions remain binding law unless and until that Court overturns them.

*Kalbfus*, 42 App. D.C. at 321. Even if she had been, the for-cause removal provision enacted by Congress provided her an official right to remain in office. Nor would "backpay" remedy the harm—as the extremely long history of mandamus shows—precisely because the injuries to Harris are not reparable by dollars and cents. Gov. Br. 49. Consider an analogy: If an executive official unilaterally removed an Article III judge, and wrongfully barred her from chambers, no amount of money could possibly remedy that injury. The same is true for Article II arbiters, from Board members to Tax Court judges.

History also disproves the government's theory that backpay displaces other relief. At common law, mandamus and backpay were complementary, not mutually exclusive, remedies. An individual could bring an action for mandamus to remedy removal and a separate action in assumpsit to receive pay. *Cf.* High, *supra*, at 270 (mandamus "will not lie" to compel payment of "salaries"; such "an indebtedness" "may be enforced by an action of assumpsit"). It thus flouts history to force Harris to "surrender her rights," including her "right to an office," just because she could seek backpay. *See Tribby v. O'Neal*, 39 App. D.C. 467, 469 (D.C. Cir. 1912).

\* \* \*

This case is of monumental importance. We are mindful that four judges of this Court have issued or joined decisions indicating they would narrow *Humphrey's Executor* into effective nonexistence; that the full Court has reached the opposite

conclusion; but that the full Court has declined to hear this matter en banc in the first instance. *Compare* En Banc Order at 1, *with id*. at 7 (Rao, J., dissenting, joined by Henderson, Katsas, Walker, JJ.), *id*. at 17 (Walker, J., dissenting, joined by Henderson J.), Stay.Op.32 (Walker, J., concurring), *id*. at 55 (Henderson, J., dissenting).

Harris respectfully urges that, even if panel members disagree with the en banc court, they not break with the full Court's judgment. But if the panel diverges from the en banc Court, Harris respectfully requests that the full Court order rehearing of the matter sua sponte, at the earliest possible opportunity. *See* D.C. Circuit Handbook of Practice and Internal Procedure §§ XII.A, XIII.B.2; *In re Flynn*, 973 F.3d 74, 77 (D.C. Cir. 2020) (per curiam).

# CONCLUSION

For the forgoing reasons, this Court should affirm.

April 7, 2025                                    Respectfully submitted,

                                                /s/ Neal Kumar Katyal

MICHAEL J. KATOR                                NEAL KUMAR KATYAL
JEREMY D. WRIGHT                                  *Counsel of Record*
KERRIE D. RIGGS                                 NATHANIEL A.G. ZELINSKY
KATOR, PARKS, WEISER & WRIGHT,                  KRISTINA ALEKSEYEVA
  P.L.L.C.                                      EZRA P. LOUVIS
1150 Connecticut Ave., NW                       SAMANTHA K. ILAGAN
Suite 705                                       MILBANK LLP
Washington, DC 20036                            1850 K St., NW
(202) 898-4800                                  Suite 1100
mkator@katorparks.com                           Washington, DC 20006
                                                (202) 835-7505
LINDA M. CORREIA                                nkatyal@milbank.com
CORREIA & PUTH, PLLC                            nzelinsky@milbank.com
1400 16th St., NW                               kalekseyeva@milbank.com
Suite 450                                       zlouvis@milbank.com
Washington, D.C. 20036                          silagan@milbank.com
(202) 602-6500
lcorreia@correiaputh.com                        CARL RIZZI
                                                LUCILLE E. BAEURLE
                                                MILBANK LLP
                                                55 Hudson Yards
                                                New York, NY 10001
                                                (212) 530-5786
                                                crizzi@milbank.com
                                                lbaeurle@milbank.com

*Counsel for Plaintiff-Appellee Cathy A. Harris*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I certify that Appellee's Response Brief contains 12,972 words.  This Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced font.

April 7, 2025

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
   *Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 7, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All counsel in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.


April 7, 2025                                    /s/ Neal Kumar Katyal
                                                 NEAL KUMAR KATYAL
                                                      *Counsel of Record*
                                                 MILBANK LLP
                                                 1850 K St., NW
                                                 Suite 1100
                                                 Washington, DC 20006
                                                 (202) 835-7505
                                                 nkatyal@milbank.com

                                                 *Counsel for Plaintiff-Appellee*
                                                 *Cathy A. Harris*