ORAL ARGUMENT SCHEDULED MAY 16, 2025

**Case Nos. 25-5037, 25-5055, 25-5057**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CATHY A. HARRIS, in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board,

*Plaintiff-Appellee,*

v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, et al.,

*Defendants-Appellants.*

---

GWYNNE A WILCOX,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
District of Columbia Civ A. No. 25-412 (RC), The Honorable Rudolph Contreras, and Civ A. No. 25-334 (BAH), The Honorable Beryl A. Howell

---

## BRIEF OF AMICI CURIAE LAW PROFESSORS JOHN C. COATES, JEFFREY N. GORDON, KATHRYN JUDGE, AND LEV MENAND IN SUPPORT OF THE PLAINTIFFS-APPELLEES

---

STEVEN A. HIRSCH, #171825
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae submit this certificate as to parties, rulings, and related cases.

### A.    Parties and Amici

The parties, intervenors, and amici appearing before the district court in *Wilcox v. Trump*, No. 25-5057, and in *Harris v. Bessent*, No. 25-5055, are listed in the combined Brief for Appellants at pages i–ii

### B.    Rulings Under Review

The rulings under review are identified in the combined Brief for Appellants at pages ii–iii.

### C.    Related Cases

The combined Brief for Appellants identifies supposedly related cases at pages iii–iv.

DATED:  April 9, 2025                    */s/ Steven A. Hirsch*
                                          Steven A. Hirsch
                                          Keker, Van Nest & Peters LLP
                                          *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE</u>

Pursuant to FRAP 29(a)(2), all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), amici state that a separate amici curiae brief is necessary due to their distinct expertise and interests, as set forth below in the section entitled "IDENTITY AND INTERESTS OF THE AMICI CURIAE."

DATED:  April 9, 2025                    */s/ Steven A. Hirsch*
                                                              Steven A. Hirsch
                                                              Keker, Van Nest & Peters LLP
                                                              *Counsel for Amici Curiae*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ..........................................................................i

CERTIFICATE OF COUNSEL REGARDING AUTHORITY
TO FILE ....................................................................................... ii

I.     IDENTITY AND INTERESTS OF AMICI CURIAE ..................1

II.    INTRODUCTION AND SUMMARY OF ARGUMENT .............4

III.   ARGUMENT ...........................................................................7

A.     Central bank independence is an essential component
of monetary policy and long-term economic growth ....................7

1.     Central-bank independence is the solution
to what economists call "the time-
inconsistency problem." ...........................................10

2.     Maintaining the credibility of Fed
independence is crucial to containing
systemic banking risks..............................................15

B.     The President's proposal to limit Fed independence to
the Fed's monetary functions is unworkable...............................18

C.     Overturning or more narrowly construing *Humphrey's
Executor* would threaten Fed independence................................23

IV.    CONCLUSION ..........................................................................29

CERTIFICATE OF COMPLIANCE ......................................................30

CERTIFICATE OF SERVICE ...............................................................31

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Consumer Fin. Prot. Bureau* v. *Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ................................................................. 25

*Dellinger v. Bessent*,
No. 24A790 (U.S. 2025) ........................................................... 24

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ...............................4, 5, 23, 24, 25, 27, 28

*PHH Corp. v. Consumer Fin. Protection. Bureau*,
881 F.3d 75 (D.C. Cir. 2018) .................................................. 25

*Seila Law LLC* v. *Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ........................................................... 4, 25

**Federal Statutes**

12 U.S.C. § 242 ................................................................... 9

12 U.S.C. § 248(f) ............................................................... 9

12 U.S.C. § 301 ................................................................. 9

12 U.S.C. § 1823(c)(4) .................................................. 16, 17

12 U.S.C. § 5383(a) ............................................................ 17

**Regulations**

12 C.F.R. §§ 200–299 .......................................................... 24

90 Fed. Reg. 3615 .............................................................. 22

**Executive Orders**

"Ensuring Accountability for All Agencies," Exec. Order No. 14,215, 90 FED. REG. 10,447 (Feb. 24, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-24/pdf/2025-03063.pdf...................................................................... 18, 19

**Other Authorities**

Alberto Alesina & Lawrence H. Summers, *Central Bank Independence and Macroeconomic Performance: Some Comparative Evidence*, 25 J. MONEY, CREDIT & BANKING 151 (1993) ............................................................................. 13

Alex Cukierman, Steven B. Webb & Bilin Neyapti, *Measuring the Independence of Central Banks and Its Effect on Policy Outcomes*, 6 WORLD BANK ECON. REV. 353, 375-76 (1992) ....................................................................... 11

Alexander Hamilton, *Final Version of the Second Report on the Further Provision Necessary for Establishing Public Credit (Report on a National Bank),* Nat'l Archives Founders Online, https://founders.archives.gov/documents/Hamilton/01-07-02-0229-0003#ARHN-01-07-02-0229-0003-fn-0152-ptr ..................... 27

Ana Carolina Garriga & Cesar M. Rodriguez, *Central Bank Independence and Inflation Volatility in Developing Countries*, 78 ECON. ANALYSIS 1320, 1320 (2023) .............................. 11

Ben S. Bernanke, Fed Emergency Lending, Brookings (Dec. 3, 2015), https://www.brookings.edu/articles/fed-emergency-lending/ ................................................................. 23

