[ORAL ARGUMENT SCHEDULED FOR MAY 16, 2025]
Nos. 25-5037, 25-5055, & 25-5057

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN HER OFFICIAL
CAPACITY AS MEMBER OF THE MERIT SYSTEMS PROTECTION BOARD,

*Appellee*,

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY,
ET AL.,

*Appellants*.


GWYNNE A. WILCOX,

*Appellee*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES, et al.,

*Appellants*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

### BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE*
### IN SUPPORT OF APPELLEES

---

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Smita Ghosh
Margaret Hassel
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* Constitutional Accountability Center (CAC) represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus curiae* certifies that a separate brief is necessary. *Amicus* is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees. CAC has filed *amicus* briefs in multiple cases about the constitutionality of for-cause removal protections in the Supreme Court and other federal courts, including on the merits in these cases in the District Court, and has accordingly developed expertise in the relevant constitutional text and history.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

i

**CORPORATE DISCLOSURE STATEMENT**

*Amicus curiae* Constitutional Accountability Center states that no party to this

brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.     PARTIES AND *AMICI*

Except for *amicus* Constitutional Accountability Center and any other *amici* who had not yet entered an appearance in this case as of the filing of Appellants' brief, all parties, intervenors, and *amici* appearing in this Court are listed in Appellants' brief.

II.    RULINGS UNDER REVIEW

Reference to the ruling under review appears in Appellants' brief.

III.   RELATED CASES

Reference to any related cases pending before this Court appears in Appellants' brief.

Dated:  April 9, 2025                                      */s/ Brianne J. Gorod*
                                                           Brianne J. Gorod

                                                           *Counsel for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. v

GLOSSARY.................................................................................... xi

INTEREST OF *AMICUS CURIAE*.................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ................................................................................. 6

    I.    Binding Precedent Affirms the Legitimacy of Multimember Independent Agencies Like the MSPB and the NLRB ........................ 6

    II.    Established Practice Confirms the Validity of Multimember Independent Agencies........................................................... 15

    III.    Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies ................................. 22

CONCLUSION .............................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ariz. Grocery Co. v. Atchison, T. & S. F. Ry. Co.*,
   284 U.S. 370 (1932) ................................................................. 17

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ................................................................. 18

*Collins v. Yellen*,
   594 U.S. 220 (2021) ................................................................. 8

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
   91 F.4th 342 (5th Cir. 2024) .................................................... 5

*Dellinger v. Bessent*,
   No. 25-cv-00385 (D.C. Cir. Mar. 27, 2025) ........................... 12

*E. Griffiths Hughes, Inc. v. FTC.*,
   63 F.2d 362 (D.C. Cir. 1933) ................................................... 11

*Exela Enter. Sols., Inc. v. NLRB*,
   32 F.4th 436 (5th Cir. 2022) .................................................... 12

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010) .............................................. 2, 5, 7, 21, 26, 29

*FTC v. Eastman Kodak Co.*,
   274 U.S. 619 (1927) ................................................................. 19

*FTC v. Klesner*,
   280 U.S. 19 (1929) ................................................................... 19

*Harris v. Bessent*,
   No. 25-5037 (D.C. Cir. Mar. 28, 2025) ................................... 22

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935) ..................................................... 2-4, 18-21, 29

*In re Hennen*,
   38 U.S. 230 (1839) ............................................................ 4, 23, 25

*Mallory v. Norfolk S. Ry. Co.*,
   600 U.S. 122 (2023) .......................................................... 5, 15

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Marbury v. Madison,*
    5 U.S. 137 (1803)....................................................... 27

*McAllister v. United States,*
    141 U.S. 174 (1891).................................................... 28

*McPherson v. Blacker,*
    146 U.S. 1 (1892)....................................................... 15

*Meta Platforms, Inc. v. FTC,*
    No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024).................. 14

*Mistretta v. United States,*
    488 U.S. 361 (1989)............................................... 15, 22

*Morrison v. Olson,*
    487 U.S. 654 (1988)............................................... 20-22

*Myers v. United States,*
    272 U.S. 52 (1926)............................................. 24, 26, 29

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)...................................................... 9

*Nat'l Sec. Archive v. CIA,*
    104 F.4th 267 (D.C. Cir. 2024).......................................... 5

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014)........................................... 4, 15-17

*Parsons v. United States,*
    167 U.S. 324 (1897)................................................... 28

*PHH Corp. v. CFPB,*
    881 F.3d 75 (D.C. Cir. 2018)........................................ 16

*Plaut v. Spendthrift Farm, Inc.,*
    514 U.S. 211 (1995).................................................... 9

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) .................................................. 2-9, 11-15, 18, 20-22, 27, 29

*Shurtleff v. United States*,
   189 U.S. 311 (1903) ................................................................. 28

*Stuart v. Laird*,
   5 U.S. 299 (1803) ..................................................................... 22

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936) ................................................................. 17

*Va. Off. for Prot. & Advoc. v. Stewart*,
   563 U.S. 247 (2011) ................................................................... 9

*Wiener v. United States*,
   357 U.S. 349 (1958) ............................................................. 2, 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ........................................................... 15, 22

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ............................................................... 4, 15

Constitutional Provisions, Statutes, and Legislative Materials

Act of July 27, 1789, ch. 4, 1 Stat. 28 ........................................... 25

Act of May 15, 1820, ch. 102, 3 Stat. 582 ...................................... 28

Act of Feb. 24, 1855, ch. 122, 10 Stat. 612 .................................... 28

Act of Feb. 25, 1863, ch. 58, 12 Stat. 665 ...................................... 28

