No. 25-5055

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CATHY A. HARRIS, in her personal capacity and in her official capacity as
member of the Merit Systems Protection Board,

Plaintiff-Appellee,

v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
For the District of Columbia, No. 1:25-cv-00412-RC
Hon. Rudolph Contreras, J.

**BRIEF OF AMICI CURIAE HAWAI'I, ARIZONA, CALIFORNIA,
COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, MAINE,
MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA,
NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA,
OREGON, RHODE ISLAND, VERMONT, WASHINGTON, WISCONSIN,
AND THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFF-
APPELLEE CATHY A. HARRIS AND AFFIRMANCE**

ANNE E. LOPEZ
  ATTORNEY GENERAL
STATE OF HAWAI'I

KALIKO'ONĀLANI D. FERNANDES*
  SOLICITOR GENERAL
STATE OF HAWAI'I

EWAN C. RAYNER
THOMAS J. HUGHES
  DEPUTY SOLICITORS GENERAL
STATE OF HAWAI'I
Department of the Attorney General
425 Queen Street
Honolulu, Hawai'i 96813
kaliko.d.fernandes@hawaii.gov
(808) 586-1360
*Counsel of Record
*Counsel for State of Hawai'i*

*(Counsel listing continues on signature pages)*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to this Court's Rule 28(a)(1), I hereby certify that:

## A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants: the States of Maine and North Carolina.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

## C.    Related Cases

We are not aware of any related cases within the meaning of this Court's Rule 28(a)(1)(C).

April 9, 2025

/s/ Kalikoʻonālani D. Fernandes
ANNE E. LOPEZ
  ATTORNEY GENERAL
KALIKOʻONĀLANI D. FERNANDES*
  SOLICITOR GENERAL
EWAN C. RAYNER
THOMAS J. HUGHES
  DEPUTY SOLICITORS GENERAL
STATE OF HAWAIʻI
Department of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi  96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel of Record
Counsel for the State of Hawaiʻi

# TABLE OF CONTENTS

INTRODUCTION AND INTERESTS OF AMICI ..................................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ...........................................................................4

    A.    The MSPB Plays a Vital Role in Upholding Merit System
        Principles in Federal Agencies ....................................................4

    B.    Invalidating For-Cause Removal Protections for Members of
        Independent Federal Bodies Like the MSPB Would Harm
        the States and Their Residents...................................................9

    C.    The MSPB's Removal Protections are Constitutional Under
        Decades of Precedent ...........................................................19

CONCLUSION ........................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Arbles v. Merit Appeals Bd.*,
515 P.3d 217 (Haw. Ct. App. 2022)..........................................................8

*Arnett v. Kennedy*,
416 U.S. 134 (1974) .......................................................................4

*Bush v. Lucas*,
462 U.S. 367 (1983) ....................................................................4, 5

*Consumers' Research v. Consumer Prod. Safety Comm'n*,
91 F.4th 342 (5th Cir.), *cert. denied*, 145 S. Ct. 414 (2024)..........10, 21

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
603 U.S. 799 (2024) ...................................................................13

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ......................................................................13

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).....................................................................13

*Fed. Election Comm'n v. NRA Political Victory Fund*,
6 F.3d 821 (D.C. Cir. 1993) ...........................................11-12, 21, 23-24

*Frazier v. Merit Sys. Prot. Bd.*,
672 F.2d 150 (D.C. Cir. 1982) ........................................... 4, 5, 6

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) .....................................................................11

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ....................... 1, 3, 4, 11, 12, 19, 20, 21, 22, 23, 24

*Kloeckner v. Solis*,
568 U.S. 41 (2012) ....................................................................1, 9

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
103 F.4th 748 (10th Cir. 2024), *cert. denied*,
No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025)....................3, 10, 11, 21, 23

*Mouton-Miller v. Merit Sys. Prot. Bd.*,
   985 F.3d 864 (Fed. Cir. 2021)...............................................................5

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
   881 F.3d 75 (D.C. Cir. 2018) ........................................................ 15, 23

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
   490 U.S. 477, 484 (1989) .................................................................22

*San Diego Bldg. Trades Council, Millmen's Union, Local 2020*
   *v. Garmon*,
   359 U.S. 236 (1959) ..........................................................................16

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ........................................ 10, 11, 12, 19-20, 21

*United States v. Torres*,
   115 F.3d 1033 (D.C. Cir. 1997) .......................................................22

*Wiener v. United States*,
   357 U.S. 349 (1958) ................................................................ 3, 15, 20

*Wilcox v. Trump*, No. 25-5057 (D.C. Cir.) ...........................................16

*Wis. Elec. Power Co. v. Costle*,
   715 F.2d 323 (7th Cir. 1983).............................................................13

**Federal Statutes and Legislation and Regulations**

5 U.S.C. § 1201 ................................................................... 10, 12, 14

5 U.S.C. § 1202 ..................................................................... 2, 10, 12

5 U.S.C. § 1204 ....................................................................................5

5 U.S.C. § 2301 ......................................................................... 2, 6, 7

5 U.S.C. § 7703 ..................................................................................10

15 U.S.C. § 41 ...............................................................................11, 14

15 U.S.C. § 2053 ...........................................................................11, 14

16 U.S.C. § 1006 ................................................................................17

29 U.S.C. § 151 ...................................................................................16

29 U.S.C. § 153 ...................................................................................11

42 U.S.C. § 5841 ...........................................................................11, 14

CSRA, Pub. L. No. 95-454, § 3, 92 Stat. 1111 (1978).....................5, 7

S. Rep. No. 95-969, 95th Cong., 2nd Sess. 1978.................................17

40 C.F.R. § 1506.2 ..............................................................................17

**State Statutes**

Haw. Rev. Stat. § 76-1.........................................................................8

