MERITS ORAL ARGUMENT SCHEDULED MAY 16, 2025
Nos. 25-5037, 25-5055

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN
HER OFFICIAL CAPACITY AS MEMBER OF THE MERIT
SYSTEMS PROTECTION BOARD,

*Appellee*,

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE TREASURY, ET AL.,

*Appellants.*

---

*On Appeal from the United States District Court
for the District of Columbia*

---

**BRIEF OF AMICI CURIAE PATRICK J. BORCHERS, MICHAEL C.
DORF, KELLEN FUNK, AZIZ HUQ, RILEY T. KEENAN, JAMES
PFANDER, AND JONATHAN D. SHAUB IN SUPPORT OF APPELLEE**

---

Joseph M. Sellers (No. 30022)
Richard A. Koffman
Alex Bodaken
**COHEN MILSTEIN SELLERS &
  TOLL PLLC**
1100 New York Ave NW, Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600
jsellers@cohenmilstein.com
rkoffman@cohenmilstein.com
abodaken@cohenmilstein.com

Alexandra Gray
**COHEN MILSTEIN SELLERS &
  TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
Tel.: (212) 838-7797
agray@cohenmilstein.com

*Counsel for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(a), undersigned counsel for amici curiae represent that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for amici curiae certify that a separate brief is necessary due to amici's expertise and interests, as set forth below in the section titled, "IDENTITY AND INTERESTS OF AMICI CURIAE."

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amici curiae or their counsel made a monetary contribution to its preparation or submission.

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.  Parties and Amici**

Except for the amici submitting this brief, and any other amici who had not yet entered an appearance in this case as of the filing of the Brief for Appellee, all parties, interventors, and amici appearing in the Court are listed in the Brief for Appellee.

**B. Rulings Under Review**

Reference to the ruling under review appears in the Brief for Appellee.

**C. Related Cases**

Reference to any related cases pending before this Court appears in the Brief for Appellee.


Dated: April 9, 2025                    By: /s/ *Joseph M. Sellers*
                                        Joseph M. Sellers
                                        *Counsel for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE
    BRIEFING ................................................................................ i

CORPORATE DISCLOSURE STATEMENT ........................................... ii

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

TABLE OF CONTENTS ........................................................... iv

TABLE OF AUTHORITIES ........................................................ v

IDENTITY AND INTERESTS OF *AMICI CURIAE* ............................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ...................................................................... 3

    I.    Injunctive Relief for Improper Removal of an Officer Accords
        with Foundational Principles of Equity and Binding Precedent........... 3

    II.   If the Court Concludes that Injunctive Relief is Not Available,
        Mandamus-Like Legal Relief is Available. ........................................ 16

CONCLUSION ................................................................... 23

APPENDIX ..................................................................... 1A

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016).............................................................. 20

*Am. Sch. of Magnetic Healing v. McAnnulty*,
  187 U.S. 94 (1902)............................................................................... 10

*U.S. ex rel Arant v. Lane*,
  47 App. D.C. 336 (D.C. Cir. 1918)...................................................... 21

*Att'y Gen. v. Chi. & Nw. Ry. Co.*,
  35 Wis. 425 (1874)................................................................................. 8

*Bd. of Liquidation v. McComb*,
  92 U.S. 531 (1875)....................................................................9, 10, 20

*Bessent v. Dellinger*,
  145 S. Ct. 515 (2025) ............................................................................ 3

*Bond v. Hopkins*
  [1802] 1 Sch. & Lefr. 413 (Ir. Ct. Ch.) ................................................. 7

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005)......................................................... 13, 16

*Cole v. Young*,
  351 U.S. 536 (1956).............................................................................. 11

*Ewing v. City of St. Louis*,
  72 U.S. 413 (1866)................................................................................ 15

*Gaines v. Thompson*,
  74 U.S. 347 (1868)....................................................................9, 15, 20

*Gordon v. Washington*,
  295 U.S. 30 (1935)................................................................................. 7

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999).......................................................................... 5, 14

v

*United States ex rel. Hall v. Union Pac. R.R. Co.*,
　28 F. Cas. 345 (C.C.D. Iowa 1875) ..................................................... 20

*Harris v. Bessent*,
　No. 1:25-cv-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025) ............. 3, 10, 19, 22

*Heckler v. Ringer*,
　466 U.S. 602 (1984) ........................................................................ 16

*James Bagg's Case*,
　77 Eng. Rep. 1272 (1615) ............................................................... 17

*Kendall v. U.S. ex rel. Stokes*.
　37 U.S. 524 (1838) ......................................................................... 19

*Kennedy v. Bremerton Sch. Dist.*,
　597 U.S. 507 (2022) ........................................................................ 13

*Litchfield v. Reg. & Receiver*,
　76 U.S. 575 (1869) ......................................................................... 20

*Liu v. SEC*,
　591 U.S. 71 (2020) ......................................................................... 15

*Marbury v. Madison*,
　5 U.S. 137 (1803) ............................................................... 1, 2, 10, 19

*Marshall v. Whirlpool Corp.*,
　593 F.2d 715 (6th Cir. 1979) ........................................................... 14

*Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*,
　1 F.3d 1031 (10th Cir. 1993) ........................................................... 13

*Naporano Matal & Iron Co. v. Sec'y of Lab. of United States*,
　529 F.2d 537 (3d Cir. 1976) ............................................................ 20

*In re Nat'l Nurses United*,
　47 F.4th 746 (D.C. Cir. 2022) ...................................................... 21, 22

*Osborn v. Bank of U.S.*,
　22 U.S. 738 (1824) ........................................................................... 9

vi

*Pennoyer v. McConnaughy*,
    140 U.S. 1 (1891) ................................................................................ 10

*Peters v. Hobby*,
    349 U.S. 331 (1955) ........................................................................... 11

*R. v. Mayor, Bailiffs, and Common Council of the Town of Liverpool*,
    97 Eng. Rep. 533 (1759) ............................................................... 18, 19