Burton A. Abrams, *How Richard Nixon Pressured Arthur Burns: Evidence from the Nixon Tapes*, 20 J. ECON. PERSPECTIVES 177, 178 (2006) ........................................................ 12, 15

Catherine L. Mann, The Great Moderation 20 Years On—
    and Beyond, Address to the Annual Conference of the
    Society of Professional Economists (Nov. 14, 2024),
    https://www.bankofengland.co.uk/speech/2024/november/c
    atherine-l-mann-society-of-professional-economists-
    annual-conference ............................................................................... 12

*Central Bank Independence*, IMF WORKING PAPER WP/24/35
    (Feb. 2024),
    https://www.imf.org/en/Publications/WP/Issues/2024/02/23
    /A-New-Measure-of-Central-Bank-Independence-545270 ........... 19, 20

Christine Kexel Chabot, *Is the Federal Reserve
    Constitutional? An Originalist Argument for Independent
    Agencies*, 96 NOTRE DAME L. REV. 1, 27–28 (2020) ...................... 26, 27

Christopher Crowe & Ellen E. Meade, *The Evolution of
    Central Bank Governance around the World*, 21 J. ECON.
    PERSPECTIVES 69 (2007) ...................................................................... 10

Cristina Bodea & Raymond Hicks, *Price Stability and
    Central Bank Independence: Discipline, Credibility, and
    Democratic Institutions*, 69 INT'L ORGS. 35, 37 (2015)
    ............................................................................................... 12, 13, 14

European Central Bank, *Benefits of Price Stability*,
    https://www.ecb.europa.eu/mopo/intro/benefits/html/index
    .en.html#:~:text=When%20inflation%20is%20low%2C%20
    stable,turn%20creating%20jobs%20and%20prosperity ...................... 8

THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES 6-13
    (2020),
    https://www.federalreserve.gov/aboutthefed/files/the-fed-
    explained.pdf ................................................................................... 9, 22

*The Federalist* No. 77............................................................................. 26

GEOFFREY M. HODGSON, THE WEALTH OF A NATION:
    INSTITUTIONAL FOUNDATIONS OF ENGLISH CAPITALISM
    (2023).................................................................................................. 9

Ines Ferré, *Trump Again Calls on 'Slow Moving' Fed to Cut Rates as Markets Continue Tumble* (Apr. 7, 2025), yahoo!finance, https://finance.yahoo.com/news/trump-again-calls-on-slow-moving-fed-to-cut-rates-as-markets-continue-tumble-122755240.html ........................................................ 10

J. BRADFORD DELONG, SLOUCHING TOWARDS UTOPIA: AN ECONOMIC HISTORY OF THE TWENTIETH CENTURY (2022) ..................... 8

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1 (2021) ....................................... 25

Letter from Sarah M. Harris to Hon. Richard J. Durbin at p. 2 (Feb. 12, 2025), https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxbo ava/2025.02.12-OUT-Durbin-530D.pdf.................................................. 5

Lev Menand, *The Logic and Limits of the Federal Reserve Act*, 40 YALE J. ON REG. 197, 240-50 (2023) ........................................ 22

MORGAN RICKS, GANESH SITARAMAN, SHELLEY WELTON & LEV MENAND, NETWORKS, PLATFORMS, AND UTILITIES: LAW AND POLICY 819-20 (2022) ............................................................... 9

Nicolò Fraccaroli, Rhiannon Sowerbutts & Andrew Whitworth, *Does Regulatory and Supervisory Independence Affect Financial Stability?* J. BANKING & FIN. 107318, at p. 2 (2025).................................................... 12

Thomas W. Merrill, *The Essential Meaning of the Rule of Law*, 17 J. OF LAW, ECON. & POL. 673 (2022)........................................ 7

To Modernize the Federal Reserve System: Hearing on H.R. 7001 Before the Subcomm. on Domestic Monetary Pol'y of the H. Comm. on Banking, Fin. & Urb. Affs., 96th Cong. 60 (1980) ...................................................................................... 21

# I.    IDENTITY AND INTERESTS OF AMICI CURIAE[1]

Amici are law professors with financial-regulation experience who have published extensive research on that subject. Here they urge that, however the Court rules on the merits of these cases, the Court make no statement that markets could construe as affecting the independence of the Federal Reserve System. Were the Court's order to raise doubts about the Fed's independence, even with respect to only some of its present functions, it could disrupt markets and undermine the credibility of Fed officials in ways that might not be easily reversed.

**John C. Coates** is the John F. Cogan Professor of Law and Economics at Harvard Law School.  His research focuses on financial regulation and institutional design, including administrative and constitutional law relevant to those topics. He has served as General Counsel of the Securities and Exchange Commission, served as a monitor for the Department of Justice of a large systemically important

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), counsel for amici represent that they authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than amici or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

financial institution, has advised the Department of Treasury and the Federal Reserve Board, and was a partner focused on financial institutions at Wachtell Lipton Rosen & Katz before coming to Harvard.