Act of June 3, 1864, ch. 106, 13 Stat. 100 ...................................... 28

Act of Mar. 2, 1889, ch. 382, 25 Stat. 855 ...................................... 16

Act of June 29, 1906, ch. 3591, 34 Stat. 584 .................................. 16

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Act of Oct. 15, 1914, ch. 323, 38 Stat. 730....................................................... 18

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717 (1914) ............................................................................................. 11, 18

An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, 24 Stat. 379 (1887) ............................................................................................. 1, 10, 16

1 Annals of Cong. (1789)........................................................................... 25, 26

Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 903, 92 Stat. 1111 ................................................................................................. 12

*Hearing on S. 195 Before the S. Comm. on Educ. & Lab.*, 74th Cong. (1935) ............................................................................................. 13, 14

Securities Act of 1933, Pub. L. No. 73-22, § 20(b), 48 Stat. 74................. 10

5 U.S.C. § 1201 ...................................................................................... 10, 12, 14

5 U.S.C. § 1202 ............................................................................................. 10

5 U.S.C. § 1202(a) ....................................................................................... 12

5 U.S.C. § 1204(b)(2)(A) ............................................................................. 10

5 U.S.C. § 1204(c) ....................................................................................... 10

15 U.S.C. § 41 ............................................................................................. 10

29 U.S.C. § 153(a) ....................................................................................... 12

29 U.S.C. § 153(d) ....................................................................................... 12

29 U.S.C. § 160(j) ....................................................................................... 12

29 U.S.C. § 175a(d) ..................................................................................... 12

U.S. Const. art. I, § 8, cl. 18........................................................................ 24

U.S. Const. art. II, § 2 ................................................................................. 24

**TABLE OF AUTHORITIES – cont'd**

Page(s)

U.S. Const. art. II, § 4 ................................................................ 23

*Violations and Abuses of Merit Principles in Federal Employment: Hearings Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Office & Civil Serv.*, 94th Cong. (1975) .................................. 13, 14

<u>Books, Articles, and Other Authorities</u>

Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175 (2021) .................................. 23

Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111 (2000) ................................................................ 17

Jimmy Carter, Federal Service Reform Message to the Congress (Mar. 2, 1978)............................................................................ 14

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev 1 (2020) ......................................................................... 9, 16

Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353 (1927) ........................... 26-28

David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161 (1995)........................................................... 25

*The Documentary History of the First Federal Congress of the United States of America* (Charlene Bangs Bickford et al. eds., 2019) ...................... 26, 27

*The Federalist No. 39* (Clinton Rossiter ed., 1961)................................... 24

*The Federalist No. 70* (Clinton Rossiter ed., 1961)................................... 23

*The Federalist No. 77* (Clinton Rossiter ed., 1961)................................... 23

Fed'l Trade Comm'n, Annual Report (1934)........................................... 19

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725
(1996) ....................................................................................... 23

Meg Jacobs, *Pocketbook Politics: Economic Citizenship in Twentieth-Century America* (2005)............................................................... 19

Danielle Kaye & Rebecca Davis O'Brien, *Trump Firings at Labor Board Paralyze the Agency*, N.Y. Times (Jan. 28, 2025),
https://www.nytimes.com/2025/01/28/us/politics/trump-nlrb-jennifer-abruzzo.html ............................................................................... 12

2 Op. O.L.C. 120 (1978) ............................................................. 22

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021 (2006)........................................................................ 25, 26

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911)....... 24

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ....................................................................................... 23

39 U.S. Op. Att'y Gen. 145 (1938).............................................. 21

White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house ....................... 1

# GLOSSARY

CFPB        Consumer Financial Protection Bureau

FHFA        Federal Housing Finance Agency

FTC         Federal Trade Commission

ICC         Interstate Commerce Commission

MSPB        Merit Systems Protection Board

NLRB        National Labor Relations Board

## INTEREST OF *AMICUS CURIAE*[2]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works to improve understanding of the Constitution and accordingly has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

Congress has been creating multimember independent agencies for most of the nation's history—they have existed for at least as long as the light bulb.[3] Nearly a century of Supreme Court precedent affirms their constitutionality. Relying on that precedent, Congress has established dozens of multimember agencies whose leaders are removable only for cause, including the National Labor Relations Board (NLRB) and the Merit Systems Protection Board (MSPB). President Trump's attempts to remove leaders of those agencies without cause

---

[2] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission.  All parties have consented to the filing of this brief.

[3] *Compare* An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, § 11, 24 Stat. 379, 383 (1887) (establishing Interstate Commerce Commission), *with* White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house (electricity installed at White House and at State, War, and Navy Building in 1891).

contravene binding Supreme Court precedent, established practice, and the Constitution's text and history.

Nearly a century ago, the Supreme Court upheld statutory removal protections for multimember independent agencies. *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). In the years since, the Court has repeatedly reaffirmed that holding. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 205-06 (2020) (affirming the legitimacy of "a traditional independent agency, run by a multimember board"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010) (multimember board with single level of for-cause protection would be adequately "subject ... to Presidential oversight"); *Wiener v. United States*, 357 U.S. 349 (1958) (upholding removal protection for multimember board).

Defendants rely on *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), to advance a cramped reading of those precedents. But this misunderstands *Seila Law* entirely. *Seila Law* did not call into question *Humphrey's Executor*. To the contrary, it reiterated that case's continuing validity.