Haw. Rev. Stat. § 76-11.......................................................................8

Haw. Rev. Stat. § 76-14(a)...................................................................8

Haw. Rev. Stat. § 76-47(a)...................................................................8

Ohio Rev. Code § 124.03(A)(1)–(2).....................................................8

Ohio Rev. Code § 124.03(A)(4)............................................................8

**Other Authorities**

Alicia Wallace, *Jobless claims spike, in worrisome sign for the US
    labor market*, CNN (Feb. 27, 2025),
    https://www.cnn.com/2025/02/27/economy/us-jobless-claims-
    layoffs/index.html..........................................................................19

Casey Keppler, Maj., USAF, *The Propriety of Restraint: Assessing the
    Viability and Wisdom of Executive and Legislative Branch Action to
    Eliminate Collective Bargaining Rights in the Department of
    Defense*, 41 Hofstra Lab. & Emp. L.J. 297 (2024) ...............................23

Congress.gov, *Current Federal Civilian Employment by State and
    Congressional District* (Dec. 12, 2024),
    https://www.congress.gov/crs-product/R47716 ................................ 5-6

Donald F. Kettl & Daniel Chenok, *The Federal Workplace Is
    Changing Rapidly, But Merit Principles Must Remain Untouched*,

Gov't Executive (Feb. 27, 2023),
https://www.govexec.com/management/2023/02/federal-workplace-
changing-rapidly-merit-principles-must-remain-untouched/383339/...................7

Eloy Oliveira et al., *What Does the Evidence Tell Us About Merit
Principles and Government Performance?* 102 Pub. Admin. 668
(2024)..................................................................................................................17

FTC, Working Together to Protect Consumers, at 4-5 (April 10, 2024)
available at
https://www.ftc.gov/system/files/ftc_gov/pdf/p238400_ftc_collabor
ation_act_report.pdf (last visited March 25, 2025) ...............................................14

Jimmy Carter, *Federal Civil Service Reform Message to the Congress*,
The American Presidency Project (Mar. 2, 1978),
https://www.presidency.ucsb.edu/documents/federal-civil-service-
reform-message-the-congress..................................................................................9

Kirti Datla & Richard L. Revesz, *Deconstructing Independent
Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013) ...................12

Pablo Alonso & Gregory B. Lewis, *Public Service Motivation and Job
Performance: Evidence from the Federal Sector*, 31 Am. Rev. Pub.
Admin. 363 (2001) ...............................................................................................17

Tami Luhby and Annie Grayer, *'I'm in limbo right now': Laid off
federal workers struggle to secure unemployment benefits*, CNN
(Mar. 13, 2025),
https://www.cnn.com/2025/03/13/politics/unemployment-benefits-
laid-off-federal-workers/index.html .....................................................................19

*The Civil Service and the Statutory Law of Public Employment*,
97 Harv. L. Rev. 1619 (1984) ................................................................................7

Tim Reid, Nathan Layne and Karen Freifeld, *Thousands fired in US
government as Trump, Musk purge federal workers*, Reuters (Feb.
13, 2025), https://www.reuters.com/world/us/mass-firings-federal-
workers-begin-trump-musk-purge-us-government-2025-02-13/ ..........................18

U.S. Government Accountability Office, *The Critical Role of Federal
Partnerships with States & Local Governments During COVID-19*

(Sept. 9, 2020), https://www.gao.gov/blog/critical-role-federal-
partnerships-states-local-governments-during-covid-19.....................................17

U.S. Merit Sys. Prot. Bd., Annual Report for FY 2023 (2024) ............................ 5-6

U.S. Merit Sys. Prot. Bd., Frequently Asked Questions about the Lack
of Quorum Period and Restoration of the Full Board (Mar. 31,
2025),
https://www.mspb.gov/FAQs_Absence_of_Board_Quorum_3_31_
2025.pdf.....................................................................................................18

U.S. Merit Sys. Prot. Bd., Strategic Plan for FY 2022–2026 (2022) .......................5

U.S. Merit Sys. Prot. Bd., Weekly Number of Cases Received in the
Regional and Field Offices Fiscal Year 2025,
https://www.mspb.gov/Recent%20ROFO%20Case%20Receipts.pdf.................18

## INTRODUCTION AND INTERESTS OF AMICI

Amici are the States of Hawaiʻi, Arizona, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia. As separate sovereigns in the federal system created by the Constitution, amici States have an interest in ensuring that the national government implementing the country's laws and administering vital federal programs is staffed by competent, attentive, and unbiased civil servants. Since the 1880s, the United States has cultivated the ability and impartiality of its workforce by developing a "merit system" for most federal employment. And since 1978, the watchdog of the federal merit system has been an independent, bipartisan, expert agency that adjudicates "particularly serious" personnel actions against federal employees: the Merit Systems Protection Board (MSPB). *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012).