*R. v. Mayor and Aldermen of Doncaster*,
    96 Eng. Rep. 795 (1752) .................................................................... 18

*R. v. Barker*,
    97 Eng. Rep. 823 (1762) .................................................................... 18

*Rudolph v. Sullivan*,
    277 F. 863 (D.C. Cir. 1922) ............................................................... 21

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................... 2, 12, 15

*In re Sawyer*,
    124 U.S. 200 (1888) ................................................................. 2, 15, 22

*Service v. Dulles*,
    354 U.S. 363 (1957) ........................................................................... 11

*Severino v. Biden*,
    71 F.4th 1038 (D.C. Cir. 2023) ......................................................... 12

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) .................................................. 4, 12, 21

*United States v. Deneale*,
    25 Fed. Cas. 817 (C.C.D.C. 1801) .................................................... 19

*United States v. Fausto*,
    484 U.S. 439 (1988) ........................................................................... 14

*United States v. Lawrence*,
    3 U.S. 42 (1795) ................................................................................. 19

*Vitarelli v. Seaton*,
  359 U.S. 535 (1959) .............................................................................. 2, 11

*Wilcox v. Trump*,
  No. 1:25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) ......................... 10, 22

*Young v. United States*,
  498 F.2d 1211 (5th Cir. 1974) .................................................................. 14

**Constitution and Statutes**

5 U.S.C. § 703 ............................................................................................. 14

5 U.S.C. § 706(2) .......................................................................................... 14

5 U.S.C. § 2102(a)(1)(B) ............................................................................... 14

28 U.S.C. § 1361 ..................................................................................... 13, 16

D.C. Code § 16-3501 ..................................................................................... 17

U.S. Const. art. III, § 2 ................................................................................... 6

**Other Authorities**

Wright & Miller, 33 Fed. Prac. & Proc. § 8305 (2d ed. 2024) ............................... 16

Audrey Davis, *A Return to the Traditional Use of the Writ of
  Mandamus*, 24 Lewis & Clark L. Rev. 1527 (2020) ................... 17, 18, 19, 21, 22

Black's Law Dictionary 1371 (9th ed. 2009) ......................................................... 17

Fed. R. Civ. P. 81(b) ..................................................................................... 13

Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and
  Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal
  Administrative Action*, 81 Harv. L. Rev. 308 (1967) ......................................... 21

Henry Home, *Principles of Equity* 27 (Michael Lobban ed., Liberty
  Fund 2014) (1778) .......................................................................................... 7

Improper Removal—Mandamus—Quo Warranto,
  38 Harv. L. Rev. 693 (1925) ........................................................................... 17

J.D. Heydon, M.J. Leeming & P.G. Turner, *Meagher, Gummow & Lehane's Equity: Doctrines & Remedies* § 21-510 (5th ed. 2015) ...................... 5

James E. Pfander & Jacob P. Wentzel,
*The Common Law Origins of* Ex parte Young,
72 Stan. L. Rev. 1269 (2020) ...........................................6, 8, 18, 19, 20

James L. High, *A Treatise on Extraordinary Legal Remedies,
Embracing Mandamus, Quo Warranto, and Prohibition* 580
(Callaghan & Co. eds., 3rd ed. 1896) ................................................. 17

John F. Manning, *Textualism and the Equity of the Statute*, 101
Colum. L. Rev. 1 (2001) ........................................................................ 6

Jonathan David Shaub, *Interbranch Equity*,
25 U. Pa. J. Const. L. 780, 839 (2023) .................................................. 9

1 Joseph Story, *Commentaries on Equity Jurisprudence, as
Administered in England and America* § 33 (Boston, Hilliard, Gray
& Co. 1836) ....................................................................................... 6, 7

F.W. Maitland, *Equity and the Forms of Action* (A.H. Chaytor & W.J.
Whittaker eds., 1910 reprt.) .............................................................. 6, 8

Louis L. Jaffe, *Judicial Control of Administrative Action* 468 (Boston:
Little, Brown & Co. 1965) ...................................................................... 8

Owen W. Gallogly, *Equity's Constitutional Source*, 132 Yale L.J.
1213 (2023) ............................................................................................ 7

Riley T. Keenan, *Functional Federal Equity*, 74 Ala. L. Rev. 879
(2023) ..................................................................................................... 5

Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame
L. Rev. 1763 (2022) ............................................................................ 6, 8

W.A. Woods, *Injunction in the Federal Courts*, 6 Yale L.J. 245
(1897) .................................................................................................... 16

## IDENTITY AND INTERESTS OF *AMICI CURIAE*

Professors Patrick J. Borchers, Michael C. Dorf, Kellen Funk, Aziz Huq, Riley T. Keenan, James Pfander, and Jonathan D. Shaub, whose background and publications are described in the Appendix, submit this brief as amici curiae. Their interest in this matter is that of legal scholars on federal courts, jurisdiction, procedure, remedies, and the law governing federal adjudication of constitutional and statutory claims against the Federal Government and its officers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"It is a settled and invariable principle," Chief Justice Marshall wrote, "that every right, when withheld, must have a remedy." *Marbury v. Madison*, 5 U.S. 137, 147 (1803) (citing 3 William Blackstone, Commentaries *109). Assuming such a right was withheld here, the available remedy is clear: from 1789 to today, courts have consistently held that executive officers threatened with or subject to unlawful removal may properly be retained in or restored to office.[2]

History and equitable practice support the district courts' remedial orders below. Indeed, history and precedent definitively establish that federal courts have the authority to order the government to retain in office or restore to office a federal officer removed unlawfully or threatened with such removal, whether that order

---

[2] *Amici* address only the remedies available to federal officials subject to unlawful purported removal. They do not address the antecedent merits question of whether Plaintiffs were unlawfully removed, which the parties have thoroughly briefed.

takes the form (as discussed further in this brief) of (I) an injunction, or (II) mandamus.[3]

That history started with *Marbury*, which drew upon English judicial practice in ordering specific relief against government officials. *See* 5 U.S. at 146-47. The Court made clear that because duties regarding executive officers' employment are "prescribed by law," a failure to uphold these duties constitutes an "illegal act" that presents "a plain case for" relief—in that case, mandamus. *Id.* at 158, 164, 170-73. The Court has since continued to acknowledge and provide for a remedy in cases involving challenges related to officeholding through both mandamus and injunctive relief. *See In re Sawyer*, 124 U.S. 200, 212 (1888); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959); *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974). As discussed below, the characterization of the remedy has evolved as equity has absorbed aspects of the common law. But the fundamental principle has not. Officials subjected to an unlawful purported discharge may seek remedies beyond monetary relief.