**Jeffrey N. Gordon** is the Richard Paul Richman Professor of Law at Columbia Law School. Professor Gordon teaches and writes extensively on a variety of business-law subjects, including the regulation of financial institutions. He is the co-author of *Principles of Financial Regulation* (2016), which addresses the challenges facing regulators of financial institutions and markets in an interconnected and evolving global financial system, particularly the challenges in maintaining financial stability. Before becoming an academic, Professor Gordon served as an attorney for the U.S. Department of the Treasury in Washington, D.C.

**Kathryn Judge** is the Harvey J. Goldschmid Professor of Law at Columbia Law School. Her research focuses on banking, financial crises, regulatory architecture, and intermediation design. She has served as a member of the Financial Stability Task Force co-sponsored by the Brookings Institution and the Chicago Booth School of Business, and as

a member of the Financial Research Advisory Committee (FRAC) to the Office of Financial Regulation. While serving on FRAC, she co-chaired the working groups on financial innovation and the London Interbank Offered Rate (LIBOR) transition.

**Lev Menand** is an associate professor of law at Columbia Law School, where he teaches financial institutions and administrative law. He has written extensively on money and banking, including a book, *The Fed Unbound: Central Banking in a Time of Crisis* (2022). Professor Menand served as senior adviser to the deputy secretary of the Treasury from 2015 to 2016 and senior adviser to the assistant secretary for Financial Institutions from 2014 to 2015. He was previously an economist at the Federal Reserve Bank of New York, where he helped to develop econometric models for the Federal Reserve System's first Comprehensive Capital Assessment and Review. While at the New York Fed, Menand was seconded to the Financial Stability Oversight Council, where he helped to prepare the Council's first financial-stability report.

## II.   INTRODUCTION AND SUMMARY OF ARGUMENT[2]

Amici curiae write to urge that the Court make no statement that markets could construe as undermining the carefully calibrated institutional design of the Federal Reserve, which prevents the President from removing members of its Board of Governors (or from demoting the Board's Chair) before they have completed their statutory terms, except for cause.

The Fed's independence rests on the same legal foundations as that of the Merit Systems Protection Board and the National Labor Relations Board. All three are multimember expert boards.[3] All three have, since their inception, enjoyed a degree of independence from presidential control. All three are understood to be covered by *Humphrey's Executor v. United States*,[4] the seminal Supreme Court

---

[2] Throughout this brief, unless otherwise indicated, emphases were added to quotations, while internal citations, footnotes, brackets, ellipses, and the like were omitted from them.

[3] *See Seila Law LLC* v. *Consumer Fin. Prot. Bureau*, 591 U.S. 197, (2020) (affirming President's power to remove individual agency heads at will, but distinguishing agencies led by multimember boards like the FTC in *Humphrey's Executor*).

[4] 295 U.S. 602 (1935).

decision whose overruling is advocated by the current Administration.[5]
As a result, statements suggesting that *Humphrey's Executor* may be
overruled jeopardize the Fed's independence, with potentially
immediate and disastrous consequences for economic and financial
stability. There is simply no logically coherent way to distinguish the
Fed's Board from the boards of these other agencies or to bifurcate its
independence that would not irreparably harm the legislative scheme
by undermining the Fed's ability to credibly commit to price stability
over the long term.

Amici law professors also write to explain the critical importance
of Federal Reserve independence to the government's capacity to
maintain price stability, fight inflation, and promote economic growth.
Research on central-bank independence demonstrates that the
government's capacity to achieve broadly agreed-upon aims—such as
monetary expansion consistent with the economy's long-run potential to
increase production—depends on governance structures that impose

---

[5] *See* Letter from Sarah M. Harris to Hon. Richard J. Durbin at p. 2
(Feb. 12, 2025),
https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxboava/2025.02.1
2-OUT-Durbin-530D.pdf.

modest but meaningful limits on the capacity of outside actors such as the President to direct policy. These structures include provisions that tenure members of multi-member boards like the Federal Reserve Board and authorize the President to remove them only for cause.

Consistent with the original public meaning of the Constitution, the U.S. has enshrined central-bank independence into law since the Federal Reserve's inception in 1913. Any judicial intervention to redress supposed constitutional deficiencies in this design would upend longstanding historical practice and settled constitutional understandings. It also would put the judiciary in the position of usurping legislative prerogatives. Congress delegated extraordinary power to the Fed to control the money supply on the understanding that these powers would *not* be subject to presidential direction. To convert the Fed's Chair to an at-pleasure appointment would be to write a statute that the enacting Congress almost certainly would not have passed.

### III.   ARGUMENT

Stability and predictability are core aspects of the rule of law.[6] The Framers were particularly concerned with stable administration and understood the Constitution as empowering Congress to design government bodies in ways that facilitate policy continuity. Accordingly, the U.S. has long relied on tenured officers, including independent judges and administrators, to formulate law that can be relied upon to persist over time. Drawing on this tradition, Congress created the Federal Reserve and insulated it from day-to-day presidential direction, thus enabling it to exercise its vast powers in ways conducive to long-term economic flourishing. Modern economic research has borne out the wisdom of that design.