*Seila Law* addressed "a new situation" involving the "almost wholly unprecedented" creation of an independent agency "wield[ing] significant executive power" while led "by a single individual." *Id.* at 238, 220, 204, 213. Making clear that it was not "revisit[ing] [its] prior decisions," the Court found

2

"compelling reasons not to *extend* those precedents to the novel context of an independent agency led by a single Director." *Id.* at 204 (emphasis added).

Explaining why *Humphrey's Executor* did not resolve whether the Consumer Financial Protection Bureau (CFPB) Director's insulation from removal was constitutional, the Court began with what it viewed as the key distinction between the CFPB and the Federal Trade Commission (FTC): "[u]nlike the New Deal-era FTC upheld there, the CFPB is led by a single Director who cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle." *Id.* at 218 (quoting *Humphrey's Ex'r*, 295 U.S. at 624). *Seila Law* distinguished single-director independent agencies from "a traditional independent agency, run by a multimember board," *id.* at 205-06, in three respects. First, the Court wrote, such agencies are "an innovation with no foothold in history or tradition." *Id.* at 222. Second, they pose a greater imposition on presidential oversight, "foreclos[ing] certain indirect methods of Presidential control." *Id.* at 225. Third, empowering a single director with "no colleagues to persuade" impermissibly "clashes with constitutional structure by concentrating power in a unilateral actor." *Id.* at 225, 204 (quotation marks omitted).

None of those features describes the NLRB or MSPB, which closely resemble agencies that have existed for 150 years. Both Boards have multiple

members with staggered terms, avoiding the concentration of power that troubled the Court in *Seila Law* while allowing every President to influence their composition. In other words, unlike the CFPB, the MSPB and the NLRB have the same structure as the 1935 FTC that the Court approved in *Humphrey's Executor*.

Even if *Seila Law* were not so definitive about what made the CFPB Director's removal protection unconstitutional, established practice has settled the constitutional legitimacy of multimember independent agencies. In separation-of-powers cases, the judiciary places "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks omitted), including practice that "began after the founding era," because it embodies "the compromises and working arrangements that the elected branches of Government themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 525-26 (2014).

Multimember independent agencies have exercised executive functions for generations. And the Supreme Court has consistently affirmed their constitutionality—right up to its recognition in *Seila Law* that Congress could eliminate the constitutional defects of the CFPB, "an independent agency that wields significant executive power," by "converting [it] into a multimember agency." 591 U.S. at 204, 237 (opinion of Roberts, C.J.) (three Justices); *id*. at 298 (Kagan, J., concurring in part and dissenting in part) (four additional Justices).

4

Multimember independent agencies are also consonant with the Constitution's original meaning.  The constitutional text, which "is silent with respect to the power of removal," *In re Hennen*, 38 U.S. 230, 258 (1839), does not specify the boundary between the President's authority to supervise subordinates and Congress's authority to shape the federal government.  Significantly, nothing in Founding-era history suggests that there is a constitutional problem with Congress imposing limits on the President's removal authority so long as those limits do not interfere with the President's ability to fulfill his duty to Take Care that the laws are faithfully executed.  And as the Supreme Court has consistently acknowledged, good-cause removal in the context of multimember expert bodies imposes no such interference.

In *Seila Law*, as in *Free Enterprise Fund*, the Supreme Court confronted "new situation[s]," *Free Enter. Fund*, 561 U.S. at 483, and prohibited "restrictions on the President's removal authority" that have "no foothold in history or tradition," *Seila Law*, 591 U.S. at 228, 222.  It did not license lower courts to strike down a time-honored structure the Supreme Court has consistently upheld as a valid "exception" to any presidential power of removal, *id.* at 204—that of a "traditional independent agency headed by a multimember board or commission," *id.* at 207.  Instead, this Court must abide by the "directly control[ling]" precedent of *Humphrey's Executor*.  *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023)

(quotation marks omitted); *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024) (declining to read *Seila Law* as overruling *Humphrey's Executor*).

## ARGUMENT

## I.    Binding Precedent Affirms the Legitimacy of Multimember Independent Agencies Like the MSPB and the NLRB.

### A.    *Seila Law* Addressed Only the Innovation of an Independent Agency Led by a Single Director.

In claiming authority to remove Wilcox and Harris without cause, President Trump relies on *Seila Law*.  *See, e.g.*, Appellants Br. 16-18.  But *Seila Law* was clear about its limited scope: "We hold that the CFPB's leadership *by a single individual* removable only for inefficiency, neglect, or malfeasance violates the separation of powers."  591 U.S. at 213 (emphasis added).  *Seila Law* clarified that the holding of *Humphrey's Executor* hinged not on the scope and nature of an agency's powers, but on the structure of the agency.  "Instead of placing the agency under the leadership of a board with multiple members," Congress "deviated from the structure of nearly every other independent administrative agency in our history."  *Id.* at 203.  "The question before us," the Court said, "is whether *this arrangement* violates the Constitution's separation of powers."  *Id.* (emphasis added).

6

As the Court explained, *Humphrey's Executor* recognized the longstanding qualification to the President's removal authority that Congress may "create expert agencies led by a *group* of principal officers removable by the President only for good cause." *Id.* at 204 (emphasis in original). In *Seila Law*, the Court was "asked to extend these precedents to a new configuration: an independent agency that wields significant executive power *and is run by a single individual*." *Id.* (emphasis added).

In refusing to extend its precedent, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power." *Id.* Rather, the Court declined "to extend those precedents to the 'new situation' before [it]," *id.* at 220 (quoting *Free Enter. Fund*, 561 U.S. at 483), which introduced a "novel impediment" to presidential authority, *id.* at 215; *accord Free Enter. Fund*, 561 U.S. at 483-84 (striking down "new situation" of "multilevel protection from removal," but declining "to reexamine any … precedents"). In short, *Seila Law* addressed only the new phenomenon of removal protections for "principal officers who, *acting alone*, wield significant executive power." 591 U.S. at 238 (emphasis added).