Defendants' actions endanger the independence at the core of the MSPB's design—risking amici States' reliance on the steady and dependable delivery of government services to the States and their residents. And in ignoring precedents dating back to *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Defendants' position imperils the stability of our legal system, and threatens to unwind the structure of numerous federal agencies.

# SUMMARY OF ARGUMENT

The MSPB plays a vital role in upholding the merit system principles for federal employees. In hearing and adjudicating major disputes between federal employees and their employers, the MSPB ensures that federal agencies are held to principles that ensure the recruitment and development of a high-quality workforce that ultimately reduces staffing costs and improves organizational results for the States and their residents. A key part of the merit principles that the MSPB enforces is the protection of federal employees against "arbitrary action, personal favoritism, or coercion for partisan political purposes[.]" 5 U.S.C. § 2301(b)(8)(A). That role is one of the reasons that Congress deemed it necessary to afford the members of the MSPB certain limited removal protections. Specifically, the President may remove MSPB members "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

Defendants' attempt to invalidate that removal protection here would inflict significant harm not just on the MSPB but on numerous other independent multimember bodies whose members have similar removal protections. It would also harm the States and ultimately the American people, who rely on the ability of these agencies to fairly and impartially carry out their congressionally mandated functions. In the short term, allowing the President to ignore close to a century's worth of precedent to remove Harris would allow him to instantly hobble the

agencies he does not care for. Without a quorum, agencies like the MSPB and the National Labor Relations Board (NLRB) are unable to properly carry out their assigned functions. And in the longer term, allowing at-will removals would substantially destabilize the agencies, restraining their independence, reducing their ability to accumulate technical expertise over time, and interfering with the structural bipartisanship Congress built into their leadership. Most importantly, it would— contrary to Congress' plain intent—leave independent board and commission members open to political pressure and coercion resulting from the President hanging "the Damocles' sword of removal" over their heads. *Wiener v. United States*, 357 U.S. 349, 356 (1958).

Defendants' arguments in support of the President's attempt to remove Harris also come in the face of decades of precedent in which courts have repeatedly upheld similar removal protections. Ever since the Supreme Court upheld for-cause removal protections for Federal Trade Commission (FTC) members in *Humphrey's Executor*, the constitutionality of the structure of agencies like the MSPB—a multimember, bipartisan, quintessential adjudicatory body—has been "uncontroversial." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 760 (10th Cir. 2024), *cert. denied*, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025). That should not change now. The Supreme Court has never overruled *Humphrey's Executor* so this case should, for this Court, be a straightforward application of binding precedent. But

even if this Court were positioned to narrowly construe or otherwise limit the scope of *Humphrey's Executor*, the decades of reliance placed on that decision—particularly by Congress in its establishment of several similarly structured, independent, multimember bodies—should strongly counsel against it.

## ARGUMENT

### A. The MSPB Plays a Vital Role in Upholding Merit System Principles in Federal Agencies

The MSPB dates back nearly fifty years, but the merit system it protects has its origin in the nineteenth century. "[G]rass-roots sentiment for 'Civil Service reform' began to grow" after the Civil War and was "brought to a head" when President Garfield was assassinated by a "dissatisfied office seeker" in 1881. *Arnett v. Kennedy*, 416 U.S. 134, 148 (1974). Congress subsequently enacted the Pendleton Act, which "created the Civil Service Commission [(CSC)] and provided for the selection of federal civil servants on a merit basis by competitive examination." *Bush v. Lucas*, 462 U.S. 367, 381 (1983); *see Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 153 (D.C. Cir. 1982) ("[T]he Pendleton Act . . . sought to replace the 'spoils system' . . . with a 'merit system' that would base selection and promotion of most civil servants on competence.").

Over the years, additional legislation, regulations, and executive orders created "an elaborate, comprehensive scheme" of substantive and procedural employment protections for federal civil servants. *Bush*, 462 U.S. at 385. But

concerns about the CSC's "dual responsibility" for managing "an increasing proportion of the federal workforce" and implementing "a wide variety of merit system rules without guidance from Congress" ultimately led President Carter to propose the creation of an "independent agency . . . charged with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies." *Frazier*, 672 F.2d at 153–54. The Civil Service Reform Act of 1978 (CSRA) abolished the CSC and replaced it with the MSPB and the Office of Personnel Management. *Id.* at 154.

The MSPB serves several important purposes. First and foremost, it protects federal employees from "arbitrary" and "improper action[.]" *Bush*, 462 U.S. at 385. The MSPB "inherited the CSC's adjudication functions and provides due process to employees as an independent, third-party quasi-judicial authority for employee appeals of adverse actions . . . and retirement decisions." U.S. Merit Sys. Prot. Bd., Strategic Plan for FY 2022–2026 2 (2022) (Strategic Plan); *see Frazier*, 672 F.2d at 155. As such, the MSPB's primary role is to hear and adjudicate disputes between federal employers and employees. *See* 5 U.S.C. § 1204(a)(1); *Mouton-Miller v. Merit Sys. Prot. Bd.*, 985 F.3d 864, 869 (Fed. Cir. 2021). In the most recent fiscal year for which data is available, the MSPB decided over 6,000 cases arising from dozens of

federal agencies.[1] U.S. Merit Sys. Prot. Bd., Annual Report for FY 2023 6, 13–16, 20–21 (2024).