Put simply, federal courts have always possessed the authority to prevent subordinate executive officials from unlawfully removing executive officers—with that authority originating in the form of mandamus and then extending into equity. In Section I, *amici* describe the English origins of this power, its integration into the

---

[3] *Amici* use the term "mandamus" to encompass all forms of mandamus-like relief available in this context. *See infra* note 7.

2

federal courts, and its later absorption into equity, all of which support the district courts' orders here. In Section II, *amici* explain that should this Court find injunctive relief unavailable, mandamus would properly provide the same redress. The bottom line is that regardless of the requested remedy's "label," *Bessent v. Dellinger*, 145 S. Ct. 515, 516 (2025) (Gorsuch, J., dissenting), an unbroken line of history and precedent demonstrates that a court "may provide . . . *some* form of effective relief preventing" the improper removal of a federal officer. *Harris v. Bessent*, No. 1:25-cv-412, 2025 WL 679303, at *11 (D.D.C. Mar. 4, 2025).

## ARGUMENT

### I.  Injunctive Relief for Improper Removal of an Officer Accords with Foundational Principles of Equity and Binding Precedent.

In his *Dellinger* dissent, Justice Gorsuch tasked lower courts with examining whether equitable relief to prevent the unlawful removal of federal officials is consistent with traditional equitable practice. *See Dellinger*, 145 S. Ct. at 517-18 (Gorsuch, J., dissenting). The answer is yes.

In the public-law context, the Supreme Court has consistently viewed injunctive relief as available to enforce federal law against government officials. In *Armstrong v. Exceptional Child Center, Inc.*, for example, the Court reaffirmed the power of federal courts to grant equitable relief to enjoin the enforcement of preempted state law, even as it concluded that the power had been displaced by the federal regulatory scheme implicated in that case. 575 U.S. 320, 326-27 (2015). In

3

tracing the origins of this judicial power, the *Armstrong* Court explained that the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id*. at 327. Similarly, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, the Supreme Court flatly rejected the government's argument that the plaintiffs were obliged to make a special historical showing to justify the recognition of a right to sue for injunctive relief in the public-law context. 561 U.S. 477, 491 n.2 (2010). Instead, the *Free Enterprise* Court reaffirmed that the right to sue under *Ex parte Young* was available for a "separation-of-powers claim" as for "every other constitutional claim." *Id.*

This Court utilized similar reasoning—in circumstances directly analogous to those here—in *Swan v. Clinton,* 100 F.3d 973 (D.C. Cir. 1996). Faced with a purportedly removed federal board member's request to halt his termination, this Court explained that the member's "request for an injunction" functioned "essentially [as] a request for a writ of mandamus." *Id.* at 976 n.1. And because the appropriate prerequisites were met, the Court treated injunctive relief as available against subordinate executive officials so long as that relief could properly redress the plaintiff's injury. *Id.* Like the Supreme Court, this Court in *Swan* thus deemed injunctive relief available in public-law controversies.

4

Although some language in decisions evaluating private-law equitable practice have suggested a narrower focus on the precise forms of "equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (internal citation omitted), the Supreme Court has not viewed those private-law decisions as relevant conflicting authority. For example, to support the assertion that suits enjoining unconstitutional actions by state and federal officials are equitable in nature, Justice Scalia in *Armstrong* relied on scholarship regarding the history of public-law judicial proceedings in the common law court of King's Bench, rather than private-law matters in the High Court of Chancery (the historical touchstone in *Grupo*). *See Armstrong*, 575 U.S. at 327 (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)). Notably, neither *Armstrong* nor *Free Enterprise Fund* cited *Grupo*. *See* Riley T. Keenan, *Functional Federal Equity*, 74 Ala. L. Rev. 879, 894-902 (2023).

Unsurprisingly, then, the Supreme Court has not looked solely to Court of Chancery proceedings in defining the equitable power of Article III courts in public-law controversies. After all, the eighteenth-century Court of Chancery refrained from enjoining government officials in large part because "the court was itself an emanation of the Crown." J.D. Heydon, M.J. Leeming & P.G. Turner, *Meagher, Gummow & Lehane's Equity: Doctrines & Remedies* § 21-510, at 787 (5th ed. 2015).

But the American system merged law and equity in a third branch independent of the executive, *see* U.S. Const. art. III, § 2, thereby eliminating Chancery's barrier to enjoining the government. This "distinctive structural assumption[] underlying the U.S. Constitution," John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 29 (2001), explains why the Supreme Court and this Court have approved injunctive relief against the government without hesitation notwithstanding the division between law and equity in pre-revolutionary England.

Perhaps the most fundamental principle of equity is that it has always operated to provide relief "where a plain, adequate, and complete remedy" cannot otherwise "be had." 1 Joseph Story, *Commentaries on Equity Jurisprudence, as Administered in England and America* § 33 (Boston, Hilliard, Gray & Co. 1836). Equity thus necessarily contemplates interaction with legal remedies; it "presuppose[s] the existence of" and acts as a "gloss written round" the common law. F.W. Maitland, *Equity and the Forms of Action* 17-20 (A.H. Chaytor & W.J. Whittaker eds., 1910 reprt.). And where common law relief recedes, equitable relief may "adapt to changes in the remedial system as a whole." *See* James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex parte Young, 72 Stan. L. Rev. 1269, 1282 (2020); *see also* Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1796 (2022) (explaining that just as the "law is not static, the equity that corrects and supplements it cannot be static either").