### A.    Central-bank independence is an essential component of monetary policy and long-term economic growth

The economy's long-term health requires a central bank with a measure of independence from executive interference. The problem may be simply stated. Modern economies depend on long-term investments, and the level of long-term investment is tied to expectations that prices

---

[6] *See generally* Thomas W. Merrill, *The Essential Meaning of the Rule of Law*, 17 J. OF LAW, ECON. & POL. 673 (2022).

will remain stable.[7] When price stability is lost, long-term investment becomes more expensive, growth slows—and those adverse effects are hard to reverse. Deflationary spirals can be similarly destructive. Monetary instability has famously contributed to democratic erosion and collapse around the world.[8]

The central goal of monetary policy is to facilitate the expansion of the money supply at a rate that lowers the cost of investment and maximizes long-term economic growth. It has long been recognized that achieving this goal requires careful institutional design, with officials insulated from short-term pressures that could undermine confidence that the central bank will strike the necessary balance. Indeed, to generate expectations that monetary policy will be appropriate over the long term, nations have long relied on institutions independent from close executive control. This innovation dates to the Bank of England

---

[7] European Central Bank, *Benefits of Price Stability*, https://www.ecb.europa.eu/mopo/intro/benefits/html/index.en.html#:~:text=When%20inflation%20is%20low%2C%20stable,turn%20creating%20jobs%20and%20prosperity.

[8] *See generally* J. BRADFORD DELONG, SLOUCHING TOWARDS UTOPIA: AN ECONOMIC HISTORY OF THE TWENTIETH CENTURY (2022).

Act in 1694, which created an independent corporation to expand the money supply, arguably launching modern financial capitalism and the industrial revolution.[9]

Congress created the Federal Reserve System in 1913. Today, the system includes the Federal Open Market Committee (FOMC), which regulates the money supply through a variety of policy tools. A seven-member majority of the FOMC are members of the Fed's Board of Governors, whom the President appoints to staggered 14-year terms and whom he can remove only "for cause."[10] Five members of the FOMC are presidents of the System's 12 regional Federal Reserve Banks, who are appointed to their positions by the boards of directors of the regional banks, subject to the approval of the Board of Governors.[11]

---

[9] *See* MORGAN RICKS, GANESH SITARAMAN, SHELLEY WELTON & LEV MENAND, NETWORKS, PLATFORMS, AND UTILITIES: LAW AND POLICY 819–20 (2022); GEOFFREY M. HODGSON, THE WEALTH OF A NATION: INSTITUTIONAL FOUNDATIONS OF ENGLISH CAPITALISM (2023).

[10] 12 U.S.C. § 242.

[11] The Board may "suspend or remove any officer or director of any Federal Reserve bank, the cause of such removal to be forthwith communicated in writing." 12 U.S.C. § 301; *see also id.*, § 248(f). For a description of the Fed's structure, *see* THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES 6–13 (2020), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf [hereinafter *Fed Explained*].

1.    **Central-bank independence is the solution to what economists call "the time-inconsistency problem."**

Recent decades have seen the rise of an entire economic literature on "central-bank independence," or CBI, demonstrating the relationship between independence and a healthy economy. In this literature, CBI is widely understood to be the antidote to a dilemma that economists have dubbed the "time-inconsistency problem." That problem arises from the fact that central-bank policies operate over an extended time frame, but a non-independent central bank can face pressures to quickly stimulate the economy for political reasons.[12]

To put it in more straightforward terms: There are times when a political leader seeking re-election will prioritize short-term economic activity over long-term price stability.[13] A president may, for example,

---

[12] *See* Christopher Crowe & Ellen E. Meade, *The Evolution of Central Bank Governance around the World*, 21 J. ECON. PERSPECTIVES 69 (2007).

[13] *See* Ines Ferré, *Trump Again Calls on 'Slow Moving' Fed to Cut Rates as Markets Continue Tumble* (Apr. 7, 2025), yahoo!finance, https://finance.yahoo.com/news/trump-again-calls-on-slow-moving-fed-to-cut-rates-as-markets-continue-tumble-122755240.html (reporting that President Trump is calling for the Fed to cut interest rates after markets decline in response to his tariff announcement: "'This would be a PERFECT time for Fed Chairman Jerome Powell to cut Interest Rates,' Trump said in a post on his social media app Truth Social on Friday. 'He is always "late," but he could now change his image, and

want unemployment to go down and economic activity to increase in the
run-up to voting. More accommodative monetary policy can achieve
such effects but also will increase the risk of higher levels of inflation in
the future.

The cure for the time-inconsistency problem is to lengthen the
decision-making horizon of central bankers by shielding them from
certain forms of outside pressure. Research, theory, and evidence all
confirm that a central bank's ability to control inflation hinges on its
ability to formulate and implement monetary policy over reasonable
time frames without undue outside interference. Consequently, nearly
all advanced economies and many developing countries now have
independent central banks that set monetary policy without being
subject to direct political control.[14] Empirically, greater regulatory and

---

quickly.'").