The Court's subsequent decision in *Collins v. Yellen* confirmed this. In that challenge to the single-director Federal Housing Finance Agency (FHFA), the Court concluded that "[a] straightforward application of our reasoning in *Seila Law*

7

dictates the result[:] ... The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power."  594 U.S. 220, 251 (2021).  And the Court reiterated that in *Seila Law*, "[w]e did not revisit our prior decisions allowing certain limitations on the President's removal power, but we found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 250-51 (quotation marks omitted).

**B.**    ***Seila Law* Rested on Three Features Specific to Single-Director Independent Agencies, None of Which Characterize the NLRB or the MSPB.**

After concluding that precedent did not resolve the legitimacy of removal protection for agency leaders serving alone, *Seila Law* discussed three aspects of single-director leadership that the Court concluded made removal limits untenable in that context: it was a historical anomaly, 591 U.S. at 220-23; it introduced new barriers to presidential oversight, *id.* at 204; and it concentrated power in the hands of one person, *id.*  None of those concerns applies to the NLRB or the MSPB.

**1.  *Historical Anomaly***

*Seila Law* stressed that "[t]he CFPB's single-Director structure is an innovation with no foothold in history or tradition" that was "almost wholly unprecedented."  *Id.* at 220-22.  In "only a handful of isolated incidents" had Congress elsewhere "provided good-cause tenure to principal officers who wield

8

power alone rather than as members of a board or commission." *Id.* at 220 (quotation marks omitted). And nearly all those "isolated examples" were also "comparatively recent and controversial." *Id.* at 221-22. This "lack of historical precedent" for the Bureau's single-director structure suggested a "constitutional problem." *Id.* at 220 (quotation marks omitted).

*Seila Law* was not the first time the Court articulated a suspicion of novelty. "Lack of historical precedent can indicate a constitutional infirmity," the Court has written, because novelty "is often the consequence of past constitutional doubts." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 260 (2011). The Court has applied this skepticism toward "novel governmental structures," *Seila Law*, 591 U.S. at 231, across multiple contexts. *See NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (while "not necessarily fatal ... sometimes the most telling indication of [a] severe constitutional problem ... is the lack of historical precedent" (quotation marks omitted)); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (Congress's "prolonged reticence" to assert authority creates an "inference" that it is "constitutionally proscribed").

But multimember independent agencies are not novel. Congress has exercised flexibility in how it structures the various components of the executive branch since the Founding, *see* Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre

Dame L. Rev 1, 39-43 (2020), and members of expert boards have enjoyed

removal protection since at least the establishment of the Interstate Commerce

Commission (ICC) in 1887.  *See* Act to Regulate Commerce, § 11, 24 Stat. at 383.

And both the NLRB and the MSPB bear the hallmarks of these traditional

agencies.  *Compare id.* (ICC has five Commissioners, serving six-year terms,

removable for cause), *with* 5 U.S.C. §§ 1201-1202 (MSPB has three Members,

serving seven-year terms, removable for cause), *and* 15 U.S.C. § 41 (NLRB has

five Members, serving five-year terms, removable for cause).  Moreover, the

MSPB's and NLRB's powers to which Appellants most strongly object—such as

the power to enforce orders (NLRB) or even just subpoenas (MSPB) in court—

have close analogs in the ICC's powers.  *Compare* Act to Regulate Commerce,

§15, 24 Stat. at 385 (ICC can seek "writ of injunction" to prevent violations of its

orders), *with* 29 U.S.C. § 160(j) (NLRB can "petition any United States district

court ... for … restraining order"); *compare* Act to Regulate Commerce, § 12, 24

Stat. at 383 (ICC "may invoke the aid of any court" to "require the attendance and

testimony of witnesses"), *with* 5 U.S.C. § 1204(b)(2)(A), (c) (MSPB may "issue

subpoenas requiring the attendance and presentation of testimony," and court may

order compliance).  And although Appellants highlight the NLRB's ability to

receive temporary injunctive relief, conduct adjudications resulting in agency

orders, and issue "regulatory decrees," Appellants Br. 30, these powers have clear

analogs as well.  *See* Securities Act of 1933, Pub. L. No. 73-22, § 20(b), 48 Stat.

74, 86 (FTC can seek "a permanent or temporary injunction or restraining order" to

prevent securities law violations); Act to Create a Federal Trade Commission, ch.

311, § 5, 38 Stat. 717, 719-20 (1914) (FTC can adjudicate); *E. Griffiths Hughes,*

*Inc. v. FTC*, 63 F.2d 362, 363 (D.C. Cir. 1933) (FTC can "adopt such rules … as

may be necessary in carrying out the act").  The NLRB's and MSPB's structures

and powers are not "novel" or "innovative" at all.  *Seila Law*, 591 U.S. at 215, 228.

## 2.  *Greater Encroachment on Presidential Oversight*

*Seila Law* also concluded that removal protections for agency heads who

serve alone intrude on presidential authority more than protections for members of

boards because they "foreclose[] certain indirect methods of Presidential control"

available in the context of multimember bodies.  *Id.* at 225.  This rendered the

CFPB's structure a "novel impediment to the President's oversight of the

Executive Branch."  *Id.* at 215.