In adjudicating employees' appeals, the MSPB is responsible for upholding the merit system principles. The CSRA included "the first statutory expression of the merit system principles that ha[d] evolved since the creation of the [CSC]." *Frazier*, 672 F.2d at 154; *see* 5 U.S.C. § 2301. These principles "are essential management practices that help ensure the Federal Government is able to recruit, select, develop, and maintain a high-quality workforce and thereby reduce staffing costs and improve organizational results for the American people." Strategic Plan at 1. The merit system principles require, among other things, "[r]ecruitment . . . from qualified individuals" where "selection and advancement [is] determined solely on the basis of relative ability, knowledge, and skills[.]" 5 U.S.C. § 2301(b)(1). They also mandate fair and equitable pay and treatment, *see id.* § 2301(b)(2)-(3), and protect employees against, among other things, "arbitrary action, personal favoritism, or coercion for partisan political purposes," *id.* § 2301(b)(8)(A). In return, the merit system principles call on employees to "maintain high standards of integrity,

---

[1] The MSPB's ability to hear appeals regarding disputes between federal employees and their employers affects approximately two million federal workers, which include residents of all fifty states. *See* Congress.gov, *Current Federal Civilian Employment by State and Congressional District* (Dec. 12, 2024), https://www.congress.gov/crs-product/R47716. For example, as of March 2024, there were 24,545 federal civilian employees subject to the MSPB's jurisdiction in Hawaiʻi alone. *Id.*

conduct, and concern for the public interest." *Id.* § 2301(b)(4). As such, the principles "serve as a lofty 'constitutional preamble' to the law of federal employment and a reflection of the cornucopia of policy goals envisioned by the modern civil service reformers." *The Civil Service and the Statutory Law of Public Employment*, 97 Harv. L. Rev. 1619, 1633 (1984).

States and their residents reap the benefits of a robust and functional federal merit system mediated by the MSPB. The merit system ensures that hiring is based on knowledge and skill, that promotion is based on demonstrated competence, and that key services are delivered across presidential administrations without political favoritism or pressure. Donald F. Kettl & Daniel Chenok, *The Federal Workplace Is Changing Rapidly, But Merit Principles Must Remain Untouched*, Gov't Executive (Feb. 27, 2023), https://www.govexec.com/management/2023/02/federal-workplace-changing-rapidly-merit-principles-must-remain-untouched/383339/. As Congress explained when it enacted the CSRA, the merit system principles were established to implement "the policy of the United States . . . to provide the people of the United States with a competent, honest, and productive Federal work force[.]" CSRA, Pub. L. No. 95-454, § 3, 92 Stat. 1111, 1112 (1978). And it is that "competent, honest, and productive Federal workforce" that allows the federal government to properly function.

A properly functioning federal government is vital to the States, given how the federal and state governments cooperate, coordinate, and complement one another in countless areas, including public health, law enforcement, education, environmental protection, agriculture, transportation, and emergency management. As the beneficiaries of federal programs and as partners to the federal government in improving the welfare of their residents, amici States depend on the work of federal agencies staffed by a capable, stable, and apolitical workforce.

The benefits of the MSPB model are evidenced by its reflection in state and local governments. For example, Hawaiʻi law establishes merit appeals boards for the state, counties, and other government employers to hear appeals from certain actions taken under the civil service law. Haw. Rev. Stat. §§ 76-11, 76-14(a), 76-47(a). Similarly, Ohio has a state personnel board of review that hears appeals from final employment decisions relating to employees in the classified state service and supervises civil service commissions at the city and township level. Ohio Rev. Code § 124.03(A)(1)-(2), (4). And, like Congress, many states and local governments have enumerated their own "merit principle policies" to ensure "the selection of persons based on their fitness and ability for public employment and the retention of employees based on their demonstrated appropriate conduct and productive performance." *Arbles v. Merit Appeals Bd.*, 515 P.3d 217, 227–28 (Haw. Ct. App. 2022) (quoting Haw. Rev. Stat. § 76-1).

**B. Invalidating For-Cause Removal Protections for Members of Independent Federal Bodies Like the MSPB Would Harm the States and Their Residents**

A core facet of the MSPB—like several other agencies—is its relative independence. *See* Jimmy Carter, *Federal Civil Service Reform Message to the Congress*, The American Presidency Project (Mar. 2, 1978), https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress. Congress intended for the MSPB to be "an independent adjudicator of federal employment disputes." *Kloeckner*, 568 U.S. at 44. And as the District Court concluded, "the MSPB's mission and purpose require independence" because giving the President direct control over its members would allow Executive Branch officials to evade any consequences for prohibited practices by simply pressuring the Board. JA84–85.

The MSPB's independence has always been part of its design. President Carter's initial proposal to Congress argued that the structure of the new Board would "guarantee independent and impartial protection to employees." Jimmy Carter, *Civil Service Reform Message*, *supra*. To ensure this independence and impartiality, Congress adopted President Carter's suggestion that the MSPB consist of three highly-qualified members from at least two different political parties serving

staggered, nonrenewable, seven-year terms unless removed "only for inefficiency, neglect of duty, or malfeasance in office." *See id.*; 5 U.S.C. §§ 1201, 1202.[2]

The MSPB is no outlier regarding the independence and political insulation Congress established for its members. Congress and the Executive have long recognized the necessity of providing independence to certain agencies and have an established tradition of doing exactly that. As the Tenth Circuit Court of Appeals recently explained:

> This nation's history indicates that Congress and the President have both long valued a relatively independent agency as a means of addressing specialized disputes with specialized expertise and providing at least a temporal degree of some independence for the agency from short-term political pressures that may not always have been welcome, even by the President.