The extent of that adaptation, to be clear, is not unlimited. Courts may not issue equitable relief beyond accepted practice merely to effectuate justice—that "conscience-based equity" model, wherein "the Chancellor considered the case as a whole and decreed what he personally thought should be done" regardless of remedial precedent, was rejected in England well before our Constitution's adoption. Owen W. Gallogly, *Equity's Constitutional Source*, 132 Yale L.J. 1213, 1243 (2023). But "equity's adherence to rules" has never "mean[t] that the law of equitable remedies was totally immutable." *Id.* at 1255; *see Bond v. Hopkins* [1802] 1 Sch. & Lefr. 413, 429 (Ir. Ct. Ch.) (explaining that although English equitable courts were bound by "fixed and certain" jurisprudential rules, they were always empowered to "illustrate . . . the operation" of those rules through application to new cases); Henry Home, *Principles of Equity* 27 (Michael Lobban ed., Liberty Fund 2014) (1778) (similar); 1 Story, *Commentaries*, §§ 19-23 (similar). "From the beginning," the Supreme Court has emphasized, "the phrase 'suits in equity'" has contemplated the issuance of relief "according to the principles" of English equitable practice "*as they have been developed in the federal courts*." *Gordon v. Washington*, 295 U.S. 30, 36 (1935) (emphasis added).

As explained in the remainder of this Section, through the gradual development of federal court precedent, injunctive relief has displaced mandamus as the favored mechanism to adjudicate the employment of executive officials—it

has "absorbed" the previous "common law practice." Pfander & Wentzel, *supra*, at 1282. That absorption, which neither created novel relief nor expanded federal courts' authority, occurred through the gradual development of remedial precedent reflecting equity's fundamental role in supplementing the common law. *See* Maitland, *supra*, at 17-20; Bray & Miller, *supra*, at 1796. As a result, although—as discussed in Section II—the legal remedy of mandamus was the primary mechanism for establishing entitlement to public office in eighteenth-century England, the use of injunctions to prevent the illegal removal of federal officers today is entirely consistent with foundational equitable principles.

Indeed, accretive adaptation has been a consistent feature of equitable practice throughout American history. For example, although courts at law adjudicated public legal rights in eighteenth-century England, "[o]ver the course of the nineteenth century," American "courts more actively deployed their equitable powers in public law controversies" to provide complete relief where there were gaps in common law remedies. *See* Pfander & Wentzel, *supra*, at 1278-79. As one example, because the English common law writ of "prohibition" failed to take hold in America as a vehicle to restrain government officials, equitable injunctions absorbed the writ's former function to afford complete relief. *See id.* at 1317-18; *Att'y Gen. v. Chi. & Nw. Ry. Co.*, 35 Wis. 425, 520 (1874) (using both mandamus and an injunction to enjoin the enforcement of unlawful railroad tolls); Louis L.

Jaffe, *Judicial Control of Administrative Action* 468 (Boston: Little, Brown & Co. 1965) ("The public action . . . evolved principally through mandamus and injunction.").

The use of equitable relief in public law included relief against public officials, as early American courts embraced equity to prevent officials from performing illicit acts. In 1824, for instance, the Supreme Court affirmed an order of restitution and an injunction—both equitable remedies—against Ohio state officials, specifically reasoning that "[t]he suit . . . might be as well sustained in a Court of equity as in a Court of law." *Osborn v. Bank of U.S.*, 22 U.S. 738, 869-71 (1824). In determining the availability of such relief, the relevant fault-line was *not* whether the remedy was legal or equitable. Instead, the "most relevant historical limitation[] on the equitable remedial power . . . [was] the traditional inability of courts to interfere with discretionary"—that is, non-ministerial—"governmental decisions." Jonathan David Shaub, *Interbranch Equity*, 25 U. Pa. J. Const. L. 780, 839 (2023). Numerous cases affirmed that relief could issue for an official's violation of ministerial duties but not for his discretionary judgments. *See, e.g.*, *Gaines v. Thompson*, 74 U.S. 347, 352-53 (1868) (noting that "whether it be by writ of mandamus or injunction," an officer could not be "required to abandon his right to exercise his personal judgment," but could be forced to exercise "definite dut[ies]"); *Bd. of Liquidation v. McComb*, 92 U.S. 531, 536 (1875) (explaining that

9

in sufficiently "clear" cases, courts could "interpose by injunction or mandamus" to restrain state officials from acting in violation of the law (emphasis removed)).

In accordance with that precedent, by the early twentieth century, the Supreme Court had affirmed or issued equitable relief running against both state and federal officers. *See, e.g.*, *Pennoyer v. McConnaughy*, 140 U.S. 1, 18, 25 (1891) (affirming "an injunction" that "restrained and enjoined" Oregon officials from acting under a statute that would be "destructive of [the plaintiff's] rights"); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110-11 (1902) (granting a "temporary injunction" against the Postmaster General to "prohibit the further withholding of the mail from [the] complainants"). In the middle of last century, the Court affirmed the district court's issuance of injunctive relief against the Secretary of Commerce in *Youngstown Sheet & Tube Co. v. Sawyer*, rejecting the government's argument that such equitable relief was improper. 343 U.S. 579, 584 (1953); *see id.* at 595 (Frankfurter, J., concurring) (agreeing that the district judge was empowered "to issue a temporary injunction in the circumstances of [the] case").[4]

---

[4] The district courts' orders in *Harris* and *Wilcox*, which enjoined subordinate executive officers but not the President, accorded with the unbroken tradition supporting judicial authority to compel the executive's subordinates to comply with law—as exemplified by *Youngstown*, *Marbury*, and numerous additional decisions. *Harris*, 2025 WL 679303, at *16; *Wilcox v. Trump*, No. 1:25-cv-334, 2025 WL 720914, at *18 (D.D.C. Mar. 6, 2025). This Court accordingly need not address, and *amici* take no position on, what if any power federal courts possess to issue injunctions operating on the President himself.