[14] *See generally* Alex Cukierman, Steven B. Webb & Bilin Neyapti,
*Measuring the Independence of Central Banks and Its Effect on Policy
Outcomes*, 6 WORLD BANK ECON. REV. 353, 375–76 (1992) (concluding
that a central bank's "legal independence is systematically and
inversely related to inflation in industrial . . . countries"); Ana Carolina
Garriga & Cesar M. Rodriguez, *Central Bank Independence and
Inflation Volatility in Developing Countries*, 78 ECON. ANALYSIS 1320,
1320 (2023) (finding that CBI not only "has been linked with lower
levels of inflation in developed and developing countries" but also is
"directly and unconditionally associated with . . . reduction of [inflation]

supervisory independence is associated with improved financial stability.[15]

This is not just an abstract theory; nor is it partisan. Economists have developed a robust literature showing that lower levels of central-bank independence are correlated with higher levels of inflation.[16] Experience in the United States has borne out these concerns.[17]

The correlation between CBI and low inflation exists "only in the presence of multiple constitutional checks and balances."[18] CBI does not imply lack of accountability, but does require some degree of insulation

---

volatility," defined as "the prospect that the market's psychology switches abruptly from fears of inflation to concerns about deflation, and back again").

[15] *See* Nicolò Fraccaroli, Rhiannon Sowerbutts & Andrew Whitworth, *Does Regulatory and Supervisory Independence Affect Financial Stability?*, 170 J. BANKING & FIN. 107318, at p. 2 (2025).

[16] *See* nn.14–15, *supra.*

[17] Burton A. Abrams, *How Richard Nixon Pressured Arthur Burns: Evidence from the Nixon Tapes*, 20 J. ECON. PERSPECTIVES 177, 178 (2006) [hereinafter *Nixon Pressure*]; *see also* Catherine L. Mann, The Great Moderation 20 Years On—and Beyond, Address to the Annual Conference of the Society of Professional Economists (Nov. 14, 2024), https://www.bankofengland.co.uk/speech/2024/november/catherine-l-mann-society-of-professional-economists-annual-conference.

[18] Cristina Bodea & Raymond Hicks, *Price Stability and Central Bank Independence: Discipline, Credibility, and Democratic Institutions*, 69 INT'L ORGS. 35, 37 (2015) [hereinafter *Stability and Independence*].

from day-to-day direct control by politicians. Indeed, as economists have shown in formal models and empirical studies, public belief in the Fed's independence from political forces is crucial to the Fed's effectiveness in preventing high levels of inflation. "[I]f the public *believes* that the central bank is free from interference and that the law [governing the bank] is unlikely to change swiftly and without debate, it will also lower inflationary expectations, leading to price stability above and beyond the control of the money supply."[19] As a result, doubts about the constitutional viability of the design and independence of the Federal Reserve may not only roil markets but also may trigger knock-on effects that are hard to predict and that may prove hard to contain. Concerns (warranted or unwarranted) that the Fed's operations could be subject to interference by other executive-branch officials could undermine the Fed's credibility, creating a heightened risk of financial instability and persistently higher levels of inflation.[20]

---

[19] *Id.*

[20] *See generally* Alberto Alesina & Lawrence H. Summers, *Central Bank Independence and Macroeconomic Performance: Some Comparative Evidence*, 25 J. MONEY, CREDIT & BANKING 151 (1993).

Far from jeopardizing democratic accountability, this limited form of insulation enables democracies to adopt widely agreed-upon policies, like price stability. "Delegation of monetary policy to an independent central bank in democracies allows the bank to actually behave in a conservative fashion that is reflected directly in lower rates of money supply growth [or other restrictive policies]. That is, the central bank can increase interest rates or target the exchange rate or money supply to ensure, most prominently, price stability, regardless of short-term government pressure."[21] CBI therefore promotes democratic values by allowing the government to create the conditions that allow economies to thrive and individuals living in those economies to exercise meaningful choice in their lives.

CBI is at least as important here, in the world's largest economy, as it is in any other nation. An infamous case of CBI breakdown in this country involved President Nixon's pressuring of Fed Chairman Arthur Burns to pursue an expansionary monetary policy in the run-up to the 1972 presidential election. That policy helped Nixon get reelected, but it

---

[21] *Stability and Independence* at 37.

also "helped to trigger an extremely costly inflationary boom-bust cycle" that took a decade to resolve.[22]

In short, CBI is critical to the economy and depends on building and maintaining democratic checks and balances that insulate the central bank from inappropriate forms of political influence. Any hint that the United States is abandoning its commitment to CBI could shake confidence in the American economy.

## 2. Maintaining the credibility of Fed independence is crucial to containing systemic banking risks.

Protecting central-bank officials from the threat of immediate removal because of policy differences also is critical to combatting moral hazard[23] and helping to contain systemic banking risks. Congress has sought to control those risks by enacting a system of checks and balances designed to control the immediate impulse to "bail out" a failing financial institution in response to political pressure to avoid the pain of an institution's default and curb losses to uninsured depositors.

---

[22] *Nixon Pressure* at 187.

[23] "Moral hazard" refers to the extra risk that people and entities take on because they believe that they are insured against resulting losses.

15

Fed independence plays an integral role in this system of checks and balances. In the "resolution" of a failing bank, the Federal Deposit Insurance Corporation ("FDIC") protects insured depositors but is otherwise mandated to resolve the bank with the "least possible cost to the deposit insurance fund." 12 U.S.C. § 1823(c)(4). This may mean imposing losses on sophisticated creditors who receive higher yields for bearing greater risk and who are presumed to have the capacity to monitor the bank's risk-taking.