"Because the CFPB is headed by a single Director with a five-year term," a

President might "*never*" be able to appoint a director and could not remove a

director holding diametrically opposed views.  *Id.*  And "the agency's single-

Director structure" meant that the President would not "have the opportunity to

appoint any other leaders [of the agency] ... who c[ould] serve as a check on the

Director's authority and help bring the agency in line with the President's preferred policies." *Id.*

None of these concerns applies to the MSPB or the NLRB. Because their Members serve staggered terms, and because the President also appoints each Board's chairperson, every President will have at least some ability to shape the agency's leadership and agenda. *See* 29 U.S.C. § 153(a); 5 U.S.C. §§ 1201, 1202(a). Moreover, unlike the CFPB, both agencies receive funding through annual appropriations. *See* 29 U.S.C. § 175a(d); Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 903, 92 Stat. 1111, 1224; *see also Seila Law*, 591 U.S. at 226.

The President also has a further check on the NLRB and the MSPB because the President can remove at will the agencies' General Counsel and Special Counsel, respectively, 29 U.S.C. § 153(d), as President Trump has already done, *see* Danielle Kaye & Rebecca Davis O'Brien, *Trump Firings at Labor Board Paralyze the Agency*, N.Y. Times (Jan. 28, 2025), https://www.nytimes.com/2025/01/28/us/politics/trump-nlrb-jennifer-abruzzo.html; *see generally Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 445 (5th Cir. 2022) ("Congress may well have wanted to provide greater protection for the Members of the Board—who hold expansive quasi-legislative, quasi-judicial powers over labor rights disputes—than for the General Counsel"); *Dellinger v.*

*Bessent*, No. 25-cv-00385 (D.C. Cir. filed Mar. 27, 2025) (per curiam) (allowing removal of Special Counsel to take effect).

### 3. *Concentration of Power in a Single Person*

The third feature of the CFPB's structure on which *Seila Law* rested was its consolidation of power in "a unilateral actor insulated from Presidential control." 591 U.S. at 204. According to the Court, this configuration has "no place in our constitutional structure." *Id.* at 220. With "the sole exception of the Presidency, that structure scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222-23. The CFPB, however, "contravene[d] this carefully calibrated system by vesting significant governmental power in the hands of a single individual." *Id.* "With no colleagues to persuade," this individual could "unilaterally" wield a range of enforcement, adjudicative, and rulemaking authorities. *Id.* at 225.

The Court found this arrangement a far cry from the "multimember body of experts" it had previously approved. *Id.* at 216. But the NLRB and the MSPB match that traditional profile. Each was established in response to significant strife and mismanagement of labor issues, in the private and federal sectors respectively. *See Hearing on S. 195 Before the S. Comm. on Educ. & Lab.*, 74th Cong. 9 (1935) [hereinafter *NLRB Hearing*] (labor conflicts caused "economic strife" that "imperil[ed] the general welfare"); *Violations and Abuses of Merit Principles in*

*Federal Employment: Hearings Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Office & Civil Serv.*, 94th Cong. 8-9 (1975) (statement of Robert E. Hampton, Chairman, U.S. Civil Serv. Comm'n) (discussing merit system abuses during the Nixon administration).  Congress knew that these difficulties called for expert, impartial bodies to adjudicate violations of and enforce the nation's labor laws.  *See NLRB Hearing*, *supra*, at 64-65 (statement of Sen. La Follette) (long, staggered terms would make the NLRB impartial and judicial in nature); *id.* at 95 (the "numerous problems, economic, social, and legal" involved in labor negotiations "require[d] expert knowledge and special training"); Jimmy Carter, Federal Service Reform Message to the Congress (Mar. 2, 1978) ("non-renewable overlapping terms" of MSPB members "removable only for cause" would "guarantee independent and impartial protection to employees"); 5 U.S.C. § 1201 (each MSPB Member must be appointed based on "ability, background, training, or experience").  Each agency's structure facilitates consensus-based decision-making and is thus a far cry from the CFPB's structure, which allowed a single director to act "*unilaterally*."  *Seila Law*, 591 U.S at 225 (emphasis in original).

\* \* \*

In sum, *Seila Law* held that the CFPB's structure could not find support in *Humphrey's Executor*.  But the Supreme Court was explicit that "we do not revisit

14

*Humphrey's Executor* or any other precedent." *Id.* at 228; *see Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam) ("[t]he Supreme Court has not disturbed" *Humphrey's Executor*). And lower courts must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Mallory*, 600 U.S. at 136 (quotation marks omitted). Because the Court in *Seila Law* focused on the CFPB's "novel" structure, lower courts must apply *Humphrey's Executor* to multimember agencies.

## II. Established Practice Confirms the Validity of Multimember Independent Agencies.

The flip side of the Supreme Court's suspicion of "novel governmental structures," *Seila Law*, 591 U.S. at 231, is that "'traditional ways of conducting government … give meaning' to the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). For that reason, the Court "put[s] significant weight upon historical practice" in separation-of-powers cases. *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted); *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("where there is ambiguity or doubt" in constitutional interpretation, "subsequent practical construction is entitled to the greatest weight"). When construing the Constitution's broadly phrased divisions among the branches, judges "must hesitate to upset the compromises and working

15

arrangements that the elected branches of Government themselves have reached," *Noel Canning*, 573 U.S. at 526, even when that practice began after the founding era." *Id.* at 525; *see id.* at 528-29 (relying on history of intra-session recess appointments that began after the Civil War).