*Leachco*, 103 F.4th at 760; *see also Consumers' Research v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 352 (5th Cir.), *cert. denied*, 145 S. Ct. 414 (2024) ("Whatever else it may be, the [Consumer Product Safety Commission's] structure is not a 'historical anomaly,' is not a recent 'innovation,' and is not lacking at least some 'foothold in history or tradition.'" (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 222 (2020))).

---

[2] Although the MSPB is an independent adjudicatory body, its adjudicatory decisions are typically reviewable in federal court. *See* 5 U.S.C. § 7703(a)(1), (d)(1).

In fact, "[i]ndependent agencies date back to at least 1887, when Congress created the Interstate Commerce Commission, a non-partisan, expert body tasked with monitoring railroads for compliance with federal law." *Leachco*, 103 F.4th at 760. Since then, Congress has enacted similar removal protections for several other federal bodies that require some degree of stability and independence from political pressure. Examples include the NLRB,[3] the FTC,[4] the Consumer Product Safety Commission (CPSC),[5] and the Nuclear Regulatory Commission (NRC).[6] As to each, Congress has applied for-cause removal protection.

As the Tenth Circuit recognized in *Leachco*, "[s]ince the Supreme Court's decision in *Humphrey's Executor*, the constitutionality of independent agencies, whose officials possess some degree of removal protection that insulates them from unlimited and instantaneous political control, has been uncontroversial." 103 F.4th at 760; *see also Seila Law*, 591 U.S. at 215 (explaining that in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), the Supreme Court "left in place two exceptions to the President's unrestricted removal power[,]" one of which is the *Humphrey's Executor* exception); *Fed. Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (upholding removal

---

[3] 29 U.S.C § 153(a).
[4] 15 U.S.C. § 41.
[5] 15 U.S.C. § 2053(a).
[6] 42 U.S.C. § 5841(e).

protections for members of the Federal Election Commission (FEC)). But that well-established, historically-rooted, and consistently-upheld independence would evaporate if the President is permitted to freely terminate the MSPB's members without cause. JA84-85.

In addition to being flatly inconsistent with Supreme Court precedent and severely hindering independent agencies from carrying out their congressional mandates in the short-term, a decision in Defendants' favor would damage the long-term stability and consistency of such agencies—goals reflected in the very structure Congress selected. By limiting the grounds for removal of MSPB members to "inefficiency, neglect of duty, or malfeasance in office[,]" 5 U.S.C. § 1202(d), and by requiring members from at least two different political parties serving staggered seven-year terms, *id.* §§ 1201, 1202, Congress intended to establish a relatively stable leadership that would "accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time[,]'" *Seila Law*, 591 U.S. at 216 (quoting *Humphrey's Executor*, 295 U.S. at 624). The structure of independent multimember bodies like the MSPB, by design, fosters the development of institutional memory and knowledge, promotes continuity, and insulates the agency from immediate influence when a new President takes office. Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 794–95 (2013).

Allowing the President to remove an MSPB member without regard to duly enacted removal protections would eviscerate Congress' goals of establishing long-term expertise and stability. That would inflict serious harm on the States and their residents, who benefit from consistency in federal policies. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (explaining that "longstanding policies may have 'engendered serious reliance interests that must be taken into account'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016))); *Wis. Elec. Power Co. v. Costle*, 715 F.2d 323, 327 (7th Cir. 1983) (noting the "benefits of a stable, consistent administrative policy"). The stability—and resulting public confidence—that removal protections support is so important because "administrative agencies establish the baseline rules around which businesses and individuals order their lives." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 862 (2024) (Jackson, J., dissenting). Those individuals and businesses—which are also residents of the States—"make investments because of [federal agency policy]. They change their practices because of it. They enter contracts in light of it. They may not like the rule, but they live and work with it, because that is what the Rule of Law requires." *Id.*

The same is true for the States themselves, which are not only subject to federal regulation in many areas, but also must cooperate and collaborate with federal agencies in a variety of contexts. When the States work with independent,

multimember enforcement agencies, including the FTC for example, the federal agencies benefit from the States' local knowledge, and the States benefit from the agencies' subject matter expertise. *See, e.g.*, FTC, Working Together to Protect Consumers, at 4–5 (April 10, 2024) https://www.ftc.gov/system/files/ftc_gov/pdf/ p238400_ftc_collaboration_act_report.pdf (last visited April 9, 2025). Not only is the long-term stability of such agencies important to the States for accumulation of that expertise and credibility, but also for the ongoing viability of large-scale collaborative investigations and prosecutions, which often take years to complete.

A decision in Defendants' favor would also endanger the purposely bipartisan structure of the MSPB and other similarly structured agencies. Like the requirement that the MSPB be "composed of 3 members . . . not more than 2 of whom may be adherents of the same political party[,]" 5 U.S.C. § 1201, several other independent bodies whose members have removal protections are structured to ensure bipartisan leadership. *See, e.g.*, 15 U.S.C. § 2053 (establishing the five-member CPSC and providing that "[n]ot more than three of the Commissioners shall be affiliated with the same political party"); 42 U.S.C. § 5841 (providing that no more than three of the five members of the NRC shall be members of the same political party); 15 U.S.C. § 41 (providing that no more than three of the five FTC Commissioners shall be from the same political party).