The common, uncontroversial use of equitable relief as a proper remedy against governmental officials formed the backdrop for numerous subsequent decisions affirming the propriety of injunctive relief to prevent removal of federal officers. Most directly, in *Vitarelli* an unlawfully dismissed Department of the Interior employee sought and received both "a declaration that his dismissal" had been "illegal and ineffective," *and* "an injunction requiring [the employee's] reinstatement." 359 U.S. at 537, 546. *Vitarelli* affirmed what the Supreme Court had recently acknowledged in a trio of then-recent cases in which wrongfully dismissed employees had sought reinstatement—*i.e.*, that injunctive relief requiring the government to reinstate the employee was an available remedy so long as the individual remained entitled to the office. *See Service v. Dulles*, 354 U.S. 363, 370, 388-89 (1957) (permitting a wrongfully terminated employee, on remand, to pursue "an order directing the [government] to reinstate him to his employment"); *Cole v. Young*, 351 U.S. 536, 540-41, 558 (1956) (same); *Peters v. Hobby*, 349 U.S. 331, 349 (1955) (granting a wrongfully dismissed employee a "declaratory judgment that his removal and debarment were invalid" as well as an injunction ordering the government to expunge records, but denying reinstatement because the employee's term would have already expired). Despite strenuous arguments by the government in all of these cases that the courts lacked authority to interfere in such personnel matters, the Court never suggested reinstatement was not an available remedy. *See*

11

*also Sampson v. Murray*, 415 U.S. at 62-63, 92 & n.68 (recognizing that courts could, in appropriate cases, properly use their "injunctive power" to reverse the discharge of even probationary employees, though declining to do so based on a balance of the equities).

This Court has likewise found injunctions against subordinate officials to prevent a federal officer's removal to be noncontroversial. *See, e.g.*, *Swan*, 100 F.3d at 978 (explaining that the Court had the power to issue "injunctive relief against subordinate [executive] officials"); *id.* at 989 (Silberman, J., concurring) (explaining that the Court could properly "compel all [relevant] officials . . . to treat [the Plaintiff] as the rightful" officeholder); *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (explaining that the Court could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*'" (quoting *Swan*, 100 F.3d at 980)); Reply Br. in Supp. of Pl.'s Mot. for Prelim. Inj. at 11, *Harris v. Bessent*, No. 1:25-cv-412 (D.D.C. Mar. 2, 2025), ECF 38 (collecting additional cases). As these cases demonstrate, the centuries-long, gradual absorption of the common law into equity has culminated in the widespread acceptance of injunctive relief to remedy the unlawful purported removal of federal officials.[5]

---

[5] The numerous cases using injunctive relief without hesitation in this context cannot be accurately described as "'drive-by' remedial ruling[s]." *See* Br. *Amici* Florida et al. at 10, *Harris v. Bessent*, No. 25-5055, 25-5037, Doc. No. 2104606 (D.C. Cir. Mar. 9, 2025) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)). It

These cases are also consistent with—and supported by—a development in the federal rules. In 1938, Rule 81(b) abolished the writs of mandamus and scire facias, but explained that "[r]elief previously available through them may be obtained by appropriate action or motion." Fed. R. Civ. P. 81(b). Although Rule 81(b) and a later change to the U.S. Code support the continued issuance of relief in the nature of mandamus, *see* 28 U.S.C. § 1361 (discussed *infra* Section II), Rule 81(b)'s contemplation of using any "appropriate action or motion" to obtain relief formally available under mandamus also readily explains the reliance on injunctions in the mid-to-late-twentieth-century decisions chronicled above. *See In re Cheney*, 406 F.3d 723, 728-29 (D.C. Cir. 2005) (explaining that because Rule 81(b) abolished the formal writ of mandamus, what were formerly mandamus principles "now govern attempts to secure similar relief, such as a mandatory injunction ordering a government employee or agency to perform a duty owed to the plaintiff" (internal citation omitted)); *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1036 n.2 (10th Cir. 1993) ("Fed. R. Civ. P. 81(b) abolished writs of mandamus, and provided that relief formerly available by mandamus may now be obtained by

---

makes little sense to denigrate the import of cases approving injunctive relief merely because the relief was so uncontroversial it failed to invite dissenting argument. The proper lesson is that the Supreme Court and others "long ago abandoned" the unavailability of injunctive relief in adjudicating entitlement to federal office. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022).

'appropriate motion' such as a motion for injunctive relief."); *Marshall v. Whirlpool Corp.*, 593 F.2d 715, 720 n.7 (6th Cir. 1979) ("Since the writ of mandamus has been abolished in federal practice [by Rule 81(b)] the [Occupational Health and Safety] Act presumably contemplates injunctive relief against the Secretary [of Labor].").[6]

History, precedent, and the federal rules thus establish that injunctive relief is available where other remedies are inadequate to prevent the unlawful removal of a federal officer. Defendants' reliance on *Grupo Mexicano* to claim otherwise is unavailing. *See* Appellants' Br. at 39, 44. Even were *Grupo*—a private-law decision—somehow relevant here, the Supreme Court has made clear in both the private-law and public-law contexts that the key question in equitable practice is whether the remedy afforded accords with the "traditional principles of equity jurisdiction." *Grupo Mexicano*, 527 U.S. at 319 (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2941, p. 31

---

[6] Although not relied upon by the district courts here, equitable relief is also available under the Administrative Procedure Act (APA). The APA provides for review of "agency action" that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory . . . authority," or "without observance of procedure required by law." 5 U.S.C. § 706(2). The purported terminations of Plaintiffs were plainly agency action. *See Young v. United States*, 498 F.2d 1211, 1218 (5th Cir. 1974). And although the Civil Service Reform Act (CSRA) has displaced the APA for many federal employees, *see United States v. Fausto*, 484 U.S. 439, 444 (1988), the CSRA does not apply to Senate-confirmed officers like Plaintiffs. 5 U.S.C. § 2102(a)(1)(B). Because the APA specifically provides for "prohibitory or mandatory injunction[s]," 5 U.S.C. § 703, injunctive relief could issue through the APA to redress Plaintiffs' purported terminations.