There will always be intense pressure to protect those sophisticated creditors in order to avoid local economic fallout or political pushback. Yet to make such bailouts commonplace would erode the discipline on which banking-system stability depends. In that event, we would see more risk-taking and more bailouts.

To avoid this, Congress devised a scheme that critically relies on the independence of multiple regulators—including the Fed. Under that scheme—known as "the systemic-risk exception"—the FDIC *can* depart from the "least possible cost" framework, but only after the relevant agencies make an "emergency determination" that such help is necessary in order to avoid "serious adverse effects on economic

16

conditions or financial stability." 12 U.S.C. § 1823(c)(4). Invoking the systemic-risk exception requires not only a determination by the Secretary of the Treasury but also a supermajority vote of the Board of the FDIC *and* of the Governors of the Federal Reserve. 12 U.S.C. § 1823(c)(4)(G).

The point is this: Protecting against excessive bailouts, shielding the "least possible cost" scheme from erosion, and resisting political pressure all depend on one thing: the credible independence of the regulatory agencies that have to sign off on any invocation of the systemic-risk exception—namely, the FDIC and the Fed. But that independence would be shattered, and Congress's careful cabining of the systemic-risk exception would collapse into short-term considerations, if the President could remove the board members of those agencies at will. The consequence would be more risk-taking and more ongoing threats to financial stability.[24]

---

[24] Similarly, Congress created a "triple key" approach for invoking the "Orderly Liquidation Authority" in the Dodd Frank Act of 2010. *See* Dodd-Frank Act § 203(a), 12 U.S.C. § 5383(a). Triggering "Orderly Liquidation Authority" ("OLA") moves a failing financial firm into a special proceeding that is likely to reduce creditor losses through use of Treasury resources. The alternative would be a bankruptcy proceeding. Before triggering the special proceeding, the Secretary of the Treasury

**B.  The President's proposal to limit Fed independence to the Fed's monetary functions is unworkable.**

The President recently issued an Executive Order ("EO")[25] rejecting the concept of independent agencies while carving out a narrow exception for the Fed's independence "in its conduct of monetary policy."[26] The EO purports to eliminate Fed independence only as to "its

---

needs to obtain the agreement of a supermajority of the Board of Governors of the Federal Reserve and of either the FDIC Board (in most cases) or the Securities Exchange Commission (in the case of a securities firm). In short, to minimize politicization of the OLA decision, Congress required concurrence by two independent financial regulatory agencies. But if board members could be removed without cause, the agencies' independence would collapse and market participants could foresee that political pressure will substitute for sound financial management. This, too, would produce more risk-taking and thus an on-going threat to financial stability.

[25] "Ensuring Accountability for All Agencies," Exec. Order No. 14,215, 90 FED. REG. 10,447 (Feb. 24, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-24/pdf/2025-03063.pdf [hereinafter "EO"]. Among other things, the EO (1) suggests that independent agencies violate the constitutional separation of powers, (2) announces that the Administration's policy is to "ensure Presidential supervision and control of the *entire* executive branch," and (3) requires "all executive departments and agencies, including so-called independent agencies," to submit all proposed and final "significant regulatory actions" to the White House Office of Information and Regulatory Affairs before publication in the *Federal Register*. EO § 1 at 10,447.

[26] *Id.*, § 2(b) at 10,477; *see also id.*, § 3(a) at 10,478.

supervision and regulation of financial institutions."[27] But the proposed dichotomy is unworkable.

CBI is a system of interdependent protections. Withdrawing even one critical element can bring that system crashing down. Two elements are especially important: the term tenure of the Governors, which can be abrogated only for cause; and the term tenure of the Chair, which cannot be abrogated—that is, the Chair cannot be demoted, only removed entirely from the Board for cause. If either of these critical foundations is weakened, Fed independence collapses.[28] For example: The Fed Chair enjoys extensive power over policy. If the Chair can be demoted, the President will have gained a tool that functionally ends

---

[27] EO § 2(b) at 10,447.

[28] *See* Tobias Adrian, Ashraf Khan & Lev Menand, *A New Measure of Central Bank Independence*, IMF WORKING PAPER WP/24/35 at p. 13 (Feb. 2024), https://www.imf.org/en/Publications/WP/Issues/2024/02/23/A-New-Measure-of-Central-Bank-Independence-545270 (discussing interdependence of CBI protections—e.g., if a central bank's chief can be removed at will by the executive, the chief's term of office "does not matter much at all," and if the chief's term of office is one year, strong removal protections are "not particularly valuable").

Fed independence; markets are likely to react; and any other CBI protections may be rendered illusory.[29]

It would shatter the credibility that the Fed needs to conduct monetary policy effectively to adopt the Government's split-the-baby approach, under which Board members and the Chair serve at the President's pleasure and under the President's direction when it comes to the "regulation of financial institutions" but not "monetary policy." Two specific problems would arise.

First, markets would swiftly realize that the President can circumvent the Fed's remaining zone of purported independence. If the President could remove Fed officials (or demote the Fed Chair) without cause except "in [the Fed's] conduct of monetary policy," the President would have an enormous incentive to identify a non-monetary *pretext* for removal or demotion—i.e., a claim that, *outside* the realm of monetary policy, the Fed isn't obeying his directives.