Significantly, the very first Congresses exercised flexibility in how they structured various components of the executive branch, *see* Chabot, *supra*, at 39-43, and Congress began establishing multimember agencies whose members could only be removed for cause nearly 150 years ago, when it created the ICC. *See* Act to Regulate Commerce, § 11, 24 Stat. at 383; *see also PHH Corp. v. CFPB*, 881 F.3d 75, 174 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (noting the "deeply rooted historical practice of independent agencies as multimember agencies"). The ICC had investigative and enforcement authority over the monumentally important railroad industry, including the power to issue cease-and-desist orders, to require payment of reparations, and to enforce its orders in court. *See* Act to Regulate Commerce, §§ 12-16, 20, 24 Stat. at 382-85, 386-87; *cf.* Appellants Br. 11, 28 (discussing the NLRB's and MSPB's limited authority to litigate).

Although the Interior Secretary initially had some authority over the ICC, *see* Act to Regulate Commerce, §§ 18, 21, 24 Stat. at 386-87, Congress eliminated it two years later, *see* Act of Mar. 2, 1889, ch. 382, §§ 7-8, 25 Stat. 855, 861-62. And in 1906, Congress empowered the ICC to prescribe "fair" and "reasonable"

practices, as well as maximum railroad rates—in other words, to promulgate regulations, *see* Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589, cementing its status as "a very powerful agency," Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1130 (2000); *see Ariz. Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370, 388 (1932) (describing ICC's ratemaking power).

In the early twentieth century, Congress established "a multitude of new agencies … using the ICC as their prototype," including the Federal Reserve Board (1913), Federal Trade Commission (1914), Federal Radio Commission (1927), Federal Power Commission (1930), Securities and Exchange Commission (1934), Federal Communications Commission (1934), National Labor Relations Board (1935), Bituminous Coal Commission (1935), and Federal Maritime Commission (1936). Breger & Edles, *supra*, at 1116 & n.14. And the "critical element of independence" for these agencies was "protection ... against removal except 'for cause.'" *Id.* at 1138.

This long pedigree of multimember independent agencies is all but dispositive of their legitimacy. "A legislative practice ... marked by the movement of a steady stream for a century and a half of time" indicates "the presence of unassailable ground for the constitutionality of the practice." *United States v.*

17

*Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327-28 (1936); *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring) ("governmental ... practice should guide our interpretation of an ambiguous constitutional provision").

For generations, these agencies have wielded powers that could be seen as executive. Although the Supreme Court initially conceived of some of their powers as "quasi-legislative or quasi-judicial," rather than as executive, *Seila Law*, 591 U.S. at 216 & n.2 (quotation marks omitted), the Court in more recent cases has at times characterized the functions that independent agencies have long carried out—enforcement, rulemaking, adjudications—as "exercises of ... the 'executive Power'" under the Constitution, *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013); *see* Appellants Br. 21.

And at the time of *Humphrey's Executor*, the FTC wielded authority comparable to that of modern independent agencies, whatever the label applied to that authority. As the Court recognized, the agency could charge private parties with statutory violations, adjudicate those charges in administrative hearings, issue cease-and-desist orders, and enforce those orders in court. *See Humphrey's Ex'r*, 295 U.S. at 620-21; *see also* An Act to Create a Federal Trade Commission, § 5, 38 Stat. at 719-20. It could order an antitrust violator to "divest itself of the stock held or rid itself of the directors chosen contrary to the provisions of sections seven and eight of this Act," Act of Oct. 15, 1914, ch. 323, § 11, 38 Stat. 730, 734-35,

18

and, until 1934, it could seek temporary restraining orders preventing violations of securities laws, *see* Fed'l Trade Comm'n, Annual Report 42 (1934). When doing so, it appeared in federal court in its own name, represented by its own attorneys. *See id.* at 45-46; *FTC v. Klesner*, 280 U.S. 19, 25 (1929) ("The formal complaint is brought in the Commission's name …."). *But cf.* Appellants Br. 4, 11. It used its authority to "make executive policy," *id*. at 29, condemning certain "practices" as "unfair methods of competition," *see* Annual Report, *supra*, at 69-72, and presiding over the adoption of "trade-practice rules" outlining industry-wide standards, *id*. at 92-94, 54-55.

The Justices who decided *Humphrey's Executor* were aware of these powers. After all, the FTC engaged in these actions across the American economy, reining in companies that, a hundred years later, remain household names. *See, e.g.*, *FTC v. Eastman Kodak Co.*, 274 U.S. 619 (1927); *cf.* Meg Jacobs, *Pocketbook Politics: Economic Citizenship in Twentieth-Century America* 69-72 (2005) (FTC's investigation of the meat-packing industry provoked charges of "treason and conspiracy" in the 1920s). And the Court knew that its decision would apply to members of the ICC and Court of Claims, *Humphrey's Ex'r*, 295 U.S. at 629, noting that its decision was not limited to agencies whose powers matched the FTC in every respect, or to agencies that did not engage in substantial rulemaking, *see supra* at 16-17 (describing the ICC's ratemaking power). Perhaps this is why the

19

Supreme Court has described the characterization of the FTC as "non-executive" in *Humphrey's Executor* as a product of "several organizational features" of the FTC, including its reliance on a "body of experts" and use of staggered terms, rather than the agency's precise powers. *Seila Law*, 591 U.S. at 216.