The statutory requirements (and corresponding historical tradition) of ensuring an independent, politically diverse membership also fosters better decision-making, because varied viewpoints "make it more likely that the costs and downsides of proposed decisions will be more fully ventilated." *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 184 (D.C. Cir. 2018) (Kavanaugh, J., dissenting). In other words, multimember independent agencies like the MSPB "do not concentrate all power in one unaccountable individual, but instead divide and disperse power across multiple commissioners or board members" who often share different political ideologies. *Id.* at 165 (Kavanaugh, J., dissenting). That structure "reduces the risk of arbitrary decisionmaking and abuse of power, and helps protect individual liberty." *Id.*

Ignoring the structure laid out by Congress—and ignoring established precedent—to remove board members without cause eviscerates the inherent advantages flowing from bipartisan leadership in independent agencies. The President could simply remove members "for no reason other than that he preferred to have on that Commission [individuals] of his own choosing." *Wiener*, 357 U.S. at 356. But "no such power is given to the President directly by the Constitution" and it would contradict clear congressional intent. *Id.* The independence of adjudicatory bodies like the MSPB would be dramatically undermined by the President hanging

"the Damocles' sword of removal" over members as a means of influencing their decision-making. *Id.*

Worse yet, permitting presidential removal at will, despite Congress' purposeful insulation of members from those political concerns, would allow a President to disable independent agencies he disfavors simply by removing board or commission members and rendering the agencies unable to operate. This action would prevent agencies from carrying out congressionally mandated functions— again, a serious harm to the amici States. For example, the NLRB—whose removal protections are currently being litigated in *Wilcox v. Trump*, No. 25-5057 (D.C. Cir.)—is critical to the States because its enforcement of the National Labor Relations Act (NLRA) protects workers' collective bargaining rights, stabilizes labor-management relations, and prevents a race to the bottom in labor standards through the national scope of its labor-practices enforcement. *See* 29 U.S.C. § 151. And the NLRA's broad preemption regime, *see generally San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959), means that the States would not generally be able to fill gaps left by a non-functional NLRB.

Here, Harris' removal would leave the MSPB with only one member. *See* Harris Brief in Opposition to Stay, at 22. Without a quorum, the Board cannot vote on petitions for review, leaving the claims of potentially thousands of federal employees in limbo. That would inflict serious harms on the States and their

residents. For example, a non-functioning MSPB—which is the primary safeguard for merit system principles—would inevitably decrease the efficiency, competence, and integrity of the agencies on which the States and their residents rely. *See generally* Eloy Oliveira et al., *What Does the Evidence Tell Us About Merit Principles and Government Performance?* 102 Pub. Admin. 668 (2024) (conducting a broad review of evidence and literature and finding that the application of merit principles in government employment is strongly associated with higher performance and lower corruption); *see also* Pablo Alonso & Gregory B. Lewis, *Public Service Motivation and Job Performance: Evidence from the Federal Sector*, 31 Am. Rev. Pub. Admin. 363, 377 (2001) (finding that "a belief that agencies based promotion and pay decisions on performance was positively related to performance"). An MSPB that is unable to properly enforce the merits system would thus harm the States' residents because "[t]he public has a right to an efficient and effective Government, which is responsive to their needs," as well as "a right to a Government which is impartially administered." S. Rep. No. 95-969, 95th Cong., 2nd Sess. 1978. And it would harm the States themselves because of the vast array of contexts in which the States rely on and cooperate with federal agencies.[7]

---

[7] Some examples include: the preparation of environmental planning and documentation, *see, e.g.*, 40 C.F.R. § 1506.2; watershed protection, *see, e.g.*, 16 U.S.C. § 1006; administration of education programs, *see, e.g.*, 34 C.F.R. § 668.24; and responding to emergencies, *see* U.S. Government Accountability Office, *The Critical Role of Federal Partnerships with States & Local Governments During*

A properly functioning MSPB is especially important to the States right now. Following the mass layoffs in February of this year,[8] the MSPB has seen a massive increase in the number of cases received on a weekly basis. *See* U.S. Merit Sys. Prot. Bd., Weekly Number of Cases Received in the Regional and Field Offices Fiscal Year 2025, https://www.mspb.gov/Recent%20ROFO%20Case%20Receipts.pdf (showing an average of around 100 cases filed per week from October 2024 to January 2025, rising to a high of *2,164* cases filed in the week beginning February 23, 2025). If the MSPB is unable to resolve appeals already pending before the Board, or in cases where one of the parties seeks appellate review with the Board, the employment status of the individual employees—many of whom are residents of amici States—will be left in limbo. And this is not just an abstract hypothetical. Between January 7, 2017, and March 3, 2022, the MSPB lacked a quorum and was unable to vote on petitions for review. *See* U.S. Merit Sys. Prot. Bd., Frequently Asked Questions about the Lack of Quorum Period and Restoration of the Full Board (Mar. 31, 2025), https://www.mspb.gov/FAQs_Absence_of_Board_Quorum_3_31_2025.pdf. That lack of quorum resulted in a backlog of "approximately 3,800 cases"

---

*COVID-19* (Sept. 9, 2020), https://www.gao.gov/blog/critical-role-federal-partnerships-states-local-governments-during-covid-19.