14

(2d ed. 1995)). That limitation is one of "substance," not "form," *Liu v. SEC*, 591 U.S. 71, 76 n.1 (2020) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004)), so what matters is not the remedial "label" but whether the issued relief "reflect[s] a foundational principle" of equitable jurisprudence, *id.* at 79. For the reasons explained above, the relief issued here reflects equity's traditional principles.

Nor are older cases questioning the availability of equitable remedies to adjudicate public-officer removal or appointment to the contrary. *See In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 376-77. In addition to relying on considerations absent here—such as the reluctance to interfere with acknowledged discretion or the existence of quasi-criminal proceedings—these cases reflected the uncertainty that could arise as the traditional contours of common law relief were being absorbed into equity. *Compare, e.g.*, *Ewing v. City of St. Louis*, 72 U.S. 413, 418-19 (1866) (calling it "well-established doctrine" that a mayor's alleged due process violations could be remedied only through legal relief—a writ of *certiorari*—rather than an injunction), *with Gaines*, 74 U.S. at 353 (reasoning two years post-*Ewing* that there is "no difference in the principle" by which federal courts could interfere with official duties, whether "by writ of mandamus or injunction"). "Much water has flowed over the dam since 1898," *Sampson*, 415 U.S. at 71, and even more since 1789. That precedential water, in *Sampson's* telling, is the gradual adaptation and accretion of equity practice to account for evolution in the common law. That

15

adaptation is itself a fundamental principle of equity. To reject the availability of injunctive relief to retain officers in or restore officers to office would thus run counter to the bedrock principle that courts of equity may adapt injunctive relief to new "circumstances and conditions brought under consideration"—as federal courts have done for centuries. W.A. Woods, *Injunction in the Federal Courts*, 6 Yale L.J. 245, 245 (1897).

## II.    If the Court Concludes that Injunctive Relief is Not Available, Mandamus-Like Legal Relief is Available.

If Plaintiffs' purported terminations were unlawful, an alternative remedy in the nature of mandamus is available. *See, e.g.*, 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."); *In re Cheney*, 406 F.3d at 728 (Section 1361 provides for "mandamus-type relief").[7] Thus, even if this Court were to determine that injunctive relief is unavailable, relief in the nature of mandamus is an available and appropriate

---

[7] Though the nomenclature used to describe mandamus-like relief is somewhat inconsistent, there is no debate that district courts may issue such relief. *See* Wright & Miller, 33 Fed. Prac. & Proc. § 8305 (2d ed. 2024) ("Although Rule 81(b) in some sense abolished mandamus in name, it did not abolish its substance, and Congress did not intend for the phrasing 'in the nature of mandamus' to change this underlying substance, either." (citing sources)); *see also In re Cheney*, 406 F.3d at 729 (noting that "it is not technically accurate to speak of . . . a *writ* of mandamus" (emphasis added)); *but see Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (noting in dicta that Section 1361 "codified" the common law writ of mandamus).

remedy, particularly in light of its historic function of reinstating public officials purportedly ousted through improper means.[8]

Mandamus to restore executive officials has been an accepted feature of judicial power since at least the King's Bench decision in *Bagg's Case* in 1615, where the court granted a "writ of restitution" against the mayor and city council for removing Bagg from his residence in Plymouth with no legal basis. *James Bagg's Case,* 77 Eng. Rep. 1271, 1272 (1615) (C.J., Coke). Writs of mandamus in eighteenth-century England generally were offered "in the form of a command." Audrey Davis, *A Return to the Traditional Use of the Writ of Mandamus*, 24 Lewis

---

[8] The remedy of *quo warranto* is also rooted in English law and can sometimes be available to compel reinstatement. *See* Black's Law Dictionary 1371 (9th ed. 2009) (defining *quo warranto* as "used to inquire into the authority by which a public office is held"); James L. High, *A Treatise on Extraordinary Legal Remedies, Embracing Mandamus, Quo Warranto, and Prohibition* 580 (Callaghan & Co. eds., 3rd ed. 1896) ("The information in the nature of a quo warranto, as used in England, has been generally employed as a corrective of the usurpation of municipal offices and franchises . . . ."). In their latest brief, State *Amici* hinge their remedial argument on the supposition that Plaintiffs' failure to specifically plead *quo warranto* dooms their reinstatement request. *See* Br. *Amici* Florida et al. at 12-17, 22, 25-31, *Harris v. Bessent*, No. 25-5055, 25-5037, Doc. No. 2108427 (D.C. Cir. Mar. 29, 2025). But as State *Amici* recognize, *quo warranto* functions to remove someone who "usurps, intrudes into, or unlawfully holds or exercises, a franchise conferred by the United States or a public office of the United States." D.C. Code § 16-3501; Br. *Amici* Florida et al. at 14. Because no one has yet been nominated by the President or confirmed by the Senate to purportedly fill Plaintiffs' positions, there is no "usurper" for Plaintiffs to challenge. Thus, *quo warranto* is not the appropriate writ here. *See* Public Office—Remedies for Improper Removal—Mandamus—Quo Warranto, 38 Harv. L. Rev. 693, 693 (1925) (when "there is no adverse claimant in possession" of a plaintiff's position, *quo warranto* is not the appropriate remedy).