---

[29] *Id.* (proposing a new measure of CBI that "do[es] not credit central bank laws that appear to offer central bank officials decisional independence in some ways but contain loopholes that render the independence generated by those features illusory.").

For example, a President displeased by the Fed's refusal to loosen *monetary policy* in the run-up to an election might exert control by demoting the Fed Chair on the pretextual ground that the Fed just isn't *regulating banks appropriately*. And once that happens, the Fed's credibility as an inflation-fighter is shot. Indeed, the President need not actually terminate or demote anyone for the Fed's inflation-fighting credibility to take a serious hit—it is enough that market participants believe that the President now *could* do so.

The second problem with the EO's split-the-baby approach is that the Fed's various functions don't fit neatly into the EO's two buckets. As former Fed Chair Paul Volcker once put it, "[t]he borderline between monetary, regulatory, and supervisory powers is sometimes indistinguishable."[30]

---

[30] To Modernize the Federal Reserve System: Hearing on H.R. 7001 Before the Subcomm. on Domestic Monetary Pol'y of the H. Comm. on Banking, Fin. & Urb. Affs., 96th Cong. 60 (1980) (statement of Hon. Paul A. Volcker, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.). Chairman Volcker pointed out that "information which the [Federal Reserve] System obtains in the course of exercising its supervisory functions provides key insights into such matters as the state of liquidity and viability of the Nation's banking institutions, indispensable elements in the formulation and implementation of monetary policy." *Id.*

The Federal Reserve, when conducting monetary policy, regulates financial institutions. For example, under its current implementation framework, when the Fed changes its target for the federal funds rate—the rate at which depository institutions lend to each other[31]—it effects this adjustment through rulemaking. Specifically, it amends Regulation D, the rule that sets reserve requirements for depository institutions and the rate of interest paid on balances maintained at the Federal Reserve banks.[32]

The Fed also plays a critical role as a "lender of last resort" to banks and nonbanks during periods of financial distress—and that role overlaps with its role in preserving price stability. Former Federal Reserve Chair and Great Depression expert Ben Bernanke has described collateralized lending as "[t]he most important tool that

---

[31] *Fed Explained* at 12.

[32] The Fed set the latter rate at 4.4% through an interim final rule on December 19, 2024. 90 Fed. Reg. 3615. More generally, bank balance-sheet regulation and supervision significantly implicate monetary policy. A restrictive regulatory and supervisory framework fosters monetary contraction while a permissive regime drives credit expansion and inflation. *See* Lev Menand, *The Logic and Limits of the Federal Reserve Act*, 40 YALE J. ON REG. 197, 240–50 (2023).

central banks (like the Fed) have for fighting financial panics."[33] It
enables the Federal Reserve to deter bank runs, quell the need for fire
sales, smooth market functioning, and otherwise promote credit
creation.

The primary reason that central banks around the world are (and
have long been) tasked with serving as lenders of last resort is that
central banks alone have the capacity to create unlimited money
instruments. The magnitude of the Great Financial Crisis of 2008 and
the financial ramifications of the COVID-19 pandemic would have been
far greater had the Fed not been willing and able to use this tool as
needed to help contain the impact of the economic shocks. These
containment efforts did not wholly prevent, but helped significantly to
mitigate, the impact on the real economy—including its capacity to
grow and to provide employment opportunities.

## C.    Overturning or more narrowly construing *Humphrey's Executor* would threaten Fed independence.

The Government has asserted here and in other recent litigation
that, even if *Humphrey's Executor* is not overruled, the "exception" that

---

[33] Ben S. Bernanke, Fed Emergency Lending, Brookings (Dec. 3, 2015),
https://www.brookings.edu/articles/fed-emergency-lending/.

*Humphrey's Executor* created to the rule of unrestricted presidential removal power "does not apply to multimember agencies that exercise substantial executive power, for instance by promulgating binding rules or issuing final decisions in administrative adjudications."[34]

That reading of *Humphrey's Executor* would spell doom for Fed independence. The Fed is a "multimember agenc[y]" that promulgates "binding rules." *See* 12 C.F.R. §§ 200–299. And the same officials oversee both monetary policy and banking and financial stability. If the latter is subject to executive control, then as a practical matter the former will be as well.

Overruling *Humphrey's Executor* would even more clearly undermine the Fed's independence. There are foundational structural similarities between the Fed—a multimember commission designed by Congress on the model of the Interstate Commerce Commission—and the Federal Trade Commission, the multimember commission that was

---

[34] Application to Vacate the Order Issued by the United States District Court for the District of Columbia and Request for an Administrative Stay at p. 17 n.5, *Dellinger v. Bessent*, No. 24A790 (U.S. 2025); *see also* Stay Motion at 2–3.

created the following year (on the same model) and that was the subject

of *Humphrey's Executor*.

Courts likewise jeopardize the Fed's policy credibility by

characterizing it as "a special arrangement sanctioned by history," as

Justice Alito proposed in a dissent last term.[35] For three reasons,

market participants may not believe that such a distinction will hold.