Thus, beginning with *Humphrey's Executor*, the Supreme Court has consistently upheld removal protections for multimember agencies with powers that "at the present time" are "considered executive." *Morrison v. Olson*, 487 U.S. 654, 699 n.28 (1988) (quotation marks omitted). Referring to agencies that exercise some "executive function," the Court described it as "plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers" who serve on multimember boards "created by Congress to carry into effect legislative policies." *Humphrey's Ex'r*, 295 U.S. at 628-29. In *Wiener v. United States*, the Court confronted "a variant of the constitutional issue decided in *Humphrey's Executor*" and reached the same result, clarifying that *Humphrey's Executor* had "explicitly 'disapproved'" any implication in *Myers* that Congress could not protect "members of a body" who were not "'purely executive'" from removal. 357 U.S. at 351-53 (quoting *Humphrey's Ex'r*, 295 U.S. at 626-28). As Appellants acknowledge, Appellants Br. 19, the executive branch understood *Humphrey's Executor* to apply to "administrative bodies" when

Congress's intent to "restrict the President's ordinary power to remove" was clear, *see* 39 U.S. Op. Att'y Gen. 145, 147 (1938).

By the time of *Morrison*, it had been established for half a century that "the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." 487 U.S. at 687 (quoting *Humphrey's Ex'r*, 295 U.S. at 630). Two decades later, the Court again confirmed the validity of removal protections for multimember bodies. Article II was satisfied when the members of the Public Company Accounting Oversight Board were shielded from removal by "a single level of good-cause tenure," making them adequately "subject ... to Presidential oversight." *Free Enter. Fund*, 561 U.S. at 509. *Seila Law* again reinforced these principles. Not only did the Court emphatically base its holding on the "new situation" of an independent officer wielding power "alone," but it explained that Congress could cure the constitutional defect while preserving removal limits by "converting the CFPB into a multimember agency." 591 U.S. at 237.

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure pioneered another half-century earlier. Over the generations, Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections. *Id.* at

230. This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken." *Stuart v. Laird*, 5 U.S. 299, 309 (1803).

Whether courts continue to understand the powers of the NLRB and the MSPB as "quasi-legislative or quasi-judicial," *Seila Law*, 591 U.S. at 216 & n.2, or "consider[] [those powers] 'executive,' at least to some degree," *Morrison*, 487 U.S. at 689 n.28, what matters is that independent agencies have been exercising those same powers with the approval of all three branches of government dating back to the 1880s. *See* 2 Op. O.L.C. 120, 121 (1978) (executive branch approving MSPB's structure). Invalidating their removal protections would interfere with what is now firmly established as a "traditional way[] of conducting government." *Mistretta*, 488 U.S. at 401 (quoting *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring)).

## III. Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies.

In addition to being validated by precedent and established practice, multimember independent agencies are fully consonant with the Constitution's original meaning, which supports Congress's authority to temper the President's exercise of removal authority.

While the Founders desired an "[e]nergetic Executive," *Harris v. Bessent*, No. 25-5037, slip op. at 4 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring), and thus settled on a "single" President rather than "a plurality of magistrates with

22

equal dignity and authority," *The Federalist No. 70*, at 423, 427 (Hamilton) (Clinton Rossiter ed., 1961), that decision did not speak to the scope of the executive's removal authority or the scope of Congress's authority to place modest limits on that authority. Indeed, at the Founding, there was no consensus that "executive" power even entailed removal authority. *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725, 1790 (1996). Removal authority was not "an inherent attribute of the 'executive power' as it was understood in England," where Parliament "exercised significant control over the tenure of officers appointed to execute the laws, including officers appointed by the King." Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175, 182, 220 (2021).

The Constitution itself "is silent with respect to the power of removal," *Hennen*, 38 U.S. at 258; *see* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1833) ("the Constitution makes no mention of any power of removal by the executive of any officers whatsoever"), apart from Congress's power to impeach, U.S. Const. art. II, § 4. Presidential removal authority was not discussed at the Constitutional Convention, and Alexander Hamilton soon after asserted that the Senate's consent would be required. *See The Federalist No. 77*, at 459 (Clinton Rossiter ed., 1961).

23

Notably, the Framers rejected a plan to delineate in the Constitution the duties of specific department heads who would serve "during pleasure." 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911). Instead, the text broadly empowers Congress to shape the federal government. It anticipates that Congress would "by Law" create "Departments" and "Officers," U.S. Const. art. II, § 2, while specifying little about their relationship to the President. *Cf. id*. art. II, § 2, cl. 1 (authorizing the President to require the opinions of principal officers). The Constitution also empowers Congress to enact laws necessary and proper "for carrying into Execution ... *all* ... *Powers* vested by this Constitution in the Government of the United States." U.S. Const. art. I, § 8, cl. 18 (emphasis added). James Madison explained that "[t]he tenure of the ministerial offices generally will be a subject of legal regulation." *The Federalist No. 39*, at 242 (Clinton Rossiter ed., 1961).

Because of the Constitution's silence on removal, the question came to the fore when Congress created the federal government's first departments. But the ensuing "Decision of 1789" addressed only who, if anyone, possesses inherent removal power—not the extent to which Congress may condition that power.

The "real point which was considered and decided" in 1789 was whether the Senate's role in approving appointments also gave it "part of the removing power." *Myers v. United States*, 272 U.S. 52, 118 (1926). As Congress considered

legislation establishing a Foreign Affairs Secretary, disagreement arose about whether to declare that the President could remove the Secretary from office. *See* David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 196-201 (1995). Reflecting the absence of authoritative constitutional text, views differed about whether the Constitution gave inherent removal power to the President, the Senate, both jointly, or neither. *Id.*; *see Hennen*, 38 U.S. at 233. The final legislation obliquely signaled that the President could remove the Secretary, without specifying whether this power was statutory or constitutional. *See* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29.