[8] *See, e.g.*, Tim Reid, Nathan Layne and Karen Freifeld, *Thousands fired in US government as Trump, Musk purge federal workers*, Reuters (Feb. 13, 2025), https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/.

that took years to clear. *Id.*; *see also* JA75. Should the Board lose quorum again now, coinciding with the massive influx of new cases, there is potential for a significantly larger backlog to accrue.

That uncertainty creates a problem for the States, too. The sudden increase in laid-off federal workers has led to a concomitant rise in claims for unemployment benefits filed with State agencies. Alicia Wallace, *Jobless claims spike, in worrisome sign for the US labor market*, CNN (Feb. 27, 2025), https://www.cnn.com/2025/02/27/economy/us-jobless-claims-layoffs/index.html. To determine whether an individual is eligible for unemployment benefits, it is necessary, in many states, to determine why the individual was terminated from their previous employment. But with so much uncertainty as to the validity of those terminations, and the MSPB unable to finally resolve so many claims, the States will face an unknown number of individuals eligible for unemployment and a significantly increased administrative burden to process those claims. *See* Tami Luhby and Annie Grayer, *'I'm in limbo right now': Laid off federal workers struggle to secure unemployment benefits*, CNN (Mar. 13, 2025), https://www.cnn.com/2025/03/13/politics/unemployment-benefits-laid-off-federal-workers/index.html.

## C. The MSPB's Removal Protections are Constitutional Under Decades of Precedent

There can be no dispute that *Humphrey's Executor* and its progeny permit for-cause removal protections for "multimember board[s] or commission[s]," *Seila Law*,

591 U.S. at 207, that exercise "predominantly quasi judicial" functions, and whose "members are called upon to exercise the trained judgment of a body of experts[,]" *Humphrey's Executor*, 295 U.S. at 624. The MSPB falls squarely within this precedent, as this Court recognized in its April 7 en banc order vacating the appellate stay. En Banc Order, at 2 ("In light of the precedent in *Humphrey's Executor* and *Wiener* concerning multimember adjudicatory bodies, the . . . government has not demonstrated the requisite strong showing that it is likely [to] succeed on the merits." (cleaned up)).

In the decades following *Humphrey's Executor*, the Supreme Court has repeatedly and consistently affirmed its validity. In *Wiener*, decided twenty-three years after *Humphrey's Executor*, the Supreme Court explained:

> Judging the matter in all the nakedness in which it is presented, namely, the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it. The philosophy of *Humphrey's Executor*, in its explicit language as well as its implications, precludes such a claim.

*Wiener*, 357 U.S. at 356.

Even on the occasions the Supreme Court has declined to extend the *Humphrey's Executor* doctrine, it has done so by distinguishing the structure of the

agencies at issue from those with multimember boards like the MSPB, and it has been clear that it was in no way overruling *Humphrey's Executor*. In *Seila Law*, for example, the Court held that removal protections for the Consumer Financial Protection Bureau's single Director were impermissible, but distinguished *Humphrey's Executor* on the basis that, among other things, "a single Director . . . cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle." *Seila Law*, 591 U.S. at 218 (quoting *Humphrey's Executor*, 295 U.S. at 624). And the Court explicitly noted that it was not "revisit[ing] *Humphrey's Executor* or any other precedent[.]" *Id.* at 228.

The Courts of Appeals have consistently recognized the continuing validity of *Humphrey's Executor*. *See, e.g.*, *Leachco*, 103 F.4th at 762 ("*Humphrey's Executor* remains good law."); *Consumers' Research*, 91 F.4th at 346 (noting that "[t]he Supreme Court expressly 'd[id] not revisit *Humphrey's Executor* or any other precedent in *Seila Law*[,]'" and thus "*Humphrey's* controls" (quoting 591 U.S. at 228)); *NRA Political Victory Fund*, 6 F.3d at 826 (concluding that there was "not much vitality" to a challenge to the FEC's independence from the President, in large part because the FEC "is patterned on the classic independent regulatory agency sanctioned . . . in *Humphrey's Executor*[.]"); *see also* En Banc Order, at 2 ("[T]he

Supreme Court has, in its own words, left [*Humphrey's Executor*] in place." (cleaned up)).

*Humphrey's Executor* is dispositive here. The MSPB is a multimember, bipartisan, adjudicatory body that decides discrete cases involving civil servants and does not promulgate far-reaching administrative rules or policies. It falls squarely within *Humphrey's Executor*, and this Court is required to follow that binding precedent. *See, e.g.*, *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997). Even if this Court would perhaps decide the underlying issue differently, it must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also* En Banc Order, at 2 ("The Supreme Court has repeatedly told the courts of appeals to follow extant Supreme Court precedent unless and until that Court itself changes it or overturns it.").

The analysis should end there. *See* En Banc Order, at 2–3. It is particularly important, moreover, for this Court to faithfully apply *Humphrey's Executor* to the MSPB rather than distinguishing it or narrowly construing it on the bases Defendants suggest given the reliance interests engendered by the case.