17

& Clark L. Rev. 1527, 1530 (2020) (citing Thomas Tapping, *The Law and Practice of The High Prerogative Writ of as Mandamus as it Obtains Both in England and in Ireland* 57 (1853)). These writs "depended exclusively on 'the character of the act or decision that was impugned,' and not that 'of the body that had acted or decided'—in other words, no officer was above such a writ." Pfander & Wentzel, *supra*, at 1301 & n.183 (quoting Lord Woolf et al., *De Smith's Judicial Review* 789-90 (6th ed. 2007)); *see also R. v. Barker,* 97 Eng. Rep. 823, 824 (1762) (asserting that whenever a subject was "dispossessed" of a public right, and had "no other specific legal remedy," the courts of common law "ought to assist by a mandamus").

Notably, use of mandamus to prevent wrongful removal of public officers was a common practice. In fact, by the seventeenth and eighteenth centuries, this was one of the *primary* uses of the writ of mandamus in England. *See* Davis, *supra*, at 1540 & n.116 (citing, *inter alia*, *R v. Corp. of Wells*, 98 Eng. Rep. 41, 41-42 (1767) and *R v. Mayor of Wilton*, 87 Eng. Rep. 642, 642 (1697)); Blackstone, *supra*, at *264-65 ("mandamus" is a "full and effectual remedy" "for refusal or admission where a person is intitled to an office" and "for wrongful removal, where a person is legally possessed" and "the franchise[] concern[s] the public"); *see also*, *e.g.*, *R. v. Mayor and Aldermen of Doncaster*, 96 Eng. Rep. 795, 795 (1752) (restoring municipal official to his office after improper removal by town council); *R. v. Mayor, Bailiffs, and Common Council of the Town of Liverpool*, 97 Eng. Rep. 533, 537

(1759) (restoring municipal official to his office after improper removal, with Lord Mansfield explaining, "the return must set out all the necessary facts, precisely; to shew that the person is removed in a legal and proper manner, and for a legal cause"); *Harris*, 2025 WL 679303, at *11 (collecting numerous cases and treatises explaining the frequent use of mandamus for this purpose). And it was this development of mandamus during the eighteenth century, especially under Lord Chief Justices Holt and Mansfield, that would become "authoritative statements of . . . mandamus to which American courts would later refer." Pfander & Wentzel, *supra*, at 1305 & n.206 (citing treatises).

Specifically, the English roots of mandamus were adopted into early cases in United States federal courts and through the passage of the All Writs Act and its absorption of Sections 13 and 14 of the Judiciary Act of 1789. *See* Davis, *supra*, at 1543-45 (discussing, *inter alia*, *United States v. Lawrence*, 3 U.S. 42, 42 (1795); *United States v. Deneale*, 25 Fed. Cas. 817, 817 (C.C.D.C. 1801) (No. 14,946); *Marbury*, 5 U.S. at 176). Although unavailable in the exercise of the Supreme Court's original jurisdiction, mandamus remedies took hold in the lower federal courts and have been part of the federal judiciary's remedial toolkit since *Kendall v. U.S. ex. rel. Stokes*. 37 U.S. 524 (1838).

A series of decisions from the latter half of the nineteenth century confirms the availability of mandamus in proper cases, including cases involving public law.

*See United States ex rel. Hall v. Union Pac. R.R. Co.*, 28 F. Cas. 345, 348-52 (C.C.D.

Iowa 1875), *aff'd sub nom. Union Pac. R.R. Co. v. Hall*, 91 U.S. 343 (1875) (granting

mandamus to restrain a publicly chartered railroad from enforcing policies that were

contrary to its organic statute); Pfander & Wentzel, *supra*, at 1309-10 (describing

how "[t]he breadth of the remedy affirmed in *Hall* represents a logical outgrowth of

public law litigation under the administrative writs as they had developed at common

law"); *Gaines*, 74 U.S. at 353 (implying that in proper cases, a court could issue

mandamus or an injunction to interfere with official action); *Litchfield v. Reg. &*

*Receiver*, 76 U.S. 575 (1869) (similar); *McComb*, 92 U.S. at 536 (explaining that in

proper cases, a court could "interpose by injunction or mandamus" wherever state

executive officers failed to conform their conduct to law (emphasis omitted)).[9] And

twentieth century cases within this Court's jurisdiction specifically held that

mandamus could properly be used to adjudicate entitlement to public office. *See,*

*e.g.*, *Rudolph v. Sullivan*, 277 F. 863, 863 (D.C. Cir. 1922) (affirming mandamus

against the Commissioners of the District of Columbia to reinstate a police officer);

---

[9] Today, lower federal courts frequently issue or approve of mandamus-like relief on matters of public law through Section 1361, otherwise known as the Mandamus and Venue Act, which was passed in 1962. *See, e.g.*, *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 188, 194 (D.C. Cir. 2016) (Tatel, J., joined by Kavanaugh & Srinivasan, JJ.) (reversing the dismissal of a motion seeking mandamus under Section 1361 to compel the Secretary of Health and Human Services to reach decisions within a statutory timeframe); *Naporano Matal & Iron Co. v. Sec'y of Lab. of United States*, 529 F.2d 537, 539, 542-43 (3d Cir. 1976) (affirming mandamus requiring the Secretary of Labor to certify the plaintiff for employment).

*U.S. ex rel Arant v. Lane*, 47 App. D.C. 336, 340 (D.C. Cir. 1918) (noting that a legal right to reinstatement can be vindicated through mandamus).[10]

History and precedent thus leave no doubt that preventing the wrongful removal of a public officer merits issuance of mandamus. From the eighteenth century to today, a plaintiff seeking mandamus has been required to show a clearly established legal right requiring the performance of a non-discretionary duty and the unavailability of other adequate relief. *See In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (articulating this standard under this Court's current jurisprudence); Davis, *supra*, at 1533-37 (articulating this standard for the eighteenth-century King's Bench). This Court held in *Swan* "that these prerequisites for stating a cause of action under the mandamus statute are met" where a federal officer seeks reinstatement. 100 F.3d at 976 n.1. Assuming the Court determines that the MSPB and NLRB removal protections are constitutional, the same is true here.