First, a carve-out based on the Fed's supposedly distinctive history

would rest on dubious historiography.[36] Recent scholarship has shown

---

[35] *Consumer Fin. Prot. Bureau* v. *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 467 n.16 (2024) (Alito, J., dissenting). Justice Alito argued that the Fed "should not be seen as a model for other Government bodies" because it "is a unique institution with a unique historical background" with a structure "adopted in the Federal Reserve Act of 1913 [that] represented an intensely-bargained compromise between two insistent and influential camps: those who wanted a largely private system, and those who favored a Government-controlled national bank." *See also Seila Law*, 591 U.S. at 222 n.8 (noting, without endorsing, the argument that the Fed may "claim a special historical status."); *PHH Corp. v. Consumer Fin. Protection. Bureau*, 881 F.3d 75, 192 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (referring to the Fed Chair as "an historical anomaly . . . due to the Federal Reserve's special functions in setting monetary policy and stabilizing the financial markets").

[36] Contemporary arguments about the President's inherent power over government officials have become unusually unmoored from original understandings of Constitutional text and structure. *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1 (2021).

that the first Congress, many of whose members helped draft the

Constitution, saw no constitutional impediment to empowering

commissions, at least some of whose members could **not** be terminated

at will by the President.[37] For example, the first Congress created a

---

[37] Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 NOTRE DAME L. REV. 1, 27–28 (2020) [hereinafter *Originalist Argument*]. Moreover, the Federalist Papers treated the Appointments Clause—which vests authority to appoint principal officers jointly in the President and Senate—as requiring *both* the President and Senate to agree to removals unless otherwise specified by Congress. *The Federalist* No. 77 ("The Appointing Power Continued and Other Powers of the Executive Considered") explained:

> It has been mentioned as one of the advantages to be expected from the co-operation of the Senate, in the business of appointments, that it would contribute to the stability of the administration. ***The consent of that body would be necessary to displace as well as to appoint.*** A change of the Chief Magistrate, therefore, would not occasion so violent or so general a revolution in the officers of the government as might be expected, if he were the sole disposer of offices. . . . Those who can best estimate the value of a steady administration, will be most disposed to prize a provision which connects the official existence of public men with the approbation ***or disapprobation*** of that body which, from the greater permanency of its own composition, will in all probability be less subject to inconstancy.

Sinking Fund Commission to repay the national debt through open-market purchases of U.S. securities.[38] Its members included Alexander Hamilton, Thomas Jefferson, John Jay, and Edmund Randolph; and the President had no power to replace or remove several of them.[39] Likewise, Hamilton's plan for the first National Bank provided for "removal of a Director by the Stockholders"—but not by the President.[40] There is no evidence that these arrangements were treated at the time as special cases, as opposed to ordinary exercises of legislative power.

Second, market participants would have reason to doubt the longevity of a Fed carveout if the judiciary continues along its path of continually scaling back agency independence. Absent a logical basis in doctrine, observers may wonder how long the "Fed exception" will last (after all, in this hypothetical world, the "*Humphrey's Executor* exception" did not survive).

---

[38] *Originalist Argument* at 34.

[39] *Id.* at 3–4.

[40] Alexander Hamilton, *Final Version of the Second Report on the Further Provision Necessary for Establishing Public Credit (Report on a National Bank)*, Nat'l Archives Founders Online, https://founders.archives.gov/documents/Hamilton/01-07-02-0229-0003#ARHN-01-07-02-0229-0003-fn-0152-ptr.

Third, as the only remaining independent agency, the Fed will be far more vulnerable to presidential interference. For example, the President might challenge the Fed carveout (a course of action consistent with what the President is now doing for the NLRB and MSPB); and observers could conclude that such a challenge may succeed on grounds that future courts will articulate.[41]

Even if observers expect such a challenge to fail, significant damage may be done by the process of litigating over the authority of the relevant Fed officials, following any presidential effort at removal or demotion. The increased likelihood of policy uncertainty alone may be enough to immediately damage the ability of the United States to sustain price stability over time, resulting in near-term and potentially irreversible harm to economic growth and vitality.

---

[41] For example, were the Supreme Court to overturn *Humphrey's Executor* with a putative Fed carveout, the market nonetheless might anticipate that courts in the future will acquiesce in the president's assertion of control over the Fed by defining down "cause" to the point where it presents no obstacle to presidential direction.

## IV.   CONCLUSION

For all the reasons stated above, the Court should avoid making any statement that could be construed as undermining the carefully calibrated institutional design of the Federal Reserve, which tenures members of the Federal Reserve Board and prevents the President from removing them (or demoting the Board Chair), except for cause.

Respectfully submitted,

DATED: April 9, 2025                 */s/ Steven A. Hirsch*
                                      Steven A. Hirsch
                                      Keker, Van Nest & Peters LLP
                                      *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(d), because this brief contains 5,557 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

DATED: April 9, 2025              <u>*/s/ Steven A. Hirsch*</u>
                                          Steven A. Hirsch
                                          Keker, Van Nest & Peters LLP
                                          *Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the

District of Columbia Circuit using the Court's CM/ECF system on

April 9, 2025, which will send notice of such filing to all counsel who are

CM/ECF registered users.


DATED:  April 9, 2025                    /s/ Steven A. Hirsch
                                         Steven A. Hirsch
                                         Keker, Van Nest & Peters LLP
                                         *Counsel for Amici Curiae*

2900113