Despite its ambiguities, the Decision of 1789 was taken as establishing that "the constitution vested the power of removal in the President alone," rather than jointly with the Senate. 1 Annals of Cong. 398 (Rep. Vining) (1789). But the degree to which Congress could limit the President's inherent removal authority was not addressed because the debate focused on where the removal power was lodged, not on Congress's authority to modify or abridge it. Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1072 (2006).

And many historical sources suggest that any "executive" power of removal recognized in that debate was limited to certain particularly executive officers.

25

Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 366 (1927) (describing the belief that "the character of the office, as determined by its primary duties and functions, suffices to mark certain officers as inherently removable [and others] ... within the protective power of Congress"). When Congress debated the creation of a Comptroller within the proposed Treasury Department, one week after debating the removability of the Foreign Affairs Secretary, James Madison—one of the most ardent champions of presidential removal, *see Myers*, 272 U.S. at 131—suggested that because the Comptroller's duties partook "of a judiciary quality as well as executive," there were "strong reasons why [the Comptroller] should not hold his office at the pleasure of the executive," 1 Annals of Cong. 636 (1789). Although Madison's eventual proposal made the Comptroller removable by the President, *Free Enter. Fund*, 561 U.S. at 500 n.6, his remarks suggested that "the Decision of 1789 did not encompass the conclusion that the President had the power to remove all officers of the United States," Prakash, *supra*, at 1071; 1 Annals of Cong. 638 (1789) (Madison noting that he "endeavored to show that the nature of this office differed from the others which the House had decided; and, consequently, that a modification might take place"); *cf.* 13 *The Documentary History of the First Federal Congress of the United States of America*, at 1533, 1524 (Charlene Bangs Bickford et al. eds., 2019) (Madison dismissing an Appointments Clause objection

26

to the creation of a Board of Commissioners who would "provide for rules," because its duties "part[took] more of legislative than any other quality").

Indeed, if anything is to be gleaned from the Decision of 1789, it is support for *Seila Law*'s distinction between single-director agencies and multimember "bod[ies] of experts." 591 U.S. at 216 (quotation marks omitted). After all, the Decision of 1789 concerned the removability of department secretaries, officials who shared an "intimate political relation" with the President. Corwin, *supra*, at 392-93 n.103 (quoting *Marbury v. Madison*, 5 U.S. 137, 169 (1803)). As Madison explained, the discussions addressed the "executive department so far as it may be described by the heads of departments," who exercised a "species of power" that was intimately related to the President's Take Care duties. 11 *Documentary History*, *supra*, at 922-23 (Madison); 15 *id.* at 665 (Madison) (objecting that a contrary resolution would have made the "*heads of departments* dependant on the Senate" (emphasis added)).

Significantly, in the following decades, inherent presidential removal authority was viewed as compatible with legislative modification. *Marbury v. Madison* observed that Congress could make certain officers "not removable at the will of the executive," in which case "the appointment is not revocable, and cannot be annulled." 5 U.S. at 162. Removal authority "was not regarded ... as embracing officers with fixed term[s]," except perhaps for certain officers who implemented

27

inherent presidential authority.  Corwin, *supra*, at 379.  Consistent with that understanding, when Congress set fixed terms for various federal officers, Congress specified that they "shall be removable from office at pleasure," Act of May 15, 1820, ch. 102, § 1, 3 Stat. 582, 582, a caveat that would have been unnecessary if the Constitution already mandated unlimited presidential removal.

In the second half of the nineteenth century, Congress began imposing limits on presidential removal, ranging from good-cause tenure to a requirement of Senate concurrence in the removal.  *E.g.*, Act of Feb. 25, 1863, ch. 58, § 1, 12 Stat. 665, 665-66; Act of June 3, 1864, ch. 106, § 1, 13 Stat. 100; Act of Feb. 24, 1855, ch. 122, § 1, 10 Stat. 612 (providing that judges of the Court of Claims hold office during "good behaviour").  When disputes arose about these provisions, the Supreme Court resolved them as statutory matters, *e.g.*, *McAllister v. United States*, 141 U.S. 174 (1891); *Shurtleff v. United States*, 189 U.S. 311 (1903), declining to resolve "the constitutional power of the president in his discretion to remove officials during the[ir] term[s]," *Parsons v. United States*, 167 U.S. 324, 334 (1897).

Not until *Myers* did the Supreme Court establish the President's constitutional power of removal.  But that decision rejected a requirement of Senate approval that could inhibit removals entirely—making it "impossible for the President, in case of political or other difference with the Senate or Congress,

28

to take care that the laws be faithfully executed." 272 U.S. at 164. In contrast, a requirement of good cause to remove the leaders of multimember expert agencies was soon upheld as consistent with the President's constitutional authority. *Humphrey's Ex'r*, 295 U.S. at 626. That rule has prevailed ever since. *See Free Enter. Fund*, 561 U.S. at 509 (curing constitutional defect by subjecting multimember body to "a single level of good-cause tenure"); *Seila Law*, 591 U.S. at 237 (inviting Congress to preserve removal limits by "converting the CFPB into a multimember agency"). Constitutional text and history, therefore, do not support Appellants' assertion that good-cause tenure for NLRB and MSPB Members violates President Trump's Article II authority.

29

# CONCLUSION

For the foregoing reasons, this Court should affirm the judgments of the District Court.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Smita Ghosh (DC Bar No. 1767180)
Margaret Hassel (DC Bar No. 90029057)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: April 9, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,497 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 9th day of April, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of April, 2025, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: April 9, 2025

*/s/ Brianne J. Gorod*
Brianne J. Gorod