First, and most directly, eviscerating the MSPB members' protections would dislodge the rights and expectations of the millions of federal employees who are eligible to file appeals with the Board. Those employees took federal jobs with the

understanding that their employment would be subject to a merit system overseen by a specialized agency whose independent structure had been upheld by the United States Supreme Court. Removing the protections Congress provided for MSPB members would deprive those workers of a key element of security and confidence in their employment, which, for many, is an important consideration for taking a federal job in the first instance. *Cf.* Casey Keppler, Maj., USAF, *The Propriety of Restraint: Assessing the Viability and Wisdom of Executive and Legislative Branch Action to Eliminate Collective Bargaining Rights in the Department of Defense*, 41 Hofstra Lab. & Emp. L.J. 297, 348 (2024) ("An important, if not the primary, appeal to federal government employment has long been its inherent stability.").

More broadly, Congress has repeatedly relied on *Humphrey's Executor* in creating independent agencies vested with a wide range of important regulatory, adjudicatory, and enforcement responsibilities. *See, e.g.*, *PHH Corp.*, 881 F.3d at 77 ("Congress has embraced and relied on [*Humphrey's Executor*] in designing independent agencies."); *Leachco*, 103 F.4th at 760. Agencies established in the decades since *Humphrey's Executor* were structured with the understanding that they would be led by officials with a measure of independence and insulation from political influence. Ignoring *Humphrey's Executor*—and the importance of *stare decisis*—after nearly a century of reliance, would upend the many vitally important federal agencies that Congress has "patterned on the classic independent regulatory

agency sanctioned . . . in *Humphrey's Executor*[.]" *NRA Political Victory Fund*, 6 F.3d at 826.

Amici States too, have relied on Congress' continuing authority to create independent agencies like the MSPB, composed of members with removal protections. Because of the extensive overlap between the States' and the federal government's regulatory interests, the legitimacy, impartiality, independence, and expertise of federal agencies are factors that directly affect the States when determining the contours of assistance from and cooperation with federal agencies, and when deciding whether (and how) to regulate under state authority. Brushing aside *Humphrey's Executor* now would dislodge the expectations amici States and their residents have developed for fair, impartial, and expert agency leadership free from excessive political influence. It would wreak havoc on numerous legislative schemes across a variety of agencies—discarding Congress' considered judgment regarding how best to structure the Nation's government. If there were ever a case where reliance interests required careful adherence to precedent, it is this one.

# CONCLUSION

For these reasons–and those in Harris' brief—this Court should affirm.

Respectfully submitted,

April 9, 2025

/s/ Kalikoʻonālani D. Fernandes

ANNE E. LOPEZ
  ATTORNEY GENERAL
KALIKOʻONĀLANI D. FERNANDES*
  SOLICITOR GENERAL
EWAN C. RAYNER
THOMAS J. HUGHES
  DEPUTY SOLICITORS GENERAL
STATE OF HAWAIʻI
Department of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel of Record
Counsel for the State of Hawaiʻi

KRISTIN K. MAYES
Attorney General
State of Arizona
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004

ROB BONTA
Attorney General
State of California
1515 Clay Street
Oakland, CA 94612

PHILIP J. WEISER
Attorney General
State of Colorado
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
Attorney General
State of Delaware
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

AARON M. FREY
Attorney General
State of Maine
6 State House Station
Augusta, ME 04333

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts
One Ashburton Place, 20th Floor
Boston, MA 02108

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
Attorney General
State of New Jersey
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 12224

KWAME RAOUL
Attorney General
State of Illinois
100 West Randolph Street
Chicago, IL 60601

ANTHONY G. BROWN
Attorney General
State of Maryland
200 St. Paul Place, 20th Floor
Baltimore, MD 21202

DANA NESSEL
Attorney General
State of Michigan
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
Attorney General
State of Nevada
100 North Carson Street
Carson City, NV 89701

RAÚL TORREZ
Attorney General
State of New Mexico
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501

JEFF JACKSON
Attorney General
State of North Carolina
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603

DAN RAYFIELD
Attorney General
State of Oregon
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609

JOSHUA L. KAUL
Attorney General
State of Wisconsin
17 W. Main Street
Madison, WI 53703

PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

NICHOLAS W. BROWN
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504

BRIAN L. SCHWALB
Attorney General
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume and limitations of Fed. R. App. P. 29(a)(5) because it contains 5,395 words, excluding portions exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word.

April 9, 2025

/s/ Kalikoʻonālani D. Fernandes
ANNE E. LOPEZ
  ATTORNEY GENERAL
KALIKOʻONĀLANI D. FERNANDES*
  SOLICITOR GENERAL
EWAN C. RAYNER
THOMAS J. HUGHES
  DEPUTY SOLICITORS GENERAL
STATE OF HAWAIʻI
Department of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel of Record

Counsel for the State of Hawaiʻi

.

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 9, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All counsel in this case are registered CM/ECF users and will be served by the appellate CM/ECF.

April 9, 2025

/s/ Kalikoʻonālani D. Fernandes
ANNE E. LOPEZ
  ATTORNEY GENERAL
KALIKOʻONĀLANI D. FERNANDES*
  SOLICITOR GENERAL
EWAN C. RAYNER
THOMAS J. HUGHES
  DEPUTY SOLICITORS GENERAL
STATE OF HAWAIʻI
Department of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel of Record*

*Counsel for the State of Hawaiʻi*