In that circumstance, the subordinate executive officials subject to the district courts' injunctions may properly be ordered to treat Plaintiffs as valid officeholders—that is, to complete "a precise, definite act about which an official

---

[10] Because *Kendall* recognized a distinctive legal basis for courts in the District of Columbia to grant mandamus relief, federal courts in other districts were not understood to have the power to enter such relief until Section 1361 was passed in 1962. *See* Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308, 311 (1967).

ha[s] no discretion whatever." *In re Nat'l Nurses United*, 47 F.4th at 757 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004)); *see* Davis, *supra*, at 1541 (noting that mandamus could issue regarding an individual's entitlement to public office because "[it] involved little to no discretion"). And because Plaintiffs are *public* officers, backpay is insufficient to remedy the harm that would occur from their unlawful removal.[11] Indeed, protection of one's position as a public officer was "the primary type of case" for which mandamus was used in the seventeenth and eighteenth centuries, because a "plaintiff [c]ould easily show a lack of an adequate remedy by claiming that the only way to reclaim what he was duly owed—his position—was to compel the defendant to restore the plaintiff to his position." Davis, *supra*, at 1540. *Sawyer* and *White*, moreover, confirm the availability of non-monetary relief in this context. *Sawyer*, 124 U.S. at 211; *White*, 171 U.S. at 377. And the courts below recognized this state of the law and the historical origins of mandamus in noting the availability of mandamus as an alternative to an injunction. *See Harris*, 2025 WL 679303, at *11; *Wilcox*, 2025 WL 720914, at *16 n.22.

---

[11] Notably, at common law, courts pondering issuance of mandamus deferred to adequate alternative remedies, much the way courts do today in evaluating the issuance of injunctive relief. *See* Tapping, *supra*, at 58 (noting that mandamus is used when there is no specific or adequate legal remedy). Routine issuance of mandamus for public officers thus confirms more generally the inadequacy of remedial alternatives.

Accordingly, if the Court finds that an injunction is unavailable, history and precedent confirm that mandamus is an appropriate remedy.

## **CONCLUSION**

History and tradition confirm that individuals threatened with or subject to unlawful removal from office may secure relief, both by injunction and by relief in the nature of mandamus, to be retained in or restored to office. Accordingly, if the Court finds that Plaintiffs' rights were violated, either injunctive relief or relief in the nature of mandamus are available remedies.

23

Dated: April 9, 2025

Respectfully submitted,

By: */s/ Joseph M. Sellers*
     Joseph M. Sellers

Joseph M. Sellers (No. 30022)
Richard A. Koffman
Alex Bodaken
**COHEN MILSTEIN SELLERS &**
  **TOLL PLLC**
1100 New York Ave NW, Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
jsellers@cohenmilstein.com
rkoffman@cohenmilstein.com
abodaken@cohenmilstein.com

Alexandra Gray
**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
88 Pine St., 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Fax.: (212) 838-7745
agray@cohenmilstein.com

*Counsel for Amici Curiae*

# APPENDIX

## List of *Amici*[†]

**Patrick J. Borchers** is the Lillis Family Distinguished Professor of Law at Creighton University. His teaching and writing in the fields of civil procedure, federal courts and jurisdiction, administrative law, and related areas has been featured in numerous law review articles. His full biography is available at: https://www.creighton.edu/campus-directory/borchers-patrick.

**Michael C. Dorf** is the Robert S. Stevens Professor of Law at Cornell Law School. In over three decades as a legal scholar, his research and teaching on constitutional law, federal jurisdiction, and civil procedure have been featured in over a hundred scholarly articles and essays and numerous books. His full biography is available at: https://www.lawschool.cornell.edu/faculty-research/faculty-directory/michael-dorf/.

**Kellen Funk** is the Michael E. Patterson Professor of Law at Columbia Law School. A legal historian, he has written extensively on the merger of law and equity in his recent book *Law's Machinery* (Oxford 2025). His full biography is available at: https://www.law.columbia.edu/faculty/kellen-r-funk.

**Aziz Huq** is the Frank and Bernice J. Greenberg Professor of Law at the University of Chicago Law School, where he focuses on American and comparative constitutional law. His research has been featured in leading law journals and other

publications. His full biography is available at: https://www.law.uchicago.edu/faculty/huq.

**Riley T. Keenan** is an assistant professor of law at the University of Richmond School of Law. He teaches and writes on federal courts and constitutional law, and his scholarship on the procedural and remedial aspects of constitutional litigation has been cited in leading civil procedure and constitutional law casebooks. His full biography is available at: https://law.richmond.edu/faculty/rkeenan/.

**James Pfander** is the Owen L. Coon Professor of Law at Northwestern University Pritzker School of Law. His research and teaching on federal jurisdiction, government accountability, and civil procedure has been featured in leading casebooks and law reviews. His full biography is available at: https://www.law.northwestern.edu/faculty/profiles/jamespfander/.

**Jonathan David Shaub** is the Norman & Carole Harned Associate Professor of Law & Public Policy at the University of Kentucky J. David Rosenberg College of Law. His teaching and writing on presidential power, constitutional law, and federal courts has been published and discussed in leading law reviews and media outlets. His full biography is available at: https://law.uky.edu/people/jonathan-shaub.

† Institution names provided for purposes of identification only.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,477 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Executed this 9th day of April, 2025.


/s/ *Joseph M. Sellers*
Joseph M. Sellers

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of April, 2025, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: April 9, 2025                    /s/ *Joseph M. Sellers*
                                        Joseph M. Sellers